**STEPTOE & JOHNSON LLP**
201 East Washington Street, Suite 1600
Phoenix, Arizona 85004-2382
Telephone: (602) 257-5242
Facsimile: (602) 257-5299

Floyd P. Bienstock, State Bar No. 006299
Erin E. Bradham, State Bar No. 022827

**Lewis Roca Rothgerber LLP**
40 North Central Avenue, 19th Floor
Phoenix, Arizona 85004-5311
Telephone: (602) 262-5311

Stephen M. Bressler, State Bar No. 009032
Jason M. Porter, State Bar No. 027475

Attorneys for Plaintiff/Counter-Defendant
Metropolitan Life Insurance Company

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Metropolitan Life Insurance Company, a New York corporation,<br><br>  Plaintiff/Counter-Defendant,<br><br>vs.<br><br>Inna Ogandzhanova, M.D.,<br><br>  Defendant/Counter-Claimant. | No. 2:12-cv-372-GMS<br><br>**STATEMENT OF FACTS IN SUPPORT OF METLIFE'S MOTION FOR SUMMARY JUDGMENT** |

Pursuant to Local Rule 56.1(a), Metropolitan Life Insurance Company ("MetLife") submits this Statement of Facts in Support of its Motion for Summary Judgment.

### LRCIV 56.1 STATEMENT OF MATERIAL, UNDISPUTED FACTS NECESSARY TO THE COURT'S DECISION

The following two material, undisputed facts entitle MetLife to summary judgment on Dr. Ogandzhanova's ("Dr O's") bad faith claim based on MetLife's

coverage decision and decision to file a declaratory judgment action ("DJA"):

1.  MetLife's July 1, 2011 coverage decision was based on medical opinions, from two board-certified psychiatrists and two board-certified psychologists, that Dr. O was exaggerating her symptoms and was not suffering from any psychiatric condition that would prevent her return to work as a radiation oncologist.  **Supporting Evidence:** Ex. 1, Dr. Joel Parker's October 2, 2010 IME report, at 2025[1] (finding "no psychiatric reason that Dr. Ogandzhanova would be unable to return to work as a radiation oncologist"); Ex. 2, Dr. Lamb's March 14, 2011 IME report, at 1848 (concluding that "the number of impaired scores generated" during formal testing was "exceptionally high"; there were "multiple indicators that Dr. Ogandzhanova was not putting forth her best effort during the current evaluation"; "Dr. Ogandzhanova is exaggerating the severity of the cognitive and emotional symptoms she claims to be experiencing, as well as the extent to which they adversely impact her ability to function"; and Dr. O's self-report of her emotional and psychological condition was "unreliable"); Ex. 30 at Ex. A, Boone's April 21, 2011 report, at 1832 (concluding that Dr. O "failed multiple cognitive symptom validity measures" in the tests and that her performance on the objective tests designed to determine if Dr. O was accurately reporting her symptoms was "implausibly severe"; "when three or more [symptom validity tests] are failed, the probability of malingering is nearly 99%"; and noting that Dr. Lamb reported a Global Assessment of Function score of 70 for Dr. O "which is typically associated with ability to work."); Ex. 30 at Exs. B, C, and D, Dr. Kaplan's October 30, 2010, April 20, 2011, and June 8, 2011 reports, 1994, 1838, 1818 (concluding that the evidence "does not support that Dr. Inna Ogandzhanova is impaired from working as a radiation oncologist secondary to Major Depressive Disorder, PTSD or any other psychiatric disorder"); Ex. 30 at Ex. E, Dr. Parker's June 2, 2011 report, at 1827 (materials provided by Dr. O's treating doctor and counsel did not

---

[1] Where the document referenced is part of the claim file, the bates prefix (MLOCLO-) is not included in the citation.

change his opinion; "Dr. Rozansky appears to have become an advocate for Dr. Ogandzhanova, rather than an effective treater. In all probability, Dr. Ogandzhanova continues to follow up with Dr. Rozansky because he continues to certify her disability and does not challenge her too much."); Ex. 30 at Ex. F, Dr. Kaplan's September 22, 2011 report (finding that comments from Dr. Rozansky did not change his opinion); Ex. 30 at Ex. G, Dr. Kaplan's December 29, 2011 report (finding that comments from Dr. O's counsel, Jason Newfield, did not change his opinion); Ex. 30, Frederick Decl, ¶17 (MetLife has continued to "review and assess Dr. Ogandzhanova's claim on an ongoing basis since" its July 1, 2011 coverage decision, including "requesting and reviewing medical records as Dr. Ogandzhanova obtains additional treatment; seeking input from appropriate medical consultants; and assessing and evaluating any new information that may have a bearing on the claim.")

