United States District Court, District of Arizona
Case No. 2:12-cv-372-GMS
Metropolitan Life Insurance Company v. Inna Ogandzhanova, M.D.

Metropolitan's Statement of Facts in Support of Motion for Summary Judgment

<u>List of Exhibits</u>

Ex. 1      10/2/2010 report by Dr. Joel Parker

Ex. 2      3/14/ 2011 report by Dr. David Lamb

Ex. 3      7/18/2013 Deposition Testimony of Mary Fuller (Excerpt)

Ex. 4      12/20/2012 Deposition Testimony of Dr. Gerald Rozansky (Excerpt)

Ex. 5      4/13/2013 Deposition Testimony of Dr. Katherine Shear (Excerpt)

Ex. 6      4/15/2013 Deposition Testimony of Jason Newfield (Excerpt)

Ex. 7      11/27/2007 letter from Jason Newfield to MetLife

Ex. 8      12/31/2007 letter from Jason Newfield to MetLife

Ex. 9      2/11/2008 letter from Jason Newfield to MetLife

Ex. 10     11/28 and 12/01/2012 Deposition Testimony of  Dr. Inna Ogandzhanova (Excerpt)

Ex. 11     Medical records of Dr. Ogandzhanova produced by Dr. Eleanor Lavretsky

Ex. 12     3/3/2008 report by Dr. David Lamb

Ex. 13     10/31/2011 letter from J. Newfield to MetLife

Ex. 14     Typed notes of Dr. Ogandzhanova to J. Newfield

Ex. 15     4/17/2013 Deposition Testimony of Donald Bates (Excerpt)

Ex. 16     3/12/2007 Asset Purchase Agreement

Ex. 17     Psychiatric Notes by Dr. Rozansky

United States District Court, District of Arizona
Case No. 2:12-cv-372-GMS
Metropolitan Life Insurance Company v. Inna Ogandzhanova, M.D.

Metropolitan's Statement of Facts in Support of Motion for Summary Judgment

<u>List of Exhibits</u>

Ex, 18    2/8/2013 Deposition Testimony of Lisa Kaarela (Excerpt)

Ex. 19    6/10/2013 Exhibit A to Defendant/Counter-Plaintiff's Discovery Responses

Ex. 20    4/16/2013 Deposition Testimony of Alex Glushanok (Excerpt)

Ex. 21    8/23/2013 Testimony from Hearing before the Honorable G. Murray Snow (Excerpt)

Ex. 22    9/4/2013 Email from E. Bradham

Ex. 23    10/17/2013 Email from S. Dawson

Ex. 24    11/27/2013 Email from E. Bradham

Ex. 25    12/5/2013 Email from E. Bradham

Ex. 26    12/13/2013 Email from J. Porter

Ex. 27    12/16/2013 Email from E. Bradham

Ex. 28    1/15/2014 Email from E. Bradham

Ex. 29    4/3/2013 Defendant/Counter-Plaintiff's Responses to Interrogatories [Third Set]

Ex. 30    1/17/2014 Declaration of James Frederick with attached exhibits:

        Ex. A    4/21/2011 Report by Dr. James Boone

        Ex. B    10/30/2010 Report by Dr. Eric Kaplan

        Ex. C    4/20/2011 Report by Dr. Eric Kaplan

United States District Court, District of Arizona
Case No. 2:12-cv-372-GMS
Metropolitan Life Insurance Company v. Inna Ogandzhanova, M.D.

Metropolitan's Statement of Facts in Support of Motion for Summary Judgment

<u>List of Exhibits</u>

Ex. D    6/8/2011 Report by Dr. Eric Kaplan

Ex. E    6/2/2011 Report by Dr. Joel Parker

Ex. F    9/22/2011 Report by Dr. Eric Kaplan

Ex. G    9/29/2011 Report by Dr. Eric Kaplan

Ex. H    7/1/2011 letter from J. Frederick to J. Newfield

Ex. I    3/10/1999 MetLife Disability Income Insurance Policy No. 6364168

Ex. J    7/28/2006 MetLife Disability Income Insurance Policy No. 6482821

Ex. K    12/31/2007 Dr. Inna Ogandzhanova statement

Ex. L    1/25/2008 letter from J. Newfield to MetLife

# EXHIBIT 1



J. Parker
7/10/13
EXHIBIT NO. 1
S. STEVENSON
# 50461

**Joel E. Parker, M.D.**
**Biltmore Psychiatric Group, PLLC**
**Board Certified: General Psychiatry,**
**Forensic Psychiatry,**
**Independent Medical Examinations**

6245 North 24th Parkway, #203
Phoenix, AZ 85016
602-843-0035 (phone)
602-843-8963 (fax)
joelparker@biltmorepsych.com

October 2, 2010

Eric Michael Kaplan, MD
Metropolitan Life Insurance Company
P. O. Box 30429
Tampa, FL 33630-3429

RE:          Inna Ogandzhanova, MD
POLICY NO:    6 364 168 AH
             6 482 821 AH
DOB:          January 7, 1963

Dear Dr. Kaplan:

Per request from Metropolitan Life, I completed a psychiatric independent medical examination for Inna Ogandzhanova, MD, in my office in Phoenix, Arizona on September 21, 2010. The purpose of the evaluation was to provide MetLife with an opinion about her psychiatric condition, her limitations, motivation to return to work, and related matters. I interviewed her for about three hours. Dr. Ogandzhanova reported that she was unable to complete the MMPI-2 during the time of the interview, as she was extremely tired. I told her that it would be necessary for her to complete it, and she reported that she would return to do it in a few days. As of September 28, 2010, she had neither returned to take the test nor had she called our office.

**STATEMENT OF NONCONFIDENTIALITY:** I explained to Dr. Ogandzhanova at the outset of the interview that I had been retained by Metropolitan Life in order to produce this document, and that all information would thus not be confidential or privileged. I told her that she was free to decline to answer any question that I asked of her, that I would not be her doctor and she would not be my patient, and that the final report could have a positive effect, negative effect, or no effect on the outcome of her case. She appeared to understand each of these warnings and agreed to proceed.

**BRIEF DESCRIPTION OF INSURED:** Inna Ogandzhanova, MD is a 47-year-old, divorced Russian woman, currently living in Casa Grande with her two

Inna Ogandzhanova, MD  Page 2
October 2, 2010

children, 3 ½  and 20 months old.  She reported having a significant other (the father of her children), who does not live there but stays there often.  She was evasive about their relationship and his living circumstances.  Dr. Ogandzhanova is a radiation oncologist.  She worked for Desert Rose Oncology prior to going out on disability in about March of 2007.  She had started and been the only doctor of Desert Rose Oncology.  She worked in a few jobs prior to this one.  Her significant other drove her from Casa Grande to this interview, but she reported driving to the grocery store.  She was very evasive about how often she got out, stating that it was variable.  She reported avoiding driving to Tucson, where her son died.  She has not returned to work since March 2007.  She receives $16,000 per month of disability income.  When I asked about her baseline income, she stated that a radiation oncologist could make up to half-a-million dollars a year, but she would not give me any specific figures.  She does not receive Social Security Disability income.  She reported no other income in the household.

**SOURCES OF FACTS:**  This independent medical examination is based on the following:
1. Purpose letter.
2. Review of about two inches of medical records.
3. Numerous video discs.

**CLINICAL INTERVIEW:**

**CURRENT SUBJECTIVE COMPLAINTS:**
1. Life changed absolutely.
2. Not much motivation.
3. Mood unimproved after having two new children.
4. Panic.
5. Depression.
6. Anger.
7. No friends.
8. "I can't function well."
9. Anxiety with thoughts of dealing with radiation oncology.

**EXAMINEE'S VIEW OF IMPAIRMENT FROM COMPLAINTS:**
1. Inability to deal with being a radiation oncologist.
2. Inability to counsel patients.
3. Inability to go to cancer centers or deal with cancer.
4. Inability to be consistent.

**HISTORY OF PRESENT ILLNESS:**  Dr. Ogandzhanova reported working as a radiation oncologist for several years.  She started a clinic in Casa Grande from the ground up.  She reported being extremely lucky.  She was working with a partner, but had a conflict with him regarding money.  She started her own business and reported working 15 hours per day, 7 days per week.

MLOCL002001

 

Inna Ogandzhanova, MD                                        Page 3
October 2, 2010

Her son, Isaac, was born on November 3, 1998, in Texas. She described him as a "brilliant person, incredible, very similar to me," and "flawless." She reported that at age three her son told her that he talked to God directly. She reported feeling that, "He's my half." She referred to him in the present tense throughout this interview, stating that he remains with her "on the other side."

On Thanksgiving Day 2001, he looked ill, and she took him to a hospital. She ordered a CBC and found that his hemoglobin was 4. A colleague stated that this "looked like leukemia." She took him to University Medical Center in Tucson, where a bone marrow biopsy diagnosed acute leukemia. From her work as a radiation oncologist, she knew there was a 95 percent cure rate from that cancer.

Isaac was admitted to University Medical Center in Tucson, and was treated as an inpatient and outpatient over the next several years. During that time, she continued to work full-time, and was very busy. She reported that, "It was my life." She had conflict with an oncologist at the hospital, Dr. Bagatell, and her son was discharged "without a white count" due to the fact that the medical team had "not reached a therapeutic relationship." She believed that she was blackballed at Phoenix Children's Hospital, where her son next received care. She saw Dr. Woods there, who treated her son briefly, but had a heart attack. He was placed on a complex regimen of chemotherapeutic agents, and had no primary doctor. She believed that this care "made me irrelevant."

Her son became septic, with gram-negative rods growing out of his blood. He ultimately developed bilateral necrotizing pseudomonas pneumonia, which she found had a 0 percent survival rate in the literature. He survived it. She remained very active in management, but was very upset with the treatment team, who she believed did not follow up as aggressively as they should. She noted that she fought for her son, and he survived it. She had ongoing conflict with the staff at Phoenix Children's Hospital.

She met with the president of Phoenix Children's Hospital in order to complain. Shortly after that her son's chart disappeared. She described many of the people as "rotten souls, bad people who didn't care."

After discharge, her son was unable to walk, and his recovery was very slow. Because he had had a severe infection, he was unable to receive chemotherapy for about five months. While at a restaurant one day, she noticed that he had an enlarged pupil in one eye, which turned out to be a recurrence of his leukemia in the optic nerve. He had radiation therapy, which she oversaw, and ultimately a bone marrow transplant in December 2003, at University Medical Center in Tucson. She corrected the plan and had ongoing conflict with staff.

In November 2004, Isaac had a recurrence and received chemotherapy. He had a second bone marrow transplant in May 2005, followed by graft versus host disease. In the fall of 2005, he was hospitalized again at University Medical Center and stayed there until his death by septic shock on March 15, 2006. She



MLOCL002002

Inna Ogandzhanova, MD                                                  Page 4
October 2, 2010

again spoke of "rotten souls" who were there. She reported that her son was
fighting for his life, and during the last several months she received a letter from
the administrating stating that she would not be allowed to interfere with
treatment, or she would be escorted from the premises.

**DEVELOPMENT OF PSYCHIATRIC SYMPTOMS:** Dr. Ogandzhanova reported
working effectively as a radiation oncologist during the time of her son's illness.
She reported that she continued to work without difficulty. She reported that she
began "self-medicating" in late 2006, being obsessed with gemstones, and
buying about $40,000 worth of them on satellite TV. This passed after a period
of time, and she began purchasing items for homes, some of which had not yet
been built. She believed that she spent approximately $200,000 on marble,
which is currently in the back yard of one of her three homes in Casa Grande,
and $500,000 on furniture, over about three years. She reported that this activity
gives her a "sense of future."

She began having panic attacks in January 2007. She reported having episodes
of shortness of breath. She once believed that she might have a cardiac problem,
for which she saw a cardiologist, who found no cardiac problems. She had
vague shortness of breath, but could not describe her symptoms otherwise.

She reported having thoughts about her son, and did not give away some of his
clothes in her house in New Mexico because they smelled like him. She believed
that one hiccup per day is from her son, and that she has an ongoing connection
with him. She referred to her son in the present tense. She expressed some
magical thinking; that bad things happen to people who did bad things to her.
She spoke of her ex-partner cutting his arm. She reported believing that after his
death Isaac "told" her to have two children, and correctly predicted the genders.
She reported that she has not become closer to her children. She reported being
angry often, including at the post office recently. She reported that the
postmaster called her and told her that she was going have to behave, or she
would no longer be able to use their post office. She became angry with a
daycare provider recently.

She rated her current mood as 2 to 5 out of 10, where 1 is suicidal and 10 is not
depressed. She reported a loss of interest in many activities, and now stays
home. She has gained about 30 pounds since the birth of her last child 20
months ago, but could not give me her current weight. She sleeps about seven
hours per night and wakes up a few times. She was evasive about her sleep
history. She rated her current energy level as 3 or 4 out of 10 (10 is best). She
denied any worthless feelings, but believed that she has been "crushed by the
outside world." She reported poor concentration and has vague thoughts about
death, but not of suicide.

She reported episodes of shortness of breath and chest discomfort, occasional
dizziness, and depersonalization, but not at the same time. She was unable to
describe any specific episode of a full-fledged panic attack. She reported that

MLOCL002003

Inna Ogandzhanova, MD
October 2, 2010

Page 5

she has episodes of anxiety with some vague shortness of breath and chest pressure.

She reported that she has been able to manage her anxiety throughout her lifetime, and described herself as a "type A personality."

She has ongoing feelings about the loss of her son. She volunteered that she had "flashbacks" about two to three times per week, often about the death of her son or some event related to his illness and demise. She avoids going to Tucson, has lost interest in working, reported a lack of loving feelings toward her children, and does not expect to have a normal life. She reported problems with anger and concentration difficulties. She denied a hyperactive startle response.

**PSYCHIATRIC TREATMENT:** She reported that she attempted to find a psychiatrist in Phoenix, but private practitioners were expensive (she receives $16,000 of disability income per month), and were not readily available. She found a psychiatrist in Los Angeles, Dr. Rozansky, whom she has visited in Los Angeles every month or so for the past 3.5 years. Dr. Rozansky has treated her with Lexapro, and she has 90-minute psychotherapy meetings with him about once a month. When asked if she had received additional treatment, she stated, "The only thing that keeps me alive is having my son with me." She has taken Lexapro only and no other psychiatric medications.

**CURRENT MEDICATIONS:**
1. Lexapro 30 mg per day.
2. Aspirin 81 mg per day.

**AGGREGATE IMPROVEMENT FROM ALL TREATMENT:** None.

**DEVELOPMENT OF DISABILITY:** Dr. Ogandzhanova reported that in January 2007, she decreased her work. She felt that she would be unable to work as much as she had. She was working 14 hours per day most days, with some paperwork on weekends. She stopped seeing patients in March 2007. She reported that another company came in and took over her business. She reported having a psychological evaluation at the onset of her disability, but could not recall the name of the evaluator.

**AGGRAVATING FACTORS:**
1. "Bad people and bad souls."
2. Being outside of routine.

**MITIGATING FACTORS:** Watching "Medium" at night.

**TREATMENT PLAN FOR THE FUTURE:** "If my son comes back, it would cure things."

**CURRENT STRESSORS:**

MLOCL002004

Inna Ogandzhanova, MD
October 2, 2010
Page 6

1. Relationship with her boyfriend.
2. Metropolitan Life.

**PAST MENTAL HEALTH TREATMENT:** Dr. Ogandzhanova denied ever receiving any previous psychiatric treatment, seeing a psychiatrist, psychologist, being psychiatrically hospitalized, or taking any psychiatric medications. She denied any suicide attempts ever.

**OCCUPATIONAL HISTORY:** She graduated from medical school in St. Petersburg, Russia in 1987. She completed an internship and came to the United States. She completed two years of internal medicine training in New York, then a four-year radiation oncology residency in Texas. She worked in Locum Tenens positions briefly and then took a job in Indiana, Pennsylvania for one year and then in West Virginia for another year. She moved to Arizona in 2000, and worked with another radiation oncologist, but left that organization to start her own clinic.

**PAST MEDICAL HISTORY:** She has had five pregnancies, three live births, and two miscarriages. She denied allergies to medications or any surgeries. She denied fractures, head trauma, seizures, or any ongoing medical problems.

**FAMILY PSYCHIATRIC HISTORY:** Denied.

**PAST PERSONAL HISTORY:** She was born in Leningrad, USSR. Her father was a computer programmer for Russian submarines, and her mother worked as a civil engineer. She described her family as "intelligentsia." She has one brother, four years younger. She described her home as, "normal, we had a three-bedroom apartment." She denied any abuse during her upbringing and reported good health. She was raised Jewish and is intermittently faithful. She believes in God. Her parents divorced when she was 19. She did well in school and denied special education. She had friends in school. She denied disciplinary problems or grade retentions.

She was married for five years in 1996, but her husband, a dentist, found someone else. She had three children, Isaac (now deceased), Asther (3), and Emanuel (20 months).

Her mother lives in Connecticut and father lives in New York. She was estranged from both of them during part of her son's illness. She blamed her mother for years for her son's death, related to exposure to bacteria. She has had no contact with her father in the past five years.

**MILITARY DUTY:** Denied.

**CRIMINAL HISTORY:** Denied.

Inna Ogandzhanova, MD                              Page 7
October 2, 2010

**LITIGATION HISTORY:** She was involved in a lawsuit against her former partner.

**SUBSTANCE USE:** She denied ever abusing alcohol. She does not drink at all now. She denied ever using any illicit substances or abusing any prescription medications.

**EXAMINEE'S DESCRIPTION OF A TYPICAL DAY:** She will arise at 7 or 7:30 a.m. She washes dishes and clothes throughout the day. She waters her plants and prepares food, such as making preserves. She cares for her children. She reports that she is never consistent, and days vary dramatically. She watches "Medium" (a television show about a woman with ESP) between 10:30 and 11:30 at night. She has a house in Mexico and a house in New Mexico, and goes to both locations. Bill paying is shared. She does no outdoor chores. She reported having no friends. She sees her two children and her significant other often. She has phone contact with an old friend occasionally.

She has sex with her boyfriend between every day and every month, a little more recently. She denied any exercise. She denied any ongoing hobbies or club involvement. She does no reading. She denied any part-time or volunteer work. She reported that Saturdays are the same as other days. She has not been to synagogue in the last year. She has eaten out three times in the past two weeks, but very infrequently before that.

**PERTINENT PSYCHIATRIC SYMPTOMS:** She denied any previous episodes of depression, or any suicide attempts. She denied any episodes of euphoria, decreased need for sleep, racing thoughts, gambling, or promiscuity. She spent $200,000 over about three years buying items for her houses, and about $40,000 on gemstones. She reported that she did this in order to give her a "sense of future." She has an irritable mood in the past. She reported being fearful of going to a cancer center.

She reported being raped three times, twice at 25 and once at 33. She denied being traumatized by any of these events, however, which she stated was unusual for a woman. In the third situation, the rapist went to prison as a result. She denied any eating disorders, auditory hallucinations, or visual hallucinations. When I asked if she is paranoid she stated that she was "scared of the outside world."

**MENTAL STATUS EXAMINATION:** Dr. Ogandzhanova was an obese, Caucasian woman who was slightly late for the interview, checked in, and went to the bathroom. She was a circumstantial and digressive historian, and wanted to speak about the details of her son's medical condition at length. Her mood was somewhat anxious. Her affect was tense at times. She cried and was quite irritable and somewhat condescending periodically throughout the interview. Her insight was poor, judgment fair. She was extremely non-psychologically minded.



MLOCL002006



Inna Ogandzhanova, MD
October 2, 2010

Page 8

On formal mental status examination, she was alert and fully oriented. Concentration was good with the examinee performing serial seven subtractions from 100 to 65 without error, when she stopped abruptly.  Registration was initially poor with two of six objects recalled at zero minutes and five of six with a repeat.  Recall was fair with four of six objects recalled at five minutes.  She was aware of five recent presidents, indicating a good long-term memory.  She correctly multiplied two single-digit problems and spelled the word "world" backwards.  She abstractly compared three sets of similar objects.

**RECORD REVIEW:**   In conjunction with this evaluation I have reviewed the following documents:

1. The purpose letter in this matter.
2. A surveillance investigation report for April 21, 22, 28, and May 9, 2009. Notable are the following:
   A. "On Tuesday, April 28, 2009, the subject visited Love's Gas Station and went to Tucson, Arizona, where she visited a lawyer's office and a Chinese restaurant."
   B. "On Saturday, May 9, 2009, the subject was verified at her residence, but remained inside throughout the day."
3. Pages two through seven, of a seven-page surveillance report, for December 2009.  Notable are the following:
   A. On Wednesday, December 9, 2009, at 10:28 a.m. "They arrived at Temple Emanuel, located at 5801 Rural Road, Tempe, Arizona."
   B. 12:25 p.m.:  "The subject and her companions arrived at Hong Kong Restaurant located at 4909 Chandler Boulevard, Chandler, Arizona, and exited the vehicle as they entered."
   C. 3:03 p.m.: "I observed the subject and her companions arriving at an unidentified residence located at 5115 Wilkinson Road, Scottsdale, Arizona."
   D. 3:27 p.m.:   "The subject and her companions were observed departing the area with the male companion driving and the subject talking on a cell phone."
4. Investigation report dated January 15, 2008, for surveillance that took place on January 8, 2008, by Busalacchi Investigative Agency.  Notable are the following:
   A. "On Tuesday, January 8, 2008, surveillance was initiated at the claimant's residence at 5 a.m.  The claimant was first observed at 10:29 a.m. as she exited from the garage and spoke with the landscaping worker at her home.  She occasionally smiled as she spoke with him.  The claimant then departed, driving the Volvo. She drove to a post office, where she mailed envelopes at a curbside box, and then drove to the residence on Maria Lane, where she picked up the elderly woman seen during the previously conducted surveillance in December 2007, and then returned to her residence.  She exited the vehicle speaking on her cell phone and entered through the garage."

Inna Ogandzhanova, MD   Page 9
October 2, 2010

B. "At 12:49 p.m., claimant departed from her residence in the Volvo to Walgreen's, where she approached the pharmacy counter. She spoke with the pharmacist for a very short period of time and then departed."

C. "The claimant departed and drove to Chase Bank where the teller assisted her with her transaction. After four minutes she returned to her vehicle, opened the driver door, then looked at the back and side body of the vehicle. She entered the driver's seat and departed. The claimant returned to her residence and parked on the driveway."

D. "In the mid-afternoon hours, a windshield repairman arrived at the residence. The claimant was observed exiting through the garage and speaking with him. She then rummaged through the front passenger seat, spoke with the worker, and then entered the garage... She entered the garage, exited, and walked to the Hummer parked on the driveway as she appeared to look for something."

E. "On Wednesday January 9, 2008, surveillance was initiated at the claimant's residence at 6:30 a.m. In the midmorning hours, a female in a Mercedes Benz picked up claimant and her husband at their residence. The female drove them to Mountain View Cemetery, where they were observed looking at a piece of land as well as blue prints. They remained at the cemetery for approximately 30 minutes. After their discussion, the female drove the claimant and her husband back to their residence."

F. "Claimant departed again at 3:09 p.m. as a passenger in their Ford Excursion. Her husband drove to Maria Lane where they remained for a few minutes. He then drove out of town to Phoenix, Arizona, where they arrived at Arizona Custom Brokers. Arizona Custom Brokers is a clearinghouse for items that have been shipped from out of the country and then inspected by U.S. Customs official before made available for pickup by the recipient."

G. "Claimant's husband drove to Babies-R-Us. Claimant entered alone, looked at baby formula and asked a clerk a question regarding the formula. She then removed a box of Similac, paid for it, and exited. She and her husband load the formula into the vehicle, and she departed as a passenger once more. He drove for an hour and 10 minutes to the residence on Maria lane, where they were observed inside the open garage of residence with the other females, and their baby. Claimant held the baby in her arms as she spoke to her and occasionally swung the baby. She smiled nearly the entire time she held the baby."

H. "Claimant drove to a mailbox and place (sic) mail in the curbside mailbox without exiting her vehicle. She then drove to Maria Lane and waited in the driveway. The elderly female seen during previous surveillance conducted in December 2007, exited the residence and entered the passenger side of the car."

Inna Ogandzhanova, MD   Page 10
October 2, 2010

5. Investigation report dated December 21, 2007, by Busalacchi Investigative Agency. Notable are the following:

A. December 17, at 1:00 p.m.: "Claimant departed driving Excursion to Office Max where it appeared that the store employee knew her as he helped her with the fax toner. After 17 minutes, the claimant exited the store and pushed the cart to the vehicle. She loaded a shopping bag in the passenger seat, departed, and then returned to her residence."

B. "At 1:47 p.m., claimant departed as a passenger in the Volvo with her husband driving. He drove for one hour and 22 minutes to Tucson, Arizona, where they entered the Arizona Center for Reproductive, Endocrinology, and Infertility Office at 3:10 p.m. They remained for almost an hour and then her husband drove the couple to a strip mall, where he dropped her off at curbside and then went to look for a parking space in this crowded strip mall."

C. On Tuesday December 18, 2007, "Claimant departed at 10:03 a.m. as a passenger in the Volvo with her husband driving. He drove the couple for 1 hour and 8 minutes to Tucson, Arizona, and to Lawrence Dembowski, CPA."

D. "At 1:46 p.m., claimant departed as a passenger and was driven to the residence on Maria Lane, where they picked up an older female and their infant. Her husband then drove to a pediatric office where they all entered."

E. "After their appointment, claimant exited smiling and talking to the older female. They departed and he drove them to Chase Bank where claimant was dropped off curbside and entered alone. She spoke with a bank employee as she stood in line. Claimant made her transaction at the counter and exited. She looked for the vehicle upon exiting and entered the passenger seat."

F. On Thursday, December 20, 2007, "Claimant departed as a passenger in the Volvo at 8:32 a.m. and was driven by her husband for 1 hour and 20 minutes to the CPA's office again in Tucson."

G. "At 2:12 p.m. claimant's husband returned to the residence. A female in a black Mercedes arrived at the residence at 2:59 p.m. with a child and walked to the residence. Both the female and child departed shortly thereafter."

H. "Three vehicles registered to Desert Oasis Medical Center, including a yellow Hummer, blue Volvo sedan, and black Ford Excursion."

I. "A search was conducted on the address of 1509 Maria Lane, Casa Grande, Arizona, 85222, to determine who may be living there since the claimant was linked to and frequented this residence several times. Three individuals are linked to this residence, one of which is the claimant. The other two are Anna Khachaturyan and Galina Khachaturyan."

2010-8-30 AM 9:40

 

Inna Ogandzhanova, MD                                                    Page 11
October 2, 2010

      J.   December 10, 2007:  "Claimant drove to Food City located at 300
           N. Florence Boulevard and entered the store."

6. An occupational review regarding radiation oncology, prepared by
   Francine E. Michel, PhD, on March 24, 2008.

7. A field claim report dated October 8, 2007.  Notable are the following:

     A.   "The insured stated that she returned to work soon after her son's
         death."

     B.   "The insured explained that she was able to function and perform
         her occupational duties and daily living in a normal manner initially,
         until October 2006, when she began feeling depressed over her
         son's death.  She stated that she began having anxiety and panic
         attacks, with difficulty concentrating and sleeping, as well as
         difficulty dealing with her patients.  She stated she felt as if she
         needed to run away.  The insured stated her condition worsened
         with each passing day.  The insured knew that she needed help
         and began searching for a psychiatrist on the Internet.  She stated
         that she had a difficult time finding a good doctor in Arizona and
         treated with a few doctors before finding Dr. Gerald Rozansky."

     C.   "The insured stated that she has depression, anxiety, and panic
         attacks, difficulty concentrating, sleeping and dealing with the
         emotional stresses of her patients.  The insured stated she can no
         longer focus and is a danger to her patients.  The insured added
         that although being away from her work has reduced her anxiety
         and panic attacks, she continues to feel depressed."

     D.   "The insured informed me that she had malpractice insurance, but
         has suspended the coverage since June 1, 2007.  The insured
         stated it was recommended that she suspend her insurance
         instead of terminating it, explaining that she would have to pay an
         early termination fee had she terminated the insurance early."

     E.   "According to the insured, due to her depression, anxiety, and
         panic attacks, she can no longer perform her occupational duties
         as a radiation oncologist.  The insured explained she used to listen
         and fight for her patients but has become resentful and angry
         towards them.  She would ask herself questions such as, 'Why is
         the person that I am treating still alive, and my son Isaac is dead?'
         She stated that she was becoming dangerous, unable of
         controlling her emotions and could no longer be emotionally
         supportive to her patients.  The insured added her occupation is
         extremely stressful and is incapable of dealing with any stress in
         her life at this time."

     F.   "The insured reiterated her doctor does not recommend that she
         return to work at the present time.  The insured was asked if she
         was unable to return in her current occupation, would she be able
         to return to work in another department or in a different line of work
         altogether.  She stated she is not well and cannot predict the
         future."

MLOCL002010

Inna Ogandzhanova, MD   Page 12
October 2, 2010

    G. "The insured stated that she would travel anywhere to find the right doctor or lawyer and stated there were not many good doctors and lawyers in Arizona."

8. An independent neuropsychological evaluation by David Lamb, PhD, dated March 3, 2008. Notable are the following:

    A. "Dr. Ogandzhanova is a 45-year-old, divorced, Russian female who identified herself as suffering from ongoing depression, Post-Traumatic Stress Disorder, and panic attacks, beginning approximately six months after her 7-year-old son Isaac died on March 15, 2006."

    B. "Per her self-report, Dr. Ogandzhanova is currently only experiencing significant difficulty with concentration and memory. She states she does not typically 'read anything' anymore, and is able to do so if she puts forth a great effort to concentrate. With regard to her memory she stated, 'Sometimes I'm forgetful,' however, she could not provide a recent example of how her memory was problematic. She did state that before her son's death, 'I could buy 200 items at Wal-Mart and remember all the prices to the penny.' Dr. Ogandzhanova stated that she is no longer able to do this."

    C. "Dr. Ogandzhanova denies any prior arrests or involvement in civil litigation." (She told me that she was involved in a lawsuit with her former partner.)

    D. "When asked about any other possible business plans, Dr. Ogandzhanova denied any interest in working in any other field in medicine. When asked about shifting her medical expertise from oncology, she stated that she did not think she would be able to get accepted into a different residency, and even if she could she did not feel she had the energy and concentration to complete a different residency program."

    E. "She also reported an ongoing experience of recurrent and intrusive distressing recollections of her son's treatment and death, recurrent distressing dreams about his death and cancer in general, and intense distress when exposed to external cues that symbolize the event (e.g. driving by UAMC). She stated that she attempts to avoid thoughts or discussion associated with her son, avoids activities and places that generate recollections of him, and/or his treatment, has a markedly diminished interest in participating in work or social activities, and feels detached and estranged from others. Dr. Ogandzhanova complains of both difficulty falling asleep and staying asleep, irritability and outbursts of anger, and difficulty with concentration, finally, these symptoms lasted for more than three months and impaired her social and occupational functioning."

    F. "At the peak of this difficulty, Dr. Ogandzhanova described having two to three anxiety episodes each day. Initially she denied any associated physiological symptoms, but when asked specifically

 
stated that she may have experienced some increased heart rate and shortness of breath. Even so, Dr. Ogandzhanova does not describe a sufficient number of symptoms typically associated with panic attacks to warrant a diagnosis of Panic Disorder."

G.   "At present, Dr. Ogandzhanova reported taking Lexapro (30 mg). She reported that it 'helps some,' but when on to state that, 'Nothing can numb the fact that it happened.'"

H.   "When asked why she might not arrange to see a psychotherapist locally, and have Dr. Rozansky manage her medications, Dr. Ogandzhanova at first stated that she was apprehensive about meeting new people. Then she acknowledged that this was a 'good idea,' since, 'I'm probably getting worse because MetLife is screwing with me.' Nonetheless, she stated, 'Right now I don't want to change anything because of MetLife.' Dr. Ogandzhanova went on to indicate that she would consider trying to see someone else once her issues with MetLife became stable."

I.   "Dr. Ogandzhanova's performance on several formal symptom validity tests did not show any difficulty with her level of effort. However, there were a number of unusual behavioral observations during the testing. For example, on the first trial of finger tapping with her dominant hand, her pace of tapping was much slower than when she had been practicing on the instrument just prior to starting. In general, she moved very slowly during timed tests, at times even asking questions in the middle of the task. Also, though she successfully completed a sample on Trailmaking Part A without lifting her pencil, during the actual test she continually lifted her pencil after reaching each circle, even when asked not to do so. When this instruction was more strongly emphasized for part B, she still lifted her pencil after reaching 5 of the 25 circles. Also, Dr. Ogandzhanova proceeded very slowly with regard to the first six items on both parts A and B despite the fact that the examiner as part of the instruction set had just traced the pathway. In addition, even after she had clearly identified the next target and began moving her pencil toward it, her production of the line was very slow. This is in contrast to her very quick production of lines while drawing designs for the Ruff Figural Fluency Test and copying the Rey-Osterreith Complex Figure. She was also very slow in drawing circles on the B test. Finally, during driving scenes test on the NAB Attention Module, after being asked, "Look at this driving scene carefully for 30 seconds," Dr. Ogandzhanova looked up after six seconds and said, 'Okay,' indicating she was finished looking."

J.   "Dr. Ogandzhanova completed the MMPI-2 and produced an invalid profile. On the standard Validity Scales, Dr. Ogandzhanova produced an extremely high score on the F Scale, while in contrast; her K score was very low. The FB Scale was also very high, with possible interpretations including: 1) Severe and chronic

MLOCL002012



Inna Ogandzhanova, MD                                                    Page 14
October 2, 2010

behavioral problems, 2) Difficulty reading or understanding the test items, or 3) Motivation to over-report psychopathology. Dr. Ogandzhanova's prior level of adjustment and vocational achievement fail to support the presence of chronic behavioral problems. Neither the VRIN nor TRIN scores were elevated, which indicates consistent responding, and a finding that argues against the presence of confusion or insufficient reading skills."

K.   "In summary, there is behavioral but no formal evidence of poor level of effort relative to the testing of cognitive symptoms, however, there is convincing evidence that Dr. Ogandzhanova was exaggerating her psychological symptoms while taking the MMPI-2. Overall, these findings suggest caution in interpreting the neuropsychological data, while Dr. Ogandzhanova's presentation of her emotional and psychological status is unreliable."

L.   "Considering her level of educational and occupational achievement, the number of impaired scores generated for this limited battery is exceptionally high, even when factoring in the possible effects of severe depression. Dr. Ogandzhanova produced five scores in the mildly impaired range (between the 16th and 11th percentile), six scores in the moderately impaired range (between the 10th and 4th percentile), and seven scores in the severely impaired range (below the 3rd percentile). Likewise, Dr. Ogandzhanova describes considerable difficulty in completing day-to-day tasks via the PCRS. However, it is notable that except for three items, which her significant other did not answer, every rating for the rest of the items was the same, with only one exception. Relative to her ability to get help when confused, Dr. Ogandzhanova provided the rating of 'can do with some difficulty,' while Mr. Bates rated this as 'fairly easy to do.' When asked, Dr. Ogandzhanova stated that she filled out the relative's form at Mr. Bates' direction, because his eyes were still blurry after an eye exam, and he could not read the form."

M.   "As mentioned previously, there is reason to question the severity of psychiatric symptoms from which Dr. Ogandzhanova claims to be suffering. However, there appears to be no dispute that Dr. Ogandzhanova did lose a young child to cancer, and there is no reason to believe that she could not suffer some emotional reaction to this loss. It also seems reasonable to expect some type of impairment in her ability to work in her chosen profession as a radiation oncologist, given the fact that her son died of cancer."

N.   Diagnoses were Post-Traumatic Stress Disorder, chronic with delayed onset, Major Depressive Disorder, single episode.

O.   "Based upon her report, Dr. Ogandzhanova meets the diagnostic criteria for Major Depressive Disorder and Post-Traumatic Stress Disorder, conditions which are consistent with the death of her son and her work as a radiation oncologist. The findings of the current

MLOCL002013

 

Inna Ogandzhanova, MD                                          Page 15
October 2, 2010

evaluation, however, call into question the severity of the
symptoms she claims to be experiencing that are associated with
these two disorders, and the extent to which they impact her ability
to function.   For example, it is difficult to reconcile Dr.
Ogandzhanova's report of worsening severity of symptoms while at
the same time not seeking out different treatment options.
Although Dr. Rozansky's notes are consistent with her reports of
monthly visits, they do not appear to document the phone calls that
she states she makes approximately every 10 days."

P.   "Her assertion that the fifth largest city in the United States does
not possess psychotherapists of sufficient skill to help her is simply
not plausible.   It is difficult to understand how her antagonistic
relationship with MetLife is preventing her from seeking out such
additional treatment, especially when she describes such as
severe depression and limited ability to function."

Q.   "With regard to the Post-Traumatic Stress Disorder, while it may be
very difficult for her to work with cancer patients, it does not appear
that she has seriously explored the option of changing her medical
specialty.   Given the fact she graduated from the Leningrad
Medical School of Pediatrics and was licensed to practice in
pediatrics in Russia, there is a question of whether she could work
as a pediatrician with minimal effort in recertification.  In addition,
there are again discrepancies between what Dr. Ogandzhanova
presented during the clinical interview and available
documentation. More to the point, despite her denial of having any
other vocational interests, the 7/12/07 field claim report by Joe M.
Auvais documents that Dr. Ogandzhanova has secured 10
different names of businesses for hair removal and skin treatments
with the Arizona Secretary of State.   Clearly she has a prior
interest in utilizing her medical degree to provide services that are
not related to cancer or radiation oncology.  Such spa conditions
would not engender cues that symbolize her son's illness or cancer
treatment, and Dr. Ogandzhanova has already explored this as a
possible vocational option, she should be able to work in this
capacity without exacerbating her Post-Traumatic Stress Disorder."

R.   "In summary, Dr. Ogandzhanova is not sufficiently engaged in
efforts to treat her depression.  She should be involved in weekly
sessions of grief counseling with a local psychotherapist.  She can
continue her medication management with Dr. Rozansky while
working with a psychologist or clinical social worker in
psychotherapy.  Secondly, Dr. Ogandzhanova should be capable
of returning to work in some capacity to utilize her medical degree.
Her obvious prior interest in skin treatment and hair removal is the
most obvious choice for her to direct her efforts."

9. A letter from Gerald Rozansky, MD, PhD, dated February 1, 2009, which
noted, "In response to your request for my patient's office notes, it is my
opinion that I would be jeopardizing my relationship with the patient.



MLOCL002014



Inna Ogandzhanova, MD                                                        Page 16
October 2, 2010

Moreover, releasing the records intrudes in the doctor/patient relationship and interferes with treatment."

10. A letter from Dr. Rozansky dated October 24, 2009, to Eric Michael Kaplan, MD. Notable are the following:

   A. "I have been meeting with her monthly. She is taking Lexapro, 30 mg daily."

   B. "Although I diagnose her with Post-Traumatic Stress Disorder, her condition is might (sic) be better described as a Prolonged Grief Disorder."

   C. "You ask me if Dr. Ogandzhanova has motivation to return to work as a radiation oncologist. There is none. The idea of interfacing with oncological patients absolutely terrifies her. She is not capable to do (sic) what is required of a radiation oncologist. She does not feel that she can do justice to patients with cancer."

   D. "She cannot see any other pictures of Isaac, read about Isaac, or see his drawings. It terrifies her to go to Isaac's old room. She has not been to the part of Tucson where Isaac spent years in the hospital. She avoids it."

   E. "As to your question of any indication of symptom magnification or malingering or secondary gains in terms of her subjective symptoms; giving up her work she gives up that person she has been and devoted her life to be as successful as she has. Financially, she earned a great deal more (and could again) than what her insurance is paying her."

   F. "Dr. Ogandzhanova's overall condition has not improved. Her symptoms persist. She continues experiencing most of her symptoms on a daily basis. She has episodes of hyperventilation several times a week. She experiences difficulty concentrating on tasks as routine as balancing her checkbook. She complains of decrease in memory. She cannot rely on anyone."

   G. "She continues being constantly depressed. She has no social life. She feels despair."

11. Psychiatric notes typed by Dr. Rozansky. Notably are the following:

   A. January 4, 2006: "Seven hours of sleep."

   B. January 15, 2007: "Phone call contacted…Lexapro okay. 10 mg, contacted therapist – will see this week."

   C. February 1, 2007: "I cannot deal with oncology – so many sad people – don't want to socialize."

   D. April 13, 2007: "Uneventful delivery. Hired locum tenens and some relief, reminded of Isaac, but away from cancer center. Better – less panic. Still on Lexapro 20 mg. Still depressed but few panic attacks, anhydonia (sic)."

   E. May 16, 2007: "Was supposed to go back to work on Monday but couldn't go back. Makes her feel like facing everything again. Walking around looking at stores. Cannot face career. Cannot face real issues, anxiety, and like before, panic attack – Lexapro to 30 mg."

MLOCL002015

 
F. May 29, 2007: "Cannot take pressure – functioned for five years –
and three months after son died – not doing well – but didn't deal
with anything – worked the five years, and the day he died... Panic
attacks started in October 2006, depression September."

G. September 1, 2007: "Girlfriend died – autoimmune disease –
became claustrophobic – came back didn't leave home –
depressed. She was my best friend – me, when patient 23.
Everyday together since friend was 17."

H. October 2, 2007: "Feel a lot of anger and put on Don – triggers a
lot of things – he is bipolar – underneath a good person. Projects
onto others nine years ago. Run out into snow in bare feet. Five
years ago he went to Mexico and decided to walk home – and
Isaac sick, Don decided that (paranoid) she was trying to put him
in jail or hospital, and that she had caused him all his illness – he
persuaded psychologist of it, he said no illness and that Inna
caused him all of problems."

12. Records from the Sun Life Clinic, March 31, 2006: "States her eight-year-
old son died two weeks ago of leukemia. He had been Dx for years ago
and received multiple and extensive chemo/ETC."

13. The initial claim for disability benefits, undated but stamped September 7,
2007. This included a typewritten statement. Notable are the following:

A. "My son Isaac Bates passed away in March of 2006. For the first
half year after his passing I did fine, I coped well, and kept working.
I took no time off nor did I seek or have any grief counseling.
Sometime about October 2006, I started experiencing depression
and anxiety."

B. "I started having panic attacks while working in the Cancer Center.
I felt I needed to run from the Cancer Center. I began having a
hard time concentrating. Had anxiety overseeing patients, which I
never experienced before. All my symptoms got worse over time.
I started having a hard time doing my daily tasks. I developed
anger, depression, anxiety, and panic attacks that led me away
from the Cancer Center. Became increasingly harder and harder
to do my job to the point I could not perform my job effectively.
About then I started seeking professional help so I could do my
job."

C. "Dr. Rozansky told me I needed to get out completely, and I did. I
left the Cancer Center in mid-March 2007. My anxiety and panic
attacks went away, but I am still depressed and angry. I can't work
feeling the way I do when I am responsible for so many lives. I
remain under Dr. Rozansky's care at this time."

D. "I am presently unable to work as a radiation oncologist. My
depression has taken away my ability to focus properly and have
the necessary emotional support for my patients. I am no good to
patients if I do not have the ability to focus, and if I cannot be
supportive. In fact, I could place them at risk for further harm in my
present condition. Also, whenever I return to the Cancer Center,

 

Inna Ogandzhanova, MD                                                    Page 18
October 2, 2010

       had intense anxiety, so I would be unable to return to that
       environment."

14. Report from Gerald Rozansky, MD, PhD, dated September 12, 2007.
    Notable are the following:

    A. "I have continued to work with Dr. Ogandzhanova. At first she was
       unable to bond with her newborn daughter, Esther, but that has
       improved considerably. She is now taking Lexapro 30 mg daily,
       and this has provided some antidepressant relief."

    B. "It is my opinion that Inna Ogandzhanova cannot function at work
       as a radiation oncologist. The effort required with the type of
       patients she has worked with is impossible because it so parallels
       and intersects with the years of torment she suffers with the son's
       illness which ended in his tragic death."

15. Handwritten notes by Dr. Rozansky, generally illegible.

**SURVEILLANCE VIDEOS:** I reviewed the following surveillance videos.

1. Disc One - Video surveillance from December 2007.

    A. December 10, 2007. Notable are the following:

      i. 12:54 p.m.: Dr. Ogandzhanova stands with her back to the
        camera, interacting with her baby, spinning around playfully,
        smiling to the baby, who appears to smile back.

      ii. 1:41 p.m.: She is seen with a grocery cart, loading groceries
        into the front and back seat of a Ford Expedition. She
        moves slowly but purposefully, leaving the grocery cart in an
        adjacent parking space, getting into the vehicle and driving
        off.

      iii. 1:58 p.m.: She is seen at her home, unloading groceries
        from the store, walking in through the garage.

    B. Video surveillance from December 17, 2007. Notable are the
    following:

      i. 9:12 a.m.: She is seen walking out of her garage, attempting
        to get into a yellow Hummer, spending some time in the
        garage.

      ii. 1 p.m.: She is seen as a passenger in a Ford Expedition.

      iii. 1:08 p.m. She is seen in what appears to be an office
        supply store, getting a supply of toner, interacting with the
        sales clerk. She continues to interact with the sales clerk in
        another aisle, surveying the inventory. She reviews a
        newspaper (likely looking at some ads) and pushes her cart
        throughout the store.

      iv. 1:22 p.m.: She is seen pushing her cart across the parking
        lot, accessing he passenger side of a Ford Expedition,
        loading her purchases into the front seat, easily stepping into
        the high vehicle while carrying some newspaper and some
        water, closing the door, and driving off.

      v. 1:26 p.m.: She is seen driving through traffic.



MLOCL002017

Inna Ogandzhanova, MD                                                      Page 19
October 2, 2010

        vi. 1:47 p.m.: She is seen getting into a green Volvo as a passenger and being driven about.

       vii. 2:30 p.m.: She is seen being driven southbound on Interstate 10 toward Tucson, exiting at Prince Road, and proceeding as a passenger in traffic in Tucson.

     viii. She enters the Arizona Reproductive Endocrinology Clinic in Tucson, Arizona.

C. Video surveillance from December 18, 2007. Notable are the following:

         i. She is a passenger in the green Volvo moving quickly.

        ii. She is a passenger in a Volvo going into a business in Tucson.

       iii. 1:46 p.m.: She is seen being a passenger in the Volvo, getting into the office of a Dr. Tanase.

       iv. She is seen at a Chase Bank branch, interacting with one of the bank employees. She smiles and points and interacts appropriately.

        v. 2:55 p.m.: She is seen walking out of a business, getting into a Volvo.

       vi. 3:43 p.m.: She is seen at a home with her male companion, in the passenger seat of the car with the door open, manipulating something as she sits on the passenger seat. She hands something to her male companion and gets out of the vehicle.

      vii. 3:47 p.m.: She leans over the passenger side of the Volvo, checking something.

D. Video surveillance from December 20, 2007. Notable are the following:

         i. 9:01 a.m.: She is seen walking after getting out of the green Volvo, after her male companion drives away.

        ii. 10:04 a.m.: She is seen walking out of a business with her sweater slung over her arm, getting into the vehicle.

2. Disc Two - Video surveillance from January 2008.

A. January 8, 2008. Notable are the following:

         i. 10:29 a.m.: She is seen standing outside of her home, interacting with someone, moving quickly and purposely, gesticulating. Affect appears to be appropriate and upbeat. She gestures and gets into the Volvo.

        ii. 10:54 p.m.: An elderly woman gets out of the backseat of the Volvo.

       iii. She is seen walking around the back of her Volvo assessing something, getting back into the vehicle and driving off.

       iv. 1:37 p.m.: She is seen interacting with a man at her home, talking at length in the driveway, gesturing and interacting appropriately.

        v. She goes out to her Volvo into the passenger seat and spends some time assessing something in the car.

MLOCL002018

 

Inna Ogandzhanova, MD                                    Page 20
October 2, 2010

    vi.  She interacts with a man who appears to be involved in installing some auto glass. She picks up the large trashcan, which has fallen over. She pulls it without difficulty into the back yard.

B. Video surveillance from January 9, 2008. Notable are the following:

    i.  She is seen getting into her Volvo. A male companion assists her. She gets into the vehicle, and then apparently gets out of it, walking toward a Mercedes Benz. She gets into the Mercedes Benz, driven by a woman, and is driven off.

    ii.  She is followed to Casa Grande to a cemetery. She walks with her male companion and the woman around the cemetery. She gesticulates to the woman, and they are engaged in what appears to be a substantial conversation. She reviews some blueprints. She gets into the vehicle about 10:13 a.m., and they drive off.

C. Video surveillance from January 9, 2008. Notable are the following:

    i.  10:31 a.m.: She is seen near her Volvo and opening the garage door.

    ii.  3:09 p.m.: She is seen getting into the Ford Expedition.

    iii.  3:19 p.m.: The Expedition goes through traffic.

    iv.  4:09 p.m.: They go to Arizona Custom Brokers in Phoenix. She waits in the vehicle, talking on a cell phone.

    v.  4:15 p.m.: Someone brings a large wooden crate taken to the car and loaded in.

    vi.  5:01 p.m.: She is seen at a store that contains furniture.

    vii.  6:13 p.m.: She is seen driving through traffic.

    viii.  6:18 p.m.: She is seen interacting with a baby, smiling, and returning to her car.

    ix.  6:22 p.m.: She is seen holding a baby, interacting in a maternal fashion toward it, smiling appropriately, while her male companion kisses the child. The child smiles as well. She rocks the baby back and forth at 6:23 p.m., making continuous eye contact with it.

    x.  6:26 p.m.: She continues to hold the baby, transfers it to the man. She looks calm, appropriate, and interactive. There are two other small children in the area.

    xi.  6:30 p.m.: She holds the child some more, interacting appropriately with it.

D. Video surveillance from January 10, 2008. Notable are the following:

    i.  10:04 a.m.: She is seen in a vehicle driving northbound on I-10 toward Phoenix. They drive to the airport.

3. Disc 3 - Video surveillance from April and May 2009.

    A. Surveillance video from April 21, 2009. Notable are the following:

MLOCL002019

Inna Ogandzhanova, MD                         Page 21
October 2, 2010

       i. 7:15 a.m.: There is a shot of the Expedition driving.
      ii. 7:48 a.m. Expedition is at a gas station. Dr. Ogandzhanova gets out of the back seat at the gas station. She is eating something as she walks.
     iii. 7:53 a.m.: She gets into the vehicle at a Love's Truck Stop. She gets into the driver's seat and then gets out and gets into the rear passenger seat, assisted by her male companion. She gets back into the driver's seat, and drives off, interacting with her male companion in the back seat.
     iv. 9:58 a.m.: She is at a McDonald's.
     v. 10:09 a.m.: She is in the vehicle, eating.
     vi. 12:25 p.m.: She is driving to Holbrook.

B. Video surveillance from April 28, 2009. Notable are the following:
       i. 6:04 a.m.: No apparent activity.
      ii. 9:13 a.m.: She is seen as a passenger at a gas station while her male companion interacts with her. She interacts appropriately with him.
     iii. 10:19 a.m.: She is seen walking with her male companion into a business.
     iv. 11:36 a.m.: She is seen walking out of a business to her male companion who is waiting in the Volvo. She gets into the vehicle, and they drive off.

4. Disc 3 – Video surveillance from December 2009. This video could not be opened, despite my attempting to view it on three computers.

5. Videodisc dated July 2007, which I was unable to view.

**DIAGNOSIS:**

| | |
|---|---|
| AXIS I: | Bereavement. |
| | Major Depression, Single Episode, Chronic. |
| | Post-Traumatic Stress Disorder. |
| AXIS II: | Narcissistic Personality Features. |
| AXIS III: | Obesity. |
| AXIS IV: | Disability Claim, Issues with Partner, Death of Son to Cancer. |
| AXIS V: | GAF is 65 (Depressed Mood and Mild Insomnia, With Some Meaningful Interpersonal Relationships). |

**OPINION:** The following represent my professional opinion, to the degree of reasonable medical certainty.

1. **What is her current DSM-IV/V Axis diagnosis?**

    See above.

2. **What are the current subjective symptoms which Dr. Ogandzhanova complains about? Please describe the frequency and severity of these current symptoms, and how the frequency and severity of symptoms have changed over the course of her mental illness?**

MLOCL002020

Inna Ogandzhanova, MD
October 2, 2010

Page 22

Dr. Ogandzhanova was very evasive about her current subjective complaints. She complained of difficulties with concentration, depression, anxiety, motivation, anger, and irritability. She reported that she is no better with treatment. She reported episodes of anxiety on an infrequent basis and could not provide me with any reasonable history regarding the frequency of her symptoms. She reported that she has substantial difficulty being consistent, emphasizing this several times during the evaluation. When I asked if her symptoms had changed at all over time, she stated that no, they have not.

The video evidence indicates substantial consistency in her behavior, however. Over four episodes of video gathering, Dr. Ogandzhanova is noted to be quite active, driving vehicles, going to Tucson, going to Phoenix, going to the airport, going to Holbrook, holding babies, going to businesses, and generally being active.

**3. Do you find any signs of psychotic symptoms?**

Possibly. Dr. Ogandzhanova **may** have a low-grade psychosis. She had some magical thinking, believing that those who had wronged her in the past would have bad things happen to them, such as her ex-partner who accidently cut himself. She believes that her son is on the "other side," is still with her, and speaks about him in the present tense. She reported that one hiccup per day is from her son. She spoke of the television changing once without reason, and believed her son was somehow responsible. She believed that her son recommended that she have two additional children, and he predicted the genders of his siblings. She denied any auditory or visual hallucinations. She **may** have a low-grade psychosis

Of note, Dr. Ogandzhanova told me that she would return to complete the MMPI-2, as she was "too tired" after the interview. She did not return to complete that exam, despite telling me that she would do so, and has therefore been noncompliant with this independent medical examination. The MMPI-2 may pick up some closely held psychosis or the possibility of malingering.

**4. Do you find any signs of suicidal ideation or behavior?**

No, she denied any suicidal feelings.

**5. Do you find any signs of cognitive impairment?**

There is limited evidence of cognitive impairment. When I asked her to recall six objects, she initially only recalled two of them, but her effort appeared to be very poor. Upon repeat, she recalled five. Five minutes later she recalled four of them. I note that Dr. Lamb's neuropsychological

Inna Ogandzhanova, MD                                             Page 23
October 2, 2010

evaluation from several years ago indicated some motivational issues and large discrepancies between the expected cognitive performance and that predicted by her educational background. If she has any cognitive impairment, it is very mild.

The video surveillance information indicates that Dr. Ogandzhanova has no substantial difficulties functioning day to day, which is inconsistent with any substantial cognitive impairment. In the video, she drives her large vehicle about, goes shopping to various locations, visits a reproductive clinic in Tucson (where she states she cannot go because of the bad experiences she had there), and appropriately interacts with an infant. In light of the substantial discrepancies between her described deficits and the videotape, I would recommend a second neuropsychological evaluation.

6. **Are there indications of symptom magnification, malingering, or secondary gains in terms of her subjective symptoms?**

I have the following concerns about symptom magnification:
   A. Her report that she cannot go to Tucson, where there is videotaped evidence of her twice going to Tucson.
   B. Her report of a lack of loving feelings toward her children, despite clear video evidence that she is bonded to a baby under her care. On December 10, 2007, she is seen playfully interacting with a baby, spinning it around playfully, and smiling at it, while it smiles back. On January 9, 2008, she is again seen interacting in a maternal fashion toward a small child.
   C. Dr. Ogandzhanova was evasive about the nature of her relationship with the children's father. The videotape evidence over the past several years shows them to be actively involved, driving to various parts of Arizona, including Scottsdale, Holbrook, and Tucson, and interacting appropriately. She told me that he does not live there, which is inconsistent with the video surveillance evidence.
   D. Dr. Ogandzhanova has not sought out appropriate treatment for her condition. If she were truly motivated to improve, she would have sought out treatment from another mental health professional. She told me that she has not improved at all despite the regular treatment from her psychiatrist. I agree with Dr. Lamb's point in his 2008 neuropsychological evaluation that her assertion that there are no reasonably qualified mental health professionals in the Phoenix metropolitan area is not credible.
   E. Her lack of following up for the MMPI-2, as she reported she would. Dr. Ogandzhanova, as a physician, is likely very aware of the Validity Scales on the MMPI-2 and therefore may be dodging this examination in order to avoid additional questions about her credibility.

MLOCL002022

Inna Ogandzhanova, MD
October 2, 2010

Page 24

F.  Her report that psychiatric care is expensive lies in stark contrast to her financial situation, with monthly disability income of $16,000, and her report of spending $40,000 on gemstones, $200,000 on marble, and $500,000 on furniture over three years.  If she were truly interested in getting better, the relatively modest cost of psychiatric treatment ($125 to $300 per hour) would be a minimal expense for this well-to-do woman.  Clearly, her assertion of a financial impediment to seeking treatment is not reality based.

I cannot support a diagnosis of malingering to a degree of reasonable medical certainty.  However, Dr. Ogandzhanova receives substantial secondary gain in the form of disability payments and a much more relaxed lifestyle than when she was working. Since the death of her son, she has conceived (with apparent assistance from an infertility clinic in Tucson) and borne two children, whom she cares for at home. She has sold off her clinic, has no liability insurance, and no job to return to. Dr. Lamb's 2008 neuropsychological evaluation indicated, "As mentioned previously, there is reason to question the severity of psychiatric symptoms from which Dr. Ogandzhanova claims to be suffering." I agree.

**7.  Please document a thorough mental status examination, including testing of immediate and remote recall, attention span, calculating abilities, fund of information, ability to abstract, and judgment.**

See above.

**8.  What are her current medications?  Does she have any medication side effects?**

Dr. Ogandzhanova is receiving Lexapro 30 mg per day, the same medication she has received for several years.  She denied any side effect with this medication.

It is notable that Dr. Ogandzhanova's medication management is substantially less aggressive than appropriate for treating an individual with her diagnoses.  She has received a single antidepressant medication, Lexapro, and no other medications.  Appropriate psychiatric medication manipulations would be:

A.  Treatment with a dual reuptake inhibitor such as Effexor, Cymbalta, Remeron, or Pristiq.
B.  Augmentation of the antidepressant with BuSpar, lithium, a thyroid medication, or possibly Wellbutrin.
C.  Augmentation with an antipsychotic medication such as Abilify or Zyprexa.

MLOCL002023

 

Inna Ogandzhanova, MD                                                    Page 25
October 2, 2010

     D. Treatment of her possible low-grade psychotic symptoms with a low-dose antipsychotic such as Risperdal, Zyprexa, Seroquel, or Abilify.

     E. Add prazosin 1 to 10 mg at bedtime to suppress anxious dreams. Dr. Ogandzhanova said she had "flashbacks" at night. When I asked if she had nightmares she said no. Nonetheless, a trial of prazosin would be reasonable and appropriate.

**9. What type, if any, of psychotherapy is Dr. Ogandzhanova engaged in?**

She could not describe the psychotherapy that she receives from Dr. Rozansky. She reported talking with Dr. Rozansky, but could not be more specific. It is notable that Dr. Ogandzhanova should likely receive cognitive behavioral therapy for her Post-Traumatic Stress Disorder, Major Depression, and Bereavement. Her statement to me that she was unable to find anyone to see her in Arizona is not credible.

**10. Please discuss your impression of Dr. Ogandzhanova's motivation to return to work as a radiation oncologist.**

She is not interested in returning to work as a radiation oncologist. She sold her practice to another organization and put her malpractice coverage "on hold" very shortly after going on disability. She also receives substantial disability payments and has transitioned into a homemaker lifestyle. She has limited incentive to return to a job where she worked 15 hours per day. It is notable that Dr. Lamb's 2008 report indicated that she had applied for licenses for several businesses in skin management. She reported being very concerned about being near oncology patients, as it is too painful for her. In light of questions about her credibility in other realms (e.g., going to Tucson, Dr. Lamb's psychological testing, being unable to connect with her children), I am unconvinced that this is accurate.

**11. Please incorporate objective tests with validity scales, such as the MMPI-2.**

She did not return to complete the MMPI-2 examination as she indicated that she would on the day of the interview. This behavior, combined with the surveillance video, calls into question her credibility.

**12. Do you find evidence of psychiatric symptoms which impair Dr. Ogandzhanova from working as a radiation oncologist?**

Dr. Ogandzhanova MAY have difficulties returning to work as a radiation oncologist, due to her subjective report that she cannot be near cancer patients. I have no objective data to support this contention, and again, note potential issues with her credibility as a historian. She has not

MLOCL002024

Inna Ogandzhanova, MD                      Page 26
October 2, 2010

appropriately grieved the loss of her son, referring to him in the present tense, believing that he is with her always. She does not believe that she will improve unless her son comes back to life.

Outside of her aversion to dealing with oncology patients, there is no psychiatric reason that Dr. Ogandzhanova would be unable to return to work as a radiation oncologist. Her depression is not substantially severe, and she reported reasonable functioning within the confines of her household. The video surveillance indicates that she is quite capable of leading an independent life. Dr. Lamb's neuropsychological evaluation from 2008 indicated concerns about the validity of her symptoms. She has no psychiatric symptom, outside of her subjective report of an inability to treat cancer patients, that would interfere with her ability to work as a radiation oncologist.

Please contact me for any questions.

Sincerely,

Joel E. Parker, M.D.
JEP/dka

MLOCL002025

**JOEL EDWARD PARKER, M.D., F.A.P.A.  April 10, 2013**

1

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


Metropolitan Life Insurance      )
Company, a New York corporation,)
                                 )
                                 )
          Plaintiff,             )
                                 )
     vs.                         )  No. 2:12-CV-00372-GMS
                                 )
Inna Ogandzhanova, M.D.,         )
                                 )
          Defendant.             )
                                 )
_____)
                                 )
Inna Ogandzhanova, M.D.,         )
                                 )
          Counter-Plaintiff,     )
                                 )
     vs.                         )
                                 )
Metropolitan Life Insurance      )
Company, a New York corporation,)
                                 )
          Counter-Defendant.     )
                                 )
_____)


     VIDEOTAPED DEPOSITION OF JOEL EDWARD PARKER, M.D.,
                         F.A.P.A.

                    Phoenix, Arizona
                    April 10, 2013
                    12:45 p.m.


                    Reported by:
                    SHANNON STEVENSON, RPR, CCR
                    Certificate No. 50461
                    BARTELT & KENYON
Prepared for:       111 West Monroe Street, Suite 425
Mr. Bienstock       Phoenix, Arizona 85003
(Certified Copy)    (602) 254-4111

**BARTELT & KENYON    (602) 254-4111**

**JOEL EDWARD PARKER, M.D., F.A.P.A.  April 10, 2013**

1    down your own diagnoses; correct?

2        A    Yes.

3        Q    And you put down bereavement, major depression,

4    single episode chronic, post-traumatic stress disorder;

5    correct?

6        A    Correct.

7        Q    So all three doctors who had examined Dr. O at

8    the point you examined her in 2010, you all three agreed

9    on these diagnoses?

10        MR. BIENSTOCK:  Objection as to form.  Lack of

11    foundation.

12        THE WITNESS:  Dr. Lamb and I agreed on major

13    depression and post-traumatic stress disorder.

14    Dr. Rozansky indicated post-traumatic stress disorder and

15    depression, as I recall, and I gave the diagnosis of

16    bereavement.  We're in the same universe, but not exactly

17    all the same.

18        Q    BY MS. ROSENTHAL:  All right.  MetLife -- oh,

19    I'm sorry, yeah.  Your diagnoses of Dr. O were put down

20    on Page 21 of Exhibit 1; correct?

21        A    Yes, my first report dated October 2nd, 2010.

22        Q    Right.  And you were also asked to give your

23    opinion as to how severe or not severe you think her

24    symptoms are; correct?

25        A    Yes.

**JOEL EDWARD PARKER, M.D., F.A.P.A.  April 10, 2013**

228

```
1    STATE OF ARIZONA         )
                              ) ss
2    COUNTY OF MARICOPA       )

3

4        BE IT KNOWN that the foregoing deposition was taken

5    before me, SHANNON STEVENSON, a Certified Reporter in and

6    for the County of Maricopa, State of Arizona; that the

7    witness before testifying was duly sworn to testify to the

8    whole truth; that the questions propounded to the witness

9    and the answers of the witness thereto were taken down by

10   me in shorthand and thereafter reduced to computer-aided

11   transcription under my direction; that the foregoing

12   227 pages are a true and correct transcript of all

13   proceedings had upon the taking of said deposition, all

14   done to the best of my skill and ability.

15       I FURTHER CERTIFY that I am in no way related to any

16   of the parties hereto, nor am I in any way interested in

17   the outcome hereof.

18   (XXX)  Signature was requested.

19   (   )  Signature was not requested.

20       DATED at Phoenix, Arizona, this 17th day of April,

21   2013.

22

23                          _____

24                          SHANNON STEVENSON, CR, RPR
                            Certified Reporter
25                          Certificate No. 50461
```

**BARTELT & KENYON    (602) 254-4111**

# EXHIBIT 2



**David G. Lamb, Ph.D.**
*Diplomate in Clinical Neuropsychology*
*American Board of Professional Psychology*
*2633 E. Indian School Rd. - Suite 310*
*Phoenix, AZ 85016*

## INDEPENDENT NEUROPSYCHOLOGICAL EVALUATION

| | |
|---|---|
| Name: | OGANDZHANOVA, Inna |
| Date of Birth: | 01/07/63 |
| Age (years-months): | 48-1 |
| Gender: | Female |
| Education Level: | 20 years |
| Diagnosis: | Reported depression, PTSD, panic attacks |
| Handedness: | Right |
| Pre-injury Occupation: | Radiation Oncologist |
| Policy Numbers: | 6 364 168 AH, & 6 482 821 AH |
| | |
| Date(s) Examined: | 03/02 & 08/11 |
| Referral Source: | Jamie Frederick, Disability Specialist |
| Date of Report: | 03/14/11 |

### BACKGROUND INFORMATION:

<u>Purpose of Referral:</u>
Jamie Frederick, Disability Specialist for Metropolitan Life Insurance Co. (MetLife), initially called on 01/13/11 to inquire regarding availability to perform a second Independent Neuropsychological Evaluation (INE) of Inna Ogandzhanova, the first having been conducted three years prior (see report dated 03/03/08). In a follow-up letter dated February 16, 2011, Eric Michael Kaplan, M.D., Psychiatric Consultant for MetLife, requested the current INE to address the following questions:

1. What is Dr. Ogandzhanova's current, DSM-4, 5 axis diagnosis?

2. What are the current subjective symptoms which Dr. Ogandzhanova complains about? Please describe the frequency and severity of these current symptoms.

3. What are Dr. Ogandzhanova's current medications? Does she have any medication side effects?

4. What type (if any) of psychotherapy is Dr. Ogandzhanova engaged in?

5. Please provide objective data regarding Dr. Ogandzhanova's subjective symptoms. Please utilize psychological/neuropsychological testing to evaluate her psychological and/or cognitive subjective complaints. Please utilize psychological tests which incorporate validity scales for both psychological (at least two tests) and cognitive complaints (at least two tests).

6. Please objectively evaluate the issues of symptom exaggeration and/or malingering.

To facilitate the formulation of an opinion in this matter, Mr. Frederick sent medical records and other documentation to be reviewed. In addition to the formal assessment, the sources of information used in generating the current report are listed below.

MLOCL001840

Sources of Information:

1. Approximately 2¼ hours of **clinical interview** of Dr. Ogandzhanova on 03/02/11.
2. Approximately 1½ hours of **formal neuropsychological testing** on 03/02/11.
3. Approximately 1¾ hours of **formal neuropsychological testing** on 03/08/11.
4. Records from **Gerald I. Rozansky, M.D., Ph.D.**:
    a. 06/19/08 Hand written treatment records from 05/23/08 through 01/03/09.
    b. 02/01/09 Letter to Whom it May Concern declining to release treatment notes.
    c. 10/24/09 Letter to Eric Michael Kaplan, M.D. summarizing treatment efforts.
    d. 02/19/10 Letter to Lisa Kaarela summarizing treatment efforts.
    e. 08/29/10 Letter to James Frederick summarizing treatment efforts.
        i. Attached: Zisook, S, Simon, NM, Reynolds III, CF, Pies, R, Lebowitz, B, Young, IT, Madowitz, J, & Shear, MK. (2001). Bereavement, complicated grief, and *DSM*, Part 2: Complicated grief. *Journal of Clinical Psychiatry*, 71(8), 1097-8.
    f. 11/10/10 Letter to James Frederick summarizing treatment efforts.
        i. Attached: page 8 of Butcher, JN, Graham, JR, Ben-Porath, YS, Tellegen, A, Dahlstrom, WG, & Kaemmer, B. (2001). MMPI-2: Manual for administration, scoring, and interpretation. Minneapolis: University of Minnesota Press.
        ii. Attached: pages 14 & 15 of Graham, JR. (1990). MMPI-2: Assessing personality and psychopathology.
5. Records from **Joel E. Parker, M.D.**:
    a. 10/02/10 Psychiatric Independent Medical Examination (IME).
    b. 10/05/10 Addendum to IME.
6. Article from **James Frederick**:
    a. News article from Life Sciences World (http://www.lifesciencesworld.com/news/view/25830) posted on 03/13/07 entitled *Radiation Therapy Services Acquires Arizona Facility*.
7. Records from **Francine E. Michel, Ph.D.**:
    a. 03/24/08 Occupational Review regarding Radiation Oncology.
8. Records from **Metropolitan Life Insurance Company**:
    a. Progress Report: Claimant's Statement, completed by hand, dated 12/22/08; 02/17, 05/20, 06/28, 11/05, & 12/10/09; 3/20, 04/01, 04/13, 09/01/10; and four undated forms – (lists last visit to Dr. Rozansky as 09/11/10 and next visit as 10/23/10), (last visit to Dr. Rozansky - 10/23/10; next visit - 11/10/10), (last visit to Dr. Rozansky - 11/10/10; next visit - 12/21/10), & [last visit to Dr. Rozansky - 12/21/10; next visit - 01/25/10 (sic)].
9. Records from **Archangel Investigations & Protection**:
    a. 05/24/09 Surveillance Investigation Report by Fred Myers for 04/21, 22, 28 & 05/09/09.
        i. Attached: DVD dated 06/02/09.
    b. Undated (missing page 1) Surveillance Investigation Report by Frederick Myers for 12/07, 08, 09 & 10/09.
        i. Attached: DVD dated 12/17/09.
    c. 03/08/10 Surveillance Investigation Report by Frederick Myers for 02/22, 23 & 03/04/09.
10. Records from **Factual Photo**:
    a. 09/14/10 Surveillance Report (no author listed) for 08/31 & 09/01, 08, 09, & 10/10.
        i. Attached: DVD (with above dates listed).
    b. 11/11/10 Surveillance Report (no author listed) for 10/21, 22, 23, 25, 27 & 11/06/10.
        i. Attached: DVD (with above dates listed).
    c. 11/19/10 Surveillance Report (no author listed) for 11/12, 15/10.
        i. Attached: DVD (with above dates listed).
    d. 01/13/11 Surveillance Report (no author listed) for 12/20, 21/10 & 01/04, 05/11.
        i. Attached: DVD (with above dates listed).
    e. 03/11/11 Surveillance Report (no author listed) for 02/27, 28/11 & 03/01, 03/11.
        i. Attached: DVD (with above dates listed).

MLOCL001841

Prior INE:
As referenced above, Dr. Ogandzhanova underwent an initial INE three years ago on February 13th and 19th of 2008, with the report generated from that evaluation dated 03/03/08. In an attempt to reestablish and maintain an adequate working alliance for the current examination, and to complete the evaluation within a reasonable timeframe, relatively little time was spent during the clinical interview asking about the events surrounding the illness and death of her first son, Isaac. Dr. Ogandzhanova expressed an appreciation of this approach, stating that it was emotionally very difficult to go through all of that information again during the Independent Psychiatric Evaluation (IPE) by Joel Parker, M.D. Also, given her failure to complete the revised Minnesota Multiphasic Personality Inventory (MMPI–2) as part of the IPE with Dr. Parker, the Personality Assessment Inventory (PAI) was given instead. If at some point in the future Dr. Ogandzhanova should complete the MMPI-2 and the results are made available, an addendum can be written to the current report incorporating those findings. Other than a change in some of the symptom validity testing, the measures utilized in the prior evaluation were again administered for the current examination. When appropriate, references will be made to findings from the 2008 INE, but in general the information will focus upon any changes observed within the past three years. Otherwise the reader is referred back to the full initial report for specific historical details.

Presenting Complaint:
Dr. Ogandzhanova is a 48-year-old divorced Russian female who identified herself as suffering from ongoing depression, posttraumatic stress disorder, and panic attacks beginning approximately 6 months after her seven-year-old son Isaac died on March 15, 2006. She denies any significant prior medical history and other than being hospitalized for her three pregnancies, has not undergone any significant surgical or medical procedure.

Pre-Evaluation Information:
Prior to the examination on 03/02/11, Dr. Ogandzhanova signed the Informed Consent Contract, which identified the referral source, explained the lack of confidentiality due to the forensic nature of the evaluation, and stated that she might not have access to the report describing the results of the assessment. Prior to formal testing on both 03/02 and 03/08/11, the importance of putting forth her best effort was emphasized to Dr. Ogandzhanova. She was also informed on both of those dates that her level of effort would be assessed during the evaluation.

**CLINICAL INTERVIEW:**
The following information was derived from data provided via direct interview of Dr. Ogandzhanova.

Medical Information:
Dr. Ogandzhanova stated that other than the delivery of her third child, she has had no medical issues since the last evaluation. There were no complications associated with her third pregnancy.

Presenting Symptoms:
Dr. Ogandzhanova estimated her current level of difficulty in a variety of areas by providing ratings on a scale from 0 (not a problem) to 10 (a very significant problem). Ratings were provided for the following listed symptoms (with Dr. Ogandzhanova's comments made during the clinical interview in *italics*): paralysis or weakness in any part of the body (0), walking (0), lack of coordination (1), tremors (2 - *she described having "tics" in her right eye, "when I'm worried", approximately once a month for about 30 min.*), blackouts or loss of consciousness (0), seizures (0), dizziness (2 - *she*

MLOCL001842

*estimated these episodes lasted between 15 and 30 min.; regarding frequency, she stated "I don't know, put once a month"), overall physical pain (0), eyesight (0), hearing (0), numbness or tingling in any part of the body (0), taste or smell (0), ability to speak or understand speech (0), ability to read or write (0), memory (5 - "I used to have very good memory, now not very good" and again described being able to remember the prices for 200 different items at Wal-Mart), ability to organize (5 – "I'm still capable to get things done, but it causes a lot of problems"), ability to concentrate (7), personality (10 - she described being less patient with people "who have bad souls"; "I hate those people"), irritability (10 - she made it clear she did not get violent, but could get very angry with people who "don't care"), anxiety (10 - she describes hyperventilating approximately twice each week, with variable severity and duration lasting from 10 min. to 2 hours), depression (8 - she feels she is depressed "half the time"), sleep (1 - she typically goes to bed at midnight and "recently, it is waking up at three in the morning and not able to go back to sleep"), fatigue (6 – "I'm tired most of the time"), activity level (3 - she is typically active only around her children, domestic chores are not a problem because "I prevent myself from negative emotions"), sexual functioning (2 - "I don't have much of a sex life", but rated this so low because "I don't care"), enjoyment of hobbies (0 -"I don't have any hobbies"), and changes in her appetite or weight (8 - "I eat for comfort").*

Functional Abilities:
Dr. Ogandzhanova and her significant other, Don Bates, both completed the PCRS, which is a self-report measure requesting ratings on her ability to effectively deal with a variety of practical situations, her current level of emotional functioning, and the impact any memory problems may have on her ability to manage day-to-day life.   Of note, as with the initial valuation, Dr. Ogandzhanova actually filled out the form on behalf of Mr. Bates (see Behavioral Observations below).  In general, Dr. Ogandzhanova rated herself as only being capable in dealing with activities of personal self-care, the same as during her initial valuation.  On average she rated items concerning flexible problem solving, memory, and interpersonal skills as "can do with some difficulty." Items related to independent living, organization/time management, emotional control, and group interactions fell between "can do with some difficulty" and "very difficult."  Dr. Ogandzhanova did not rate any of the items as "can do with ease", and only used the "fairly easy to do" rating for items related to personal self-care.  Mr. Bates rated all of the items in a similar manner, with none of the items having a greater than one point difference.

Family Information:
Dr. Ogandzhanova still has not communicated with either her brother or parents since her son Isaac's death.  She was married from 1991 until 1997, but has not had contact with her ex-husband for 15 years.  Mr. Bates is her current domestic partner and the biological father of all three of her children.  Her daughter, Esther, will be four years old in March and her son Emmanuel is currently two years old.

Social Development:
Dr. Ogandzhanova continues to describe having "no friends" as a result of her avoidance of social interactions.

Substance Use:
Dr. Ogandzhanova continues to deny any tobacco, alcohol, or illicit drug use prior to her son's death.  Currently, she will have one glass of wine "once in a blue moon", but denies any current tobacco or illicit drug use.

---

MLOCL001843

Interactions with the Legal System:
Dr. Ogandzhanova denies any prior arrests or involvement in civil litigation since the last evaluation.  She states that she has everything from MetLife go through her attorney as an intermediary, because "MetLife is just terrorizing me, sending depressing letters, constantly insult."

Vocational Record:
Dr. Ogandzhanova continues to deny working outside the home.

Financial Support:
Dr. Ogandzhanova indicated that currently her sole source of financial support was from her long-term disability payments.

Current Living Situation:
At present, Dr. Ogandzhanova states she is living alone with her two children.  Her significant other, Don Bates, has a separate residence, "but he helps" with the children and is frequently at her house.  Dr. Ogandzhanova provided a number of ratings (0 = totally independent, 10 = cannot do this at all) relative to common daily functions.  She rates herself as being totally independent relative to personal hygiene, dressing herself, washing and ironing clothes, preparing simple snacks, shopping for groceries and more expensive items, and reciting her address and phone number.  Slightly more challenging are preparing well rounded meals, driving a motor vehicle, and taking medications, all of which she rates as 2.  A moderately difficult rating was provided for remembering appointments (6).  Dr. Ogandzhanova complained of considerable difficulty in her ability to keep track of her daily schedule (7) and keep her house clean or function alone outside the home (8).   She basically reports being unable to manage her finances (10).   Dr. Ogandzhanova provided comments about some of these provided ratings, including: dressing herself (this is hard to initiate when she is depressed), ironing clothes (she rarely does this because it requires too much attention to detail), house cleaning ("it's a mess" because her children are messy and she frequently does not have energy to pick things up), preparing well rounded meals ("for children I do", but her children are picky eaters so she often finds it easier to "go to the Golden Corral"), shopping for groceries (although she has no physical or cognitive problem in doing this, her significant other usually does it because she does not like to be around "too many people"; she will shop for groceries at approximately once every two months), buying more expensive items (although she thinks this would be difficult, she feels she could comparison shop successfully), managing finances (she has a problem tracking payments and remembering to make them on time, as well as not balancing a checkbook because "I cannot deal with it"), keeping track of her daily schedule (she has difficulty remembering tracking tasks because of "concentration, motivation, and tiredness"), reciting her address and phone number ("I would remember 500 telephone numbers by heart, no longer"), remembering appointments ("it was a good thing G [office administrative assistant] called me and reminded me of my appointment today"), functioning alone outside the home (she estimates that she will go outside the home alone approximately once every three months "I don't like to go by myself"), driving a motor vehicle ("I can drive" but does not like to drive long distances because it is hard to concentrate), and taking medications (she estimates she successfully takes her Lexapro approximately 80% percent of the time, but has decreased motivation because "I don't think anything can help me").

Psychological History:
Over the past three years, Dr. Ogandzhanova continues to describe having significant difficulties with depression.  She still denies any active thoughts of suicide, stating "I have to take care of my children."  However, she added "I love my children, but it does not help me" from still being

MLOCL001844

depressed about Isaac's death.  She stated several times that the only thing that would eliminate her depression would be to "bring my son back and erase everything that happened."

Psychiatric Symptoms:
Little has changed in Dr. Ogandzhanova's description of the symptoms associated with the posttraumatic stress disorder related to her son's death.  She still reports seeking to avoid thoughts or discussions related to her son, avoids activities and places that produce recollections of him, has a markedly diminished interest in participating in work or social activities, and feels detached and estranged from others.  Dr. Ogandzhanova still complains of difficulty staying asleep, irritability and outbursts of anger, and difficulty with concentration.  As before, these symptoms are of a greater duration than three months and have impaired her social and occupational functioning.

Relative to possible panic attacks, Dr. Ogandzhanova described episodes of hyperventilation approximately every two weeks.  She stated these episodes could last anywhere from 10 minutes to two hours.  As with the initial valuation, Dr. Ogandzhanova's description of symptoms is not sufficient to warrant a diagnosis of panic disorder.

Nothing has changed relative to Dr. Ogandzhanova's description of the symptoms associated with her depression.  She still describes experiencing depressed mood for most of the day nearly every day, having a marked diminished interest or experience of pleasure with most activities, significant weight gain, insomnia, lack of energy, and reduced ability to concentrate.  She continues to describe these symptoms as causing her significant difficulty in functioning both socially and occupationally.

Treatment Efforts:
As described in the initial report, Dr. Ogandzhanova stated that in mid-November of 2006, she tried but was able to obtain psychiatric help for her symptoms of anxiety.  She then used the Internet to research possible psychiatrists in California, calling several offices to inquire about possible services.  She described choosing Dr. Rozansky in Los Angeles because he answered his own phone and could see her relatively quickly.  She did confirm that he does not speak Russian, so that was not a factor in her choice.  Although she agreed in 2008 that it might be a good idea to see a local psychotherapist, currently Dr. Ogandzhanova stated "I could not get myself to see other people."

Dr. Ogandzhanova reported that she continues to go to Los Angeles approximately once every month to meet directly with Dr. Rozansky.  Approximately half the time she flies over and back in a single day taking a taxi to transport between the airport and his office.  For the other half of her appointments, Dr. Ogandzhanova states that her significant other, Mr. Bates, will drive her and the children over and they spend the night.  She does not drive because of the "stress of high traffic there in LA."  She states that the typical appointment lasts from 60 to 90 minutes, and involves both a medication check and psychotherapy.  Dr. Ogandzhanova had difficulty expressing why she continues to see Dr. Rozansky even though her depression has not significantly improved.  She did say she felt he was supportive of her and that "I feel relief" after the sessions.  "It helps me to deal with this life, to continue surviving."  At the beginning of the second session of testing on 03/08, Dr. Ogandzhanova stated "I am horribly depressed today."  When asked to explain, she stated that she had seen Dr. Rozansky the day prior, but then modified her statement to the effect that she was not as depressed as during the first day of the evaluation, because she was so "furious."  She declined to elaborate further, stating that she wanted to proceed with finishing the evaluation.

MLOCL001845

Case 2:12-cv-00372-GMS   Document 281-1   Filed 01/17/14   Page 41 of 222

Three years after the initial valuation, Dr. Ogandzhanova reports that she is still taking the same dose of Lexapro (30 mg).  She reported in 2008 that it "helps some," but "nothing can numb the fact that it happened."  Nothing in the documentation from Dr. Rozansky explains why there has been no change in her medication despite years of ongoing incapacitating psychiatric symptoms. He notes that she is "motivated and cooperative in her treatment", but also reports that her overall condition has not improved or that there has been some limited progress.  Of particular interest is an article Dr. Rozansky sent from the Journal of Clinical Psychiatry proposing the addition of the diagnosis of complicated grief to the Diagnostic and Statistical Manual.  In addition to laying out the criteria for complicated grief, the article cites evidence that complicated grief "...can be effectively treated using strategies and techniques that specifically target the syndrome of complicated grief."  It is unclear whether Dr. Rozansky has obtained training in Complicated Grief Therapy, and if not, whether he has sought out mental-health professionals with such training in the Phoenix area.

As stated three years ago, it is difficult to understand Dr. Ogandzhanova's failure to seek different treatment options in the face of her report of a worsening severity of symptoms.  Other than being comfortable with him and feeling supported, she could not articulate how her visits with Dr. Rozansky were helpful.  In fact, she described being both depressed and angry after having visited him prior to the second day of the current evaluation, calling into question the benefits of such visits to her emotional state.  Her ability to travel independently to Los Angeles for psychiatric treatment six times a year is inconsistent with her claim that she cannot function alone outside the home more than once every three months.  Over five years ago, Dr. Ogandzhanova was able to research the Internet to find psychiatric resources, call a number of offices, find a suitable provider, and then travel to a different state to meet a stranger and initiate psychiatric treatment. She was able to do this at the same time she reports experiencing increasing difficulty in her ability to function at work.  She should therefore be able to apply the same abilities currently to research local mental health professionals who have experience in providing Complicated Grief Therapy, which is apparently successful in treating her condition, as noted in the article supplied by Dr. Rozansky.

**TESTS ADMINISTERED:**
Dr. Ogandzhanova underwent the following tests and procedures:  Clinical Interview; Booklet Category Test; the revised California Verbal Learning Test (CVLT-2); Controlled Oral Word Association (COWA); Finger Tapping Test; Grooved Pegboard Test; the Screening & Attention Modules of the Neuropsychological Assessment Battery (NAB); Ruff Figural Fluency Test (RFFT); Symptom Validity Testing (SVT); Trail Making Test, Parts A and B; the Rey-Osterrieth Complex Figure Test; the Third Edition of the Wide Range Achievement Test (WRAT3); the Personality Assessment Inventory (PAI); and the Patient Competency Rating Scale (PCRS).  Her significant other, Don Bates, also completed the PCRS.

**BEHAVIORAL OBSERVATIONS:**
It is interesting to note some similarities in behavior across these two evaluations.  In 2008, Dr. Ogandzhanova stated that she had filled out the Relative's Form for her significant other, Mr. Bates, because his eyes were blurry after an eye exam and he could not read the form.  For the current evaluation, she also filled out the form for Mr. Bates because they needed to complete it while he was driving them up from Casa Grande.  She stated that although her attorney had forwarded the evaluation packet the prior Monday, she had only checked her e-mail on the day before the evaluation.

Dr. Ogandzhanova arrived about 20 minutes late for both appointments of the current evaluation (she was approximately 40 minutes late for the first appointment in 2008).  Mr. Bates did call to

MLOCL001846

state that their GPS guidance had prompted them to take a wrong turn.  Interestingly, he stated the same thing happened again on the second appointment.  Her significant other drove her to Phoenix for both appointments, but did not come into the office.

There were no observed gross disturbances in gait.  Unlike the first evaluation, Dr. Ogandzhanova did not show any pain behavior during the 1½ days of the current evaluation.  She seemed to feel relatively comfortable in expressing herself from the beginning of the assessment.  Affect was varied, with some tearfulness when again describing aspects her son's illness.  As with the first evaluation, Dr. Ogandzhanova was animated in expressing anger and frustration about her interactions with MetLife, but also relative to other people she considered to have "bad souls".

There was no evidence of delusions or hallucinatory processes nor was the content of her language suggestive of a psychotic condition.  She did describe her first son's nanny, Galena, as being able to communicate "with the other side."  She stated that Galena "saw" Isaac right after she went into contractions during her third pregnancy, but was very careful to state that she did not see him and that she was "not crazy."

Surveillance Data:
The covert surveillance of Dr. Ogandzhanova provides equivocal data relative to the current assessment.  For example, there are frequent extended periods during which a lack of activity was noted, substantiating Dr. Ogandzhanova's claims of limited social activity and a preference to isolate herself.  It also appears that Mr. Bates does tend to drive more when the two of them are together in a vehicle.  Conversely, Dr. Ogandzhanova was observed driving on the highway to Payson and beyond, which is contrary to her claim that she did not drive over long distances due to her difficulty with concentration.  She is also seen functioning by herself in the community on a number of occasions despite her claim during the clinical interview that she only went out alone approximately once every three months.

**LEVEL OF EFFORT:**
During the 2008 evaluation, there was convincing evidence that Dr. Ogandzhanova had not accurately presented her emotional and psychological status.  Although there was also considerable behavioral evidence of reduced cooperation relative to cognitive testing, her scores on formal Symptom Validity testing were within normal limits.

Dr. Ogandzhanova's performance on one of two formal Symptom Validity tests was indicative of a sub-optimal level of effort.  Performance on three separate embedded measures of effort was below recommended cutoffs.  As with the first evaluation, there were also a number of unusual behavioral observations during the testing.  For example, on the Ruff Figural Fluency Test she began to repeatedly retrace the lines on several of her last designs instead of generating more unique patterns.  Also, Dr. Ogandzhanova so quickly drew the copy of the Rey Osterrieth Complex Figure and with such little effort towards accuracy, that she was asked to try again.  She was only marginally slower in copying the figure on the second trial.

Dr. Ogandzhanova asked to complete the PAI with the examiner present so that she can ask for clarification on any specific item.  She read every item out loud, but only occasionally asked for clarification, usually with regard to the meaning of a word, such as "jittery."  Early on she noted an item that she felt was intended "to see if I'm answering right."  The Negative Impression Management scale was slightly elevated, raising the possibility of some exaggeration of complaints.  Use of Negative Distortion Configural Analysis for the PAI (Morey & Hopwood, 2007) placed Dr. Ogandzhanova in the mild range of the Effortful Negative Distortion classification.

MLOCL001847

In summary, there is evidence of poor effort relative to the testing of cognitive symptoms on multiple measures, both formal and embedded. There is also evidence that Dr. Ogandzhanova was exaggerating her psychological symptoms while taking the PAI, although these indicators were in the mild range. Nonetheless, these findings indicate that Dr. Ogandzhanova's presentation of her cognitive and emotional / psychological status is unreliable.

## INTERPRETATION OF TEST RESULTS:

As observed in the prior report, the number of impaired scores generated for this limited battery is exceptionally high when taking into account Dr. Ogandzhanova's educational professional achievements. However, this observation is secondary to the fact that there were multiple indicators that Dr. Ogandzhanova was not putting forth her best effort during the current evaluation. Given these findings, there can be no confidence that the scores produced by Dr. Ogandzhanova actually reflect her current level of ability.

Diagnostic Impression:

Based upon the symptoms Dr. Ogandzhanova described during the clinical interview, technically she still meets the criteria for Posttraumatic Stress Disorder (Chronic, with delayed onset) and Major Depressive Disorder (Single Episode, moderate). However, there is reason to suspect that Dr. Ogandzhanova has exaggerated the degree to which she is suffering from these symptoms. As noted in the previous report, these diagnoses would not be unexpected giving the death of her son and the manner in which that occurred. Nonetheless, having generated evidence of exaggeration of symptoms on two separate evaluations three years apart, it is difficult to place confidence in Dr. Ogandzhanova's self-report, which is the primary basis for making the diagnosis. With this caution in place, the following multiaxial diagnosis is presented:

| | | |
|---|---|---|
| AXIS I | = | 309.81 Posttraumatic Stress Disorder, Chronic, with delayed onset |
| | | 296.22 Major Depressive Disorder, Single Episode |
| AXIS II | = | 799.9 Diagnosis Deferred |
| AXIS III | = | Obesity |
| AXIS IV | = | Death of child, not currently working |
| AXIS V | = | GAF = 70 (Current) |

## CONCLUSIONS:

In summary, the primary finding of the current evaluation is the evidence from multiple sources that Dr. Ogandzhanova is exaggerating the severity of the cognitive and emotional symptoms she claims to be experiencing, as well as the extent to which they adversely impact her ability to function.

David G. Lamb, Ph.D., ABPP-CN
**Board Certified in Clinical Neuropsychology by the**
**American Board of Professional Psychology**

References

Morey, L.C. & Hopwood, C.J. (2007). Casebook for the Personality Assessment Inventory (PAI): A structural summary approach. Psychological Assessment Resources, Inc., Lutz, FL.

MLOCL001848

## *Independent Neuropsychological Evaluation*

Name:   OGANDZHANOVA, Inna     Date of Birth: 1/7/63     Age (years-months): 48-1
Gender: Female                Education Level: 20 years    Handedness:   Right
Date(s) Examined: 03/02 & 08/11   Date of report: 03/14/11

Scores for the current (2011) evaluation are presented in bold, while scores from the 2008 assessment are presented in italics.

### *Effort:*

| Dot Counting | Total Errors | x̄ Ungrouped Time | x̄ Grouped Time | E-Score |
|---|---|---|---|---|
| Raw Scores | 3 *0* | 10.5 *7.33* | 6.83 *4.5* | 17 *12* |

Boone, K., Lu, P., & Herzberg, D. (2002). The Dot Counting Test manual. Western Psychological Services

### *Motor Functioning:*

| Finger Tapping | | Mean | | Percentile |
|---|---|---|---|---|
| Right | (Dominant Hand) | 16.6 *45.2* | | <1 *34* |
| Left | | 14.4 *40.8* | | <1 *38* |

Age, education, and gender-adjusted normative data (age range is 20-80 years)  Heaton, R.K. Grant,I. & Matthews C.G. (1991).  Comprehensive norms for an expanded Halstead Reitan Battery  Psychological Assessment Resources, Inc.

| Grooved Pegboard | | Seconds | | Errors | | Percentile |
|---|---|---|---|---|---|---|
| Right | (Dominant Hand) | 89 *83* | | 0 *0* | | 1 *1* |
| Left | | 91 *83* | | 0 *1* | | 4 *8* |

Age, education, and gender-adjusted normative data (age range is 20-80 years)  Heaton, R.K. Grant,I. & Matthews C.G. (1991).  Comprehensive norms for an expanded Halstead Reitan Battery  Psychological Assessment Resources, Inc.

### *Attention:*

**Neuropsychological Assessment Battery (NAB)**

| Attention Module | | Raw Scores | | Percentile |
|---|---|---|---|---|
| Orientation | | 29 *29* | | 50 *50* |
| Digits Forward | | 4 *6* | | <1 *14* |
| Digits Backward | | 2 *2* | | 3 *10* |
| Dots | | 6 *4* | | 30 *18* |
| Numbers & Letters | Part A Efficiency | 64 *52* | | <1 *<1* |
| | Part B Efficiency | 86 *63* | | 38 *18* |
| | Part C Efficiency | 58 *51* | | 24 *24* |
| | Part D Efficiency | 40 *37* | | 14 *12* |
| Driving Scenes | | 18 *22* | | <1 *<1* |
| Attention Composite (Standard) Score | | 53 *62* | | <1 *1* |

Age, gender, education corrected normative data  Stern, R.A. & White, T. (2003)  NAB Neuropsychological Assessment Battery Administration, scoring, and interpretation manual  Psychological Assessment Resources, Inc.

| Screening Module | | Raw Scores | | Percentile |
|---|---|---|---|---|
| Attention | Number Letter A Efficiency | 101 | | <1 |
| | Number Letter B Efficiency | 25 | | 3 |
| Language | Auditory Comprehension | 55 | | 34 |
| | Naming | 9 | | 58 |
| Memory | Shape Learning Immediate Recognition | 1 | | 7 |
| | Shape Learning Delayed Recognition | 2 | | 31 |
| | Story Learning Immediate Recognition | 12 | | 2 |
| | Story Learning Delayed Recognition | 9 | | 2 |
| Spatial | Visual Discrimination | 4 | | 21 |
| | Design Construction | 7 | | 38 |
| Executive Functions | Mazes | 3 | | 2 |
| | Word Generation | 2 | | 1 |
| Domain Composite Scores | | Standard Score | | Percentile |
| Attention | | 53 | | <1 |
| Language | | 91 | | 27 |
| Memory | | 68 | | 2 |
| Spatial | | 88 | | 21 |
| Executive Functions | | 59 | | <1 |
| TOTAL INDEX | | 60 | | <1 |

Age, gender, education corrected normative data  Stern, R.A. & White, T. (2003)  NAB Neuropsychological Assessment Battery Administration, scoring, and interpretation manual  Psychological Assessment Resources, Inc.

David G. Lamb, Ph.D. ABPP-CN
2633 E. Indian School Rd., Suite 310
Phoenix, Arizona 85016

MLOCL001849

INE of Inna Ogandzhanova          3/3/08                    Page 2

| Trail Making Test | Raw | Errors | | Percentile |
|---|---|---|---|---|
| Part A | 59 52 | 0 0 | | 5 1 |
| Part B | 111 130 | 0 1 | | 16 1 |

*Age, education, and gender-adjusted normative data (age range = 20-80 years)  Heaton, R.K. Grant, I. & Matthews C.G. (1991)  Comprehensive norms for an expanded Halstead-Reitan Battery  Psychological Assessment Resources, Inc. (Computer Version)*

## Concept Formation:

| Booklet Category Test | Raw | | T Score | | Percentile |
|---|---|---|---|---|---|
| Total Errors | 41 44 | . | 41 38 | | 37 12 |
| Number of Errors by Subtest | I 0 1 | II 2 1 | III 7 4 | IV 8 10 | V 13 19 | VI 7 8 | VII 4 1 |

*Age, education, and gender-adjusted normative data (age range = 20-80 years)  Heaton, R.K. Grant, I & Mathews C.G. (1991)  Comprehensive norms for an expanded Halstead-Reitan Battery  Psychological Assessment Resources, Inc.*

## Memory:

| CVLT-II | | Raw | | Percentile |
|---|---|---|---|---|
| **Recall Measures** | | | | |
| # recalled by trial (raw) | | 6, 8, 10, 12, 14 6, 6, 6, 8, 10 | | |
| Trial 1 | | 6  6 | | 31 31 |
| Trial 5 | | 14 10 | | 69 16 |
| Total Words Recalled | | 50 36 | | 54 7 |
| List B | | 4  5 | | 16 31 |
| Short delay | Free Recall | 12 7 | | 69 7 |
| | Cued Recall | 10 8 | | 16 7 |
| Long Delay | Free Recall | 12 9 | | 50 16 |
| | Cued Recall | 9 8 | | 16 7 |
| **Learning Characteristics** | | | | |
| Semantic Clustering | | 0.0 -0.6 | | 31 16 |
| Serial Clustering | | 1.3 0.8 | | 84 69 |
| List A → Slope | | 2.0   1 | | 84 16 |
| Consistency | | 94 73 | | 84 31 |
| **Recall Errors** | | | | |
| Repetitions | | 8 5 | | 31 50 |
| Intrusions | | 2 5 | | 69 31 |
| **Recognition** | | | | |
| Correct Hits (#) | | 13 14 | | 16 31 |
| Total Recognition Discriminability | | 3 3.3 | | 50 69 |

*Age, education, and gender-adjusted normative data  Delis, D.C., Kramer, J.H., Kaplan, E., & Ober, B.A. (2000)  CVLT-II  The California Verbal Learning Test Second Edition.  The Psychological Corporation, Harcourt Brace Jovanovich.*

| Rey-Osterrieth Complex Figure | Raw | Percentile |
|---|---|---|
| Copy | 31.0 31.0 | 31 31 |
| 30' Delayed Recall | 16.5 13.0 | 49 30 |

*Age-adjusted normative data  From Spreen, O. & Strauss, E (1998)  A compendium of neuropsychological tests  Administration, norms, and commentary (2nd Edition) (p. 359) Oxford Univ. Press*

## Flexible Thinking:

| Controlled Oral Word Association | Raw | Percentile |
|---|---|---|
| "F" | 15 8 | |
| "A" | 9 8 | |
| "S" | 10 7 | |
| Total | 34 23 | 17 3 |

*16-59, 60-79, 80-95 year-olds  education-adjusted normative data  From Spreen, O. & Strauss, E (1998)  A compendium of neuropsychological tests  Administration, norms, and commentary (2nd Edition) (p. 448) Oxford Univ. Press*

| Ruff Figural Fluency Test | Scores | | Percentile |
|---|---|---|---|
| Unique Designs (Adjusted) | 59 81 | | 5 25.0 |
| Perseverations | 9 1 | | |
| Error Ratio (Adjusted) | 0.1525 | .0122 | 21 99.9 |
| Strategies | 0 4 | | |
| Strategy-Based Designs | 0 13 | | |

*Age-adjusted normative data with educational corrective factor  Ruff Figural Fluency Test Administration manual (1988)  Neuropsychological Resources*

David G. Lamb, Ph.D. ABPP-CN
2633 E. Indian School Rd., Suite 310
Phoenix, Arizona 85016

MLOCL001850

INE of Inna Ogandzhanova                    3/3/08                              Page 3

*Academic Abilities:*

| Wide Range Achievement Test | | Raw | | Std. Score | | Grade | | Percentile |
|---|---|---|---|---|---|---|---|---|
| Reading | | 50 | | 105 | | PHS | | 63 |
| Spelling | | 43 | | 100 | | HS | | 60 |
| Arithmetic | | 41 | | 97 | | HS | | 42 |

5-75 year-old normative data  From Wilkinson, G S (1993) WRAT3 administration manual Wide Range

*Personality Composition and Psychological Distress:*

**PAI** (Listed as T-Scores)

| Validity Scales | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| ICN | | | INF | | | NIM | | | PIM | |
| 43 | | | 47 | | | 73 | | | 34 | |

| Clinical Scales | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| SOM | ANX | ARD | DEP | MAN | PAR | SCZ | BOR | ANT | ALC | DRG |
| 56 | 90 | 81 | 85 | 48 | 77 | 81 | 75 | 39 | 41 | 42 |

| Treatment Scales | | | | |
|---|---|---|---|---|
| AGG | SUI | STR | NON | RXR |
| 67 | 49 | 62 | 78 | 51 |

| Interpersonal Scales | |
|---|---|
| DOM | WRM |
| 56 | 31 |

Scores generated by Morey, L C (2000) PAI Interpretive Explorer Module, Psychological Assessment Resources, Inc

*David G. Lamb, Ph.D. ABPP-CN*
*2633 E. Indian School Rd., Suite 310*

MLOCL001851

David G. Lamb, Ph.D.>

1

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


Metropolitan Life Insurance Company, )
a New York Corporation,              )
                                     )
                     Plaintiff,      )
v.                                   ) Case No.:
                                     ) 2:12-CV-00372-GMS
Inna Ogandzhanova, M.D.,             )
                                     )
                     Defendant.      )
_____)
                                     )
Inna Ogandzhanova, M.D.,             )
                                     )
                Counter-Plaintiff,   )
v.                                   )
                                     )
Metropolitan Life Insurance Company, )
                                     )
                Counter-Defendant.   )
_____)




VIDEOTAPED DEPOSITION OF DAVID G. LAMB, Ph.D.



Phoenix, Arizona
March 11, 2013

VOLUME 1
PAGES 1 - 131



                         Prepared by:
                         Deborah L. Tucker, RPR
                         Certified Reporter
(Copy)                   No. 50464

David G. Lamb, Ph.D.>

11

```
1        A.      Certainly.

2        Q.      You'll know who I'm talking about.

3                I wanted -- in fact, I had pre-marked to save

4    time, three exhibits.  Exhibit 1 is your -- the first

5    IME that you performed in 2008, correct?

6        A.      It appears to be so, yes.

7        Q.      And Exhibit 2 is the second one that you did

8    in March of 2011?

9        A.      That looks correct, yes.

10       Q.      All right.  And Exhibit 3, I believe, is your

11   expert report that you recently created and produced?

12       A.      Yes.

13       Q.      Okay.  In between the second report that's on

14   -- in Exhibit 2 in 2011 and 2013, did you do any further

15   evaluations of Dr. O?

16       A.      No.  You mean direct evaluations?

17       Q.      Right.

18       A.      No.

19       Q.      Did you do anything in terms of furthering

20   your understanding of her problems or alleged problems

21   between 2011 and 2013?

22               MR. BRESSLER:  I -- I'm going to object to the

23   form.  Are you talking beyond what's described in this

24   report --

25               MS. ROSENTHAL:  Yes.
```

David G. Lamb, Ph.D.>

131

```
 1    STATE OF ARIZONA     )
                           )   ss.
 2    COUNTY OF MARICOPA   )

 3              BE IT KNOWN that the foregoing deposition

 4    was taken before me, Deborah L. Tucker, Certified

 5    Reporter No. 50464 and Notary Public in and for the

 6    County of Maricopa, State of Arizona; that the witness

 7    before testifying was duly sworn by me to testify to the

 8    whole truth; that the questions propounded to the

 9    witness and the answers of the witness thereto were

10    taken down by me in shorthand and thereafter reduced to

11    typewriting under my direction; that pursuant to

12    request, notification was provided that the deposition

13    is available for review and signature; that the

14    foregoing pages are a true and correct transcript of all

15    proceedings had upon the taking of said deposition, all

16    done to the best of my skill and ability.

17              I FURTHER CERTIFY that I am in no way

18    related to any of the parties hereto nor am I in any way

19    interested in the outcome hereof.

20              DATED at Phoenix, Arizona, this 11th day of

21    March, 2013.

22

23                                 _____

                                      Notary Public
24                                    CSR #50464
      My Commission expires:
25    October 29, 2016
```

# EXHIBIT 3

**Page 1**

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

METROPOLITAN LIFE INSURANCE COMPANY, )
a New York corporation,          )
                                 )
        Plaintiff,      ) Case No.
                        ) 2:12-cv-372-GMS
    vs.                 )
                        ) VOLUME I
INNA OGANDZHANOVA, M.D.,        )
                               )
        Defendant.         )

DEPOSITION OF MARY E. FULLER, taken pursuant to
notice, at the Executive Center, 477 Congress
Street, Portland, Maine, on July 17, 2013, commencing at
1:02 P.M., before Lisa S. Bishop, RPR, RMR, a Notary Public
in and for the State of Maine.

Esquire Deposition Solutions
415-591-3333

**Page 2**

1  APPEARANCES:
2  For the Plaintiff, MetLife
3  FLOYD BIENSTOCK, ESQ.
   Steptoe & Johnson, LLP
4  201 East Washington Street
   Suite 1600
5  Phoenix, AZ 85004
   (602)257-5263
6  fbienstock@steptoe.com
7  For the Defendant, Dr. Ogandzhanova
8  STEVEN J. GERMAN, ESQ.
   Adelman German, PLC
9  8245 N. 85th Way
   Scottsdale, AZ 85258
10 (480)607-9166
   Steve@AdelmanGerman.com
11
   ANITA ROSENTHAL, ESQ.
12 STEVE DAWSON, ESQ.
   Dawson & Rosenthal
13 1850 N. Central Ave.
   Suite 510
14 Phoenix, AZ 85004
   602-494-3800
15 sdawson@dawsonandrosenthal.com
16
17
18
19
20
21
22
23
24
25

**Page 3**

1              I N D E X
2  Deponent:  MARY E. FULLER
3     Examination by:            Page
4        ATTY. BIENSTOCK           4
5              EXHIBITS
6  Number        Description        Page
7  1    Documents Reviewed List        72
8  2    Chronology              73
9  3    Report with Handwritten Notes      74
10 4    Notes              74
11 5    Documents Reviewed with Handwritten Notes   76
12 6    Barbara Mueller's Report with Handwritten Notes  76
13 7    Letter, 9/2/11                98
14 8    Dr. Rozansky's Psychiatric Notes      108
15 9    Dr. Lavretsky's Medical Records      116
16 10   2007 Biennial MD License Renewal Application   133
17 11   2009 Biennial MD License Renewal Application   135
18 12   2011 Biennial MD License Renewal Application   137
19
20     (Exhibits Included with Original and Copies.)
21
22
23
24
25

**Page 4**

1      THE VIDEOGRAPHER:  This is the tape number one in
2  the videotaped deposition of Mary Fuller in the matter of
3  Metropolitan Life Insurance Company versus Inna
4  Ogandzhanova; is that right?
5      MR. BIENSTOCK:  Inna Ogandzhanova --
6  Ogandzhanova.
7      THE VIDEOGRAPHER:  Okay.
8      MR. BIENSTOCK:  Dr. O.
9      THE VIDEOGRAPHER:  The deposition is being held
10 at Executive Office Suites in Portland, Maine.  Today's
11 date is 7/17/13 and the time on the record is 1:02.  My
12 name is Paul Spencer and I'm the videographer.  The court
13 reporter is Lisa Bishop.
14      Counsel, would you please introduce yourselves
15 and affiliations to the witness?
16      MR. BIENSTOCK:  Floyd Bienstock for the
17 plaintiff, MetLife.
18      MR. GERMAN:  Steve German here with Steve Dawson
19 and Anita Rosenthal on behalf of Dr. O.
20      THE VIDEOGRAPHER:  Can you swear in the witness,
21 please?
22      MARY E. FULLER, having been duly sworn by the Notary
23 Public, was examined and testified as follows:
24      EXAMINATION BY ATTY. BIENSTOCK:
25  Q   Will you please state your name for the record?

Page 97

1  and that she had no restrictions and limitations.
2     Q   So the answer is yes, Dr. Rozansky was sent Dr.
3  Lamb's neuropsychological testing report?
4        MR. GERMAN: Misstates her testimony.
5     A   The answer was they failed to send it to him both
6  times even though he asked for the -- any information they
7  had and only sent it after determining that Dr. O didn't
8  have restrictions and limitations. They didn't send it in
9  2008 when -- when he asked for that and they didn't send it
10 to him in 2011 as is the normal custom and practice
11 throughout the industry until they had already decided what
12 their position was going to be.
13    Q   So you agree that MetLife sent Dr. Rozansky Dr.
14 Lamb's 2011 neuropsyche testing report, correct?
15       MR. GERMAN: Asked and answered.
16    Q   Yes or no?
17    A   MetLife --
18    Q   Yes or no?
19       MR. GERMAN: Misstates her testimony.
20    A   MetLife withheld those reports until they made a
21 determination that she wasn't disabled, that's what
22 happened.
23    Q   So they sent it to him?
24    A   After they made the determination and -- and
25 ignored his input when he provided it.

Page 98

1     (Exhibit No. 7, Letter, 9/2/11, marked for
2  identification.)
3     Q   Let me show you what's marked as Exhibit 7. Is
4  Exhibit 7 a letter from Dr. Rozansky dated September 2,
5  2011, to MetLife?
6     A   Yes.
7     Q   And is this a letter from him to MetLife
8  commenting on the reports of the psychiatrist, Dr. Parker,
9  and neuropsychologist, Dr. Lamb, that was sent to him
10 asking him for his comments?
11    A   Yes.
12    Q   And as of the date of this letter, September 2,
13 2011, had MetLife stopped making disability payments to Dr.
14 O under her two disability policies?
15       MR. GERMAN: Form and foundation.
16    A   Well, prior to that, they had paid benefits with a
17 reservation of rights with no basis really for doing so.
18 Let me see the date they actually --
19    Q   Now that wasn't responsive. Move to strike. And
20 can you -- if you would please stop arguing your opinions
21 and just answer the questions, we will get through this a
22 lot more quickly.
23       MR. GERMAN: Floyd, I don't think she's arguing
24 her positions. I think she's trying her best to answer
25 your questions. If you don't like the answer you get, you

Page 99

1  tend to reask the same question hoping for a different
2  answer.
3        MR. BIENSTOCK: Can you read the question back,
4  please?
5        (Reporter read requested material.)
6        MR. GERMAN: Objection. Argumentative. Form.
7        MR. BIENSTOCK: There's no question pending. I
8  don't know what you are objecting to.
9        MR. GERMAN: That question.
10    A   Do you want me to answer?
11    Q   What question are you answering?
12    A   The one you just asked about whether they had
13 stopped making disability payments.
14    Q   All right.
15    A   And they had made the determination not to pay --
16 that she was not disabled and they were paying her under
17 reservation of rights, but they had still paid her and --
18 but they had changed the nature of the payments. They were
19 paid under reservation of rights.
20    Q   From the first date that MetLife decided to pay
21 Dr. O benefits under her two disability policies, they
22 never stopped making monthly payments, have they? Yes or
23 no?
24    A   No, they have not.
25    Q   Okay. Did you read Dr. Rozansky's letter,

Page 100

1  Exhibit 7 --
2     A   Yes.
3     Q   -- as part of your review in this case?
4     A   Yes.
5     Q   Did you see at the bottom of the first page of it
6  where he agrees with Dr. Lamb that it may not be plausible
7  that Dr. O could not find a psychotherapist of sufficient
8  skill to help her in Arizona --
9        MR. GERMAN: Misstates --
10    Q   -- in Phoenix?
11       MR. GERMAN: Misstates the report.
12    A   Can you tell me where you are looking at?
13    Q   Yeah, three lines up from the bottom on the first
14 page of Exhibit 7, do you see where it says he states,
15 quote, her assertion that the fifth largest city in the
16 United States does not possess psychotherapists of
17 sufficient skill to help her, this is simply not plausible,
18 unquote. Then he writes maybe it is not plausible.
19    A   However, Dr. O stated that on researching the
20 availability of therapists in the area where she lives,
21 there's not a great selection.
22    Q   All right. That's what Dr. O told Dr. Rozansky,
23 right?
24       MR. GERMAN: Form.
25    A   Yes.

Page 117

1    A   Yes.
2    Q   Do you see where Dr. Lavretsky wrote considering
3  applying for disability?
4    A   Yes.
5    Q   Do you realize that on the very first day she went
6  to Los Angeles to meet with Dr. Lavretsky and Dr. Rozansky,
7  she was considering applying for disability benefits?
8        MR. GERMAN: Form and foundation.
9    A   Well, obviously I don't know what she was thinking
10 beyond what's in the record, but it wouldn't be surprising
11 given the whole reason that she decided that she needed
12 help that she would be considering going for disability
13 because of how she was -- because of what was happening to
14 her when she was in the workplace, the panic attacks, the
15 anxiety, the hatred of her patients, so, you know, she
16 certainly wasn't seeking psychiatric help before that.  She
17 went when she was worried about her performance, so I
18 don't -- I don't find that unusual.
19   Q   I don't think I asked you if you found it unusual,
20 but take a look at page five under recommendations.  Can
21 you please read point one, the very first recommendation
22 Dr. Lavretsky made to Dr. O after meeting with her on
23 January 4, 2007?
24   A   The recommendation was to find a psychiatrist
25 locally as she may need regular follow-up care and

Page 118

1  treatment.
2    Q   And do you know if she ever followed Dr.
3  Lavretsky's recommendation to find a psychiatrist locally
4  for regular follow-up care and treatment?
5        MR. GERMAN: Asked and answered.
6    A   I mean only in what she had said and -- in the
7  notes.  I don't know whether she did or didn't.
8    Q   How long has Dr. Rozansky been treating Dr. O for
9  now?
10   A   Well, since January of 2007.
11   Q   So six years or so?
12   A   Yes.
13   Q   Okay.  And has her condition materially improved
14 based on your review of the records?
15       MR. GERMAN: Foundation.
16   A   Well, I know Dr. Shear's opinion is that her
17 depression has gotten better, but that her complicated
18 grief and PTSD has not.
19   Q   Okay.  And was anything done that you're aware of
20 by Dr. Rozansky to change the course of treatment over this
21 period of time because she was not fully better?
22       MR. GERMAN: Form.  Foundation.
23   A   I mean you would have to ask Dr. Rozansky that,
24 but obvious -- I mean as an outsider looking in, what he
25 was doing was helping her, so why would he change his plan?

Page 119

1  Her depression was going away, so at least he got one of
2  the three co-morbid psychiatric impairments under control.
3  Why would he then decide that what he's doing isn't
4  appropriate for her and he needs to change the plan?
5    Q   Well --
6    A   It was working, I mean she was getting a little
7  better.
8    Q   Does Dr. Rozansky agree that Dr. O no longer is
9  suffering from major depressive disorder?
10       MR. GERMAN: Foundation.
11   A   I don't know.
12   Q   Okay.  Did -- did Dr. O's PTSD get better over the
13 six years that Dr. Rozansky was treating her?
14       MR. GERMAN: Asked and answered.
15   A   I don't see anything in the records that says that
16 and in fact Dr. Shear would say -- says no based on her
17 review.
18   Q   Okay.
19   A   Nor is her complicated grief better.
20   Q   Dr. Rozansky never diagnosed Dr. O with
21 complicated grief, did he?
22   A   I think he called it bereavement or grief.  As I
23 said, as we discussed earlier, complicated bereavement is a
24 relatively new term.
25   Q   Based on your experience in the disability

Page 120

1  insurance industry, should a treatment plan for someone who
2  is disabled as a result of psychological conditions include
3  a return to work plan?
4        MR. GERMAN: Foundation.
5    A   Not if the medical evidence doesn't support that
6  as an optimum outcome for the insured.  The insured is
7  obligated to get treatment.  The hope is that that
8  treatment will enable them to return to work, but it's not
9  required that that be the goal of treatment.  In some
10 cases, a return to work is not going to be therapeutically
11 good for that individual, you know.  The doctor's job is to
12 figure out what's the matter with the person and treat
13 them.  If in doing that, they improve well enough so that
14 they are able to return to work, that's great, but
15 typically -- and again, in psychiatric claims, it's not
16 like a broken leg where you can say with casts and physical
17 therapy and -- we can get you back up and functioning.
18       You can't predict what the outcome of a
19 psychiatric claim is going to be like you can the outcomes
20 of other kinds of medical conditions because it all depends
21 on the person's -- the complexity of the person's history,
22 the complexity of their psychiatric diagnoses, their
23 response to the treatment interventions, any other external
24 factors that might be continuing to influence that person,
25 so that's why they are so hard.  That's why I created a

Page 156

1                    C E R T I F I C A T E

2

3            I, Lisa S. Bishop, RPR, RMR, a Notary Public in

4    and for the State of Maine, hereby certify that the

5    within-named deponent was sworn to testify the truth, the

6    whole truth, and nothing but the truth, in the

7    aforementioned cause of action.

8            I further certify that this deposition was

9    stenographically reported by me and later reduced to print

10   through Computer-Aided Transcription, and the foregoing is

11   a full and true record of the testimony given by the

12   deponent.

13           I further certify that I am a disinterested

14   person in the event or outcome of the above-named cause of

15   action.

16           IN WITNESS WHEREOF, I subscribe my hand

17   this _____ day of _____, 2013.

18

19                         _____

20                         Lisa S. Bishop, RPR, RMR, Notary Public

21

22   My Commission Expires:  January 27, 2016

23

24

25

# EXHIBIT 4

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


METROPOLITAN LIFE INSURANCE      )
COMPANY, a New York corporation, )
                                 )
   Plaintiff/Counter-Defendant,  )
                                 )
          VS.                    )   NO. CV-12-372-PHX-GMS
                                 )
                                 )
INNA OGANDZHANOVA, M.D.,         )
                                 )
   Defendant/Counter-Claimant.   )
_____  )


DEPOSITION OF GERALD I. ROZANSKY, M.D., Ph.D.

Los Angeles, California

Thursday, December 20, 2012


REPORTED BY:

KATHLEEN C. BANNON
CSR No. 3110

Page 6

| | | |
|---|---|---|
| 09:37:17 | 1 | THE VIDEOGRAPHER: Please proceed. |
| 09:37:20 | 2 | THE COURT REPORTER: Would you raise your |
| 09:37:31 | 3 | right hand, please. |
| 09:37:31 | 4 | Do you solemnly swear the testimony |
| 09:37:31 | 5 | you're about to give in this deposition shall be the |
| 09:37:31 | 6 | truth, the whole truth and nothing but the truth? |
| 09:37:31 | 7 | THE WITNESS: Yes. |
| 09:37:31 | 8 | THE COURT REPORTER: Thank you. |
| 09:37:31 | 9 | |
| 09:37:31 | 10 | EXAMINATION |
| 09:37:32 | 11 | BY MR. BRESSLER: |
| 09:37:32 | 12 | Q   Good morning. |
| 09:37:33 | 13 | A   Good morning. |
| 09:37:34 | 14 | Q   Would you please tell us your name for |
| 09:37:36 | 15 | the record. |
| 09:37:36 | 16 | A   Yes. Gerald Ivan Rozansky. |
| 09:37:41 | 17 | Q   Dr. Rozansky, you were kind enough to let |
| 09:37:43 | 18 | me look at your file before the deposition began, |
| 09:37:45 | 19 | and it's here in a black notebook, along with some |
| 09:37:50 | 20 | original notes in this folder here? |
| 09:37:53 | 21 | A   Yes. |
| 09:37:53 | 22 | Q   Okay. And what I've done, Dr. Rozansky, |
| 09:37:57 | 23 | is before the deposition started, Dr. Ogandzhanova's |
| 09:38:02 | 24 | counsel provided us with a copy of your medical |
| 09:38:06 | 25 | records which we've marked as Exhibit 1. |

Page 7

| | | |
|---|---|---|
| 09:38:09 | 1 | These were produced in response to a |
| 09:38:12 | 2 | subpoena, and they've been Bates numbered 1 through |
| 09:38:17 | 3 | 215. All right? |
| 09:38:19 | 4 | A   All right. |
| 09:38:19 | 5 | (Exhibit 1 was marked for identification |
| 09:38:19 | 6 | by the Certified Shorthand Reporter.) |
| 09:38:19 | 7 | BY MR. BRESSLER: |
| 09:38:19 | 8 | Q   And it turned out that we were missing |
| 09:38:21 | 9 | some records for a two-year period, and so we went |
| 09:38:26 | 10 | back to Dr. -- we'll call her Dr. O for the sake of |
| 09:38:31 | 11 | simplicity. |
| 09:38:31 | 12 | A   Yes. |
| 09:38:32 | 13 | Q   And some additional records were produced |
| 09:38:33 | 14 | to us called "Rozansky Supp.," S-u-p-p, and these |
| 09:38:39 | 15 | were numbered 1 through 93, and I had those marked |
| 09:38:42 | 16 | as Exhibit 2 to your deposition, okay? |
| 09:38:45 | 17 | A   Okay. |
| 09:38:47 | 18 | (Exhibit 2 was marked for identification |
| 09:38:47 | 19 | by the Certified Shorthand Reporter.) |
| 09:38:47 | 20 | BY MR. BRESSLER: |
| 09:38:47 | 21 | Q   During today's deposition, I may ask you |
| 09:38:49 | 22 | to refer to things in your medical records, and |
| 09:38:52 | 23 | you're free to do so if you want to refer to them, |
| 09:38:55 | 24 | and they've been marked as exhibits, okay? |
| 09:38:58 | 25 | A   Okay. |

Page 8

| | | |
|---|---|---|
| 09:38:59 | 1 | Q   One thing I did not see in your file, |
| 09:39:01 | 2 | Dr. Rozansky, is billing records. Did you say you |
| 09:39:06 | 3 | did not have billing records? |
| 09:39:06 | 4 | A   That's correct. |
| 09:39:07 | 5 | Q   How do -- do you treat Dr. O for free, or |
| 09:39:12 | 6 | did you charge for the visits? |
| 09:39:13 | 7 | A   I charge for the visits. |
| 09:39:15 | 8 | Q   And how do you bill her? |
| 09:39:17 | 9 | A   I don't. She brings me a check. |
| 09:39:20 | 10 | Q   So every session that she comes, she just |
| 09:39:22 | 11 | pays you cash? |
| 09:39:24 | 12 | MR. GERMAN: Objection. |
| 09:39:24 | 13 | Go ahead. |
| 09:39:25 | 14 | THE WITNESS: Yeah, well she pays me a |
| 09:39:27 | 15 | check, and sometimes she mails it to me if she |
| 09:39:31 | 16 | doesn't have a check with her. |
| 09:39:32 | 17 | BY MR. BRESSLER: |
| 09:39:33 | 18 | Q   Do you issue any billings to her? |
| 09:39:35 | 19 | A   No. |
| 09:39:36 | 20 | Q   Are any portions of her visits paid for |
| 09:39:40 | 21 | or reimbursed by health insurance? |
| 09:39:42 | 22 | A   Not that I know of. |
| 09:39:44 | 23 | Q   Okay. What rate do you charge her for |
| 09:39:47 | 24 | these visits? |
| 09:39:48 | 25 | A   $400. |

Page 9

| | | |
|---|---|---|
| 09:39:49 | 1 | Q   For an hour? |
| 09:39:50 | 2 | A   Approximately, yes. |
| 09:39:55 | 3 | Q   What did you do -- let me back up for a |
| 09:39:59 | 4 | moment. |
| 09:40:00 | 5 | Is there any place that you have a record |
| 09:40:01 | 6 | of the payments that Dr. O has made to you? |
| 09:40:09 | 7 | A   My bank deposits, but it's not specific |
| 09:40:12 | 8 | to Dr. O. |
| 09:40:14 | 9 | Q   For example, she doesn't give you a 1099 |
| 09:40:19 | 10 | or anything like that? |
| 09:40:20 | 11 | A   No. |
| 09:40:21 | 12 | Q   What did you do to prepare for today's |
| 09:40:27 | 13 | deposition? |
| 09:40:28 | 14 | A   Well, I met with the attorney, and I |
| 09:40:38 | 15 | reviewed some of the things that I've written in the |
| 09:40:43 | 16 | past extensively. |
| 09:40:46 | 17 | Q   When you say you reviewed things written |
| 09:40:49 | 18 | in the past, are you talking about your notes on |
| 09:40:51 | 19 | Dr. O, or are you talk -- |
| 09:40:54 | 20 | A   Yes, yes. |
| 09:40:54 | 21 | Q   When did you meet with -- well, let me |
| 09:40:57 | 22 | make it more general, when did you meet with counsel |
| 09:41:01 | 23 | to prepare for the deposition? |
| 09:41:05 | 24 | A   Last week, I believe. |
| 09:41:06 | 25 | Q   What time was your meeting, what time of |

## Page 29

```
10:05:23   1   in the acidity of the blood, and often people who
10:05:27   2   are having panic attacks, I think it's a chemical
10:05:30   3   reaction in the brain.  There is some sense that
10:05:32   4   you're dying, and they feel like they're dying.
10:05:35   5       Q   Did these happen in your office, or is
10:05:39   6   this what she reported to you?
10:05:41   7       A   She reported the panic attacks.  I've
10:05:43   8   seen her when she's had an attack in the office,
10:05:46   9   too.  That's when I suggested she breathe into a
10:05:52  10   paper bag.
10:05:57  11       Q   Did you set up a treatment plan for her?
10:06:02  12       A   A specific treatment plan?
10:06:04  13       Q   Yes.
10:06:04  14       A   Other than visits with her?
10:06:06  15       Q   Right.
10:06:06  16       A   That was the treatment plan.
10:06:08  17       Q   Okay.
10:06:10  18       A   Medicating.
10:06:11  19       Q   So when you say the treatment plan, it
10:06:15  20   consisted of visits, correct?
10:06:16  21       A   Yes, and medicating.
10:06:20  22       Q   How often did you want to see her?
10:06:22  23       A   As often as I could.
10:06:24  24       Q   If she -- you were limited because she's
10:06:27  25   in another state, correct?
```

## Page 30

```
10:06:29   1       A   That's right.
10:06:30   2       Q   If she lived just down the street, how
10:06:32   3   often would you want to see her?
10:06:34   4       MR. GERMAN:  Objection; form, foundation.
10:06:37   5       THE WITNESS:  If she lived down the
10:06:38   6   street, probably once a week.
10:06:43   7   BY MR. BRESSLER:
10:06:43   8       Q   In January of 2007, when she came in to
10:06:45   9   see you, and you were describing the intensity of
10:06:50  10   her pain like a burn victim, how often would you
10:06:56  11   have wanted to see her at that time?
10:06:59  12       A   Well, the reality was that she was from
10:07:01  13   another city and coming to see me.  I talked with
10:07:05  14   her about seeing someone, you know, where she lives
10:07:08  15   so that things could happen faster.  She answered
10:07:15  16   with this remark about the availability of people in
10:07:21  17   her area, that when she called, they were not
10:07:25  18   available.
10:07:28  19       Q   We'll talk about that in a moment.
10:07:29  20       Let's go back to a treatment plan.  I
10:07:33  21   realize there is medication and visits.  Let's talk
10:07:36  22   about the visits.
10:07:38  23       When she came to see you on January 4,
10:07:40  24   2007, and you, as you described it, saw the
10:07:46  25   intensity of her pain, had she been a local patient,
```

## Page 31

```
10:07:48   1   how often would you have wanted to see her at that
10:07:51   2   point in time?
10:07:51   3       MR. GERMAN:  Asked and answered.
10:07:53   4       THE WITNESS:  I think we answered that.
10:07:55   5   BY MR. BRESSLER:
10:07:55   6       Q   Well, I understood, it was just
10:07:57   7   generally, but I'm talking about as of January 2007,
10:08:00   8   how often would you want to see her?
10:08:08   9       A   As often as I could.  If she was that way
10:08:12  10   and she was impaired and couldn't function at home,
10:08:15  11   I would want to see her more often than not.
10:08:19  12       Q   Two to three times a week?
10:08:21  13       A   Sometimes.
10:08:26  14       Q   You continue to see her to this day,
10:08:29  15   correct?
10:08:29  16       A   Yes.
10:08:30  17       Q   When was the last time you saw her?
10:08:32  18       A   I think Saturday a week ago.
10:08:35  19       Q   And maybe she sees you once every
10:08:38  20   month, maybe two or three months, correct?
10:08:41  21       A   Yes.
10:08:42  22       Q   By the way, how does that work?  Does she
10:08:44  23   just -- when she finishes a session with you, does
10:08:47  24   she book another session at that time, or does she
10:08:50  25   just call you up and say "Can I come out next
```

## Page 32

```
10:08:52   1   Tuesday?"
10:08:53   2       A   Both things occur.
10:08:56   3       Q   It's done both ways?
10:08:57   4       A   Yes.
10:08:57   5       Q   Sometimes she sets up appointments; other
10:08:59   6   times she just calls and says "I'm coming"?
10:09:03   7       A   Yes.
10:09:04   8       Q   All right.  If she were a local patient,
10:09:08   9   somebody who lived in the Los Angeles area, today,
10:09:11  10   how often would you want to see her?
10:09:28  11       A   Today, anywhere from once a week to once
10:09:33  12   a month.
10:09:36  13       Q   So the frequency of the visits still is
10:09:38  14   not to your liking.  You'd like to see her more
10:09:42  15   frequently?
10:09:42  16       MR. GERMAN:  Objection; foundation, form.
10:09:48  17       THE WITNESS:  Yes.
10:09:50  18   BY MR. BRESSLER:
10:09:50  19       Q   Have you ever told her that?
10:09:51  20       A   Yes.
10:09:52  21       Q   Okay.  Now, you said that in the first
10:09:54  22   visit you'd talked about seeing someone where she
10:09:57  23   lived, which is Arizona?
10:09:59  24       A   Yes.
10:10:00  25       Q   And she's in Casa Grande?
```

## Page 34

```
10:10:41   1   available.
10:10:42   2      Q   Was it your thinking that she ought to be
10:10:44   3   seeing someone two to three times a week, and it's
10:10:47   4   not practical to see somebody in another state two
10:10:50   5   to three times a week but it is practical to see
10:10:52   6   someone in Arizona that frequently?
10:10:54   7      MR. GERMAN:  Objection; form and
10:10:58   8   foundation.
10:11:03   9      THE WITNESS:  I thought that she was in
10:11:05  10   enough difficulty with herself that it would be
10:11:11  11   helpful to her to have someone who was more
10:11:13  12   available to her, and I thought that someone nearby
10:11:16  13   geographically would be easier to work with.
10:11:21  14   BY MR. BRESSLER:
10:11:21  15      Q   Somebody that could see her more
10:11:24  16   frequently?
10:11:24  17      A   That's not necessarily the case.  She'd
10:11:26  18   already told me that she could hardly get an
10:11:30  19   appointment for the first go-round, no less more
10:11:35  20   frequently in the future.
10:11:37  21      I have seen other people from Phoenix,
10:11:41  22   and from other states.
10:11:43  23      Q   On a frequency of two to three times a
10:11:46  24   week?
10:11:46  25      A   No, not on a frequency of two to three
```

## Page 35

```
10:11:50   1   times a week.
10:11:51   2      Q   Do you --
10:11:53   3      A   I've seen people in Los Angeles who
10:11:54   4   travel great distances, or from Southern California
10:11:57   5   who might come in more often than once a week.
10:12:02   6      Q   Did you accept at face value her
10:12:05   7   statement that there weren't physicians available in
10:12:08   8   Arizona?
10:12:14   9      A   At the time I accepted that as her
10:12:18  10   reality, and felt that the situation was difficult
10:12:23  11   enough that she needed the help then -- it's like an
10:12:27  12   emergency room situation -- and that I should
10:12:29  13   provide it, and we'd worry about the issue of
10:12:33  14   finding someone locally later on.
10:12:36  15      Q   And did you later on, as you put it,
10:12:38  16   revisit this with her about how she might be better
10:12:41  17   served with somebody locally?
10:12:49  18      A   I don't know anyone locally to say that
10:12:54  19   there would be someone who would better serve her.
10:12:55  20      Q   It's not a comment on you, Dr. Rozansky,
10:12:58  21   but a comment on you said that she really should be
10:13:02  22   seeing somebody, ideally, at least at that point in
10:13:06  23   time, two to three times a week, and my question to
10:13:07  24   you is after you got past what you called the
10:13:11  25   emergent situation, did you then talk to her about,
```

## Page 36

```
10:13:14   1   "Well, now maybe it's time to try somebody in
10:13:19   2   Phoenix or Casa Grande that you could see more
10:13:22   3   often"?
10:13:22   4      A   We talked about finding a therapist that
10:13:26   5   she could talk to more frequently.
10:13:28   6      Q   What did she say in response?
10:13:29   7      A   She didn't want to.
10:13:30   8      Q   Now, when you say therapist, you're a
10:13:32   9   psychiatrist, correct?
10:13:33  10      A   Yes.
10:13:33  11      Q   When you were referring to a therapist,
10:13:35  12   were you thinking of like a Ph.D. or a Master's
10:13:39  13   level counselor?
10:13:42  14      A   That it could be someone that she could
10:13:44  15   be in contact with, could be that.
10:13:48  16      Q   She never followed up on your advice, did
10:13:50  17   she?
10:13:55  18      A   I don't recall.
10:13:56  19      Q   You're not aware of her seeing a
10:13:59  20   therapist, are you?
10:14:02  21      A   I'm aware that she saw -- no, I'm not
10:14:09  22   aware of her seeing a therapist.  I'm a therapist,
10:14:18  23   also, by the way.
10:14:18  24      Q   But you were recommending a therapist in
10:14:21  25   Arizona, correct?
```

## Page 37

```
10:14:21   1      A   I was recommending that she see someone
10:14:21   2   locally that she could have more immediate contact
10:14:24   3   with.
10:14:24   4      And again, what she said was that that
10:14:27   5   was not the case, that she didn't have anyone there
10:14:31   6   that she either particularly wanted to see or felt
10:14:35   7   good about seeing, and --
10:14:38   8      Q   Do you know whether she saw anybody at
10:14:40   9   all in Arizona?
10:14:41  10      A   I don't know.
10:14:52  11      Q   You said that your treatment plan
10:14:54  12   consisted of both visits and medication?
10:14:57  13      A   That's right.
10:14:58  14      Q   What medication?
10:15:01  15      A   It ended up being Solexa -- Lexapro,
10:15:05  16   excuse me, Lexapro.
10:15:06  17      Q   How did you settle on that?
10:15:09  18      A   Well, first she was on Effexor, which,
10:15:13  19   with pregnancy, is not a good idea, so it was
10:15:16  20   stopped.
10:15:17  21      Q   Did you put her on Effexor, or did
10:15:20  22   somebody else?
10:15:21  23      A   I don't know, but I know that I put her
10:15:24  24   on Lexapro, and how did I settle on Lexapro?
10:15:27  25   Lexapro is a good antidepressant with a fairly good
```

Page 41

| | | |
|---|---|---|
| 10:19:55 | 1 | Q   Is that 56? Go back to 55, "Husband |
| 10:20:00 | 2 | bipolar, lots of medications," next line "Panama"; |
| 10:20:05 | 3 | what does that mean? |
| 10:20:06 | 4 | A   I think she traveled to Panama. It said |
| 10:20:07 | 5 | after that, "Wanted to be out of the situation, feel |
| 10:20:09 | 6 | depression but managed it; could take mind away, |
| 10:20:12 | 7 | distraction." |
| 10:20:12 | 8 | She traveled. She did lots of different |
| 10:20:15 | 9 | things to try and get her mind off of whatever was |
| 10:20:19 | 10 | troubling her, and that was one of the things, was |
| 10:20:24 | 11 | travel. |
| 10:20:25 | 12 | Q   Did she -- to your knowledge, did she |
| 10:20:27 | 13 | ever invest in any Panamanian ventures? |
| 10:20:31 | 14 | A   I don't know. |
| 10:20:31 | 15 | Q   Do you know whether she lost any money in |
| 10:20:33 | 16 | any Panamanian investments? |
| 10:20:36 | 17 | A   I know she was running through a lot of |
| 10:20:39 | 18 | money, and I don't know whether it was Panama or |
| 10:20:42 | 19 | not. |
| 10:20:43 | 20 | Q   She was spending a lot. |
| 10:20:44 | 21 | A   Yes. |
| 10:20:45 | 22 | Q   But I'm talking about investing money in |
| 10:20:49 | 23 | Panamanian ventures, and then losing the investment. |
| 10:20:52 | 24 | Are you aware of any -- |
| 10:20:57 | 25 | A   Specifically, no. |

Page 42

| | | |
|---|---|---|
| 10:20:59 | 1 | Q   Generally? |
| 10:20:59 | 2 | A   I don't recall that. |
| 10:21:01 | 3 | Q   Okay. If you turn the page, there's a |
| 10:21:04 | 4 | January 15 note on page 56; do you see that? |
| 10:21:13 | 5 | A   Page 56? |
| 10:21:14 | 6 | Q   January 15. |
| 10:21:15 | 7 | A   13th. |
| 10:21:18 | 8 | Q   Is it the 13th? |
| 10:21:20 | 9 | A   I have the 13th. 5/16 -- |
| 10:21:24 | 10 | Q   No, no, January. 5/16 is May. You're |
| 10:21:27 | 11 | looking at the May 16 note. Go up a little bit to |
| 10:21:31 | 12 | January. |
| 10:21:32 | 13 | A   Oh, yes, yes, yes. |
| 10:21:40 | 14 | Q   It says that -- "Phone call," and by the |
| 10:21:46 | 15 | way, when she would call you, would you generally |
| 10:21:48 | 16 | make a record that she called you? |
| 10:21:50 | 17 | A   No. |
| 10:21:52 | 18 | Q   Okay. Here it says, "Phone call; |
| 10:21:54 | 19 | contacted GYN and Lexapro okay, 10 milligrams; |
| 10:21:58 | 20 | contacted therapist, will see this week"; do you see |
| 10:22:02 | 21 | that? |
| 10:22:02 | 22 | A   Yes. |
| 10:22:03 | 23 | Q   Do you know who that therapist is? |
| 10:22:05 | 24 | A   No. |
| 10:22:06 | 25 | Q   Are you aware whether she actually saw |

Page 43

| | | |
|---|---|---|
| 10:22:08 | 1 | that therapist? |
| 10:22:09 | 2 | A   No, I'm not aware of it. |
| 10:22:10 | 3 | Q   Okay. Would it be fair to say that if |
| 10:22:12 | 4 | she saw a therapist you would likely know about it? |
| 10:22:16 | 5 | MR. GERMAN: Objection; form, foundation. |
| 10:22:16 | 6 | THE WITNESS: Well, I know this much |
| 10:22:19 | 7 | about it, I said she contacted a therapist and will |
| 10:22:21 | 8 | see this week. I know nothing more about that so I |
| 10:22:24 | 9 | don't know that she did or didn't. I presume that |
| 10:22:26 | 10 | since I didn't hear anything about it that she |
| 10:22:30 | 11 | probably didn't. |
| 10:22:31 | 12 | Q   Okay. And we're now nearly six years |
| 10:22:34 | 13 | later from January 15, 2007, and to your knowledge, |
| 10:22:35 | 14 | she never did see a therapist, correct? |
| 10:22:38 | 15 | A   Yeah, to my knowledge, no, she never did. |
| 10:22:40 | 16 | Q   And that was something you had |
| 10:22:43 | 17 | recommended to her? |
| 10:22:44 | 18 | A   Yes. |
| 10:22:48 | 19 | Q   Now, you said that you scheduled |
| 10:22:52 | 20 | appointments one of two ways: Either she would make |
| 10:22:56 | 21 | an appointment with you when she saw you, or she |
| 10:22:59 | 22 | would go home and call you and say, "How about next |
| 10:23:02 | 23 | Tuesday," correct? |
| 10:23:04 | 24 | A   Correct. |
| 10:23:04 | 25 | Q   If she were to call you up, how much of a |

Page 44

| | | |
|---|---|---|
| 10:23:08 | 1 | wait would there be to get in to see you? |
| 10:23:12 | 2 | A   If it was urgent, I could see her the |
| 10:23:15 | 3 | next day. |
| 10:23:16 | 4 | Q   Okay. If it wasn't urgent, but she said |
| 10:23:19 | 5 | "you know, I would like to come see you"? |
| 10:23:21 | 6 | A   Maybe a week. |
| 10:23:22 | 7 | Q   Would she call you directly, or did you |
| 10:23:24 | 8 | have some office professional that did the |
| 10:23:27 | 9 | scheduling? |
| 10:23:30 | 10 | A   Directly. I do the scheduling. |
| 10:23:35 | 11 | Q   When she would come see you, were these |
| 10:23:37 | 12 | generally hour-long visits? |
| 10:23:39 | 13 | A   Yes. |
| 10:23:41 | 14 | Q   What did you do in these visits? |
| 10:23:43 | 15 | Describe a typical visit. |
| 10:23:51 | 16 | A   A typical visit is she would describe how |
| 10:23:57 | 17 | she's feeling, what's going on with her in her |
| 10:24:02 | 18 | present life, what's happened since the last time we |
| 10:24:08 | 19 | met that seemed of significance to her. I would ask |
| 10:24:15 | 20 | for probably clarification. |
| 10:24:18 | 21 | This is a generalized statement that |
| 10:24:20 | 22 | would be true with almost any patient coming in on |
| 10:24:24 | 23 | that kind of basis. If we're doing a different kind |
| 10:24:33 | 24 | of formal psychoanalysis, or something like that, it |
| 10:24:36 | 25 | would be different than this, but this would be |

11 (Pages 41 to 44)

Page 45

| | | |
|---|---|---|
| 10:24:39 | 1 | typical with someone who I see periodically.  So I |
| 10:24:41 | 2 | try and catch up with what's going on with them, and |
| 10:24:44 | 3 | what's happening with them, and how the medication |
| 10:24:46 | 4 | is working or not working, and that would be it. |
| 10:24:55 | 5 | Q   You mentioned formal psychoanalysis.  Did |
| 10:24:59 | 6 | you ever do formal psychoanalysis with her? |
| 10:25:01 | 7 | A   With her? |
| 10:25:02 | 8 | Q   Yes. |
| 10:25:03 | 9 | A   Well, I'm a psychoanalyst, so in a sense |
| 10:25:06 | 10 | everything I do is based in some psychoanalytic |
| 10:25:11 | 11 | background, so I think a bit differently than most |
| 10:25:14 | 12 | people do when they're talking with someone. |
| 10:25:18 | 13 | Q   What I was trying to ask, Doctor, and |
| 10:25:19 | 14 | maybe I didn't ask it well is before I'd asked you |
| 10:25:22 | 15 | what you did in a visit. |
| 10:25:24 | 16 | A   Uh-huh. |
| 10:25:24 | 17 | Q   And you were talking about general visits |
| 10:25:26 | 18 | where you listened to patients, and then you |
| 10:25:29 | 19 | distinguished that from formal psychoanalysis, and |
| 10:25:32 | 20 | so my question to you is, okay, if formal |
| 10:25:35 | 21 | psychoanalysis is something different, did you ever |
| 10:25:38 | 22 | do that with Dr. O? |
| 10:25:40 | 23 | A   No, I wasn't seeing her frequently |
| 10:25:43 | 24 | enough.  Formal psychoanalysis would be -- could be |
| 10:25:47 | 25 | several times a week. |

Page 46

| | | |
|---|---|---|
| 10:25:49 | 1 | Q   Did you ever tell her, you know, "I'd |
| 10:25:51 | 2 | like to see you more frequently so I can do formal |
| 10:25:54 | 3 | psychoanalysis with you"? |
| 10:26:04 | 4 | A   No.  It was obvious that there was |
| 10:26:08 | 5 | limitations on how frequently I could see her, that |
| 10:26:10 | 6 | our visits were helping her.  She felt better with |
| 10:26:14 | 7 | that.  She developed an ability with her children, |
| 10:26:18 | 8 | that she could start relating to them.  At first, |
| 10:26:21 | 9 | when they were first born, she was afraid that she |
| 10:26:26 | 10 | couldn't bond to them, and that improved.  So she |
| 10:26:29 | 11 | was improving.  So the treatment was effective, and |
| 10:26:32 | 12 | I felt that justified our continuing as we were |
| 10:26:35 | 13 | doing; that if she found someone else to work with, |
| 10:26:38 | 14 | that would be fine with me, too, but it was working, |
| 10:26:41 | 15 | and it was helpful. |
| 10:26:42 | 16 | I think her situation was particularly |
| 10:26:45 | 17 | unique and that she needed whatever she could have |
| 10:26:50 | 18 | right now to help. |
| 10:26:51 | 19 | Q   Did you have any treatment goals when you |
| 10:26:54 | 20 | undertook treatment of her? |
| 10:26:55 | 21 | A   Yes, to be symptomatically better. |
| 10:26:59 | 22 | Q   Do you think you've achieved that? |
| 10:27:02 | 23 | A   I think I am achieving that. |
| 10:27:09 | 24 | Q   Is there further work to be done? |
| 10:27:11 | 25 | A   Yes. |

Page 47

| | | |
|---|---|---|
| 10:27:13 | 1 | Q   What needs to be done? |
| 10:27:16 | 2 | A   Further help. |
| 10:27:17 | 3 | Q   Consisting of? |
| 10:27:20 | 4 | A   Evaluating the present, her life, how she |
| 10:27:23 | 5 | is with herself.  She remains fragile, and with that |
| 10:27:34 | 6 | she needs what work she can get and help in seeing |
| 10:27:39 | 7 | what other things she can do for herself. |
| 10:27:44 | 8 | Q   Have you referred her to anybody? |
| 10:27:48 | 9 | Q   Recently? |
| 10:27:49 | 10 | Q   Ever. |
| 10:27:52 | 11 | A   No.  You mean a specific person? |
| 10:27:54 | 12 | Q   Or a specific specialist.  In other |
| 10:27:57 | 13 | words, not Dr. Smith, but a neurologist, a |
| 10:28:02 | 14 | neuropsych, any other professional just generally: |
| 10:28:06 | 15 | "You need to see so and so"? |
| 10:28:08 | 16 | A   For what? |
| 10:28:09 | 17 | Q   That's what I'm trying to understand.  I |
| 10:28:11 | 18 | wanted to know if you're -- if you're still working |
| 10:28:17 | 19 | on getting her symptomatically better, have you made |
| 10:28:21 | 20 | any referrals to other healthcare professionals? |
| 10:28:24 | 21 | A   For what? |
| 10:28:25 | 22 | Q   I don't know, Doctor.  That's why I'm |
| 10:28:27 | 23 | asking you. |
| 10:28:29 | 24 | A   Well, since I don't have any particular |
| 10:28:31 | 25 | reason to refer her to someone else, no, I haven't, |

Page 48

| | | |
|---|---|---|
| 10:28:34 | 1 | other than that I thought someone locally, where she |
| 10:28:37 | 2 | lives, would be better, but she doesn't quite live |
| 10:28:40 | 3 | there anymore. |
| 10:28:41 | 4 | Q   What about a grief counselor, have you |
| 10:28:44 | 5 | referred her to anybody? |
| 10:28:46 | 6 | A   I've suggested that that might be open to |
| 10:28:48 | 7 | her, and her reality is that if Isaac doesn't come |
| 10:28:52 | 8 | back there is no reason to go to a grief counselor. |
| 10:29:00 | 9 | Q   During your visits, did you ever do eye |
| 10:29:03 | 10 | movement desensitization reprocessing? |
| 10:29:07 | 11 | A   No. |
| 10:29:10 | 12 | Q   Cognitive behavioral therapy? |
| 10:29:13 | 13 | A   I think part of psychoanalysis is |
| 10:29:15 | 14 | cognitive behavioral therapy. |
| 10:29:17 | 15 | Q   How did you do that? |
| 10:29:19 | 16 | A   By working with her, and examining what |
| 10:29:22 | 17 | she does, and educating her about what's happening |
| 10:29:25 | 18 | to her. |
| 10:29:26 | 19 | Q   Can you give me some specific examples? |
| 10:29:28 | 20 | A   A specific example was the initial thing, |
| 10:29:29 | 21 | that when I saw that she was hyperventilating and |
| 10:29:32 | 22 | that the chemicals were changing in her bloodstream |
| 10:29:35 | 23 | as a result of hyperventilating, I suggested she |
| 10:29:39 | 24 | breathe into a paper bag and change the chemistry of |
| 10:29:44 | 25 | her blood supply. |

12  (Pages 45 to 48)

Page 49

| | | |
|---|---|---|
| 10:29:45 | 1 | Q   Is that part of cognitive behavioral |
| 10:29:46 | 2 | therapy? |
| 10:29:46 | 3 | A   Specifically, what is cognitive |
| 10:29:49 | 4 | behavioral therapy?  It's helping people understand |
| 10:29:52 | 5 | what's happening to them and changing what they're |
| 10:29:54 | 6 | doing.  So that's what I was doing. |
| 10:29:57 | 7 | Q   By having her breathe into a bag? |
| 10:29:59 | 8 | A   That's right -- well, more than that. |
| 10:30:02 | 9 | The explanation of what happens, that's very |
| 10:30:04 | 10 | important to her.  She's a scientist.  She's -- you |
| 10:30:07 | 11 | know, no more than I can tell her to walk backwards |
| 10:30:11 | 12 | would be helpful or eye movements would be.  I know |
| 10:30:14 | 13 | this is helpful, and I know how it's helpful.  It's |
| 10:30:18 | 14 | been helpful in a lot of people. |
| 10:30:20 | 15 | Q   Can you give us other examples of how you |
| 10:30:24 | 16 | employed cognitive behavioral therapy in your |
| 10:30:27 | 17 | visits? |
| 10:30:27 | 18 | A   I don't know there are any specifics to |
| 10:30:30 | 19 | cognitive behavioral therapy.  I think it's part of |
| 10:30:33 | 20 | a style that certain people are trained in, but I |
| 10:30:36 | 21 | think after this number of years of doing a variety |
| 10:30:38 | 22 | of therapies, that it all becomes my therapy, and |
| 10:30:41 | 23 | the way I do it.  So I don't really identify it |
| 10:30:45 | 24 | particularly as cognitive behavioral, or Freudian |
| 10:30:49 | 25 | psychoanalytic, or Jungian psychoanalytic, but it's |

Page 50

| | | |
|---|---|---|
| 10:30:54 | 1 | all a part of what I do. |
| 10:30:55 | 2 | Q   So you're saying what you do has many |
| 10:30:58 | 3 | elements of cognitive behavioral therapy? |
| 10:31:02 | 4 | A   I think cognitive behavioral therapy has |
| 10:31:05 | 5 | many elements of what I do. |
| 10:31:06 | 6 | Q   Can you give us some examples of what you |
| 10:31:09 | 7 | do that might qualify or be termed cognitive |
| 10:31:12 | 8 | behavioral therapy? |
| 10:31:14 | 9 | A   I think most of what I do is a cognitive |
| 10:31:18 | 10 | behavioral therapy. |
| 10:31:19 | 11 | Q   Okay.  Help me understand what that is so |
| 10:31:23 | 12 | that I -- |
| 10:31:23 | 13 | A   What cognitive behavioral therapy is? |
| 10:31:25 | 14 | Q   Or what you would do that would be an |
| 10:31:27 | 15 | example, besides the bag, breathing in the bag. |
| 10:31:29 | 16 | A   That was an example.  It's all that I do, |
| 10:31:32 | 17 | is cognitive behavioral therapy.  I work with people |
| 10:31:36 | 18 | about what they're doing, what their behavior is, |
| 10:31:40 | 19 | how it helps them, how it doesn't help them, and |
| 10:31:43 | 20 | educate them about what they might do differently. |
| 10:31:46 | 21 | Q   Do you ever work with her in terms of |
| 10:31:50 | 22 | imagining herself back practicing radiation |
| 10:31:53 | 23 | oncology? |
| 10:31:55 | 24 | A   Specifically, we have talked about that, |
| 10:32:00 | 25 | and that she finds that -- I wrote about that.  It's |

Page 51

| | | |
|---|---|---|
| 10:32:05 | 1 | in the -- it's in there, what her attitudes are |
| 10:32:09 | 2 | about that.  It comes so close to what she had been |
| 10:32:13 | 3 | through with Isaac that she couldn't do that.  She |
| 10:32:16 | 4 | can't even consider it, so there is not an issue of |
| 10:32:21 | 5 | going there. |
| 10:32:22 | 6 | Q   So the answer to my question would be |
| 10:32:24 | 7 | that that's just something you do not do in your |
| 10:32:27 | 8 | visits with her, correct? |
| 10:32:30 | 9 | A   That there's no reason to do that in the |
| 10:32:33 | 10 | therapy. |
| 10:32:35 | 11 | Q   Meaning that you don't do it with her, |
| 10:32:37 | 12 | correct? |
| 10:32:37 | 13 | MR. GERMAN:  Objection; asked and |
| 10:32:38 | 14 | answered. |
| 10:32:39 | 15 | THE WITNESS:  Meaning that if the |
| 10:32:40 | 16 | opportunity came up that I thought that was an |
| 10:32:42 | 17 | opening, that I might do that.  It would be my |
| 10:32:46 | 18 | choice at the time. |
| 10:32:47 | 19 | BY MR. BRESSLER: |
| 10:32:47 | 20 | Q   Have you done -- |
| 10:32:51 | 21 | A   The point is, I mean, take her as a burn |
| 10:32:53 | 22 | victim.  You don't tell her to put her hands, you |
| 10:32:57 | 23 | know, close to warm situations to see how much she |
| 10:33:01 | 24 | can tolerate.  Her involvement in radio oncology is |
| 10:33:09 | 25 | about the same as that.  It's horrendous. |

Page 52

| | | |
|---|---|---|
| 10:33:18 | 1 | You know, I think that's what's lost is |
| 10:33:21 | 2 | how much pain this woman is in when she comes close |
| 10:33:24 | 3 | to anything about Isaac, and the death of Isaac, and |
| 10:33:30 | 4 | all that she is as a person.  She developed, through |
| 10:33:35 | 5 | many trials, into the person she is and was, and was |
| 10:33:40 | 6 | very successful with that, and it all came to an |
| 10:33:44 | 7 | abrupt halt, and she is hardly able to be together |
| 10:33:50 | 8 | as a person as a result of that because the very |
| 10:33:54 | 9 | things that she worked for, the very things that she |
| 10:33:57 | 10 | thought about herself are gone. |
| 10:34:00 | 11 | Q   In light of the intensity that you're |
| 10:34:02 | 12 | describing, wouldn't it make sense, wouldn't it be |
| 10:34:06 | 13 | appropriate for her to be seeing somebody, you or |
| 10:34:08 | 14 | somebody else, on a frequency of more than once a |
| 10:34:12 | 15 | month? |
| 10:34:16 | 16 | A   Could you repeat that? |
| 10:34:17 | 17 | MR. BRESSLER:  I'll just have the court |
| 10:34:18 | 18 | reporter read it back. |
| 10:34:00 | 19 | (The record was read as follows: |
| 10:34:00 | 20 | "Question:  In light of the |
| 10:34:02 | 21 | intensity that you're describing, |
| 10:34:04 | 22 | wouldn't it make sense, wouldn't it be |
| 10:34:06 | 23 | appropriate for her to be seeing |
| 10:34:07 | 24 | somebody, you or somebody else, on a |
| 10:34:10 | 25 | frequency of more than once a month?") |

Page 53

| | | |
|---|---|---|
| 10:34:32 | 1 | MR. GERMAN: Objection; form and |
| 10:34:34 | 2 | foundation. |
| 10:34:34 | 3 | THE WITNESS: I answered that. |
| 10:34:37 | 4 | BY MR. BRESSLER: |
| 10:34:37 | 5 | Q  The answer being yes? |
| 10:34:39 | 6 | A  Of course. |
| 10:34:40 | 7 | Q  During your sessions with her, do you |
| 10:34:44 | 8 | engage in interpersonal therapy? |
| 10:34:48 | 9 | A  You are giving me specific names to |
| 10:34:50 | 10 | specific things that don't exist.  It's all |
| 10:34:54 | 11 | interpersonal.  It's between two people. |
| 10:34:56 | 12 | Q  So the term "interpersonal therapy" |
| 10:34:59 | 13 | doesn't have a specific meaning within the |
| 10:35:03 | 14 | psychiatric field? |
| 10:35:04 | 15 | A  It does to some people. |
| 10:35:06 | 16 | Q  Not to you? |
| 10:35:07 | 17 | A  Not to me. |
| 10:35:07 | 18 | Q  What about motivational interviewing? |
| 10:35:11 | 19 | A  I do motivational interviewing.  I do |
| 10:35:12 | 20 | interpersonal therapy.  I do all of these things |
| 10:35:15 | 21 | depending on how you're going to define them. |
| 10:35:21 | 22 | Q  But to you they can mean many things? |
| 10:35:24 | 23 | A  Yes. |
| 10:35:32 | 24 | MR. GERMAN:  Steve, we've been going |
| 10:35:33 | 25 | about an hour. |

Page 54

| | | |
|---|---|---|
| 10:35:34 | 1 | MR. BRESSLER:  Do you want to take a |
| 10:35:35 | 2 | break? |
| 10:35:35 | 3 | MR. GERMAN:  I think it's a good idea to |
| 10:35:38 | 4 | take a break once every hour. |
| 10:35:40 | 5 | MR. BRESSLER:  Then we'll take one. |
| 10:35:41 | 6 | MR. GERMAN:  Yeah. |
| 10:35:41 | 7 | THE VIDEOGRAPHER:  Off the record at |
| 10:35:46 | 8 | 10:35. |
| 10:35:47 | 9 | (Brief recess.) |
| 10:51:42 | 10 | THE VIDEOGRAPHER:  On record at 10:52. |
| 10:52:12 | 11 | BY MR. BRESSLER: |
| 10:52:12 | 12 | Q  Dr. Rozansky, I want to change gears a |
| 10:52:16 | 13 | little bit. |
| 10:52:18 | 14 | Did you understand whether or not Dr. O |
| 10:52:22 | 15 | participated in her son Isaac's care? |
| 10:52:29 | 16 | A  No.  I don't know what her |
| 10:52:32 | 17 | participation was or was not.  I know that she |
| 10:52:38 | 18 | participated, and I know she expressed her views, |
| 10:52:41 | 19 | and there was some fuss about that at one of the |
| 10:52:46 | 20 | hospitals. |
| 10:52:47 | 21 | Q  And that's what I wanted to ask you about |
| 10:52:49 | 22 | because in one of your letters -- that I think I've |
| 10:52:56 | 23 | got the citation to it wrong -- I thought it was |
| 10:53:01 | 24 | your October 24, 2009, letter to Dr. Kaplan, and it |
| 10:53:20 | 25 | will be page 181 of Exhibit I. |

Page 55

| | | |
|---|---|---|
| 10:53:24 | 1 | MR. GERMAN:  What's the date of the |
| 10:53:25 | 2 | letter? |
| 10:53:26 | 3 | MR. BRESSLER:  October 24, 2009. |
| 10:53:28 | 4 | THE WITNESS:  181? |
| 10:53:29 | 5 | MR. BRESSLER:  Yes. |
| 10:53:31 | 6 | Q  And I'm just telling you where it is.  I |
| 10:53:33 | 7 | don't think you'll have to turn to it unless you'd |
| 10:53:37 | 8 | like to. |
| 10:53:37 | 9 | A  Okay, no. |
| 10:53:39 | 10 | Q  Let me just -- you wrote: |
| 10:53:39 | 11 | "She actively participated in |
| 10:53:41 | 12 | Isaac's treatment to such a degree that |
| 10:53:43 | 13 | when she -- when Isaac needed radiation |
| 10:53:46 | 14 | therapy to the brain because of the |
| 10:53:48 | 15 | spread of his disease to the optic |
| 10:53:50 | 16 | nerve and eye, she was allowed to plan |
| 10:53:52 | 17 | the radiation treatment including the |
| 10:53:54 | 18 | drawing of blocks to identify the |
| 10:53:57 | 19 | radiation treatment field and to |
| 10:53:58 | 20 | protect the normal surrounding tissue |
| 10:53:59 | 21 | for her son." |
| 10:54:00 | 22 | Do you recall writing that? |
| 10:54:02 | 23 | A  Yeah. |
| 10:54:03 | 24 | Q  Okay.  But yet, your notes also say, and |
| 10:54:08 | 25 | you just mentioned a couple moments ago, that she |

Page 56

| | | |
|---|---|---|
| 10:54:12 | 1 | had some friction with the doctors who were treating |
| 10:54:15 | 2 | her son. |
| 10:54:16 | 3 | A  Yes. |
| 10:54:17 | 4 | Q  Tell us about that. |
| 10:54:20 | 5 | A  Well, what I -- I'm not sure whether it's |
| 10:54:23 | 6 | that incident or what, but they complained about her |
| 10:54:28 | 7 | entry into treatment, and I think the hospital told |
| 10:54:32 | 8 | her that she -- I know the hospital told her that |
| 10:54:34 | 9 | she couldn't participate anymore at the hospital |
| 10:54:39 | 10 | doing that because it was interfering with the |
| 10:54:41 | 11 | treatment of her son, and that she would have to |
| 10:54:43 | 12 | step down from doing that. |
| 10:54:46 | 13 | Q  Did you understand that -- let me back |
| 10:54:50 | 14 | up. |
| 10:54:50 | 15 | Do you know which hospitals? |
| 10:54:53 | 16 | A  No.  I don't remember. |
| 10:54:53 | 17 | Q  Are you aware that the University Medical |
| 10:54:56 | 18 | Center apparently asked her to transfer her son's |
| 10:54:59 | 19 | healthcare elsewhere? |
| 10:55:01 | 20 | A  Yes. |
| 10:55:02 | 21 | Q  And are you aware that he was transferred |
| 10:55:04 | 22 | to Phoenix Children's Hospital? |
| 10:55:08 | 23 | A  I don't remember that name of the |
| 10:55:09 | 24 | hospital, but, yes, I know that he was transferred. |
| 10:55:12 | 25 | Q  And are you aware that she also had |

Page 65

| | | |
|---|---|---|
| 11:07:00 | 1 | danger. |
| 11:07:00 | 2 | And you could explain to them -- talk |
| 11:07:03 | 3 | about cognitive behavioral therapy -- you can |
| 11:07:05 | 4 | explain to them over and over again the reality is |
| 11:07:07 | 5 | not that, is that it's necessary for them to squat. |
| 11:07:10 | 6 | They're not dying.  They have to squat until their |
| 11:07:13 | 7 | oxygen level goes up, and they can get up and walk |
| 11:07:16 | 8 | again. |
| 11:07:16 | 9 | And these parents in group would talk |
| 11:07:18 | 10 | about how they felt inside, and they felt absolutely |
| 11:07:22 | 11 | helpless and frightened, and you can -- you could |
| 11:07:26 | 12 | point out to them, wait a second, your kid got up |
| 11:07:31 | 13 | each time and was okay, but they couldn't here that. |
| 11:07:35 | 14 | They knew the feeling inside as a parent that this |
| 11:07:37 | 15 | was, you know, this was not good. |
| 11:07:39 | 16 | Q   Was that helpful for the parents, though, |
| 11:07:41 | 17 | to be with other parents of cyanotic children, and |
| 11:07:46 | 18 | share their experiences in a group? |
| 11:07:47 | 19 | A   It was the conclusion of our paper that |
| 11:07:50 | 20 | the new parents of the group were very pleased |
| 11:07:52 | 21 | because it gave them information.  The parents who |
| 11:07:54 | 22 | had been around a long time did not want to do it |
| 11:07:55 | 23 | because they had what we call this anticipatory |
| 11:07:59 | 24 | grieving.  They were always ready for death to |
| 11:08:03 | 25 | occur, and they would anticipate that death by a |

Page 66

| | | |
|---|---|---|
| 11:08:05 | 1 | sense of grief inside, and they wanted to get as far |
| 11:08:08 | 2 | away from that as they would.  They would divorce |
| 11:08:10 | 3 | each other to get away from it, lots of divorces. |
| 11:08:15 | 4 | Q   Did you ever recommend to Dr. O that she |
| 11:08:17 | 5 | participate in some sort of -- |
| 11:08:17 | 6 | A   To look for a grieving group, yes. |
| 11:08:20 | 7 | Q   And did she ever do that? |
| 11:08:21 | 8 | A   No. |
| 11:08:22 | 9 | Q   Okay. |
| 11:08:22 | 10 | A   She wouldn't, too, if you know her. |
| 11:08:25 | 11 | She's too private for that.  She won't do it. |
| 11:08:29 | 12 | Q   Going to your May 16, 2007, note which is |
| 11:08:32 | 13 | on page 11 and page 56 -- it's the same note, it's |
| 11:08:39 | 14 | at two different points -- |
| 11:08:40 | 15 | A   11 and -- |
| 11:08:51 | 16 | Q   Of Exhibit 1. |
| 11:08:52 | 17 | A   11, yeah. |
| 11:08:53 | 18 | Q   And, it's typed up at page 56.  You |
| 11:08:57 | 19 | wrote, "Was supposed to go back to work on Monday." |
| 11:09:00 | 20 | Given that she had sold her practice two |
| 11:09:03 | 21 | months earlier, what was your understanding about |
| 11:09:05 | 22 | her arrangement with the purchaser of the practice? |
| 11:09:08 | 23 | A   I don't know. |
| 11:09:11 | 24 | Q   Let's go to your next visit, which is two |
| 11:09:19 | 25 | visits down, which is July 27, 2007, page 57. |

Page 67

| | | |
|---|---|---|
| 11:09:27 | 1 | A   Got it -- I am on page 19.  You're |
| 11:09:32 | 2 | looking at the typed one. |
| 11:09:33 | 3 | Q   You're looking at page 15, sir? |
| 11:09:35 | 4 | A   What about the other one? |
| 11:09:36 | 5 | Q   If you prefer to read from the |
| 11:09:38 | 6 | handwritten one that's fine.  The typed one is page |
| 11:09:41 | 7 | 57. |
| 11:09:45 | 8 | A   Probably you'd prefer to look at the |
| 11:09:48 | 9 | typed one than look at my handwriting. |
| 11:09:50 | 10 | Q   Well, I wasn't going to say anything. |
| 11:09:52 | 11 | A   Okay, 57. |
| 11:09:53 | 12 | Q   You wrote in there, "found a lawyer"; do |
| 11:09:55 | 13 | you see that? |
| 11:09:59 | 14 | A   Where are you at? |
| 11:10:00 | 15 | Q   July 27, 2007 -- your hand's in my way. |
| 11:10:08 | 16 | A   I'm sorry. |
| 11:10:10 | 17 | Q   Right there. |
| 11:10:11 | 18 | A   Found a lawyer, yeah. |
| 11:10:11 | 19 | Q   What was that in reference to? |
| 11:10:15 | 20 | A   That she wanted a lawyer to talk about -- |
| 11:10:22 | 21 | I suspect the only thing she was looking for was her |
| 11:10:28 | 22 | case. |
| 11:10:29 | 23 | Q   Her disability claim? |
| 11:10:31 | 24 | A   Yeah, her disability claim. |
| 11:10:31 | 25 | Q   Now, given at that point in time the only |

Page 68

| | | |
|---|---|---|
| 11:10:32 | 1 | thing she had done was telephone her insurance agent |
| 11:10:35 | 2 | to tell Met Life that she was going to submit a |
| 11:10:41 | 3 | disability claim, do you know why she wanted to get |
| 11:10:44 | 4 | a lawyer at that point? |
| 11:10:45 | 5 | A   Well, I told her -- she said something |
| 11:10:46 | 6 | about the insurance thing to me, and I said that you |
| 11:10:49 | 7 | should talk to a lawyer about that.  I don't know |
| 11:10:51 | 8 | anything about the insurance claim. |
| 11:10:54 | 9 | Q   Was that before she ever submitted a |
| 11:10:56 | 10 | disability claim, or after she submitted the claim |
| 11:10:59 | 11 | that you had -- |
| 11:11:00 | 12 | A   I don't know.  It was incidental. |
| 11:11:04 | 13 | Q   Because this apparently is before any -- |
| 11:11:07 | 14 | A   I think it follows the line, "Everything |
| 11:11:10 | 15 | new is a stress; found a lawyer."  I wanted her to |
| 11:11:12 | 16 | get some of it off her back and give it to somebody |
| 11:11:16 | 17 | else, so she could give it to a lawyer. |
| 11:11:19 | 18 | Q   Do you know how she found that lawyer? |
| 11:11:20 | 19 | A   No. |
| 11:11:21 | 20 | Q   Do you know if she was surfing the |
| 11:11:23 | 21 | Internet to find a lawyer? |
| 11:11:24 | 22 | A   I don't know. |
| 11:11:24 | 23 | Q   You also wrote, "Insurance man always |
| 11:11:29 | 24 | happy to hear from me; he wasn't happy to hear from |
| 11:11:33 | 25 | me"; do you see that? |

17 (Pages 65 to 68)

Page 105

| | | |
|---|---|---|
| 12:03:44 | 1 | Q   Does she have conflict with her father? |
| 12:03:50 | 2 | A   Yes. |
| 12:03:50 | 3 | MR. GERMAN:  Objection; form, foundation. |
| 12:03:52 | 4 | BY MR. BRESSLER: |
| 12:03:53 | 5 | Q   Conflict with her brother? |
| 12:03:54 | 6 | A   Yes. |
| 12:03:56 | 7 | Q   A little ways down you've written |
| 12:03:59 | 8 | "financial situation"; do you see that? |
| 12:04:02 | 9 | A   The same page? |
| 12:04:03 | 10 | Q   Yes, right there. |
| 12:04:07 | 11 | What's that in reference to? |
| 12:04:29 | 12 | A   Well, it's -- she's first talking about |
| 12:04:33 | 13 | the children and how she feels about them, and then |
| 12:04:37 | 14 | she says, "I cannot take outside demands or stress; |
| 12:04:44 | 15 | hard to communicate on numbers.  Comprehensive |
| 12:04:50 | 16 | situation."  I don't know what that is.  "Financial |
| 12:04:52 | 17 | situation," says she can't -- these are things that |
| 12:04:55 | 18 | she can't deal with. |
| 12:04:58 | 19 | Q   Now, you're aware at this point in |
| 12:05:01 | 20 | time -- well, let me rephrase that. |
| 12:05:03 | 21 | Met Life was paying her monthly -- her |
| 12:05:05 | 22 | monthly disability benefit. |
| 12:05:07 | 23 | A   Yes. |
| 12:05:08 | 24 | Q   And it has always paid her monthly |
| 12:05:11 | 25 | disability benefit, correct? |

Page 106

| | | |
|---|---|---|
| 12:05:13 | 1 | MR. GERMAN:  Objection; form, |
| 12:05:14 | 2 | foundation. |
| 12:05:15 | 3 | THE WITNESS:  Yes. |
| 12:05:15 | 4 | BY MR. BRESSLER: |
| 12:05:15 | 5 | Q   To this day, it pays her monthly |
| 12:05:18 | 6 | disability payment, correct? |
| 12:05:20 | 7 | MR. GERMAN:  Objection; form, |
| 12:05:21 | 8 | foundation. |
| 12:05:21 | 9 | THE WITNESS:  I assume so. |
| 12:05:22 | 10 | BY MR. BRESSLER: |
| 12:05:22 | 11 | Q   So do you know what the reference to |
| 12:05:25 | 12 | "financial situation" in your note means? |
| 12:05:26 | 13 | A   Just dealing with money in her daily |
| 12:05:34 | 14 | life, that -- and the future, what her future will |
| 12:05:37 | 15 | be about.  She feels threatened in terms of the |
| 12:05:40 | 16 | insurance policy.  She said that when she bought the |
| 12:05:46 | 17 | policy, it was supposed to continue to pay her, and |
| 12:05:49 | 18 | that from the beginning with Met Life, they've been |
| 12:05:52 | 19 | looking for reasons to not pay her, and so she feels |
| 12:05:56 | 20 | this adversarial position from them, rather than a |
| 12:06:00 | 21 | supportive situation.  You know, their ads are |
| 12:06:02 | 22 | always supportive.  Their behavior is other than |
| 12:06:07 | 23 | supportive in her -- |
| 12:06:08 | 24 | Q   In her view? |
| 12:06:08 | 25 | A   In her view, yes.  It's investigating. |

Page 107

| | | |
|---|---|---|
| 12:06:11 | 1 | What are we doing here today, but investigating her |
| 12:06:15 | 2 | as to whether she's real or not real, whether she's |
| 12:06:17 | 3 | getting adequate treatment or not.  So, you know, |
| 12:06:20 | 4 | you're not here as a friend of Inna's.  You're here |
| 12:06:25 | 5 | to investigate and find how she is not carrying out |
| 12:06:28 | 6 | her part, or how she doesn't deserve to get what she |
| 12:06:33 | 7 | paid for.  So she has a hard time dealing and -- |
| 12:06:39 | 8 | where she needs concentration. |
| 12:06:42 | 9 | She's beginning to see that she's also |
| 12:06:45 | 10 | having problems with memory and forgetting things, |
| 12:06:49 | 11 | and this is one of the concerns with PTSD, is that |
| 12:06:54 | 12 | people have cognitive changes that occur, and this |
| 12:07:00 | 13 | may be occurring with her.  So she says "I cannot |
| 12:07:05 | 14 | deal with important decisions." |
| 12:07:06 | 15 | Q   Let's talk about that for a moment. |
| 12:07:08 | 16 | If she was beginning, at least in her |
| 12:07:10 | 17 | view, to have problems with memory and forgetting |
| 12:07:15 | 18 | things, did you refer her to a neurologist? |
| 12:07:18 | 19 | A   We talked about a neurologist.  She |
| 12:07:20 | 20 | didn't follow through on that. |
| 12:07:22 | 21 | Q   Did you say to her, "Inna, I think if |
| 12:07:24 | 22 | you're really having these problems with your memory |
| 12:07:28 | 23 | and forgetting things, you do need to go see a |
| 12:07:31 | 24 | neurologist, at least for a consultation"? |
| 12:07:33 | 25 | MR. GERMAN:  Asked and answered. |

Page 108

| | | |
|---|---|---|
| 12:07:34 | 1 | THE WITNESS:  I don't know that those |
| 12:07:35 | 2 | were my specific words, but yes. |
| 12:07:36 | 3 | BY MR. BRESSLER: |
| 12:07:36 | 4 | Q   And she didn't follow your |
| 12:07:38 | 5 | recommendation? |
| 12:07:39 | 6 | A   No. |
| 12:07:39 | 7 | Q   Did you say to her, you should go see a |
| 12:07:43 | 8 | neuropsychologist -- let me rephrase it. |
| 12:07:47 | 9 | Did you recommend to her that she see a |
| 12:07:49 | 10 | neuropsychologist? |
| 12:07:52 | 11 | A   No, I did not. |
| 12:07:53 | 12 | Q   Why not? |
| 12:07:54 | 13 | A   Because I would not refer her to a |
| 12:07:57 | 14 | neuropsychologist after -- I think that the proper |
| 12:08:02 | 15 | place for her to see is a neurologist. |
| 12:08:09 | 16 | Q   Did she tell you why she wasn't going to |
| 12:08:10 | 17 | see a neurologist? |
| 12:08:12 | 18 | A   Because she can't organize much of |
| 12:08:14 | 19 | anything in her life.  She mostly feels like she's |
| 12:08:18 | 20 | trying to escape, and that's what she tries to do, |
| 12:08:22 | 21 | escape. |
| 12:08:22 | 22 | Q   Now, you say she doesn't organize things |
| 12:08:25 | 23 | in her life. |
| 12:08:25 | 24 | A   Yes. |
| 12:08:26 | 25 | Q   But she does have -- at one point she had |

27  (Pages 105 to 108)

Page 113

| 12:12:23 | 1 | Q When she flies, does she come with Don or |
| 12:12:26 | 2 | by herself? |
| 12:12:27 | 3 | A I don't know. |
| 12:12:38 | 4 | Q I want to talk about your October 24, |
| 12:12:39 | 5 | 2009, letter to Dr. Eric Kaplan, and it's at page |
| 12:12:46 | 6 | 181 of Exhibit 1. |
| 12:12:48 | 7 | A This -- back in there? |
| 12:12:54 | 8 | Q Yes. |
| 12:13:06 | 9 | A Yes. |
| 12:13:06 | 10 | Q Now, at this point in time, October 24, |
| 12:13:09 | 11 | 2009, you've been treating her over two and a half |
| 12:13:12 | 12 | years, correct? |
| 12:13:15 | 13 | A Yes. |
| 12:13:16 | 14 | Q And at this point in time, you're |
| 12:13:20 | 15 | reporting that there is -- that she's not improving. |
| 12:13:23 | 16 | MR. GERMAN: Objection. |
| 12:13:33 | 17 | BY MR. BRESSLER: |
| 12:13:33 | 18 | Q Do you need to review the letter more, |
| 12:13:35 | 19 | Doctor? I wanted to follow up and ask you a |
| 12:13:37 | 20 | question. |
| 12:13:39 | 21 | A You said that I said that she's not |
| 12:13:42 | 22 | improving? |
| 12:13:43 | 23 | Q At least describing a situation where |
| 12:13:45 | 24 | she's not improving, and my question to you is at |
| 12:13:54 | 25 | the outset of the -- let's back up. |

Page 114

| 12:13:56 | 1 | At the outset of the deposition, you told |
| 12:14:00 | 2 | me that your treatment consisted of visits which had |
| 12:14:03 | 3 | been roughly monthly, but sometimes even less |
| 12:14:07 | 4 | frequency, and medication which is Lexapro, correct? |
| 12:14:10 | 5 | A Right. |
| 12:14:11 | 6 | Q And the Lexapro has been, for many years, |
| 12:14:14 | 7 | 30 milligrams of Lexapro, correct? |
| 12:14:16 | 8 | A Correct. |
| 12:14:17 | 9 | Q In light of the fact that she's not |
| 12:14:19 | 10 | getting better, why not change the treatment and |
| 12:14:26 | 11 | either have more frequent visits, or increase the |
| 12:14:32 | 12 | dosage of the medication, or change the medication? |
| 12:14:47 | 13 | A I think the medication was treating her |
| 12:14:50 | 14 | adequately. There is some question about add-on |
| 12:14:57 | 15 | medications when someone is depressed, but I felt |
| 12:15:00 | 16 | that she was having more than a depression, and it |
| 12:15:03 | 17 | was this issue of complicated grief that came up, |
| 12:15:07 | 18 | and that complicated grief is one that is long-term |
| 12:15:14 | 19 | and needs supportive care, and that's what I was |
| 12:15:17 | 20 | providing, and that I'm an expert in. |
| 12:15:21 | 21 | Q You're an expert in complicated grief? |
| 12:15:24 | 22 | A No, in supportive care. |
| 12:15:35 | 23 | As far as an expert in complicated grief, |
| 12:15:39 | 24 | I think anyone who's been in practice a long time |
| 12:15:43 | 25 | becomes knowledgeable about complicated grief. |

Page 115

| 12:15:46 | 1 | Q You did not see any need to refer her out |
| 12:15:49 | 2 | to somebody who held themselves out as a specialist |
| 12:15:51 | 3 | in complicated grief, did you? |
| 12:15:54 | 4 | A No, I did not. |
| 12:15:56 | 5 | Q Did you -- strike that. |
| 12:15:58 | 6 | A That would be tantamount to saying to her |
| 12:16:02 | 7 | that -- all these different pieces you have to go to |
| 12:16:07 | 8 | different people for, and again, she's a very, you |
| 12:16:10 | 9 | know, difficult person in terms of her ability to |
| 12:16:14 | 10 | bond to anyone now, and I think that in some ways |
| 12:16:20 | 11 | she's -- although I'm saying here, you know, she's |
| 12:16:23 | 12 | not improving -- baseline stuff is not improving, |
| 12:16:26 | 13 | that, in fact, she has improved on the surface in |
| 12:16:30 | 14 | terms of her ability to function, and I think the |
| 12:16:34 | 15 | business of the children is a measure of her |
| 12:16:38 | 16 | improvement, that she's able to relate to them, but |
| 12:16:40 | 17 | I think that's about it. |
| 12:16:42 | 18 | And if you've worked with anyone with |
| 12:16:45 | 19 | complicated grief, they may go on their whole life |
| 12:16:50 | 20 | in complicated grief and develop varying degrees of |
| 12:16:57 | 21 | health, but the baseline underneath is that their |
| 12:17:00 | 22 | child died, but for her, not only did the child die, |
| 12:17:10 | 23 | but she's somehow responsible for, which is not |
| 12:17:13 | 24 | unusual for someone with complicated grief. |
| 12:17:16 | 25 | I've treated concentration camp people, |

Page 116

| 12:17:20 | 1 | who -- where this is very much at issue. They feel |
| 12:17:22 | 2 | responsible, if they survived -- obviously they |
| 12:17:26 | 3 | survived; I'm seeing them -- they feel responsible |
| 12:17:32 | 4 | for the people who died, and they survived on the |
| 12:17:36 | 5 | bread of people who were starving not having, and |
| 12:17:38 | 6 | that's well documented. That's complicated grief |
| 12:17:43 | 7 | there, and I've worked with people from there. |
| 12:17:46 | 8 | Same thing with Vietnam War veterans, who |
| 12:17:49 | 9 | also had complicated grief, that they survived and |
| 12:17:53 | 10 | their buddies didn't, and we have it again now with |
| 12:17:56 | 11 | the wars that we're fighting now. |
| 12:17:58 | 12 | So the improvement is something that's up |
| 12:18:02 | 13 | here. The depth of despair underneath, it remains; |
| 12:18:05 | 14 | that they feel much like the burn victim, that |
| 12:18:10 | 15 | anyone who comes close to that may pierce it, and |
| 12:18:17 | 16 | hurt them again is evident with her. |
| 12:18:20 | 17 | Q Why not -- if she's still at this |
| 12:18:25 | 18 | baseline, why not refer her out for therapy? |
| 12:18:30 | 19 | A Because I was working with her. |
| 12:18:32 | 20 | Q Okay. But at the beginning of your |
| 12:18:33 | 21 | treatment, you suggested that she see somebody in |
| 12:18:36 | 22 | Arizona -- |
| 12:18:36 | 23 | A Yes. |
| 12:18:37 | 24 | Q -- perhaps on a more frequent basis. |
| 12:18:39 | 25 | Why not at this point, two and a half |

## Page 117

| | | |
|---|---|---|
| 12:18:41 | 1 | years later, where she's not better, why not say |
| 12:18:44 | 2 | "now is the time for you to go see somebody more |
| 12:18:47 | 3 | frequently"? |
| 12:18:48 | 4 | A   Because I have a good working |
| 12:18:50 | 5 | relationship with her that she appreciates, and I |
| 12:18:52 | 6 | feel like that's important to continue for. |
| 12:18:54 | 7 | Q   Why not increase the frequency of your |
| 12:18:57 | 8 | visits with her? |
| 12:18:58 | 9 | A   Because this is the frequency that we |
| 12:19:01 | 10 | have right now. |
| 12:19:03 | 11 | Q   But why not -- that sort of begs the |
| 12:19:06 | 12 | question:  Why not increased frequency? |
| 12:19:08 | 13 | A   Because right now this seems to be what |
| 12:19:11 | 14 | she tolerates. |
| 12:19:14 | 15 | Q   Or is willing to do? |
| 12:19:16 | 16 | MR. GERMAN:  Objection. |
| 12:19:19 | 17 | THE WITNESS:  "Willing to do" is a |
| 12:19:21 | 18 | negative comment about her, and I don't accept it as |
| 12:19:26 | 19 | willing to do.  It's that what she can do. |
| 12:19:30 | 20 | BY MR. BRESSLER: |
| 12:19:30 | 21 | Q   You mentioned -- why not -- why not refer |
| 12:19:36 | 22 | her out to somebody for a consultation for a second |
| 12:19:39 | 23 | opinion? |
| 12:19:41 | 24 | MR. GERMAN:  Asked and answered. |
| 12:19:42 | 25 | THE WITNESS:  Because as I've said, I |

## Page 118

| | | |
|---|---|---|
| 12:19:43 | 1 | have a working relationship with her that seems to |
| 12:19:46 | 2 | benefit her, and I will continue that, and continue |
| 12:19:51 | 3 | to be supportive to her in that regard. |
| 12:19:56 | 4 | We can talk about many things about what |
| 12:19:58 | 5 | she might do and things that she might do, but right |
| 12:20:02 | 6 | now she won't do them.  She doesn't feel prepared to |
| 12:20:06 | 7 | open herself up to another person.  She feels that |
| 12:20:10 | 8 | with what her experience has been and -- over and |
| 12:20:16 | 9 | over again in her life, and again with Met Life now, |
| 12:20:19 | 10 | is that she doesn't trust many people with what goes |
| 12:20:22 | 11 | on inside of her. |
| 12:20:24 | 12 | Q   She recently went to see a psychiatrist |
| 12:20:28 | 13 | in New York named Dr. Katherine Shear. |
| 12:20:31 | 14 | A   Yes. |
| 12:20:33 | 15 | Q   What do you know about that? |
| 12:20:34 | 16 | A   That it was someone that I had read |
| 12:20:35 | 17 | about, so I was pleased that she was going to see |
| 12:20:38 | 18 | her, and that this seemed to be someone who knew |
| 12:20:42 | 19 | about complicated grief, and I would like to hear |
| 12:20:46 | 20 | her ideas about what's going on. |
| 12:20:49 | 21 | Q   Did you refer her to Katherine Shear? |
| 12:20:51 | 22 | A   I didn't refer her, no.  I gave her the |
| 12:20:56 | 23 | article. |
| 12:20:56 | 24 | Q   If you were interested to hear |
| 12:20:59 | 25 | Dr. Shear's second opinion, why not in October of |

## Page 119

| | | |
|---|---|---|
| 12:20:59 | 1 | 2009, when you were writing Dr. Kaplan, why not get |
| 12:21:02 | 2 | one then? |
| 12:21:03 | 3 | MR. GERMAN:  Asked and answered. |
| 12:21:05 | 4 | THE WITNESS:  Because I didn't.  I was |
| 12:21:10 | 5 | doing what I was doing.  I don't know why I didn't |
| 12:21:12 | 6 | do something else. |
| 12:21:13 | 7 | BY MR. BRESSLER: |
| 12:21:13 | 8 | Q   You mentioned add-on therapy to the |
| 12:21:16 | 9 | Lexapro. |
| 12:21:17 | 10 | A   Yes. |
| 12:21:17 | 11 | Q   What are you referring to? |
| 12:21:19 | 12 | A   Other antidepressants on top of it. |
| 12:21:22 | 13 | Q   Such as? |
| 12:21:23 | 14 | A   Mood stabilizers.  There are any number |
| 12:21:27 | 15 | of antidepressant drugs and medications. |
| 12:21:31 | 16 | Q   Which ones would they be specifically? |
| 12:21:33 | 17 | A   I don't know right now what I would use. |
| 12:21:42 | 18 | Q   At some point did you add on Abilify? |
| 12:21:45 | 19 | A   Yes. |
| 12:21:46 | 20 | Q   When did you add that on? |
| 12:21:49 | 21 | A   What or when? |
| 12:21:50 | 22 | Q   Yes, when. |
| 12:21:53 | 23 | A   I don't know. |
| 12:21:54 | 24 | Q   What dosage? |
| 12:21:55 | 25 | A   I don't recall. |

## Page 120

| | | |
|---|---|---|
| 12:21:55 | 1 | Q   Why did you add Abilify? |
| 12:21:58 | 2 | A   As a mood stabilizer to see if it would |
| 12:22:02 | 3 | be effective on top of the Lexapro. |
| 12:22:03 | 4 | Q   Has it been? |
| 12:22:05 | 5 | A   No. |
| 12:22:05 | 6 | Q   Have you discontinued it? |
| 12:22:06 | 7 | A   Yes. |
| 12:22:07 | 8 | Q   When did you discontinue it? |
| 12:22:09 | 9 | A   I don't know. |
| 12:22:10 | 10 | Q   Have you replaced it with another add-on? |
| 12:22:12 | 11 | A   No. |
| 12:22:13 | 12 | Q   So right now she's on 30 milligrams of |
| 12:22:17 | 13 | Lexapro and that's it? |
| 12:22:19 | 14 | A   Correct.  You say that again in a |
| 12:22:23 | 15 | critical way, and I -- |
| 12:22:24 | 16 | Q   Doctor, let me stop you because that's |
| 12:22:27 | 17 | not -- it was not a critical comment. |
| 12:22:30 | 18 | A   The way you say it is critical. |
| 12:22:31 | 19 | Q   I think you're reading too much into it. |
| 12:22:33 | 20 | I'm trying to find out whether she's on any other |
| 12:22:36 | 21 | medication today besides Lexapro, and that was my |
| 12:22:39 | 22 | question. |
| 12:22:39 | 23 | A   And what I'm questioning is what |
| 12:22:42 | 24 | difference does that make? |
| 12:22:45 | 25 | Q   Because we're here to learn.  Is she on |

30 (Pages 117 to 120)

## Page 166

14:04:59 1 certain stages, need particular things to happen in
14:05:02 2 order to continue to develop the way other people
14:05:08 3 develop, and if that gets skewed, you may develop
14:05:13 4 aberrantly and become rather peculiar. Psychotic?
14:05:20 5 Is that psychosis just because you're different
14:05:23 6 from other people?
14:05:23 7    Q   Does Abilify treat that condition or
14:05:27 8 phenomenon you're talking about?
14:05:29 9    A   Abilify would not -- the question would
14:05:36 10 be if I could treat it because that's who the person
14:05:39 11 is. If you're -- you know, if you grow up thinking
14:05:48 12 you're a swan, giving some drug is not going to turn
14:05:53 13 you into a duck, so far.
14:05:56 14    Q   But if you think you're a duck and you're
14:06:01 15 not perceiving accurately, does Abilify help correct
14:06:06 16 that?
14:06:09 17       MR. GERMAN:  Form and foundation.
14:06:10 18       THE WITNESS:  It may quiet down the
14:06:17 19 moods, the swings of things that go on.
14:06:24 20       There's a great theory as to what part of
14:06:26 21 the brain may be affected by various drugs, and we
14:06:30 22 don't know the end of it. But Abilify may be
14:06:34 23 thought of as a soother. It quiets things down, and
14:06:37 24 maybe during that time you could help the person be
14:06:40 25 a swan or a duck, or whatever you want to help them

## Page 167

14:06:43 1 with.
14:06:44 2 BY MR. BRESSLER:
14:06:44 3    Q   How long does it take before you notice
14:06:47 4 whether Abilify is going to be effective or not?
14:06:50 5    A   It can be a few weeks. It can be longer
14:06:54 6 than that.
14:06:55 7    Q   How long did you stay with Abilify?
14:06:58 8    A   I don't recall.
14:06:59 9    Q   But at some point you felt it wasn't
14:07:01 10 helping?
14:07:02 11    A   That's right.
14:07:05 12    Q   Now, Dr. O pays you out of pocket and
14:07:09 13 does not submit her reimbursements, to your
14:07:13 14 knowledge, to a health insurance company, correct?
14:07:14 15    A   That's correct.
14:07:15 16    Q   Do you know whether she submits the
14:07:18 17 prescribed medications to her health insurance?
14:07:21 18    A   No, I don't know.
14:07:23 19    Q   Do you know why she doesn't submit your
14:07:25 20 visits to a health insurance company?
14:07:27 21    A   No.
14:07:33 22    Q   Do you know whether or not she has
14:07:35 23 submitted them and they've declined to pay for it?
14:07:39 24    A   No.
14:07:42 25    Q   After the October 8 visit, 2011, there

## Page 168

14:07:46 1 seems to be a four-month gap before you saw her
14:07:49 2 again on February 20, 2012, which is page 44 of
14:07:54 3 Exhibit 1.
14:08:01 4    Q   Do you know why there's a four-month gap?
14:08:05 5    A   No.
14:08:06 6    Q   Now, the first thing you've written up
14:08:08 7 there is "bad faith," question mark, question mark.
14:08:11 8 What is that a reference to?
14:08:20 9    A   I think it had to do with the insurance.
14:08:22 10    Q   So she hadn't seen you in four months,
14:08:24 11 and then came in to talk about it?
14:08:26 12    A   I don't know that she hadn't seen me in
14:08:30 13 four months. I don't have notes for four months.
14:08:33 14    Q   Below that, you've written "bad faith"
14:08:37 15 again.
14:08:37 16    A   Uh-huh.
14:08:37 17    Q   And then underneath that it says "should
14:08:40 18 she move" -- can you read the rest for me?
14:08:45 19    A   "Residence here."
14:08:45 20    Q   Okay. Meaning Los Angeles?
14:08:47 21    A   Yes. She was questioning whether she
14:08:49 22 should move to Los Angeles.
14:08:51 23    Q   Why was she considering that?
14:08:53 24       MR. GERMAN:  Foundation.
14:08:54 25 BY MR. BRESSLER:

## Page 169

14:08:54 1    Q   Why do you understand she was considering
14:08:56 2 that?
14:09:07 3    A   Somehow feeling it might be easier for
14:09:11 4 her living here.
14:09:12 5    Q   Did it have anything to do with your
14:09:15 6 treatment, or just generally?
14:09:17 7    A   I think generally, not with my treatment.
14:09:19 8    Q   Do you know if she owns any homes in the
14:09:22 9 Los Angeles area?
14:09:24 10    A   Not that I know of.
14:09:28 11    Q   The next visit is two months after that,
14:09:30 12 or maybe six weeks after that, April 2, 2012, on
14:09:34 13 page 45 and 46.
14:09:36 14       MR. GERMAN:  Foundation, form.
14:09:42 15 BY MR. BRESSLER:
14:09:42 16    Q   Do you see that?
14:09:43 17    A   Yes.
14:09:44 18    Q   You have written down there at the top of
14:09:58 19 the page, not the very top, but "patients hate me."
14:10:03 20 That's what it --
14:10:07 21       MR. GERMAN:  Objection --
14:10:10 22       THE WITNESS:  "Patients like me."
14:10:11 23       MR. BRESSLER:  Oh, it's "like." That
14:10:13 24 looks like an H.
14:10:14 25       MR. GERMAN:  Objection.

## Page 186

| | | |
|---|---|---|
| 14:42:57 | 1 | Q  Anything else? |
| 14:42:58 | 2 | A  Yeah, just herself.  She -- she's not as |
| 14:43:07 | 3 | overwhelmed as she was when I first started seeing |
| 14:43:14 | 4 | her.  She, although very negative in many ways, is |
| 14:43:20 | 5 | able to form positive relationships with people. |
| 14:43:27 | 6 | Q  Such as? |
| 14:43:28 | 7 | A  They're few and far between, but people |
| 14:43:30 | 8 | who meet her, can find her to be pleasant and |
| 14:43:35 | 9 | charming, and it's not an intimate relationship, but |
| 14:43:41 | 10 | she does that. |
| 14:43:43 | 11 | She's not -- she's trying to take care of |
| 14:43:50 | 12 | herself in terms of her weight and her appearance, |
| 14:43:53 | 13 | so that's an improvement. |
| 14:43:57 | 14 | She -- she's not in a total funk all the |
| 14:44:08 | 15 | time.  She has some sense of empowerment; is easily |
| 14:44:12 | 16 | torn apart, and it's easy for her to just crumble |
| 14:44:19 | 17 | and -- but she comes back from that.  So I think |
| 14:44:23 | 18 | that's an improvement. |
| 14:44:31 | 19 | Q  Anything else? |
| 14:44:31 | 20 | A  No, I think that does it. |
| 14:44:52 | 21 | Q  In the Carroll case, that one involved |
| 14:45:02 | 22 | post-traumatic stress syndrome, did it not? |
| 14:45:05 | 23 | A  Yeah.  Okay. |
| 14:45:08 | 24 | Q  Correct? |
| 14:45:13 | 25 | A  You'd have to refresh me on that one. |

## Page 187

| | | |
|---|---|---|
| 14:45:17 | 1 | Q  Well, I think you were telling us that's |
| 14:45:19 | 2 | the one where it was a waiter who was involved in an |
| 14:45:24 | 3 | altercation. |
| 14:45:24 | 4 | A  Yeah. |
| 14:45:25 | 5 | Q  And you testified in that case, did you |
| 14:45:28 | 6 | not, sir, that your recommendation would be |
| 14:45:32 | 7 | twice-a-week sessions to treat the PTSD? |
| 14:45:36 | 8 | A  Perhaps.  I don't know.  I don't |
| 14:45:44 | 9 | remember.  He was not an ongoing patient with me.  I |
| 14:45:48 | 10 | did an evaluation. |
| 14:45:49 | 11 | Q  Well, I appreciate that.  You were asked |
| 14:45:52 | 12 | in that case what you felt would be appropriate |
| 14:45:54 | 13 | treatment for PTSD, and you said twice-a-week |
| 14:45:59 | 14 | therapy sessions. |
| 14:46:01 | 15 | A  For him. |
| 14:46:01 | 16 | MR. GERMAN:  Form, foundation. |
| 14:46:02 | 17 | BY MR. BRESSLER: |
| 14:46:02 | 18 | Q  For him? |
| 14:46:02 | 19 | A  Not PTSD, for him. |
| 14:46:04 | 20 | Q  Yes, a patient with PTSD. |
| 14:46:08 | 21 | A  That patient with PTSD. |
| 14:46:11 | 22 | Q  Right. |
| 14:46:11 | 23 | A  I was talking about him, not PTSD. |
| | | There's a difference. |
| 14:46:14 | 24 | There's a difference. |
| 14:46:17 | 25 | Q  All right. |

## Page 188

| | | |
|---|---|---|
| 14:46:18 | 1 | Do you think there is a dose-response |
| 14:46:19 | 2 | relationship, that the more therapy, the better? |
| 14:46:22 | 3 | A  No. |
| 14:46:22 | 4 | MR. GERMAN:  Form, foundation. |
| 14:46:25 | 5 | BY MR. BRESSLER: |
| 14:46:25 | 6 | Q  No? |
| 14:46:25 | 7 | A  No, not necessarily.  I think there are |
| 14:46:28 | 8 | some patients that seeing them more often can really |
| 14:46:31 | 9 | be harmful to them. |
| 14:46:34 | 10 | If you take a borderline psychotic and |
| 14:46:36 | 11 | put them into a five-time-a-week therapy, it can be |
| 14:46:41 | 12 | horrendous unless you have a hospital setting where |
| 14:46:45 | 13 | you're going to do that at all, which doesn't exist. |
| 14:46:49 | 14 | Q  What's the ideal number of visits for |
| 14:46:52 | 15 | Dr. O, putting aside travel considerations? |
| 14:46:56 | 16 | A  It depends on the time that you're |
| 14:46:57 | 17 | talking about in her treatment.  I think initially |
| 14:47:01 | 18 | twice a week would have been important.  I think now |
| 14:47:04 | 19 | once a week would be good. |
| 14:47:05 | 20 | Q  But now you're seeing her, at most, once |
| 14:47:08 | 21 | a month, and sometimes once every several months. |
| 14:47:11 | 22 | MR. GERMAN:  Objection; form, foundation. |
| 14:47:13 | 23 | BY MR. BRESSLER: |
| 14:47:13 | 24 | Q  Or once every four months. |
| 14:47:15 | 25 | MR. GERMAN:  Objection. |

## Page 189

| | | |
|---|---|---|
| 14:47:15 | 1 | THE WITNESS:  That's what we can do.  You |
| 14:47:17 | 2 | do what you can do. |
| 14:47:21 | 3 | BY MR. BRESSLER: |
| 14:47:25 | 4 | Q  Do you believe that activity is |
| 14:47:27 | 5 | therapeutic for Dr. O? |
| 14:47:31 | 6 | MR. GERMAN:  Objection; form, |
| 14:47:32 | 7 | foundation. |
| 14:47:33 | 8 | THE WITNESS:  Activity? |
| 14:47:33 | 9 | BY MR. BRESSLER: |
| 14:47:33 | 10 | Q  Yes.  Doing things is good for her mental |
| 14:47:36 | 11 | health. |
| 14:47:37 | 12 | A  Yes. |
| 14:47:38 | 13 | Q  Can work be therapeutic? |
| 14:47:40 | 14 | MR. GERMAN:  Objection; form and |
| 14:47:41 | 15 | foundation. |
| 14:47:43 | 16 | THE WITNESS:  Can work be therapeutic? |
| 14:47:45 | 17 | MR. GERMAN:  Yes. |
| 14:47:46 | 18 | THE WITNESS:  It can also be detrimental. |
| 14:47:49 | 19 | BY MR. BRESSLER: |
| 14:47:49 | 20 | Q  Did Dr. O get some relief by doing |
| 14:47:54 | 21 | furniture work? |
| 14:47:55 | 22 | MR. GERMAN:  Objection; form and |
| 14:47:55 | 23 | foundation. |
| 14:47:56 | 24 | THE WITNESS:  Not that I recall. |
| 14:48:00 | 25 | It would fall into the category of her |

## Page 206

| | | |
|---|---|---|
| 15:09:56 | 1 | set of your notes and any letters that you may have |
| 15:10:00 | 2 | written in this matter? |
| 15:10:01 | 3 | A   I don't know. |
| 15:10:03 | 4 | Q   Do you want to take a look at it really |
| 15:10:06 | 5 | quick, or we can do it during a break, but I'm going |
| 15:10:10 | 6 | to mark it as an exhibit, so why don't you hold on |
| 15:10:14 | 7 | to that? |
| 15:10:15 | 8 | A   Oh, this? |
| 15:10:15 | 9 | Q   Yes. |
| 15:10:16 | 10 | A   Yeah, I've looked at this.  Yeah, this |
| 15:10:19 | 11 | was as much -- this was the thing we were looking |
| 15:10:22 | 12 | at? |
| 15:10:22 | 13 | Q   Before, I believe that's a complete set |
| 15:10:24 | 14 | of all your handwritten notes and all the letters |
| 15:10:27 | 15 | that you've written in this matter. |
| 15:10:29 | 16 | A   Okay. |
| 15:10:29 | 17 | Q   And I just wanted you to verify that |
| 15:10:31 | 18 | that -- that these are your records and that they do |
| 15:10:35 | 19 | encompass all the notes and letters you've written |
| 15:10:37 | 20 | in this matter. |
| 15:10:39 | 21 | And I have a set for you, too, Steve. |
| 15:11:02 | 22 | A   Yes. |
| 15:11:02 | 23 | MR. GERMAN:  Okay.  Why don't we mark |
| 15:11:04 | 24 | that as Exhibit 3, please. |
| 15:11:26 | 25 | (Exhibit 3 was marked for identification |

## Page 207

| | | |
|---|---|---|
| 15:11:26 | 1 | by the Certified Shorthand Reporter.) |
| 15:11:26 | 2 | BY MR. GERMAN: |
| 15:11:26 | 3 | Q   Let's turn to your treatment in the |
| 15:11:32 | 4 | care of Dr. O.  We've established that you first |
| 15:11:35 | 5 | started seeing Dr. O in January of 2007; does that |
| 15:11:39 | 6 | sound about right to you? |
| 15:11:39 | 7 | A   Yes. |
| 15:11:40 | 8 | Q   And does he continue to be a patient of |
| 15:11:43 | 9 | yours? |
| 15:11:43 | 10 | A   Yes. |
| 15:11:45 | 11 | Q   How often, on average, does she see you? |
| 15:11:50 | 12 | A   Once a month. |
| 15:11:52 | 13 | Q   So if she started seeing you in January |
| 15:11:54 | 14 | of 2007, by this January it will have been six years |
| 15:11:59 | 15 | that you've been treating her? |
| 15:12:00 | 16 | A   Yes. |
| 15:12:01 | 17 | Q   So you've seen her and treated her |
| 15:12:03 | 18 | roughly around 70 times, 72 times? |
| 15:12:06 | 19 | MR. BRESSLER:  Object to form, lack of |
| 15:12:09 | 20 | foundation. |
| 15:12:09 | 21 | THE WITNESS:  Yes. |
| 15:12:10 | 22 | BY MR. GERMAN: |
| 15:12:10 | 23 | Q   If you saw her roughly once a month for |
| 15:12:12 | 24 | six years that would be about 72 visits; is that |
| 15:12:15 | 25 | right? |

## Page 208

| | | |
|---|---|---|
| 15:12:15 | 1 | A   Yes. |
| 15:12:16 | 2 | Q   And also in addition to these in-person |
| 15:12:21 | 3 | sessions, I believe you had mentioned that she would |
| 15:12:23 | 4 | call you over the phone, as well? |
| 15:12:25 | 5 | A   Yes. |
| 15:12:28 | 6 | Q   And how often would you say she would |
| 15:12:30 | 7 | phone you? |
| 15:12:31 | 8 | And let's start off, when you first |
| 15:12:33 | 9 | started treating her in 2007 for the first year or |
| 15:12:36 | 10 | two, how often was she calling you between |
| 15:12:39 | 11 | sessions? |
| 15:12:44 | 12 | A   I would say no more than once every |
| 15:12:47 | 13 | couple weeks. |
| 15:12:48 | 14 | Q   Okay.  So in addition to your monthly |
| 15:12:51 | 15 | sessions, she was also calling you over the phone |
| 15:12:54 | 16 | every couple of weeks? |
| 15:12:55 | 17 | A   Yes. |
| 15:13:00 | 18 | Q   Do you feel, after having treated Inna |
| 15:13:03 | 19 | dozens of times, that you're in a position to offer |
| 15:13:07 | 20 | your opinions as to the nature of her psychiatric |
| 15:13:12 | 21 | illnesses? |
| 15:13:12 | 22 | A   Yes. |
| 15:13:15 | 23 | Q   Any restrictions and limitations she |
| 15:13:17 | 24 | might suffer as a result of these psychiatric |
| 15:13:20 | 25 | illnesses? |

## Page 209

| | | |
|---|---|---|
| 15:13:21 | 1 | A   I'm sorry, what? |
| 15:13:22 | 2 | Q   Any restrictions and limitations she |
| 15:13:24 | 3 | might suffer as a result of her psychiatric |
| 15:13:28 | 4 | illnesses by way of performing her occupation? |
| 15:13:33 | 5 | A   Yes.  Well, I think as I've described |
| 15:13:36 | 6 | her, she's, you know, fairly fragile, and a lot of |
| 15:13:43 | 7 | what she deals with within herself is her identity |
| 15:13:50 | 8 | as a physician, and particularly a radio oncologist, |
| 15:13:59 | 9 | and the fact that that's the treatment that her son |
| 15:14:03 | 10 | had, and that she had treated people with that |
| 15:14:07 | 11 | illness in the past, and had been effective in that |
| 15:14:10 | 12 | treatment, or that that treatment is effective for |
| 15:14:14 | 13 | that particular diagnosis, that it's just |
| 15:14:21 | 14 | unfathomable to her that he died, and it remains |
| 15:14:27 | 15 | that way. |
| 15:14:27 | 16 | And in fact, at times she feels she |
| 15:14:33 | 17 | communicates with him, that she is -- that there is |
| 15:14:37 | 18 | certain communication which does go on between the |
| 15:14:39 | 19 | two of them, which I've seen in other cases of a |
| 15:14:46 | 20 | parent-and-child relationship with death of the |
| 15:14:51 | 21 | child. |
| 15:14:51 | 22 | Q   Would you call that magical thinking? |
| 15:14:54 | 23 | MR. BRESSLER:  Object to form, leading. |
| 15:14:57 | 24 | THE WITNESS:  You can call it magical |
| 15:14:59 | 25 | thinking. |

## Page 245

| | | |
|---|---|---|
| 16:10:41 | 1 | different medications? |
| 16:10:43 | 2 | A   Yes.  I think that was one of the reasons |
| 16:10:46 | 3 | why we went to Lexapro is because it's a relatively |
| 16:10:52 | 4 | safe antidepressant in terms of pregnancy. |
| 16:10:54 | 5 | Q   Has Inna expressed to you her feelings |
| 16:10:58 | 6 | about trying out different medications or doctors |
| 16:11:00 | 7 | who she may think of as pill pushers? |
| 16:11:02 | 8 | A   She would rather not have any medication |
| 16:11:07 | 9 | than take multiple medications.  She feels that the |
| 16:11:10 | 10 | Lexapro does what it can do, and that's all right |
| 16:11:13 | 11 | with her.  She does not want more. |
| 16:11:20 | 12 | Q   And is that one of the reasons why you |
| 16:11:23 | 13 | focus in on psychoanalysis with her? |
| 16:11:26 | 14 | A   It's not psychoanalysis.  It's Rosansky's |
| 16:11:34 | 15 | form of psychotherapy. |
| 16:11:37 | 16 | Q   Okay. |
| 16:11:37 | 17 | A   Every one, when they've been practicing |
| 16:11:38 | 18 | for a long time, does it their own way, so -- |
| 16:11:45 | 19 | Q   We've talked about PTSD, and major |
| 16:11:49 | 20 | depressive disorder. |
| 16:11:51 | 21 | A   Uh-huh. |
| 16:11:52 | 22 | Q   What is Inna's prognosis with those two |
| 16:11:55 | 23 | afflictions? |
| 16:11:58 | 24 | A   It's wide open.  I think her prognosis is |
| 16:12:11 | 25 | not great; in other words, it's poor.  I think that, |

## Page 246

| | | |
|---|---|---|
| 16:12:17 | 1 | you know, she's sustained herself at this level now |
| 16:12:22 | 2 | for a while.  Part of it's going to depend on what |
| 16:12:26 | 3 | the children are like and what she's like with the |
| 16:12:28 | 4 | children.  She'll have something to focus on as |
| 16:12:34 | 5 | they're growing older and times change.  So -- but |
| 16:12:40 | 6 | her prognosis in regard to her own pain and |
| 16:12:44 | 7 | suffering, that's certainly improved, and hopefully |
| 16:12:50 | 8 | she can make use of that and grow more. |
| 16:12:54 | 9 | The next point to look for is what active |
| 16:12:59 | 10 | involvement she can have in living besides the |
| 16:13:01 | 11 | children because that's going to be vital in terms |
| 16:13:05 | 12 | of her life as the children grow older. |
| 16:13:08 | 13 | Q   Now, you've testified that in all |
| 16:13:10 | 14 | probability she won't ever be able to return to work |
| 16:13:14 | 15 | as a radiation oncologist. |
| 16:13:17 | 16 | A   Yes. |
| 16:13:18 | 17 | Q   Are there -- aside from PTSD and |
| 16:13:22 | 18 | depressive disorder, you mentioned before |
| 16:13:25 | 19 | complicated grief disorder.  Is that another |
| 16:13:28 | 20 | affliction she suffers that also contributes to |
| 16:13:31 | 21 | making it most probably she'll never work as a |
| 16:13:36 | 22 | radiation oncologist? |
| 16:13:37 | 23 | MR. BRESSLER:  Object to form. |
| 16:13:39 | 24 | THE WITNESS:  They all blend into each |
| 16:13:40 | 25 | other.  It's what -- it's Inna.  It's not these |

## Page 247

| | | |
|---|---|---|
| 16:13:44 | 1 | various diseases or diagnoses.  And, you know, for |
| 16:13:51 | 2 | her to -- I wouldn't want to go to her if I were -- |
| 16:13:56 | 3 | if I had cancer and needed a radiation oncologist, |
| 16:14:02 | 4 | even knowing her and knowing her remarkable |
| 16:14:06 | 5 | intellectual capacity, and all of that.  I might |
| 16:14:09 | 6 | take her in as a consultant on a case or something, |
| 16:14:11 | 7 | but I wouldn't want her treating me. |
| 16:14:15 | 8 | Q   Why is that? |
| 16:14:16 | 9 | A   Because I think she's in too many places |
| 16:14:19 | 10 | at once with it.  You know, it's her child again, |
| 16:14:24 | 11 | and it's what treatment he got, and what should be |
| 16:14:27 | 12 | the right treatment that she gives, and if the |
| 16:14:29 | 13 | patient gets sick, is it her fault, is she failing |
| 16:14:33 | 14 | again, and all those things are open to her, and no. |
| 16:14:39 | 15 | Q   Real quickly, what is complicated grief |
| 16:14:42 | 16 | disorder? |
| 16:14:43 | 17 | MR. BRESSLER:  Objection; lack of |
| 16:14:45 | 18 | foundation. |
| 16:14:46 | 19 | THE WITNESS:  It is thought of and, you |
| 16:14:48 | 20 | know, it's not a specific diagnosis as of now in |
| 16:14:53 | 21 | terms of the DSM diagnosis. |
| 16:14:56 | 22 | BY MR. GERMAN: |
| 16:14:56 | 23 | Q   Is it going to be, as far as you know? |
| 16:14:59 | 24 | MR. BRESSLER:  Objection; lack of |
| 16:15:00 | 25 | foundation. |

## Page 248

| | | |
|---|---|---|
| 16:15:01 | 1 | THE WITNESS:  Whether it -- no, I don't |
| 16:15:02 | 2 | know. |
| 16:15:02 | 3 | BY MR. GERMAN: |
| 16:15:02 | 4 | Q   You don't know whether -- |
| 16:15:03 | 5 | A   Yeah, it's all kept very secret.  It's |
| 16:15:06 | 6 | absurd.  Most people would know someone who's had |
| 16:15:11 | 7 | complicated grief, where the grief has been beyond |
| 16:15:15 | 8 | what one usually expects of, yes, you go through a |
| 16:15:18 | 9 | year or two years of grieving.  They used to speak |
| 16:15:21 | 10 | of it as two years, if it's a close loved one, like |
| 16:15:25 | 11 | a spouse or parent, and then it comes in waves and |
| 16:15:29 | 12 | those waves subside. |
| 16:15:31 | 13 | Well, with complicated grief it doesn't |
| 16:15:33 | 14 | go that way, and it doesn't disappear and they -- I |
| 16:15:39 | 15 | know a lady where her daughter died, and she just |
| 16:15:43 | 16 | saw her in a cloud last week, and this is not a |
| 16:15:47 | 17 | patient, and she talks to her daughter occasionally, |
| 16:15:55 | 18 | and the daughter answers, and she has a whole group |
| 16:15:59 | 19 | of people who are involved with her and with each |
| 16:16:02 | 20 | other who do the same thing.  This is all |
| 16:16:06 | 21 | complicated grief. |
| 16:16:08 | 22 | To me it's a state of denial that the |
| 16:16:11 | 23 | person is dead, you know, and what that means, and |
| 16:16:17 | 24 | they're kept alive in a variety of ways in the |
| 16:16:20 | 25 | person's mind, and she's absolutely certain that |

Page 277

```
16:55:37   1   depressed.
16:55:38   2       Q  Has Inna talked to you about any feelings
16:55:42   3   she may have with regard to whether or not Met Life
16:55:46   4   is challenging her integrity?
16:55:57   5       A  Not in that word of integrity.  I'm not
16:56:01   6   quite sure what --
16:56:03   7       Q  Where they're saying she's exaggerating,
16:56:04   8   or malingering, or questioning whether she can work
16:56:07   9   but she's saying that she can't, those types of
16:56:10  10   things.
16:56:11  11       A  Yes, that's been talked about because
16:56:12  12   that's the very kind of things that the psychologist
16:56:15  13   and the psychiatrist were intimating.  They were
16:56:17  14   questioning whether she was malingering or not, or
16:56:23  15   whether she's exaggerating the symptoms, or whether
16:56:26  16   she's capable or not of returning to work.
16:56:32  17       Q  Now, there's a comprehensive letter that
16:56:36  18   Mr. Bressler brought up to you that was in your file
16:56:42  19   that Inna had prepared, talking about the reports
16:56:45  20   prepared by --
16:56:48  21       A  Oh, yes.
16:56:48  22       Q  -- the neuropsychologist hired by Met
16:56:51  23   Life, and the psychiatrist hired by Met Life.
16:56:54  24          Having had a chance to read through that
16:56:57  25   letter and see that letter, can you give the jury a
```

Page 278

```
16:56:59   1   sense of how their reports and their opinions
16:57:04   2   impacted Inna on an emotional and psychological
16:57:11   3   level?
16:57:11   4       A  Well, I think she listed how it impacted
16:57:14   5   her, that she felt they were -- this is recalling; I
16:57:24   6   haven't seen the letter recently, but I remember her
16:57:26   7   doing this -- that she said they were really saying
16:57:31   8   one thing about her that agreed with the way she
16:57:33   9   was, and then concluding the opposite of saying that
16:57:37  10   obviously she may -- they said that she -- I can't
16:57:46  11   recall the specific words now, but it was really
16:57:48  12   that they would conclude that she was incapable and
16:57:54  13   then say that she was capable, that they would say
16:57:57  14   reasons that -- it was like she couldn't function as
16:58:01  15   a radio oncologist, and they could understand how
16:58:05  16   the son dying of a disease that she might have
16:58:07  17   treated, that this would affect her in some way, and
16:58:12  18   then go on to say that she's malingering or
16:58:16  19   incapable -- that she's capable of doing radio
16:58:21  20   oncology, where someone suggested that she become a
16:58:25  21   different -- go in a different field of medicine,
16:58:29  22   that she could be a pediatrician since she graduated
16:58:32  23   from the medical school of pediatrics in Moscow, and
16:58:36  24   she pointed out that it's a medical school, it's not
16:58:39  25   a pediatric school.  You don't come out and you're a
```

Page 279

```
16:58:43   1   pediatrician.  You come out and you're a physician.
16:58:45   2          And besides, the argument isn't over
16:58:51   3   whether she can function as a physician, it's
16:58:54   4   whether she can function as a radio oncologist.
16:59:01   5       Q  At some point in time you were provided
16:59:04   6   the reports prepared by Dr. Lamb, the
16:59:09   7   neuropsychologist, and Dr. Parker, the psychiatrist,
16:59:11   8   in June and August of 2011, and I want to show you
16:59:16   9   what we're going to mark as Exhibit No. 5.
16:59:39  10          (Exhibit 5 was marked for identification
16:59:39  11          by the Certified Shorthand Reporter.)
16:59:39  12   BY MR. BRESSLER:
16:59:39  13       Q  Why don't you page through this letter
16:59:45  14   just to refresh yourself.
17:00:16  15       A  Well, I can't concentrate on this without
17:00:19  16   answering this.  I just have to send a message.
17:00:21  17          MR. GERMAN:  You want to go off the
17:00:22  18   record really quick?
17:00:24  19          THE VIDEOGRAPHER:  Off the record, 1700
17:00:25  20   hours.
17:00:32  21          (Brief recess.)
17:14:03  22          THE VIDEOGRAPHER:  On record at 17:14.
17:14:06  23   BY MR. GERMAN:
17:14:06  24       Q  Dr. Rozansky, have you had a chance to
17:14:09  25   look at what's been marked as --
```

Page 280

```
17:14:11   1       A  Yes.
17:14:12   2       Q  -- Exhibit No. 5?
17:14:12   3       A  Yes.
17:14:14   4       Q  And have you familiarized yourself with
17:14:16   5   this letter?
17:14:17   6       A  Yes.
17:14:17   7       Q  And is this a letter that you prepared
17:14:19   8   after first having been provided the reports
17:14:23   9   prepared by the neuropsychologist, David Lamb, and
17:14:29  10   the psychiatrist, Joel Parker, who were both hired
17:14:32  11   by Met Life to evaluate Inna?
17:14:34  12       A  Yes.
17:14:36  13       Q  And what we see in this letter, are these
17:14:41  14   your general thoughts and comments after having
17:14:45  15   reviewed the reports?
17:14:46  16       A  Yes.
17:14:50  17       Q  And in addition to what you've included
17:14:53  18   in this letter, your other opinions including your
17:15:04  19   diagnoses of Inna, and your opinion that she cannot
17:15:07  20   work as a radiation oncologist, we've already talked
17:15:11  21   about, but as far as this letter is concerned, it's
17:15:15  22   mostly to comment on their reports and their
17:15:18  23   opinions, correct?
17:15:19  24       A  Yes.
17:15:20  25       Q  Turn to page two of the letter, please.
```

Page 286

17:21:49 1    low-grade psychotic symptoms are, and that's not a
17:21:56 2    diagnostic category, and there's no psychiatric
17:22:05 3    reason, outside of her aversion to dealing with
17:22:10 4    oncology patients, is enough reason medically to not
17:22:14 5    work as a radiation oncologist.
17:22:17 6        Q   Explain that for us.
17:22:19 7        A   Well, if you can't stand -- if you
17:22:22 8    emotionally cannot tolerate -- it's sort of like a
17:22:32 9    surgeon.  If a surgeon becomes afraid of touching
17:22:35 10   blood, he can no longer function as a surgeon.
17:22:42 11       Q   So although physically he might be able
17:22:45 12   to do surgery --
17:22:46 13       A   Yeah, physically he could do surgery but
17:22:49 14   emotionally he's phobic about blood, and he will not
17:22:51 15   function as a surgeon because he can't deal with the
17:22:56 16   phobia the whole time you're there.
17:23:01 17       So the statement and conclusions don't
17:23:04 18   make sense.
17:23:10 19       And I went on to say:
17:23:11 20       "It seems to me that most people
17:23:13 21       would not want to be treated for cancer
17:23:15 22       or any other illness by a physician who
17:23:18 23       has an aversion to treating them."
17:23:25 24       Q   On page 5 of your letter, the second to
17:23:31 25   the last paragraph you write:

Page 287

17:23:34 1       "To further quote Dr. Parker," open
17:23:36 2       quote, "the available evidence
17:23:39 3       indicates that Dr. O has an aversion to
17:23:43 4       dealing with oncology patients but no
17:23:45 5       other psychiatric impediment to her
17:23:49 6       working as a radiation oncologist," end
17:23:51 7       quote.
17:23:53 8       Open quote, "Dr. Rozansky, for his
17:23:54 9       part, appears to have limited
17:23:56 10      objectivity, as is often seen in
17:23:59 11      treating psychiatrists who have a
17:24:01 12      therapeutic alliance with their
17:24:04 13      patients.  Dr. Rozansky appears to be
17:24:05 14      taking Dr. O's complaints at face
17:24:10 15      value," close quote.
17:24:11 16      Would you respond to Dr. Parker's
17:24:19 17   criticisms directed at you.
17:24:30 18       A   First of all, a therapeutic alliance by
17:24:35 19   description and -- is something that you hope to
17:24:42 20   attain with a patient.  I'm not saying that I had a
17:24:46 21   therapeutic -- well, I would say I have a
17:24:49 22   therapeutic alliance.  She comes in.  She talks to
17:24:52 23   me; I talk to her.  That's a therapeutic alliance.
17:24:55 24   If I don't have a therapeutic alliance, you don't
17:24:58 25   have a relationship with the patient, at least not a

Page 288

17:25:00 1    positive one.  And it would be the same as an
17:25:03 2    attorney not having some alliance with their client,
17:25:07 3    in some sense.  So that's a minor point.
17:25:13 4        As far as limited objectivity, the very
17:25:20 5    essence of psychoanalysis is to know yourself well
17:25:27 6    enough that you have a fairly objective view of
17:25:33 7    things.  You don't -- your personality doesn't get
17:25:38 8    in the way, and when it does you know it's happening
17:25:41 9    so you can do something with it.
17:25:42 10       And so the whole time that I see a
17:25:46 11   patient, at the same time I am examining myself and
17:25:50 12   my reactions because they can be a clue as to what
17:25:54 13   the patient is about, and also a clue as to what I'm
17:25:57 14   reacting to.  But by having had analysis, I know
17:26:00 15   what I'm reacting to, what's happening.
17:26:03 16       So in terms of limited objectivity, he
17:26:07 17   doesn't know what he's talking about with me, and I
17:26:13 18   think I've had enough experience to know my
17:26:17 19   objectivity.
17:26:17 20       Q   Okay.  In closing, will you tell us, in
17:27:08 21   your own words, what Inna's prognosis is over the
17:27:16 22   long term with respect to her psychiatric illnesses
17:27:19 23   and, in general, and in particular, how they, in all
17:27:25 24   likelihood, will impact her ability to work as a
17:27:28 25   radiation oncologist in the future.

Page 289

17:27:38 1        A   I'll just talk off the top of my head.  I
17:27:41 2    don't know where this will go, but let's see.
17:27:46 3        If it were another patient and she's come
17:27:57 4    in with these complaints, and I would say, well,
17:28:03 5    it's quite an accomplishment that you've made in
17:28:06 6    therapy with her, she is taking care of her children
17:28:10 7    and managing her house, and living her life.  Now,
17:28:14 8    for someone who's been very sick, that would be
17:28:17 9    quite an accomplishment.  The only reason that it's
17:28:23 10   not an accomplishment is that Met Life feels that
17:28:31 11   there's no reason to pay her on her policy.
17:28:36 12       So then we go to whether she should work
17:28:39 13   as a radio oncologist.  That becomes the problem.
17:28:44 14   Well, that doesn't have to do with mental health.
17:28:48 15   Mental health has been described by some as the
17:28:51 16   ability to work and love with a minimum of anxiety.
17:28:57 17   That's it.  That's mental health.  Not work as a
17:29:02 18   radio oncologist.
17:29:05 19       It may be that people who become
17:29:07 20   physicians are sick, or people who become lawyers
17:29:12 21   are sick, and that's why they find the solution to
17:29:16 22   their illness is doing the work.  They do.  You
17:29:20 23   know, you can carry this ad nauseam.
17:29:27 24       So she's better, and that's an
17:29:29 25   improvement that she's had.  That it's not a very

Page 313

1                REPORTER'S CERTIFICATE

2

3              I, Kathleen C. Bannon, CSR NO. 3110, a

4  Certified Shorthand Reporter in and for the State of

5  California, do hereby certify:

6              That prior to being examined, the

7  witness named in the foregoing proceedings declared

8  under penalty of perjury to testify to the truth,

9  the whole truth, and nothing but the truth;

10             That said proceedings were taken by me

11 in shorthand at the time and place herein named and

12 were thereafter transcribed into typewriting under

13 my direction, said transcript being a true and

14 correct transcription of my shorthand notes.

15             Pursuant to Federal Rule 30(e),

16 transcript review was not requested.

17             I further certify that I have no

18 interest in the outcome of this action.

19                          January 7, 2013

20

21

22                  _____

                    Kathleen C. Bannon
23                  CSR 3110

24

25

# EXHIBIT 5

**M. Katherine Shear, M.D.>**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

- - - - - - - - - - - - - - - - - -x

METROPOLITAN LIFE INSURANCE COMPANY,
a New York corporation,

               Plaintiff,

-vs-

INNA OGANDZHANOVA, M.D.,

               Defendant.

No. CV-12-372-PHX-GMS
- - - - - - - - - - - - - - - - - -x


       DEPOSITION of M. KATHERINE SHEAR, M.D.


          New York, New York

          April 13, 2013




          Prepared by:

          Darby Ginsberg, RPR

M. Katherine Shear, M.D.>

Page 46

1    experiencing acute grief, how do you tease apart
2    whether it's acute grief, depression or both?
3         A.  So they have different criteria.  So the
4    acute grief, the hallmark of grief -- let me say,
5    back up for one -- I know there is a lot of
6    controversy about this, and I believe what I
7    believe, but there are a lot of people who don't
8    agree with me.  So I finally said to myself, you
9    know, I can't -- there is a smaller group of us
10   who are more or less the researchers who tend to
11   think the way that I do and the larger group that
12   thinks the other way.  So I said --
13        Q.  Who is the larger group then?
14        A.  People who have been writing in The New
15   York Times and blogs on the Internet and --
16        Q.  Well, I mean, people within the field
17   rather than --
18        A.  Okay.
19        Q.  -- the lay --
20        A.  Within the field I think the
21   preponderance of agreement, of thought is --
22   within the field the preponderance of thought is
23   in favor of the exclusion which is why it's going
24   forward because a large number of people have
25   reviewed this very carefully.

Page 47

1         Q.  I apologize.  I thought you said the
2    exclusion was being taken out.
3         A.  Yes, it is.
4         Q.  Okay.  But you said that the
5    preponderance of the people favor the exclusion?
6         A.  I am sorry.  Then I misspoke if I said
7    that.  Favor the removal of the exclusion.
8         Q.  Thank you.  Please continue.
9         A.  In any case, I decided that maybe the
10   problem was the word "depression" because when
11   you say the word "depression" and I say the word
12   "depression," we may mean something different.
13   And I know that when I say the word "depression,"
14   I mean clinical syndrome that's characterized by
15   very specific diagnostic criteria that have to
16   occur over a certain time, at least a two-week
17   period, and there have to be at least five of
18   nine symptoms, two of which have to be -- two of
19   the core symptoms -- it's a very specific
20   reliably identifiable syndrome.
21        Whereas you may mean depression as, you
22   know, you feel depressed when you wake up in the
23   morning and the sun isn't shining.
24        And so I looked up the definition in the
25   dictionary and, in fact, both definitions are in

Page 48

1    the dictionary:  Namely, depression is, it does
2    mean sadness, basically.  That's one of the
3    definitions.  So that's relevant here because if
4    you are using the term "depression" to refer to
5    sadness, then indeed, anyone with acute grief is
6    experiencing that kind of depression or sadness.
7         But beyond that, most people with acute
8    grief do not have the two-week period in which
9    they feel sad for most of the day, every day and
10   lose interest in everything else in life and have
11   sleep, appetite, worthlessness, low energy,
12   et cetera, suicidal thinking.  Most people don't
13   meet all of these criteria.  In fact, there have
14   been studies looking at this exact thing, and it
15   seems that by two months they are -- after the
16   loss of someone, they are about 30 percent of
17   grieved spouses at least, who meet those
18   criteria.
19        So what's important to understand here
20   is that grief, the hallmark of grief is not
21   sadness.  Actually, it's yearning and longing.
22   So it's different from depression.  In which
23   we -- generally you don't yearn or long for
24   anything.  You simply feel sad, and often the
25   sadness is related to some personal -- feeling of

Page 49

1    personal failure or negative global view of the
2    world.  It's not -- grief is very specifically
3    focused on an individual that's been lost; and as
4    I said, it contains the intense yearning and
5    longing for that person, along with the sadness
6    that they are gone.  And a lot of interest in
7    that person.
8         So if, for example, you go to visit
9    someone -- I will just say this one last thing --
10   but if you go to visit someone shortly after they
11   have lost someone, it's not unusual to see them
12   maybe looking back over a photo album or
13   something and smiling and laughing at, you know,
14   memory, memories of some event that happened or
15   feeling very fond memories for that person.  And
16   that, again, that's not what we see with
17   depression.
18        Q.  So that person might have acute grief
19   but no depression?
20        A.  But no depression.  Exactly.
21        Q.  Now, you wrote in your report, and we
22   will talk about Dr. Ogandzhanova in a little
23   while, but you no longer -- you think she is no
24   longer depressed; is that correct?
25        A.  That's correct.

M. Katherine Shear, M.D.>

Page 50

1    Q. Do you believe, based on what you
2  reviewed, that she was depressed at some point in
3  time?
4    A. Yes.
5    Q. When do you think she was depressed?
6    A. I think she was depressed in the period
7  after her son died, and I am not recalling
8  exactly -- the reason why I think she was
9  depressed is because I did ask a colleague who is
10  trained to do research assessments. I decided
11  that was one way to address the diagnostic
12  problem that I -- you know, that I thought was
13  maybe the best way in this circumstance where I
14  wanted a sort of really a truly objective
15  assessment. And she did prepare a report in
16  which she asked the questions in the way that we
17  ask them. And so what I am not remembering is
18  exactly whether it was the period right after her
19  son died or whether it may have been a little bit
20  later because --
21    Q. All right. Are you able to say when you
22  think the depression resolved?
23    A. No.
24    Q. Now you spoke a short while ago
25  favorably of Dr. Rozansky's treatment?

Page 51

1    A. Right.
2    Q. Do you think that that may have helped
3  to resolve her depression?
4    A. Yes, I do.
5    Q. Now, you say that he didn't give
6  complicated grief therapy or anything like
7  that --
8    A. Correct.
9    Q. -- to her?
10    A. Correct.
11    Q. Do you think that might be one reason
12  why she is still suffering from what you believe
13  to be complicated grief that's gone unaddressed?
14    A. That it's gone unaddressed? Well, I
15  think by definition it's gone unaddressed.
16  Whether that's the reason -- I mean, if it had
17  been addressed, it's, as you know from reading my
18  papers, it's not a hundred percent that she would
19  have gotten better, either. But, you know, yes.
20  Would I like to see her have the trial of this
21  treatment? Probably. I think it would be worth
22  trying.
23    Q. Have you made any recommendations to
24  Dr. Rozansky?
25    A. No.

Page 52

1    Q. Have you made any recommendations to
2  Dr. Ogandzhanova?
3    A. No.
4    Q. Have you offered to treat Dr.
5  Ogandzhanova?
6    A. No.
7    Q. Have you had any discussions with
8  counsel about treating her?
9    A. I believe they asked me that
10  hypothetical question, and I -- I -- so I told
11  them that I, myself would probably not be able to
12  treat her because I am actually going away on a
13  sabbatical, and I am not sure that I am going to
14  resume my private practice when I come back.
15  So -- but there are people who could. I could
16  help them identify someone who could treat her,
17  who knows the treatment, who could treat her.
18    Q. Are there treaters in Arizona, to your
19  knowledge?
20    A. No.
21    Q. Are you saying you don't know or you are
22  saying that there are no treaters?
23    A. There are no treaters in Arizona to the
24  best of my knowledge. I would be very surprised
25  if there is anyone in Arizona right now.

Page 53

1    Q. Now when you say there are no treaters
2  to your knowledge, are you referring to your
3  specific --
4    A. Yes.
5    Q. -- 16 --
6    A. Yes.
7    Q. -- should I call it step or
8  16-session --
9    A. Session.
10    Q. -- session therapy? Are there other
11  schools or therapies that address complicated
12  grief?
13    A. No. I mean, so, you know, in our field
14  that's -- there is nothing -- okay. There has
15  been -- there has been one attempt at treatment.
16  There has been one study. So there is -- so we
17  don't really know if something works or not
18  unless we test it.
19    There have been two other studies that
20  test a treatment very, very similar to ours, not
21  exactly the same. They are called CBT
22  treatments. One of them I don't think is
23  published yet. It was done in Australia.
24    Q. CBT being cognitive behavioral therapy?
25    A. Cognitive behavioral therapy.

M. Katherine Shear, M.D.>

## Page 54

1    Q. Is that similar to your -- I am sorry --
2    to your complicated grief therapy?
3    A. Our complicated grief therapy uses many
4    CBT strategies and procedures, yes.
5    Q. Such as visualization and sensitization?
6    A. Such as diary monitoring, such as a
7    technique that we call revisiting that's very
8    similar to exposure treatments.
9    Q. Now, Dr. Rozansky didn't do any --
10   anything like this, did he?
11       MR. DAWSON: Objection.
12       THE WITNESS: Not that I know of.
13       MR. DAWSON: Foundation.
14   BY MR. BRESSLER:
15   Q. Go ahead. You were about to further
16   explain whether there are other complicated grief
17   therapies out there besides yours?
18   A. Right.
19   Q. And I think you said there may be some
20   others, but not tested, and you have tested
21   yours?
22   A. Right. Right. And so I don't know if
23   there are. I really have no way of knowing if
24   there would be someone in Arizona who would say
25   they do complicated grief treatment or treatment

## Page 55

1    for complicated grief.
2    Q. So if I were to go on the Internet and
3    type in "complicated grief treatment Arizona," I
4    might get some hits?
5    A. You might get some hits.
6    Q. And I might find some providers who
7    treat it?
8    A. You might.
9    Q. And --
10   A. Who say they treat it.
11   Q. And your comment would be that you don't
12   know whether it's been tested like your treatment
13   has been tested?
14   A. Well, I know that it hasn't. I don't
15   know whether -- but in the absence of testing a
16   treatment, we don't know whether it works or it
17   doesn't work, and that would be similar I guess
18   to what Dr. Rozansky is doing. There is no
19   reason to think it doesn't work, and there is no
20   reason to think it does.
21   Q. So at this point, would it be fair to
22   say you would like to see Dr. Ogandzhanova in
23   your complicated grief therapy program, correct?
24   A. I think it would be -- I think it would
25   be a reasonable next step for her.

## Page 56

1    Q. And you don't know whether it would help
2    or whether it would not?
3    A. What we know is that it -- from all we
4    can tell, it has a better chance of working than
5    a sort of standard psychotherapy.
6    Q. And you don't know until you try?
7    A. Correct.
8    Q. You said that there is some debate on
9    what to call it, and you said there is three
10   terms.
11   A. Yes.
12   Q. What are those three?
13   A. So one is complicated grief. One is the
14   other one that I told you, which was persistent
15   complex bereavement disorder.
16   Q. And the third is?
17   A. Is prolonged grief disorder.
18   Q. And you probably told me this, but what
19   one do you use?
20   A. We -- we use the term "complicated
21   grief" in our --
22   Q. "We" being you and your team?
23   A. Myself and my colleagues and the
24   colleagues that are participating in the four-
25   site study that I mentioned and other people

## Page 57

1    that, you know, who basically are starting to do
2    this around the world now.
3    Q. Okay. But it sounds like the DSM-V is
4    going to go with the term "persistent complex
5    bereavement disorder"?
6    A. Correct.
7    Q. And it's going to be in Section 3, which
8    is, we need further study; something more is
9    needed?
10   A. Correct.
11   Q. But it will still be in the V Code where
12   it's not a mental condition but --
13   A. Bereavement will still be a V Code, not
14   complicated grief.
15   Q. Okay. Is complicated grief a V Code
16   now?
17   A. No.
18   Q. So what, to your understanding, will
19   change about the V Code from DSM-IV to DSM-V?
20   A. Only -- only the description, and I am
21   really not sure about that. But that's what I --
22   that's what could change. I did -- I did want to
23   go back, actually, if it's okay, to the ICD-11
24   because we --
25   Q. Thank you. I meant to go back on that.

M. Katherine Shear, M.D.>

Page 82

1  planning to look -- l don't know the answer. In
2  the first study, again, the numbers were too
3  small for much of any subgroup analyses like
4  that.
5        I am just trying to think if we -- well,
6  we probably did it, but it didn't see any effect
7  of time, you know, there was no difference, but
8  because the numbers were small enough, the
9  confidence in that is not as high as it would --
10  this study has more old people, as you noticed.
11  So we are hoping we can do that, but we also have
12  curtailed the age range so -- to the older adult
13  group, but we will be looking at whether both --
14  oh, both age of the people, but also time since
15  the loss effects, you know, we call that a
16  moderator of treatment outcome. So is that a
17  moderator? In other words, does it -- that
18  characteristic change the outcome in some way?
19      Q. Have you in your clinical practice had
20  success treating people who are say 5 to 10 years
21  removed from the death?
22      A. Yes.
23      Q. So that's one of the reasons you told us
24  earlier that you never know whether the
25  complicated grief therapy will divert the mind

Page 83

1  back or get the mind back on track to integrated
2  grief until you try?
3      A. Right. I mean, I guess, you know, l
4  have a little bit of discomfort with the wording
5  that you use because that would be like saying,
6  you never know whether Penicillin is going to
7  work to treat an infection until you try. That's
8  literally true because each person is different,
9  but we do know a little bit about it. I mean, we
10  know that there is a likelihood greater than
11  something else.
12      Q. Okay.
13      A. And because the condition tends to last
14  a fairly long time without treatment, we also
15  know that probably compared to no treatment or
16  compared to a treatment like IPT or supportive
17  psychotherapy is -- so -- so that's what our
18  research tells us.
19      Q. But you wouldn't be recommending it here
20  unless you thought it could help?
21      A. Exactly.
22      Q. And you do think it could help?
23      A. Of course. Because and -- so I am a
24  researcher, and in general, if someone in my
25  family is suffering in some way, I am going to

Page 84

1  look for a treatment for that condition that's
2  been tested and proven to be efficacious prior to
3  using something that hasn't been. So that's
4  where I am coming from.
5      Q. And you believe that your treatment has
6  been proven efficacious?
7      A. In an initial study, yes. We will see.
8  I mean, if it's replicated, I will have a lot
9  more confidence.
10      Q. Let me change gears now to talk about
11  Dr. Ogandzhanova. When is your understanding
12  that Isaac Bates died?
13      A. The date of his death?
14      Q. Yes. Or the rough time period.
15      A. In 2000 -- well, can I look at my notes?
16      Q. Sure.
17      A. I don't have the report here.
18        MR. DAWSON: Did you mark the report?
19        MR. BRESSLER: I did not. The copy that
20  l brought with me --
21        MR. DAWSON: I have got it.
22        MR. BRESSLER: -- is marked up.
23        MR. DAWSON: I have a copy of it.
24        THE WITNESS: He died on March 15, 2006.
25      Q. When do you understand Dr. Ogandzhanova

Page 85

1  first started experiencing symptoms because of
2  his death?
3      A. I believe, actually, that she was
4  experiencing symptoms of numbness and
5  intermittent extreme sadness, acute grief
6  beginning pretty much right after he died.
7  However, she didn't recognize those as -- she
8  doesn't -- she doesn't identify those as
9  symptoms, and I believe that she -- she didn't
10  start experiencing symptoms that she considered
11  to be probably impairing until the fall of 2006,
12  sometime in the fall of 2006.
13      Q. Now did she say she didn't experience
14  impairing symptoms until the fall or did she say
15  she didn't experience or notice symptoms until
16  the fall?
17      A. I believe that she -- my memory is that
18  she experienced acute grief because I asked her
19  about that very directly, and she experienced --
20  that she definitely experienced intense sadness
21  and a kind of numbness that she -- and a sort of
22  determination to continue her life as best she
23  could; associated with that in spite of these
24  feelings.
25      Q. Can there be a delay of grief symptoms

M. Katherine Shear, M.D.>

## Page 178

1    Q. So, for example, just out of curiosity,
2  in that study where you came to the conclusion
3  that people responded better to complicated grief
4  therapy than IPT personal therapy?
5    A. Right.
6    Q. When you reach the end of that 16
7  sessions, those that didn't respond to
8  complicated grief, did you say, based on what we
9  are learning here, we can't continue to treat
10  you, but we recommend that you continue with this
11  treatment because we think that some day you
12  could be a responder?
13    A. So, okay. So if the person -- it
14  depends on what's happened during that
15  non-responsive course. If the person has made
16  slow progress, but hasn't really been able to
17  take up the treatment, we might say, you might
18  want to do this -- you might want to give this
19  another try.
20    If the person has made their best effort
21  and they are not getting anywhere, we would
22  probably say, you know, there is still
23  complicated grief symptoms to address and clearly
24  you need to address them. Some other -- you
25  know, it makes sense to try something else.

## Page 179

1    Q. Like CBT?
2    A. Well, this is kind of CBT. But
3  another -- yes, just to work with a therapist,
4  stay focused on these symptoms and trying other
5  specific procedures and techniques. I mean, we
6  have -- in psychotherapy there is quite a lot of
7  different ways to work with people.
8    Q. So just because somebody is not a
9  responder at the end of the 16 sessions doesn't
10  mean that they cannot be helped with more
11  treatment down the road?
12    A. I mean that's -- we make that assumption
13  generally.
14    Q. Are you planning any studies or research
15  in the future on the efficacy of, say, 32
16  sessions?
17    A. Not at the moment, no.
18    Q. Okay. Do you know whether Dr. Rozansky
19  ever met with Donald Bates?
20    A. I don't know.
21    Q. Do you believe it's important to meet
22  with a significant other in rendering treatment?
23    MR. DAWSON: Objection. Form and
24  foundation.
25    THE WITNESS: It's too broad a question.

## Page 180

1  BY MR. BRESSLER:
2    Q. Would it have -- if you had been
3  providing complicated grief therapy to
4  Dr. Ogandzhanova, would you have wanted to meet
5  with Donald Bates?
6    A. You have probably done your homework,
7  and you have done your homework so well, you
8  probably know that the third session of
9  complicated grief treatment we do encourage
10  someone to invite a significant other to come to
11  the session. Not everyone does. Is it a
12  critical part of the treatment? No.
13    Q. Now, isn't the precise reason that
14  Dr. Ogandzhanova gives for not being able to
15  return to work really at the heart of your
16  complicated grief therapy bad memory?
17    MR. DAWSON: Would you read that
18  question back?
19    (Record read.)
20    MR. DAWSON: Form.
21    THE WITNESS: I really -- I am sorry. I
22  don't understand what you are asking.
23  BY MR. BRESSLER:
24    Q. Well, she says she can't go back to
25  radiation oncology because it conjures up the

## Page 181

1  very bad memory she has of her son's sickness.
2  He died from cancer, and there she is treating
3  cancer, correct?
4    MR. DAWSON: Objection. Form.
5    THE WITNESS: So we call that -- so
6  people with complicated grief -- I am not
7  sure if this is what you are getting at, but
8  maybe it is -- people with complicated grief
9  very often experience intense physical and
10  emotional activation and upset in response
11  to reminders of the person who died and/or
12  the circumstances of the death.
13    Yes. It is the case that Dr. O, in
14  working with individuals with cancer, is
15  confront -- you know, is forced to confront
16  exactly that; exactly the reminders, and
17  it's very, very difficult, virtually
18  impossible for someone with complicated
19  grief to do that.
20    Q. And that's exactly what your therapy
21  tries to do is confront those reminders?
22    A. It's a part of our therapy
23  entails gradual exposure to those reminders. We
24  call it revisiting, yes. But in this case -- so
25  we do that in a very particular way but -- and we

M. Katherine Shear, M.D.>

Page 182

1   may or may not get to a point where -- where
2   someone can, you know, can do that without --
3   without feeling distressed or, you know, high
4   levels of distress.
5       Q. But as you said, you never know until
6   you try?
7       A. Correct.
8       Q. Dr. O expressed some resentment to
9   patients. Is that something that can be
10  addressed in complicated grief therapy?
11      A. Is the resentment that she feels when
12  people complain about something relatively minor?
13  Is that --
14      Q. Well, I was just trying to -- whatever
15  resentment she may have, whether it's to patients
16  who get cured of their cancer and her son
17  couldn't or patients who complain about their
18  situation and she feels like, I have lost my son,
19  what are you complaining about? Whatever the
20  resentment may be, is this something that can be
21  addressed in complicated grief therapy?
22      A. I guess it would be the same, the same
23  issue. Possibly.
24      Q. I am just talking about being addressed.
25      A. Well, I guess we don't -- we don't

Page 183

1   really directly address. We may or may not. You
2   know, we may or may not directly address that.
3       Q. If you saw it as something that was
4   inhibiting her functionality, would it be
5   something you would want to address?
6       A. Possibly.
7       Q. Earlier we talked about people you have
8   treated many, many years after their loved one
9   dies?
10      A. Yes.
11      Q. I forgot the timeframe you gave me, but
12  you have had success with people quite removed
13  from it?
14      A. Yes.
15      Q. How far out have you had success?
16      A. We would have to go back and look. I
17  can't tell you exactly, but I do think certainly
18  four, five years out, definitely.
19      Q. Does the name Virginia Estridge ring a
20  bell?
21      A. Of course.
22      Q. Okay. She began her treatment 20 years
23  after?
24      A. Correct.
25      Q. And that was a favorable outcome, wasn't

Page 184

1   it?
2       A. Correct.
3       Q. If somebody came to you and said, I lost
4   my son seven years ago, would you accept them as
5   a patient?
6       A. If they have complicated grief,
7   absolutely.
8       Q. Have you ever treated anyone who said
9   they were disabled from their occupation, but
10  after your treatment was able to return to work?
11      A. Are you talking about complicated grief
12  in particular?
13      Q. Yes. I am sorry if I didn't specify
14  that.
15      A. No one is coming to mind right at this
16  minute, but it's possible.
17      Q. Is there literature that you are aware
18  of on a patient's prior exposure to death and the
19  response to it?
20      A. Generally speaking, there -- there is --
21  you know, there is literature that says the more
22  exposure to trauma you have, the more sensitive
23  you are. We generally think of that as a
24  sensitization; and it is -- there is a literature
25  that says that prior exposure to loss is a risk

Page 185

1   factor for complicated grief. I don't know if we
2   -- sort of a chronic negative outcome of grief.
3   I am not sure how well documented that is, but
4   that's the general -- that's the general
5   understanding.
6       Q. It seems a little counterintuitive that
7   if somebody has been desensitized because of a
8   lot of exposure --
9       A. Right.
10      Q. -- that they might be more resilient
11  later?
12      A. Right. It is counterintuitive in that
13  way and, in fact, when I was training, I was
14  taught probably what you just said; that if you
15  had a lot of exposure to trauma, you probably do
16  better, and then there were research studies in
17  the last couple of decades that showed exactly
18  the opposite; that for some reason -- there is an
19  idea of kindling -- it might be something like
20  that -- in the brain, but whatever the reason it
21  does seem to be the case that the more exposure
22  you have, the more sensitive you are as opposed
23  to the opposite, which sort of from a kind of
24  logic point of view could also make sense.
25      Q. You said the research is still in the

**M. Katherine Shear, M.D.>**

```
1                C E R T I F I C A T E

2

3    STATE OF NEW YORK       )

4                            )ss.:

5    COUNTY OF NEW YORK      )

6

7               I, DARBY GINSBERG, a Notary Public

8    within and for the State of New York, do hereby

9    certify:

10              That M. KATHERINE SHEAR, M.D., the

11   witness whose deposition is herein before set

12   forth, was duly sworn by me and that such

13   deposition is a true record of the testimony

14   given by such witness.

15              I further certify that I am not related

16   to any of the parties to this action by blood or

17   marriage; and that I am in no way interested in

18   the outcome of this matter.

19              IN WITNESS WHEREOF, I have hereunto set

20   my hand this 19th day of April, 2013.

21

22

23

     ------------------
24   DARBY GINSBERG
     Commission Number: 01GI6230654
25   Expires:  11-1-2014
```

# EXHIBIT 6



UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

- - - - - - - - - - - - - - - - - - -x

METROPOLITAN LIFE INSURANCE COMPANY,
a New York corporation,

      Plaintiff,

 -vs-

INNA OGANDZHANOVA, M.D.,

      Defendant.

No. CV-12-372-PHX-GMS
- - - - - - - - - - - - - - - - - - -x


   DEPOSITION of JASON NEWFIELD


    New York, New York

    April 15, 2013


    Prepared by:

    Michele Moskowitz, RPR

Jason Newfield>

Page 118

1    A.   Mm-hmm.
2    Q.   Is that accurate?
3    A.   Yes, that's what it says.  And then
4  I say we'll address on a case-by-case basis any
5  request to expand the scope of the
6  authorization.
7    Q.   So my question is whether you ever
8  expanded the scope of the authorization to
9  permit something other than written access to
10  medical records.
11    A.   I don't recall, nor do I recall
12  whether there was a specific request for me to
13  address on a case-by-case basis.
14    Q.   And just so we're clear, the only
15  thing the authorization permitted was written
16  access to medical records, meaning it did not
17  permit written contact with Dr. Rozansky?
18    A.   At that point in time.
19    MR. DAWSON:  Objection to form.
20    A.   Correct.
21    Q.   And you don't recall whether that
22  changed?
23    A.   Is that a statement or a question?
24    Q.   I'll withdraw the question.
25    A.   Okay.

Page 119

1    Q.   I want to talk about your meeting
2  with Mr. Stemmler.  That meeting was in New
3  York, correct?
4    A.   It was here in my office.
5    Q.   And it was here in your office at
6  your request, right?  Let me ask that
7  differently.
8    MetLife sent someone to meet with
9  you in New York rather than Arizona at your
10  request?
11    A.   Yes.
12    Q.   And Dr. Ogandzhanova was also there
13  for that meeting?
14    A.   Yes.
15    Q.   What do you remember about the
16  meeting?
17    A.   Mr. Stemmler -- if I'm getting his
18  name right -- met with myself and my client,
19  Dr. Ogandzhanova, and asked questions
20  concerning her claim and other information.
21    Q.   Did you think that Mr. Stemmler did
22  anything impolite or unprofessional or improper
23  in that meeting?
24    A.   As we sit here today I don't have a
25  recollection.

Page 120

1    Q.   Okay.
2    (Document Bates stamped MLOCL 397
3  was marked Newfield Exhibit 10 for
4  identification, as of this date.)
5    Q.   Is Exhibit 10 a letter from you to
6  Lisa Kaarela dated November 27, 2007?
7    A.   Yes.  It appears to be a letter I
8  sent via certified mail to MetLife.
9    Q.   And looking at the -- just the
10  third -- the second to last paragraph, you say,
11  "Delaying this process is tantamount to
12  bad-faith claim handling"?
13    A.   The third paragraph from the bottom
14  paragraph?  Sorry.
15    Q.   Second paragraph from the bottom
16  paragraph.
17    A.   Oh, okay.  Yes, that's what's
18  written.
19    Q.   Okay.  You believed as of November
20  27, 2007, that MetLife had committed bad faith
21  by delaying Dr. Ogandzhanova's claim?
22    A.   I believe that their claim handling
23  conduct was problematic, that they were
24  delaying the process, and I believed that that
25  delay was bad faith.

Page 121

1    Q.   Okay.
2    (Document Bates stamped MLOCL 997
3  through 999 was marked Newfield Exhibit 11
4  for identification, as of this date.)
5    Q.   Is Exhibit 11 a December 31, 2007,
6  letter from you to Lisa Kaarela?
7    A.   Yes.  It appears I sent a letter
8  fax and first class mail to Lisa Kaarela.
9    Q.   And looking at page 99, using the
10  Bates number, the fourth paragraph down, did
11  you put MetLife on notice on December 31, 2007,
12  that its claim handling conduct had caused
13  damage to Dr. Ogandzhanova?
14    A.   It appears that I did.
15    Q.   And did you believe on December 31,
16  2007, that Dr. Ogandzhanova had a right in law
17  and equity to pursue that claim for damage
18  resulting from MetLife's conduct?
19    A.   It was -- I was advising them that
20  we were reserving our rights in law and equity
21  to pursue our claims, any and all, for damages
22  resulted from their claim handling conduct.
23    Q.   Meaning that Dr. Ogandzhanova --
24  you believe Dr. Ogandzhanova had a claim for
25  damages from bad-faith claim handling as of

Jason Newfield>

Page 122

1  December 31, 2007?
2      A.   No.  What I meant was what I said,
3  which is that they were delaying her claim and
4  that we were reserving her rights, which is
5  fairly standard in many letters.
6      Q.   You believed that MetLife had
7  committed bad faith in the way it was
8  handling -- well, did you believe that MetLife
9  had committed bad faith in the way it was
10 handling Dr. Ogandzhanova's claim as of
11 December 31, 2007?
12     A.   Well, I'll answer it this way:  I
13 believed that they were unreasonably delaying
14 an appropriate adjudication of the claim.
15     Q.   And you said in your previous
16 letter that that was tantamount to bad-faith
17 claim handling?
18     A.   I don't know if it's my previous
19 one, but it's the one that we just discussed,
20 yes.
21     Q.   Okay.  So what did you believe that
22 MetLife had done as of December 31, 2007, that
23 was tantamount to bad-faith claim handling?
24     A.   Well, we're stepping back five and
25 a half years.

Page 123

1      Q.   Okay.
2      A.   And I haven't spent any more of my
3  time reviewing this in preparation for the
4  deposition, but I did believe that after
5  meeting with Mr. Stemmler, which we had hoped
6  would satisfy any and all claim concerns given
7  that we had a rather lengthy meeting with
8  Mr. Stemmler and addressed his questions and
9  concerns, that it was an unreasonably long
10 period of time for MetLife to continue to -- or
11 to begin to review her claim.
12     Q.   Is there anything else as we sit
13 here that you thought was bad-faith claim
14 handling as of that time?
15     A.   I'm going to say that whatever's in
16 my letter is what I believed at the time.
17     Q.   How about Lisa Kaarela's
18 antagonistic and biased -- antagonistic and
19 biased approach to the claim, did you believe
20 that that was bad faith?
21     A.   So are you talking about that in
22 isolation or the overall -- in the aggregate
23 the manner in which the claim was being
24 adjudicated?  Because that's my perception, is
25 the manner in which the claim was being

Page 124

1  adjudicated, whether it was her bias or her
2  antagonistic nature towards me or
3  Dr. Ogandzhanova.
4      Q.   But Lisa Kaarela's -- the -- what
5  you described earlier as Lisa Kaarela's
6  antagonistic and biased approach to the claim
7  was part of what made you believe MetLife's
8  claim handling was tantamount to bad faith?
9      A.   I'm not really sure I can answer it
10 in that way.  I think that my perception at the
11 time when I crafted this letter and I laid out
12 our concerns were that MetLife's conduct was
13 unreasonable and improper.
14     Q.   On the next page, page 999, of your
15 letter, you describe two employees that were
16 still working with Dr. Ogandzhanova after she
17 sold the business.
18     A.   Okay.
19     Q.   And one of those employees, Kuhn
20 Jang, was working to provide continuity of
21 patient care from Dr. Ogandzhanova's practice
22 to the new practice, right?
23     A.   That's not the term that I used.
24     Q.   What term did you use?
25     A.   It's in my letter.  It says, "Her

Page 125

1  job duties are to review and coordinate
2  previous treatment plans of patients with
3  current treatment plans to ensure the
4  continuity of patient care from her practice to
5  the new practice and to provide dosimetry and
6  radiation physics and technical support."
7      Q.   And you believe she was doing
8  that -- well, let me ask you this first:  You
9  also submitted some utility bills along with
10 this December 31, 2007, letter, looking at the
11 third to last paragraph?
12     A.   That's what it indicates, yes.
13     Q.   Those utility bills, you say in the
14 letter, were for the location of the office
15 currently at 1227 East Clear View Drive in Casa
16 Grande?
17     A.   Right.  I think that was her home
18 address at the time.
19     Q.   Did you mention in the letter that
20 that was also her home?
21     A.   I didn't mention in the letter that
22 it was her home, but I think it was on the
23 claim form that we looked at earlier, if I'm
24 not mistaken, which if you want me to
25 reference, it would be --

Jason Newfield>

| Page 130 | Page 132 |
|---|---|

**Page 130**

1    Q.    Okay.

2    A.    And I'm not -- I really don't have

3  a recollection as to that issue back when.

4    Q.    Now, I'm just going to call her

5  Anna.  What Anna, the office manager, was doing

6  included following accounts receivable and

7  coordinating date of service remittance overlap

8  with Arizona Radiation Therapy Management

9  Services, right?  This is --

10    A.    That's what I articulated in this

11  letter.

12    Q.    Okay.  Did you know that

13  Dr. Ogandzhanova was being paid $16,000 by the

14  new purchaser to, among other things, follow

15  the accounts receivable and coordinate date of

16  service remittance overlap with the new

17  purchaser?

18    A.    I don't know that certainly as we

19  sit here now and I don't know if I had any

20  recollection of that back when.

21    Q.    Okay.  But you didn't mention that

22  $16,000 payment in the letter?

23    A.    So again, I'm not really sure to

24  the foundation of that question, but if you

25  want me to look through the letter and confirm

**Page 131**

1  that that's not in there, I'm going to agree

2  with you that I don't see it in this.

3    Q.    Okay.  Would the information you

4  had about what the other employees were doing

5  for Dr. Ogandzhanova have came from

6  Dr. Ogandzhanova?

7    A.    So that's probably an

8  attorney/client privilege issue, but I'm going

9  to tell you that I didn't make it up.

10    Q.    Okay.  You didn't have any reason

11  to think it wasn't true?

12    A.    So without touching upon

13  attorney/client, I imagine that the source of

14  information was somebody who knew about that

15  and I'm not sure in terms of attorney/client

16  how to really answer that question differently.

17    Q.    But you wouldn't have said it if

18  you didn't think it was true, if you didn't

19  have reason to think it was true?

20    A.    No.  I must have been comfortable

21  that that information was conveyed to me.

22  Although I do make mistakes more often than I

23  care to.

24        (Document Bates stamped MLOCL 771

25  and 772 was marked Newfield Exhibit 12 for

**Page 132**

1    identification, as of this date.)

2        THE WITNESS:  And off the record.

3        (A discussion was held off the

4    record.)

5    Q.    Is Exhibit 12 a February 11, 2008,

6  letter from you to Lisa Kaarela?

7    A.    Yes.  It looks like I sent a fax

8  and mailed a letter February 11, 2008, to Lisa

9  Kaarela.

10    Q.    I want you to look at the last

11  paragraph of the letter.  You say, "Based upon

12  the standards espoused in Arizona case law, we

13  believe that MetLife's conduct satisfies the

14  bad-faith inquiry and Dr. Ogandzhanova intends

15  to pursue her claim through litigation."

16    A.    That's what I said.

17    Q.    So as of February 11, 2008, you

18  believed that MetLife had committed actionable

19  bad faith in connection with Dr. Ogandzhanova's

20  claim?

21    A.    It was my understanding or my

22  perspective at that time that the duty of good

23  faith and fair dealing, which I think is

24  inherent in insurance contracts, had been

25  violated.

**Page 133**

1    Q.    And that Dr. Ogandzhanova had an

2  actionable claim under Arizona law for

3  violation of the duty of good faith and fair

4  dealing?

5    A.    I believe that was my

6  understanding.

7    Q.    And that was based on the issues --

8  well, let me ask you this:  We discussed

9  earlier your issues with Lisa Kaarela.  Is

10  there any other specific employee at MetLife

11  that you believed engaged in bad faith or

12  otherwise handled the claim improperly?

13    A.    At any point in time?

14    Q.    Yes.

15    A.    Well, I would think -- and I forget

16  the name of the person that jumped into the

17  claim later on, I think it was Jamie, Jamie

18  Frederick.

19    Q.    Jamie Frederick, right.

20    A.    And I don't recall if I dealt

21  directly with Jamie on the issues concerning

22  Dr. Parker -- Parker's the name, right?

23    Q.    Right.

24    A.    I think when I shared those

25  concerns with MetLife -- and if it was Jamie,

Jason Newfield>

| Page 142 | Page 144 |
|---|---|

**Page 142**

1    that she paid me on an hourly basis and I never
2    received a percentage of any of her benefits.
3    I don't have any financial stake in the outcome
4    of this lawsuit whatsoever.  And in fact
5    today's the first day where I'm meeting these
6    fine people to my right.
7        Q.    Have you spoken with either
8    Mr. Dawson or Ms. Rosenthal or Mr. German
9    before today?
10       A.    I have.
11       Q.    When did you first speak with them?
12       A.    I don't recall.
13       Q.    How many times have you spoken with
14   them?
15           MR. DAWSON:  Well, let me object to
16       the compound nature.  You have a lot of
17       names in that question.
18           MS. BRADHAM:  Okay.
19       Q.    So these questions are all about
20   any of Dr. Ogandzhanova's current attorneys?
21       A.    Mm-hmm.
22       Q.    How many times have you spoken with
23   one of Dr. Ogandzhanova's current attorneys?
24       A.    And I guess that would include
25   staff, right?

**Page 143**

1        Q.    Okay.  Also including staff.
2        A.    Several, but I don't really know
3    specifically.
4        Q.    Could it be more than five?
5        A.    It's probably not, although --
6    well, maybe.  Because I had to coordinate the
7    deposition and I advised them that I got served
8    with a subpoena.
9        Q.    All right.  Did you refer
10   Dr. Ogandzhanova's current counsel?
11       A.    No, I did not.
12       Q.    Did you speak with Mr. Dawson and
13   Ms. Rosenthal this morning before the
14   deposition?
15       A.    I did.
16       Q.    For how long?
17       A.    I'm going to say 45 minutes.
18       Q.    Apart from coordinating and
19   scheduling issues, did you speak with any of
20   Dr. Ogandzhanova's counsel or staff about her
21   claim in preparation for the deposition?
22       A.    Hmm.
23       Q.    Other than the 45 minutes that we
24   just talked about.
25       A.    Right.  I did meet with Mr. German

**Page 144**

1    once.  So that wasn't in preparation for the
2    deposition, but I did speak with him.
3        Q.    Was that an in-person meeting?
4        A.    It was.
5        Q.    Approximately when was that?
6        A.    Sometime between when the lawsuit
7    was filed and today.  And I can't even tell you
8    if it was in 2013 or 2012.
9        Q.    How long was that meeting?
10       A.    45 minutes.
11       Q.    Did he come out here to meet with
12   you?
13       A.    He came -- I met him here in my
14   office.
15       Q.    Have you ever had any discussions
16   with Dr. Lamb or Dr. Parker related to
17   Dr. Ogandzhanova's claim?
18       A.    No.  I sent them those letters I
19   identified earlier, that's been it.
20       Q.    How about Dr. Kaplan or Dr. Boone?
21       A.    No.
22       Q.    Did you ever have any discussions
23   with a MetLife consultant?
24       A.    I don't know what that means.
25       Q.    Okay.  Did you ever have any

**Page 145**

1    discussions with -- okay.  I think that's --
2    that answers the question.
3           So you didn't have any discussions
4    with someone at MetLife who you thought of as a
5    consultant?
6        A.    You mean like a physician
7    consultant?
8        Q.    I think so.
9        A.    I don't believe I have.
10       Q.    Okay.
11           (Document Bates stamped MLOCL 2178
12       through 2215 was marked Newfield Exhibit
13       13 for identification, as of this date.)
14       Q.    Is Exhibit 13 an October 31, 2011,
15   letter from you to Jamie Frederick?
16       A.    Yes.  I sent a letter via certified
17   mail October 31, 2011, with some additional
18   material.
19       Q.    Okay.  I want you to turn to page
20   2181, page 4 of the letter.
21           MR. DAWSON:  What page did you say?
22           THE WITNESS:  2181.
23           MS. BRADHAM:  2181.
24       Q.    Looking at section D on that page,
25   you say, "Dr. Parker claims that

Jason Newfield>

**Page 146**

1   Dr. Ogandzhanova has not sought out appropriate
2   treatment for her condition." Did I read that
3   correctly?
4        A.   Yeah, that's the quote.
5        Q.   You were aware as of October 31,
6   2001, that Dr. Parker believed Dr. Ogandzhanova
7   wasn't receiving appropriate treatment?
8        A.   2011?
9        Q.   Yes, sorry.  You were aware as of
10  October 31, 2011, that Dr. Parker believed
11  Dr. Ogandzhanova was not receiving appropriate
12  treatment?
13            MR. DAWSON: Objection; foundation.
14       A.   This is Dr. Parker's claim that I'm
15  addressing.
16       Q.   I'm just asking whether you were
17  aware of it.
18       A.   I'm aware that that was a claim
19  that Dr. Parker had raised.
20       Q.   Looking down at the next paragraph,
21  the first sentence, one of the issues that
22  Dr. Lamb and Dr. Parker had, in your words,
23  chosen to drive home forcefully was their claim
24  that Dr. Ogandzhanova should have been seeing a
25  local professional more frequently?

**Page 147**

1        A.   Without reviewing additional
2   materials, I'm not fully comfortable answering
3   that, but I believe that they were grasping at
4   whatever they could at that moment to try and
5   feed MetLife what MetLife was looking for in
6   the context of their medical review so I was
7   working through my rebuttal of those issues.
8        Q.   You say in the first paragraph that
9   Dr. Parker chastises Dr. Ogandzhanova on the
10  issue of not locating an appropriate
11  professional in the Phoenix area.  So based on
12  that did you understand as of October 31, 2011,
13  that MetLife was taking the position that
14  Dr. Ogandzhanova had not located an appropriate
15  professional in the Phoenix area?
16            MR. DAWSON: Objection.  It's
17  misstating what you just read there and
18  lacks foundation.
19       A.   And I guess just to answer it, this
20  is what I'm addressing in terms of Dr. Parker
21  rather than MetLife.
22       Q.   Okay.  But you understood that
23  Dr. Parker in his report to MetLife had claimed
24  that Dr. Ogandzhanova needed to seek an
25  appropriate professional in the Phoenix area?

**Page 148**

1        A.   Well, again, I don't have the
2   documents to refer to, meaning Dr. Parker's
3   report.  I think what I've quoted are a portion
4   of his report where he said if she were truly
5   motivated to improve that she would have sought
6   out treatment from another mental health
7   professional, and I believe based on what I've
8   written that he chastised her for not locating
9   an appropriate professional in the Phoenix
10  area.
11       Q.   You reviewed both Dr. Parker's
12  report and Dr. Lamb's report, correct?
13       A.   I did in connection with this work,
14  yes.
15       Q.   And Dr. Ogandzhanova also reviewed
16  Dr. Parker and Dr. Lamb's reports?
17       A.   Is that what she's testified to?
18            MS. BRADHAM: I can go ahead and
19  mark this.
20            (Letter from Dr. Ogandzhanova to
21       Mr. Newfield was marked Newfield Exhibit
22       14 for identification, as of this date.)
23       Q.   Exhibit 14 is a document that I
24  understand has been produced by
25  Dr. Ogandzhanova in the litigation.  Is Exhibit

**Page 149**

1   14 a letter that Dr. Ogandzhanova wrote to you
2   with her thoughts about Dr. Parker and
3   Dr. Lamb's reports?
4            MR. DAWSON: Just let me object.  I
5   don't believe this was produced by
6   Dr. Ogandzhanova in the litigation.  I
7   believe this was received by virtue of a
8   subpoena from your side to Dr. Rozansky.
9            MS. BRADHAM: Okay.  Thank you.
10  You may well be right.
11            MR. DAWSON: But just so he knows
12  that too as he tries to answer your
13  question.
14       A.   I actually note the Bates stamp
15  says Rozansky down at the bottom.  I'm not sure
16  I can answer the question.  I guess I can
17  answer it by saying I think I've seen this
18  before because I think it was addressed to me.
19       Q.   Okay.
20       A.   I think it says, "Jason, I have
21  reviewed all their reports."
22       Q.   And the person who wrote this or at
23  least the person who purported to write this
24  was Dr. Ogandzhanova, not Dr. Rozansky?
25       A.   I would -- I would -- I have every

```
 1                    C E R T I F I C A T E

 2

 3    STATE OF NEW YORK  )

 4                       )

 5    COUNTY OF NEW YORK )

 6

 7         I, MICHELE MOSKOWITZ, a Shorthand Reporter

 8    and Notary Public within and for the State of

 9    New York, do hereby certify:

10         That JASON NEWFIELD, the witness whose

11    examination is hereinbefore set forth, was duly

12    sworn by me and that this transcript of such

13    examination is a true record of the testimony

14    given by such witness.

15         I further certify that I am not related to

16    any of the parties to this action by blood or

17    marriage and that I am in no way interested in

18    the outcome of this matter.

19         IN WITNESS WHEREOF, I have hereunto set my

20    hand this 25th day of April, 2013.

21

22

23

24    ----------------------

25    MICHELE MOSKOWITZ
```

# EXHIBIT 7



# FRANKEL & NEWFIELD, P.C.

ATTORNEYS AT LAW

Justin C. Frankel*
Jason A. Newfield*

*Admitted in NY, CT and PA

585 Stewart Avenue
Suite 301
Garden City, NY 11530
Tel: (516) 222-1600
Fax: (516) 222-0513
www.frankelnewfield.com

November 27, 2007

**VIA CERTIFIED MAIL**

Lisa Kaarela
Technical Claim Advisor
Met Life
PO Box 30429
Tampa, FL 33630-3429

Re:    Dr. Inna Ogandzhanova

Dear Mrs. Kaarela:

In furtherance of the above claim, we are enclosing herewith the following materials:

- Additional Financial information to support our BOE claim; and
- Asset Purchase Agreement.

These materials have no impact upon the acceptance of liability and continue to represent efforts to delay the process. Moreover, while Met Life continues to state that materials are being referred for review, it is problematic that any such reviews are taking as long as this, given the relative simplicity of the claim.

This is a mental health claim, predicated upon the inability to work at Dr. Ogandzhanova's occupation as a Radiation Oncologist, treating cancer patients. As you know, Dr. Ogandzhanova lost her child to cancer, and it is unfathomable that Met Life is having any difficulty in recognizing her impairment. Delaying this process is tantamount to bad faith claim handling.

We are thus providing Met Life with a brief window in which to accept liability of the claim, absent which we intend to consider all of our rights under the policy, including a claim for bad faith under Arizona law. We trust that this will not be necessary.

Thank you for your attention to this matter.

Very truly yours,

FRANKEL & NEWFIELD, P.C.

By: _____
Jason A. Newfield

JAN/bms
Enclosures
cc: Dr. Inna Ogandzhanova
X:\Shared\Ogandzhanova\MetLife 7 ltr.wpd

EXHIBIT
10
Newfield
9/5/13

MLOCL000397

# EXHIBIT 8



# FN
## FRANKEL & NEWFIELD, P.C.

ATTORNEYS AT LAW

Justin C. Frankel*
Jason A. Newfield*

*Admitted in NY, CT and PA

December 31, 2007

585 Stewart Avenue
Suite 312
Garden City, NY 11530
Tel: (516) 222-1600
Fax: (516) 222-0513
www.frankelnewfield.com

VIA FACSIMILE (813) 673-3637
AND FIRST CLASS MAIL

Lisa Kaarela
Technical Claim Advisor
Met Life
18210 Cranes Nest Drive
Tampa FL, 33647

Re:  Dr. Inna Ogandzhanova

Dear Mrs. Kaarela:

We acknowledge receipt of your letter dated December 19, 2007, and wish to respond herein. First, we want to once again request that all claim letters be sent via facsimile, in addition to mail, so as to not further delay receipt of time sensitive materials. We trust that Met Life will comply with this simple request.

To respond directly to the issues raised in your letter, I need to first sharply dispute the factual errors and/or misrepresentations contained in your letter. While I generally do not believe it is productive to have a back and forth regarding timing issues, etc., in this case, it is clear that Met Life is attempting to buttress its support for continuing to delay a claim decision upon the fact that Dr. Ogandzhanova filed her notice of claim in June 2007 for an onset date in March 2007.

Let us now become clear about the real facts regarding Dr. Ogandzhanova's claim. On September 14, 2007, Met Life received a Claimant Statement, Occupational Description, Attending Physician Statement and Narrative Statement from Dr. Rozansky, the treating physician.[1]

On October 8, 2007, we met with Steven Stemmler of Met Life in my office to address ALL claim issues, and during an exhaustive discussion with Mr. Stemmler, answered all of his inquiries. In fact, I do not believe that there remained any follow up inquiries by Met Life directly flowing from that field interview - other than the information sent the next day (discussed below). Quite frankly, we thought that liability would have been accepted immediately after that field interview.

The day following that meeting, on October 9, 2007, we provided Met Life with Dr. Ogandzhanova's CPT codes, her 2002-2004 tax returns and her financial statements for 2005-2006 (as no tax returns have yet been filed for those years).

EXHIBIT
Newfield
4/15/13   ms
PENGAD 800-631-6989

---

[1]  Your letter is inconsistent, noting in one place that the claim forms were received on September 17, 2007, and then later that Dr. Rozansky's statement was received on September 13, 2007.

 FRANKEL & NEWFIELD, P.C.

Lisa Kaarela
Met Life

Met Life then began to chase the office notes from Dr. Rozansky (rather than contacting him to discuss the issues with an eye toward understanding the nature and severity of Dr. Ogandzhanova's condition), likely in the hope of cherry picking notations, rather than appreciating Dr. Rozansky's findings and opinions.

What remains confusing is the statement in your letter that "based on the documentation that was legible in Dr. Rozansky's records, ...", and "Therefore, in order to continue to expedite our evaluation ..." and IME was to be scheduled. The confusion lies in the fact that if this discusses the legible records, presumably this opinion was forged on or about November 20, 2007, when your consultant reviewed the records. Yet, even as of today, December 28, 2007, over five (5) weeks later, no examination has been scheduled. Kindly articulate how this demonstrates ANY EFFORT to expedite the process, or to "continue to expedite" Met Life's evaluation.

Rather, this is simply one further example of Met Life delaying the acceptance of liability of the claim. What could be the possible explanation for the over five (5) week time in scheduling an examination? And how does that equate to expediting the process?

Attached please find an impact statement from Dr. Ogandzhanova, indicating how Met Life's conduct has impacted upon her condition, and has unfortunately furthered the severity of her problems. Rest assured, Met Life is now on notice that its claim handling conduct has caused damages to Dr. Ogandzhanova beyond simply a failure to timely accept liability of her claim. Dr. Ogandzahnova reserves all of her rights in law and equity to pursue any and all claims for damages resulting from Met Life's claim handling conduct.

Regarding the IME that was mentioned in your letter, be advised that Dr. Ogandzhanova requests that the examination be scheduled for Los Angeles, California. In addition, we request that Met Life identify the type of professional who be performing an examination of Dr. Ogandzhanova.[2]

To respond to the financial requests contained in your December 19, 2007 letter, please note once again that Dr. Ogandzhanova has not filed tax returns for 2005-06, either personally or through Desert Rose Oncology. We cannot provide what has not been generated.

Please find the profit and loss analysis for the years 2005 and 2006.

We previously provided Met Life with the purchase agreement, but enclosed are providing additional materials in connection with the purchase agreement, including various schedules. We are also providing updated payroll information for Kun Jiang and Anna Khachaturyan, whose positions are identified in Schedule 3.16 attached.[3]

---

[2]     We are also requesting that Met Life provide the CV of the provider and may have follow up inquiries following identification of the examiner.

[3]     This information was also covered during the interview with Steven Stemmler on October 8, 2007.

MLOCL000998

 FRANKEL & NEWFIELD, P.C.

Lisa Kaarela
Met Life

For further explanation, Kun Jiang is a Dosimetry Manager, earning $ 65,000 annually, with a date of hire of May 1, 2004. Her job duties are to review and coordinate previous treatment plans of patients with current treatment plans to ensure the continuity of patient care from Dr. Ogandzhanova's practice to the new practice (Arizona Radiation Therapy Management Services ("ARTMS")), and to provide dosimetry and radiation physics technical support.

For further explanation, Anna Khachaturyan is an Office Manager, earning 14.00/hour, with a date of hire of March 29, 2005. Her job duties are to process insurance payments, follow accounts receivable and coordinate date of service/remittance overlap with Arizona Radiation Therapy Management Services, and patient communications and accounts receivable.

The utility bills are for the location of the office, currently located at 1227 E. Clearview Drive, Casa Grande, AZ 85222.

Lastly, please find the lease document pertaining to the Phillips Medical Capital lease which is a laser equipment that was not part of the transfer with ARTMS.

We request that Met Life immediately schedule the examination and respond to our letter addressing the specific issues raised.

Very truly yours,

FRANKEL & NEWFIELD, P.C.

By: _____
Jason A. Newfield

JAN/bms
Enclosures
cc: Dr. Inna Ogandzhanova
X:\Shared\Ogandzhanova\MetLife 9 ltr.wpd

MLOCL000999

# EXHIBIT 9



# FRANKEL & NEWFIELD, P.C.

ATTORNEYS AT LAW

Justin C. Frankel*
Jason A. Newfield*

*Admitted in NY, CT and PA

February 11, 2008

585 Stewart Avenue
Suite 312
Garden City, NY 11530
Tel: (516) 222-1600
Fax: (516) 222-0513
www.frankelnewfield.com

2008 FE 14  PH 4:03

**VIA FACSIMILE (813) 983-6489**
**AND FIRST CLASS MAIL**

Lisa Kaarela
Technical Claim Advisor
Met Life
18210 Cranes Nest Drive
Tampa FL, 33647

Re:    Dr. Inna Ogandzhanova

Dear Mrs. Kaarela:

We are in receipt of the CV for Dr. Lamb, which it is noted was finally provided to us after numerous efforts to secure same.[1]  His CV is quite notable for the fact that he appears to have practice focus upon areas of neuropsychology as it pertains to brain injury and other neurological impairments.  However, we fail to see where his qualifications truly address the issues faced in Dr. Ogandzhanova's claim.

Nonetheless, while we are notifying Met Life that Dr. Lamb appears to lack the appropriate qualifications, Dr. Ogandzhanova intends to attend the testing - since her alternative would be to once again remain at the mercy of another extended delay in the process, with Met Life continuing to refuse to timely administer her claim.

Moreover, it continues to bewilder us that Met Life has still failed to address the issues raised in our letter of January 25, 2008, which further raises our concerns about the fundamental claim handling approach toward Dr. Ogandzhanova.

Accordingly, we can only describe our perception of Met Life's conduct to be further indicative of a punitive and bad faith process, which has far exceeded the bounds of proper claim handling.   Under Arizona law, the inquiry in bad faith is whether there is sufficient evidence to conclude that in the investigation, evaluation and processing of the claim, the insurer acted unreasonably and either knew or was conscious of the fact that its conduct was unreasonable.

Given the multiple efforts made by Dr. Ogandzhanova to secure a prompt claim determination, and given the lack of promptness in Met Life's pursuit of its claim investigation, and

---

[1]     This was requested in our letter of January 25, 2008.  The CV was not provided until February 7, 2008, following another phone discussion.



MLOCL000771



**FRANKEL & NEWFIELD, P.C.**

Lisa Kaarela
Met Life

its steadfast refusal to acknowledge the severity of Dr. Ogandzhanova's impairment, despite powerful evidence from her treating physician[2], it is readily apparent that Met Life is engaging in bad faith claim conduct.

Moreover, we have requested on multiple occasions that Met Life issue benefits to Dr. Ogandzhanova while its investigation continues, in an effort to treat its insurer fairly, yet each such request has been rejected or gone unanswered, most recently in our discussion on February 8, 2008. Moreover, Met Life is fully aware that its conduct is substantially impacting Dr. Ogandzhanova.[3]

While we fully expect Met Life to once again rehash its tired position that somehow Dr. Ogandzhanova is the party who has been tardy, we reject that contention wholly, and note, as we have in prior letters, that Met Life chose to pursue a claim investigation strategy to include a personal interview with Dr. Ogandzhanova back in October 2007.   The information conveyed in that interview with Mr. Steven Stemmler should have been sufficient to grant benefits.  Now, many months later, Met Life has continued to refuse to provide these benefits, serving to delay the just and prompt consideration of the claim.

Based upon the standards espoused in Arizona case law, we believe that Met Life's conduct satisfies the bad faith inquiry, and Dr. Ogandzhanova intends to pursue her claim through litigation. In this litigation, Dr. Ogandzhanova will pursue her claims under the contract, including claims for future benefits claims for bad faith and punitive damages and claims for attorneys' fees, as well as any other legal or equitable claims that are proper under the facts of this claim.

Guide yourself accordingly.

Very truly yours,

FRANKEL & NEWFIELD, P.C.

By: _____
Jason A. Newfield

JAN/bms
cc: Dr. Inna Ogandzhanova
X:\Shared\Ogandzhanova\Met Life 14 ltr.wpd

2008 FE 14  PH 4:03

---

[2]    If Met Life were not seeking to delay the processing of the claim, it would have long ago conducted a peer to peer discussion with Dr. Rozansky, the physician treating Dr. Ogandzhanova.

[3]    Our letter of January 31, 2007 enclosed a personal statement from Dr. Ogandzhanova indicating the implications of Met Life's delay.

MLOCL000772

# EXHIBIT 10

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

METROPOLITAN LIFE INSURANCE )
COMPANY, a New York )
corporation, )
 )
Plaintiff/Counter-Defendant, )
 )
v. ) No.CV-12-372PHX-GMS
 )
INNA OGANDZHANOVA, M.D., )
 )
Defendant/Counter-Claimant. )
_____ )

DEPOSITION OF INNA OGANDZHANOVA, M.D.

Volume 1

Phoenix, Arizona

November 28, 2012

Prepared by:

CINDY MAHONEY, RPR, RMR
Certified Court Reporter
Certificate No. 50680

1    pregnant?

2         A    I wanted to get pregnant right away.

3    At some point I saw a fertility specialist.  I

4    don't remember when.

5         Q    Why did you want to get pregnant

6    right away?

7         A    Sir, I lost my child.  I didn't want

8    to be old woman with nobody.  Nobody can do

9    anything to substitute my son Isaac, but I

10   wanted to have a child.  I didn't want to be

11   old woman with nobody.

12        Q    Since 2006 have you seen anybody

13   besides Dr. Rozansky, the other doctor in LA,

14   the OB-GYN doctor, the fertility specialist,

15   and Dr. Sheer?

16        A    I don't think I saw any other

17   specialists.  I think I saw --

18        Q    Any other doctors?

19        A    I saw -- I saw -- yeah, OB specialist

20   I saw -- OB-GYN doctor.  And that's what I

21   think, just cannot recall right now.

22        Q    What was the name of the fertility

23   specialist?

24        A    I saw two fertility specialists.

25        Q    What are the names?

Page 166

1   survive the bone marrow transplant.

2           My son had two of those and another

3   of his own.  My son survived, according to

4   Dr. Graham, what no other patients survive.

5   So many things happened to him.

6       Q   And he eventually passed away on

7   March 15, 2006?

8       A   Yes, he did.

9           MR. GERMAN:  We're going to take a

10  break.

11          (A recess was held, after which the

12  deposition resumed as follows:)

13      Q   BY MR. BRESSLER:  Dr. O, after your

14  son died, did you keep working?

15      A   Yes, I did.

16      Q   Did your schedule change at all or

17  did you keep working full time?

18      A   No.  My schedule have not changed at

19  all.

20      Q   Did you apply for more insurance with

21  MetLife after your son died?

22      A   My agent called me, I remember, at

23  some point and I agreed to -- I agreed to more

24  insurance.

25      Q   When did your agent call you?

Page 214

```
 1   STATE OF ARIZONA      )
     COUNTY OF MARICOPA    )
 2              Be it known that the foregoing deposition

 3   was taken by me pursuant to stipulation of counsel;

 4   that I was then and there a Certified Court Reporter

 5   in the State of Arizona, and by virtue thereof

 6   authorized to administer an oath; that the witness

 7   before testifying was duly sworn by me to testify to

 8   the whole truth; pursuant to request, notification

 9   was provided that the deposition is available for

10   review and signature; that the questions propounded

11   by counsel and the answers of the witness thereto

12   were taken down by me in shorthand and thereafter

13   transcribed into typewriting under my direction;

14   that the foregoing pages are a full, true, and

15   accurate transcript of all the proceedings had upon

16   the taking of said deposition, all done to the best

17   of my skill and ability.

18              I FURTHER CERTIFY that I am in no way

19   related to nor employed by any parties hereto; nor

20   am I in any way interested in the outcome thereof.

21              Dated at Phoenix, Arizona, this_____day

22   of_____, 2012.

23              _____
                   CINDY MAHONEY, RMR, No. 50680
24

25
```

Page 215

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

METROPOLITAN LIFE INSURANCE )
COMPANY, a New York corporation, )
)
    Plaintiff/Counter-Defendant, )
)
vs. )No. CV-12-372-PHX-GMS
)
INNA OGANDZHANOVA, M.D., )
)
    Defendant/Counter-Claimant. )
_____ )

DEPOSITION OF INNA OGANDZHANOVA

Volume 2

Pages 215 through 312, Inclusive

Phoenix, Arizona

December 1, 2012

Prepared by:

Meri Coash, RMR, CRR

Certified Realtime Reporter

(Copy)                    Certified Reporter #50327

Page 259

1    what has been marked as Exhibit 6 to the deposition, which

2    comes from Dr. Rozansky's response to the subpoena, pages

3    137 through 158.

4              MR. GERMAN:   Yeah.   So we object to the form

5    and foundation of your question, but we will allow our

6    client to explain how this may have come about, so you are

7    free to ask her questions about that.   So we're not

8    waiving the attorney-client privilege across the board.

9    We don't feel that this is, indeed, a formal waiver, but

10   she can explain.

11   BY MR. BRESSLER:

12      Q.   Please explain to me how Exhibit 6, this letter

13   to Jason Newfield, came about.

14      A.   Well, I remember I got, like you said, all those

15   reports from Dr. Parker, Dr. Lamb, and I became very angry

16   about that reports.   There was some misrepresentation of

17   facts.   I was angry, and I was ventilating on a piece of

18   paper.   And I remember coming to Dr. Rozansky's office and

19   discussing with him -- I had the paper and I was

20   discussing with him some of the issues with Dr. Rozansky.

21      Q.   Let me stop you just so your answer is in some

22   perspective.   You went to Dr. Rozansky's office with

23   Exhibit 6 in hand to discuss with him?

24      A.   To discuss some issues why I was anger.

25      Q.   But you had this physically with you when you saw

1    STATE OF ARIZONA    )

2    COUNTY OF MARICOPA  )

3                   BE IT KNOWN the foregoing deposition was

4    taken by me pursuant to stipulation of counsel; that I was

5    then and there a Certified Reporter of the State of

6    Arizona, and by virtue thereof authorized to administer an

7    oath; that the witness before testifying was duly sworn by

8    me to testify to the whole truth; notice was provided that

9    the transcript was available for signature by the

10   deponent; that the questions propounded by counsel and the

11   answers of the witness thereto were taken down by me in

12   shorthand and thereafter transcribed into typewriting

13   under my direction; that the foregoing pages are a full,

14   true, and accurate transcript of all proceedings and

15   testimony had and adduced upon the taking of said

16   deposition, all to the best of my skill and ability.

17        I FURTHER CERTIFY that I am in no way related to

18   nor employed by any parties hereto nor am I in any way

19   interested in the outcome hereof.

20        DATED at Phoenix, Arizona, this_____day of

21   _____, 2012.

22

23        _____

24        Meri Coash, RMR, CRR
          Certified Reporter #50327

25

# EXHIBIT 11

*Eleanor Lavretsky, M.D., Ph.D.*

*Adult and Geriatric Psychiatry*

Westwood Medical Consultants
462 N. Linden Drive, Suite 230  Beverly Hills, CA 90212
Phone: (310) 246-9249  Fax: (310) 246-0186

## CONFIDENTIAL PATIENT INFORMATION

DATE: _1/4/08_

NAME: _Ogandzhanova Inna_    DOB: _1 7 63_
      Last          First        MI

ADDRESS: _1227 E. Clearview Dr_
              Street

_Casa Grande    Az 85222_    PHONE (___) ▮▮▮▮
City                    Zip Code

Social Security: ▮▮▮▮▮▮▮    Spouse name: _____

Employer Name: _Desert Rose Clc_  Work Phone (___) _____

Person to notify in case of emergency: _Don Bates_  Phone (▮▮▮) ▮▮▮▮▮▮

Who referred you to us: _____

## INSURANCE INFORMATION

Insurance Company: _____ _private_ _____

Insured person name and DOB: _____

ID: _____    Group: _____

## MEDICAL INFORMATION

Primary/Family Doctor. _____ Phone (___) ____
Major medical problems: _____
Current medications: _____
Allergies: _____ _NKA_ _____

CONSENT: The undersigned hereby authorizes Doctor to perform such deemed appropriate by Doctor to make a thorough diagnosis of the Patient's needs. I also authorize Doctor to perform any and all forms of treatment that may be indicated in connection with me or my dependent's disease. I hereby assign my insurance benefits to be paid directly to Dr. Lavretsky, MD. I understand that I am financially responsible for non-covered services. I authorize Doctor to release my insurance carrier any information required processing this claim.

PATIENT'S SIGNATURE: _____

MLOEL000002

**REDACTED**

ELEANOR LAVRETSKY, MD, PhD

**INITIAL PSYCHIATRIC EVALUATION**

DATE: 1/4/07

**IDENTIFYING INFORMATION & PRESENTING PROBLEM:**

~ 44 yo CF MD radiation oncologist, in 1988 from Leningrad (Russia) now living in Phoenix AZ, with husband, currently pregnant w/ baby girl due in March.

**PRESENT ILLNESS & HISTORY:**

Patient states that her friends referred her to my office as she does not want to see a psychiatrist in Arizona.

She is presenting with complaints of severe anxiety, panic attacks, depression. Main stressor - loss of her son in March 2006 (2° leukemia). She developed depressive symptoms, anxiety, poor concentration. Depression and anxiety became worse in October. She is anxious, restless, has frequent panic attacks. She cannot stay in one place, keeps traveling from one place to another. She cannot sleep. All night watching TV, Jewelry shows/sales. She spent a lot of money on Jewelry (~$40,000) She does not need this Jewelry. Cannot work, cannot see oncology patients that remind her about her late son.

**ADDITIONAL MEDICAL HISTORY:**

No active problems.

Pregnancy 30 wks

NAME  Ogandzhanova, Inna

ELEANOR LAVRETSKY, MD, PhD

## INITIAL PSYCHIATRIC EVALUATION

DATE: 1/4/07

**ADDITIONAL SOCIAL HISTORY:**
Family Jewish
Born in Russia (leningrad = St Petersburg)
Graduated from leningrad Pediatric
Institute. Now radiation oncologist.
husband of 10 years is suffering from
Bipolar Disorder, cannot help her much.

**ADDITIONAL FAMILY HISTORY:**
Denies
Parents and brother in N.Y. they
are not in touch 2° since family
disagreements

**MENTAL STATUS:**

**Appearance:** Pleasant CF, pregnant, in blue
sweater

**Behavior:** Very emotional, seeking help,
considering applying for disability

**Level of Consciousness:** alert

**Orientation:** x4

**Memory:** fair

**Speech:** emotional, tearful

**Mood:** anxious, depressed. Reports frequent
(at times daily) panic attacks, pessimistic
expectations, afraid of delivery

**Affect:** labile
her own life baby's life
and wellbeing

**Associations:** goal directed

**Hallucinations:** Denies

**Delusions:** Ø

**Content:** focused on loss of son, fearful for her
unborn daughter. Her own inability to concentrate
take care of herself, family.

**Suicidal or Homicidal Ideation:** Denies

**Impulse Control:** Ø (compulsive jewelry buy)

**Insight and Judgment:** fair

**ADLS:**

NAME: Ogardzhanova
Inna

ELEANOR LAVRETSKY, MD, PhD

## INITIAL PSYCHIATRIC EVALUATION

DATE: 1/4/07

**DIAGNOSIS**

AXIS I: Major Psychiatric Diagnosis: _Depressive Disorder_
_(R/o Bipolar Disorder)_
_Anxiety with panic attacks_

AXIS II: _Deferred_

AXIS III: _Pregnancy_

AXIS IV: _Severe psychosocial stressors (loss of her son)_

AXIS V: _40/80_

**RECOMMENDATIONS:**                                    GAS:

1. Pt recommended to find a psychiatrist
locally as she may need regular
follow up care, treatment

2. She also would need a local
psychiatrist if she is applying
for disability in Arizona

3. Start psychotherapy now and
continue after birth of her
baby daughter, as she may be at
risk for postpartum depression

4. Offered Lexapro 10mg po daily,
(side effects discussed)

SIGNATURE: _E Lavretsky M.D._

NAME _Ogandzhanova, Inna_

03/26/2013  11:48  3182460186

MLOEL000005

## DECLARATION OF CUSTODIAN OF RECORDS

I am employed by the Eleanor Lavretsky, MD as _____ (position) and am the duly authorized Custodian of Records. As Custodian, I have the authority to make the following declaration on behalf of the Eleanor Lavretsky, MD I hereby certify:

1.  The Eleanor Lavretsky, MD received a request for records from the law firm of Lewis and Roca LLP regarding Inna Ogandzhanova.

2.  I have diligently and thoroughly searched all documents and records in the possession of the Eleanor Lavretsky, MD with regard to the above-referenced patient. I am producing copies of all documents, records or other tangible things that fall within the request of the patient's authorization. Where data has been stored electronically, we have made hard copies of the data to produce or we have provided a floppy disk containing the data. We have not withheld any documents or data responsive to the request.

3.  I affirm that since receipt of the request for records, that we have not destroyed, erased, thrown away, or relinquished possession of any documents or data responsive to the request.

4.  The copies of the records that accompany this Declaration are true copies of the documents and records of the Eleanor Lavretsky, MD.

5.  These documents and records were prepared by the personnel of this business in the ordinary course of its business or received and kept by the Eleanor Lavretsky, MD in the ordinary course of business.

6.  To the extent the documents and records were prepared by the Eleanor Lavretsky, MD, the records were:

    a.  made at to near the time of the underlying event
    b.  by, or from information transmitted by a person with first hand knowledge acquired in the course of the Eleanor Lavretsky, MD's regularly conducted business activity
    c.  made and kept entirely in the course of that regularly conducted business activity
    d.  made pursuant to a regular practice of the Eleanor Lavretsky, MD.

7.  I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this ___26___ day of ___March___, 2013.

_____ *Lavretsky md*          ___ELEANOR Lavretsky MD___
Custodian of Records *[Signature]*                Custodian of Records *[Print Name]*

## IF NO RECORDS, INITIAL NO. 1 BELOW AND SIGN:

1.  _____ I hereby declare under penalty of perjury that a thorough search of our records has been conducted and to the best of my knowledge there are no records for the above referenced matter.

EXECUTED this _____ day of_____, 2013.

_____                         _____
Custodian of Records *[Signature]*                Custodian of Records *[Print Name]*

3395484.1

# EXHIBIT 12



EXHIBIT NO. 1
Dr Lamb
3-11-13
jmsteno.com

### David G. Lamb, Ph.D.
Diplomate in Clinical Neuropsychology
American Board of Professional Psychology
3420 East Shea Blvd. - Suite 111
Phoenix, AZ 85028
(602) 996-1396 - Appointments
(602) 996-4600   -   Direct line
(602) 996-4501   -   FAX

## INDEPENDENT NEUROPSYCHOLOGICAL EVALUATION

| | |
|---|---|
| Name: | OGANDZHANOVA, Inna |
| Date of Birth: | 1/7/63 |
| Age (years-months): | 45-1 |
| Gender: | Female |
| Education Level: | 20 years |
| Diagnosis: | Reported depression, PTSD, panic attacks |
| Handedness: | Right |
| Pre-injury Occupation: | Radiation Oncologist |
| Policy Number: | 6 364 168 AH, 6 482 821 AH, & 6 482 882 AH |
| | |
| Date(s) Examined: | 2/13 & 19/08 |
| Referral source: | Lisa Kaarela, Disability Specialist |
| Date of report: | 3/3/08 |

**BACKGROUND INFORMATION:**

<u>Purpose of Referral:</u>
Lisa Kaarela, Disability Specialist for Metropolitan Life Insurance Co. (MetLife), initially called on 1/29/08 to inquire regarding availability to perform an Independent Neuropsychological Evaluation. More formally, Eric Michael Kaplan, M.D., psychiatric consultant for MetLife, requested the current Independent Neuropsychological Evaluation of Inna Ogandzhanova in a letter dated January 25, 2008. In this correspondence, Dr. Kaplan asked for the following questions to be addressed:

1. What is her current, DSM-4, 5 axis diagnosis?

2. What are the current subjective symptoms which Inna Ogandzhanova, M.D. complains about? Please describe the frequency and severity of these current symptoms, and how the frequency and severity of symptoms have changed during the course of her mental illness.

3. What are her current medications? Does she have any medication side effects?

4. What type (if any) of psychotherapy is Inna Ogandzhanova, M.D. engaged in?

5. Please provide objective data regarding Inna Ogandzhanova, M.D.'s subjective symptoms. Please utilize psychological/neuropsychological testing to evaluate her psychological and/or cognitive subjective complaints. Please utilize tests which incorporate validity scales for both psychological and cognitive complaints.

6. Please objectively evaluate the issues of symptom exaggeration and/or malingering.

7. Please discuss your impression of Inna Ogandzhanova, M.D.'s motivation to return to work as an oncological radiologist.



To facilitate the formulation of an opinion in this matter, Dr. Kaplan sent medical records and other documentation to be reviewed. In addition to the formal assessment, the documents used in generating the current report are listed below.

<u>Sources of Information:</u>

1.  Approximately 2½ hours of clinical interview of Dr. Ogandzhanova on 2/13/08.
2.  Approximately 2 hours of formal neuropsychological testing on 2/13/08.
3.  An additional 3½ hours of formal neuropsychological testing on 2/19/08.
4.  Records from MetLife:
    a.  7/12/07 Field Claim Report by Joe Mauvais.
    b.  8/8/07 Field Claim Report by Stephen P. Stemmler.
5.  Records from Factual Photo:
    a.  Unsigned surveillance report dated 7/25/07.
6.  Records from Busalacchi Investigative Agency:
    a.  Investigative Report by Peter Busalacchi dated 12/21/07 (missing page 1).
    b.  Investigative Report by Peter Busalacchi dated 1/15/08.
7.  Records from Gerald I. Rozansky, M.D., Ph.D.:
    a.  Hand written notes dated 1/4/06, 1/15, 2/1, 4/13, 5/29, 6/12, 7/27, 9/1, & 10/2/07.
    b.  Typed Psychiatric Notes dated 1/4/06, & 1/15, 2/1, 4/13, 5/29, 6/12, 7/27, 9/1, 10/2, & 11/9/07.
8.  Records from Sun Life Family Health Center:
    a.  Hand written notes dated 1/30/01, 4/16/02, 3/31 & 4/17/06, & 1/17/07.
9.  Records from Thomas D. McCoy, M.D.:
    a.  New Patient Visit form dated 1/8/99.
    b.  Undated Patient Questionnaire form.
10. Records from Frankel & Newfield, PC:
    a.  Facsimile coversheet from Jason A. Newfield dated 9/14/07, listing transmission of the following materials:
        i.   Attending Physician Statement, Dr. Gerald Rozansky.
        ii.  Narrative report, Dr. Rozansky.
        iii. Claimant's Statement, along with Occupational Description and Employer's Statement.
    b.  Facsimile coversheet from Jason A. Newfield dated 9/21/07, listing transmission of the following materials:
        i.   Client authorization for medical records.
        ii.  Claimant's Statement, page 2 signed and dated.

<u>Presenting Complaint:</u>
Dr. Ogandzhanova is a 45-year-old divorced Russian female who identified herself as suffering from ongoing depression, posttraumatic stress disorder, and panic attacks beginning approximately 6 months after her seven-year-old son Isaac died on March 15, 2006. She denies any significant prior medical history and other than being hospitalized for her two pregnancies, has not undergone any significant surgical or medical procedure.

<u>Pre-Evaluation Information:</u>
Prior to the examination on 2/13/08, Dr. Ogandzhanova stated that she had only received the first pages of the Informed Consent Contract and Joint Notice of Privacy Practices for Health Information forms that had been faxed to Lisa J. Kaarela, Technical Claim Adviser at MetLife.

MLOCL000757

Case 2:12-cv-00372-GMS    Document 281-1    Filed 01/17/14    Page 118 of 222

She had apparently received the entire Neuropsychological Questionnaire and the Relative's Form of the PCRS. Dr. Ogandzhanova provided a copy of a letter dated 2/7/08 from Ms. Kaarela to Jason Newfield, Esq., providing the dates of the current evaluation and requesting Mr. Newfield to "…forward the enclosed information, which was provided to us by Dr. Lamb's office, to Dr. Ogandzhanova for her review and completion prior to her appointment with Dr. Lamb." New and complete versions of these forms were provided to Dr. Ogandzhanova, which she read and signed. The Informed Consent Contract identified the referral source, explained the lack of confidentiality due to the forensic nature of the evaluation, and stated that she might not have access to the report describing the results of the assessment. Although she indicated that she understood this information, she also stated that she felt the evaluation should be made available to her because that is her standard medical practice and she also felt that the entire process should "be transparent." Nevertheless, it was verbally re-iterated to Dr. Ogandzhanova that MetLife was the referral source and that there would be no confidentiality regarding any information that she might share during the evaluation. Dr. Ogandzhanova requested permission to audiotape the clinical interview and asked for copies of all the paperwork, which was subsequently provided.

Dr. Ogandzhanova called on the afternoon 2/14/08 to state that she felt physically ill and did not anticipate being able to come in the following day to complete her evaluation. She was subsequently rescheduled for the afternoon of 2/19/08. Prior to formal testing on both of these dates, the importance of putting forth her best effort was emphasized. Dr. Ogandzhanova was also informed of the fact that her level of effort would be assessed during the evaluation.

**CLINICAL INTERVIEW:**
The following information was derived from data provided via the completed Neuropsychological Questionnaire and direct interview of Dr. Ogandzhanova.

<u>Medical Information:</u>
In the section of the Neuropsychological Questionnaire that requested a brief description of her presenting complaint, Dr. Ogandzhanova wrote:

> My only son passed away on March 15, 2006. I through [sic] myself into work and worked my usual hours. My symptoms started In October '06. I became severely depressed, angry, I developed severe anxiety, panic attacks, difficulty sleeping (difficulty falling asleep, very early waking up 3 - 4 a.m.).

She indicated that she felt these problems were getting worse and wrote that "MetLife improper conduct" was contributing to making her symptoms worse. She noted that the severity of her symptoms was reduced when she avoided the University of Arizona Medical Center (UAMC) where son was treated, her former oncology clinic, and crowds in general.

Dr. Ogandzhanova also provided the following hand written notes to augment the description of her current problems provided on the Neuropsychological Questionnaire:

> Gradually my symptoms became worse. I had developed difficulty to do my job. I didn't and I couldn't care about my oncology patients anymore. I was eating excessively to make me feel better (I gained ~ 40 pounds). I was seeking for psychiatric help and became a patient of Dr. Rozansky early January '07. My symptoms continued and worsened. At some point I realized I could not do my job of Radiation Oncologist anymore. It became progressively more difficult for me to communicate c̄ people, to relate to people. I couldn't meet the responsibility and demand of Radiation Oncology anymore. It became very difficult for me, at

MLOCL000758

Case 2:12-cv-00372-GMS   Document 281-1   Filed 01/17/14   Page 119 of 222

 

*times impossible to concentrate on my job. I continue having all my symptoms, I am staying constantly depressed. I through (sic) myself into activities to take a significant portion of the day. I do not socialize with people anymore, I don't like most of the people, I became mistrustfull (sic). I still experience severe anxiety, anger. Nothing really makes me feel better. I stay sad and irritable most of the time. I try to avoid people, places and everything else, that associate with my son illness, cancer and all the events associated &amp; that to stay sane. As it is I experience constant flashbacks on traumatic events surrounding my son's death and illness. They are worse when anything reminds me of it.*

Dr. Ogandzhanova stated that she continued working throughout her son's illness, and in fact, was seeing a patient on the day he died. She stated she would work during the day and then stay with Isaac at the hospital at night. Per her report, her son was initially treated in 2001 at UAMC, before receiving treatment at Phoenix Children's Hospital. She describes being very upset with the level of care provided at Phoenix Children's Hospital and reported that they also lost her son's medical records. They then returned to UAMC for the transplants and she described being very comfortable and confident in the physician who was in charge of the transplant team. Nonetheless, Dr. Ogandzhanova had very strong complaints aimed towards the administration at UAMC, describing an incident two weeks before Isaac's death where she was told that she would be escorted from the hospital if she continued to interfere with his treatment. She felt this was unwarranted, insisting that she only complained when there were obvious problems, giving the example of her son's oxygen mask not being replaced after a procedure. Dr. Ogandzhanova describes being somewhat shocked by her son's death in that it looked as if he was getting better, but then had a sudden downturn in his condition due to complications. She stated that "he had septic shock that was basically irreversible."

Cognitive Symptoms:
Per her self-report, Dr. Ogandzhanova is currently only experiencing significant difficulty with concentration and memory. She stated that she does not typically "read anything" anymore, and is only able to do so if she puts forth a great effort to concentrate. With regard to memory, she stated "sometimes I'm forgetful." However, she could not provide a recent example of how her memory is problematic. She did state that before her son's death, "I could buy 200 items at Wal-Mart and remember all the prices to the penny." Dr. Ogandzhanova stated that she is no longer able to do this.

Family Information:
Inna Ogandzhanova was born in Leningrad (now St. Petersburg), Russia on 1/7/63. The birth process and developmental milestones were described as normal and she denies any infantile high fevers or convulsions. She also reports that she had no problems with learning to read and has never been diagnosed with Attention Deficit Disorder. Dr. Ogandzhanova was raised in St. Petersburg with her 34-year-old brother, who has completed an MBA and apparently lives in Salt Lake City. Dr. Ogandzhanova stated that she was not sure of his whereabouts or circumstances, since she had not communicated with either her brother or parents since her son became ill as a consequence of their lack of support at that time.

Dr. Ogandzhanova's father is 71 years old and her mother is 68. They are both retired engineers who live on the East Coast.

Dr. Ogandzhanova was married from 1991 until 1997. Don Bates is her current domestic partner and the biological father of both of her children. Her deceased son, Isaac, was "seven years, four months, and 12 days" old when he died on 3/15/06. Her daughter, Esther, is currently 10 months old.

MLOCL000759

 

Educational History:
Dr. Ogandzhanova received all of her public school education in Leningrad, Russia. She described her average grade as being an A. Dr. Ogandzhanova received her doctoral degree in medicine from the Leningrad Medical School of Pediatrics in 1987. She described obtaining a 3.5 GPA while in medical school. She stated that she subsequently completed the one-year internship associated with her studies and could have practiced as a pediatrician in Russia at that time. Instead, she immigrated to New York and completed a one-year internship in internal medicine at Brooklyn Hospital. Dr. Ogandzhanova then relocated to the University of Texas in Galveston to complete a four year residency in radiation oncology.

Social Development:
Dr. Ogandzhanova describes having many friends as a child, especially when she was a teenager. Relative to organized social activities, she indicated she was in a number of academic clubs while growing up in Russia. Currently, she states that she has few friends as a result of her avoidance of social interactions. This also extends to a lack of involvement in any formal organized social activities.

Substance Use:
Dr. Ogandzhanova denies any tobacco, alcohol, or illicit drug use prior to her son's death. Currently, she reports having one glass of wine or one mixed drink approximately every two weeks. She denies any current tobacco or illicit drug use.

Interactions with the Legal System:
Dr. Ogandzhanova denies any prior arrests or involvement in civil litigation.

Vocational Record:
Since completing her residency in Texas, Dr. Ogandzhanova states that she has only worked as a radiation oncologist. Her first position was in Texas at "Locum tenant" from 1996 until 1997. She then relocated to the town of Indiana, Pennsylvania, where she worked for Equimed Corporation from 1997 until 1998. Dr. Ogandzhanova was at the University of West Virginia from 1998 until 1999, before relocating to Arizona to work for two years for Millennium Physician Services. She worked exclusively for herself in Casa Grande, Arizona at that point.

Dr. Ogandzhanova stated that she had her own accelerators and treatment delivery equipment in her facility in Casa Grande. She would refer out to Barrow's Neurological Institute or UAMC for patients with brain tumors to receive treatment through the Gamma knife. Despite describing how emotionally demanding it was for her to work with her patients, she rarely referred them out for mental health treatment. She stated that she felt her emotional support of the patients and their family was an integral goal to her role as their physician. Dr. Ogandzhanova denied ever using the DSM-IV to diagnose patients because of their emotional reactions to having cancer. She estimated that she had some type of involvement in the treatment of 25 to 30 patients per day, but only about 70% required significant emotional support.

When asked about other possible business plans, Dr. Ogandzhanova denied any interest in working in any other field in medicine. When asked about shifting her medical expertise from oncology, she stated that she did not think she would be able to get accepted into a different residency and even if she could, did not feel that she had the energy and concentration to complete a different residency program. She did admit to having designed some new furniture for her home in an effort to distract herself from thoughts of her son's death, but doubted that she could make a successful career of this skill.

MLOCL000760



Financial Support:
Dr. Ogandzhanova indicated that currently her sole source of financial support was from personal savings.

Current Living Situation:
At present, Dr. Ogandzhanova is living with her significant other, Don Bates, and their 10 month old daughter Esther. She described herself as being totally independent relative to taking care of her personal hygiene, dressing, washing clothes, preparing simple snacks, driving a motor vehicle, and taking her medication. As noted above, she has considerable difficulty with housecleaning, ironing clothes, and preparing well-rounded meals due to her apathy and lack of energy. This combines with her desire to avoid people to make it difficult for her to function alone outside the home or shop for groceries. Dr. Ogandzhanova stated that difficulty with maintaining her focus has made it very difficult for her to manage her finances, giving the example that she has not worked on her tax returns even though she knows she must complete them. Finally, she reports having a difficult time tracking her daily schedule and remembering appointments due to her difficulty with initiating behavior and following through on tasks.

Psychological History:
Dr. Ogandzhanova denies any significant emotional distress or depression prior to October of 2006. As noted above, she describes significant difficulties with depression and anxiety since that time. While she denied any active thoughts of suicide, she did claim apathy about continuing to live. With regard to changes in her mood or attitude, Dr. Ogandzhanova wrote "I do not care about many things anymore." She went on to state "I would like to stay in bed and watch TV and drink tea" and then added that she tries to push herself to be more active. Nonetheless, Dr. Ogandzhanova stated that because of her apathy and lack of energy, she does very little house cleaning, meal preparation, or other necessary chores. She did note that on some days she can go out for the entire day, but that it is very hard for her to initially get going.

On 2/19/08, Dr. Ogandzhanova began by stating she wanted to correct some information provided on the Neuropsychological Questionnaire regarding her psychological symptoms. Although she had previously denied having a dramatic change in her personality, she expressed a great deal of frustration about not being able to fix things when she had always previously been "a doer" and an efficient problem solver. With regard to an item asking whether she believed others were against her or are planning to harm her in some way, Dr. Ogandzhanova states that she has difficulty going out in public because she now feels "surrounded by horrible people and as if I am a little girl." She also stated she felt MetLife was trying to harm her by denying her benefits. She went on to state "for several months I get worse, because of being betrayed by MetLife." More specifically, she provided an example of how her anxiety is getting worse by stating she had a very hard time getting out of her house earlier on that day (2/19) to go to the bank. Finally, Dr. Ogandzhanova elaborated on her prior comments about current treatment efforts (see below).

Psychiatric Symptoms:
Dr. Ogandzhanova described feeling intense helplessness while her son's condition deteriorated. She also reported an ongoing experience of recurrent and intrusive distressing recollections of her son's treatment and death, recurrent distressing dreams about his death and cancer in general, and intense distress when exposed to external cues that symbolize the event (e.g. driving by UAMC). She stated that she attempts to avoid thoughts or discussions associated with her son, avoids activities and places that generate recollections of him and/or his treatment, has a markedly diminished interest in participating in work or social activities, and feels detached and estranged from others. Dr. Ogandzhanova complains of both difficulty falling asleep and staying

*David G. Lamb, Ph.D., ABPP-CN*

 

asleep, irritability and outbursts of anger, and difficulty with concentration.   Finally, these symptoms have lasted for more than three months and have impaired her social and occupational functioning.

When describing the periods of anxiety associated with being at her clinic, Dr. Ogandzhanova stated that the level of anxiety gradually built up over several hours to the point where she felt she must escape.  She would then make an excuse to leave, but typically returned after approximately one hour.  The time necessary to build up to the point where she felt she had to leave the clinic gradually decreased as she also simultaneously experienced a gradual increase in her difficulty with sleeping, irritability, and distrust of other people.   At the peak of this difficulty, Dr. Ogandzhanova described having two to three anxiety episodes each day.  Initially, she denied any associated physiological symptoms, but when asked specifically, stated that she may have experienced some increased heart rate and shortness of breath.  Even so, Dr. Ogandzhanova does not describe a sufficient number of symptoms typically associated with panic attacks to warrant a diagnosis of panic disorder.  Also, since panic attacks typically reach a peak within 10 minutes of an abrupt start, her description is inconsistent with that diagnosis.

Dr. Ogandzhanova describes experiencing depressed mood for most of the day nearly every day, a marked diminished interest or experience of pleasure with most activities, significant weight gain, insomnia, lack of energy, and reduced ability to concentrate.  She states that these symptoms have contributed to her difficulty in functioning both socially and occupationally. Because of this functional impairment and the fact that symptoms have persisted for longer than two months, Dr. Ogandzhanova does not meet the diagnostic criteria for bereavement.

<u>Treatment Efforts:</u>
At present, Dr. Ogandzhanova reports taking Lexapro (30 mg).  She reported that it "helps some," but went on to state that "nothing can numb the fact that it happened."  Of the common side effects associated with Lexapro, Dr. Ogandzhanova did not complain of either nausea or increased sweating.  However, it may be contributing to her complaints of sleep difficulties and fatigue.

Dr. Ogandzhanova stated that she realized she needed some help with her anxiety in mid-November of 2006 when her anxiety episodes began making it very difficult for her to continue working.  She tried to get an appointment to see a psychiatrist at UAMC, but describes being told that she would only be able to see a resident and that the first available appointment was in three months.  When asking why this was the situation, Dr. Ogandzhanova states she was told that insurance reimbursement in Arizona was very poor for psychiatry, so there was subsequently a shortage of psychiatrists in the area.  As a consequence, she describes researching on the Internet, calling several psychiatrists in California, and choosing Dr. Rozansky in Los Angeles because he answered his own phone and could see her relatively quickly.

Dr. Ogandzhanova reported that she continues to go to Los Angeles approximately once every month to meet directly with Dr. Rozansky.  She supplements these office visits by calling him when she feels the need, which she estimated to on average be every 10 days.  When asked why she might not arrange to see a psychotherapist locally and have Dr. Rozansky manage her medications, Dr. Ogandzhanova at first stated that she was apprehensive about meeting new people.  Then she acknowledged that this was "a good idea," since "I'm probably getting worse, because MetLife is screwing with me."  Nonetheless, she stated "right now I don't want to change anything because of MetLife."  Dr. Ogandzhanova went on to indicate that she would consider trying to see someone else once her issues with MetLife became stable.

MLOCL000762

 

**TESTS ADMINISTERED:**
Dr. Ogandzhanova underwent the following tests and procedures: Clinical Interview; Booklet Category Test; the revised California Verbal Learning Test (CVLT-2); Controlled Oral Word Association (COWA); Finger Tapping Test; Grooved Pegboard Test; the Attention Module of the Neuropsychological Assessment Battery (NAB); Ruff Figural Fluency Test (RFFT); Symptom Validity Testing (SVT); Trail Making Test, Parts A and B; the Rey-Osterrieth Complex Figure Test; the revised Minnesota Multiphasic Personality Inventory (MMPI-2); and the Patient Competency Rating Scale (PCRS). Her significant other, Don Bates, also completed the PCRS.

**BEHAVIORAL OBSERVATIONS:**
Dr. Ogandzhanova arrived for the appointment approximately 40 minutes late. She did call at 9:05 to state that they were stuck in traffic and she anticipated having a 30 minute delay. Her significant other drove her to the office. There were no observed gross disturbances in gait. Dr. Ogandzhanova infrequently demonstrated some pain behavior by grimacing when adjusting her lower back in the chair. She was initially somewhat reserved, but seemed to feel more comfortable as the evaluation proceeded. Affect was generally neutral in presentation, but included tearfulness when describing her son's illness as well as the aforementioned anger and frustration being in evidence when speaking of MetLife. There was no evidence of delusions or hallucinatory processes nor was the content of her language suggestive of a psychotic condition.

**LEVEL OF EFFORT:**
Dr. Ogandzhanova's performance on several formal Symptom Validity tests did not suggest any difficulty with her level of effort. However, there were a number of unusual behavioral observations during the testing. For example, on the first trial of Finger Tapping with her dominant hand, her pace of tapping was much slower than when she had been practicing on the instrument just prior to starting. In general, she moved very slowly during timed tests, at times even asking questions in the middle of the task. Also, although she successfully completed the sample on Trail Making Part A without lifting her pencil, during the actual test, she continually lifted her pencil after reaching each circle, even when asked not to do so. When this instruction was more strongly emphasized for Part B, she still lifted her pencil after reaching five of the 25 circles. Also, Dr. Ogandzhanova proceeded very slowly with regard to the first six items on both Parts A and B, despite the fact that the pathway had just been traced by the examiner as part of the instruction set. In addition, even after she had clearly identified the next target and began moving her pencil toward it, her production of the line was very slow. This is in contrast to her very quick production of lines while drawing designs for the Ruff Figural Fluency Test and copying the Rey-Osterrieth Complex Figure. She was also very slow in drawing circles on The b Test. Finally, during the Driving Scenes test of the NAB Attention Module, after being asked "Look at this driving scene carefully for 30 seconds," Dr. Ogandzhanova looked up after six seconds and said "okay," indicating that she was finished looking.

Dr. Ogandzhanova completed the MMPI-2 and produced an invalid profile. Of the standard Validity Scales, Dr. Ogandzhanova produced an extremely high score on the F Scale, while in contrast, her K Scale score was very low. The Fb scale was also very high, with possible interpretations including: 1) severe and chronic behavioral problems, 2) difficulty reading or understanding the test items, or 3) motivation to overreport psychopathology. Dr. Ogandzhanova's prior level of adjustment and vocational achievement fail to support the presence of chronic behavioral problems. Neither the VRIN nor TRIN scores were elevated, which indicates consistent responding, a finding that argues against the presence of confusion or insufficient reading skills.

---

*David G. Lamb, Ph.D., ABPP-CN*

MLOCL000763


In summary, there is behavioral, but no formal evidence of a poor level of effort relative to the testing of cognitive symptoms. However, there is convincing evidence that Dr. Ogandzhanova was exaggerating her psychological symptoms while taking the MMPI-2. Overall, these findings suggest caution in interpreting the neuropsychological data, while the Dr. Ogandzhanova's presentation of her emotional and psychological status is unreliable.

**INTERPRETATION OF TEST RESULTS:**
Although cognitive testing was limited due to the restricted scope of Dr. Ogandzhanova's complaints, the only score that could be considered to be a cognitive strength was the Error Ratio score from the Ruff Figural Fluency Test. This score was high because Dr. Ogandzhanova produced very few perseverative errors. However, when examining productivity on this test in general, her score fell in the low average range.

Considering her level of educational and occupational achievement, the number of impaired scores generated for this limited battery is exceptionally high, even when factoring in the possible effects of severe depression. Dr. Ogandzhanova produced five scores in the mildly impaired range (between the 16th and 11th percentile), six scores in the moderately impaired range (between the 10th and 4th percentile), and seven scores in the severely impaired range (below the 3rd percentile). Likewise, Dr. Ogandzhanova describes considerable difficulty in completing day-to-day tasks via the PCRS. However, it is notable that except for three items which her significant other did not answer, every rating for the rest of the items was the same with only one exception. Relative to her ability to get help when confused, Dr. Ogandzhanova provided a rating of "can do with some difficulty," while Mr. Bates rated this as "fairly easy to do." When asked, Dr. Ogandzhanova stated that she filled out the Relative's Form at Mr. Bates direction, because his eyes were still blurry after an eye exam and he could not read the form.

Diagnostic Impression:
As mentioned previously, there is reason to question the severity of psychiatric symptoms from which Dr. Ogandzhanova claims to be suffering. However, there appears to be no dispute that Dr. Ogandzhanova did lose a young child to cancer and there is no reason to believe that she should not suffer some emotional reaction to this loss. It also seems reasonable to expect some type of impairment in her ability to work in her chosen profession as a radiation oncologist, given the fact that her son died of cancer. Thus, the following DSM-IV diagnoses are presented, with the primary adjustments for severity of symptoms being made regarding her level of functional impairment.

| | | |
|---|---|---|
| AXIS I | = | 309.81 Posttraumatic Stress Disorder, Chronic, with delayed onset |
| | | 296.22 Major Depressive Disorder, Single Episode, moderate |
| AXIS II | = | 799.9 Diagnosis Deferred |
| AXIS III | = | None |
| AXIS IV | = | Death of child, not currently working |
| AXIS V | = | GAF = 70 (Current) |

**CONCLUSIONS:**
Based upon her report, Dr. Ogandzhanova meets the diagnostic criteria for major depressive disorder and posttraumatic stress disorder, conditions which are consistent with the death of her son and her work as a radiation oncologist. The findings of the current evaluation, however, call into question the severity of the symptoms she claims to be experiencing that are associated with these two disorders and the extent to which they impact her ability to function. For example, it is difficult to reconcile Dr. Ogandzhanova's report of worsening severity of symptoms while at the

MLOCL000764

 
same time not seeking out different treatment options. Although Dr. Rozansky's notes are consistent with her report of monthly visits, they do not appear to document the phone calls that she states she makes approximately every 10 days. Even so, the fact that she goes through the time, effort, and expense of traveling to Los Angeles once a month for psychiatric treatment indicates that she is capable of following through on weekly psychotherapy sessions in the greater Phoenix Metropolitan area. Her assertion that the fifth largest city in the United States does not possess psychotherapists of sufficient skill to help her is simply not plausible. It is difficult to understand how her antagonistic relationship with MetLife is preventing her from seeking out such additional treatment, especially when she describes such as severe depression and limited ability to function.

With regard to the posttraumatic stress disorder, while it may be very difficult for her to work with cancer patients, it does not appear she has seriously explored the option of changing her medical specialty. Given the fact that she graduated from the Leningrad Medical School of Pediatrics and was licensed to practice pediatrics in Russia, there is a question of whether she could work as a pediatrician with minimal effort in recertification. In addition, there are again discrepancies between what Dr. Ogandzhanova presented during the clinical interview and available documentation. More to the point, despite her denial of having any other vocational interests, the 7/12/07 Field Claim Report by Joe Mauvais documents that Dr. Ogandzhanova has secured 10 different names of businesses for hair removal and skin treatments with the Arizona Secretary of State. Clearly she has a prior interest in utilizing her medical degree to provide services that are not related to cancer or radiation oncology. Since such spa conditions should not engender cues that symbolize her son's illness or cancer treatment, and Dr. Ogandzhanova has already explored this as a possible vocational option, she should be able to work in this capacity without exacerbating her posttraumatic stress disorder. In fact, as she described herself with regard to her efforts in furniture design, being engaged in a productive activity and once again becoming a "doer" should also help alleviate her symptoms of depression.

In summary, Dr. Ogandzhanova is not sufficiently engaged in efforts to treat her depression. She should be involved in weekly sessions of grief counseling with a local psychotherapist. She can continue her medical management with Dr. Rozansky while working with a psychologist or clinical social worker in psychotherapy. Secondly, Dr. Ogandzhanova should be capable of returning to work in some capacity that utilizes her medical degree. Her obvious prior interest in skin treatment and hair removal is the most obvious choice for her to direct her efforts.

David G. Lamb, Ph.D., ABPP-CN
**Board Certified in Clinical Neuropsychology by the
American Board of Professional Psychology**

_David G. Lamb, Ph.D., ABPP-CN_

MLOCL000765

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


Metropolitan Life Insurance Company, )
a New York Corporation,              )
                                     )
                    Plaintiff,       )
v.                                   ) Case No.:
                                     ) 2:12-CV-00372-GMS
Inna Ogandzhanova, M.D.,             )
                                     )
                    Defendant.       )
_____)
                                     )
Inna Ogandzhanova, M.D.,             )
                                     )
              Counter-Plaintiff,     )
v.                                   )
                                     )
Metropolitan Life Insurance Company, )
                                     )
            Counter-Defendant.       )
_____)



VIDEOTAPED DEPOSITION OF DAVID G. LAMB, Ph.D.



Phoenix, Arizona
March 11, 2013

VOLUME 1
PAGES 1 - 131



Prepared by:
Deborah L. Tucker, RPR
Certified Reporter
(Copy)                    No. 50464

Lamb, Ph.D., David G.>

Page 11

| | | | |
|---|---|---|---|
| 10:03:35 | 1 | A. | Certainly. |

10:03:36   2      Q.    You'll know who I'm talking about.

10:03:38   3            I wanted -- in fact, I had pre-marked to save

10:03:41   4      time, three exhibits.  Exhibit 1 is your -- the first

10:03:48   5      IME that you performed in 2008, correct?

10:03:52   6      A.    It appears to be so, yes.

10:03:54   7      Q.    And Exhibit 2 is the second one that you did

10:03:57   8      in March of 2011?

10:04:01   9      A.    That looks correct, yes.

10:04:02  10      Q.    All right.  And Exhibit 3, I believe, is your

10:04:05  11      expert report that you recently created and produced?

10:04:15  12      A.    Yes.

10:04:16  13      Q.    Okay.  In between the second report that's on

10:04:22  14      -- in Exhibit 2 in 2011 and 2013, did you do any further

10:04:31  15      evaluations of Dr. O?

10:04:35  16      A.    No.  You mean direct evaluations?

10:04:38  17      Q.    Right.

10:04:38  18      A.    No.

10:04:38  19      Q.    Did you do anything in terms of furthering

10:04:42  20      your understanding of her problems or alleged problems

10:04:47  21      between 2011 and 2013?

10:04:50  22            MR. BRESSLER:  I -- I'm going to object to the

10:04:51  23      form.  Are you talking beyond what's described in this

10:04:54  24      report --

10:04:54  25            MS. ROSENTHAL:  Yes.

Lamb, Ph.D., David G.>

Page 131

```
 1   STATE OF ARIZONA      )
                           )  ss.
 2   COUNTY OF MARICOPA    )

 3              BE IT KNOWN that the foregoing deposition

 4   was taken before me, Deborah L. Tucker, Certified

 5   Reporter No. 50464 and Notary Public in and for the

 6   County of Maricopa, State of Arizona; that the witness

 7   before testifying was duly sworn by me to testify to the

 8   whole truth; that the questions propounded to the

 9   witness and the answers of the witness thereto were

10   taken down by me in shorthand and thereafter reduced to

11   typewriting under my direction; that pursuant to

12   request, notification was provided that the deposition

13   is available for review and signature; that the

14   foregoing pages are a true and correct transcript of all

15   proceedings had upon the taking of said deposition, all

16   done to the best of my skill and ability.

17              I FURTHER CERTIFY that I am in no way

18   related to any of the parties hereto nor am I in any way

19   interested in the outcome hereof.

20              DATED at Phoenix, Arizona, this 11th day of

21   March, 2013.

22

23                              _____
                                    Notary Public
24                                  CSR #50464
     My Commission expires:
25   October 29, 2016
```

# EXHIBIT 13



# FRANKEL & NEWFIELD, P.C.

ATTORNEYS AT LAW

Justin C. Frankel*
Jason A. Newfield*

*Admitted in NY, CT and PA

October 31, 2011

585 Stewart Avenue
Suite 312
Garden City, NY 11530
Tel: (516) 222-1600
Fax: (516) 222-0513
www.frankelnewfield.com

**VIA CERTIFIED MAIL**
Jamie Frederick
Met Life
18210 Cranes Nest Drive
Tampa FL, 33647

Re:    Dr. Inna Ogandzhanova

Dear Mr. Frederick:

We write to provide our feedback and outline our concerns with the reports, and conclusions issued by Met Life's hired doctors, Psychiatrist Joel Parker, and Neuropsychologist, David Lamb. At the outset, we are troubled that Met Life appears not to be interested in conducting an impartial and unbiased review. Supporting this position is the fact that Met Life rejected our request and offer to collaborate on an independent provider for the evaluations, despite our substantial and demonstrated concerns regarding bias of those selected by Met Life.

Moreover, Met Life rejected our request that we be provided with copies of the materials which Met Life was providing to the examiner. Met Life has also refused to provide copies of the surveillance of which so much is being made and for which substantial reliance appears to have occurred by Met Life's hired doctors. Through this conduct, Met Life made its intentions clear; It did not want to engage in a neutral evaluation of Dr. Oganzhanova's claim, but rather, wanted to ensure that whomever examined her was someone that is a hired gun

Next, we are troubled as to the significant bias revealed by Dr. Parker's conclusions. It is readily clear Dr. Parker pre-determined a conclusion and then worked backward to reach his conclusion, refusing to alter his views or approach information or evidence in a way that would have compelled him to deviate from his result oriented path.

We will address the various items that are contained within Dr. Parker's report, and then address additional items of concern regarding his report. This letter addresses why Dr. Parker's opinions are flawed, and overtly biased and why Dr. Lamb's conclusions share similar flaws. There can be little dispute but that Dr. Parker's opinions and conclusions are largely based upon speculation, and rely upon a myriad of information that is neither relevant, significant nor accurate.

The final preliminary matter is that Met Life apparently conducted a wealth of surveillance, obtaining certain videotape of activity, but this documentation has not been provided by Met Life, thus hampering our ability to fully address the issues. We would urge Met Life to re-consider its



EXHIBIT
Newfield 13
4/15/13  MM

MLOCL002178



FRANKEL & NEWFIELD, P.C.

Jamie Frederick
October 31, 2011
Page 2

position, and provide the surveillance reports and unedited videotapes to our office.[1]

## QUALIFICATIONS ANALYSIS

There is an interesting dichotomy between the doctors which Met Life chose to utilize (and over the protestations of Dr. Oganzhanova), and her treating doctor, Dr. Rozansky. While Met Life has sought to impugn Dr. Rozansky, (without any basis), the reality is that Met Life hired a professional witness to examine Dr. Oganzhanova and issue a report Met Life desired.

As noted during the scheduling process, Dr. Parker's website, http://biltmorepsych.com/Biltmore/Forensic_Psychiatry.html; http://biltmorepsych.com/Biltmore/IMEs.html reveals that he has testified more than 70 times since 2002 and has performed hundreds of examinations for insurance companies and disability carriers. He also spends half of his professional time performing Forensic Psychiatric evaluations. He is the prototypical professional witness, someone that Met Life remained hellbent on utilizing, despite the concerns raised by Dr. Oganzhanova's research. In this regard, one could readily determine that he lacked neutrality, but, rather approached his interaction with Dr. Ogandzhanova as a prosecutor. See United States v. John Doe, 74 F.Supp.2d 310, 312 (S.D.N.Y. 1999).

## SUBSTANTIVE CONCERNS

We are in possession of a report Dr. Rozansky has apparently provided to Met Life addressing a number of issues regarding the examination process and the purported "findings", and we incorporate this material into our response. His response is limited to the extent that Met Life places any emphasis upon the surveillance it has obtained – as it has not been willing to provide copies. Notwithstanding, a host of issues were identified by Dr. Rozansky which are critical to Met Life's ongoing consideration of Dr. Ogandzhanova's claim.

First, Dr. Rozansky addresses an issue raised in the reports of the purported "motivation" for Dr. Ogandzhanova to return to work as a radiation oncologist. Dr. Rozansky addresses the suggestion offered by Dr. Lamb that Dr. Ogandzhanova is not sufficiently engaged in efforts to treat her depression, and that weekly meetings would be of benefit to her. Dr. Rozansky's comments are telling, in that he notes that the approach taken between himself and Dr. Ogandzhanova should not be challenged by Dr. Lamb, as one could make the argument why not have Dr. Ogandzhanova get daily treatment, or have her hospitalized? Dr. Rozansky, relying upon his long standing experience and expertise in working directly with patients notes that he has the ability to judge the most optimal treatment for his patients. It appears that Dr. Lamb uses the frequency of treatment as an issue to

---

[1]     Should Met Life decide to provide the surveillance materials which its hired doctors have relied upon so heavily, Dr. Ogandzhanova reserves her right to submit a further response upon viewing this material.

MLOCL002179



FRANKEL & NEWFIELD, P.C.

Jamie Frederick
October 31, 2011
Page 3

attack the legitimacy of Dr. Ogandzhanova's level of impairment.

Dr. Rozansky also tackles the position put forth about Dr. Ogandzhanova not finding any treating providers in Pheonix, a point that the Met Life reviewers sought to exploit - without any sound reasoning. Dr. Rozansky provides some information in this regard, noting that Dr. Ogandzhanova indicated that there was not a great selection of providers for her when she was initially seeking treatment. He notes the cultural issues and the overall distrust which Dr. Ogandzhanova has, which obviously has impacted upon her ability to work with other mental health providers.

Dr. Rozansky's numerous prior statements addressing Dr. Ogandzhanova's level of impairment were not properly considered by Met Life's hired doctors. Dr. Rozansky has noted that she "once was energetic and stimulated by life, this is no longer the case." (October 24, 2009 report).

**CONCERNS WITH DR. JOEL PARKER'S REPORTS**
**OCTOBER 5, 2010 RESPONSE TO REQUEST FROM MET LIFE DR. KAPLAN**

Dr. Parker, hired by Met Life, and over the objections of Dr. Ogandzhanova, issued a report which has numerous internal inconsistencies, several which impact upon the credibility to ascribe to his opinions.

1.      He claims Dr. Ogandzhanova was "very evasive about her current subjective complaints", yet then goes on to list a myriad of complaints that she shared. Thus, is she evasive, or did she provide a myriad of complaints? This appears to be nothing more than an unsupported attack upon Dr. Ogandzhanova.

2.      Dr. Parker also notes that Dr. Ogandzhanova had "limited evidence of cognitive impairment" yet noted that Dr. Lamb's prior testing had revealed an exceptionally high "number of impaired scores" – perhaps an effort to impugn Dr. Ogandzhanova. Unsupported speculation appears to be the hallmark of Dr. Parker's report.

3.      Met Life asked Dr. Parker whether there were indications of symptom magnification, malingering or secondary gains in terms of Dr. Ogandzhanova's subjective symptoms. Dr. Parker willingly offered an array of benign issues that he attempted to string together to formulate "evidence" that Dr. Ogandzhanova was either malingering, magnifying her symptoms or was pursuing her claim for secondary gain. As shown below, each of these items fail to support such a conclusion, but, rather, demonstrate the substantial bias that Dr. Parker brought to his role.

A.      Evidence of Dr. Ogandzhanova going to Tuscon. Dr. Parker uses this as "evidence" that Dr. Ogandzhanova was engaging in symptom magnification. He claims that she reported an inability to go to Tuscon, yet was captured on videotape as going there two times.



FRANKEL & NEWFIELD, P.C.

Jamie Frederick
October 31, 2011
Page 4

The reality is that Dr. Parker intentionally miscast what Dr. Ogandzhanova has said. She has stated, numerous times, that she avoids places in Tuscon, which is a large city, but where she has admittedly gone. She avoids the area around the hospital where her son was, and places that cause her emotional pain. Thus, her activity is fully consistent with what she has offered, and is not any evidence that she has been less than truthful during this process.

B.  The claim of a lack of loving feelings toward her children. Dr. Parker attempts to depict Dr. Ogandzhanova as not being truthful, as she has been portrayed on surveillance (purportedly) interacting in a maternal fashion with her daughter.

Dr. Ogandzhanova actually advised early on that she struggled in connecting with her newborn daughter. This is documented. She never stated that she had a lack of loving feelings toward her daughter. But, once again, Dr. Parker has miscast statements and sought to impugn Dr. Ogandzhanova. Distortion without basis is willful bad faith conduct.

C.  Dr. Parker's over-utilization of the term "evasive" serves to highlight his approach toward Dr. Ogandzhanova, his bias and his prosecutorial reporting. A poor strategy, but when all else fails, call the claimant evasive, so as to raise the specter that she lacks candor.

Here, Dr. Parker claims that she was evasive about the nature of her relationship with the father of her children. He claims that Dr. Ogandzhanova was not being truthful, in claiming that he does not live with her, when he is shown on videotape to be actively involved.

Dr. Ogandzhnaova never claimed that he was not actively involved, or that they did not spend time together. Rather, she advised that they do not live together, a truthful statement. Seeking to string together misstatements is not the role of an independent reviewer, and for Met Life to rely upon such mis-information is telling about its intentions.

D.  Dr. Parker claims that "Dr. Ogandzhanova has not sought out appropriate treatment for her condition." He claims that "if she were truly motivated to improve", she would have sought out treatment from another mental health professional. He chastises her on the issue of not locating an appropriate professional in the Phoenix area.

This issue is one that both Dr. Lamb and Dr. Parker have chosen to drive home forcefully. Both of them largely ignore the cultural issues that Dr. Ogandzhanova brings (a general distrust), and the difficult circumstances in which her need for treatment has arisen. She articulates that it is very difficult to open up about the

MLOCL002181



FRANKEL & NEWFIELD, P.C.

Jamie Frederick
October 31, 2011
Page 5

issues that continue to trouble her, but that she has a comfort with Dr. Rozansky. She notes that she contemplated other providers, but that she was ultimately unable to compel herself to seek further professionals.

E.   Dr. Parker uses the mis-communication about the MMPI-2 follow up, as purported "evidence" to support his concerns about symptom magnification. What a farce that is. He intimates that her not following up (she disagrees with the characterization) was likely due to her being "very aware" of the validity scales on the MMPI-2, and that she was dodging the examination in order to avoid issues with her credibility.

It is so readily and painfully obvious that Dr. Parker lacks any credibility himself. This issue serves to highlight his pure, unmitigated bias. Did Dr. Parker undertake to express to Dr. Ogandzhanova what the MMPI-2 was, or how would he infer that she was "very aware" of the validity scales, and how does he take the incredible leap that she was "dodging" the examination.

F.   Dr. Parker then tries to address the financial issues, claiming that Dr. Ogandzhanova reported that her psychiatric care is expensive, but he challenges this on the basis that she is paid about $ 16,000.00 per month on disability, and reportedly spent significant sums of money on various luxury items over the prior years.

What is interesting and significant about Dr. Parker's "observation" is that he fails to comment on how such exorbitant expenditures might be indicative of part of her problem, and how she might have been spending that money rather recklessly in an effort to forget about how much pain she was in. To the extent that he calls this self-medicating, he should have incorporated this into his analysis as evidence of the level of her impairment. Instead, rather than try to gather insight, Dr. Parker chose the path of trying to impugn her. Dr. Rozansky noted in his October 24, 2009 report that this obsessive compulsive buying of things she does not need may have been to distract her and provide short term relief.

He also fails to appreciate that Dr. Ogandzhanova's income was not only far in excess of what her disability payments are, but that she spent so much time and effort to become the career person she was. He completely ignores that issue, which is strong evidence of her credibility. Instead, he seeks to attack her credibility baselessly.

Interestingly, Dr. Parker does state that he is unable to support a diagnosis of malingering, despite his suggestion that she receives "substantial" secondary gain – and a more relaxed lifestyle than when she was working. Here again, Dr. Parker acts as if Dr. Ogandzhanova has a simple upper respiratory infection, which she has milked and refuses to try to work again. In his effort to support this theme, he comments that she sold her business, has no liability insurance and has no job to return to, as if that is sufficient reason to question her motivations.

MLOCL002182



FRANKEL & NEWFIELD, P.C.

Jamie Frederick
October 31, 2011
Page 6

Dr. Parker claims that Dr. Ogandzhanova has "transitioned into a homemaker lifestyle" - another effort to impugn her credibility. He claims she has limited incentive to return to a job where she worked 15 hour days. He claims to be unconvinced about Dr. Oganzhonava's statement that she is concerned about being near oncology patients – however, to buttress this point, he relies on several other issues which already have been demonstrated to be flawed in reasoning.

Dr. Rozansky also provides insight into how Dr. Parker's approach was biased and flawed, in that he failed to properly consider who Dr. Ogandzhanova was pre-disability, noting that her "entire core has been hardworking and driven to accomplish", and that "being a physician is central to her identity." He further notes that Dr. Ogandzhanova can earn much more working than from disability, and that she has never been one to go for the easy way. All of these important character traits were overlooked or intentionally ignored by Dr. Parker. It is shameful that Dr. Parker will so recklessly mudsling.

Despite all of his efforts to impugn Dr. Ogandzhanova, Dr. Parker still opines that she "may have difficulties returning to work as a radiation oncologist". He notes that it is reasonable to expect "some" type of impairment in her functional ability to work in her chosen profession as a radiation oncologist, given the fact that her son died of cancer. Yet, despite this acknowledgment, Dr. Parker remained intent to attacking Dr. Ogandzhanova's credibility at every turn.

Dr. Parker claims to have no objective data to support the inability to work. What about his finding of "low-grade psychotic symptoms"? Is that not some evidence to support a conclusion about her functional ability to be a radiation oncologist? It is dubious to suggest that she has psychotic symptoms, yet to assert that she is unrestricted in her ability to work in her field. And what about common sense? This woman lost her son to a disease that she was trained to treat, and has successfully treated many patients, but could not save her son. Is this tragic irony lost on Dr. Parker, or is he so driven by his economic relationship with Met Life that he blinds himself to common sense and reality?

He notes that she has not appropriately grieved the loss of her son, however, something that the medical professionals likely all agree upon. Yet, once again, Dr. Parker relies heavily upon the surveillance materials to "demonstrate" that she is quite capable of leading an independent life - yet the information purportedly revealed on surveillance in no way equates to the ability to work in her profession and offers no insight into Dr. Ogandzhanova's cognitive or emotional condition and how same would impact her ability to work in her profession.

Another important point to note, and as noted by Dr. Rozansky, it appears that Dr. Parker created an adversarial relationship from the word "go" with Dr. Ogandzhanova[2], and Dr. Rozansky

_____

[2]     We know that Dr. Parker vehemently disputes this. At a minimum, however, this is Dr. Ogandzhanova's perception of what transpired. If she is overly paranoid or psychotic - as portrayed – perhaps that also would be evidence of her functional impairment.

MLOCL002183



FRANKEL & NEWFIELD, P.C.

Jamie Frederick
October 31, 2011
Page 7

notes that such an adversarial position is further exacerbated by Dr. Ogandzhanova's cultural background (which Dr. Parker makes no mention of). Dr. Rozansky also notes further indicia of how adversarial the encounter was between Dr. Parker and Dr. Ogandzahnova, at least from her perspective, relating how Dr. Ogandzahanova felt about some of Dr. Parker's actions during their time together. While Dr. Parker feels such an attack on him is improper, it is respectfully submitted that Dr. Ogandzhanova's perceptions are important.

Dr. Parker's attack upon Dr. Rozansky is also quite telling. Accusing Dr. Rozansky of having "limited objectivity" and to be taking Dr. Ogandzhanova's complaints at face value is another way to try to undercut the strong support which Dr. Rozansky has provided for this claim. A common technique of prosecuting psychologists (one cannot characterize Dr. Parker as a forensic psychologist, as his bias and refusal to account for non-malingering explanations makes him more akin to a prosecutor), is to attack the treating doctor and raise the specter of pro-claimant bias. To address this attack, Dr. Rozansky relates his extensive experience in working with PTSD and complicated grief, as well as his work performing examinations for the Federal government, as providing him with keen insight and objectivity.

Substantively, Dr. Parker's attack fails here, however, as Dr Rozansky has provided a wealth of support, predicated upon intellectual reasoning, rather than bias and selective embracing of information. Dr. Rozansky's logic model serves to eviscerate Dr. Parker's claims, as he notes that if Dr. Ogandzhanova's behavior was manipulative, then it is a poor attempt by someone who has progressed as well as she has in her life. He rather believes that she has simply been unable to progress after being unable to keep her son alive.

### JUNE 2, 2011 REPORT TO MET LIFE DR. KAPLAN

In this follow up report, Dr. Parker remains dismissive of Dr. Rozansky, demonstrating his antipathy toward Dr. Rozansky (which might have colored his impartiality toward Dr. Ogandzhnaova). He asserts that Dr. Rozansky's opinions lack real value, as he is "likely unaware of the video surveillance" and the purportedly invalid psychological testing. Further, Dr. Parker attacks the complicated grief issues, asserting that Dr. Rozansky is not providing any treatment for her condition.

Since Met Life has refused to provide Dr. Rozansky (or our office) with the surveillance it appears to rely so heavily upon (and which appears to be benign based upon what Drs. Parker and Lamb have incorporated), it is wholly improper for Met Life to ascribe more weight to the opinions of its hired doctors, and to be dismissive of Dr. Rozansky upon the basis that he has not seen the surveillance. **THIS ALONE IS EVIDENCE OF BAD FAITH.**

MLOCL002184



**FRANKEL & NEWFIELD, P.C.**

Jamie Frederick
October 31, 2011
Page 8

From the reports provided, it appears the (most recent) surveillance has demonstrated the following issues[3]:

a. Dr. Oganzhanova stands outside her home, with a small child nearby (P.5);
b. She conversed with someone in a car from her front yard (P.5);
c. She drives to school, and fuels her car (P.5);
d. She interacts with a couple outside a building (P.5);
e. She goes to the Social Security building (as a passenger and stays inside the car, while the driver entered the building) (P.5);
f. She has a meal at the Hong Kong Kitchen Buffer (P.6);
g. She is a passenger in a vehicle (P.6);
h. She moved items into her vehicle (P.6);
i. She went to Sky Harbor International Airport (P.6);
j. She drives her car, and goes to Crazy Buffet and interacts with her two children, and is with her "male companion" (P.6);
k. No activity from her, despite activity around the household; (P.6);
l. Loaded items into her car and became passenger (P.6);
m. She ate again at Crazy Buffet and interacts with a salesperson at a store (P.6);
n. She talks on a cell phone while a passenger in a car (P.6);
o. She goes to Superstition Mental Health (P.6);
p. She speaks to someone from her front yard (P.6);
q. She drives to a store (P.7);
r. She goes to TLC Preschool (P.7).

These are the sum totals of the activity which is reported by Dr. Parker from the surveillance which Met Life sought and obtained from **numerous** occasions spanning 5 months, including from November 12, and 15, 2010, December 20, and 21, 2010, January 4, 2011, February 27, and 28, 2011, March 1, and 3, 2011. It should also be noted that it appears Met Life sought and obtained surveillance on multiple prior occasions, although such materials have not been produced. Moreover, despite Dr. Parker reporting about other surveillance from October and November 2010 – wherein there was "no activity from Dr. Ogandzhanova" on six days during the October 21, 2010 to November 6, 2010 period, he offers nothing from this lack of activity as support for her claimed impairments. That is likely because it obviously would support Dr. Ogandzhanova's restrictions.

Dr. Parker also claims that Dr. Rozansky's opinion is "colored by his therapeutic alliance" and it becomes a personal attack. He defends himself as an advocate, another demonstration of a lack of impartiality. He accuses Dr. Rozansky of being clinically inappropriate with his treatment

---

[3]  Dr. Parker's report also discusses surveillance all the way back to 2007, 2008, and 2009, which obviously yielded little, or Met Life would have sought to terminate the claim back then. Once again, however, we have not been provided this material.


FRANKEL & NEWFIELD, P.C.

Jamie Frederick
October 31, 2011
Page 9

– a severe accusation. He makes the speculative assertion that Dr. Rozansky and Dr. Ogandzanova are in cahoots with each other, suggesting that "in all probability, Dr. Ogandzhanova continues to follow up with Dr. Rozansky because he continues to certify her disability and does not challenge her too much.". (P.8)

Such unsupported attacks are further evidence that Dr. Parker is not an independent reviewer, but, rather, one who is delivering a result oriented conclusion for his employer (here, Met Life). IT CANNOT BE EFFECTIVELY DEFENDED THAT THESE ISSUES EVISCERATE DR. PARKER'S ABILITY TO BE AN IMPARTIAL WITNESS. HE MAY BE MET LIFE'S HIRED EXPERT, FOR LITIGATION, BUT HE IS NOT A NEUTRAL. IT WOULD BE BAD FAITH FOR MET LIFE TO RELY UPON THIS OPINION.

Substantively, and despite his bias, Dr. Parker does admit a number of critical items which serve to support Dr. Ogandzhanova's impairment:

1.   Dr. Ogandzhanova's cultural perspective "may explain some of Dr. Ogandzhanova's behavior". (P.8). However, he refuses to acknowledge that it could have impacted the testing.[4] *Since his opinion in this regard runs counter to the literature, it must be discounted and cannot form the basis of Dr. Parker's opinion.*
2.   Circumstantial and digressive historian, and wanted to speak about the details of her son's medical condition at length. Even had to stop her with excessive details about her son. How does this harmonize with the claim that she was evasive?
3.   She cried and was quite irritable throughout the interview.
4.   She has an aversion to dealing with oncology patients.

Despite these important admissions, Dr. Parker refuses to provide any significance to any of these issues, instead issuing an *ipse dixit* pronouncement that Dr. Ogandzhanova's invalid testing leads him to conclude she is magnifying her symptoms. However, given that he acknowledged significant issues which serve to demonstrate some level of impairment, while refusing to ascribe

---

[4]    His opinion ignores the medical literature regarding the MMPI, which notes that "the Psychologist administering and interpreting the MMPI must pay attention to all relevant factors, including age, sex, education, social class, religious background, place of residence, and other historical data". "Cultural and language differences in the test subject may affect test performance and may result in inaccurate MMPI results." See http://www.answers.com/topic/minnesota-multiphasic-personality-inventory

The MMPI has been the subject of substantial criticism, encapsulated in a Wall Street Journal article from March 5, 2008 (attached), entitled "Malingerer Test Roils Personal-Injury Law", and addressing the fact that the testing brands many people liars who have "genuine symptoms". Critics of the Fb scale also claim that it "discriminates against women and is prone to false positives."

MLOCL002186



**FRANKEL & NEWFIELD, P.C.**

Jamie Frederick
October 31, 2011
Page 10

any weight to such findings and observations, his ultimate opinions are severely undercut.

### DR. LAMB'S MARCH 2011 REPORT

It is significant to note that Dr. Lamb appears to have over represented the significance of Dr. Ogandzhanova's scores, where he formulates the opinion that she was "exaggerating her psychological symptoms while taking the PAI" – as he notes that these indicators were in the "**mild range**". Thus, based upon mild enhancements in scoring, he concludes Dr. Ogandzhanova lacks credibility. It is apparent that mere mild elevations are not sufficient for one to conclude a lack of reliability or to accuse one of exaggerating her symptoms.

In fact, her scores on numerous clinical scales would appear to indicate that she suffers significant anxiety and depression (which should and would be expected in her condition), while her Somatic scoring was within normal limits.

It is also significant to note that Dr. Lamb provided no accounting whatsoever for Dr. Ogandzhanova's cultural background. Instead, he focused on her "educational professional achievements" to opine that the number of impaired scores was exceptionally high. (P.9). Dr. Lamb also claims that this is based upon "multiple indicators" that she was not putting forth her best effort during the evaluation. Accordingly, he asserts that there can be no confidence that the scores produced actually reflect her current level of ability.

Despite all efforts to impugn her credibility, and mitigate her level of impairment, Dr. Lamb was forced to admit that Dr. Ogandzhanova "still meets the criteria for Posttraumatic Stress Disorder" (PTSD). (P.9). Yet, while he notes that "these diagnoses would not be unexpected given (sic) the death of her son and the manner in which that occurred", Dr. Lamb believed there is reason to suspect she has exaggerated the degree to which she is suffering. (P.9). Accordingly, he feels comfortable in being dismissive of Dr. Ogandzhanova's reporting of her impairment level, despite the findings and opinions provided by Dr. Rozansky. Once again, the role of a hired, but not independent, doctor is to attack the claimant, and where possible, the treating provider.

Moreover, in his prior report, Dr. Lamb admitted that it seems "reasonable to expect some type of impairment in her ability to work in her chosen profession as a radiation oncologist, given the fact that her son died of cancer." (2008 report, P.9).

While Dr. Lamb noted that Dr. Ogandzhanova still has not communicated with her family (brother or parents) since her son's death, nor has she had contact with her ex-husband in 15 years, he ascribes no clinical significance to these dysfunctional relationships. (P.4). A neutral evaluator would at least provide some insight into how or why such relationships help complete the picture. Because this evidence would serve to reinforce the nature and severity of Dr. Ogandzhanova's difficulties, however, Dr. Lamb simply ignored this information during his consideration of the issues. The same holds true regarding Dr. Ogandzhanova indicating that she has "no friends". (P.4).

MLOCL002187



FRANKEL & NEWFIELD, P.C.

Jamie Frederick
October 31, 2011
Page 11

Similar treatment is given to Dr. Ogandzhanova's indication that she has episodes of hyperventilation approximately every two weeks. Since Dr. Lamb indicates that this is not sufficient to warrant a diagnosis of panic disorder, he chooses to completely ignore any clinical significance to the issues. Parsing out symptoms to simply be dismissive of a larger picture is not appropriate for a medical reviewer – rather, some clinical significance out to be ascribed to these frequent symptoms.

It is also interesting to note that Dr. Lamb indicated the "covert surveillance of Dr. Ogandzhanova provides equivocal data relative to the current assessment." He notes that "there are frequent extended periods during which a lack of activity was noted, substantiating Dr. Ogandzhanova's claims of limited social activity and a preference to isolate herself." (P.8). He also notes that Mr. Bates does drive more when the two of them are together. However, he tries to rest upon Dr. Ogandzhanova having driven a long distance, and purportedly "functioning by herself in the community on a number of occasions". As noted above, the activities observed hardly constitute significant activity, and certainly not with the sustained level of activity that could translate into working – let alone working as a radiation oncologist.

Another point which serves to demonstrate the bias in which Dr. Lamb presented his opinions is the fact that despite Dr. Ogandzhanova's "scores on formal Symptom Validity testing were within normal limits", and his statement from the 2008 report that "Dr. Ogandzhanova's performance on several formal Symptom Validity tests did not suggest <u>any</u> difficulty with her level of effort", he claimed that she did not accurately present her emotional and psychological state during the 2008 evaluation.[5] Dr. Lamb also sought to point out that she drew items with such little effort toward accuracy (which might serve to demonstrate a lack of patience, rather than one who is not giving good effort).

Dr. Lamb also thought that Dr. Ogandzhanova should be able to translate her prior training into working as a Pediatrician. (2008 report, P.10). He myopically fails to appreciate that the same difficulties she would have in dealing with oncology patients would translate into her dealings with practicing medicine on children.

Dr. Lamb also sought to impugn Dr. Ogandzhanova due to the purported "Very high" FB scale score from her 2008 MMPI testing. He notes that the possible interpretations for this scoring

---

[5]     Dr. Lamb noted an elevated Fb scale. This Fake Bad scale has been rejected as being both unscientific and over reporting of malingering. J.N. Butcher, et al. The Construct Validity of the Lees-Haley Fake-Bad Scale(FBS): Does this Scale Measure Somatic Malingering and Feigned Emotional Distress? 18, 473-485 (Archives of Clinical Neuropsychology June 2003). A.S. Bury & R.M. Bagby, The Detection of Feigned Uncoached and Coached Posttraumatic Stress Disorder with the MMPI-2 in a Sample of Workplace Accident Victims, 14(4), 472-484 (Psychological Assessment 2002). <u>See also</u> Butcher, Gass et al., Potential for Bias in MMPI-2 Assessments Using the Fake Bad Scale (FBS), Psychol. Inj. and Law, 2007

MLOCL002188



FRANKEL & NEWFIELD, P.C.

Jamie Frederick
October 31, 2011
Page 12

were that she either (1) had severe and chronic behavioral problems; (2) had difficulty reading or understanding test items; or (3) motivation to over report psychopathology. When seeking this explanation, Dr. Lamb dismissed (1), claiming that Dr. Ogandzhanova's prior level of adjustment and vocational achievement would not support it being due to chronic behavioral problems. Yet, critically, Dr. Lamb either intentionally, or ignorantly, failed to consider just how vocationally impacted she became as a result of her tremendous loss – and that alone could well support the scoring which she achieved on the FB scale. Moreover, her adjustment had become so poor that this tandem explanation should have been more appropriately considered.

Another explanation which has support from the record, but which Dr. Lamb was equally dismissive of was the language barrier and cultural issues identified numerous times by Dr. Rozansky. Dr. Lamb sought to dismiss this on the basis that Dr. Ogandzhanova had purported consistent responding to other portions of his testing. Thus, he effectively concluded that her scoring MUST be based upon a desire to over report – even though he admitted there was "no formal evidence of a poor level of effort". Worse still, due to his "conclusion" about the MMPI, he then suggested caution should be applied to the remainder of her results, claiming they were unreliable. **HIS OVERTLY BIASED INTERPRETATION OF THE RESULTS RENDERS HIS OPINIONS LESS THAN CREDIBLE.**

Thus, in summary, it appears that Met Life is choosing to rely upon flawed conclusions which do not logically flow from the evidence, which is summarized below.

1.     Met Life embraces the opinions of its hired providers, who rely upon the apparent results of benign surveillance, showing limited activity. The activities in which the reviewers sought to seize upon were issues that were either mis-stated or overstated by the examiners, including the issue of traveling to Tuscon. Met Life has intentionally hamstrung a meaningful response to these apparently benign issues of surveillance, refusing to provide the material to either Dr. Rozansky or this office, so that we can address what is seen.

2.     Met Life embraces the opinions of its hired providers, who rely upon opinions that Dr. Ogandzhanova did not give good effort or overstated her symptoms, despite admissions that her Symptom Validity tests did not suggest any difficulty with her level of effort. Thus, these opinions run counter to the test results. Instead, the doctors rely upon "behavioral, but not formal evidence of a poor level of effort." This is simply bad science, as where the formal testing shows good effort, it is inappropriate to create the appearance of poor effort. Moreover, Met Life's hired doctors refuse to credit alternative rationales for the scoring, despite good evidence to support these alternative rationales.

3.     Met Life embraces the opinions of its hired providers, who claim that Dr. Rozansky has limited objectivity, while ignoring that they are paid examiners who are professional witnesses. Acting more like prosecutors than as independent experts,

MLOCL002189



**FRANKEL & NEWFIELD, P.C.**

Jamie Frederick
October 31, 2011
Page 13

the opinions which Met Life seeks to rely upon lack indicia of credibility and independence. It is readily apparent that these evaluators were hired by Met Life to deliver a result oriented conclusion, and would remain steadfast in this role, regardless of what evidence was presented contrary to these opinions.

4.   At days end, the doctors admit that Dr. Ogandzhanova would have limitations in returning to her work as a radiation oncologist, although they claim that she should be capable of returning to work "in some capacity" that utilizes her medical degree. Even assuming that this is true, such an opinion supports the continuation of benefits under her own occupation policy, which insures against her inability to perform her own occupation – a radiation oncologist.

We would expect that following consideration of this material, along with the report from Dr. Rozansky, that Met Life would remove the reservation of rights it has wrongfully imposed upon Dr. Ogandzhanova's claim.

We look forward to hearing further from Met Life with regard to the substantial concerns that have been raised herein.

Very truly yours,

FRANKEL & NEWFIELD, P.C.

By:  _____

Jason A. Newfield

JAN/bms
Enclosures
cc: Dr. Inna Ogandzhanova
X:\Shared\Ogandzhanova\INNA MetLife 44 ltr.wpd

'11 NOV -3 PM 2:08

MLOCL002190

# EXHIBIT 14

Jason, I reviewed all their reports.

They are all biased and have conflicting conclusions between them. Both Dr. Lamb and Dr. Parker are trying to discredit me without any basis. And is that what MetLife calls "independent evaluation"?

1) Both Dr. Lamb and Dr. Parker look at my status as an absolutely set and done in stone.

Both doctors seem not to be willing to understand what I am going through and/or are lacking a capacity to understand it. To judge a person they have to be able first of all to understand that person's make up, it is different from asking them to have empathy or even sympathy. It is understood that they are not the treating physicians in this case.

They both have a very simplistic understanding of what I am going through and of my coping mechanisms. Some of my symptoms fluctuate, the way I cope with my situation changes some. For example , on page 6 Dr. Lamb in his first report stated:"...she had considerable difficulty with housecleaning...preparing well-rounded meals..." It was true then. Recently I actually concentrated on making different meals finding some reward in doing it to the degree that I accidentally burned my right hand very badly two times. I am still trying to find on a daily basis what I need to do to cope. One thing remains unchanged for sure. It is my inability to function as a Radiation Oncologist. Nobody could possibly mistake the ability to perform routine daily functions with the ability to perform as a Radiation Oncologist.

2) Both Dr. Lamb and Dr. Parker had conflicting statements in each of their individual Reports and between both Doctors statements and conclusions.

Dr. Lamb under behavioral observation stated that" there was no evidence of delusions or hallucinatory processes nor was the content of her language of a psychotic condition."

Dr. Parker in his report concluded that I had a low grade psychoses.



EXHIBIT 6

NAME: Ogandzhanova

Meri Coash 12-1-12

DR. O-SDT-ROZANSKY-000137

3) Issue raised regarding my visits to Tucson

In Dr. Lamb first report on page 3, under Clinical Interview,..."She noted that severity of her symptoms was reduced when she avoided the University of Arizona Medical Center where her son was treated, her former oncology clinic and crowds in general."

Yes, in fact I avoided it. They can not discredit me here. Their surveillance did not show otherwise. Few times I had to go to Tucson, each time I avoided the area of the hospital.

Dr. Parker had a letter from Dr. Rozansky during preparation of his first report. On page 16 of Dr. Parker report dated 10/02/10 he included pertinent points he considered from Dr. Rozansky letter:
" D. ... She has not been to part of Tucson where Isaac spent years in the hospital. She avoids it."

Consider this fact to be the objective finding.

Dr. Parker in his report page 23 under A) dated 10/02/10 stated the following: " I have the following  concerns about symptoms magnification:
A. Her report that she cannot go to Tucson, where there is videotaped evidence of her twice going to Tucson."

You see how Dr. Parker changed the facts and statements in such a way that he could then use it against me. It is disingenuous on his part. Shame on him!

You see, I did tell both Dr. Rozansky and Dr. Lamb that I was avoiding going to the places in Tucson that reminded me of past associated with my son illness and passing, mostly University of Arizona Medical Center. As you see even Dr. Lamb reaffirmed what I said it in his own words(See above). The significance of this nuance is that in no time I have visited the places in Tucson that caused me emotional path. The places that I was videotaped visiting are located in  different areas of Tucson. After all Tucson is a big city.

4) We need to address the issue raised by Metlife about my ability to drive

the vehicle.

Dr. Lamb stated in his first report on page 6: " She described herself as being totally independent relative to…driving a motor vehicle…"

I can drive the vehicle but when ever I can I always prefer another person to drive the vehicle. Don Bates, when ever I am with him drive the vehicle most of the time, that was noted by Dr. Lamb.

5) Dr. Lamb in his reports tries to use any benign facts that no doctors usually would report to raise a point.

On page 8 of first report he described that I was 40 minutes late. He also importantly stated that my significant other drove me there. Does he also undergo evaluation? What is the relevance?

Dr. Lamb found another nonsense point to stress.

I helped Mr. Bates in writing his answers on his forms on two occasions( I reported that myself to Dr. Lamb and I specifically asked him if it was acceptable or he wanted Don to redo the form Dr. lamb expressed no problem with that fact at that time.
In his second report Dr. Lamb stated on page 4 :" of note, as with the initial valuation, Dr. Ogandzhanova actually filled out the form on behalf of Mr. Bates(see behavioral observation below.)"
Then on page 7 of the same report under behavioral observation:
" It is interesting to note some similarities in behavior across these two evaluations. In 2008, Dr. Ogandzhanova stated the she had filled out the Relative's form for her significant other, Mr. Bates, because his eyes were blurry after the eye exam and he could not read the form. For the current evaluation, she also filled out the form for Mr. Bates because they needed to complete it while he was driving them up from Casa Grande. She stated that although her attorney had forwarded the evaluation packet the prior Monday, she had only checked her e-mail on the day before the evaluation."

What is the problem? I did not conceal the fact that I filled out the form under Mr. Bates Instructions. I did not state that I have filled out the forms for Mr. Bates. I stated that I filled out his form according to his instructions because he could not. I stated this fact to Dr. Lamb to make sure that it was

DR. O-SDT-ROZANSKY-000139

acceptable to him. If again he told us that it was not acceptable, Mr. Bates would have redone the form at the second appointment or Dr. Lamb would have waited till next day in the case of the first occurrence.( as his vision was blurry.) Dr. Lamb demonstrated in this case a very passive aggressive behavior.

Dr. Lamb was looking for any possible angles including creating the situations in order to use it against the person he evaluated in order to please his contracting agency, MetLife and it is not what an "independent evaluator" should do.

With all my respect to his supposed professionalism, these are all "he said, she said" nonsense that does not substantiate his conclusions.


6) Issue of Validity of my test results.

Under Level Of Effort of the first report of Dr. Lamb page 8 he admitted:
"Dr. Ogandzhanova performance on several formal Validity tests did not suggest any difficulty with her level of effort" These are the objective findings but he would not stop here. This is not what MetLife hired him for. He went on speculating on his subjective observations.
Dr. Lamb reported That MMPI-ll produced an invalid profile. You have already looked up the literature about it. Also what is "severe and chronic behavioral problems?" I do have a lot of problems and they have nothing to do with my past achievements. " Dr. Ogandzhanova's prior level of adjustment and vocational achievement fail to support the presence of the chronic behavioral problems."
Then Dr. Lamb concludes "In summary, there is behavioral ,but no formal evidence of a poor level of effort relative to the testing of cognitive symptoms." You see he even contradicts himself.
 Then Dr. Lamb decisively stated:" However there is convincing evidence that Dr. Ogandzhanova was exaggerating her psychiatric symptoms while taking MMPI-ll exam. Overall these findings suggest caution in interpreting the psychiatric data., while the Dr. Ogandzhanova presentation of her emotional and psychiatric status is unreliable." Dr. Lamb is overreaching here. He does not present the realistic basis for his conclusion. His conclusion of my results of MMPI-ll exam is incorrect, conflicting and biased. Because of his obvious bias and overreaching conclusions, he is

DR. O-SDT-ROZANSKY-000140

trying to dismiss all my feelings and sufferings. What does he know or understand about them? Could he truly understand them? Has he lost his son recently? The answer to all the above questions is "NO", could he really judge my behavior and my responses to my tragedy? No, he cannot. Importantly, how would he feel to loose his son to suicide if he worked as a pediatric psychiatrist?... and then if the outside party reported that he exaggerated his feelings and then had an opinion on what you should have experienced to consider your feelings to be "CORRECT and VALID"? Both Dr. Lamb and Dr. Parker to the best of my knowledge did not go through what I am going through(being an Oncologist loosing my own son to cancer...) and with all my respect they are not qualified to measure the degree of truthfulness on my behalf. More so they cannot possibly know how they would have felt or behaved in the similar circumstances.(remember the famous story written by O Henry about the writer and the publicist who both found their wives left them?)

7) We need to address my efforts to find psychiatrist.

Dr. Lamb wrote in his first report on page 7 second par. from the bottom "As a consequence she describes researching on the internet, calling several psychiatrists in California and choosing Dr. Rozansky in L.A."

I did not research on the internet myself. At that time I did not even know how to use internet. I could have multiple witnesses who would state it. Yes, some aspects of my life are unusual but it does not make it untrue. I have not driven to LA by myself, Mr. Bates drove me there.(accept one time when he was not available and I was desperate) Don performed the internet search at that time and came up with a few contact numbers. I believe that he called then two doctors and made the appointments with two doctors for me. I saw both of them for the first meeting. I do not remember the name of another doctor. That female psychiatrist was a typical "pill pusher" but I did like Dr. Rozansky and as you know I became his patient.
Dr. Lamb made here another statement that I have no idea where it came from as I definitely did not say anything like that. On his first report p. 7 on the last par." Right now I do not want to change anything because of MetLife." I remember though stating that I did not want to see anyone else at the time." Dr. Ogandzhanova went on indicating that she would consider trying to see someone else once her issues with MetLife became stable." I did not say it. I did say that I would consider seeing some local psychologist

DR. O-SDT-ROZANSKY-000141

(not psychiatrist) in addition to seeing Dr. Rozansky, Yes, I considered and I decided that I did not want to, I did not want to meet another person, to spell my guts to somebody else who could not understand what I am going through any way. It is my choice. On p.8 Lamb went on and concluded:" It is difficult to understand how her antagonistic relationship with MetLife is preventing her from seeking such additional treatment." I am with him. I have no idea either. I have never stated anything like that. I simply felt comfortable with Dr. Rozansky and did not think that additional sessions with another practitioner would help me. I have a right to feel that way and I have rights as a patient.

Dr. Lamb in his second report dated 3/14/11 page 6 second par. from the bottom stated confirming the validity of what I said above:" Although she agreed in 2008 that it might be a good idea to see a local psychotherapist, currently Dr. Ogandzhanova stated "I could not get myself to see other people." " Not a crime. No controversy.

Also in his second report 3/14/11 page7 Dr. Lamb insisted: "As stated three years ago, it is difficult to understand Dr. Ogandzhanova failure to seek different treatment options in the face of her report of a worsening severity of symptoms." I did not report the worsening of my symptoms. Even Lamb himself in the same report on 3/14/11 page6 under psychiatric symptoms stated "little has changed in Dr. Ogandzhanova description of the symptoms..."

How could you trust any of Dr. Lamb conclusions if he contradicts himself in the SAME report , trying to exaggerate the effect of the point he is trying to make?
Then he continued on page 7 of the same report;" other than being comfortable with him and feeling supported, she could not articulate how her visits with Dr. Rozansky were helpful." I described, he did not listen. Then he continues ..:"In fact she describes being both depressed and angry after having visited him prior to the second day of the current evaluation, calling into question the benefits of such visits to her emotional state." First of all any successful psychoanalytic session today does not guarantee symptom- free tomorrow. The fact that I described feeling depressed and angry ( which is quite common combination of feelings I experience) it doesn't mean by any stretch of imagination a session with Dr. Rozansky somehow caused it. It is not true. As a matter of fact Dr. Lamb asked me if

DR. O-SDT-ROZANSKY-000142

sessions with Dr. Rozansky helped me and I said that they do. On the bottom of page 6 of the second report Dr. Lamb stated himself : "She did say she felt he was supportive of her and that "I feel relief" after the sessions." It helps me to deal with my life, to continue surviving." "I guess it was not enough for Lamb He had to work for the money MetLife paid him to please MetLife and to have more referrals from them in the future. Basically it is obvious that Dr. Lamb report is financially motivated. Then he progressed into a presumptive, condescending f... he is ;" Her ability to travel independently to Los Angeles for psychiatric treatments 6 times a year( I actually checked, I flew to Los Angeles last year only three time) is inconsistent with her claim that she can not function alone outside the home more than every three months." I see on the page 5 of the same report he stated;"... she estimated that she will go outside the home alone approximately once every three months.." That is a lie and/or confusion on the part of Dr. Lamb I HAVE NEVER SAID IT!!! I would have never said it for multiple reasons. The most obvious one is that it is simply not true. Second, how could I function and provide any minimal care for my two living children under those restricted circumstances? I have no idea where Dr. Lamb heard it. Did he make it up or perhaps he misunderstood? I do have an accent. I give him a benefit of a doubt that he confused and /or misunderstood what I said. They try to picture me as unreasonable as possible using all possible methods. Dr. Lamb continues in the same report same page 7:" over five years ago, Dr. Ogandjhanova was able to research the internet to find psychiatric resources, call a number of offices. Find a suitable provider, and then travel to the different state to meet a stranger and initiate the psychiatric treatment. She was able to do this at the same time she reports increasing difficulty in her ability to function at work. She should therefore be able to apply the same abilities currently to research local mental health professionals who have experience in providing Complicated Grief Therapy, which is apparently successful in treating her condition, as noted in the article supplied by Dr. Rozansky."
How mean it is!!! How dare he to talk like that!
First of all five years ago I did not know how to use internet! I can bring multiple witnesses! Here we go again. Don Bates did it for me. I believe he was one who actually called two doctor's offices. He also drove me to Los Angeles, I did not drive by myself. Second, what abilities I possess and how I apply them is not his F… business. He definitely does not get how I feel and it is not his job. His job apparently is to go after the poor woman for his own bread and butter, to provide for his family. He needs to go home and

DR. O-SDT-ROZANSKY-000143

pray that he has a son at home to provide for. You can not be sure what your fate brings to you in the future. I myself did not understand some things that later on I had to revisit. My mom had a lawyer in PA who had a son diagnosed with Leukemia. I remember asking him every time I talked to him, how his son was doing. Only later on when I found myself in the same situation I realized that it was a very irritating thing to hear.

The suggestion by Dr. Lamb that it is in a way my obligation to make all necessary efforts to be sure I get cured reminds me the situation if a Life Insurance company decided not to pay the claim if the insured died, using the excuse that he should have searched for the better treatment and to take some extraordinary actions to search for the cure.

Dr. Lamb should have stated that he could not fully understand the depth of the effect that comes with loosing a child as he has never experienced it. and accept my symptoms and complains for it's true value and as genuine . Why would he think that increasing severity of symptoms would push me necessarily to look for the outside help? Especially because of my depression.? In reality you realize that nobody could help you, that the reality is that my son is not coming back and nobody could create this miracle for me. And short of that, if I found somebody(psychiatrist) who understood me, trying to work with me on my daily challenges, that is the best someone could hope for. That is the truth in the nutshell. If they want to make sure that it is in fact the truth, there is only one way for them to experience it. Become an Oncologist, have a wonderful boy, have the boy to diagnose with Leukemia, undergo all we went through , lose your son and then I would be happy to have another talk with them but unfortunately I do not think they would have had much to say to me then. It just shows his complete lack of understanding of what I feel or even what some other people could feel if they found themselves in my shoes. Dr. Lamb is incompetent to make any sound conclusions on this subject. His conclusions sound more like speculations They are all biased, they are all the interpretations of the "hired gun" doing the best "job" he could for the MetLife. Dr. Lamb writes in conclusion in his first review :'"In summary, Dr. Ogandzhanova is not sufficiently engaged in efforts to treat her depression. She should be involved in weekly sessions of grief counseling with local psychotherapist" It sounds to me like a court sentencing.

8) Dr. Lamb is still trying to rule out the diagnosis of panic attack.

DR. O-SDT-ROZANSKY-000144

On the page 7 of his first report Dr. Lamb reported the symptoms of panic attack I complained at the time. He criticized the panic attacks I reported by not following the typical pattern. They can not catch me in any inconsistency here. I experienced what I experienced.
I can not be discredited on this basis. Don't you think that if I wanted to describe the perfect symptoms I would know where to find it in the medical books?
First of all I could only present my symptoms. Second of all If I continue experiencing the episodes of hyperventilation (and I do), they do not have to be necessarily part of the diagnosis of the panic attacks. They are most probably part of my emotional problems associated with anxiety and posttraumatic stress disorder. My condition does not read Dr. Lamb books. It has a mind of it's own.


9) Social isolation.

Dr. Lamb in his first report p.5 under the Social Development stated:"
Currently, she extends to a lack of involvement in any formal organized social activities."
Dr. Lamb also stated in his second report page 8 under Surveillance Data:"
The covert surveillance of Dr. Ogandzhanova provides equivocal data relative to the current assessment. For example, there are frequent extended periods during which a lack of activity was noted, substantiating Dr. Ogandzhanova claims of limited social activity and a preference to isolate herself. It also appears that Mr. Bates does tend to drive more when the two of them are together in the vehicle."


10) Deficiency of Psychiatrists in the State of Arizona.

I sent you the links to several articles. You can see there is a sever shortage of psychiatrists in the State of Arizona. You also can see that UMC in Tucson did have the shortage of Psychiatrists.

11) I do not have any other vocational interests.
Don Bates secured several trade names many years ago. Again Dr. Lamb in his first report last page is trying to raise a question about my integrity." In

DR. O-SDT-ROZANSKY-000145

addition, there are again discrepancies between what Dr. Ogandzhanova presented during the clinical
interview and available documentation .."

12) Conclusion of disability.

In his first report Dr. Lamb concluded:" Based upon her report, Dr. Ogandzhanova meets the diagnostic criteria for major depressive disorder and posttraumatic stress disorder, conditions which are consistent with the death of her son and her work as a radiation oncologist."

In his second report Dr. Lamb still concurs the diagnosis(page 9):" Based upon the symptoms Dr. Ogandzhanova described during the clinical interview, technically she still meets the criteria for Posttraumatic Stress Disorder((Chronic with delayed onset)and Major Depressive Disorder (Single Episode, moderate).

13) Dr. Lamb accuses me in exaggeration of severity of my symptoms.

" In summary, the primary finding of the current evaluation is the evidence from the multiple sources that Dr. Ogandzhanova is exaggerating the severity of the cognitive and emotional symptoms she claims to be experiencing, as well as the extent of which they adversely impact her ability to function." That is it. These are all his speculations.

Under cognitive symptoms Dr. Lamb stated that " Dr. Ogandzhanova is currently only experiencing significant difficulty with concentrating and memory" It is obvious that I had others cognitive symptoms. Dr. Lamb is underreporting them.

Dr. Lamb based his conclusion on the speculative opinion of my insufficient treatment effort, his anecdotal belief that I supposedly said that I did not leave the house by myself more than once in three months!!!( evidence of my reclusive behavior but still caught on occasional leave to the store and etc., his belief in my ability and obligation to find a better treatment option, his subjective behavioral observation and interpretation of his own thought and beliefs, suspicion of the reasons of me being driven late two times for his appointment, of the help I gave to Mr. Bates in writing his answers on his forms on two occasions( I reported that myself to Dr. Lamb and I

DR. O-SDT-ROZANSKY-000146

specifically asked him if it was acceptable or he wanted Don to redo the form. Dr. lamb expressed no problem with that fact at that time.)With all my respect to his supposed professionalism, these are all "he said, she said" nonsense that does not substantiate his conclusion.

Dr. Lamb did not say that I could work as a Radiation Oncology and that I had no limitation. Thus he agreed with myself and Dr. Rozansky that I can not work as a Radiation Oncologist. So MetLife can not lean on Dr. Lamb report to say that I have no limitations to work as a Radiation Oncologist. And that is of the most importance.

In his first report on page 5 second par. from the bottom Dr. Lamb stated:

"She estimated that she had some type of involvement in the treatment of 25 to 30 patients per day, but only about 70% required significant emotional support." Only 70% ! It means objectively that majority of the patients required my significant emotional support! ...which I could not possibly provide under my current circumstances.

14) I have never reported a lack of loving feelings towards my children.

In Dr. Parker report dated 10/2/10:"... reported a lack of loving feelings toward her children..." Not true. I reported difficulty getting close and having the feelings I believed I had to experience at first when my daughter was born. Dr. Rozansky helped me then explaining to me that I was afraid to get close to my daughter because I was afraid to loose her. This is an example how Dr. Parker manipulates the simple facts to make a potentially damaging to me conclusions.

In his report dated 10/02/10 on page 23:" B. his (Lamb) report of a lack of loving feelings toward her children, despite clear video evidence that she is bonded to baby under her care. On December 10 ,2007, she is seen playfully interacting with baby, spinning it around playfully, and smiling at it, while it smiles back. On January 9, 2008, she is again seen interacting in a maternal fashion toward a small child." As I said I did have an emotional difficulty bonding with the child in the beginning. It is not the same as having"...lack of loving feelings..." that I have never claimed

The proof is in the notes Dr. Rozansky gave MetLife and that notes were

DR. O-SDT-ROZANSKY-000147

also part of the report Dr. Parker presented to MetLife on 10/02/10.
Page 18 Dr. Parker report dated 10/02/10 states on the top of the page:"14.
Report from Gerald Rozansky, MD, PhD, dated September 12,
2007.Notable are the following:
A."I have continued to work with Dr. Ogandzhanova. At first she was
unable to  bond with her newborn daughter, Esther, but that has improved
considerably."

You see for yourself, that I have never said that I had a lack of loving
feelings toward my children. As you see here, I did say that at first I was
unable to bond but by September 12,2007 ( the date of the note of Dr.
Rozansky) it has considerably improved. So it is obviously true that by
December10, 2007 and January 9, 2008 I have bonded with my daughter.
Their video evidence represented a true picture. But what is clear that both
Lamb and Parker have manipulated my statements and even the surveillance
report ordered by MetLife and misrepresented them to a such degree that
they then presented obviously disingenuous conclusions, they used it to
question my credibility and discredit me as a historian and then they both
used it for a wrong conclusion doubting my disability. It is very important to
stress that Dr. Lamb had the  typed psychiatric note from Dr. Rozansky
before my first visit with him in February 2007. It actually shows a lack of
credibility on the part of Dr. Lamb and Dr. Parker and puts in doubt the
credibility of all their reports.

15) Untrue and inconsistent statements in Dr. Parker reports.

There are multiple untrue statements throughout the report where Dr. Parker
claimed me telling him  different facts that I have not said.

Dr. Parker in his first report stated on page 5 under "Development of
Disability."
"She reported having a psychiatric evaluation at the onset of her disability,
out (is it But?) could not recall the name of the evaluator."
I do not know what Dr. Parker means here. It was not a psychiatric
evaluation. I had appointments with two doctors the first time I went to LA.
I talked to both of them but another Doctor was more into prescribing
medications but I needed somebody to help to understand what was going
on with me. When I met Dr. Rozansky I realized that I felt comfortable with
him and that he sincerely wanted to understand what I was going through.

On Page 7 under his description of a typical day Dr. Parker stated;" Bill paying is shared" What does he mean?

"She had sex with her boyfriend between every day and every month, a little more recently." Total confusion of the facts I told him. I actually said that at that time we hardly had any sex at all, I said it was very infrequent, may be once a month. I actually explained him that we had a bad relationship at that time. I did not feel comfortable to discuss my sex life with him but I answered out of concern that I would be accused of hiding some secrets. As you see, it still did not do any good, Dr. Parker still confused my answers.

Besides using his favorite ward "evasive" he used another word "condescending" that I am sure came from the textbook for the Forensic Psychologist( they should be renamed Forensic Pathologist- kill that F... patient.) In his first report on page 7 under mental status examination: " She cried and was quite irritable and somewhat condescending periodically throughout the interview…"

16) Dr. Parker reports are full of aborted and manipulated data and subjectivity.

Under current subjective complaints in his 10/02/10 report , he has limited my complaints to a few. That was not a case during the interview. As you see even Dr. Lamb recorded much broader complaints I presented with. During the second interview Dr. Lamb relied more on my answers according to his questioner scale. Dr. Parker could have asked me the same question making sure he recorded all my complaints in case for what ever reason I had a problem verbalizing them at that time.

If you look at page 21 of the same report under the section of his Opinions, you could also see:
MetLife posted a questions to Dr. Parker:" What are the current subjective symptoms which Dr. Ogandzhanova complains about? Please, describe the frequency and severity of symptoms over the course of her mental illness?"

" Dr. Ogandzhanova was very evasive about her current subjective complaints." And then Parker is going on and presents some. If a patient describes what she feels to the best ability she had at the time, it does not

DR. O-SDT-ROZANSKY-000149

mean evasive. Dr. Parker repeats several times throughout his reports that I have been evasive. It is a cheap way to question my credibility when he has nothing to substantiate his report with, after all that is the word he is trained to use in the forensic psychiatry. And there lies the difference. A regular Psychiatrist in comparison to the Forensic Psychiatrist most probably would not use the word "evasive" in his report at all. My policy did allow MetLife to use the Doctor of their choice for my examination, but nobody would have thought that the Doctor of their choice had to be ONE AND THE ONLY FORENSIC PSYCHIATRIST in whole USA.

On the top of page22 of the same report: " She reported that she has substantial difficulty being consistent, emphasizing this several times during the evaluation". Then:" The video evidence indicates substantial consistency in her behavior, however. Over four episodes of video gathering, Dr. Ogandzhanova is noted to be quite active, driving vehicles, going to Tucson, going to Phoenix, going to the Airport, going to Holbrook, holding babied, go to businesses, and generally being active." All his phrases, each word is carefully measured to evaluate my feelings and discredit me. Nobody would believe that a professional Psychiatrist has no abstractive thinking and is still stuck on the level of concrete thinking. When an educated patient in my circumstances is talking about difficulty to be consistent, it does not mean if she could go to the store, it means a much higher level of functioning. After all MetLife is not trying to determine if I am qualified for the assisted living. If Dr. Parker did not understand what I meant or was interested to have a more comprehensive explanation Dr. Parker could have asked me but he has not.

Dr. Lamb in his second report admits that little has changed in Dr. Ogandzhanova description of her symptoms (page 6 upper half of the page report dated 3/14/11).


17)Nature of relationship with the children's father.

First of it has nothing to do with my ability to work as a radiation oncologist. Second of all I was trying to answer what our relationship is to the best of my ability. Being a Forensic pathologist, Dr. Parker found problem even here: " She reported having a significant other(the father of her children), who does not live there but stays there often. She was evasive about their relationship and his living circumstances." Dr. Parker found me

DR. O-SDT-ROZANSKY-000150

being evasive on multiple occasions throughout his report. I have never being evasive, actually I am known to be a very straightforward person. It's not that I care what he thinks about me. I believe that Dr. Parker used similar tactic and similar wording in majority of his reports. I am sure that "evasive" is his favorite word. It is a simple way to put doubts about the credibility of a person without using any facts. Dr. Parker used his favorite ward "evasive" many times in his report dated 10/02/10:
On page 4, "She was evasive about her sleep history." On page 2," She was evasive about her relationship and his living circumstances. Then on the same page," She was very evasive about how often she got out, stating that it was variable." Yes, it was variable. MetLife own surveillance report showed exactly that. Sometimes there were no activity for days and weeks, other days I was going to the stores and so for.

18) We need to address my lack of following up for the MMPI-ll with Dr. Parker.

Almost everything Dr. Parker does has a calculated element and alternative motive.
Dr. Lamb has not scheduled me to return on September 28 by the end of the interview. He did tell me to call his office back and to schedule an appointment. He did ask me to come back sooner as he explained to me that he could not complete his report for MetLife without me completing the test portion. As you see it was a lie. He could have scheduled me for September 28 with his staff but I have never been informed about that appointment. Dr. Parker or his office staff have never called me to reschedule if it remained to be a concern.. No, Dr. Parker would rather use it as another scored point against me in his paid by MetLife report. On October 2, 2010 evaluation he stated;" …She did not return to complete that exam, despite telling me that she would do so, and has therefore been non-compliant with independent medical examination." You see that man know no shame, he has guts to call it" an independent medical examination."
For the first time I saw Dr. Lamb on 2/13/08 and 2/19/08. I saw Lamb on both days. Dr. Lamb did not have problem rescheduling me in comparison to Dr. Parker who used it against me.

You see Dr. Parker terrorized me for 3,5 hours making me to go through the littlest detail of my son illness and passing. I cried out loud but he would not stop like a fascist. I was exhausted and emotionally torn at the end and I told

DR. O-SDT-ROZANSKY-000151

Dr. Parker that I was incapable to take any test at that time. I did tell him that I would return but no appointment was set. He is simply lying because he has nothing for MetLife , nothing at all unless he makes things up!

I called Dr. Rozansky and I told him that I had a horrible time with Dr. Parker and that I could not come back to his office for any reason. I e-mailed later the letter to Dr. Rozansky so he could understand what I went through.

Under "updated opinion" section of Dr. Parker report dated 06/02/2011, he stated that: " Rozansky appears to have limited objectivity who have therapeutic alliances with their patients...

C... he was not present for evaluation and therefore has no contemporaneous information about Dr. Ogandzhanova' mental state at the time of the evaluation...

First of all I kept in close contact with Dr. Rozansky, I e-mailed him a letter describing what I went through with Dr. Parker.

Second, just look at the amount and detailing of the information Dr. Parker got from me. I have never described so many details about Isaac illness and passing to Dr. Rozansky. If I found it therapeutic to me, I can assure you I would have told all about it to Dr. Rozansky. You could see that he pretty much did not bother to get any other information including my complaints. Majority of other material he directly adopted and excepted from Dr. Lamb without any verification . Nazis did not think they did anything wrong either.

19) Re-battle of Dr. Parker conclusion.

A. Dr. Parker was asked a question by MetLife if there were indications of Symptoms magnification, malingering, or secondary gains in terms of my subjective symptoms.

Besides several subjective thoughts based on a wrong facts that he covered, Dr. Parker made his conclusion: " I cannot support a diagnosis of malingering to a degree of reasonable medical certainty ."

Now, I would like to respond to Dr. Parker following claim that "She has sold off her clinic, has no liability insurance. And no job to return to." When I realized that I was doing progressively worse, I did sell the clinic, eventually I personally terminated my medical liability insurance( I have never been sued and had never had any malpractice claims against me.) As

DR. O-SDT-ROZANSKY-000152

far as a job is concern, Dr. Parker is right ,I do not have a job. Isn't what I was saying all along?

B. Most important was Dr. Parker answer to MetLife posted question: " Do you find evidence of psychiatric symptoms which impair Dr. Ogandzhanova from working as a radiation oncologist?"

That was the answer that allowed MetLife to claim that I had no limitations to work as a radiation oncologist. Let us analyze what made Dr. Parker to say so.( Page 23 , Parker report dates10/02/1 ))
What did allow Dr. Parker to conclude it? Does he have any substance to say it?
He started:" Dr. Ogandzhanova MAY have difficulties returning to work as a radiation oncologist, due to her subjective report that she cannot be near cancer patients. I have no objective data to support this contention and again, note potential issues with her credibility as a historian."
Dr. Parker here acknowledged my difficulty to return to work as a radiation oncologist but nobody possibly could give him any other objective evidence to that regard. The evidence is actually what he stated earlier himself. These are the facts that I did sell the clinic, I did cancel my malpractice insurance and the fact that I do not have a job. Very well. As far as my credibility as a historian is concern I have covered in my previous points extensively why all his points against me are absurd and invalid and therefore Dr. Parker could not use them against me to discredit me.

Dr. Parker continues:" She has not appropriately grieved the loss of her son. Referring to him in the present tense, believing that he is with her always. She does not believe that she will improve unless her son comes back to life." First of all the way I grieve appropriately or inappropriately is my business. This belief of mine could not be used to say that I have no limitations to work as a Radiation Oncologist any way. Just exactly how can Dr. Parker or anybody else suggest I should grief?

Further..:" Outside of her aversion to dealing with oncology patients, there is no psychiatric reason that Dr. Ogandzhanova would be unable to return to work as a radiation oncologist." If radiation oncologist has a pathologic aversion to their patients, she/he can not work as a radiation oncologist. "Her depression is not substantially severe." Not true."… and she reported reasonable functioning within the confines of her household." It is not a

DR. O-SDT-ROZANSKY-000153

reasonable statement as nobody could possibly confuse the reasonable functioning with a daily activities within confines of the household with demanding comprehensive functioning as a radiation oncologist.

" ...the video surveillance indicates that she is quite capable of leading an independent life.". It is true, I have never requested to live in a half way house, but being capable to go to the store or Office Max do not rise to the ability of comprehensive functioning  as a radiation oncologist.

Last two sentences: " Dr. lamb's neuropsychological evaluation from 2008 indicated concerns about the validity of her symptoms. She has no psychiatric symptoms, outside her subjective report of inability to treat cancer patients, that would interfere with her ability to work as a radiation oncologist."

 Dr. Lamb "concern" about validity of my symptoms was based on the self-fabricated facts( we have an objective proof to discredit most of them-see #14 point of my current report.)

It is obvious and indisputable that I presented with multiple psychiatric complaints far  wider than just my inability to treat cancer patients. Some of them are outlined quite well under Psychiatric Symptoms in both reports of Dr. Lamb. On page 7 of his first report, Dr. Lamb stated :" Dr. Ogandzhanova describes...significant weight gain.." He admitted that I reported gaining 40 pounds during the same evaluation.(on page 3 of the same report.)

In his report dated 10/02.10,  Dr. Parker is disregarding the obvious parts of the records of Dr. Lamb that Parker extensively quoted in his report dated 10/02/10.Dr. Parker could have used some comprehensive thinking and combine the fact that Dr. Lamb mentioned in his first report about my complain of gaining some 40 pounds and his own observation as a part of his mental status examination on page 7 that I was "an obese , Caucasian woman." The only reason why the professional psychiatrist could have used the gross description of me being overweight is if he thought that it was perhaps part of my emotional state and would have asked me more questions about it. Dr. Parker did not do it.

On page 22 of his first report Dr. Parker answered the posted question by MetLife: "Do you find any signs of cognitive impairment?"

Dr. Parker answered: " There is limited evidence of cognitive impairment."

DR. O-SDT-ROZANSKY-000154

Thus you can see decisively that conclusion of Dr. Parker that I have no limitations to work as a radiation oncologist is unfounded, biased and incorrect.

I would not recommend MetLife to continue relying heavily on Dr. Parker report as it would never withstand any legal scrutiny.

20) It is important that Dr. Lamb has never concluded that I can work as a Radiation Oncologist without any limitations.

 As a matter of fact Dr. Lamb concluded in his report that was later repeated by Dr. Parker in his own report dated 10/02/10on page 14:
" M. ..there appears to be no dispute that Dr. Ogandzhanova did lose child to cancer, and there is no reason to believe that she could not suffer some emotional reaction to this loss. It also seems reasonable to expect some type of impairment in her ability to work in her chosen profession as a radiation oncologist, given the fact that her son died of cancer."

21) Report from Dr. Rozansky dated September 12, 2007 that was part of the record and report of Dr. Parker dated 10/02/10 said :
"B . It is my opinion that Inma Ogandzhanova cannot function at work as a radiation oncologist. The effort required with the type of patients she has worked with is impossible because it so parallels and intersects with the years of torment she suffers with the son's illness which ended in his tragic death."

Dr. Rozansky as my Doctor has known and treated me for years and his opinion carries more validity than two "hired guns".

22) MetLife has no credible foundation to discontinue my Policy payments.

 Both doctors concerned my psychiatric diagnosis, specifically that I met all criteria for the DX.

Dr. Rozansky supports the position that I can not function as a radiation oncologist.

Dr. Lamb has never stated that I have no limitations to work as a radiation oncologist.

DR. O-SDT-ROZANSKY-000155

Dr. Parker could not support the diagnosis of Malingering to a reasonable medical certainty.

Dr. Parker found that I have no limitations to work as a radiation oncologist but it is unfounded and not credible. ( see point #18 of my current report.)

MetLife has tested and followed me for over 4 years and after dismissing a bunch of self-made nonsense you can clearly see that MetLife could not show anything of any substance to contradict my current status.

MetLife needs to stop playing their "bad faith" games, stop harassing me, stop surveillance (especially when it comes to photographing my minor children which is illegal.),and  continue paying on my policies for which I paid MetLife for years.

DR. O-SDT-ROZANSKY-000156

1)Dr. Rozansky should also request the surveillance materials . Meaning , they can try to minimize Dr. Rozansky's opinion by suggesting that he didn't have the benefit of reviewing the surveillance when offering opinions. If not, Dr. Rozansky can work off the reports in the reports, and say that such materials STILL DO NOT SUPPORT THE ABILITY IN HER OWN OCCUPATION.

2) Dr. Rozansky needs to address MetLife accusations of lack of medication management, as to why lexapro has not been altered by Dr. Rozansky over the past several years.

3) Address MetLife accusations of a lack of other treatment, whether finding another doctor(challenging my assertion that I could not find MD in AZ, and on why I was not engaged in different type of treatment cognitive behavioral therapy), or more intense treatment. Fundamentally, the issue relates to the fact that Dr. Rozansky KNOWS that I cannot return to my prior work. Thus , his treatment emphasis is on daily living and surviving. MetLife and their "experts" do not want to acknowledge that I can not return to the work of radiation oncologist, so they need to attack me and you for not trying harder to get me back.

4) MetLife makes emphasis on me not being motivated to go back to work. I can not do my job, and while there are some subtle acknowledgement of this, they instead question why I cannot be a pediatrician, or engage in some other medical field.

How different would being a pediatrician be than doing the oncology? Doubtful that this can be done with my health status. Dr. Rozansky should take this issue on, and develop the rebuttal from a medical perspective.

5)Emphasis on MMPI-ll and the F scale. This test is particularly ill suited for individuals suffer from Post-Traumatic Stress Disorder, like myself. Some literature states that " the results indicate that FBS is more likely to measure general maladjustment and somatic complaints rather than malingering. The rate of false positives produced by the scale is unacceptably high, especially in psychiatric settings. The scale is likely to classify an unacceptably large number of individuals who are experiencing genuine psychological distress as malingerers. It is recommended that the FBS include " my sleep is fitful and disturbed" and I have nightmares every

DR. O-SDT-ROZANSKY-000157

few nights." As noted in the article, those with PTSD might legitimately answer true, and then be scaled toward the FBS cutoff.

It is for Dr. Rozansky to address the F scale and issues and concerns with it.

DR. O-SDT-ROZANSKY-000158

EXHIBIT 15

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

METROPOLITAN LIFE INSURANCE            )
COMPANY, a New York corporation,       )
                                       )
     Plaintiff/Counter-Defendant,      )
                                       )
vs.                                    )No. CV-12-372-PHX-GMS
                                       )
INNA OGANDZHANOVA, M.D.,               )
                                       )
     Defendant/Counter-Claimant.       )
_____)

VIDEOTAPED DEPOSITION OF DONALD BATES

Phoenix, Arizona

April 17, 2013

Prepared by:

Meri Coash, RMR, CRR

Certified Realtime Reporter

(Copy)                     Certified Reporter #50327

Bates, Donald                                        April 17, 2013

---

Page 6

```
09:10:07   1   German, on behalf of the defendant/counterplaintiff.
09:10:11   2          THE VIDEOGRAPHER:  Would the court reporter
09:10:12   3   please swear in the witness.
           4
           5          DONALD BATES,
           6   the witness herein, having been first duly sworn by the
           7   Certified Reporter, was examined and testified as follows:
           8
           9          EXAMINATION
          10   BY MR. BIENSTOCK:
09:10:25  11   Q.  Sir, will you please state your name and address,
09:10:27  12   for the record.
09:10:28  13   A.  My name is Donald Bates.  I live at 1650 North
09:10:33  14   Kadota Avenue, Casa Grande, Arizona.
09:10:36  15   Q.  Sir, are you on any medications today that would
09:10:46  16   in any way prevent you from understanding questions and
09:10:50  17   truthfully answering them to the best of your ability?
09:10:52  18   A.  No.
09:10:52  19   Q.  Okay.  What medications are you currently taking?
09:10:56  20          MR. GERMAN:  Objection.  His health isn't an
09:11:01  21   issue and I don't think he's placed it in issue, so I
09:11:04  22   don't think his medications are discoverable.
09:11:11  23          MR. BIENSTOCK:  Well, if you're instructing
09:11:12  24   him not to answer, instruct him not to answer.  But I
09:11:15  25   think it is in the circumstances to make sure that we
```

Page 7

```
09:11:19   1   don't have a claim later that he was not able to
09:11:21   2   effectively participate in the deposition.
09:11:24   3          MR. GERMAN:  Well, I want to also make sure
09:11:25   4   that we're not later opening the door to his private
09:11:29   5   health background, doctors, that sort of thing.  And if
09:11:34   6   it's for that limited reason, I can consult with Mr. Bates
09:11:38   7   and he can make an informed decision.
09:11:41   8          MR. BIENSTOCK:  Well, his health may very
09:11:43   9   well be an issue in the lawsuit, but I would certainly
09:11:46  10   agree by allowing him to answer this, you're not in any
09:11:50  11   way waiving your argument that it's not.
09:11:52  12          MR. GERMAN:  Okay.  We will proceed.
09:11:52  13   BY MR. BIENSTOCK:
09:11:56  14   Q.  Can you please answer the question, sir?
09:11:57  15   A.  I'll ask you to repeat the question, if you
09:11:59  16   would.
09:11:59  17   Q.  I'm just asking what medications you're currently
09:12:04  18   taking.
09:12:04  19   A.  I take lithium and I am prescribed a sleeping
09:12:10  20   aid, which I don't always take.
09:12:12  21   Q.  All right.
09:12:17  22   A.  I --
09:12:18  23   Q.  Go ahead.
09:12:19  24   A.  And I also am prescribed Seroquel.
09:12:21  25   Q.  And for what conditions do you take lithium and
```

Page 8

```
09:12:29   1   Seroquel?
09:12:29   2   A.  I've been clinically diagnosed with manic
09:12:35   3   depressant bipolar, rapid cycle.
09:12:48   4   Q.  And for how long have you been diagnosed with
09:12:56   5   that condition?
09:12:57   6   A.  First clinical diagnosis was somewhere around
09:13:02   7   1994.  But I've had this condition for as long as I can
09:13:08   8   remember.
09:13:08   9   Q.  Is the treatment for it currently effective, from
09:13:21  10   your perspective?
09:13:22  11   A.  Certainly.
09:13:23  12   Q.  Sir, have you ever been in a deposition before?
09:13:35  13   A.  I have.
09:13:36  14   Q.  How many times?
09:13:37  15   A.  Once.
09:13:37  16   Q.  And in what circumstance was that?
09:13:41  17   A.  Concerned a -- a real estate -- Excuse me.  It
09:13:50  18   concerned a title insurance claim on a piece of property
09:13:54  19   owned by an LLC, Dr. Ogandzhanova, the managing -- and
09:14:01  20   owner of that LLC, and it involved issues of title.
09:14:06  21   Q.  And that --  Was that related to property in
09:14:12  22   Raton, New Mexico?
09:14:13  23   A.  That's correct.
09:14:14  24   Q.  Are you represented by an attorney today?
09:14:19  25   A.  Yes.
```

Page 9

```
09:14:21   1   Q.  By whom?
09:14:23   2   A.  I believe I'm --  No, I -- I suppose I'm not.
09:14:32   3   Q.  Okay.
09:14:38   4   A.  I'm not sure how to answer that question.  I have
09:14:41   5   an attorney here.
09:14:41   6   Q.  Well, have you entered into an engage -- a
09:14:45   7   retention agreement with any of -- either of the attorneys
09:14:48   8   who are here today or any of their colleagues?  Do you
09:14:53   9   have a written agreement with any of them --
09:14:54  10   A.  No.
09:14:55  11   Q.  -- to represent you?
09:14:57  12          Do you have any understanding that they are
09:14:59  13   representing you for any purpose?
09:15:01  14          MR. GERMAN:  Do you mind if we take a minute
09:15:05  15   and --
09:15:06  16          MR. BIENSTOCK:  Well, let him answer the
09:15:08  17   question while it's pending and then --
09:15:08  18          MR. GERMAN:  Okay.
09:15:10  19          MR. BIENSTOCK:  -- you can.
09:15:11  20          THE WITNESS:  Can you repeat the question,
09:15:12  21   please.
09:15:12  22   BY MR. BIENSTOCK:
09:15:13  23   Q.  Sure.
09:15:14  24          Do you have an understanding with either of
09:15:15  25   the attorneys who are here today for Dr. Ogandzhanova or
```

Bates, Donald                                    April 17, 2013

Page 154

```
14:40:30   1   didn't, then we could continue to operate.  So there was
14:40:35   2   never a desire to sell it for the sake of selling it.  If
14:40:41   3   somebody wanted to buy it and it's a reasonable
14:40:45   4   transaction from a business point of view and it makes
14:40:47   5   sense, then that would be something you would likely move
14:40:51   6   forward on.  But if it didn't sell, then it didn't sell.
14:40:54   7   BY MR. BIENSTOCK:
14:40:54   8       Q.  When did he first tell you that?
14:40:56   9       A.  Well, from the start of the idea of does somebody
14:41:05  10   want to buy the clinic, there's -- I'm sure that we had a
14:41:07  11   discussion.  And the discussion is -- And I certainly
14:41:11  12   informed her of the fact that oftentimes these discussions
14:41:14  13   go nowhere.
14:41:17  14       In the case of 21st Century Oncology, I did
14:41:20  15   my research and had learned that less than 5 percent of
14:41:24  16   whoever they approach ever gets done.  As far as the group
14:41:28  17   CTSI, this was their expansion and their attempt to
14:41:32  18   acquire cancer centers and so on.  This was a fairly new
14:41:36  19   thing for them.  Didn't particularly like their approach,
14:41:41  20   but certainly not going to give up on somebody's in- --
14:41:46  21   interest in buying.  And -- But that oftentimes these
14:41:51  22   things don't happen.  And if -- if it continues -- if
14:41:55  23   progress continues and we're at a point where you have a
14:41:57  24   chance to sell the cancer center when it actually comes
14:42:00  25   down to it, then you have that choice, yes or no.  And if
```

Page 155

```
14:42:04   1   it doesn't, wasn't going to keep us from keeping the
14:42:07   2   cancer center and continuing operating that cancer center.
14:42:11   3       Q.  The question was, when did Dr. Ogandzhanova first
14:42:14   4   tell you that if one of these offers resulted in something
14:42:19   5   that was acceptable, she would sell the cancer center?
14:42:23   6       MR. GERMAN:  Objection.  Form and
14:42:24   7   foundation.
14:42:25   8       THE WITNESS:  I can't give you a specific
14:42:26   9   date or time.  Again, the discussion was there's interest.
14:42:31  10   If the process goes to -- to some point where it looks
14:42:36  11   like a deal can be done, then you start talking about
14:42:39  12   doing the deal.  But the exchange of preliminary
14:42:42  13   information, things like that is not a deal done.
14:42:44  14       So it certainly, in my mind, was not in the
14:42:48  15   summer, and probably was more in the latter part of '06
14:42:56  16   that it seemed like by then the negotiations with T- --
14:43:01  17   CTSI had gone nowhere and that was shut down.
14:43:05  18   Negotiations with 21st Century seemed to be progressing
14:43:09  19   pretty well, and it certainly seemed like the chance of
14:43:13  20   getting a sale done was looking okay.
14:43:21  21   BY MR. BIENSTOCK:
14:43:21  22       Q.  So Dr. O- -- Ogandzhanova told you sometime in
14:43:23  23   April of 2006 that she had an interest in selling the
14:43:26  24   clinic?
14:43:27  25       MR. GERMAN:  Objection.  Misstates
```

Page 156

```
14:43:28   1   testimony.  Form and foundation.
14:43:30   2       THE WITNESS:  I didn't say that.  What I
14:43:32   3   said was is that there were inquiries made, in this
14:43:40   4   particular case, by CTSI.  The conversation was, "We're
14:43:45   5   being contacted.  People are interested in your cancer
14:43:48   6   center," for the same reason that we built the cancer
14:43:50   7   center.
14:43:51   8       The whole idea behind building that cancer
14:43:53   9   center in Casa Grande was the demographics of northern
14:43:57  10   Pinal County.  And it was the same reason why Banner,
14:44:01  11   Catholic Charities, and other hospitals were interested in
14:44:04  12   building hospitals in Casa Grande or Maricopa.  And
14:44:08  13   doctors and -- other doctors were moving into there --
14:44:11  14   into the area.  Population growth, the dynamics of its
14:44:15  15   closeness to Phoenix.  Because of that, this
14:44:17  16   state-of-the-art, stand-alone clinic was a target of
14:44:22  17   anybody who looked at or thought about expansion.  But,
14:44:26  18   again, the thought of wanting to do something does not
14:44:30  19   always translate into actually doing it.  And so the
14:44:33  20   discussion was these people are interested.  We owe it to
14:44:36  21   ourselves to not close any doors for any reason.  That's
14:44:40  22   bad business.  And so let's hear what they have to say.
14:44:43  23   If it happens, if it continues on, we get somewhere with
14:44:46  24   it, then at some point we have to make more concrete
14:44:49  25   decisions, but right now, let's just see where it goes.
```

Page 157

```
14:44:52   1   BY MR. BIENSTOCK:
14:44:52   2       Q.  And she told you that in April 2006?
14:44:54   3       A.  No.  I told her that.  And she said fine.
14:44:57   4   Let's -- let's see what happens.
14:44:58   5       Q.  Okay.  Now, she actually sold the clinic in March
14:45:02   6   of 2007, correct?
14:45:04   7       A.  That's correct.
14:45:04   8       Q.  And the closing date was March 12, 2007?
14:45:09   9       A.  That is correct.
14:45:09  10       Q.  All right.  How far in advance of that date did
14:45:15  11   Dr. O decide that she was going to sell the clinic --
14:45:18  12       MR. GERMAN:  Foundation, form.
14:45:19  13   BY MR. BIENSTOCK:
14:45:19  14       Q.  -- to 21st Century?
14:45:21  15       MR. GERMAN:  Foundation, form.
14:45:24  16       THE WITNESS:  After the first of the year, a
14:45:26  17   significant amount of swapping of information, they had
14:45:30  18   had a chance to review patient load, CPT codes.  They had
14:45:35  19   had a chance to put their own personnel -- come and visit
14:45:38  20   the cancer center.  Their physicist came to visit, people
14:45:42  21   like that.  At that point in time, they then seemed to be
14:45:48  22   more positively progressing towards a completion.  And,
14:45:58  23   again, these purchases by 21st Century Oncology only occur
14:46:04  24   at about 5 percent of their inquiries, so though -- though
14:46:07  25   there seemed to be hope that we are moving towards a
```

Bates, Donald                                    April 17, 2013

Page 202

16:09:47   1   foundation.
16:09:47   2       THE WITNESS: No. The sale of her practice
16:09:49   3   contemplated the sale of the practice, and this document
16:09:52   4   contemplates two months, but they certainly had the right
16:09:57   5   to retain her for any length of time they wanted to. But
16:10:01   6   in terms of practicing radiation oncology for 21st
16:10:06   7   Century, this document would say -- would indicate two
16:10:10   8   months, yes.
16:10:15   9       Ah, okay. I see. This is not the final --
16:10:21  10   certainly not a final draft. And -- But specific to this
16:10:29  11   document, it does say two months.
16:10:31  12   BY MR. BIENSTOCK:
16:10:31  13       Q. Are -- are you aware of another version that was
16:10:34  14   actually the final, signed by 21st Century, where the
16:10:38  15   employment agreement that was being proposed and agreed to
16:10:41  16   by Dr. O was for more than two -- two months?
16:10:43  17       MR. GERMAN: Form and foundation.
16:10:45  18       THE WITNESS: No, sir. But I know that this
16:10:49  19   is not the -- this is a draft, and this draft did not
16:10:53  20   become a final. That, I do know looking at this draft.
16:10:57  21   BY MR. BIENSTOCK:
16:10:59  22       Q. Was there ever a final that was also signed by a
16:11:04  23   representative of 21st Century of this agreement,
16:11:07  24   Exhibit 7?
16:11:07  25       MR. GERMAN: Foundation.

Page 203

16:11:14   1       THE WITNESS: No, sir. This -- this
16:11:15   2   document doesn't exist in the final swapping of documents.
16:11:21   3   This is a -- basically, an agreement of mutual
16:11:28   4   understanding, essentially an intent as to the parameters,
16:11:33   5   how those parameters were memorialized by contract. But
16:11:37   6   this -- this was not part of the final -- Specifically
16:11:41   7   this was not the final -- part of the final contract, and
16:11:47   8   this document was amended beyond this date as well.
16:11:50   9   BY MR. BIENSTOCK:
16:11:54  10       Q. This proposal -- Actually, both Exhibit 6 and 7
16:11:58  11   also included a five-year covenant pursuant to which Dr. O
16:12:04  12   would not be able to participate in any manner in the
16:12:09  13   provision of radiation oncology services within 100 miles
16:12:13  14   of the cancer clinic, correct?
16:12:15  15       A. I see that.
16:12:15  16       Q. Is that -- That was your understanding that they
16:12:19  17   were proposing?
16:12:21  18       MR. GERMAN: Objection.
16:12:21  19       THE WITNESS: That's what they propose. But
16:12:24  20   that's not in the final agreement. That was -- First of
16:12:27  21   all --
16:12:27  22   BY MR. BIENSTOCK:
16:12:27  23       Q. That's fine.
16:12:28  24       A. No, to answer your question.
16:12:30  25       Q. All right. That's -- that's what Dr. O agreed to

Page 204

16:12:33   1   in Exhibit 6 and 7, right?
16:12:35   2       MR. GERMAN: Objection. Form and
16:12:36   3   foundation.
16:12:36   4       THE WITNESS: Yes. Correct.
16:12:37   5   BY MR. BIENSTOCK:
16:12:42   6       Q. And there -- there never was an employment
16:12:45   7   agreement between 21st Century and Dr. O in connection
16:12:50   8   with the sale of her cancer center to 21st Century, was
16:12:57   9   there?
16:12:57  10       MR. GERMAN: Objection. Form, foundation.
16:12:59  11       THE WITNESS: An employment agreement?
16:13:02  12   There was certainly a personal services agreement that was
16:13:07  13   executed, which required her participation after the sale
16:13:11  14   of the cancer center, so I would -- I would disagree with
16:13:16  15   you.
16:13:16  16   BY MR. BIENSTOCK:
16:13:17  17       Q. Okay. There was nothing called an "Employment
16:13:18  18   Agreement," capital E capital A, was there?
16:13:22  19       A. Using your terminology, no.
16:13:24  20       Q. All right. Ultimately, Dr. O sold her cancer
16:13:35  21   center to 21st Century for just under $8 million. Is that
16:13:35  22   correct?
16:13:41  23       A. That is correct.
16:13:41  24       Q. And how was it that the proposed purchase price
16:13:46  25   in September of approximately 6 and a half million went up

Page 205

16:13:51   1   to approximately 8 million?
16:13:53   2       MR. GERMAN: Objection. Form.
16:13:53   3       THE WITNESS: In the preliminary
16:13:55   4   discussions, they are valuing the practice. The question
16:13:58   5   was, were they going to assume certain equipment leases
16:14:02   6   and other liabilities of the business or not? And so in
16:14:07   7   the final executed contracts, they agreed to do that. And
16:14:11   8   at the time of closing, part of the money that you
16:14:15   9   referred to as $8 million, a significant portion of that
16:14:20  10   was wired to different vendors and things like that. The
16:14:27  11   ultimate amount of money that Dr. O received was well
16:14:32  12   below 8 million.
16:14:33  13   BY MR. BIENSTOCK:
16:14:34  14       Q. Well, the amount that went to pay off the leases
16:14:36  15   was approximately a million and a half, correct?
16:14:39  16       A. 1.6, I think. But fair enough.
16:14:42  17       Q. So she netted approximately 6.4 million from the
16:14:47  18   sale?
16:14:47  19       A. That'd be correct.
16:14:47  20       Q. Okay.
16:14:52  21       (Deposition Exhibit 8 was marked for
16:14:52  22       identification.)
16:14:52  23   BY MR. BIENSTOCK:
16:14:53  24       Q. Is Exhibit 8 what you called earlier, I believe,
16:15:00  25   the final agreement?

Bates, Donald                                      April 17, 2013

## Page 206

```
16:15:01    1     A.  Yes, sir.
16:15:09    2     Q.  And is that Dr. O's signature on the last page of
16:15:34    3   Exhibit 8 both as the owner/president of Desert Rose
16:15:38    4   Oncology and on her own behalf individually?
16:15:40    5     A.  Yes, it is.
16:15:41    6     Q.  Did she sign this in your presence?
16:15:44    7     A.  I'm sure that she did.
16:15:46    8     Q.  Okay.  Was there a closing meeting of any kind
16:15:53    9   with representatives of 21st Century?
16:15:56   10     A.  No, sir.
16:15:56   11     Q.  Okay.  And did this -- did Dr. O's signing occur
16:16:04   12   at her lawyer's office or somewhere else?  Do you recall?
16:16:15   13     A.  This doc- --
16:16:15   14         MR. GERMAN:  Form, foundation.
16:16:16   15         THE WITNESS:  This document was signed at
16:16:19   16   the cancer center.
16:16:20   17   BY MR. BIENSTOCK:
16:16:22   18     Q.  Okay.  And how was it delivered to 21st Century?
16:16:26   19     A.  My understanding is, is that it was delivered by
16:16:36   20   FedEx by either Dr. Ogandzhanova's attorney representing
16:16:45   21   the sale with 21st Century or their attorney, but it came
16:16:49   22   by messenger or FedEx.
16:16:52   23     Q.  Okay.  And this agreement is between an entity
16:16:55   24   called Arizona Radiation Therapy Management Services,
16:17:00   25   Inc., and Desert Rose Oncology, LLC, and Dr. O.  Do you
```

## Page 207

```
16:17:05    1   see that?
16:17:06    2     A.  I do.
16:17:06    3     Q.  This entity that was the buyer, is -- is it your
16:17:11    4   understanding that that's an affiliate of 21st Century?
16:17:15    5     A.  Yes.
16:17:15    6     Q.  Okay.  And this asset purchase agreement called
16:17:28    7   a sale of all tangible assets at -- at the cancer center
16:17:33    8   as well as all of the records and the goodwill and going
16:17:38    9   concern value of -- of the cancer center as a business?
16:17:41   10     A.  That is --
16:17:41   11         MR. GERMAN:  Form.
16:17:42   12         THE WITNESS:  That is correct.
16:17:43   13   BY MR. BIENSTOCK:
16:17:43   14     Q.  And it also transferred to 21st Century --
16:17:47   15   You're still comfortable calling the buyer 21st Century?
16:17:51   16     A.  Yes, that's fine.
16:17:52   17     Q.  -- various trade names?
16:17:54   18     A.  That's correct.
16:17:55   19     Q.  And those were trade names that you had
16:17:56   20   personally registered?
16:17:57   21     A.  That is correct.
16:17:58   22     Q.  And as part of the closing, you had to sign off
16:18:01   23   and transfer those trade names to 21st Century?
16:18:05   24     A.  Yes, sir.
16:18:05   25     Q.  And did you do that?
```

## Page 208

```
16:18:05    1     A.  I did.
16:18:07    2     Q.  And did you get any compensation for doing that?
16:18:08    3     A.  No, sir.
16:18:12    4     Q.  The final purchase price, as reflected on page 4
16:18:16    5   of Exhibit 8, was $7,975,130.39.  Is that correct?
16:18:23    6     A.  That's correct.
16:18:24    7     Q.  And the net to Desert Rose Oncology and
16:18:30    8   Dr. Ogandzhanova was $6,479,201?
16:18:35    9     A.  That is correct.
16:18:36   10     Q.  All right.  And the seller, if you turn to page
16:18:44   11   5, meaning Desert Rose Oncology and Dr. Ogandzhanova, were
16:18:51   12   responsible for any and all taxes and other charges
16:18:54   13   resulting from this transaction.  Is that correct?
16:18:56   14     A.  Of course.
16:18:57   15     Q.  Okay.  And have either of them paid any taxes as
16:19:00   16   a result of this transaction?
16:19:01   17         MR. GERMAN:  Foundation, form.
16:19:03   18         THE WITNESS:  I couldn't possibly know.
16:19:03   19   BY MR. BIENSTOCK:
16:19:09   20     Q.  Why not?
16:19:10   21     A.  You said "either of them."  Are you discussing
16:19:13   22   21st Century as well?
16:19:14   23     Q.  No.  The -- the seller, either Desert Rose
16:19:17   24   Oncology or Dr. Ogandzhanova, did either of them pay any
16:19:19   25   taxes as a result of the sale of the cancer center that
```

## Page 209

```
16:19:24    1   was consummated by Exhibit 8?
16:19:26    2     A.  I stated previously that I don't know whether she
16:19:29    3   filed taxes, and I, therefore, can't answer whether she
16:19:33    4   paid any taxes.
16:19:34    5     Q.  And is that also true for Desert Rose Oncology?
16:19:40    6     A.  We were discussing Desert Rose Oncology.
16:19:49    7     Q.  Well -- Okay.  Do you know, who was doing Desert
16:20:09    8   Rose Oncology's taxes in 2007?
16:20:15    9     A.  I...
16:20:15   10         MR. GERMAN:  Foundation, form.
16:20:16   11         THE WITNESS:  Not Mr. Dembowski, but I don't
16:20:18   12   know for sure.  I don't know.
16:20:21   13   BY MR. BIENSTOCK:
16:20:25   14     Q.  When was the last time Dr. O or Desert Rose
16:20:29   15   Oncology used Mr. Dembowski for the preparation of taxes?
16:20:33   16     A.  Again, I don't know, but the last time she used
16:20:37   17   Dembowski was just before the sale of -- for -- for
16:20:41   18   something, but I don't believe it involved taxes.
16:20:43   19     Q.  Well, you testified earlier that you were the one
16:20:47   20   who would provide Mr. Dembowski with the documentation and
16:20:52   21   materials he needed to file the taxes for Desert Rose
16:20:55   22   Oncology.  Is that correct?
16:20:56   23     A.  That's correct.  Yes.
16:20:57   24     Q.  Okay.  When was the last time you provided anyone
16:21:01   25   documents or information with which to provide -- file
```

# EXHIBIT 16

EXECUTION COPY

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT,** dated and effective as of March 12, 2007 (the "Agreement"), is between Arizona Radiation Therapy Management Services, Inc., an Arizona corporation ("Buyer") and Desert Rose Oncology, LLC, an Arizona limited liability company (the "Seller"). Inna Ogandzhanova, M.D. ("Ogandzhanova") is executing this Agreement for the purpose of binding Ogandzhanova to perform her obligations under Sections 8 and 9 and as otherwise expressly set forth herein.

## RECITALS

1.      Seller is engaged in the business of providing patient care services in the specialty of radiation therapy at a physician practice located at 1281 East Cottonwood Lane, Casa Grande, Arizona 85222 (the "Office"). The business, activities, ownership, operation and management of the Office pertaining or related to providing patient services in the specialty of radiation therapy shall be referred to as the "Business."

2.      Seller owns certain assets related to the Business.

3.      Buyer desire to acquire from Seller and Seller desires to sell to Buyer certain assets used in the Business.

4.      Buyer and Seller wish to set forth the terms under which Buyer shall acquire certain assets and assume certain liabilities of Seller and have each agreed to the transactions described herein and have agreed to enter into this Agreement and such other agreements as shall be necessary to effect the transactions contemplated hereby. This Agreement and such other agreements as shall be necessary to effect the transactions herein shall each be referred to herein individually as a "Transaction Document" and, collectively, as the "Transaction Documents."

**NOW, THEREFORE,** in consideration of the execution and delivery of the Transaction Documents, the sales, purchases and leases of property and services thereunder, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      Asset Purchase.

1.1      Assets Being Sold and Purchased.

(a)      Subject to and upon satisfaction or waiver of the terms and conditions of this Agreement, at the Closing (as defined in Section 2 herein), Seller shall transfer, sell, convey, assign (or cause to be assigned) and deliver to Buyer, pursuant to a Bill of Sale in the form attached hereto and made a part hereof as Exhibit 1.1(a) (the "Bill of Sale"), and Buyer shall purchase from Seller, all right, title and interest to and in Seller's assets used by, for and in connection with, the Business, as the same existed immediately prior to the Closing and reflected on the books and records of the Seller (the "Assets"), excluding only the specific assets set forth in Section 1.1(c) below, but including, without limitation, the following:

446264.08

Exhibit 8
Name: Bates
Meri Coash 4-17-13

MLOARTMSI000001

EXECUTION COPY

(i)        all tangible assets used in the Business whether owned or leased, including, without limitation, all instruments, medical equipment, supplies and office equipment and all fixtures and improvements;

(ii)       the leases and agreements set forth on <u>Schedule 1.1(a)(ii)</u> attached hereto (the "Assigned Agreements");

(iii)      all files, documents, instruments, papers, books and records relating to the Business, operations, condition of (financial or other) results of operations and assets and properties of Seller, including without limitation, patient lists, medical documentation, payor verification, mailing lists and related documentation; and

(iv)      all telephone numbers, facsimile numbers, electronic addresses and passwords used in connection with the Business; and

(v)       while not a registered assumed name of the Seller (such assumed name is registered to an immediate family member of Ogandzhanova), Seller has utilized the following trade names in commerce: "Desert Oasis Cancer Center"; "Casa Grande Cancer Center"; Casa Grande Valley Regional Cancer Center"; "Casa Grande Valley Cancer Center"; "Valley Cancer Center of Casa Grande"; "Desert Oasis Oncology Center"; "Cancer Services of Casa Grande"; "Casa Grande Regional Cancer Center"; and "Desert Oasis Cancer Center of Casa Grande" (collectively, the "Seller Trade Names");

(vi)      all other assets and property of the Seller used or held for use in connection with the Business, including, without limitation, the goodwill and going concern value of the Assets and the Business.

(b)        At Closing, Seller shall permit Buyer to take physical possession of all of the Assets at the locations where they are then located.

(c)        Notwithstanding anything to the contrary herein, the following assets of Seller are not being sold hereunder and shall not be included in the term "Assets":

(i)        the assets described on <u>Schedule 1.1(c)(i)</u> hereto;

(ii)       any accounts receivable of Seller existing as of the Closing Date;

(iii)      any contract of Seller that is not listed on <u>Schedule 1.1(a)(ii)</u> hereto under the heading "Assigned Agreements" and is not used or required as part of the day-to-day operations of the Business;

(iv)      any accounts payable of Seller;

(v)       all cash, cash equivalents, securities and short-term investments held by Seller; and

446264.08

MLOARTMSI000002

(vi)     all of Seller's non-transferable permits and licenses used in the Business.

(d)     Seller shall transfer, convey and assign to Buyer, Seller's title to all of the Assets at the Closing, free and clear of any liens, pledges, charges, mortgages, security interests, restrictions, easements, liabilities, claims, encumbrances or right of others of every kind and description (collectively, "Liens"), except for those Liens listed on Schedule 1.1(d) hereto, said Liens so listed being herein called the "Permitted Liens."

1.2     Liabilities.

(a)     Liabilities Not Assumed.  Except as specifically provided herein and in Section 1.2(b) below, Buyer shall not assume, pay, honor, discharge or otherwise become responsible for any liabilities or obligations of Seller, and all such liabilities and obligations shall remain solely those of Seller, and Seller shall pay, perform and discharge, all such obligations and liabilities of Seller promptly when due in accordance with their terms.  Without limiting the generality of the preceding sentence and except as specifically provided in Section 1.2(b), Buyer shall not assume or become responsible for:

(i)     any liabilities or obligations of Seller including, without limitation, any personal obligations of any shareholder of Seller incurred in any capacity, including those arising out of any claim, litigation or proceeding, or any contract, license, commitment or other agreement relating to the operations of the Business or the occurrence of any event on or before the Closing including, without limitation, accounts payable of the Business;

(ii)     any obligations, liabilities, undertakings, Liens (other than Permitted Liens) or restrictions to which the Assets or the Business are subject and that are not disclosed in writing in this Agreement;

(iii)     any liability or obligation arising out of or related to past, present or future actions, litigations, suits, enforcement actions, proceedings, arbitrations or governmental or regulatory authority investigations, audits or otherwise, including, without limitation, demand or directive letters or correspondence, or of notice regarding any of the foregoing involving the Assets, the Business, Seller or any shareholder of Seller to the extent the foregoing relate to events, acts or omissions arising on or before the Closing;

(iv)     any liability or obligation, in contract, tort or for violation of any law by Seller or any officer, director, shareholder, employee or agent of Seller that arises out of or results from any act, omission, occurrence or state of facts on or before the Closing, and any liability or obligation, in contract, tort or for violation of any law solely by Seller or any officer, director, shareholder, member, employee or agent of Seller that arises out of or results from any act, omission, occurrence or state of facts after the Closing;

(v)     any compensation obligations or any liabilities or obligations of Seller arising out of or in connection with any employee benefit plan of Seller or any other liabilities or obligations of Seller to any employees with respect to his or her service to the Business on or before the Closing, including but not limited to any liability or obligation for

3

MLOARTMSI000003

any severance pay due any employee of Seller upon his or her termination of employment and any and all accrued vacation and/or sick leave, bonuses and other benefits to the extent that such liabilities or obligations are owed as a result of acts, omissions, occurrences or state of facts on or before the Closing;

(vi)    any liabilities or obligations of Seller for indebtedness for borrowed money, including, but not limited to, any and all liabilities and obligations related to real estate financings and any and all obligations to any secured party in connection with any of the Assets;

(vii)    subject to Section 1.3(c), any liabilities or obligations of Seller for any type of taxes owed by Seller whatsoever;

(viii)    any and all Medicare, Medicaid and other third party payor obligations arising from any acts or omissions for any period prior to the Closing, including without limitation, any retroactive denial of claims, civil monetary penalties or any gain on sale that may be recognized by any of the foregoing as a result of the transactions, contemplated herein; or

(ix)    any other liabilities or obligations of any nature relating to the operations of the Business or the occurrence of any event on or before the Closing, whether known or determined as of the Closing or unknown or undetermined as of the Closing.

(b)    Liabilities Assumed.  Subject to the terms and conditions set forth in this Agreement, effective as of the Closing Date, the Buyer shall assume and agree to pay, perform and discharge, when due, the obligations of Seller under the Assigned Agreements to the extent such obligations arise after the Closing and relate to rent, or goods or services sold or provided after the Closing.  Those liabilities assumed by the Buyer pursuant to this Section 1.2(b) are referred to herein as the "Assumed Liabilities."

1.3    Purchase Price.

(a)    As consideration for the sale, assignment, conveyance, transfer and delivery of the Assets, Buyer shall pay to Seller an amount equal to Seven Million Nine Hundred Seventy Five Thousand One Hundred Thirty and 39/100 Dollars ($7,975,130.39) (the "Purchase Price"), which amount shall be paid by wire transfer of immediately available funds as follows:

(i)    $6,479,201.00, to Seller to an account as Seller shall designate in writing or by email to Buyer's counsel;

(ii)    $1,318,658.80, to GE Commercial Finance Healthcare Financial Services ("GE") to an account designated by GE, at the Seller's direction and on behalf of the Seller; and

(iii)    $177,270.59, to Philips Medical Capital ("Philips") to an account designated by Philips, at the Seller's direction and on behalf of the Seller.

4

446264.08

MLOARTMSI000004

EXECUTION COPY

(b)      Each party hereto agrees (a) that the Purchase Price for the Assets will be allocated for all federal and state tax purposes (including but not limited to, income, excise, sales, use, personal property and transfer taxes, and otherwise) among the Assets in accordance with Schedule 1.3(b) attached hereto and made a part hereof which is in accordance with Section 1060 of the Internal Revenue Code, (b) to file separately a Federal Form 8594 with its Federal Income Tax Return consistent with such allocation for the tax year in which the Closing Date occurs, and (c) that no party will take a position on any tax returns or filings with any governmental or regulatory authority charged with the collection of taxes or having jurisdiction over the transaction contemplated hereunder or in any judicial proceeding, that is in any manner inconsistent with the terms of the allocation set forth on Schedule 1.3(b). Seller shall be responsible for any and all taxes and other charges resulting from this transaction.

(c)      All utilities charges, real estate and personal property taxes, monthly rental payments under any leases assumed by Buyer pursuant to this Agreement, amounts prepaid or payable in respect of contracts and agreements assumed by Buyer pursuant to this Agreement and similar prepaid items and similar accrued expenses, shall be prorated between the Seller and Buyer as of 11:59 p.m. on the day immediately preceding the Closing Date.

2.      Closing.   The closing of this transaction (the "Closing") shall take place by telephone, mail, electronic mail and/or facsimile or at a location mutually agreed upon. The date on which the Closing takes place is referred to herein as the "Closing Date."

3.      Representations and Warranties of Seller. In order to induce Buyer to enter in this Agreement and to consummate the transactions contemplated by this Agreement, Seller and Ogandzhanova represents and warrants to Buyer as of the date hereof and as of the Closing Date as follows:

3.1      Organization, Qualification and Authority.

(a)      Seller is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Arizona and is in good standing as a foreign corporation in all jurisdictions in which it conducts business or owns assets. Seller's execution and delivery of this Agreement and each of the other Transaction Documents delivered at the Closing, and the performance by Seller of the transactions contemplated hereby and thereby, have been duly authorized by all necessary actions and proceedings of the Seller. This Agreement and each of the other Transaction Documents executed and delivered by the Seller at the Closing are valid and legally binding upon the Seller and are enforceable against it in accordance with its terms.

(b)      The Seller has full limited liability company power and authority to execute and deliver this Agreement and each other Transaction Document to which it is a party, to perform its obligations under this Agreement and each other Transaction Document, and to consummate the transactions contemplated under this Agreement and each other Transaction Document, including, without limitation, to sell and transfer the Assets and the Business pursuant to this Agreement. The Seller has taken all necessary limited liability company action to execute and deliver this Agreement and each other Transaction Document to

5

446264.08

MLOARTMSI000005

EXECUTION COPY

which it is a party, to authorize its officers, directors and all other authorized personnel to execute and deliver this Agreement, and to execute and deliver such further documents as are necessary and proper to consummate the terms and provisions of this Agreement. The execution and delivery by the Seller of this Agreement and each other Transaction Document to which it is a party, and the performance by the Seller of its obligations hereunder and thereunder, have been duly and validly authorized by the members of the Seller. This Agreement and each other Transaction Document to which the Seller is a party have been duly and validly executed and delivered by the Seller and constitute the legal, valid and binding obligations of the Seller enforceable against the Seller in accordance with the terms of the Agreement and each of the other Transaction Documents.

(c)     Ogandzhanova is the sole owner of all of the issued and outstanding membership interests of Seller.  There are no outstanding agreements, options, warrants, rights, contracts, calls, puts or other agreements or commitments providing for the disposition or acquisition of any of the shares of Seller.

3.2     Title to the Assets.

(a)     Seller has good and marketable title to the Assets.  With regard to those Assets in which Seller possesses leasehold interests, such leasehold interests are valid and transferable (in certain cases, with Lessor's consent) in accordance with the terms of this Agreement, except as set forth on Schedule 3.2(a).  Upon the sale, assignment, transfer and conveyance of the Assets to Buyer as contemplated under this Agreement, there will be vested in Buyer good and marketable title to all of the Assets, free and clear of all Liens other than Permitted Liens, and there are no adverse conditions that will interfere with Buyer's use and enjoyment of or ability to encumber any of the Assets in any respect or that will impede Buyer's ability to use the Assets in connection with the provision of patient care services in the specialty of radiation therapy.

(b)     Except as indicated on Schedule 3.2(b), none of the Assets is subject to any Lien.  All Liens set forth on Schedule 3.2(b), other than the Permitted Liens set forth on Schedule 1.1(d) have been terminated and/or released on or prior to the Closing Date.

(c)     Seller is not obligated to offer any individual or entity the opportunity to purchase any Assets prior to or simultaneously with offering the Buyer the opportunity to purchase the Assets that has not been expressly waived by such person or entity prior to Closing.  No person or entity has a right of first refusal or a right of participation with respect to the sale of any of the Assets by Seller that has not been expressly waived by such person or entity prior to Closing.  All notices required to be provided by Seller to any individual or entity in connection with the sale of any of the Assets have been timely provided by the Seller or have been expressly waived prior to Closing and all such notices, to the extent provided, were complete and accurate.

(d)     Except as set forth in Schedule 3.2(d) attached hereto, as of the Closing Date, the Assets are free of defects and deficiencies, in good operating condition and repair, normal wear and tear excepted, and suitable for the purposes used, are adequate and sufficient for the operations and conduct of the Business as currently operated, and comply with

446264.08

MLOARTMSI000006

and are being operated and otherwise used in full compliance with all material laws, ordinances, statutes, regulations and other legal requirements applicable to such Assets.

3.3     Violation of Other Instruments.   Except as set forth in Schedule 3.3 attached hereto, neither the execution and delivery of this Agreement or any other Transaction Document, nor the consummation of the transactions contemplated hereby or thereby, violates: (i) any agreement of Seller, (ii) the certificate of formation or any governing documents of the Seller or (iii) any statute, ordinance, regulation, order, judgment or decree of any court or governmental agency or board, or conflicts with or will result in any breach or acceleration of any of the terms of or will constitute a default under or result in the termination of or the creation of any Lien pursuant to the terms of any contract or agreement to which Seller is a party or by which Seller or any of the Assets is bound.   No consents, approvals or authorizations of, or filings with, any governmental authority or any other person or entity are required to be obtained by Seller in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, except for required consents set forth in Schedule 3.3.

3.4     Legal Matters.  Except as set forth in Schedule 3.4 attached hereto, there are no suits, actions, claims, investigations, administrative proceedings or other proceedings, criminal, civil, or quasi civil, pending or threatened by or against the Business, the Assets or Seller.  Seller knows of no facts or circumstances that could reasonably be expected to give rise to any claim, investigation, administrative proceeding or other proceeding, criminal, civil, or quasi civil that would be required to be disclosed under this Section 3.4.   To the Seller's knowledge, Seller is not in default under any, and Seller has complied with all, statutes, ordinances, regulations, orders, judgments and decrees of any court or governmental entity or agency, applicable to the Seller, the Business, or the Assets.

3.5     Compliance with Applicable Law.

(a)     General.  Seller is not default under any, and Seller has complied with all, statutes, ordinances, regulations, orders, judgments and decrees of any court or governmental entity or agency, applicable to Seller, the Business or the Assets, including, without limitation, all laws, statutes and regulations related or incident to the licensure, credentialing and certification of providers of professional medical services, physicians and health professionals, health and safety matters, employment and labor laws, health laws and regulations and Medicare and Medicaid regulations.  Seller has no knowledge of any basis for assertion of any violation of the foregoing or for any claim for compensation or damages or otherwise arising out of any violation of the foregoing.  Seller has not received any notification of any asserted present or past failure to comply with any of the foregoing that has not been satisfactorily responded to in the time period required thereunder.

(b)     Medicare and Medicaid.  Seller and each employee of Seller is in compliance with all laws, rules and regulations of Medicare, Medicaid and other governmental health care programs, and has filed all claims and other forms in the manner prescribed by such laws, rules and regulations.  Except as set forth on Schedule 3.5(b), neither the Seller nor any Seller employee has been subject to any audit relating to improper and/or fraudulent Medicare or Medicaid procedures or practices.  There is no basis for any claim or request for recoupment or reimbursement from Seller or any Seller employee, or for reimbursement by Seller or any Seller

employee of, any federal or state agency or instrumentality or other provider reimbursement entities relating to Medicare or Medicaid. No deficiency (either individually or in the aggregate) in any such claims, returns, invoices, cost reports and other filings, including claims for overpayments or deficiencies for late filings, has been asserted or threatened by any federal or state agency or instrumentality or other provider reimbursement entities relating to Medicare or Medicaid claims or any other third party payor and there is no basis for any claims or requests for reimbursement.

(c)     Permits. Set forth in Schedule 3.5(c) attached hereto is a complete and accurate list of all licenses, certificates, permits, approvals, franchises, notices and authorizations issued by governmental entities or other regulatory authorities, federal, state or local (collectively, the "Permits"), held by Seller. To the knowledge of Seller, the Permits set forth in Schedule 3.5(c) are all the Permits required for the conduct of the Business as currently operated. All the Permits set forth in Schedule 3.5(c) are in full force and effect. The Seller has not engaged in any activity that, to the knowledge of Seller, would cause or permit revocation or suspension of any Permit, and no action or proceeding seeking to or contemplating the revocation or suspension of any Permit is pending or, to the knowledge of Seller, threatened. There are no existing defaults or events of default or events or state of facts which, with notice or lapse of time or both, would constitute a material default by the Seller under any Permit. The Seller has no knowledge of any material default or claimed or purported or alleged material default or state of facts which with notice or lapse of time or both would constitute a material default on the part of any party in the performance of any obligation to be performed or paid by any party under any Permit. Except as set forth in Schedule 3.5(c), to the knowledge of Seller, the consummation of the transactions contemplated hereby and in each of the other Transaction Documents will in no way affect the continuation, validity or the effectiveness of the Permits or require the consent of any person or entity.

(d)     Arizona Law. Neither the Seller nor the Business is required to hold a Certificate of Need or similar designation, license or permit (an "Arizona License") from the Arizona Department of Health Services or any other entity having jurisdiction over the Seller or the Business. Except for required approvals of any governmental agency with regard to the transfer of any Permit, the consummation of the transactions contemplated hereby will in no way affect the continuation, validity or effectiveness of the Permits set forth in Schedule 3.5(c) or require the consent of any person or entity or require Buyer or any affiliate thereof to obtain an Arizona License.

3.6     Agreements. Schedule 3.6 attached hereto contains a true, complete and accurate list of all those contracts and other agreements to which Seller is a party, related, in each case only to the Business or the Assets, or by or to which Seller's assets or properties are bound or subject as such instruments relate to the Business, including without limitation, those which: (i) are for the purchase or sale of materials, supplies, equipment, inventory or services; (ii) are franchise or other royalty contracts or similar contracts material to the Business; (iii) are contracts for the grant to any person of any preferential rights to purchase any of Seller's assets or properties; (iv) are leases of real or personal property with respect to the Business; (v) are capital or other leases relating to any Assets; (vi) are employment, personal service, or other executory contracts; or (vi) are material to the business or are contracts to be assigned to Buyer which do not fit into one of the aforementioned categories (the "Material Agreements"). The

446264.08

MLOARTMSI000008

Material Agreements shall be organized on Schedule 3.6 under the following two headings: "Assigned Agreements" and "Material Agreements Not Assumed by Buyer."

3.7   Third Party Reimbursement.   Complete copies of all third party reimbursement agreements relating to the operation of the Business (the "Reimbursement Agreements") that are currently in force have been delivered to Buyer prior to the execution of this Agreement.  There are no facts or circumstances that could result in (i) the cancellation or non-renewal of any Reimbursement Agreement; or (ii) any retroactive adjustment by any payor under any Reimbursement Agreement.

3.8   Fraud and Abuse; False Claims.   Except as set forth and described in Schedule 3.8, Seller has not engaged in any activities that are prohibited under 42 U.S.C. §§ 1320a-7, 1320a-7a, 1320a-7b, 1395nn, and 1396b, 31 U.S.C.  § 3729-3733, and the federal Champus statute (or other federal or state statutes related to false or fraudulent claims) or the regulations promulgated thereunder pursuant to such statutes, or related state or local statutes or regulations, or which are prohibited by rules of professional conduct, including but not limited to the following:  (a) knowingly and willfully making or causing to be made a false statement or representation of a fact in any application for any benefit or payment; (b) knowingly and willfully making or causing to be made any false statement or representation of a fact for use in determining rights to any benefit or payment; (c) failing to disclose knowledge by a claimant of the occurrence of any event affecting the initial or continued right to any benefit or payment on its own behalf or on behalf of another, with intent to fraudulently secure such benefit or payment; and (d) knowingly and willfully soliciting or receiving any remuneration (including any kickback, bribe or rebate), directly or indirectly, overtly or covertly, in cash or in kind or offering to pay or receive such remuneration (i) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part by Medicare or Medicaid, or (ii) in return for purchasing, leasing, or ordering or arranging for or recommending purchasing, leasing, or ordering any good, Office, service or item for which payment may be made in whole or in part by Medicare or Medicaid. Seller has no knowledge of any facts or circumstances which could result in any claim by Medicare, Medicaid or any other Payor for any retroactive adjustments.

3.9   Rates and Reimbursement Appeals.  Neither Seller nor any employee of Seller has any reimbursement or payment rate appeals, disputes or contested positions currently pending before any governmental authority or any administrator of any Payor Programs with respect to the Business.

3.10   Insurance.   Seller maintains insurance policies covering all of its respective properties and assets and the various occurrences that may reasonably arise in connection with the operation of the Business.  Such policies are in full force and effect and all premiums due thereon prior to or on the Closing Date have been paid in full.  Seller has complied with all the provisions of such policies.  Such insurance is of comparable amounts and coverage as that which companies engaged in similar businesses maintain.  A complete list and brief description of the insurance policies, including limits of coverage, maintained by Seller in connection with the Business is set forth in Schedule 3.10 attached hereto.  There are no notices of any pending or threatened termination or premium increases with respect to any of such policies.  Except as set forth on Schedule 3.10, Seller has not had any casualty loss or occurrence

9

that may give rise to any claim of any kind not covered by insurance and Seller is not aware of any occurrence which may give rise to any claim of any kind not covered by insurance. Except as set forth on Schedule 3.10, no third party has filed any claim against Seller for personal injury or property damage of a kind for which liability insurance is generally available which is not fully insured, subject only to the standard deductible. All claims against Seller that are covered by insurance have been reported to the insurance carrier on a timely basis.

3.11    Brokers.  Buyer shall not have any obligation to pay any fee or other compensation to any person, firm or corporation hired by, or otherwise dealt with by, Seller in connection with this Agreement and the transactions contemplated hereby, and Seller hereby agrees to indemnify and hold Buyer harmless from any liability, damage, cost or expense arising from any claim for any such fee or other compensation.

3.12    Books and Records.  The books and records of Seller are complete and correct, have been maintained in accordance with good business practices and accurately reflect the basis for the financial position and results of operations of Seller set forth in the Financial Statements. All of such books and records, including true and complete copies of all written contracts, have been made available for inspection by Buyer and its representatives.

3.13    Leased Real Property.  A list and description of all real property leased to or by Seller in connection with the Business or in which Seller has any interest in connection with the Business is set forth in Schedule 3.13 attached hereto (the "Leased Real Property"). The Leased Real Property is held subject to written leases or other agreements which are valid and effective in accordance with their respective terms, and, to the best knowledge of Seller, there are no existing defaults or events of default, or events which with notice or lapse of time or both would constitute defaults thereunder on the part of Seller. Seller has no knowledge of any default or claimed or purported or alleged default or state of facts which, with notice or lapse of time or both, would constitute a default on the part of any other party in the performance of any obligation to be performed or paid by such other party under any lease. Seller has not received any notice to the effect that any lease with respect to the Office (the "Office Lease"), (i) will not be renewed at the termination of the term thereof or that such Office Lease will be renewed only at a substantially higher rent or (ii) will not be assigned or subleased to Buyer on substantially the same terms and conditions set forth in the Office Lease as of the date hereof.

3.14    Financial Statements.  Seller has delivered to the Buyer copies Seller's internal financial statements of the Seller for the periods ended December 31, 2004; December 31, 2005 and December 31, 2006 (collectively, the "Financial Statements"). Except for the variations expressly noted in Schedule 3.14 hereto, all of the Financial Statements have been prepared from the financial records of the Seller in accordance with generally accepted accounting principles, consistently applied and fairly present the financial condition of the Seller, as at their respective dates and the respective results of the operations of the Seller and of the Business, for the periods covered thereby. The Financial Statements do not contain any items of special or nonrecurring income or any other income not earned in the ordinary course of business except as expressly specified therein, and include all adjustments, which consist only of normal recurring accruals, necessary for such fair presentation

446264.08

MLOARTMSI000010

3.15    Office.

(a)    The buildings, appurtenances and fixtures comprising the Office are in good operating condition, normal wear and tear excepted, and are in the aggregate sufficient to satisfy the current business activities as conducted there.

(b)    The Office: (i) has direct access to public roads or access to public roads by means of a perpetual access easement, such access being sufficient to satisfy the current and reasonably anticipated transportation requirements of the Business as presently conducted at such parcel; and (ii) are served by all utilities in such quantity and quality as are sufficient to satisfy the current sales levels and business activities as conducted at such locations.

(c)    The Seller has received no notice of any condemnation proceeding or special assessment with respect to any portion of the Office or any access thereto, and, to the knowledge of Seller, no proceedings or special assessments are contemplated or pending by any governmental or regulatory authority.

3.16    Employees. Set forth in Schedule 3.16 is a list of all employees of Seller and their respective positions, job categories, salaries and accrued benefits. Except as set forth in Schedule 3.16, the transactions contemplated by this Agreement will not result in any liability for severance pay to any employee or independent contractor of the Seller. Except as set forth in Schedule 3.16, the Seller has not informed any employee or independent contractor providing services to the Seller that such person will receive any increase in compensation or benefits or any ownership interest in the Seller as a result of the transactions contemplated hereby.

3.17    Labor Relations. There have been no violations of any federal, state or local statutes, laws, ordinances, rules, regulations, orders or directives with respect to the employment of individuals by, or the employment practices or work conditions of, Seller, or the terms and conditions of employment, wages and hours. Seller is not engaged in any unfair labor practice or other unlawful employment practice and there are no outstanding charges of unfair labor practices or other employee-related complaints pending or, to the knowledge of Seller, threatened against Seller before the National Labor Relations Board, the Equal Employment Opportunity Commission, the Occupational Safety and Health Review Commission, the DOL or any other federal, state, local or other governmental authority. There is no strike, picketing, slowdown or work stoppage or organizational attempt pending or, to the knowledge of Seller, threatened against or involving any or the Business. No issue with respect to union representation is pending or, to the knowledge of Seller, threatened with respect to the employees of Seller. No union or collective bargaining unit or other labor organization has ever been certified or recognized by Seller as the representative of any of the employees of Seller.

3.18    Absence of Undisclosed Liabilities. Seller has no liabilities or other obligations of any nature arising out of or relating to the Business or the Assets except as otherwise disclosed herein or as reflected on the Seller's financial statements previously delivered to the Buyer, and liabilities and obligations incurred in the ordinary course of business since the date thereof.

11

446264.08

MLOARTMSI000011

3.19  <u>True and Correct Representations and Warranties and Statements of Facts.</u> No representation or warranty made by Seller in this Agreement or in any of the Transaction Documents is false or inaccurate in any material respect, and no statement of material fact made by Seller herein or therein contains any untrue statement of material fact or omits to state any material fact of which Seller is aware that is necessary in order to make the statement not misleading in any material respect.

3.20  <u>Schedules.</u>  All Schedules attached hereto are integral parts of this Agreement and are true, complete and correct in all material respects. Nothing in a Schedule shall be deemed adequate to disclose an exception to a representation or warranty made herein, unless the Schedule identifies the exception with reasonable particularity and describes the relevant facts in reasonable detail, including by explicit cross reference to another Schedule to the Agreement. Seller is responsible for preparing and arranging the Schedules corresponding to the lettered and numbered paragraphs contained in this Agreement.

4.  <u>Representations and Warranties of Buyer.</u>  In order to induce Seller to enter in this Agreement and to consummate the transactions contemplated by this Agreement, Buyer represents and warrants to Seller as of the date hereof and as of Closing Date, the following:

4.1  <u>Legal Status.</u>  Buyer is a corporation organized, validly existing and in good standing under the laws of the State of Arizona. Buyer's execution and delivery of this Agreement and each of the other Transaction Documents and the performance by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all necessary actions and proceedings. This Agreement is valid and legally binding upon the Buyer and is enforceable against the Buyer in accordance with its terms. The Buyer has full corporate power and authority to execute and deliver this Agreement and each other Transaction Document to which it is a party, to perform its obligations under this Agreement and each other Transaction Document, and to consummate the transactions contemplated under this Agreement and each other Transaction Document. The Buyer has taken all necessary corporate action to execute and deliver this Agreement and each other Transaction Document to which it is a party, to authorize its officers to execute and deliver this Agreement, and to execute and deliver such further documents as are necessary and proper to consummate the terms and provisions of this Agreement. The execution and delivery by the Buyer of this Agreement and each other Transaction Document to which it is a party, and the performance by the Buyer of its obligations hereunder and thereunder, have been duly and validly authorized by the Buyer. This Agreement and each other Transaction Document to which the Buyer is a party have been duly and validly executed and delivered by the Buyer and constitute the legal, valid and binding obligations of the Buyer enforceable against the Buyer in accordance with the terms of the Agreement and each of the other Transaction Documents.

4.2  <u>No Legal Bar; Conflicts.</u>  Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby, violates any provision of the certificate of incorporation or by-laws of Buyer or, to the Buyer's knowledge, any statute, ordinance, regulation, order, judgment or decree of any court or governmental agency, or, to the Buyer's knowledge, conflicts with or will result in a breach of any of the terms of or will constitute a default under or result in the termination of or the creation of a lien

12

EXECUTION COPY

pursuant to the terms of any contract or agreement to which the Buyer is a party or by which the Buyer or any of its respective assets is bound.

4.3     Brokers.  The Seller shall have no obligation to pay any fee or other compensation to any person, firm or corporation hired by, or otherwise retained by, the Buyer in connection with this Agreement and the transactions contemplated hereby, and the Buyer hereby agrees to indemnify and hold Seller harmless from any liability, damage, cost or expense arising from any claim for any such fee or other compensation.

5.     Intentionally deleted.

6.     Delivery of Documents.

6.1     Delivery of Buyer's Documents.  At the Closing, Buyer shall deliver to Seller the following documents, any of which may be waived by Seller in its discretion:

(a)     the Purchase Price;

(b)     the Assignment and Assumption Agreement attached hereto as Exhibit 6.1(b) executed by Buyer with respect to all Assigned Agreements and Assumed Liabilities (the "Assignment and Assumption Agreement");

(c)     the Management Services Agreement by and between Seller and Buyer attached hereto as Exhibit 6.1(c) executed by Buyer (the "Management Services Agreement"); and

(d)     the Professional Services Agreement by and between Seller and Advanced Radiotherapy, PLLC attached hereto as Exhibit 6.1(d), executed by Advanced Radiotherapy, PLLC (the "Professional Services Agreement").

6.2     Delivery of Seller's Documents.  At the Closing, Seller shall deliver to Buyer the following documents, any of which may be waived by the Buyer in its discretion:

(a)     certified copies of the written authorization of Seller authorizing the sale of the Assets pursuant hereto, the execution and delivery of this Agreement and all other documents delivered in connection herewith by officers of Seller and the performance by Seller of its obligations hereunder and thereunder in accordance with the terms of this Agreement and a certificate of Seller dated as of the Closing Date confirming that such written authorization remains in full force and effect as of such date and confirming the authority of the individuals signing the Transaction Documents ("Seller's Officer's Certificate") and such other documents on behalf of Seller, together with the true signatures of such individuals;

(b)     the executed Bill of Sale;

(c)     the Assignment and Assumption Agreement executed by Seller;

(d)     with respect to the Seller Trade Names, the execution by the registered assignor;

446264.08

MLOARTMSI000013

     (e)     the Management Services Agreement executed by Seller; and

     (f)     the Professional Services Agreement executed by Seller.

     6.3    Third Party Consents.  The parties acknowledge that certain of the Material Agreements and the rights and benefits thereunder may not, by their terms, be assignable.  Notwithstanding anything contained herein or in the Assignment and Assumption Agreement to be executed and delivered in connection herewith, this Agreement shall not constitute an agreement to assign any such Material Agreement and Buyer shall not be deemed to have assumed the same or to be required to perform any obligations thereunder, if an attempted assignment thereof, without the consent of a third party thereto would constitute a breach thereof or in any way affect the rights of Seller or any Buyer under any such Material Agreement.  In such event, Seller shall cooperate with Buyer and use commercially reasonable efforts to provide for Buyer all benefits to which Seller is entitled under such Material Agreement; provided however, that as to any Assigned Agreement set forth on Schedule 3.6, the assignment of which by its terms requires the prior written consent of any third party thereto, in the event such consent is not obtained within thirty (30) days following the Closing Date, Buyer shall have the right to refuse assignment of such Material Agreement.

     7.    Conditions Precedent to the Obligations of Buyer.  The obligations of Buyer to enter into and complete the transaction contemplated by this Agreement and each of the other Transaction Documents is subject to the fulfillment on or prior to the Closing Date of the following conditions, any one or more of which may be waived by the Buyer in its sole discretion:

     7.1    Governmental Licenses, Permits and Approvals.  Any and all permits and approvals from any governmental or regulatory body required for the Buyer and/or Seller to lawfully enter into this Agreement or consummate the Closing of the transactions contemplated in the Transaction Documents shall have been obtained by such party.  Further, Buyer shall have obtained any and all licenses, permits, provider numbers, consents, approvals and waivers required to operate the Business and the Office immediately after the Closing.

     7.2    Authority and Third Party Consents.  Seller and Buyer shall have obtained all consents and authorizations necessary to complete the transactions contemplated in this Agreement and the Transaction Documents.  All consents, permits and approvals from parties to any Assigned Agreements which may be required in connection with the performance by Seller of its respective obligations under this Agreement and the Transaction Documents, or to assure the continuance of such contracts or other agreements in full force and effect after the Closing Date (without any material breach by Seller and without giving any contracting party the right to terminate or modify) shall have been obtained by Seller.

     7.3    Litigation.  No action, suit or proceeding shall have been instituted before any court or governmental agency or regulatory body or instituted or threatened by any governmental or regulatory body to restrain or prevent the carrying out of the transactions contemplated hereby or to seek damages in connection with such transactions.

14

MLOARTMSI000014

7.4    Documents Satisfactory. All proceedings to be taken and all documents to be executed and delivered by Seller in connection with the consummation of the transactions contemplated hereby shall be reasonably satisfactory as to form and substance to Buyer and its counsel.

7.5    Due Diligence Analysis. The Closing of the transactions contemplated hereby shall be expressly contingent upon Buyer's completion of the Due Diligence Analysis and the results of such Due Diligence Analysis being satisfactory to Buyer in its sole and unfettered discretion.

8.    Non-Compete and Non-Solicitation.

8.1    For a period of three (3) years following the Closing, Seller and Ogandzhanova agree that neither shall permit any person or entity, directly or indirectly (alone or together with others) controlling, controlled by, affiliated with or related to Seller or Ogandzhanova to, directly or indirectly (including through ownership, management, operation or control of any other person or entity, or participation in the ownership, management, operation or control of any other person or entity, or by being connected with or having any interest in, as a stockholder, agent, consultant or partner, any other person or entity):

(a)    engage in the ownership, operation, control or management of radiation oncology facilities or otherwise engage in the provision of radiation oncology services (whether as a separate business or in conjunction with each other or with any business or practice) (a "Competing Business") within forty-five (45) mile radius of the Office (the "Service Area");

(b)    have any interest, whether as owner, stockholder, member, partner, director, officer, consultant or otherwise, in any Competing Business in the Service Area; provided, however, that the foregoing restriction shall not prevent Seller or Ogandzhanova from owning stock in any Competing Business listed on a national securities exchange or traded in the over-the-counter market; provided that such Seller does not own more than an aggregate of one percent (1%) of the stock of such entity.

8.2    Seller and Ogandzhanova acknowledge that the restrictive covenants contained herein have unique value to Buyer, the breach of which cannot be adequately compensated in an action of law. Seller and Ogandzhanova further agree that, in the event of the breach of the restrictive covenants contained herein, Buyer shall be entitled to obtain appropriate equitable relief, including, without limitation, a permanent injunction or similar court order enjoining Seller or Ogandzhanova from violating any of such provisions, and that pending the hearing and the decision on the application for permanent equitable relief, Buyer shall be entitled to a temporary restraining order and a preliminary injunction. The prevailing party shall be entitled to reimbursement from the other party of its reasonable costs and expenses (including attorneys' fees and disbursements) of, or related to, such action or proceeding. No such remedy shall be construed to be the exclusive remedy of Buyer and any and all such remedies shall be held and construed to be cumulative and not exclusive of any rights or remedies, whether at law or in equity, otherwise available under the terms of this Agreement, at common law, or under federal, state or local statutes, rules and regulations.

15

MLOARTMSI000015

EXECUTION COPY

8.3     The parties acknowledge and agree that the restrictions set forth in Section 8.1 shall not apply to the Management Services Agreement or Professional Services Agreement.

9.     Indemnification.

9.1     Indemnification of Buyer  Seller and Ogandzhanova hereby agree, jointly and severally, to indemnify and hold harmless Buyer and its respective officers, directors, members, employees, agents, representatives and affiliates from and against all claims, suits, obligations, liabilities, damages and expenses, including, without limitation, reasonable attorneys' fees ("Losses"), based upon, arising out of or resulting from:

(a)     any breach of Seller's representations, warranties, covenants or agreements contained herein or in any Transaction Document or in any other agreement or document delivered to any Buyer pursuant hereto;

(b)     any obligation, contract or liability of Seller not constituting one of the Assumed Liabilities;

(c)     any and all claims of any third party for alleged liabilities or obligations of Seller related to or occurring during the period prior to the Closing, other than those specifically assumed by Buyer hereunder as Assumed Liabilities;

(d)     any and all claims of any third party, including without limitation, any interest holder in Seller, related to the distribution of all or any portion of the Purchase Price;

(e)     any and all claims brought by any employee of Seller relating to periods prior to the Closing; and

(f)     any and all actions, suits, proceedings, claims, demands, assessments, judgments, costs and expenses, including without limitation, reasonable attorneys' fees and expenses, incident to any of the foregoing or incurred in attempting to oppose the imposition thereof, or in enforcing this indemnity.

9.2     Indemnification of Seller.  Buyer hereby agrees to indemnify and hold harmless Seller and its officers, directors, employees, agents, representatives and affiliates from and against all Losses based upon, arising out of or resulting from:

(a)     any breach of any Buyer's representations, and any of any Buyer's, warranties, covenants or agreements contained herein or in any Transaction Document or in any other agreement or document delivered to Seller pursuant hereto;

(b)     any obligation, contract or liability constituting one of the Assumed Liabilities;

(c)     any and all claims of any third party for alleged liabilities or obligations of the Buyer related to or occurring during the period after the Closing;

16

446264.08

MLOARTMSI000016

(d)     any and all actions, suits, proceedings, claims, demands, assessments, judgments, costs and expenses, including without limitation, reasonable attorneys' fees and expenses, incident to any of the foregoing or incurred in attempting to oppose the imposition thereof, or in enforcing this indemnity.

9.3     Notice and Opportunity to Defend.  If either party (the "Indemnitee") receives notice of any claim or the commencement of any action or proceeding with respect to which any other party is obligated to provide indemnification (the "Indemnifying Party") pursuant to Section 9.1 or 9.2, the Indemnitee shall promptly, (and in any event within five (5) business days after receiving notice of the claim) give the Indemnifying Party notice thereof; provided, however, that the failure to deliver such notice shall not be a condition precedent to any liability of the Indemnifying Party under the provisions for indemnification contained in this Agreement except to the extent the failure to deliver such notice prejudices the Indemnifying Party's ability to defend such proceeding. The Indemnifying Party may compromise and defend, at such Indemnifying Party's own expense and by such Indemnifying Party's own counsel, any such matter involving the asserted liability of the Indemnitee. In any event, the Indemnitee, the Indemnifying Party and the Indemnifying Party's counsel shall cooperate in the compromise of, or defense against, any such asserted liability; provided, however, that Indemnitee shall not compromise or settle any such matter without Indemnifying Party's prior written consent. The Indemnitee, at its own expense, can choose to have its counsel participate in the defense of such asserted liability, provided, however, the Indemnifying Party's counsel shall control such defense. If the Indemnifying Party chooses to defend any claim, the Indemnitee shall make available to the Indemnifying Party any books, records or other documents within its control that are necessary or appropriate to such defense.

9.4     Payment.  The Indemnifying Party shall pay the Indemnitee the amount of established claims for indemnification within thirty (30) days after the establishment thereof (the "Due Date"). Any amounts not paid by the Indemnifying Party when due under this Section 9.4 shall bear interest from the Due Date thereof until the date paid at a rate equal to three (3) points above the interest announced from time to time by Citibank, N.A. as its prime or base rate of interest.

10.     Disclosure of Information.

10.1     Confidential Information.  Each of the parties hereto recognizes and acknowledges that (i) the transaction contemplated hereby (including the terms and existence of this Agreement) are highly confidential matters and (ii) during the course of negotiations in connection with the transaction contemplated hereby each party will grant access to, certain plans, systems, methods, designs, procedures, books and records relating to operations, personnel and practices, as well as records, documents and information concerning business activities, practices, procedures and other confidential information of the other party (all of the foregoing, collectively, the "Confidential Information"), all of which constitute and will constitute valuable, special and unique assets of such party's business. Each party hereto shall treat Confidential Information as confidential, shall make all reasonable efforts to preserve its confidentiality, and shall not duplicate or disclose such Confidential Information, except in connection with the transaction contemplated hereby to advisors, attorneys, accountants, bankers, investment bankers, consultants and affiliates as Buyer, in its reasonable discretion, shall deem necessary

17

446264.08

MLOARTMSI000017

and which parties shall agree to be bound by an obligation of confidentiality at least as restrictive as set forth herein (the foregoing parties being referred to herein as "Designated Representatives").   Except for such disclosure to Designated Representatives as may be necessary or appropriate and such public or other disclosures as may be required by court order or any state or federal law or regulation to which a party is subject or in order to defend litigation (in which case the disclosing party shall provide the other party with notice and a copy of the required disclosure a reasonable period of time in advance of such disclosure), the parties agree to use all reasonable efforts to maintain in confidence the existence and terms of this letter and the Transaction and no party shall issue any press release or public statement without the prior written consent of the other party.

     10.2   Injunctive Relief.  The parties hereto acknowledge that the restrictions contained in Section 10.1, in view of the nature of the business in which the other parties are engaged, are reasonable and necessary in order to protect the respective legitimate interests of such other parties, and that any material violation thereof could result in irreparable injuries to such other party.  Each therefore acknowledges that, in the event of a breach or threatened breach of the provisions of this Section 8, the other party shall be entitled to obtain from any court of competent jurisdiction, preliminary and permanent injunctive relief restraining the breaching party from disclosing any such records, documents or information to any person, firm, corporation, association or other entity whatsoever or from using any thereof in any manner whatsoever.

     10.3   Other Remedies.  Nothing contained in this Section 10 shall be construed as prohibiting any party hereto from pursuing any other remedies available to it for any such breach or threatened breach, including the recovery of damages.

     11.   Post-Closing Access to Information.  Seller and Buyer each acknowledge that, subsequent to Closing, each may need access to the Assets, the Office and to information, books and records, documents or computer data in the control or possession of the other for purposes of concluding the transactions contemplated herein and for audits, investigations, compliance with governmental requirements, regulations and requests, review by Buyer's lenders and the prosecution or defense of third party claims.  Accordingly, Buyer and Seller each agree that each will make available to the other and its agents, independent auditors and/or governmental entities such documents and information as may be available relating to the Assets, Seller's operations of the Office in respect of periods prior to Closing and will permit the other to make copies of such documents and information at the requesting party's expense.  Seller further agrees that (i) upon reasonable request, it shall participate in connection with any audit or review of such documents and information and (ii) such documents and information shall be accurate and complete and provided to Buyer or its designees in a manner sufficient to conduct a thorough and efficient audit or review.

     12.   Survival.

     (a)   All of the representations and warranties of the Seller and Buyer contained in this Agreement shall survive the Closing and continue for the applicable statute of limitations period governing the respective matters set forth therein.

446264.08

MLOARTMSI000018

     (b)    Except as otherwise expressly set forth herein, each of the covenants set forth in this Agreement and the indemnification obligations of the parties set forth in this Agreement shall survive the Closing for the applicable statute of limitations period governing the respective matters set forth therein.

    13.    <u>Further Assurances.</u>

     (a)    Each of the parties hereto shall, at the request of the other party, furnish, execute and deliver such documents, instruments, certificates, notices and further assurances as counsel for the requesting party shall reasonably deem necessary or desirable to effect complete consummation of this Agreement and the consummation of each of the Transaction Documents and to carry out the transactions contemplated hereunder and thereunder, or in connection with the preparation and filing of reports required or requested by governmental agencies or other regulatory bodies and reconcile and pay, to the extent due, any amounts due and owing the other party related to prepaid or prorated expenses, as set forth in Section 1.3(c).

     (b)    At Buyer's request and upon reasonable notice, Seller shall provide Buyer with access to all books and records related to the Business for purposes of review by any governmental authority having jurisdiction over Buyer, including without limitation, the Securities and Exchange Commission.

    14.    <u>Miscellaneous.</u>

    14.1    <u>Notices.</u>  Any notice or other communication required or which may be given hereunder shall be in writing and shall be delivered personally, sent by certified mail, postage prepaid, return receipt requested or by a nationally recognized overnight courier, and shall be deemed given when so delivered personally or by facsimile, or if mailed, five (5) days after the date of mailing as follows:

| | |
|---|---|
| If to Seller: | Desert Rose Oncology, LLC<br>1227 E. Clearview Drive<br>Casa Grande, AZ 85222<br>Attention: Inna Ogandzhanova, M.D. |
| With a copy to: | Gust & Rosenfield Attorneys<br>201 E. Washington Street<br>Suite 800<br>Phoenix, AZ 85004<br>Attention: John Hay, Esq. |
| If to Buyer to: | Arizona Radiation Therapy Management Services, Inc.<br>2234 Colonial Boulevard<br>Fort Myers, Florida 33907<br>Attention: Daniel Dosoretz, M.D.<br>President and Chief Executive Officer |

MLOARTMSI000019

EXECUTION COPY

With a copy to:     Garfunkel, Wild & Travis, P.C.
111 Great Neck Road
Great Neck, New York 11021
Attention: Norton L. Travis, Esq.

14.2   Entire Agreement.  This Agreement and each of the Transaction Documents (including the Exhibits and Schedules and thereto) contains the entire agreement among the parties with respect to the transactions contemplated hereby and supersedes all prior agreements, written or oral, with respect thereto.

14.3   Waivers and Amendments.  This Agreement may be amended, modified, superseded, canceled, renewed or extended, and the terms and conditions hereof may be waived, only by a written instrument signed by the parties or, in the case of a waiver, by the party waiving compliance.  No delay on the part of any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any waiver on the part of any party of any right, power or privilege hereunder, nor any single or partial exercise of any right, power or privilege hereunder, preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder.  The rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies which any party may otherwise have at law or in equity.

14.4   Governing Law.  This Agreement shall be governed and construed in accordance with the laws of the State of Arizona without regard to its conflicts of law principles.

14.5   Savings Clause.  If any provision of this Agreement, or the application of any provision hereof to any person or circumstances, is held to be legally invalid, inoperative or unenforceable, then the remainder of this Agreement shall not be affected unless the invalid provision substantially impairs the benefit of the remaining portions of this Agreement to each of the parties.

14.6   Exhibits and Schedules.  The exhibits and schedules to this Agreement are incorporated hereby as a part of this Agreement as fully as if set forth in full herein.

14.7   Headings.  The headings in this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

14.8   Assignment.  This Agreement and all of the provisions hereof will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by (x) Seller without the prior written consent of the Buyer, or (y) the Buyer without the prior written consent of Seller; provided, however, that the Buyer shall have the right, without the consent of Seller, to assign all or any portion of its rights, duties and obligations under this Agreement and under any Transaction Document to any affiliate of the Buyer but the Buyer shall not be relieved of its obligations hereunder or under any Transaction Documents.

14.9   Facsimile Signatures.  This Agreement may be executed by any of the parties (the "Originating Parties") and transmitted to the other parties (the "Receiving Parties")

20

446264.08

MLOARTMSI000020

EXECUTION COPY

by facsimile, telecopy, telex or other form of written electronic transmission, and, upon confirmation of receipt thereof by the Receiving Parties, this Agreement shall be deemed to have been duly executed by the Originating Parties.  Upon the request of the Receiving Parties, the Originating Parties shall provide the Receiving Parties with an executed duplicate original of this Agreement.

       14.10  <u>Counterparts</u>.   This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which taken together shall constitute a single instrument.

**[SIGNATURE PAGE TO FOLLOW[]**

21

446264.08

MLOARTMSI000021

EXECUTION COPY

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

ARIZONA RADIATION THERAPY
MANAGEMENT SERVICES, INC.

By: _____

Name:  DAVID M. KOENINGER

Title:  VICE PRESIDENT

DESERT ROSE ONCOLOGY, LLC

By: _____

Name:

Title:

_____

Inna Ogandzhanova, M.D.

SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT

MLOARTMSI000022

EXECUTION COPY

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

ARIZONA RADIATION THERAPY
MANAGEMENT SERVICES, INC.

By: _____
      Name:
      Title:

DESERT ROSE ONCOLOGY, LLC

By: _____
      Name: INNA OGANDZHANOVA, M.D.
      Title: OWNER/PRESIDENT

      _____
      Inna Ogandzhanova, M.D.

SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT

MLOARTMSI000023

# EXHIBIT 17

# Gerald I. Rozansky M.D, Ph.D

### Psychiatry and Addiction Medicine

CONFIDENTIAL

Re: INNA OGANDZHANOVA, M.D.

## PSYCHIATRIC NOTES

1/04/06

Panic Attacks..never any problem with depression

Son passed away in March - grieving- but functioning-

In October- started feeling depressed- started having sleep problems- would go to office 4AM - and totally irregular sleeping after that.

"and I couldn't help him- treat all these other people are are ancient"

Hard to concentrate and very depressed-

Got pregnant-

"Began feeling couldn't deal with cancer-At 10:30AM- breathing, pulse and needed to run away--regular patients doesn't bother me that much-

Cancer patients - son- nothing could do- 3 bone marrows- leukemia- plain- 90% survive--standard, typically feel fine--brain never shuts.

Spiritual Occurrences - 44 yrs old-

"Would fly to get away 3 days of the week- for couple of months- Panama, Caribbean, if stay at home or in the clinic feel better- Anything to do with cancer - I cannot deal with it - feel I need anxious need to run away-

Husband helps in the clinic-he coul

dn't deal with Isaac being sick."

7 hours sleep

Diagnosis 2001

Radiation Oncologist

Worked never took off- even when he was dying- was very pragmatic-

Never panic with danger- always look for resolution. Came to U.S by herself- Always goal oriented

"Want to lay in bed, watch TV - nothing excites me"- don't care if lives or dies. Not suicidal- not depressive by nature

Husband bipolar. Lot of medications.

Panama. Wanted to be out of the situation- feel depression - but managing it- could take mind away- distraction. Mo & Fa in NY State-  doesn't want to talk to them - parents- would  cope and son with zero white blood cells and get mother's illness. Mother and fa divorced brought father and his wife. Mother and brother and mother developed cancer.

Husband pulled away - manic depressive

SSRI - check with pregnancy. Effexor  (ditto marks)

To find therapist in Arizona

DX - PTSD

DR. O-SDT-ROZANSKY-000055

CONFIDENTIAL

Panic Attacks
Depression
Identity Crisis - she has always been the capable one- 1st time faced helplessness and failure--No one to depend on- she takes over-

01/15/07 Phone call - contacted GYN and Lexapro O.K., 10mg. - contacted therapist- will see this week
02/01/07   Still depressed- stopped buying - no difference with medication. Nothing makes me feel less depressed.
Cannot shut brain - constantly "My son is gone - I cannot deal with oncology - so many sad people - don't want to socialize - when Isaac was sick - no one cared- want to stay away from any system of people."
When son in hospital she complained about the care - letter that she was interfering with the care of her son-
People don't interest me any more - few people interest me-
Pregnancy - cannot deal with people or doctors- just want to lay in bed and not feel anything. By nature very active person but not now.

04/13/07
Uneventful delivery - Hired Locum Tenens and some relief - reminded of Isaac -
But away from cancer center feel better - less panic
Still on Lexapro 20 mgm. Still depressed - but few panic attacks-
Anhydonia

05/16/07
Was supposed to go back to work on Monday - couldn't go back - makes her feel like facing everything again. Walking around looking at stores.
Cannot face career
Cannot face real issues - anxiety and like  before, panic attack -
Lexapro to 30 mgm

05/29/07
Cannot take pressure - functioned for 5 years - and 3 months after son died - not doing well - but didn't deal with anything - worked the 5 years and the day he died - he developed septic shock and for 4 days hope and than not - no reaction for 5 months.
Practice - doesn't have to get in the middle of night - good  money
Can't go to place where Isaac died - University Hotel where stayed -
Panic attacks started in October 06. Depression Sept.   At the same time - never on meds before -was working all the time - outside of own body- what to do? No emergency. Delayed since April going back to work- originally after daughter's birth - 2 weeks. I am a doer -

06/12/07
Family next  to us - Isaac - saw his neighbor's child - as his friend because same age- cruel reject Isaac - Don shouldn't have shown the picture of this other kid-
You always can should should - feel have to try harder -

DR. O-SDT-ROZANSKY-000056

Wait of 3 months to see resident - cannot stand to back into office -
Depression

**CONFIDENTIAL**

Buying jewelry
07/27/07
Everything new is a stress
Found a lawyer-
Feel better with less stress
Extremely sensitive- 2 days ago- crying- used to be referring and now people treat her differently -
Less able to deal with problems of every day life - not panic attacks- but not dealing with any patients.
Crying - how people treat you when they don't need you anymore (Dr. She referred to) -
Now vulnerable - it touches me how horrible people are
Felt dependent - but frustrated
Lexapro - 30mg
Depression - now more vulnerable, crying because angry - they have hurt me - powerless - he got from me what he needed
Insurance man - always happy to hear from me - he wasn't happy to hear from me -
Doesn't want to be part of food chain - Away from stress - feels never will be the same as was.

09/01/07
Girl friend died - auto immune disease - became claustrophobic - came back- didn't leave home - depressed. She was my best friend - me when patient 23 - every day together since friend was 17.

10/02/07
Feel a lot of anger and put on Don- triggers a lot of things - he is bi-polar - underneath a good person - projects onto others- 9 years ago run out into snow in bare feet. 5 yrs ago - he went to Mexico and decided to walk home - and Isaac sick Don decided that (paranoid) - she was trying to put him in jail or hospital and that she had caused him all his illness- he persuaded psychologist of it, he said no illness and that that Inna causing all of problems - He would disappear - Isaac in hospital and bone transplant - Don got restraining order- Don wasn't there for Isaac's birthday (last).
Multiple symptoms
Angry with him - all energy toward Isaac and another woman for 4 months at a bottom and Don needed her - 2000 depressed 3 months, never out of house - antidepressant>mania.
Now angry and put it all on Don and torture him for timing of his behavior - so ~~can~~ ᵒᵃⁿᵈ give him access to anything..now cycling--multiple medications - he checks himself now observing ego. Patient is driving him nuts..
Was always able to make own way, educated first husband - dental school for him- didn't love each other- no connection deep down

11/09/07
I don't want to leave home - stress when go out

DR. O-SDT-ROZANSKY-000057

Went to NY - needed water - told to sit down- felt would faint- under emotional stress- feel everything- want to get back into house
Met Life charging 3000/month while deciding if disabled or not-
Abused at every turn
Intensity of reaction-
Harder time to deal with outside world - put upon- wonderful when some nice- feel helpless

12/03/07
Discussed want to move Isaac- emotionally where he was buried first and can't go there-
Can't get to basement where Isaac's room was - there was house for Isaac next to babysitter-
Phobic about anything connected with Isaac and spending-scared to fly- water- strangers. Feel very vulnerable. Difficulty with being.

CONFIDENTIAL

DR. O-SDT-ROZANSKY-000058

# EXHIBIT 18

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

METROPOLITAN LIFE INSURANCE          )
COMPANY, a New York corporation,     )
                                     )
            Plaintiff,               )
                                     ) No.
            vs.                      ) 2:12-CV-00372-GMS
                                     )
INNA OGANDZHANOVA, M.D.,             )
                                     )
            Defendant.               )
                                     )
INNA OGANDZHANOVA, M.D.,             )
                                     )
            Counter-Plaintiff,       )
                                     )
            vs.                      )
                                     )
METROPOLITAN LIFE INSURANCE          )
COMPANY, a New York Corporation,     )
                                     )
            Counter-Defendant.       )
                                     )


VIDEOTAPED DEPOSITION OF LISA KAARELA


Phoenix, Arizona
February 8, 2013
9:03 a.m.



Prepared for:                   Prepared By:
STEPHEN M. BRESSLER, ESQ.       LISA J. ANDERSON, RPR
                                Certified Reporter
                                Certificate Number 50079
                                CANYON STATE REPORTING
                                2415 E. Camelback, Suite 700
    (Copy)                      Phoenix, AZ 85016-4245

Kaarela, Lisa (Bressler)                         February 8, 2013
          Metropolitan Life Insurance Company vs. Ogandzhanova

                                                                48

1    benefits without any reservation of rights as of

2    April 22nd, 2008; correct?

3              MR. BRESSLER:  Object to form.

4              THE WITNESS:  Okay.  I don't -- I have to say

5    the information received from her doctor and reviewed by

6    our medical consultant was really insufficient and not

7    really enough to go on.  That's why we did get the

8    independent IME and the testing.  And based on that, even

9    though there were some questions, I erred on the side of

10   the insured based on what we had, even though there was

11   still questions, and I still had questions, but I felt I

12   wanted to put her in benefit.

13   BY MR. GERMAN:

14       Q.    Okay.  And you saw --

15       A.    And continue -- I'm sorry.  And continue my

16   evaluation as the claim progressed.

17       Q.    And at that time, you had also conducted quite a

18   bit of surveillance before you approved her claim;

19   correct?

20             MR. BRESSLER:  Object to form.

21             THE WITNESS:  I'm not sure what you mean by

22   "quite a bit."

23   BY MR. GERMAN:

24       Q.    Well, there were 12 days of surveillance

25   conducted within the first six months of her claim and

Kaarela, Lisa (Bressler)                          February 8, 2013
            Metropolitan Life Insurance Company vs. Ogandzhanova

138

```
 1    STATE OF ARIZONA   )
                         )   ss
 2    COUNTY OF MARICOPA )

 3

 4          BE IT KNOWN that the foregoing videotaped

 5    deposition was taken before me, LISA J. ANDERSON,

 6    Certified Court Reporter, Certificate Number 50079; that

 7    the witness before testifying was duly sworn by me to

 8    testify to the whole truth; that the questions propounded

 9    to the witness and the answers of the witness thereto were

10    taken down by me in shorthand and thereafter reduced to

11    computer-aided transcription under my direction; that the

12    reading and signing of the deposition by the witness was

13    not waived; that the foregoing 137 pages constitute a true

14    and accurate transcript of all proceedings had upon the

15    taking of said deposition, all done to the best of my

16    skill and ability.

17          I FURTHER CERTIFY that I am in no way related to

18    any of the parties hereto, nor am I in any way interested

19    in the outcome hereof.

20          DATED at Phoenix, Arizona, this _____ day of

21    _____, 2013.

22

23

24                          _____
                            LISA J. ANDERSON, RPR
                            Certified Reporter
25                          Certificate Number 50079
```

# EXHIBIT 19

Steven C. Dawson – (# 006674)
Anita Rosenthal – (# 006199)
**DAWSON & ROSENTHAL, P.C.**
1850 N. Central Avenue, Suite 510
Phoenix, AZ  85004
Telephone (602) 494-3800
Facsimile (602) 957-9857
dandr@dawsonandrosenthal.com

Steven J. German – (#014789)
**ADELMAN GERMAN, P.L.C.**
8245 North 85th Way
Scottsdale, AZ 85258
Telephone (480) 607-9166
Facsimile (480 (607-9031
steve@adelmangerman.com

Attorneys for Defendant/Counter-Plaintiff

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Metropolitan Life Insurance Company, a New York corporation,<br><br>                    Plaintiff,<br><br>v.<br><br>Inna Ogandzhanova, M.D.,<br><br>                    Defendant. | NO:  2:12-CV-00372-GMS<br><br>**DEFENDANT/COUNTER-PLAINTIFF'S SUPPLEMENTAL RESPONSES TO REQUESTS FOR PRODUCTION OF DOCUMENTS [SECOND SET]**<br>*(Supplements in Italics)* |
| Inna Ogandzhanova, M.D.,<br><br>                    Counter-Plaintiff,<br><br>v.<br><br>Metropolitan Life Insurance Company, a New York corporation,<br><br>                    Counter-Defendant. | |

1

Defendant/Counter-Claimant.

**OBJECTION:**   The request seeks documents that are outside the permissible scope of discovery under Rule 26(b)(1). (3) The request is overbroad in time and scope.  Given the breadth of the request and, in conjunction with the other objections, the request is unduly burdensome and oppressive.  The information sought is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence at the time of trial.  Furthermore, the request is vague, ambiguous, overbroad, oppressive, an invasion of privacy and solely intended to harass the Defendant/Counter-Plaintiff.  MetLife's lawsuit against Dr. Ogandzhanova requests reimbursement of benefits paid to her after July 1, 2011.  Therefore, Dr. Ogandzhanova's financial interests or investments prior to July 1, 2011 have no relevance.  Furthermore, her financial interests or investments after July 1, 2011 are also irrelevant and not reasonably calculated to lead to the discovery of admissible evidence at the time of trial.  The issue in this lawsuit is whether Dr. Ogandzhanova can perform the substantial and material duties of a radiation oncologist beginning in July 2011.

*RESPONSE: Without waiving the foregoing objections, there are no documents responsive to this request.*

25.    Produce all documents and communications relating to any investment of the gross proceeds received from the sale of the assets of your oncology practice (in March 2007) and the proceeds received from the sale of the building in which your practice was located (in March 2007). This includes but is not limited to all documents relating to the Panamanian investments) you testified about in your deposition dated

11

11/28/13 (at pages 204 through 211).

**OBJECTION:**   The request seeks documents that are outside the

permissible scope of discovery under Rule 26(b)(1). (3) The request is overbroad

in time and scope.  Given the breadth of the request and, in conjunction with the

other objections, the request is unduly burdensome and oppressive.

Overbroad, unduly burdensome, oppressive, irrelevant and not reasonably

calculated to lead to the discovery of admissible evidence at the time of trial.

Plaintiff/Counter-Defendant has subpoenaed and received records regarding the

sale of Dr. Ogandzhanova's radiation oncology practice, which includes

information as to the amount of the sale.  To the extent this request can be

streamlined, Dr. Ogandzhanova would be in a better position to try to identify

and attempt to retrieve the documents requested.

*RESPONSE: Without waiving the foregoing objections, Inna*

*Ogandzhanova has attempted, to the best of her knowledge, recollection and*

*ability, to summarize the distribution of the net proceeds from the sale of Desert*

*Rose Oncology and the medical office building.  See Exhibit "A" The amounts*

*reflected on the attached summary are estimations and not exact figures but*

*provide a general overview of how the funds were spent.  See also documents*

*on the enclosed disk labeled DR. O – 2ND RFP SUPP – 002749 - 002785 relating to*

*the Panamanian investments and financial transactions relating to said*

*investments as well as documentation of the spending of other funds from the*

*sale of the medical practice and office building.*

26. Produce copies of the complete federal income tax returns, including W-2

# EXHIBIT A

## SUMMARY OF SALE OF PROCEEDS FROM DESERT ROSE ONCOLOGY, LLC
## AND SALE OF 1281 E. COTTONWOOD LN., CASA GRANDE, AZ

| | |
|---|---|
| Net proceeds to Inna Ogandzhanova from sale of practice | $6,479,201.00 |
| | |
| Gross proceeds from sale of building | $5,965,000.00 |
|    Payoff of construction loan | ($1,650,000.00) |
|    Payoff of bank loan | ($2,075,000.00) |
| Net proceeds from sale of building | $2,240,000.00 |
|    50% of net proceeds paid to Donald W. Hill, M.D. | ($1,120,000.00) |
| Net proceeds from sale of building to Inna Ogandzhanova | $1,120,000.00 |
| | |
| **Total Net Sale Proceeds to Inna Ogandzhanova** | **$7,599,201.00** |
| | |
| Investment in Panama | -$4,130,030.00 |
| | |
| Payoff of loan for New Mexico property | -$2,982,500.00 |
| | |
| Payoff of loan for Colorado property | -$1,240,000.00 |
| | **($753,329.00)** |

## VERIFICATION

I, Inna Ogandzhanova, under penalty of perjury, verify that I have read the foregoing Defendant/Counter-Plaintiff's Supplemental Responses to Request for Production [Second Set], and believe the contents therein are true and accurate to the best of my present knowledge, except those matters upon information and belief, and as to those, I believe them to be true.

Dated this __10__ day of May, 2013.

**Inna Ogandzhanova**

{AG:00182014.DOCX}

EXHIBIT 20

1   IN THE UNITED STATES DISTRICT COURT

2   DISTRICT OF ARIZONA
    ----------------------------------------X
3   METROPOLITAN LIFE INSURANCE COMPANY,
    a New York corporation,
4
                        Plaintiff,
5     - against -

6   INNA OGANDZHANOVA, M.D.,

7                       Defendant.

8   No. 2:12-CV-00372-GMS
    ----------------------------------------X
9   INNA OGANDZHANOVA, M.D.,

10                      Counter-Plaintiff,
      - against -
11
    METROPOLITAN LIFE INSURANCE
12  COMPANY, a New York corporation,

13                      Counter-Defendant.
    ----------------------------------------X
14

15                      25 Main Street
                        Hackensack, New Jersey
16
                        April 16, 2013
17                      1:10 p.m.

18

19      Videotaped  Deposition of Non-Party Witness,

20  ALEX GLUSHANOK, before Rita Persichetty, a Notary

21  Public of the State of New Jersey.

22

23      ELLEN GRAUER COURT REPORTING CO. LLC
           126 East 56th Street, Fifth Floor
24             New York, New York 10022
                   212-750-6434
25                 REF:  103317

GLUSHANOK

1

2     A     Yeah, because at that time, between 4

3 and 7 percent was not common, because CPI

4 tended to be lower than 4.

5     Q     Right.

6     A     So I believe it was different.   Let

7 me just tell you exactly.   Nothing was

8 3 percent flat.  No.  Actually, no.  It was the

9 same thing but within 1 and 7 percent.

10     Q     So it continued to be tied in to the

11 consumer price index?

12     A     The consumer price index, yes.

13     Q     But now the minimum that it could

14 increase was, instead of 4 percent, 1 percent?

15     A     It was 1 percent, the maximum was

16 still 7.

17     Q     The maximum is still 7.

18           And did the interplay or the impact

19 of having the lifetime rider, was it the same

20 on the cost of living rider on the second

21 policy as it was the first policy?

22     A     It was the same.  Actually I need to

23 correct myself, the cost of living increases

24 stop after age 65.

25     Q     On the second policy?

GLUSHANOK

1

2     A     And I believe on the first one too.

3  I can look it up, but I think so.  Yes.

4     Q     Why is it, and maybe you misspoke,

5  but when you testified that if you had a

6  lifetime rider, the cost of living rider would

7  cost more in premium, if that's correct, if I

8  understood that correctly, why would that --

9              MS. BRADHAM:  Foundation.

10             Go ahead.

11    A     Yeah, you know, what I'm telling you

12  right now is from memory of a number of years

13  ago.

14    Q     Uh-huh.

15    A     So maybe in actuality it was

16  different when it sold in conjunction with your

17  occupation rider, okay, because I guess it

18  increases the likelihood of her claim.

19    Q     Okay.

20    A     And that makes the rider more

21  expensive.  But lifetime rider has no bearing

22  on that because the disability -- according to

23  this, disability increases based on cost of

24  living stop at age 65.  So then it plateaus.

25    Q     Did you sell, according to your

GLUSHANOK

1
2     it --
3          A     I can't disclose the nature of a
4     claim for a particular person, but yeah, I
5     remember some.
6          Q     Do you remember if any of the other
7     Met Life claims on policies that you issued
8     went into litigation or were paid without
9     litigation?
10         A     You know, I don't remember if any
11    other policies went into litigation.
12         Q     Okay.  Fair enough.
13               I want you to look at back at
14    Exhibit 1, which is the Dr. Ogandzhanova's
15    first policy.
16         A     Uh-huh.
17         Q     And initially you had testified that
18    you thought the COLA benefit ran -- continued
19    after age 65, and then it looked like you saw
20    something in the documents that reminded you?
21         A     That's correct.
22         Q     And that reminded you that it didn't
23    run past age 65.  And I want to ask, what did
24    you see in the document that reminded you that
25    the benefit did not run past age 65?

|     | GLUSHANOK |
| --- | --- |
| 1   |     |

1            GLUSHANOK

2        A    Well, there is a specific page in the

3    contract that refers to this rider.

4        Q    Okay.  And can you refer me to that

5    page or --

6        A    Yes.

7        Q    If you're not there, it might be

8    1715.

9        A    1714.

10       Q    1714.

11       A    And 1715 is a continuation of it,

12   yes.

13       Q    And then 1715, on Page 1715, it

14   discusses when the cost of living adjustment

15   terminates, right?

16       A    Yes.

17       Q    And the cost of living adjustment

18   terminates on one of three dates, the date a

19   period of disability ends, right?

20       A    Uh-huh.

21       Q    The date the maximum benefit period

22   ends?

23       A    Uh-huh.

24       Q    And the first premium due date on or

25   after your 65th birthday, right?

```
 1                        GLUSHANOK

 2        A    Yes.

 3        Q    So that means that the COLA benefit

 4   does not run after, at least the first premium

 5   due date, after someone's 65th birthday, right?

 6        A    There would be no more increases,

 7   yes.

 8        Q    No more increases.

 9             But there would still -- the lifetime

10   benefit would still be calculated, so you

11   wouldn't -- you wouldn't go back to the

12   original amount of coverage under the policy

13   when you calculate the lifetime benefit that's

14   paid out, the lifetime -- I'm jumbling up this

15   question entirely, so let me start over.

16             Actually, you know what, you already

17   answered it, and you said it a lot better than

18   I was just in my question so...

19        A    It would remain level at that time,

20   yeah.

21        Q    Right.  Okay.  And then looking back

22   to Page 8 of the policy, and we're still

23   looking at Exhibit 1, there's a section called

24   Waiver of Premiums?

25        A    Yes.
```

GLUSHANOK

1

2    Q     And Mr. Dawson had asked you a

3   question about what you would typically

4   represent, what you would typically tell

5   insured's about the COLA provision.

6         Now that you've had a chance to

7   review the COLA provision, would you typically

8   have told insureds if it came up in your

9   discussion, that the COLA provision ends at age

10  65?

11   A     Yes, I would always describe the

12  rider or any provision of the contract as it

13  was.

14   Q     Okay.  Thank you.

15         And you didn't tell Dr. Ogandzhanova

16  anything different here than what we just saw

17  in the policy?

18   A     Yes.

19   Q     So you didn't tell Dr. Ogandzhanova

20  that the COLA benefit continued on until life

21  rather than ending at age 65?

22   A     I don't remember ever telling that to

23  her.

24         (Glushanok Exhibit 6, Claim

25      notification form, marked for

1                          GLUSHANOK

2     and on claim, you don't have premiums that are

3     due any longer as long as you're disabled,

4     correct?

5               MS. BRADHAM:  Form.  You've already

6          looked at the policy provision that

7          explains that.

8               MR. DAWSON:  Then never mind.

9          A    The premium is still due, but you

10    don't have to pay it, it's waived.

11         Q    Okay.  Now, my question is that you

12    were then asked -- well, what did you tell

13    Dr. Ogandzhanova about this, and I'm wondering,

14    do you really have a memory of what you told

15    her about it?

16         A    No, all I said is I explained the

17    product the way it is.

18         Q    All right.  You would explain the

19    product to the best of your understanding --

20         A    Exactly.

21         Q    -- correct?

22              And whether you had any confusion

23    about it at the time or not, I assume you have

24    no memory sitting here today?

25         A    I have no memory, and I don't think I

1                         GLUSHANOK

2    had any confusion about it.

3        Q    Then lastly, I think it was brought

4    out by counsel, you and I just met for the

5    first time before the deposition today?

6        A    That's correct.

7        Q    And we had a conversation, obviously,

8    about the subject of your deposition, correct?

9        A    Yes.

10       Q    Would it be fair to characterize our

11   conversation as rehearsing or practicing the

12   questions and answers?

13       A    No.

14       Q    No.  Thank you.

15   FURTHER EXAMINATION

16   BY MS. BRADHAM:

17       Q    Okay.  I just got a handful more

18   questions.

19            The discussion that you had with

20   Dr. Ogandzhanova about Isaac's death, what was

21   her manner in that discussion?  What was her

22   mood or manner in that discussion?

23       A    You know, I don't remember, but it

24   was a tragic kind of information, so I don't

25   think she was very happy about it, obviously,

```
1              A C K N O W L E D G M E N T

2

3    STATE OF              )

4                          :ss

5    COUNTY OF             )

6

7         I, ALEX GLUSHANOK, hereby certify that I

8    have read the transcript of my testimony

9    taken under oath in my deposition of April 16,

10   2013; that the transcript is a true, complete

11   and correct record of my testimony, and that

12   the answers on the record as given by me are

13   true and correct.

14

15

16                    _____

17                         ALEX GLUSHANOK

18

19   Signed and subscribed to before me

20   this _____ day of _____, 2013

21

22   _____

23   Notary Public, State of New Jersey

24

25
```