2. Based on the medical evidence described in SOF 1, MetLife concluded that Dr. O was no longer disabled in July 2011, but continued to pay the claim each subsequent month under a reservation of rights while it sought a judicial determination on coverage through this DJA. **Supporting Evidence: Ex. 30 at** Ex. H, July 1, 2011 letter from Jamie Frederick, at 2243-45; Ex. 3, Fuller (Dr. O's claim-handling expert) Dep. 99:12-24 (conceding that MetLife "never stopped making monthly payments" even after it determined Dr. O was no longer disabled).

The following two undisputed facts each independently entitle MetLife to summary judgment on Dr. O's claim for accelerated policy benefits:

3. MetLife has paid Dr. O the full amount of benefits owed under the Policies and never stopped making monthly payments to Dr. O, even while it sought a coverage determination in this DJA. **Supporting Evidence:** Ex. 30 at H, July 1, 2011 letter from Jamie Frederick, at 2243-45; Ex. 3, Fuller Dep. 99:12-24 (conceding that MetLife "never stopped making monthly payments" even after it determined Dr. O was no longer disabled).

4.     Both Dr. O's treating physician, Dr. Gerald Rozansky, and her complicated grief expert, Dr. Katherine Shear, admit that Dr. O's allegedly debilitating psychological condition may improve after this litigation resolves or if she receives treatment for complicated grief, the primary diagnosis allegedly preventing her from working as a radiation oncologist. **Supporting Evidence:** Ex. 4, Rozansky Dep. 288:20-290:9 (conceding that Dr. O has already improved and that she might improve further once the lawsuit resolves); Ex. 5, Shear Dep. 49:21-50:4 (conceding that Dr. O has already recovered from her original diagnosis of depression and is "no longer depressed"), 51:11-22 (admitting that Dr. O has never received care for complicated grief (her primary diagnosis), that she might have recovered if she had received such care, and that treatment for complicated grief is still "worth trying"), 52:7-17 (Dr. Shear told Dr. O's counsel that she could help identify someone who could treat Dr. O for complicated grief), 55:21-56:7 (opining that complicated grief therapy would be a "reasonable next step" for Dr. O and "has a better chance of working than a sort of psychotherapy"; conceding that she will not know if complicated grief therapy will work for Dr. O until she tries it), 82:23-84:9 (Dr. Shear recommends complicated grief therapy for Dr. O, which has been proven effective in an initial study and may help her), 180:24-182:7 (cognitive grief therapy might work to address Dr. O's concerns about being reminded of her son's sickness when treating cancer patients), 183:11-184:6 (Dr. Shear has had success using complicated grief therapy to treat people up to 20 years after the initial loss that caused their grief); Ex. 3, Fuller Dep. 120:13-25 ("You can't predict what the outcome of a psychiatric claim is going to be like you can the outcomes of other kinds of medical conditions," such as a broken leg, that permit more definitive statements about likely return of functioning).

The following two undisputed facts entitle MetLife to summary judgment on Dr. O's bad faith claim based on alleged misconduct occurring before June 4, 2010:

5.     Dr. O was aware of alleged misconduct before June 4, 2010, which her attorney concluded was sufficient to state an actionable claim for bad faith. **Supporting**

3

**Evidence:** Ex. 6, Newfield Dep. 120:19-25; 122:6-25; 132:17-133:6; 120:5-8; 121: 5-8; 132:5-9 (testifying that he concluded Dr. O had an "actionable claim for bad faith" based on delay in the initial coverage decision and other misconduct, before June 4, 2010, and authenticating letters to MetLife threatening to sue); Ex. 7, November 27, 2007 letter from Jason Newfield to MetLife (threatening to sue for bad faith delay in accepting coverage); Ex. 8, December 31, 2007 letter from Jason Newfield to MetLife, at 998 (threatening to sue for delays and an allegedly improper request for information that allegedly harmed Dr. O); Ex. 30 at Ex. K, "Impact Statement" from Dr. O attached to Newfield December 31, 2007 letter, at 1000-01 (asserting that delays and requests for information have harmed Dr. O); Ex. 30 at Ex. L, January 25, 2008 letter from Newfield to MetLife, at 80800-803 (asserting that MetLife acted improperly in connection with pre-2010 Independent Medical Examinations by imposing unauthorized conditions); Ex. 9, February 11, 2008 letter from Newfield to MetLife, at 771-72 (threatening to sue for bad faith and asserting that MetLife's delay in accepting coverage and "fundamental claim handling approach" have harmed Dr. O and constitute bad faith under Arizona law).

6.  Dr. O did not file suit within two years for alleged misconduct by MetLife occurring before June 4, 2010. **Supporting Evidence**: Dr. O's Counterclaim for Breach of Contract and Bad Faith (Dkt. # 8) filed June 4, 2012.

MetLife is entitled to a declaration that Dr. O was not disabled, as defined under the Policies, after July 1, 2011, based on the following five undisputed facts:

7.  To be "Totally Disabled" under the Policies, Dr. O must be receiving "appropriate" care from an appropriate physician for the condition causing her disability. **Supporting Evidence**: Ex. 30 at Ex. I, Disability Income Insurance Policy – Omni Plus, Policy No. 364168AH, issued to Dr. Ogandzhanova on March 10, 1999, at 1699 ("You will not be considered to be totally disabled for any time you are not receiving care by a physician which is appropriate to the condition causing the disability"); Ex. 30 at Ex. J, Disability Income Insurance Policy,  Policy No.

1  6482821AH, at 1759 (to be "Totally Disabled," insured must be "receiving appropriate
2  care from a physician who is appropriate to treat the condition causing the impairment").

3       8.    Dr. O's own expert, Dr. Shear, admitted that Dr. O has not sought or
4  received any treatment for her primary diagnosis of complicated grief and that
5  complicated grief treatment might have worked, and may still work, for Dr. O.
6  **Supporting Evidence**: Ex. 5, Shear Dep. 51:11-22 (admitting that Dr. O has never
7  received care for her primary diagnosis – complicated grief, that she might have
8  recovered if she had received such care, and that the treatment is still "worth trying"),
9  52:7-17 (Dr. Shear told Dr. O's counsel that she could help identify someone who could
10 treat Dr. O for complicated grief), 55:21-56:7 (opining that complicated grief therapy
11 would be a reasonable next step for Dr. O and "has a better chance of working than a
12 sort of psychotherapy"; conceding that she does not know if complicated grief therapy
13 will work for Dr. O until Dr. O tries it), 82:23-84:9 (testifying that she recommends
14 complicated grief therapy for Dr. O, which has been proven effective in an initial study
15 and may help her), 180:24-182:7 (cognitive grief therapy might work to address Dr. O's
16 concerns about being reminded of her son's sickness when treating cancer patients),
17 183:11-184:6 (Dr. Shear has had success using complicated grief therapy to treat people
18 up to 20 years after the initial loss that caused their grief).

19       9.    Since she began claiming she was disabled, Dr. O has seen Dr. Rozansky
20 roughly once a month (and sometimes even less frequently) and he has never materially
21 changed his treatment plan for her. **Supporting Evidence**: Ex. 4. Rozansky Dep. 31:19-
22 21 (Dr. O seeks Dr. Rozansky once a month or once every two or three months), 37:11-
23 14 (Dr. Rozansky's treatment plan for Dr. O consisted of office visits and Lexapro),
24 113:23-114:8 (Dr. Rozansky's treatment plan has continued to consist of office visits
25 and 30 milligrams of Lexapro), 188:20-24 (something Rozansky only sees Dr. O once
26 every four months), 167:7-11 & 119:8-120:11 (despite the availability of "any number
27 of antidepressants and medications," apart from adding a prescription for Abilify for an
28

1  unspecified period, Dr. Rozansky never tried any medications other than Lexapro with
2  Dr. O), 245:5-15 (Dr. O hasn't tried other medications because she doesn't want to).

3      10.  Dr. O has refused to follow her treating doctors' recommendations that she
4  receive weekly or bi-weekly treatment, participate in a grief support group, see a grief
5  counselor or see a neurologist, and Dr. Rozansky has avoided even raising other
6  treatment options because he knows Dr. O will refuse. **Supporting Evidence**: Ex. 4,
7  Rozansky Dep. 30:2-6 (Dr. Rozansky wants to see Dr. O once a week), 30:19-31:13 (Dr.
8  Rozansky wanted to see Dr. O "as often as I could," and up to two or three times a
9  week, when he started his treatment), 52:11-53:6 ("of course" it would be appropriate
10 for Dr. O to be receiving treatment more than once a month), 188:14-18 (ideally, Dr.
11 Rozansky would have seen Dr. O twice and week and would now be seeing her once a
12 week), 32:21-24 (in his first visit, Dr. Rozansky talked to Dr. O about seeking treatment
13 in Arizona), 35:20-37:8 (Dr. Rozansky recommended Dr. O see a local therapist she
14 could "have more immediate contact with," but she did not want to), 43:12-18 (Dr. O
15 told Dr. Rozansky that she would find a local therapist, but never did), 66:4-11 (Dr.
16 Rozansky recommended Dr. O participate in a "grieving group," but she would not),
17 47:4-8 (Dr. Rozansky suggested Dr. O see a grief counselor, but she would not), 107:15-
18 20 (Dr. Rozansky talked to Dr. O about seeing a neurologist, but she "didn't follow
19 through"), 245:5-15 (Dr. O has not tried other medications because she does not want
20 to), 45:17-46:25 (Dr. Rozansky has not done formal psychoanalysis on Dr. O because he
21 would need to see her several times a week), 46:1-5 (Dr. Rozansky did not recommend
22 formal psychoanalysis because "[i]t was obvious that there was limitations on how
23 frequently I could see her"), 117:21-11 (Dr. Rozansky has not recommended Dr. O see a
24 different therapist for "a consultation or second opinion" because he knows she will not
25 agree; "we can talk about many things about what she might do . . . but right now she
26 won't do them"); Ex. 10, Ogandzhanova Dep. at 133:8-21 (apart from Dr. Rozansky and
27 the expert she saw for purposes of this litigation (Dr. Shear), Dr. O has only seen one
28 other psychiatrist (Eleanor Lavretsky), whom she saw on the same day she initially saw

6

1 Dr. Rozansky); Ex. 11, Lavretsky records, at MLOEL000005 (Dr. Lavretsky
2 recommended Dr. O obtain treatment in Arizona "as she may need regular follow-up
3 care, treatment").

4     11.    When Dr. O learned that the doctors who performed the IMEs, Dr. Lamb
5 and Dr. Parker, concluded she should be receiving more frequent treatment, including
6 treatment to specifically address her complicated grief, she refused to try either.
7 **Supporting Evidence**: Ex. 12, Dr. David Lamb's March 3, 2008 IME report, at 765
8 (Dr. O "is not sufficiently engaged" in efforts to treat her condition; Dr. O "should be
9 involved in weekly sessions of grief counseling with a local psychotherapist"); Ex. 2,
10 Dr. David Lamb's March 2011 IME report, at 1846 ("it is difficult to understand Dr.
11 Ogandzhanova's failure to seek different treatment options in the face of her report of
12 worsening severity of symptoms"); Ex. 30 at Ex. H, July 1, 2011 letter from Frederick to
13 Newfield, at 2244 (inviting Dr. O, her counsel or her doctor to comment on IME
14 reports); Ex. 30 at Ex. E, Dr. Parker's June 2, 2011 IME report, at 1827 (Dr. Rozansky
15 "does not provide any specific treatment for complicated grief" and should have
16 "referred [Dr. O] to a therapist using strategies and techniques that specifically target the
17 syndrome of complicated grief"); Ex. 6, Newfield Dep. 145:11-18, 146:5-19, 147:1-
18 148:10, 148:11-14 (conceding that he reviewed Dr. Lamb's and Dr. Parker's reports and
19 was aware of Dr. Parker's claim that Dr. O had "not sought out appropriate treatment");
20 Ex. 13, October 31, 2011 letter from Newfield to MetLife, at 2181-82 (addressing Dr.
21 Parker's claim that Dr. O "had not sought out appropriate treatment" and Dr. O's
22 response that she would not seek treatment with anyone but Dr. Rozansky); Ex. 14,
23 typed letter from Dr. O to Newfield, at 141-144 (addressing her review of Dr. Lamb and
24 Dr. Parker's reports and responding to their conclusions); Ex. 10, Ogandzhanova Dep. at
25 259:13-20 (testifying that she reviewed Dr. Lamb's and Dr. Parker's report and prepared
26 a note to her attorney responding to them, authenticating Ex. 14).

27     The following three undisputed facts entitle MetLife to summary judgment on
28 Dr. O's COLA claim:

7

12. Under the Policies, "no cost-of-living adjustments will be made after . . . [t]he first Premium Due Date on or after Your 65th birthday." **Supporting Evidence:** Ex. 30 at I, Disability Income Insurance Policy – Omni Plus, Policy No. 364168AH, issued to Dr. Ogandzhanova on March 10, 1999, at 1715; Ex. 30 at Ex. J, Disability Income Insurance Policy, Policy No. 6482821AH, at 1745; Ex. 20, Glushanok Dep. 42:17-43:3, 84:17-85:86:7, 88:2-23, 108:11-109:2 (testifying that he understood COLA benefits do not extend past age 65 and never represented otherwise to Dr. O).

13. MetLife had the right to re-open Dr. O's deposition, pursuant to the Court's ruling at the August 23, 2013 hearing, because Dr. O did not disclose her claim for COLA benefits past age 65 until after her deposition. **Supporting Evidence:** Ex. 21, August 23, 2014 Hrg. Tr. 30:22-31:11; Ex. 29, Defendant/Counter-Plaintiff's Responses to Interrogatories [Third Set], at 3 (claiming that Dr. O is entitled to COLA benefits past age 65).

14. Dr. O's counsel, Steve Dawson, acknowledged that Dr. O's claim for COLA benefits past age 65 had not been disclosed until after her deposition, represented that Dr. O was withdrawing that claim to avoid MetLife re-opening her deposition, and agreed to enter into a stipulation to dismiss the COLA claim, but has since refused to approve any proposed stipulation or propose an alternative, despite repeated follow-up attempts by MetLife. **Supporting Evidence:** Ex. 22, 9/4/2013 e-mail from E. Bradham re providing date Dr. O first raised her claim for COLA benefits past age 65, after her deposition); Ex. 23, 10/17/2013 e-mail from S. Dawson (acknowledging that Dr. O's claim for COLA benefits had not been raised before her deposition and agreeing to stipulate to withdraw the claim); Ex. 24, 11/27/2013 e-mail from E. Bradham (proposing language for stipulation dismissing Dr. O's claim for COLA benefits past age 65); Ex. 25, 12/5/2013 e-mail from E. Bradham ("Steve Dawson previously agreed to enter into a stipulation related to Ogandzhanova's withdraw of her COLA claim. Are the stipulation and proposed order I sent with my November 26, 2013 e-mail acceptable?"); Ex. 26, 12/13/2013 e-mail from J. Porter ("we also have not heard back from you on whether

1. Dr. O will agree to the COLA stipulation and proposed Order that Erin previously circulated. Can we please hear back from you on this?"); Ex. 27, 12/16/2013 e-mail from E. Bradham (asking for a response on the COLA issue) and 12/17/2013 response from A. Rosenthal (representing that Dr. O's counsel, Steve Dawson hoped to respond by the next week); Ex. 28, 1/15/2014 e-mail from E. Bradham (asking counsel to respond by the end of the day on 1/16/2014 or MetLife would have to raise the issue with the Court).

## UNDISPUTED BACKGROUND FACTS

The following undisputed facts are not necessary to the court's decision, and thus are not part of the statement of material, undisputed facts required under Local Rule 56.1. However, these facts are provided in MetLife's Motion for Summary Judgment to provide background. *See* LRCiv. 56.1(a) ("Other undisputed facts . . . such as those providing background about the action or parties" can be cited in a motion but are not part of the LRCiv. 56.1(a) separate statement of facts).

15. Dr. O worked full time for a year after her son's death. **Supporting Evidence**: Ex. 10, Dr. O Dep. at 166:13-15.

16. Dr. O represented to MetLife that she was suffering no emotional problems when she applied for the second of her two disability policies in May 2006, two months *after* her son died. **Supporting Evidence**: Ex. 30 at Ex. J at 1775, May 18, 2006 Application for Disability Income Insurance, 1775.

17. In April 2006, shortly before Dr. O applied for her second MetLife disability policy, Dr. O began receiving inquiries about the sale of her practice. **Supporting Evidence**: Ex. 15, Bates Dep. 155:22-157:2.

18. Dr. O entered into an agreement to sell her practice on September 11, 2006, before she saw a psychiatrist. **Supporting Evidence**: Ex. 15, Bates Dep. at 223:17-21; Ex.4, Rozansky Dep. 207:3-7 (Dr. Rozansky first started seeing Dr. O in January 2007).

19. Dr. O's claimed disability coincided with the closing on of the sale of her practice and medical building for more than $10 million on March 12 2007, a few days before she gave birth to a daughter. **Supporting Evidence**: Ex. 15, Bates Dep. at 204:20-23, 208:4-5; Ex. 19, Ex. A to Defendant/Counter-Plaintiff's Supplemental Responses to Request for Production of Documents [Second Set] No. 25 (Dr. O discovery response listing proceeds of sale); Ex. 10, Ogandzhanova Dep. at 226:8-12.

20. As part of the sale, Dr. O agreed to a non-compete clause preventing her from working as a radiation oncologist within 45 miles of her home in Casa Grande for the next three years. **Supporting Evidence**: Ex. 16, Asset Purchase Agreement, MLOARTMSI000015; Ex. 15, Bates Dep. 205:24-206:7.

21. Dr. O had only two sessions with her treating psychiatrist, Dr. Rozansky, before finalizing the sale of her practice and Dr. Rozansky's treatment notes for those sessions do not reflect a recommendation that she stop working. **Supporting Evidence**: Ex. 17, Dr. Rozansky Treatment Notes, DR. O-SDT-ROZANSKY-000055-56; Ex. 4, Rozansky Dep. 6:22-4 (authenticating treatment notes).

22. As part of its investigation of Dr. O's disability claim, MetLife hired Phoenix neuropsychologist Dr. David Lamb in 2008 to conduct an IME of Dr. O. Dr. Lamb found "convincing evidence that Dr. O was exaggerating her psychological symptoms" during his IME tests. **Supporting Evidence:** Ex. 12, Dr. Lamb March 3, 2008 IME report, at 764.

23. Nevertheless, and although MetLife still had questions about coverage, it gave Dr. O the benefit of the doubt and accepted coverage on April 17, 2008. **Supporting Evidence:** Ex. 18, Kaarela Dep. 48:8-12.

24. The Policies allowed MetLife continued to monitor the claim to determine if Dr. O remained disabled. **Supporting Evidence:** Ex. 30 at Ex. I, Disability Income Insurance Policy – Omni Plus, Policy No. 364168AH, issued to Dr. Ogandzhanova on March 10, 1999, 1699-1700, 1704; Ex. 30 at Ex. J, Disability Income Insurance Policy, Policy No. 6482821AH, 1751, 1756.

10

DATED this 17th day of January, 2014.

        STEPTOE & JOHNSON LLP

        By /s/ Erin E. Bradham
          Floyd P. Bienstock
          Erin E. Bradham

        LEWIS ROCA ROTHGERBER LLP
        Stephen M. Bressler
        Jason Porter
        40 North Central Avenue, 19th Floor
        Phoenix, Arizona 85004-4429

        *Attorneys for Plaintiff/Counter-Defendant Metropolitan Life Insurance Company*

## CERTIFICATE OF SERVICE

I hereby certify that on January 17, 2014, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

  Steven J. German, Esq.
  Adelman German, P.L.C.
  8245 North 85th Way
  Scottsdale, Arizona 85258
  *Attorneys for Defendant/Counter-Claimant Inna Ogandzhanova*

  Steven C. Dawson, Esq.
  Anita Rosenthal, Esq.
  Dawson & Rosenthal, P.C.
  25 Schnebly Hill Road
  Sedona, Arizona 86336-4233
  *Attorneys for Defendant/Counter-Claimant Inna Ogandzhanova*

        /s/ Erin E. Bradham
        STEPTOE & JOHNSON LLP

Doc. # DC-8308742 v.1