# EXHIBIT 21

1

```
 1                    UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF ARIZONA

 3

 4   Metropolitan Life Insurance         )
     Company, a New York corporation,    )
 5                                        )
                   Plaintiff,            )  No. CV 12-372-PHX-GMS
 6                                        )
                   vs.                   )  Phoenix, Arizona
 7                                        )  August 23, 2013
     Inna Ogandzhanova, M.D.,            )  1:33 p.m.
 8                                        )
                   Defendant.           )
 9   _____)
                                          )
10   Inna Ogandzhanova, M.D.,            )
                                          )
11                 Counter-Plaintiff,    )
                                          )
12                 vs.                   )
     Metropolitan Life Insurance         )
13   Company, a New York corporation,    )
                                          )
14                 Counter-Defendant.    )
     _____)
15

16

17               REPORTER'S TRANSCRIPT OF PROCEEDINGS

18             BEFORE THE HONORABLE G. MURRAY SNOW

19             (Discovery Hearing/Scheduling Conference)

20

21

22   Court Reporter:          Gary Moll
                              401 W. Washington Street, SPC #38
23                            Phoenix, Arizona  85003
                              (602) 322-7263
24
     Proceedings taken by stenographic court reporter
25   Transcript prepared by computer-aided transcription
```

1          You know, the other thing that occurs to me is,

2    really, virtually everything having to do with these computers,

3    it's Mr. Bates that is the one who installed the Deep Freeze

4    and had the -- you know, took care of making sure the

5    hard drives were replaced back in 2007 and has the confidence,    14:15:00

6    at least it seems relative -- relative to my lack of

7    confidence, to understand how these things work.  So I would

8    think through -- and I'm just thinking aloud, but, you know,

9    maybe a declaration from him as well as a declaration from our

10   own forensic computer examiner could shed a lot of light on    14:15:22

11   whether there really is, you know, shenanigans going on here,

12   or whether there are more likely benign explanations, which is

13   what we believe.

14          THE COURT:  You know what?  I've decided against any

15   of that.    14:15:40

16          Mr. Dawson, you will file your declarations of your

17   client with respect to the fact that all computers have been

18   provided.

19          Ms. Bradham, rather than opening up the plaintiff's

20   deposition again, I'm going to allow you to move for sanctions    14:15:59

21   and allow you to -- sanctions that would include a jury

22   instruction pertaining to the spoliation of evidence.  And then

23   you can -- so I'm not going to open up the deposition again,

24   but I am going to allow you to move for sanctions, including a

25   jury instruction regarding negative inferences that they can    14:16:21

1    draw from the spoliation of evidence.

2            Do you understand what I'm --

3            MS. BRADHAM:  Your Honor, I do.  I know that -- and

4    I'm not sure if this is something we'd want to do, but I know

5    that sometimes one of the sanctions or steps that's -- that's     14:16:36

6    ordered in this sort of context is an order to show cause

7    where, you know, we would be moving for sanctions.  I'm not --

8    I'm not sure if we want to move to do that at this point, but

9    I'm wondering if the Court is foreclosing that option.

10           THE COURT:  Well, I'm not foreclosing the option, but    14:17:00

11   it's essentially the same thing, as far as I'm concerned.  You

12   can either move for sanctions or you can move for an order to

13   show cause why sanctions shouldn't be entered, but it's going

14   to be the same result, unless you can tell me why it shouldn't.

15           MS. BRADHAM:  Okay.  Thank you, Your Honor.             14:17:16

16           Also, with respect to the -- the new claims, the COLA

17   and the other issue we'd raised about the reasons for her

18   failure to file taxes, I'm not certain if I understand the

19   Court's order on that issue and whether we could -- we can

20   reopen the deposition as to new issues.                         14:17:40

21           THE COURT:  Well, I'm not going to let you ask into

22   taxes.  But to the extent you can establish that

23   Dr. Ogandzhanova raised for the first time after the deposition

24   the argument that she was told that there was some sort of a

25   COLA benefit on the policy, I will allow you to reopen the       14:18:00

1   deposition to ask her questions only about that issue.

2          MS. BRADHAM:  And how would you like us to establish

3   that?  In just a notice that we'd file with our motion that --

4   that we'd file that would state when -- when she first raised

5   the issue?                                                    14:18:20

6          THE COURT:  Yes.  I guess what I would like is I would

7   like you to provide that to Mr. Dawson and Mr. German.  And if

8   in fact they don't contest that that's the first time they can

9   raise -- they can find that she raised the issue and it was

10  after her deposition, that they allow you to depose her on that  14:18:38

11  point.

12          If they have a dispute about whether or not that's the

13  first time she raised the issue, then they can provide you with

14  counter information.

15          And if you can't resolve it, you can have a telephone    14:18:51

16  conference with me one last time.  But otherwise, all discovery

17  is over, and Mr. Porter, that includes your renewed request for

18  the subpoena, as far as I'm concerned.

19          MS. BRADHAM:  Your Honor, I have one last question,

20  which is about the documents we believe that have not been      14:19:08

21  produced from the Court's April 24th order from the

22  interrogatories and request for production that relate to

23  financial issues.

24          THE COURT:  Fair enough.  What I think you need to do

25  is sit down, like you would with any other discovery order, and  14:19:23

```
 1   review with Mr. Dawson and Mr. German the specific documents

 2   that you think haven't been provided.  They will then have the

 3   opportunity to provide them for you.

 4          If they have such documents, they will provide them;

 5   if they don't have any further documents, they will so certify.   14:19:43

 6          MS. BRADHAM:  Thank you, Your Honor.

 7          THE COURT:  Anything else?

 8          MR. DAWSON:  Your Honor, this is Steve Dawson.

 9          I just want to make sure that I'm going back and

10   understanding where I was making notes about number 1, the        14:19:59

11   declaration about no other computers to the deletions.

12          THE COURT:  The deletions are what they are.  I'm

13   going to allow -- here's what I'm inclined to do.

14          I am going to allow the plaintiff, should they choose

15   to do so, to file an order to show cause or a motion for          14:20:22

16   sanctions.

17          MR. DAWSON:  Okay.  Okay.  I'm --

18          THE COURT:  Which would --

19          MR. DAWSON:  -- not going to interrupt you.  Go ahead

20   and finish, yes.                                                  14:20:30

21          THE COURT:  Yeah, which would allow the jury to hear

22   testimony that your clients destroyed material on their

23   computer, and then allow the jury, if they -- if they determine

24   it's relevant, to draw a negative inference about your client's

25   case if they in fact determine that she destroyed documents       14:20:43
```

C E R T I F I C A T E

 1

 2

 3

 4

 5

 6

 7         I, GARY MOLL, do hereby certify that I am duly

 8  appointed and qualified to act as Official Court Reporter for

 9  the United States District Court for the District of Arizona.

10         I FURTHER CERTIFY that the foregoing pages constitute

11  a full, true, and accurate transcript of all of that portion of

12  the proceedings contained herein, had in the above-entitled

13  cause on the date specified therein, and that said transcript

14  was prepared under my direction and control.

15

16

17         DATED at Phoenix, Arizona, this 23rd day of August,

18  2013.

19

20

21                        _____s/Gary Moll_____

22

23

24

25

EXHIBIT 22

| | |
|---|---|
| **From:** | Bradham, Erin |
| **Sent:** | Wednesday, September 04, 2013 4:44 PM |
| **To:** | Steve German <Steve@adelmangerman.com> (Steve@adelmangerman.com); sdawson@dawsonandrosenthal.com; arosenthal@dawsonandrosenthal.com |
| **Cc:** | Bienstock, Floyd; Bressler, Steve (SBressle@lrlaw.com); Porter, Jason (JPorter@LRLaw.com); Denman, Michell (MDenman@lrlaw.com); Eckert, RC; Sheri Sadler (Sheri@adelmangerman.com) |
| **Subject:** | MetLife/Ogandzhanova: COLA issue |

Counsel:

During the August 23 hearing, Judge Snow ordered that MetLife was permitted to depose Dr. Ogandzhanova on the lifetime COLA issue if the issue hadn't been disclosed before her original deposition on November 18 and December 1, 2012. We have not located any disclosure of the lifetime COLA claim that was made before December 1, 2012.

The first time MetLife learned that Dr. Ogandzhanova *might* be seeking a lifetime COLA was in Dr. Reiser's expert report (disclosed on January 11, 2013). In his report, Dr. Reiser "assum[ed] the annual cost of living adjustment (COLA) continues for lifetime" for some of his calculations. He did not explain the basis for claiming a lifetime COLA.

On April 3, 2013, you disclosed (in response to Interrogatory No. 21), that representations about a lifetime COLA were allegedly made to Dr. Ogandzhanova at the time she purchased her 2006 policy. You claimed, for the first time, that Dr. Ogandzhanova was "entitled to COLA increases for life."

If we have overlooked something and the lifetime COLA claim was disclosed before December 1, 2012, please let us know. If not, please let us know what dates your office and Dr. Ogandzhanova are available to continue her deposition. We would appreciate a response by COB on Wednesday, September 11.

**Erin E. Bradham**
Of Counsel
EBradham@steptoe.com

# Steptoe

+1 602 257 5251 direct
+1 602 452 0922 fax

Steptoe & Johnson LLP
201 E. Washington Street
Suite 1600
Phoenix, AZ 85004
www.steptoe.com

This message and any attached documents contain information from the law firm Steptoe & Johnson LLP that may be confidential and/or privileged. If you are not the intended recipient, please do not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

# EXHIBIT 23

**Bradham, Erin**

| | |
|---|---|
| **From:** | Steve Dawson <sdawson@dawsonandrosenthal.com> |
| **Sent:** | Thursday, October 17, 2013 5:03 PM |
| **To:** | Bradham, Erin; 'Steve German <Steve@adelmangerman.com> (Steve@adelmangerman.com)'; Anita Rosenthal |
| **Cc:** | Bienstock, Floyd; 'Bressler, Steve (SBressle@lrlaw.com)'; 'Porter, Jason (JPorter@LRLaw.com)'; 'Sheri Sadler (Sheri@adelmangerman.com)' |
| **Subject:** | RE: Dr. Ogandzhanova (COLA/Lifetime) |

Erin,

      Steve G. or I will respond sometime tomorrow on the scheduling issues relating to the motion for sanctions, but in the meantime I am addressing your proposed Stipulation and Order regarding the issue of COLA benefits beyond age 65.

      The predicate for your position that Dr. O cannot "unilaterally withdraw her claim for COLA benefits past age 65," is incorrect.  In the first place, it is less than accurate to state that she has unilaterally withdrawn her claim, given the Court's Order concerning MetLife's argument that it was entitled to depose Dr. O a second time because there had been no mention in pleadings or elsewhere of the lifetime COLA issue before she was originally deposed.

      Secondly, Rule 41 has no application to Dr. O's agreement to not seek entitlement to these benefits beyond age 65.  Rule 41 addresses dismissal of "actions," which is defined as the dismissal of *all* claims that had been brought, or in some jurisdictions, as all claims against a particular party.

      Consequently, Dr. O was *required* by the Court to agree not to pursue the argument that COLA benefits continued for the life of the policy unless she also agreed to again be deposed.  And Rule 41 does not prevent her from making this election – even in the absence of the Court's ruling.

      As for your suggestion that MetLife will "**forgo**" a second deposition "**if**" Dr. O "agrees" to its Stipulation and Proposed Order, you seem to be seeking to turn back the clock.   Per the Court's direction, MetLife was not permitted to depose Dr. Ogandzhanova a second time if she agreed to forgo any claim of entitlement to COLA benefits beyond age 65, which she has done.  If MetLife wishes, Dr. O will enter into an appropriate stipulation memorializing her agreement that she is not, and will not be pursuing such benefits.

      As for your willingness to "defer" MetLife's entitlement to attorneys' fees "as the prevailing party," this is no concession.  There has been no resolution of this particular issue on the merits, and given the circumstances, there is no support for any claim that MetLife is the prevailing party.

      Lastly, it is our position that it would be a violation of the Court's ruling on this matter for MetLife to proceed to notice Dr. O for a second deposition.

Steve Dawson
P: 928-282-3111
F: 928-282-3126
P: 602-494-3800
F: 602-957-9857

sdawson@dawsonandrosenthal.com

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying

# EXHIBIT 24

| | |
|---|---|
| **From:** | Bradham, Erin |
| **Sent:** | Wednesday, November 27, 2013 10:21 AM |
| **To:** | Steve Dawson |
| **Cc:** | Bienstock, Floyd; 'Bressler, Steve (SBressle@lrlaw.com)'; 'Porter, Jason (JPorter@LRLaw.com)'; 'Sheri Sadler (Sheri@adelmangerman.com)'; 'Steve German <Steve@adelmangerman.com>' (Steve@adelmangerman.com)'; Anita Rosenthal |
| **Subject:** | RE: Dr. Ogandzhanova (COLA/Lifetime) |
| **Attachments:** | STIPULATION FOR DISMISSAL OF COLA CLAIM WITH PREJUDICE.DOC; PROPOSED ORDER RE DISMISSAL OF COLA CLAIM WITH PREJUDICE.DOCX |

Steve D.,

　　　In reviewing loose ends in this case, I wanted to address the COLA claim.  Your e-mail below agreed to enter into a stipulation memorializing Dr. Ogandzhanova's agreement to drop her claims related to COLA benefits past the age of 65.  Please let me know if the attached Stipulation and Proposed Order are acceptable and if we have permission to sign and file them for you.

　　　Although we disagree with the legal arguments in your e-mail below, we do not need to resolve those issues at this point given that you indicate Ogandzhanova is willing to enter into a stipulation.

**Erin E. Bradham**
Of Counsel
EBradham@steptoe.com

# Steptoe

+1 602 257 5251 direct
+1 602 452 0922 fax

Steptoe & Johnson LLP
201 E. Washington Street
Suite 1600
Phoenix, AZ 85004
www.steptoe.com

This message and any attached documents contain information from the law firm Steptoe & Johnson LLP that may be confidential and/or privileged. If you are not the intended recipient, please do not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

**From:** Steve Dawson [mailto:sdawson@dawsonandrosenthal.com]
**Sent:** Thursday, October 17, 2013 5:03 PM
**To:** Bradham, Erin; 'Steve German <Steve@adelmangerman.com> (Steve@adelmangerman.com)'; Anita Rosenthal
**Cc:** Bienstock, Floyd; 'Bressler, Steve (SBressle@lrlaw.com)'; 'Porter, Jason (JPorter@LRLaw.com)'; 'Sheri Sadler (Sheri@adelmangerman.com)'
**Subject:** RE: Dr. Ogandzhanova (COLA/Lifetime)

Erin,

　　　Steve G. or I will respond sometime tomorrow on the scheduling issues relating to the motion for sanctions, but in the meantime I am addressing your proposed Stipulation and Order regarding the issue of COLA benefits beyond age 65.

　　　The predicate for your position that Dr. O cannot "unilaterally withdraw her claim for COLA benefits past age 65," is incorrect.  In the first place, it is less than accurate to state that she has unilaterally withdrawn her claim, given

1

the Court's Order concerning MetLife's argument that it was entitled to depose Dr. O a second time because there had been no mention in pleadings or elsewhere of the lifetime COLA issue before she was originally deposed.

Secondly, Rule 41 has no application to Dr. O's agreement to not seek entitlement to these benefits beyond age 65. Rule 41 addresses dismissal of "actions," which is defined as the dismissal of *all* claims that had been brought, or in some jurisdictions, as all claims against a particular party.

Consequently, Dr. O was *required* by the Court to agree not to pursue the argument that COLA benefits continued for the life of the policy unless she also agreed to again be deposed. And Rule 41 does not prevent her from making this election – even in the absence of the Court's ruling.

As for your suggestion that MetLife will **"forgo"** a second deposition "**if**" Dr. O "agrees" to its Stipulation and Proposed Order, you seem to be seeking to turn back the clock. Per the Court's direction, MetLife was not permitted to depose Dr. Ogandzhanova a second time if she agreed to forgo any claim of entitlement to COLA benefits beyond age 65, which she has done. If MetLife wishes, Dr. O will enter into an appropriate stipulation memorializing her agreement that she is not, and will not be pursuing such benefits.

As for your willingness to "defer" MetLife's entitlement to attorneys' fees "as the prevailing party," this is no concession. There has been no resolution of this particular issue on the merits, and given the circumstances, there is no support for any claim that MetLife is the prevailing party.

Lastly, it is our position that it would be a violation of the Court's ruling on this matter for MetLife to proceed to notice Dr. O for a second deposition.

Steve Dawson
P: 928-282-3111
F: 928-282-3126
P: 602-494-3800
F: 602-957-9857

sdawson@dawsonandrosenthal.com

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that this transmittal is received in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments.

**From:** Bradham, Erin [mailto:EBradham@steptoe.com]
**Sent:** Wednesday, October 16, 2013 5:25 PM
**To:** Steve German <Steve@adelmangerman.com> (Steve@adelmangerman.com); Steve Dawson; Anita Rosenthal
**Cc:** Bienstock, Floyd; Bressler, Steve (SBressle@lrlaw.com); Porter, Jason (JPorter@LRLaw.com); Sheri Sadler (Sheri@adelmangerman.com)
**Subject:** FW: Dr. Ogandzhanova (COLA/Lifetime)

Steve,

We have never heard back from you on the Stipulation and Proposed Order regarding Ogandzhanova's claim for COLA benefits past age 65. When you respond on the scheduling issues for the Motion for Sanctions, please also respond to our e-mail on the COLA issue.

Erin E. Bradham
Of Counsel
EBradham@steptoe.com

**Steptoe**

+1 602 257 5251 direct     Steptoe & Johnson LLP
+1 602 452 0922 fax        201 E. Washington Street
                           Suite 1600
                           Phoenix, AZ 85004
                           www.steptoe.com

---

This message and any attached documents contain information from the law firm Steptoe & Johnson LLP that may be confidential and/or privileged. If you are not the intended recipient, please do not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

---

**From:** Bradham, Erin
**Sent:** Monday, September 23, 2013 11:36 AM
**To:** 'Steve German'; Bienstock, Floyd
**Cc:** Steve Dawson (sdawson@dawsonandrosenthal.com); Anita Rosenthal; Sheri Sadler; Terry Olsen; ann@dawsonandrosenthal.com (ann@dawsonandrosenthal.com); Bressler, Steve (SBressle@lrlaw.com); Porter, Jason (JPorter@LRLaw.com)
**Subject:** RE: Dr. Ogandzhanova (COLA/Lifetime)

Steve,

    Under Rule 41, Dr. Ogandzhanova cannot unilaterally withdraw her claim for COLA benefits past age 65.   However, MetLife will agree to stipulate to entry of Judgment in its favor on Dr. Ogandzhanova's claim for COLA benefits past age 65, and forego the deposition it would otherwise be entitled to take of Dr. Ogandzhanova on this issue, if Dr. Ogandzhanova agrees to the attached Stipulation and Proposed Order.  We would defer any issue of MetLife's entitlement to attorney's fees and costs as the prevailing party on the claim until after the resolution of the other issues in the case.

    Please let us know by September 27, 2013 if you agree to the attached draft Stipulation and Proposed Order for entry of judgment on Dr. Ogandzhanova's claim for COLA benefits past age 65 under her MetLife individual disability policies.  Otherwise, we intend to notice her deposition for November 14, 2013.  If that date does not work for Dr. Ogandzhanova, please provide alternate dates for Dr. Ogandzhanova's deposition in November.

**Erin E. Bradham**
Of Counsel
EBradham@steptoe.com

## Steptoe

+1 602 257 5251 direct     Steptoe & Johnson LLP
+1 602 452 0922 fax        201 E. Washington Street
                           Suite 1600
                           Phoenix, AZ 85004
                           www.steptoe.com

---

This message and any attached documents contain information from the law firm Steptoe & Johnson LLP that may be confidential and/or privileged. If you are not the intended recipient, please do not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

---

**From:** Steve German [mailto:Steve@adelmangerman.com]
**Sent:** Friday, September 13, 2013 3:02 PM
**To:** Bienstock, Floyd; Bradham, Erin
**Cc:** Steve Dawson (sdawson@dawsonandrosenthal.com); Anita Rosenthal; Sheri Sadler; Terry Olsen; ann@dawsonandrosenthal.com (ann@dawsonandrosenthal.com)
**Subject:** Dr. Ogandzhanova (COLA/Lifetime)

Dear Floyd and Erin:

Please be advised that Dr. Ogandzhanova is not be pursuing a claim for COLA benefits, past the age of 65, with the understanding that this was the only basis for which MetLife was entitled to re-depose her.

Thank you.

Steve German



This Adelman German, P.L.C., e-mail message, and any attachment(s) hereto, are intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any use, dissemination, distribution or copying of this e-mail message, and/or any attachment hereto, is strictly prohibited. If you have received this e-mail in error, please immediately notify us by reply e-mail at *Steve@AdelmanGerman.Com* permanently delete the original and any copy of this message, its attachment(s), and any printout thereof. Thank you.

# EXHIBIT 25

**From:**  Bradham, Erin
**Sent:**  Thursday, December 05, 2013 12:29 PM
**To:**  Steve German <Steve@adelmangerman.com> (Steve@adelmangerman.com)
**Cc:**  Sheri Sadler (Sheri@adelmangerman.com); sdawson@dawsonandrosenthal.com; arosenthal@dawsonandrosenthal.com; Bienstock, Floyd; Bressler, Steve (SBressle@lrlaw.com); Porter, Jason (JPorter@LRLaw.com)
**Subject:**  FW: Dr. O adv. MetLife

Steve,

MetLife has made all required disclosures under Rule 26.  If you disagree, please identify what specific subsections of Rule 26 you believe require MetLife to make additional disclosures, and what specific information you contend MetLife has not provided that is required under those subsections.

As you know, the Court's October 25, 2013 Order (Dkt. 241) required Ogandzhanova to produce all documents Cardwell "considered" in forming his opinions on November 22, 2013, consistent with the parties' agreement to exchange such information.  We have already provided such documents to you by giving you a list of the documents Loehrs considered, all of which had already been produced and did not contain mark-ups.  Please immediately produce all documents that Cardwell considered as required under the Order (or a list of documents if they have already been produced and do not contain mark-ups).  Loehrs is being deposed on Monday so *we must receive Cardwell's documents (or list) by start of business tomorrow morning.*

Your e-mail discloses new information you say you learned recently about Ogandzhanova's use of the desktop computer she produced.  What is the source of this information?  Why didn't you learn and disclose this information sooner, before our expert's report was due?  Is the information you recently learned somehow different, or in addition to, the information contained in Cardwell's report?  You say, "the Dell was in use up to the time the desktop computer was wiped in 2009."  Does Ogandzhanova now admit that the Dell desktop she produced was not in use after 2009?  If so, what computer has Ogandzhanova been using for the last four years?  Where is that computer and why hasn't it been produced?  Where is the Seagate hard-drive Ogandzhanova used in 2009, and why hasn't it been produced?  These are questions that we have been asking for months, and that should have been addressed in response to the Court's August 23, 2013 Order requiring Ogandzhanova to affirm that she produced all computers she "used" during the relevant period.  If you now have new information that will answer these questions, please provide it right away, and before Loehrs' deposition.

Also, Steve Dawson previously agreed to enter into a stipulation related to Ogandzhanova's withdraw of her COLA claim.  Are the stipulation and proposed order I sent with my November 26, 2013 e-mail acceptable?

Finally, it appears that the last two motion papers Ogandzhanova filed – her Response to the Motion to Strike and her Reply in support of her Motion to Subpoena Loehrs' File – were filed after the applicable filing deadlines.  Why were the pleadings filed late?

Erin E. Bradham
Of Counsel
EBradham@steptoe.com

# Steptoe

+1 602 257 5251 direct   Steptoe & Johnson LLP
+1 602 452 0922 fax      201 E. Washington Street
                         Suite 1600
                         Phoenix, AZ 85004
                         www.steptoe.com

This message and any attached documents contain information from the law firm Steptoe & Johnson LLP that may be confidential and/or privileged. If you are not the intended recipient, please do not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

**From:** Steve German [mailto:Steve@adelmangerman.com]
**Sent:** Wednesday, December 04, 2013 5:20 PM
**To:** Bradham, Erin; Bienstock, Floyd; Steve Bressler (SBressle@lrlaw.com); JPorter@LRRLaw.com
**Cc:** Anita Rosenthal; Steve Dawson; Sheri Sadler; Terry Olsen
**Subject:** Dr. O adv. MetLife

Erin:

Kindly let us know if you will voluntarily provide the disclosures required under Rule 26 for Tami Loehrs.  This would require more than just a list of the documents she references in her Report.

Tami's deposition is scheduled for Monday.  Before then, I wanted to relay something I've learned since Tami's 2nd report was prepared. Apparently, the Hitachi Hard Drive that came with the Dell was in use up to the time the desktop computer was wiped in 2009.  I don't understand all the technical aspects of it all, but from what I do understand now, the Hitachi Hard Drive's contents were mirrored to a different hard drive (a Seagate, I believe). After the Hitachi was copied onto the Seagate, the Hitachi hard drive was completely wiped.  It was then rebuilt using select information from the Seagate Hard Drive. So, apparently, there was a Seagate


e Hard Drive that was used for purposes of temporarily storing a copy of the Hitachi Hard Drive.

When the Hitachi was reformatted, select data, files were pulled from the Seagate back to the Hitachi.

I hope I am explaining the above correctly, but I caution you that this is not something I fully understand, although Tami should.

Thank you.

Steve G.



**This Adelman German, P.L.C., e-mail message, and any attachment(s) hereto, are intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any use,**

dissemination, distribution or copying of this e-mail message, and/or any attachment hereto, is strictly prohibited. If you have received this e-mail in error, please immediately notify us by reply e-mail at *Steve@AdelmanGerman.Com* permanently delete the original and any copy of this message, its attachment(s), and any printout thereof. Thank you.

# EXHIBIT 26

| | |
|---|---|
| **From:** | Porter, Jason <JPorter@lrrlaw.com> |
| **Sent:** | Friday, December 13, 2013 11:35 AM |
| **To:** | Steve German (Steve@adelmangerman.com); 'Sheri Sadler' (Sheri@adelmangerman.com); 'Terry Olsen' (Terry@adelmangerman.com) |
| **Cc:** | Steve Dawson (sdawson@dawsonandrosenthal.com); Anita Rosenthal (arosenthal@dawsonandrosenthal.com); Bressler, Steve; Bienstock, Floyd; Bradham, Erin; Eckert, RC; Denman, Michell |
| **Subject:** | Ogandzhanova - Tax Records |
| **Attachments:** | RE: Dr. Ogandzhanova (COLA/Lifetime) |

Steve and Sheri,

As you are aware, we re-submitted tax authorizations to the IRS several months ago, seeking tax transcripts and tax returns for Dr. O and her various business entities. It has come to our attention that the IRS (over the last several months) has sent records and correspondence directly to Dr. O relating to these requests. Please produce those records and correspondence to our office promptly? Thank you.

Also, we also have not heard back from you on whether Dr. O will agree to the COLA stipulation and proposed Order that Erin previously circulated (attached). Can we please hear from you on this? Thanks.



**Jason M. Porter, Associate**
**Lewis Roca Rothgerber LLP | Two Renaissance Square Suite 1900**
**40 North Central Avenue | Phoenix, Arizona 85004-4429**
**(T) 602.262.5763 | (F) 602.734.3915**
**JPorter@LRRLaw.com | http://www.LRRLaw.com**

 **Lewis and Roca LLP is now Lewis Roca Rothgerber LLP.**

---

This message and any attachments are intended only for the use of the individual or entity to which they are addressed. If the reader of this message or an attachment is not the intended recipient or the employee or agent responsible for delivering the message or attachment to the intended recipient you are hereby notified that any dissemination, distribution or copying of this message or any attachment is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the sender. The information transmitted in this message and any attachments may be privileged, is intended only for the personal and confidential use of the intended recipients, and is covered by the Electronic Communications Privacy Act, 18 U.S.C. §2510-2521.

In accordance with Internal Revenue Service Circular 230, we advise you that if this message or any attachments contains any tax advice, such tax advice was not intended or written to be used, and it cannot be used, by any taxpayer for the purpose of avoiding penalties that may be imposed on the taxpayer.

# EXHIBIT 27

| | |
|---|---|
| **From:** | Anita Rosenthal <arosenthal@dawsonandrosenthal.com> |
| **Sent:** | Tuesday, December 17, 2013 12:12 PM |
| **To:** | Bradham, Erin; Steve Dawson; 'Steve German <Steve@adelmangerman.com> (Steve@adelmangerman.com)' |
| **Cc:** | Bienstock, Floyd; 'Bressler, Steve (SBressle@lrlaw.com)'; 'Porter, Jason (JPorter@lrrlaw.com)'; 'Denman, Michell (MDenman@lrrlaw.com)'; Eckert, RC; 'Sheri Sadler (Sheri@adelmangerman.com)'; 'Terry Olsen (Terry@adelmangerman.com)' |
| **Subject:** | RE: MetLife/Ogandzhanova: Cardwell's Deposition |

Erin- Mark has Jan 14th available for his deposition.  We are continuing to look for any emails between Cardwell and our two firms that would be responsive to your request.  We should have that to you by the end of this week.  He relied on no other documents than the ones listed out previously.

As for the COLA issue—as you know, Steve D. has always said to you that we are not pursuing a claim for COLA past age 65.  He is however, not able to look at the specific language you included in your stipulation you sent over.  Hopefully, that too, will be done by the end of this week.

Anita

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

---

**From:** Bradham, Erin [mailto:EBradham@steptoe.com]
**Sent:** Monday, December 16, 2013 10:39 AM
**To:** Anita Rosenthal; Steve Dawson; 'Steve German <Steve@adelmangerman.com> (Steve@adelmangerman.com)'
**Cc:** Bienstock, Floyd; 'Bressler, Steve (SBressle@lrlaw.com)'; 'Porter, Jason (JPorter@lrrlaw.com)'; 'Denman, Michell (MDenman@lrrlaw.com)'; Eckert, RC; 'Sheri Sadler (Sheri@adelmangerman.com)'; Terry Olsen (Terry@adelmangerman.com)
**Subject:** RE: MetLife/Ogandzhanova: Cardwell's Deposition

Anita,

Thank you for your e-mail.  The list you have provided appears to be a list of the documents counsel provided to Mr. Cardwell, not a list of the documents Mr. Cardwell considered in forming his opinions (as required under the Court's October 25, 2013 Order).  Did Mr. Cardwell consider any other documents in forming his opinion other than the materials counsel provided him?

Please also produce any of Cardwell's communications with counsel identifying facts, data or assumptions Cardwell considered in forming his opinions (as MetLife did for Loehrs).  We produced this information for Loehrs with the understanding that Ogandzhanova would produce the same information for Cardwell.  Ogandzhanova's counsel have represented in numerous court filings and other communications that they believe this information must be produced for the opposing party to have a fair opportunity to assess an expert's opinions.

We are also still waiting for a response to my e-mail (attached) providing a draft stipulation and proposed order to dismiss Ogandzhanova's claim for COLA benefits past age 65.  Steve Dawson previously agreed to enter into a stipulation on this issue.  Please let me know whether MetLife's draft stipulation and proposed order are acceptable to Ogandzhanova.

Finally, please let me know which of the dates I previously circulated – January 10, 14 or 15 – work for Mr. Cardwell's deposition.

**Erin E. Bradham**
Of Counsel
EBradham@steptoe.com

# Steptoe

+1 602 257 5251 direct          Steptoe & Johnson LLP
+1 602 452 0922 fax              201 E. Washington Street
                                          Suite 1600
                                          Phoenix, AZ 85004
                                          www.steptoe.com

This message and any attached documents contain information from the law firm Steptoe & Johnson LLP that may be confidential and/or privileged. If you are not the intended recipient, please do not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

**From:** Anita Rosenthal [mailto:arosenthal@dawsonandrosenthal.com]
**Sent:** Wednesday, December 11, 2013 10:15 AM
**To:** Bradham, Erin; Steve Dawson; 'Steve German <Steve@adelmangerman.com> (Steve@adelmangerman.com)'
**Cc:** Bienstock, Floyd; 'Bressler, Steve (SBressle@lrlaw.com)'; 'Porter, Jason (JPorter@lrrlaw.com)'; 'Denman, Michell (MDenman@lrrlaw.com)'; Eckert, RC; 'Sheri Sadler (Sheri@adelmangerman.com)'
**Subject:** RE: MetLife/Ogandzhanova: Cardwell's Deposition

Erin—I will ask Cardwell about dates he can be available.  As for the materials he considered—we provided Mark with:

1. The mirrored hard drives.
2. Both of Tami's reports and attached disks.
3. Motion for Sanctions.
4. And your email to all of us of Aug 20, 2013 at 6:32, outlining Tami's opinions.
5. He did not have access to Inna's live Hotmail account.

Anita

This transmittal may be a confidential attorney client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone or email and immediately delete this message and all its attachments

**From:** Bradham, Erin [mailto:EBradham@steptoe.com]
**Sent:** Tuesday, December 10, 2013 4:42 PM
**To:** Anita Rosenthal; Steve Dawson; Steve German <Steve@adelmangerman.com> (Steve@adelmangerman.com)
**Cc:** Bienstock, Floyd; Bressler, Steve (SBressle@lrlaw.com); Porter, Jason (JPorter@lrrlaw.com); Denman, Michell (MDenman@lrrlaw.com); Eckert, RC; Sheri Sadler (Sheri@adelmangerman.com)
**Subject:** MetLife/Ogandzhanova: Cardwell's Deposition

Counsel:

        We would like to schedule Mr. Cardwell's deposition.  The following dates will work for us: January 10, 14 or 15.  Please let us know which of those dates works for Mr. Cardwell.

# EXHIBIT 28

| **From:** | Bradham, Erin |
|---|---|
| **Sent:** | Wednesday, January 15, 2014 10:38 AM |
| **To:** | Anita Rosenthal; Steve Dawson; 'Steve German <Steve@adelmangerman.com> (Steve@adelmangerman.com)' |
| **Cc:** | Bienstock, Floyd; 'Bressler, Steve (SBressle@lrlaw.com)'; 'Porter, Jason (JPorter@lrrlaw.com)'; 'Denman, Michell (MDenman@lrrlaw.com)'; Eckert, RC; 'Sheri Sadler (Sheri@adelmangerman.com)'; 'Terry Olsen (Terry@adelmangerman.com)' |
| **Subject:** | RE: MetLife/Ogandzhanova: COLA |
| **Attachments:** | RE: Dr. Ogandzhanova (COLA/Lifetime).msg |

Counsel:

We still have not heard from Steve Dawson or any of Ogandzhanova's counsel on whether my proposed language for the stipulation and proposed order regarding Ogandzhanova's claim for COLA benefits past age 65 is acceptable. Please get back to us on this issue by the end of the day tomorrow. Otherwise, we will need to address this issue with the Court.

**Erin E. Bradham**
Of Counsel
EBradham@steptoe.com

# Steptoe

| +1 602 257 5251 direct | Steptoe & Johnson LLP |
|---|---|
| +1 602 452 0922 fax | 201 E. Washington Street |
| | Suite 1600 |
| | Phoenix, AZ 85004 |
| | www.steptoe.com |

This message and any attached documents contain information from the law firm Steptoe & Johnson LLP that may be confidential and/or privileged. If you are not the intended recipient, please do not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

---

**From:** Anita Rosenthal [mailto:arosenthal@dawsonandrosenthal.com]
**Sent:** Tuesday, December 17, 2013 12:12 PM
**To:** Bradham, Erin; Steve Dawson; 'Steve German <Steve@adelmangerman.com> (Steve@adelmangerman.com)'
**Cc:** Bienstock, Floyd; 'Bressler, Steve (SBressle@lrlaw.com)'; 'Porter, Jason (JPorter@lrrlaw.com)'; 'Denman, Michell (MDenman@lrrlaw.com)'; Eckert, RC; 'Sheri Sadler (Sheri@adelmangerman.com)'; 'Terry Olsen (Terry@adelmangerman.com)'
**Subject:** RE: MetLife/Ogandzhanova: Cardwell's Deposition

Erin- Mark has Jan 14th available for his deposition. We are continuing to look for any emails between Cardwell and our two firms that would be responsive to your request. We should have that to you by the end of this week. He relied on no other documents than the ones listed out previously.

As for the COLA issue—as you know, Steve D. has always said to you that we are not pursuing a claim for COLA past age 65. He is however, not able to look at the specific language you included in your stipulation you sent over. Hopefully, that too, will be done by the end of this week.

Anita

# EXHIBIT 29

Steven C. Dawson – (# 006674)
Anita Rosenthal – (# 006199)
**DAWSON & ROSENTHAL, P.C.**
1850 N. Central Avenue, Suite 510
Phoenix, AZ  85004
Telephone (602) 494-3800
Facsimile (602) 957-9857
dandr@dawsonandrosenthal.com

Steven J. German – (#014789)
**ADELMAN GERMAN, P.L.C.**
8245 North 85th Way
Scottsdale, AZ 85258
Telephone (480) 607-9166
Facsimile (480 (607-9031
steve@adelmangerman.com

Attorneys for Defendant/Counter-Plaintiff

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Metropolitan Life Insurance Company, a New York corporation,<br><br>               Plaintiff,<br><br>v.<br><br>Inna Ogandzhanova, M.D.,<br><br>               Defendant. | **NO:  2:12-CV-00372-GMS**<br><br>**DEFENDANT/COUNTER-PLAINTIFF'S RESPONSES TO INTERROGATORIES [THIRD SET]** |
| Inna Ogandzhanova, M.D.,<br><br>               Counter-Plaintiff,<br><br>v.<br><br>Metropolitan Life Insurance Company, a New York corporation,<br><br>               Counter-Defendant. | |

1

Defendant/Counter-Plaintiff, by and through undersigned counsel and pursuant to Rule 33, Federal Rules of Civil Procedure, hereby responds to Plaintiff/Counter-Defendants' Third Set of Interrogatories. In doing so, Defendant/Counter-Plaintiff incorporates herein the information and materials submitted with disclosure statements exchanged between the parties, responses to discovery, and/or that were produced at, or described during depositions taken in this matter:

<u>**GENERAL OBJECTIONS**</u>

1.      Defendant/Counter-Plaintiff objects to any attempt to impose any further or greater obligation upon her to search for responsive information or to supplement these responses, except as is imposed by law, regulation, the Federal Rules of Civil Procedure or the Rules of this Court.

2.      Defendant/Counter-Plaintiff objects to providing documents protected by the attorney-client privilege or work product rule.

3.      Defendant/Counter-Plaintiff was deposed by MetLife's attorneys over the course of two days, met with MetLife's field representative, and was evaluated, interviewed and examined by a psychiatrist (Dr. Parker) and/or a neuropsychologist (Dr. Lamb), both hired by MetLife, in 2008, 2010, and/or 2011. Furthermore, MetLife performed covert surveillance and secretly video-taped Dr. Ogandzhanova over the course of approximately 50 days. Thus, much of what is asked herein is already known to MetLife, who also secured several background checks of Dr. Ogandzhanova by private investigators. Dr. Ogandzhanova's prior statements and testimony are incorporated herein. Dr. Ogandzhanova objects generally to the redundancy, over-breadth, overly-burdensome, and harassing nature of MetLife's discovery requests, and directs MetLife to its claim file, which holds the answers to many of its questions and requests.

4.      Defendant/Counter-Plaintiff objects to the MetLife's Interrogatories to the extent that they seek information already provided by Defendant/Counter-Plaintiff or otherwise available to or in the possession of MetLife or its counsel.

5.      Defendant/Counter-Plaintiff objects to the Interrogatories on the ground that discovery is continuing and Defendant/Counter-Plaintiff and her attorneys have not yet completed their discovery or preparation for trial, nor have they completed their analysis of information gathered to date. These answers are based upon information presently available to Defendant/Counter-Plaintiff and her attorneys and upon the investigation they have been able to complete as of this date. Future investigation and

1   discovery may supply additional documents, facts, and information, add meaning to
2   known facts, or establish entirely new factual conclusions and contentions, all of which
    may lead to addition to, changes in, and variations from the answers set forth herein.
3   These answers are made without prejudice to the right of Defendant/Counter-Plaintiff
    to submit any and all admissible evidence available to her at the time of trial,
4   arbitration or similar procedure.

5         6.      Defendant/Counter-Plaintiff incorporates the above Objections as though
    fully set forth in response to the Interrogatories below.

6

7                              **INTERROGATORIES**

8         21.     If your answer to any of the requests for admission propounded in

9   Plaintiff/Counter-Defendant's First Set of Requests for Admission to

10  Defendant/Counter-Claimant is anything other than an unqualified admission, state in

11  detail each and every fact that you contend supports such qualification or denial.

12

13  **OBJECTION:  Duplicative, calls in part for a legal conclusion, misstates**

14  **the terms of the policies.**

15  **RESPONSE:  The MetLife Disability Income Insurance Policy describes, at**

16  page 9 of 13, the Cost-of-Living Adjustment (COLA) Rider and when the COLA

17  increases stop.  Subparagraph 3 provides that COLA increases stop at the first

18  premium due date on or after the insured's 65th birthday.  However, if an insured

19  is disabled, there is no "premium due date on or after your 65th birthday"

20  because premiums are waived.  Thus, Inna Ogandzhanova is entitled to COLA

21  increases for life, as her policy includes a Lifetime Rider.  It was also

22  represented and understood that COLA increases continued for the duration of

23  a claim, when Inna purchased her policies.  See also Defendant/Counter-

24  Claimant's Disclosure Statements served to date.

25

26

                                        3

22.     Identify every credit or debit card you or Your Companies have owned or used from January 1, 2004, to the present. For each credit or debit card, please identify the type of card (Visa, MasterCard, Discover, etc.), the applicable credit card company or banking institution, the location of the applicable banking institution or credit card company, the account number, the current balance, and the respective dates the credit or debit card was active and closed.

**OBJECTION:**  The information sought is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence at the time of trial. Furthermore, the interrogatory is overbroad, oppressive, an invasion of privacy and solely intended to harass the Defendant/Counter-Plaintiff. MetLife's lawsuit against Dr. Ogandzhanova requests reimbursement of benefits paid to her after July 1, 2011.  Therefore, Dr. Ogandzhanova's financial records prior to July 1, 2011 have no relevance.  The issue in this lawsuit is whether Dr. Ogandzhanova can perform the substantial and material duties of a radiation oncologist beginning in July 2011.  What credit or debit cards Dr. Ogandzhanova has owned is irrelevant.  Furthermore, Plaintiff/Counter-Defendant has previously been provided with Dr. Ogandzhanova's complete credit reports which provide information regarding her credit card history.

**RESPONSE:** The information sought is included in prior Disclosures and discovery responses.

23.     Identify every bank account you or Your Companies have owned or used from January 1, 2004, to the present. For each account, please identify the banking institution, the location of the branch in which the account was located, the account

4

number, the current balance, and the respective dates the account was opened and
closed.

**OBJECTION:** The information sought is irrelevant and not reasonably
calculated to lead to the discovery of admissible evidence at the time of trial.
Furthermore, the interrogatory is overbroad, oppressive, an invasion of privacy
and solely intended to harass the Defendant/Counter-Plaintiff. MetLife's lawsuit
against Dr. Ogandzhanova requests reimbursement of benefits paid to her after
July 1, 2011. Therefore, Dr. Ogandzhanova's bank account records prior to July
1, 2011 have no relevance. Furthermore, her bank account records after July 1,
2011, which contain detailed information as to her daily personal spending
habits, are also irrelevant and not reasonably calculated to lead to the discovery
of admissible evidence at the time of trial. The issue in this lawsuit is whether
Dr. Ogandzhanova can perform the substantial and material duties of a radiation
oncologist beginning in July 2011. The information requested in the
interrogatory has no relevance to the issues in this lawsuit.

24.    Identify each and every business entity (including corporations, limited
liability companies, general and limited partnerships, closely held corporations, and
sole proprietorships) that you have any ownership or financial interest in from January
1 , 2004, to the present. For each business entity, please describe in detail the nature
and value of the ownership or financial interest, and the respective dates that the
ownership or financial interest was acquired and sold.

**OBJECTION:** The information sought is irrelevant and not reasonably
calculated to lead to the discovery of admissible evidence at the time of trial.

1   Furthermore, the interrogatory is overbroad, oppressive, an invasion of privacy

2   and solely intended to harass the Defendant/Counter-Plaintiff. MetLife's lawsuit

3   against Dr. Ogandzhanova requests reimbursement of benefits paid to her after

4   July 1, 2011. Therefore, information prior to July 1, 2011 has no relevance.

5   Furthermore, Plaintiff/Counter-Defendant has been provided and will be

6   provided with Dr. Ogandzhanova's tax return documentation which shows any

7   income earned either individually or from any business entity for which Dr.

8   Oganzhanova has an ownership interest.

9

10      **RESPONSE:** This information was gathered previously by MetLife, and, is

11  included in its claim file.

12      25.   Identify every financial institution (including brokerage firms, banks, trust

13  companies and insurance companies) at which you or Your Companies presently have

14  an account/policy or have had an account/policy since January 1, 2004. For each

15  account/policy, please identify the location of the branch office in which the account/

16  policy is/was located, the account/policy number, the value of the account/policy, the

17  respective dates the account/policy was opened and closed, and the broker(s)/

18  agent(s) assigned to the account/policy.

19

20      **OBJECTION:** The information sought is irrelevant and not reasonably

21  calculated to lead to the discovery of admissible evidence at the time of trial.

22  Furthermore, the interrogatory is overbroad, oppressive, an invasion of privacy

23  and solely intended to harass the Defendant/Counter-Plaintiff. MetLife's lawsuit

24  against Dr. Ogandzhanova requests reimbursement of benefits paid to her after

25  July 1, 2011. Therefore, Dr. Ogandzhanova's financial records prior to July 1,

26

2011 have no relevance.  Furthermore, her financial records after July 1, 2011 are also irrelevant and not reasonably calculated to lead to the discovery of admissible evidence at the time of trial.  The issue in this lawsuit is whether Dr. Ogandzhanova can perform the substantial and material duties of a radiation oncologist beginning in July 2011.  Her bank and financial account information has no relevance to the issues in this lawsuit.

**RESPONSE:**  Redundant.  See response to Number 23.

26.      Identify every real estate holding or real estate interest you or Your Companies have had from January 1, 2002 to present. For each holding or interest identified, please describe in detail the nature and value of the holding or interest, the location of the holding or interest, and the respective dates that the holding or interest was acquired and sold.

**OBJECTION:**   The information sought is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence at the time of trial. Furthermore, the interrogatory is overbroad, oppressive, an invasion of privacy and solely intended to harass the Defendant/Counter-Plaintiff.  MetLife's lawsuit against Dr. Ogandzhanova requests reimbursement of benefits paid to her after July 1, 2011.  Therefore, Dr. Ogandzhanova's interest in any real estate holdings prior to July 1, 2011 have no relevance.  Furthermore, her interest in any real estate holdings after July 1, 2011 are also irrelevant and not reasonably calculated to lead to the discovery of admissible evidence at the time of trial. The issue in this lawsuit is whether Dr. Ogandzhanova can perform the substantial and material duties of a radiation oncologist beginning in July 2011.

Information regarding interest in any real estate holdings has no relevance to the issues in this lawsuit.

**RESPONSE:** MetLife has access to public records, and has analyzed and evaluated Dr. Ogandzhanova's real estate holdings. See Navigant Expert Report.

27.     Identify the sources of all revenue, earnings, or income generated or received by you or Your Companies from January 1, 2004 to present. This request encompasses revenue, earnings, and income whether it was distributed, retained, or reinvested. This request also encompasses any rental income or earnings.

**OBJECTION:** The information sought is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence at the time of trial. Furthermore, the interrogatory is overbroad, oppressive, an invasion of privacy and solely intended to harass the Defendant/Counter-Plaintiff. MetLife's lawsuit against Dr. Ogandzhanova requests reimbursement of benefits paid to her after July 1, 2011. Therefore, information prior to July 1, 2011 has no relevance. Furthermore, Plaintiff/Counter-Defendant has been provided and will be provided with Dr. Ogandzhanova's tax return documentation which shows any income earned either individually or from any business entity for which Dr. Oganzhanova has an ownership interest.

**RESPONSE:** Without waiving the foregoing objection, Inna Ogandzhanova's only source of income is income from her two individual disability income policies with MetLife. Her revenues prior to disability have been in MetLife's possession since July 2007.

28. Identify all loans you or Your Companies applied for or received from January 1, 2002, to present. For each loan or loan application, please identify the lender, the amount of the loan/loan request; and provide a description of the purpose of the application or loan. For each loan that currently has an outstanding balance, state the amount of the balance and the maturity date of the loan.

**OBJECTION:**  **The information sought is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence at the time of trial. Furthermore, the interrogatory is overbroad, oppressive, an invasion of privacy and solely intended to harass the Defendant/Counter-Plaintiff. MetLife's lawsuit against Dr. Ogandzhanova requests reimbursement of benefits paid to her after July 1, 2011. Therefore, Dr. Ogandzhanova's financial records prior to July 1, 2011 have no relevance. Furthermore, her financial records after July 1, 2011 are also irrelevant and not reasonably calculated to lead to the discovery of admissible evidence at the time of trial. The issue in this lawsuit is whether Dr. Ogandzhanova can perform the substantial and material duties of a radiation oncologist beginning in July 2011. What loans Dr. Ogandzhanova or her business entities has applied for or received is irrelevant. Furthermore, Plaintiff/Counter-Defendant has previously been provided with Dr. Ogandzhanova's complete credit reports which provide information regarding her loan history.**

29. Except as previously identified, identify all other investments and financial interests that you or Your Companies hold or have held from January 1, 2004 to present. This includes the ownership bonds, stocks, precious metals, jewelry, artwork,

9

or other personal belonging. For each investment or financial interest, please provide a detail description of the investment or interest and the current value of the investment or interest.

**OBJECTION:** The information sought is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence at the time of trial. Furthermore, the interrogatory is overbroad, oppressive, an invasion of privacy and solely intended to harass the Defendant/Counter-Plaintiff. MetLife's lawsuit against Dr. Ogandzhanova requests reimbursement of benefits paid to her after July 1, 2011. Therefore, Dr. Ogandzhanova's financial interests or investments prior to July 1, 2011 have no relevance. Furthermore, her financial interests or investments after July 1, 2011 are also irrelevant and not reasonably calculated to lead to the discovery of admissible evidence at the time of trial. The issue in this lawsuit is whether Dr. Ogandzhanova can perform the substantial and material duties of a radiation oncologist beginning in July 2011. Information regarding financial interests or investments has no relevance to the issues in this lawsuit.

30. Identify every person who has assisted Your Companies in preparing or maintaining financial records, tax records, and files since January 1, 2004.

**OBJECTION:** The information sought is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence at the time of trial. Furthermore, the interrogatory is overbroad, oppressive, an invasion of privacy and solely intended to harass the Defendant/Counter-Plaintiff. Dr.

Ogandzhanova has already provided Plaintiff/Counter-Defendant with her income tax returns.

**RESPONSE:**  The entities responsible for preparing Dr. Ogandzhanova's tax returns are identified in the returns that were previously provided.

31. Please identify with specificity where you were on the following dates including the address, city and state: 7/18/07 - 7/21/07, 12/10/07 - 12/12/07, 12/16/07 - 12/20/07, 1/7/08 - 1/10/08, 4/21/09, 4/22/09, 4/28/09, 5/9/09, 12/7/09 - 12/10/09, 2/22/10, 2/23/10, 3/4/10, 8/31/10, 9/1/10, 9/8/10 - 9/10/10, 10/21/10 - 10/23/10, 10/25/10, 10/27/10, 11/6/10, 11/12/10, 11/15/10, 12/20/10, 12/22/10, 1/4/11, 1/5/11,2/27/11, 2/28/11, 3/1/11 and 3/3/11.

**OBJECTION:**   The information sought is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence at the time of trial. Furthermore, the interrogatory is overbroad, oppressive, an invasion of privacy and solely intended to harass the Defendant/Counter-Plaintiff.   MetLife conducted surveillance by three separate surveillance companies on each of the dates identified in this interrogatory and has video of Dr. Oganzhanova's whereabouts on those dates.  Not only is the information requested irrelevant, but there is no possible way for Dr. Oganzhanova to recall or reasonably reconstruct her time.

32.    Identify when you first consulted with counsel and when you first retained counsel in connection with the potential sale of the assets of your radiation oncology business?

11

**RESPONSE:** Attorney-client privileged. Dr. Ogandzhanova's communications with her attorneys are privileged and are not discoverable. Moreover, Defendant/Counter-Plaintiff does not recall when counsel was first retained and/or consulted regarding the potential sale of her radiation oncology business. Plaintiff/Counter-Defendant is, however, in possession of, and has subpoenaed records from her prior counsel, regarding the sale of her radiation oncology practice and other than the documentation and information contained in those records, Dr. Oganzhanova has no personal recollection as to when counsel was first retained and/or consulted.

33. Identify all insurance providers that provide(d) malpractice insurance to you or Desert Rose Oncology, LLC, from January 1, 2004, to present.

**RESPONSE:** Mutual Insurance Company of Arizona.

DATED this 3rd day of April, 2013.

ADELMAN GERMAN PLC



By: _____
      Steven J. German

**DAWSON & ROSENTHAL, P.C.**
Steven C. Dawson
Anita Rosenthal
1850 N. Central Avenue, Suite 510
Phoenix, AZ 85004
*Attorneys for Defendant/*
*Counter-Plaintiff*

12

Original of the foregoing e-mailed
and mailed this 3rd day of April, 2013, to:

Steven Bressler
Jason Porter
Lewis and Roca LLP
40 North Central Avenue, 19th Floor
Phoenix, Arizona  85004-4429

Floyd P. Bienstock
Erin E. Bradham
STEPTOE & JOHNSON LLP
201 East Washington Street
Suite 1600
Phoenix, Arizona 85004-2382

*Attorneys for Plaintiff/Counter-Defendant*
*Metropolitan Life Insurance Company*

13

# EXHIBIT 30

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Metropolitan Life Insurance Company, a
New York corporation,

            Plaintiff/Counter-Defendant,

vs.

Inna Ogandzhanova, M.D.,

           Defendant/Counter-Claimant.

No. 2:12-cv-372-GMS

**DECLARATION OF
JAMES FREDERICK**

I, James Frederick, state as follows:

    1.    I am a Manager, Disability Income Claims at Metropolitan Life Insurance Company.

    2.    From approximately April 2008 to the present, I have been the claim examiner with responsibility for Dr. Inna Ogandzhanova's individual disability claim.

    3.    As a result, I am familiar with MetLife's document management practices in connection with Dr. Ogandzhanova's claim. I am familiar with the documents sent and received by MetLife related to Dr. Ogandzhanova's claim and with the contents of MetLife's claim file. I make this Declaration based upon my personal knowledge of the matters described herein.

    4.    The documents attached as Exhibits A through L of this Declaration are true and correct copies of documents maintained by MetLife in its claim file for Dr.

1   Ogandzhanova's claim, which is kept in the course of MetLife's regularly conducted

2   business activity as part of MetLife's regular practice.

3       5.   Exhibit A (Bates No. MLOCL001832) is a true and correct copy of a report

4   from Dr. James Boone received by MetLife on or around April 21, 2011 and

5   incorporated into its claim file.

6       6.   Exhibit B (Bates Nos. MLOCL001992 – MLOCL001994) is a true and

7   correct copy of a report from Dr. Eric Kaplan received by MetLife on or around October

8   30, 2010 and incorporated into its claim file.

9       7.   Exhibit C (Bates Nos. MLOCL001838   MLOCL001839) is a true and

10  correct copy of a report from Dr. Eric Kaplan received by MetLife on or around April

11  20, 2011 and incorporated into its claim file.

12      8.   Exhibit D (Bates Nos. MLOCL001818 – MLOCL001819) is a true and

13  correct copy of a report from Dr. Eric Kaplan received by MetLife on or around June 8,

14  2011 and incorporated into its claim file.

15      9.   Exhibit E (Bates Nos. MLOCL001820 – MLOCL001828) is a true and

16  correct copy of a report from Dr. Joel Parker received by MetLife on or around June 2,

17  2011 and incorporated into its claim file.

18      10.  Exhibit F (Bates No. MLOCL002228) is a true and correct copy of a report

19  from Dr. Eric Kaplan received by MetLife on or around September 22, 2011 and

20  incorporated into its claim file.

21      11.  Exhibit G (Bates No. MLOCL002175) is a true and correct copy of a report

22  from Dr. Eric Kaplan received by MetLife on or around December 29, 2011 and

23  incorporated into its claim file.

24      12.  Exhibit H (Bates Nos. MLOCL002243 – MLOCL002245) is a true and

25  correct copy of a letter I sent to Jason Newfield, Inna Ogandzhanova's attorney, on July

26  1, 2011, which is included in MetLife's claim file.

27

28

2

13. Exhibit I (Bates Nos. MLOCL001695 – MLOCL001742) is a true and correct copy of Disability Income Insurance Policy No. 6364168 issued to Inna Ogandzhanova on March 10, 1999, which is contained in MetLife's claim file.

14. Exhibit J (Bates Nos. MLOCL001745 – MLOCL001780) is a true and correct copy of the Disability Income Insurance Policy No. 6482821 issued to Inna Ogandzhanova on July 28, 2006, which is contained in MetLife's claim file.

15. Exhibit K (Bates Nos. MLOCL001000- MLOCL001001) is a true and correct copy of a statement from Inna Ogandzhanova that was received by MetLife by fax on or around December 31, 2007.

16. Exhibit L (Bates No. MLOCL000801- MLOCL000803) is a letter from Jason Newfield dated January 25, 2008 that was received by MetLife on or around January 28, 2008.

17. In my capacity as the claim examiner responsible for Dr. Ogandzhanova's claim, I have continued to review and assess Dr. Ogandzhanova's claim on an ongoing basis since sending my July 1, 2011 letter, attached as Exhibit H. My ongoing review includes, among other things, requesting and reviewing medical records as Dr. Ogandzhanova obtains additional treatment; seeking input from appropriate medical consultants; and assessing and evaluating any new information that may have a bearing on the claim.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 17th day of January, 2014.

JAMES FREDERICK

3

Doc. # DC-6309337 v 1

# EXHIBIT A

**Medical Consultant Transcription:**

| | |
|---|---|
| **Claimant:** | **Inna Ogandzhanova** |
| **Claim No.:** | **120706054945** |
| **Date:** | **04-21-11** |
| **Examiner:** | **Jamie Frederick, T068** |

Dr. Lamb's IME is reviewed that was performed on 03-02-11 and 03-08-11.  Dr. Ogandzhanova fails multiple cognitive symptom validity measures (dots, Finger Tapping combined, and Reliable Digit Span).  These are measures easily passed by persons with moderate to severe traumatic brain injury, pain, depression, and other clinical conditions.  Her performance is also implausibly severely impaired (< or = 5th percentile given her observed behavior on surveillance, including driving and functioning alone in the community.  Research demonstrates when three or more SVTs are failed, the probability of malingering is nearly 99%.  Dr. Lamb also reports the psychological test data (Personality Assessment Inventory) indicate exaggeration of problems.

Dr. Lamb writes "In summary the primary finding of the current evidence is that she is exaggerating the severity of the cognitive and emotional symptoms she claims to be experiencing, as well as to the extent to which they adversely impact her ability to function."

Dr. Lamb reports her diagnoses are PTSD and Major Depressive Disorder.  He reports a GAF score of 70 which is typically associated with ability to work.

James R. Boone, PhD, –04-21-11
Diplomate in Clinical Neuropsychology
American Board of Professional Psychology
Dictated but not proofread
JB:spc
13-00368873

MLOCL001832

# EXHIBIT B

Policyholder Name: Inna Ogandzhanova
Claim #: 120706054945
for Jamie Fredericks
Claiming disability since 3/13/07 for Depression
Occupation: Radiation Oncologist

**Gerald Rozansky, M.D.   Psychiatrist**

8/29/10 letter reviewed:
Meets monthly.
Occasional panic attacks
Mood has lifted

Diagnosis: PTSD with anxiety and depression, Complicated Grief

**Joel Parker, M.D.   Psychiatric IME**

10/2/10 report reviewed.

Dr. Ogandzhanova reported she was unable to complete the MMPI-2 testing as she was
too tired.   She reported she would return to complete the testing in a few days.   As of
9/28, she did not call or return to take the test.

She was evasive.

Current subjective complaints:
Lift changed absolutely, not much motivation, mood unimproved after having 2 children,
panic, depression, anger, no friends, can't function well, anxiety with thoughts of dealing
with radiation oncology.

Examinee's view of impairment: inability to deal with being a radiation oncologist,
inability to counsel patients, inability to go to cancer centers or deal with cancer, inability
to be consistent.

Complaints of : anger, mood 2-5/10, loss of interest, stays home, gained 30 pounds since
birth of last child, sleeps about 7 hours, wakes up a few times, energy 3-4/10, poor
concentration, vague thoughts about death, but denied suicidal ideation.

Sees Dr. Rozansky in Los Angeles once month.
Takes Lexapro 30 mg. daily, only psychiatric medication.

MSE:
Cried
Was irritable
Insight poor, judgment fair

MLOCL001992

Alert and fully oriented, concentration good, registration initially poor, then improved, recall fair, long term memory good, attention good.

Diagnosis:
Axis 1: Bereavement, Major Depression, single, chronic and PTSD
Axis 2: Narcissistic Personality Features
GAF 65

"Dr. Ogandzhanova was very evasive about her current subjective complaints."

She denied auditory or visual hallucinations.   She may have a low grade psychosis.   She had some magical thinking regarding her son.

There is limited evidence of cognitive impairment.
"The video surveillance information indicates that Dr. Ogandzhanova has no substantial difficulties functioning day to day, which is inconsistent with any substantial cognitive impairment."

"In light of the substantial discrepancies between her described deficits and the videotape, I would recommend a second neuropsychological evaluation."

Documentation of various concerns about symptom magnification.

"I cannot support a diagnosis of malingering to a degree of reasonable medical certainty. However, Dr. Ogandzhanova receives substantial secondary gain ..."

She is not interested in returning to work as a radiation oncologist.

"She did not return to complete the MMPI-2 examination as she indicated that she would on the day of the interview.   This behavior , combined with the surveillance video, calls into question her credibility."

"Dr. Ogandzhanova may have difficulties returning to work as a radiation oncologist , due to her subjective report that she cannot be near cancer patients.   I have no objective data to support this conention..."
"She has no psychiatric symptom, outside of her subjective report of an inability to treat cancer patients, that would interfere with her ability to work as a radiation oncologist."

**Surveillance Report:**
9/14/10 report; Claimant observed to drive, care for her children, shop.

MLOCL001993

**Impression:**

I have reviewed the summary letter from Dr. Rozansky, surveillance report and a Psychiatric IME regarding Dr. Inna Ogandzhanova.   I found the IME to be thorough and well organized.   Dr. Parker was unable to complete the IME because the claimant was noncompliant with completing the MMPI-2.   Various discrepincies are documented in this IME report regarding the claimant's psychiatric condition.

The medical information presently contained in the file is sufficient to render an opinion regarding the claimant's level of impairment and the resultant restrictions and limitations, if any, in her mental capacity.

In summary, based on all the available evidence, the documentation does not support that Dr. Inna Ogandzhanova is impaired from working as a radiation oncologist secondary to Major Depressive Disorder, PTSD or any other psychiatric disorder.

**Recommendations:**

1. Please utilize the above impressions to assist you in determination of her request for disability income.
2. I would be happy to review any additional medical documentation you may receive.
3. Since the claimant was not compliant with the objective testing recommended by Dr. Parker, I recommend Neuropsychologist Testing to include validity scales for cognitive and psychological symptoms.

Eric Michael Kaplan, M.D.
October 30, 2010
Diplomate, American Board of Psychiatry and Neurology
Diplomate, American Board of Forensic Medicine
Diplomate, American Board of Disability Analysts

MLOCL001994

# EXHIBIT C

Policyholder Name: Inna Ogandzhanova
Claim #: 120706054945
for Jamie Fredericks
Claiming disability since 3/13/07 for Depression
Occupation: Radiation Oncologist

**David Lamb, Ph.D.   Neuropsychological IME Report**

Report reviewed.
3/2/11, 3/8/11 examination dates

subjective complaints; problems with memory, concentration, irritability, anxiety,
depression, fatigue, change in appetite, lack of enjoyment and libido, lack of energy,
PTSD symptoms.

Meds: still taking Lexapro at 30 mg. daily.

Testing:
Dr. Ogandzhanova's performance on one or two formal Symptom Validity Tests was
indicative of a sub-optimal level of effort.
PAI: negative impression management scale was slightly elevated, raising the possibility
of some exaggeration of complaints.
These findings indicate that Dr. Ogandzhanova's presentation of her cognitive and
emotional/psychological status is unreliable.

Diagnosis:
Axis 1: PTSD, Major Depressive Disorder
GAF 70

"In summary, the primary finding of the current evaluation is the evidence from multiple
sources that Dr. Ogandzhanova is exaggerating the severity of the cognitive and
emotional symptoms she claims to be experiencing, as well as the extent to which they
adversely impact her ability to function."

**Surveillance Report**
12/20/10, 12/22/10, 1/4/11, 1/5/11, 2/27/11, 2/28/11, 3/1/11, 3/3/11,

The claimant was observed to be active.  She was observed to drive, care for children,
shop, go to several restaurants and other locations.   No abnormal activities were noted.
Dress and behavioral were normal.

MLOCL001838



**Impression:**

I have reviewed surveillance reports and a Neuropsychological IME regarding Dr. Inna Ogandzhanova. I found the IME report to be thorough and well organized. This Neuropsychological IME provides objective evidence of symptom exaggeration. There is evidence that the claimant is exaggerating both cognitive and psychological symptoms.

The medical information presently contained in the file is sufficient to render an opinion regarding the claimant's level of impairment and the resultant restrictions and limitations, if any, in her mental capacity.

In summary, the documentation does not support that Dr. Inna Ogandzhanova is impaired from working as a radiation oncologist secondary to Major Depressive Disorder, PTSD or any other psychiatric disorder.

**Recommendations:**

1. Please utilize the above impressions to assist you in determination of her request for disability income.
2. I would be happy to review any additional medical documentation you may receive.
3. Please send a copy of the Neuropsychological IME Report to Dr. Parker. After reviewing this report, please ask Dr. Parker to comment on whether Dr. Ogandzhanova is or is not impaired from working as a radiation oncologist secondary to any psychiatric or cognitive disorder.


Eric Michael Kaplan, M.D.
April 20, 2011
Diplomate, American Board of Psychiatry and Neurology
Diplomate, American Board of Forensic Medicine
Diplomate, American Board of Disability Analysts

# EXHIBIT D

Policyholder Name: Inna Ogandzhanova
Claim #: 120706054945
for Jamie Fredericks
Claiming disability since 3/13/07 for Depression
Occupation: Radiation Oncologist

**Joel Parker, M.D.**
**Psychiatrist, 6/2/11 report**

Report reviewed.
"I stand by my opinions regarding her symptoms, her magnification of symptoms, her lack of appropriate treatment, and the recommendations for appropriate care."
"The available evidence indicates that Dr. Ogandzhanova has an aversion to dealing with oncology patients, but has no other psychiatric impediment to her working as a radiation oncologist."

**James Boone, Ph.D.  MetLife Consultant**

4/21/11 report:
"Given her observed behavior on surveillance, including driving and functioning alone in the community, research demonstrates when 3 or more SVTs are failed, the probability of malingering is nearly 99%."

**Impression:**

I have reviewed the report from Dr. Parker and Dr. Boone regarding Dr. Inna Ogandzhanova.   I found the reports from both consultants to be thorough and well organized.   Dr. Boone documented evidence of malingering.   Dr. Parker did not find evidence supporting restrictions or limitations from working as a radiation oncologist secondary to a psychiatric disorder.

The medical information presently contained in the file is sufficient to render an opinion regarding the claimant's level of impairment and the resultant restrictions and limitations, if any, in her mental capacity.

In summary,  the documentation does not support that Dr. Inna Ogandzhanova is impaired from working as a radiation oncologist secondary to  Major Depressive Disorder, PTSD or any other psychiatric disorder.

**Recommendations:**

1.  Please utilize the above impressions to assist you in determination of her request for disability income.

MLOCL001818

2. I would be happy to review any additional medical documentation you may receive.

June 8, 2011
Diplomate, American Board of Psychiatry and Neurology
Diplomate, American Board of Forensic Medicine
Diplomate, American Board of Disability Analysts

MLOCL001819

# EXHIBIT E



Joel E. Parker, M.D.
**Biltmore Psychiatric Group, PLLC**
Board Certified: General Psychiatry,
Forensic Psychiatry,
Independent Medical Examinations

6245 North 24th Parkway, #203
Phoenix, AZ  85016
602-843-0035 (phone)
602-843-8963 (fax)
joelparker@biltmorepsych.com

June 2, 2011

Eric Michael Kaplan, MD
Metropolitan Life Insurance Company
P. O. Box 30429
Tampa, FL 33630-3429

RE:                       Inna Ogandzhanova, MD
POLICY NUMBERS:     6 364 168 AH and 6 482 821 AH
DATE OF BIRTH:        January 7, 1963

Dear Dr. Kaplan:

As you know, I completed an independent medical examination for Dr. Ogandzhanova in late September 2010, from which I produced a report.  I have also produced an addendum dated October 5, 2010.   I recently received a packet of additional documents, with a request to provide an update in my previous opinion.  I have not interviewed Dr. Ogandzhanova again.

**RECORD REVIEW:**  In conjunction with this report I have reviewed the following documents:
1. The cover letter in this matter.
2. My independent medical examination, of some 26 pages, dated October 2, 2010.
3. My addendum dated October 5, 2010.
4. A report from Gerald Rozansky, MD, PhD, dated November 10, 2010.  Notable are the following:
   A. "She focuses on her daily life and raising her two children.  There was much concern about her being required to have a full psychological evaluation and the insistence that she see a particular psychiatrist/psychologist who was selected by her insurance carrier.  I encouraged her to have the evaluation."
   B. "Dr. Ogandzhanova wrote a letter describing her view of the meeting.  It was obvious that she was disturbed by the evaluation and meeting.  She felt betrayed at being taken through the history of Isaac's illness and treatment.  She concludes that once again the insurance company is being punitive, doubtful of her sincerity, and looking for some way of

*11 JUN-06 PM10:20

MLOCL001820

 
showing that she is not disabled, or, at least, not making a sincere effort to improve."

C. "If the psychologist was performing in the way she described, his behavior is, at least, questionable. I presume that after this information-gathering session his suggestion that she undergo psychological testing would be problematic. Testing under circumstances Dr. Ogandzhanova describes would bring into question the accuracy of the testing."

D. "She thought she was to have four hours of evaluation and testing (in my IME): 'instead it took 3.5 hours to talk, and then testing was to come. He told me that he needs the results of the testing, and I should come back. I couldn't go back. He took me through Isaac's story; an interrogation. He took me through all of my emotions. I had no strength to think or question. If I chose not to answer and didn't answer, I felt I would be accused of being evasive. I always wanted to be noticed, but I had high self-esteem. I didn't want fame. I want to be left alone. Everything is too much. Just like out of prison.'"

E. "She felt that she had been shattered by an interrogation by the evaluator. She felt belittled and had lost her usual sense of self-esteem since the day of the evaluation session. Thoughts were scattered resulting in her shifting back and forth between problems of raising her children, trying to organize herself, and soothe herself. Affect shifted from the topic of the conversation, overall feeling defeated in trying her best."

F. "There is suspicion as to about the goals of the insurance company when they were insistent that she see this particular evaluator (Dr. Parker), and according to her he was pushing her to disintegrate. Under the circumstances, she felt she could not continue with formal testing. Dr. Parker offered to have her rest and return another day for testing, and she felt this would only result in further emotional degradation and personal disintegration. She reacts with anxiety if prompted to take further testing."

G. "If Dr. Parker behaved in the ways that Dr. Ogandzhanova describes, it would, in my opinion, be contrary to the usual approaches to evaluation techniques, unless the methods were specifically used in an attempt to push the patient to the point of defenselessness and perhaps bring forward a more obvious picture of her symptoms. If this is the case, then her reaction, as she describes them, certainly present a person who had functioned in superior ways until the death of her child, and who is now disabled."

H. "If her behavior is manipulative and only an attempt to portray psychopathology for secondary gain, this behavior would also indicate a severe degree of psychopathology. As discussed before: What is the gain? Financial? Her income was substantially greater before, when she was able to function as a radiation oncologist. She had been an eminently successful, independent person, who dealt with many obstacles in life that few of us have to endure, but at this time in her life, no longer is capable."

I. "I think it would be helpful if you let Dr. Ogandzhanova know what is the purpose and goal in your approach with her. Do you have information

MLOCL001821

 
about her that is contrary to what she is presenting to me?  If this is the case, then I might be able to work with her to help her improve her present state.  At present, her impression is that her only contact with her insurance company and its agents is conflictual in an attempt to discredit her... And add the fact that the patient comes from a world where psychiatric evaluations were used to send people a Gulag (sic), and you might have some impression why Dr. Ogandzhanova reacts as she does."

5.  A manual for administration, scoring, and interpretation of the MMPI-2.

6.  Several claimants' statements indicating no significant change.

7.  Video surveillance report dated November 11, 2010.  Notable are the following:
    A.  Thursday, October 21, 2010:  No activity from Dr. Ogandzhanova.
    B.  Friday, October 22, 2010:  No activity from Dr. Ogandzhanova.
    C.  Saturday, October 23, 2010:  No outside activity from Dr. Ogandzhanova.
    D.  Monday, October 25, 2010:  No activity from Dr. Ogandzhanova.
    E.  Wednesday, October 27, 2010:  No activity from Dr. Ogandzhanova.
    F.  Saturday, November 6, 2010:  No activity by Dr. Ogandzhanova.

8.  Independent neuropsychological evaluation by David Lamb, PhD, dated March 14, 2011.  Notable are the following:
    A.  "At present, Dr. Ogandzhanova states that she is living alone with her two children.  Her significant other, Don Bates, has a separate residence, 'But he helps' with the children and is frequently at her house."
    B.  "Dr. Ogandzhanova had difficulty expressing why she continues to see Dr. Rozansky, even though her depression has not significantly improved.  She did say she felt he was supportive of her, and that, 'I feel relief' after the sessions."
    C.  "Three years after the initial valuation (sic) Dr. Ogandzhanova reports she is still taking the same dose of Lexapro (30 mg).  She reported in 2008 that it 'helped some,' but 'nothing can numb the fact that it happened.'  Nothing in the documentation from Dr. Rozansky explains why there has been no change in her medication despite years of ongoing incapacitating psychiatric symptoms.  He notes that she is 'motivated and cooperative in her treatment,' but also that her overall condition is not improved or that there has been some limited progress.  Of particular interest is an article Dr. Rozansky sent from the Journal of Clinical Psychiatry proposing the addition of complicated grief to diagnostic and statistical manual.  In addition to laying out the criteria for complicated grief, the article sites evidence that complicated grief, '... Can be effectively treated using strategies and techniques that specifically target the syndrome of complicated grief.'  It is unclear whether Dr. Rozansky has obtained training in complicated grief therapy, and if not, whether he has sought out mental health professionals with such training in the Phoenix area."
    D.  "As stated three years ago, it is difficult to understand Dr. Ogandzhanova's failure to seek different treatment options in the face of her report of a worsening severity of symptoms.  Other than being comfortable with him and feeling supported, she could not articulate how her visits with Dr. Rozansky were helpful.  In fact, she describes being

MLOCL001822

Inna Ogandzhanova, MD       Page 4
June 2, 2011

both depressed and angry after having visited him prior to the second day of the current evaluation, calling into question the benefits of such visits to her emotional state. Her ability to travel independently to Los Angeles for psychiatric treatment six times a year is inconsistent with her claim that she cannot function alone outside of home more than once every three months. Over five years ago Dr. Ogandzhanova was able to research the Internet and find psychiatric resources, call a number of offices, find a suitable provider, and then travel to a different state to meet a stranger and initiate psychiatric treatment. She was able to do this at the same time she reports experiencing increasing difficulties with her ability to function at work. She should therefore be able to apply the same abilities currently to research local mental health professionals who have experience in providing complicated grief therapy, which is apparently successful in treating her condition, as noted in the article supplied by Dr. Rozansky."

E.  "It is interesting to note some similarities in behavior across these two evaluations. In 2008, Dr. Ogandzhanova stated that she had filled out the Relatives Form for her significant other, Mr. Bates, because his eyes were blurry from an eye exam, and he could not read the form. For the current evaluation, she also filled out the form for Mr. Bates because they needed to complete it while he was driving them up from Casa Grande."

F.  "Dr. Ogandzhanova arrived about 20 minutes late for both appointments of the current evaluation (she was about 40 minutes late for the first appointment in 2008)."

G.  "The covert surveillance of Dr. Ogandzhanova provides equivocal data relative to the current assessment. For example, there are frequent extended periods during which a lack of activity was noted, substantiating Dr. Ogandzhanova's claims of limited social activity and a preference to isolate herself."

H.  "Dr. Ogandzhanova's performance on one of two formal symptom validity tests was indicative of a suboptimal level of effort. Performance on three separate imbedded measures of effort was below recommended cutoffs. As with the first evaluation, there were also a number of unusual behavioral observations during the testing. For example, on the Ruff Figural Fluency Test she began to repeatedly retrace the lines on several of her last designs instead of generating more unique patterns. Also, Dr. Ogandzhanova so quickly drew the copy of the Rey-Osterrieth Complex Figure, and with such little effort towards accuracy, that she was asked to try again. She was only marginally slower in copying the figure on the second trial."

I.  "In summary, there is evidence of poor effort relative to the testing of cognitive symptoms in multiple measures, both formal and embedded. There is also evidence that Dr. Ogandzhanova was exaggerating her psychological symptoms while taking the PAI, although these indicators were in the mild range. Nonetheless, these findings indicate that Ms.

 
Ogandzhanova's presentation of her cognitive and emotional status is unreliable."

J. "As observed in the prior report, the number of impaired scores generated for this limited battery is exceptionally high when taking into account Dr. Ogandzhanova's educational, professional achievements. However, this observation is secondary to the fact that there are multiple indicators that Dr. Ogandzhanova was not putting forth her best effort during the current evaluation. Given these findings, there can be no confidence that the scores produced by Dr. Ogandzhanova actually reflect her current level of ability."

K. "Based upon the symptoms Dr. Ogandzhanova described during the clinical interview, technically she still meets the criteria for Post-Traumatic Stress Disorder (chronic, with delayed onset), and Major Depressive Disorder (single episode, moderate). However, there is reason to suspect that Dr. Ogandzhanova has exaggerated the degree to which she is suffering from these symptoms. As noted in the previous report, these diagnoses would not be unexpected given the death of her son and the manner in which that occurred. Nonetheless, having generated evidence of exaggeration of symptoms on two separate evaluations three years apart, it is difficult to place confidence in Dr. Ogandzhanova's self-report, which is the primary basis for making the diagnosis."

L. "In summary, the primary finding of the current evaluation is the evidence from multiple sources that Dr. Ogandzhanova is exaggerating the severity of the cognitive and emotional symptoms she claims to be experiencing, as well as to the extent to which they adversely affect her ability to function."

9. A surveillance report with video from November 12 and 15, 2010.

   A. This indicates Dr. Ogandzhanova standing outside of a garage, with a small child nearby.

   B. November 15, 2010: She is seen in the front yard conversing with someone in a car.

10. Surveillance video from December 20, 2010 through January 5, 2011. Notable are the following:

   A. Monday, December 20, 2010:

      1) 8:50 a.m.: She is seen loading a large sport utility vehicle, getting her children into it, and driving off. She drives to a school, goes to a gas station, fuels her vehicle, and leaves the area.

      2) 10:02 a.m.: She interacts with a couple outside of a building. The man assists with a child in the vehicle, gets in the vehicle, and they drive off.

      3) 10:30 a.m.: She arrives at a building in Phoenix.

      4) 10:30 a.m.: She goes to 2930 E. Camelback Road, Phoenix.

      5) 2:29 p.m.: She is seen parked at the Social Security Administration in Casa Grande, having been driven as a passenger in her truck. She stayed in the vehicle while her male companion entered the building.

'11 JUN-06 ᴀᴍ10:20

MLOCL001824

 
    6) 3:28 p.m.: She goes to the Hong Kong Kitchen Buffet where she consumes a meal with her male companion and at least one child (the video is somewhat distant).

    7) 4:15 p.m.: She is a passenger in a vehicle going home.

  B. December 21, 2010:

    1) She is seen walking around the garage, interacting with her male companion, moving various items in and out of the Ford Excursion with New Mexico license plates.

    2) 12:23 p.m.: She moved various items into the vehicle.

    3) 1:11 p.m.: She is at Sky Harbor International Airport.

  C. January 4, 2011: She is seen loading various items into the Ford Excursion. She is noted to be driving the Ford Excursion in the afternoon. She goes out to the "Crazy Buffet" for dinner. She interacts with her two children, helping them while they eat. Her male companion is there as well. She is a passenger in the vehicle after it leaves.

11. Surveillance report dated March 11, 2011, for February 27 through March 3, 2011, with accompanying video. Notable are the following:

  A. February 27, 2011: There is activity around the household, but not apparently from Dr. Ogandzhanova.

  B. February 28, 2011:

    1) She is videotaped sitting in the passenger side of the vehicle after loading it with several items.

    2) She is seen eating at the Crazy Buffet. She arrives at a shopping center and speaks on a cellular telephone. She drives to Radio Shack and walks inside. She then goes to a Sprint store and a Discount Tire. She interacts with the salesman regarding her vehicle, apparently discussing the tires, gesticulating without difficulty.

    3) 10:28: a.m. She leaves Discount Tire. She makes several telephone calls.

    4) 10:41 a.m.: She speaks on the cellular telephone and returns to Discount Tire.

    5) 1:35 p.m.: She is seen talking on the cell phone while a passenger in the Excursion.

  C. March 1, 2011:

    1) 3:07 p.m.: She arrives, according to the report, at Superstition Mental Health, where she walked into the facility, accompanied by the male and the child at 3:16 p.m.

    2) 3:18 p.m.: She walks into the facility with her child.

    3) 3:45 p.m.: The male and child exit the facility, and return to the vehicle.

    4) 3:55 p.m.: She leaves the facility alone. She gets into the passenger side of the vehicle and leaves.

  D. March 3, 2011:

    1) She stands in the front yard speaking with someone out of view.

    2) 8:38 a.m.: She gets in the vehicle and drives away.

MLOCL001825

Inna Ogandzhanova, MD                        Page 7
June 2, 2011

    3) 8:56 a.m.:  She goes to the Sprint store.
    4) 9:59 a.m.:  She goes to The Home Depot, where she remains in the vehicle.
    5) 10:36 a.m.:  She drives away.
    6) 10:41 a.m.:  She arrives at Office Max and goes inside for about 20 minutes and then returns to her vehicle.
    7) 1:12 p.m.:  She returns home.
    8) 2:31 p.m.:  She goes to PV Design Center in Paradise Valley, and is videotaped driving.  She goes to TLC Preschool at 5:39 p.m., goes to Safeway.

**UPDATED OPINION:**

1. My review of these additional materials does not substantially change the opinions contained in my October 2, 2010 independent medical examination.  In that interview, Dr. Ogandzhanova reported difficulties functioning as a radiation oncologist due primarily to her difficulty dealing with cancer patients.  The additional data do not change this basic subjective impediment to her returning to work as a radiation oncologist.

2. However, the new information provides further evidence of Dr. Ogandzhanova's inconsistency with regard to her reports of symptoms versus her measured deficits.  Dr. Lamb's neuropsychological evaluation found "Dr. Ogandzhanova is exaggerating the severity of the cognitive and emotional symptoms she claims to be experiencing" but to meet the criteria (which are primarily subjective) for Post-Traumatic Stress Disorder and Major Depression.

3. Dr. Rozansky, for his part, appears to have limited objectivity, as is often seen in treating psychiatrists who have a therapeutic alliance with their patients.  Dr. Rozansky appears to be taking Dr. Ogandzhanova's complaints at face value. I have the following concerns:

    a. He is likely unaware of the video surveillance and the invalid psychological testing.
    b. He provides information about complicated grief, but does not provide any specific treatment for this condition.
    c. He provides pages from the testing manual for the MMPI-2, with underlined passages regarding "Ethical Test Usage," "Testability of the Test Taker," "Who can take the MMPI-2," and "Administering the MMPI-2." However, he was not present for the evaluation and therefore has no contemporaneous information about Dr. Ogandzhanova's mental state at the time of the evaluation.  His opinion about the appropriateness of the psychological testing is colored by his therapeutic alliance with Dr. Ogandzhanova and her distortions about the IME process.
    d. Dr. Rozansky's concern that in my forensic psychiatric interview, I "was pushing her to disintegrate" is inaccurate, distorted, and offensive.  He was not present for the interview, nor is he a forensic psychiatrist. He

MLOCL001826

Inna Ogandzhanova, MD    Page 8
June 2, 2011

writes: "She felt betrayed at being taken through the history of Isaac's illness and treatment" and "She felt that she had been shattered by an interrogation by the evaluator." According to the mental status examination from my IME, Dr. Ogandzhanova "was a circumstantial and digressive historian, and wanted to speak about the details of her son's medical condition at length. Her mood was somewhat anxious. Her affect was tense at times. She cried and was quite irritable and somewhat condescending periodically throughout the interview." In reality, I had to redirect Dr. Ogandzhanova to keep her on track and avoid excessive detail regarding her son's demise.

E. Dr. Rozansky appears to have become an advocate for Dr. Ogandzhanova rather than an effective treater. In all probability, Dr. Ogandzhanova continues to follow up with Dr. Rozansky because he continues to certify her disability and does not challenge her too much. In his report, Dr. Lamb expresses concern about Dr. Rozansky's treatment, in that complicated grief, "'... Can be effectively treated using strategies and techniques that specifically target the syndrome of complicated grief.' It is unclear whether Dr. Rozansky has obtained training in complicated grief therapy, and if not, whether he has sought out mental health professionals with such training in the Phoenix area."

e. Further, Dr. Rozansky has failed to provide Dr. Ogandzhanova with adequate treatment. Unless Dr. Ogandzhanova has absolutely refused any changes of medication, Dr. Rozansky's failure to treat her with more aggressive antidepressant medications is clinically inappropriate. Instead of medication changes, he could have treated her with psychotherapy that is more intensive or referred her to a therapist using "strategies and techniques that specifically target the syndrome of complicated grief," (as referenced in his submitted article on this topic). However, he has not pursued any of these appropriate treatment modalities.

4. To his credit, Dr. Rozansky brings an interesting cultural perspective to this evaluation, when he noted "and add the fact that the patient comes from a world where psychiatric evaluations were used to send people a Gulag (sic), and you might have some impression why Dr. Ogandzhanova reacts as she does." This background may explain some of Dr. Ogandzhanova's behavior, but not the invalid psychological testing.

5. I stand by my opinions regarding her symptoms, her magnification of symptoms, her lack of appropriate treatment, and the recommendations for appropriate care.

6. The available evidence indicates that Dr. Ogandzhanova has an aversion to dealing with oncology patients but has no other psychiatric impediment to her working as a radiation oncologist.

Please contact me for any questions.

MLOCL001827

Inna Ogandzhanova, MD
June 2, 2011

Page 9

Sincerely Yours,

Joel E. Parker, M.D.
JEP/dka

'11 JUN-06 ᴀᴹ10:21

MLOCL001828

# EXHIBIT F

Policyholder Name: Inna Ogandzhanova
Claim #: 120706054945
for Jamie Fredericks
Claiming disability since 3/13/07 for Depression
Occupation: Radiation Oncologist

**Letter from Gerald Rozansky, M.D.**

9/2/11 letter reviewed.
Dr. Rozansky describes his education and practice, including his work as a psychoanalyst.
He describes personality characteristics regarding the claimant.

**Impression:**

I have reviewed the report from Dr. Rozansky regarding Dr. Inna Ogandzhanova.   The information in this report does not change my previous impressions of this case.

The medical information presently contained in the file is sufficient to render an opinion regarding the claimant's level of impairment and the resultant restrictions and limitations, if any, in her mental capacity.

In summary,  the documentation does not support that Dr. Inna Ogandzhanova is impaired from working as a radiation oncologist secondary to  Major Depressive Disorder, PTSD or any other psychiatric disorder.

**Recommendations:**

1.  Please utilize the above impressions to assist you in determination of her request for disability income.

2.  I would be happy to review any additional medical documentation you may receive.

September 22, 2011
Diplomate, American Board of Psychiatry and Neurology
Diplomate, American Board of Forensic Medicine
Diplomate, American Board of Disability Analysts

MLOCL002228

# EXHIBIT G

Policyholder Name: Inna Ogandzhanova
Claim #: 120706054945
for Jamie Fredericks
Claiming disability since 3/13/07 for Depression
Occupation: Radiation Oncologist

**Letter from Jason Newfield, attorney**
**10/31/11**

I have reviewed the letter from attorney Jason Newfield in which he documents his opinions and disagreements with the reports provided by Drs. Parker and Lamb.

I disagree with Mr. Newfields' various opinions and I found the reports by Drs. Parker and Lamb to be thorough, well supported and non-biased.

**Impression:**

I have reviewed the letter from attorney, Jason Newfield regarding Dr. Inna Ogandzhanova.   The information in this letter does not change my previous impressions of this case.

The medical information presently contained in the file is sufficient to render an opinion regarding the claimant's level of impairment and the resultant restrictions and limitations, if any, in her mental capacity.

In summary,  the documentation does not support that Dr. Inna Ogandzhanova is impaired from working as a radiation oncologist secondary to  Major Depressive Disorder, PTSD or any other psychiatric disorder.

**Recommendations:**

1.  Please utilize the above impressions to assist you in determination of her request for disability income.

2.  I would be happy to review any additional medical documentation you may receive.

Eric Kaplan, M.D.
December 29, 11
Diplomate, American Board of Psychiatry and Neurology
Diplomate, American Board of Forensic Medicine
Diplomate, American Board of Disability Analysts

# EXHIBIT H

Metropolitan Life Insurance Company
P.O. Box 30429
Tampa, FL 33630-3429
Tel: 800-929-1492



Individual Disability Income
Disability Income Claims

July 1, 2011

Jason Newfield, Esquire
Frankel & Newfield, PC
585 Stewart Avenue
Suite 312
Garden City, NY 11530

Re:     Insured:        Inna Ogandzhanova, MD
        Policy Nos.:    6 364 168 AH and 6 482 821 AH

Dear Mr. Newfield

Reference is made to Dr. Ogandzhanova's claim for benefits under the above-numbered policies.

We are writing to update you on the status of our review of Dr. Ogandzhanova's claim and respond to your June 20, 2011 letter. Initially, we would like to respond to your letter and offer you a brief timeline of events that have transpired since approximately September 2010.

As you know, Dr. Ogandzhanova attended an independent examination with Psychiatrist Joel Parker, MD, on September 21, 2010. We received Dr. Parker's report on October 8, 2010. On October 14, 2010, we received an additional report from Dr. Parker in response to his review of Gerald Rozansky, MD, Ph.D.'s August 29, 2010 letter and attachments, and additional information from our claim file. On October 30, 2010, our consulting board-certified psychiatrist reviewed Dr. Parker's reports, and like Dr. Parker, recommended Dr. Ogandzhanova attend an independent examination with a board-certified neuropsychologist. On November 16, 2010, we received additional information from Dr. Rozansky.

On December 15, 2010, we communicated with you that we continue to have questions about Dr. Ogandzhanova's claim and were asking her to attend an independent examination with Neuropsychologist David Lamb, Ph.D. You contacted our office on December 29, 2010, and we discussed Dr. Ogandzhanova's claim. On January 14, 2011, we notified your office of dates of Dr. Lamb's availability to meet with Dr. Ogandzhanova. You contacted our office that same day asking why we had not responded to your December 29, 2010 letter, and we shared that we did not receive your letter via fax or mail. Your office faxed us your December 29, 2010 letter on January 14, 2011.

On January 18, 2011, we acknowledged receipt of your letter and asked for a response about Dr. Ogandzhanova's availability to attend the independent examination with Dr. Lamb. On January 21, 2011, we received a letter from your office that Dr. Ogandzhanova was available to meet with Dr. Lamb on February 23, 2011. On January 24, 2011, we sent your office a letter confirming the appointment for February 23, 2011.

On February 17, 2011, we notified your office that Dr. Ogandzhanova called Dr. Lamb's office and rescheduled the independent examination to March 2, 2011. We also provided paperwork for Dr. Ogandzhanova to complete in preparation for meeting with Dr. Lamb. On March 2, 2011, we sent your office a letter in response to your December 29, 2010 letter that was not received in our office until January 14, 2011.

MLOCL002243

On March 29, 2011, we received the report from Dr. Lamb from his meeting and testing with Dr. Ogandzhanova. This was referred to our consulting psychiatrist on April 4, 2011, and his report was received on April 20, 2011. To ensure the thoroughness of our evaluation, Dr. Lamb's report was forwarded for review to Dr. Parker on April 21, 2011. All of this updated information was reviewed by our consulting board-certified neuropsychologist on April 21, 2011.

On June 6, 2011, we received Dr. Parker's report of his review of Dr. Lamb's report, as well his response to Dr. Rozansky's November 16, 2010 letter and attachments. Dr. Parker's report was reviewed by our consulting psychiatrist on June 8, 2011, and by our consulting neuropsychologist on June 23, 2011.

Considering the aforementioned details and timeline of events that have transpired since September 2010, we vehemently disagree with the statements made in your June 20, 2010 letter, and believe that your letter grossly mischaracterizes the integrity of our evaluation of Dr. Ogandzhanova's claim. Please remember that we continued to pay total disability benefits to Dr. Ogandzhanova despite the numerous questions we have had in this matter.

Notwithstanding, although we deem this information to be confidential and proprietary, and to demonstrate our continued good faith administration of the claim, we have enclosed copies of our letters to Drs. Parker and Lamb. Please note we are not aware of any controlling legal authority which requires us to provide you with this information at this time. Also, separately, we have forwarded copies of Drs. Parker's and Lamb's reports to Dr. Rozansky, and we welcome any feedback or response he wishes to provide, including providing copies of any updated medical records or reports.

Regarding the current status of the claim, based upon the totality of information reviewed, we do not find that Dr. Ogandzhanova is experiencing any restrictions and limitations as a result of her claimed psychiatric condition, and we firmly believe this finding is supported by the independent and objective testing carried out by Drs. Parker and Lamb, as well as in the opinions offered by our consulting psychiatrist and neuropsychologist. Additionally, we have observed Dr. Ogandzhanova's level of activity, and find what was observed to be in stark contrast to her claimed level of impairment.

Although we currently find no restrictions and limitations, we want to afford Dr. Ogandzhanova the opportunity to provide us with any additional information to consider in our review. Along with a response from Dr. Rozansky to Drs. Parker's and Lamb's reports, we also welcome any feedback or response from you and Dr. Ogandzhanova, including details of any other treatment she is receiving or doctor that she is seeing. However, if we determine that we need to request additional information, we want to remind you that significant constraints have been imposed upon our use of the authorizations, and there may be information we need for our review that falls outside the scope of our permitted use of the authorizations. Consequently, we reserve all rights and defenses under the policies and all applicable state laws.

Lastly, we shared in communications with your office that Dr. Lamb would administer the MMPI-2 test to Dr. Ogandzhanova during the March 2, 2011 neuropsychological testing. According to our consulting neuropsychologist, Dr. Lamb administered the Personality Assessment Inventory (PAI) in lieu of the MMPI-2. Our consultant noted, "The PAI is also a widely used and comprehensive measure of psychological functioning that contains validity scales."

Mr. Newfield, we look forward to receiving your response to this letter, and to receiving any additional information from you and Dr. Ogandzhanova. In the interim, continued payment of disability benefits to Dr. Ogandzhanova and waiver of the policies' premiums are made under a

MLOCL002244

Re: Insured: Inna Ogandzhanova, MD                                                Page 3

complete reservation of rights, and should in no way be deemed an admission to our ongoing liability in this matter.

If you have any questions, please call me at 800 929-1492, extension 6205.

Sincerely

Jamie Frederick, M.Ed., DHP, DIA
Technical Claims Reference Advisor
Disability Income Business

Enclosures

MLOCL002245

# EXHIBIT I

 

# MetLife®

# Metropolitan Life Insurance Company

A Mutual Company Incorporated in New York State

Metropolitan Life Insurance Company will pay the benefits of this policy according to its provisions.

## Disability Income Insurance Policy - Omni Plus

* **Noncancelable and Guaranteed Renewable to Age 65. No Change in Premium Rates.** This means that, as long as you pay the premium on time, we cannot change your policy or its premium rate until the first premium due date on or after your 65th birthday.

* **Renewal Privilege from Age 65 to Age 75. Premium Rates are Subject to Change.** If you are actively and regularly employed full time as of the first premium due date on or after your 65th birthday, you may continue this policy to the first premium due date on or after your 75th birthday for as long as you remain so employed. This privilege is explained on page 7.

* The Schedule of Benefits provided by this policy is shown on page 3.

* There is an exclusion for Preexisting Conditions on page 8.

* This policy is eligible for dividends.

We have issued this policy to you in consideration of the payment of the premium and the statements made in your application. Your application is part of your policy.

Louis J. Ragusa
Vice President and Secretary

Robert H. Benmosche
Chairman of the Board,
President and Chief Executive Officer

| | |
|---|---|
| Insured | **INNA OGANDZHANOVA** |
| Date of Issue | **MARCH 10, 1999** |
| Policy Number | **6 364 168  AH** |

**TRUE COPY**

**10-Day Right to Examine Policy.** Please read this policy. It is a legal contract between you and us. You may return the policy to us or to the account representative through whom you bought it within 10 days from the date you received it. If you return it within the 10-day period, the policy will be considered never to have been issued. We will refund any premium paid.

**This is not a policy of worker's compensation insurance. The employer does not become a subscriber to the worker's compensation system by purchasing this policy, and if the employer is a non-subscriber, the employer loses the benefits which would otherwise accrue under the worker's compensation laws. The employer must comply with the worker's compensation law as it pertains to non-subscribers and the required notifications that must be filed and posted.**

See Table of Contents and Company address on back cover.

AH 1-90-TX                                1                                DFAACF

MLOCL001695

# Metropolitan Life Insurance Company

## SCHEDULE OF BENEFITS

| BENEFIT PROVISIONS | AMOUNT | ELIMINATION PERIOD(DAYS) | MAX. BENEFIT PERIOD | PREMIUM FOR TERM |
|---|---|---|---|---|
| MONTHLY BENEFIT FOR TOTAL DISABILITY | $ 9,500 | 90 | TO AGE 65 | $   565.8 |
| LIFETIME MONTHLY BENEFIT FOR TOTAL DISABILITY | SEE 1LT-90 FOR BENEFIT | LIFETIME PROVISIONS | | XXXXX |
| DATE OF RIDER:   JULY 10, 1999 | | | | |
| MONTHLY BENEFIT FOR RESIDUAL DISABILITY | SEE 1RD-90 FOR BENEFIT PROVISIONS | | | XXXXX |
| DATE OF RIDER:   MARCH 10, 1999 | | | | |
| GUARANTEED INSURABILITY BENEFIT | SEE 1GI-90 FOR BENEFIT PROVISIONS | | | |
| UNIT OF INCREASE | $ 1,500 | XXX | MAR. 10, 2013 | $   7.97 |
| MAXIMUM TOTAL INCREASE | $ 8,550 | XXX | EXPIRY DATE | |
| DATE OF RIDER:   MARCH 10, 1999 | | | | |
| MONTHLY BENEFIT FOR TOTAL DISABILITY IN YOUR OCCUPATION | SEE 1YO-90 FOR BENEFIT PROVISIONS | | | XXXXXX |
| DATE OF RIDER:   MARCH 10, 1999 | | | | |
| COST-OF-LIVING ADJUSTMENT FOR DISABILITY BENEFITS | SEE 1CA-90 FOR BENEFIT PROVISIONS | XXX | XXX | $   195.13 |
| DATE OF RIDER:   JULY 10, 1999 | | | | |
| PREFERRED RISK PREMIUM CREDIT | | | | ($   65.01 |
| | POLICY FEE | | | $     3.09 |
| | TOTAL PREMIUM FOR TERM | | | $   707.05 |

Endorsements and Riders to Your policy may change terms (including definitions, conditions, exclusions and limitations of coverage).  You should always check each Endorsement and Rider to confirm what coverage You have.

### INSURED
### INNA   OGANDZHANOVA

| | | | |
|---|---|---|---|
| DATE OF ISSUE | MARCH 10, 1999 | 6 364 168 AH | POLICY NUMBER |
| PLAN | DISABILITY INCOME | | |
| OCCUPATIONAL CLASS | NONSMOKER  5A | 1 MO(S) | TERM |

AH 1-90                            3

DHAAIN

MLOCL001696

# Metropolitan Life Insurance Company

## SCHEDULE OF BENEFITS

| BENEFIT PROVISIONS | AMOUNT | ELIMINATION PERIOD(DAYS) | MAX. BENEFIT PERIOD | PREMIUM FOR TERM |
|---|---|---|---|---|
| MONTHLY BENEFIT FOR TOTAL DISABILITY | $ 8,000 | 90 | TO AGE 65 | $   471.0 |
| LIFETIME MONTHLY BENEFIT FOR TOTAL DISABILITY | SEE 1LT-90 FOR BENEFIT | | LIFETIME PROVISIONS | XXXXX. |
| DATE OF RIDER:    JULY 10, 1999 | | | | |
| MONTHLY BENEFIT FOR RESIDUAL DISABILITY | SEE 1RD-90 FOR BENEFIT PROVISIONS | | | XXXXX: |
| DATE OF RIDER:   MARCH 10, 1999 | | | | |
| GUARANTEED INSURABILITY BENEFIT | SEE 1GI-90 FOR BENEFIT PROVISIONS | | | |
| UNIT OF INCREASE | $ 1,500 | XXX | MAR. 10, 2013 $ | 7.9: |
| MAXIMUM TOTAL INCREASE | $ 7,200 | XXX | EXPIRY DATE | |
| DATE OF RIDER:   MARCH 10, 1999 | | | | |
| MONTHLY BENEFIT FOR TOTAL DISABILITY IN YOUR OCCUPATION | SEE 1YO-90 FOR BENEFIT PROVISIONS | | | XXXXXX |
| DATE OF RIDER:   MARCH 10, 1999 | | | | |
| COST-OF-LIVING ADJUSTMENT FOR DISABILITY BENEFITS | SEE 1CA-90 FOR BENEFIT PROVISIONS | XXX | XXX | $   162.40 |
| DATE OF RIDER:    JULY 10, 1999 | | | | |
| PREFERRED RISK PREMIUM CREDIT | | | | ($    52.33 |
| | POLICY FEE | | | $     3.09 |
| | TOTAL PREMIUM FOR TERM | | | $   592.16 |

INSURED
INNA    OGANDZHANOVA

| DATE OF ISSUE | MARCH 10, 1999 | 6 364 168 AH | POLICY NUMBER |
|---|---|---|---|
| PLAN | DISABILITY INCOME | | |
| OCCUPATIONAL CLASS | NONSMOKER  5A | 1 MO(S)  TERM | |

AH 1-90                                   3

DHAAIN

MLOCL001697

# Metropolitan Life Insurance Company

## SCHEDULE OF BENEFITS

| BENEFIT PROVISIONS | AMOUNT | ELIMINATION PERIOD(DAYS) | MAX. BENEFIT PERIOD | PREMIUM FOR TERM |
|---|---|---|---|---|
| MONTHLY BENEFIT FOR TOTAL DISABILITY | $ 6,500 | 90 | TO AGE 65 | $   345.69 |
| MONTHLY BENEFIT FOR RESIDUAL DISABILITY | SEE 1RD-90 FOR BENEFIT PROVISIONS | | | XXXXXX |
| DATE OF RIDER:   MARCH 10, 1999 | | | | |
| GUARANTEED INSURABILITY BENEFIT | SEE 1GI-90 FOR BENEFIT PROVISIONS | | | |
| UNIT OF INCREASE | $ 1,300 | XXX | MAR. 10, 2013 | $   6.91 |
| MAXIMUM TOTAL INCREASE | $ 5,850 | XXX | EXPIRY DATE | |
| DATE OF RIDER:   MARCH 10, 1999 | | | | |
| MONTHLY BENEFIT FOR TOTAL DISABILITY IN YOUR OCCUPATION | SEE 1YO-90 FOR BENEFIT PROVISIONS | | | XXXXXX |
| DATE OF RIDER:   MARCH 10, 1999 | | | | |
| PREFERRED RISK PREMIUM CREDIT | | | | ($   27.35 |
| | | | POLICY FEE | $   3.09 |
| | | | TOTAL PREMIUM FOR TERM | $   328.34 |

INSURED
INNA    OGANDZHANOVA

| DATE OF ISSUE | MARCH 10, 1999 | 6 364 168 AH | POLICY NUMBER |
|---|---|---|---|
| PLAN | DISABILITY INCOME | | |
| OCCUPATIONAL CLASS | NONSMOKER  5A | 1 MO(S)  TERM | |

AH 1-90                               3

DHAAIN

MLOCL001698

## Understanding This Policy

"You" and "your" mean the insured named on page 3.

"We", "us" and "our" mean Metropolitan Life Insurance Company.

To make this policy clear and easy to read, we have left out many cross-references and conditional statements. Therefore, the provisions of the policy must be read as a whole. For example, the General Exclusions on page 8 apply to all benefit provisions of this policy.

A policy term and a policy anniversary are measured from the date of issue of the policy. For example, if the date of issue is May 5, 1992, the first policy anniversary is May 5, 1993. If the policy term is 6 months, the first term ends November 4, 1992.

Read this policy to find out how to exercise your rights. If you want to submit a claim, change an address, or request any other action by us, you should do so on the forms prepared for each purpose. You can get these forms from your account representative or your local Metropolitan office.

## Definitions

**Disability** means total disability that starts while your policy is in force.

**Total disability** or **totally disabled** means that due to injury or sickness, you are: (a) not able to perform the material and substantial duties of your regular occupation (your regular occupation is your usual work when total disability starts); and (b) not gainfully employed.

You will not be considered to be totally disabled for any time you are not receiving care by a physician which is appropriate for the condition causing the disability. However, you need not be under the care of a physician for benefits to continue if:

1.   Your physician provides certification acceptable to us that continued care would be of no benefit to you; and

2.   You are still totally disabled as defined in this policy.

**Presumptive total disability** means that you are presumed totally and permanently disabled if an injury or sickness causes the total and permanent loss of:

1.   The use of both your hands, both your feet or one hand and one foot;

2.   The sight of both your eyes;

3.   Your speech; or

4.   Your hearing in both ears.

In such cases, we will consider you to be totally disabled even if you are able to work and even if you are not receiving medical care by a physician; and we will waive the elimination period.

**Injury** means an accidental bodily injury that takes place while your policy is in force.

**Sickness** means sickness or disease that first manifests itself while your policy is in force.

**Date of Issue** means the date that the policy takes effect. This date is shown on page 3.

**Elimination period** means the number of days of disability from the start of a continuous period of disability to the date benefits become payable for that disability. This period for each benefit is shown on page 3.

**Continuous period of disability** means an unbroken period of disability, or successive periods of disability due to the same or a related cause that are separated by less than 6 months.

MLOCL001699

 

## Definitions (Continued)

**Maximum benefit period** means the longest period of time for which we will pay benefits for any one period of disability. This maximum is shown on page 3.

Benefits will end on the earliest of:

1. The date your disability ends;

2. The end of the maximum benefit period; or

3. The first premium due date on or after your 65th birthday.

However, if benefits for your disability started after the first premium due date on or after your 63rd birthday, benefits will end on the earlier of:

1. The date your disability ends; or

2. The date 24 months of benefits have been paid for the period of disability.

**Preexisting condition** means a sickness or a physical condition for which, in the 5 years prior to the date of issue, medical advice or treatment was recommended by or received from a physician.

**Physician** means a person, other than you or a member of your immediate family, who is legally licensed to practice medicine. Where required by law, this includes a duly licensed practitioner operating within the scope of his or her license.

**Complications of pregnancy** means:

1. Diseases of the mother which are not caused by pregnancy but which co-exist with and are adversely affected by pregnancy, such as heart, kidney, lung and other similar diseases;

2. Maternal conditions caused by the pregnancy which make its treatment more difficult, such as placenta praevia, ectopic pregnancy, hemorrhage following delivery, or similar severe conditions; and

3. A caesarean section or a miscarriage.

It does not include abortion unless performed for therapeutic reasons. It also does not include physician-prescribed rest, false labor, morning sickness, occasional spotting, or other minor conditions associated with normal pregnancy.

## Benefits

**Monthly Benefit for Total Disability**

We will pay the monthly benefit for total disability shown on page 3 while you are totally disabled.

This benefit will start after the elimination period; however, the elimination period will be waived for presumptive total disability. We will pay it while you remain totally disabled, but not beyond the maximum benefit period. For periods of less than a month, benefits will be prorated based on a 30-day month. If you die after benefits had been paid for 12 months or more during a period of disability, the benefit payable for the last month of disability will be paid to your beneficiary for the first 3 months after your death.

MLOCL001700



## Benefits (Continued)

| | |
|---|---|
| **Total Disability Because of Transplant Surgery** | If you are totally disabled because you have had surgery, at least 6 months after the date of issue, to transplant part of your body to someone else, we will consider you totally disabled due to sickness. |
| **Rehabilitation** | While you are receiving the total disability benefit, we will consider participating in an occupational rehabilitation program aimed at helping you to return to gainful employment in your regular occupation. The program may be at your request or we may suggest it. We will continue to pay benefits to you based on terms that we agree on with you.

In no case will we continue benefits beyond the maximum benefit period. |

### Recurrent and Concurrent Disability

| | |
|---|---|
| **Recurrent Disability** | If you become disabled within 6 months of the end of a prior period of disability, for which benefits were paid, and which was due to the same or a related cause, we will deem it a continuation of the prior disability. Otherwise, we will treat your disability as a new period of disability. |
| **Concurrent Disability** | If a disability is caused by more than one injury and/or sickness, we will pay benefits as if the disability were caused by one injury or sickness. |

### Renewal Privilege if Employed--Total Disability Benefit With Limited Benefit Period

| | |
|---|---|
| **Renewal Privilege** | From age 65 to age 75, you may continue the total disability benefit shown on page 3, as long as:

1.  You remain actively and regularly employed full time; and

2.  The premium is paid on time.

You may exercise this privilege only while your policy is in force and you are not disabled.

We may require proof after your 65th birthday that you have continued to be actively and regularly employed full time.

**Actively and regularly employed full time** means active work for at least 30 hours per week and at full pay. |
| **Total Disability Benefit With Limited Benefit Period** | If you continue the total disability benefit shown on page 3 under this privilege, the maximum benefit period will be 24 months. |
| **Premiums** | The premium will be at the rate then in effect for your class and attained age, and will change, according to the table of premium rates, as of each policy anniversary. We may change the table of premium rates for your policy, but only if we change it for all policies in this class. |

MLOCL001701

## Renewal Privilege if Employed--Total Disability Benefit With Limited Benefit Period (Continued)

We will refund any premium paid after the premium due date on or next following your 65th birthday for a period during which you are no longer working full time, since your policy would not provide coverage for that period.

## Provisions Applicable to All Benefits

**Waiver of Premiums**

After you have been disabled for a continuous period of 90 days, we will waive any premium that becomes due while you remain disabled. Your policy and its benefits will continue as if the premium had been paid.

We will also refund any premium that became due during the first 90 days of disability, and the pro rata portion of any previously paid premium applicable to that period.

The premium waived will be based on the frequency of payment in effect on the date your disability starts.

If, for a continuous period of disability, premiums are being waived, and benefits have been payable for 12 months or more, any premiums due during the first 90 days after that period of disability ends will not be payable. This additional 90-day waiver of premium will apply only once during a continuous period of disability, including recurrent disabilities. Thereafter, any premiums due will be payable. If you do not pay the first premium due by the end of its grace period, your policy will end.

**General Exclusions**

We will not pay benefits for a disability:

1. Due to act of war, whether declared or undeclared;

2. Due to pregnancy or childbirth, but we will cover disability due to complications of pregnancy as defined on page 6;

3. Due to any loss we have excluded by name or specific description;

4. Due to your committing, or attempting to commit, a felony.

**Preexisting Conditions Limitation**

We will not pay benefits for a disability that starts during the first 2 years after the date of issue if it was due to a preexisting condition. This limitation does not apply to any condition which was disclosed, and which was not misrepresented, in the application for this policy and was not excluded by name or specific description.

## Premium and Reinstatement

**Premium Payment**

The payment of the premium shown on page 3, on or before the date of issue, will keep the policy in force for the term which starts on the date of issue. At the end of any term while the policy has been in force, it may be renewed for a further term (called a renewal term). To renew, you must pay the premium shown on page 3 by the end of the policy's grace period.

The last renewal term of the policy will end on the day before the first premium due date on or after your 65th birthday. See Renewal Privilege if Employed on page 7 for renewal past this date.

MLOCL001702

 

## Premium and Reinstatement (Continued)

All premium terms will begin at 12:01 A.M. and end at midnight Standard Time, where you live.

You may change the frequency of payment with our approval.

**Grace Period**     This policy has a 31-day grace period. This means that each premium after the first may be paid up to 31 days after its due date. During the grace period, the policy will stay in force.

**Reinstatement**     If you do not pay the premium before the end of the grace period, you may apply for reinstatement by completing an application and paying the premium due. If we have not sent you a written disapproval of the application within 45 days, the policy will be reinstated as of the date we received the premium.

Any premiums we, or any of our account representatives, accept for a reinstatement will be applied to a period for which premiums have not been paid.

The reinstated policy will cover only a loss that results from an injury which occurs, or a sickness that did not manifest itself during the period of lapse, after the date of reinstatement. In all other respects all rights under the policy will remain the same, subject to any provisions noted on or attached to the reinstated policy.

**Suspension During Military Service**     If you enter full-time active duty in the military (land, sea or air) service of any nation or international authority, you may suspend your policy. But, you may not suspend the policy during active duty for training lasting 3 months or less. The policy will not be in force while it is suspended, and you will not be required to pay premiums. When we receive your written request to suspend the policy, we will refund the pro rata portion of any premium paid for a period beyond the date we receive your request.

If your full-time active duty in military service ends before the first premium due date on or after your 65th birthday, you may place this policy back in force without evidence of insurability. Your coverage will start again when:

1.  We receive your written request to place the policy back in force; and

2.  You pay the required pro rata premium for coverage until the next premium due date.

Your request and premium payment must be received by us within 90 days after the date your active duty in the military ends. Premiums will be at the same rate that they would have been had your policy remained in force. The policy will not cover any loss due to injury which occurs or sickness which starts while the policy is suspended. In all other respects you and we will have the same rights under the policy as before it was suspended.

## Dividends

Every year we determine an amount to be paid to our policyholders as dividends. We will determine the share, if any, for this policy and credit it as a dividend at the end of the policy year. We do not expect that any dividend on this policy will be paid for at least 5 years from its date of issue.

MLOCL001703



**Claims**

6 364 168 A H

| | |
|---|---|
| **Time of Loss** | All losses must begin while your policy is in force. |
| **Written Notice of Claim** | Written notice of claim must be given to us at our home or head office within 30 days after a covered loss starts, or as soon as reasonably possible. |
| **Claim Forms** | After we receive the written notice of claim we will send you our proof of loss forms within 15 days. If we do not, you will meet the written proof of loss requirements if you send us, within the time set forth below, a written statement of the nature and extent of your loss. |
| **Written Proof of Loss** | Written proof of loss must be sent to us within 90 days after the end of a period for which you claim benefits. If that is not reasonably possible your delay will not affect your claim. But, except in the case of legal incapacity, written proof must be given within one year after the time such proof is otherwise required. |
| **Physical Examination** | At our expense, we have the right to have a physician examine you as often as we feel is reasonably necessary. |
| **Time of Payment of Claim** | After we receive written proof of loss, we will pay the benefits due under the policy--subject to continuing proof of loss. |
| **Payment of Claims** | All benefits will be paid to you. But, if you are not legally competent to give a valid release, or if any benefit is payable to your estate, we may pay up to $1,000 to anyone who we believe is entitled to it. If we do that in good faith, we will not be liable to anyone for the amount we pay. |
| **Beneficiary** | The beneficiary is the person or persons to whom any benefits unpaid at your death are payable. You may name a contingent beneficiary to become the beneficiary if all the beneficiaries die while you are alive. If no beneficiary or contingent beneficiary is named, or none is alive when you die, your estate will be the beneficiary. While you are alive, you may change any beneficiary or contingent beneficiary.<br><br>If more than one beneficiary is alive when you die, we will pay them in equal shares, unless you have chosen otherwise. |
| **How to Change the Beneficiary** | You may change the beneficiary or contingent beneficiary of this policy by written notice or assignment of the policy. No change is binding on us until it is recorded at our home or head office. Once recorded, the change binds us as of the date you signed it. We may require that you send us the policy to make the change. |
| **Assignment** | We will not be bound by an assignment of your policy or of any claim unless we receive a written assignment at our home or head office before we pay the benefits claimed. We will not be responsible for the validity of any assignment. |
| **Misstatement of Age and Sex** | If your age or sex is not stated correctly on our records, the benefits under the policy will be those that the premium you paid would have bought at your correct age and sex. |

MLOCL001704

 

## General Provisions

**The Contract**

This policy with riders, if any, and the written application attached make up the entire contract. All statements in the application will be representations and not warranties. No statement will be used to contest the policy unless it appears in the application.

**Limitation on Account Representative's or Other Person's Authority**

No account representative or other person except our President, our Secretary or a Vice-President may (a) make or change any contract of insurance; or (b) change or waive any of the terms of this policy. Any change or waiver must be in writing and signed by our President, Secretary, or Vice-President.

**Time Limit on Certain Defenses**

1. **Misstatements in the Application** -- After this policy has been in force during your lifetime for 2 years from its date of issue, misstatements, except for fraudulent misstatements, made by you on the application for this policy cannot be used to void this policy or deny a claim for a loss incurred or a disability that begins more than 2 years after the issue date.

2. **Preexisting Conditions** --No claim for loss incurred or disability starting after 2 years from the date of issue will be reduced or denied on the ground that a sickness or physical condition had started before the date of issue of this policy unless, on the date of loss, that sickness or physical condition was excluded from coverage by name or specific description.

**Legal Actions**

No legal action may be brought until 60 days after written proof of loss has been given. No such action may be brought after 3 years from the time written proof of loss is required to be given.

**Conformity with State Statutes**

Any provision in this policy which, on the date of issue, conflicts with the laws of the state in which you reside on that date is amended to meet the minimum requirements of such laws.

**Waiver of Policy Provisions**

Our failure to invoke or enforce a right we have reserved under the terms of this contract may not be deemed a permanent waiver of that right.

Copy of application is attached.

MLOCL001705

 

**Metropolitan Life Insurance Company**

## Rider: Lifetime Monthly Benefit for Total Disability

This rider is a part of the policy if it is referred to on page 3.

**Date of Rider**

The effective date of this rider is shown on page 3.

**Benefit**

This rider provides a lifetime total disability benefit. We will pay this benefit during your continuous total disability if:

1. Such disability starts before age 65 and continues until age 65; and

2. The benefits under your policy have been paid during your disability.

**When Payable**

We will start to pay this benefit on the later of:

1. The first premium due date on or after your 65th birthday; or

2. The date the monthly benefit for total disability, as shown on page 3, ends.

We will pay it while you remain totally disabled for as long as you live.

Benefits will not be payable under this rider for any period for which benefits are payable under the total disability benefit under your policy.

**Amount of Benefit**

The monthly amount we will pay will be based on the monthly benefit for total disability shown on page 3. The amount on page 3, plus any cost-of-living adjustment that applies to this rider, will be multiplied by a factor determined from the table below.

| Age at the Start of Total Disability | Factor |
|---|---|
| 55 or less | 1.0 |
| 56 | .9 |
| 57 | .8 |
| 58 | .7 |
| 59 | .6 |
| 60 | .5 |
| 61 | .4 |
| 62 | .3 |
| 63 | .2 |
| 64 | .1 |

**Time Limit on Certain Defenses**

1. **Misstatements in the Application** --After this rider has been in force during your lifetime for 2 years from its date, misstatements, except for fraudulent misstatements, made by you on the application for this rider cannot be used to void this rider or deny a claim under this rider for a disability that begins more than 2 years after the date of the rider.

MLOCL001706

## Rider: Lifetime Monthly Benefit for Total Disability (Continued)

2. **Preexisting Conditions** --No claim for disability starting after 2 years from the date of this rider will be reduced or denied on the ground that a sickness or physical condition had started before the date of this rider unless, on the date the disability started, that sickness or physical condition was excluded from coverage by name or specific description.

**Premium**          The premium for this rider is shown on page 3.

**Termination**      This rider will end on the earliest of:

1. The date the policy ends;

2. The first premium due date on or after your 65th birthday; or

3. The date you request in writing to end this rider, in which case you must return the policy to us. We will change the policy and return it to you.

Louis J. Ragusa
Vice President and Secretary

MLOCL001707

 

**Metropolitan Life Insurance Company**

## Rider: Monthly Benefit For Residual Disability

This rider is a part of the policy if it is referred to on page 3.

**Date of Rider**     The effective date of this rider is shown on page 3.

**Definitions**     The definition of disability is amended to read as follows:

"**Disability** means either total or residual disability that starts while your policy is in force."

**Residual disability** means that, because of injury or sickness:

1. Your current earnings are reduced to 80 percent or less of your prior earnings; however, if earnings are reduced to 20 percent or less, you will be considered totally disabled;

2. You are receiving care by a physician which is appropriate for the condition causing the disability; and

3. You are not able to perform all of the material and substantial duties of your regular occupation but (a) are performing one or more such duties; or (b) are engaged in another occupation.

**Earnings** means compensation for services you perform, according to generally accepted accounting standards. It includes salary, fees, commissions, bonuses and other payment for services which you render--after deduction of normal and customary unreimbursed business expenses, but before deduction of any income taxes.

Earnings do not include:

1. Income from dividends, interest, rent, royalties, annuities, or investments;

2. Income from deferred compensation plans, formal sick pay benefits, disability income policies, or retirement plans; or

3. Any other forms of unearned income not derived from your job activities.

**Prior earnings** means the greater of:

1. Your average monthly earnings for the 12 months just before your disability started; or

2. Your highest average monthly earnings for any 2 successive calendar years during the 5-year period just before the start of your disability.

After the start of a period of disability the prior earnings are increased each year by a percentage equal to the increase in the CPI-U, but not less than 4 percent.

**CPI-U** means the Consumer Price Index for Urban Wage Earners and Clerical Workers for all items. It is published by the United States Bureau of Labor Statistics. If the CPI-U cannot be used or is not available, we will choose a suitable index to replace it. CPI-U will then mean the chosen index.

MLOCL001708

 

## Rider: Monthly Benefit For Residual Disability (Continued)

**Benefits**

**Monthly Benefit for Residual Disability** —While you are residually disabled, we will pay a monthly benefit for residual disability, if the elimination period has been met (by total disability and/or residual disability).

The monthly amount of this benefit equals:

$$\frac{A-B}{A} \times \text{Monthly Benefit for Total Disability}$$

"A" is your prior earnings, as defined.

"B" is your earnings for the month for which residual disability is claimed. Such earnings will not include income received for services you performed prior to the date your residual disability started. If monthly earnings are 20 percent or less of prior earnings we will consider "B" to be zero; that is, the full monthly benefit for total disability will be payable.

For example, if your Monthly Benefit for Total Disability is $1,000, your prior earnings are $2,000, and your monthly earnings are reduced to $800 during your disability, your residual disability benefit would be computed as follows:

$$\frac{\$2,000 - \$800}{\$2,000} \times \$1,000 = \$600$$

For periods of less than a month, benefits will be prorated based on a 30-day month.

In determining "A" and "B", the same accounting method (i.e., cash or accrual) will be used.

However, during the first 6 months of residual disability, the minimum benefit will be 50 percent of the monthly benefit for total disability.

The residual disability benefit will be payable starting on the day after the elimination period ends; however, we will not pay a residual disability benefit while we are paying you the total disability benefit.

We will continue to pay this benefit until the earliest of:

1. The date you are no longer residually disabled;

2. The date the maximum benefit period is reached for a continuous period of disability; or

3. The first premium due date on or after your 65th birthday.

However, if benefits for your disability started after the premium due date on or after your 63rd birthday, benefits will end on the earlier of:

1. The date you are no longer disabled; or

2. The date 24 months of benefits have been paid for the continuous period of disability.

You must be receiving care by a physician which is appropriate for the condition causing the disability. However, you need not be under the care of a physician for benefits to continue if:

1. Your physician provides certification acceptable to us that continued care would be of no benefit to you; and

2. You are still disabled as defined in this policy.

MLOCL001709

### Rider: Monthly Benefit For Residual Disability (Continued)

We may have you examined, at our expense, as often as we feel is reasonably necessary.

We may also require proof from you as to your:

1. Prior earnings; and

2. Earnings for each month for which disability is claimed.

This may include your income tax returns, income statements, accountant's statements or other proof acceptable to us. We have the right to have an audit performed at our expense as often as we feel is reasonably necessary.

**Recovery Benefit–** Following a continuous period of disability for which at least 12 months of benefits have been payable, we will pay you a recovery benefit equal to 3 times the benefit payable for the last month of your disability. This recovery benefit will be payable only once for a continuous period of disability, including recurrent disabilities.

**Time Limit on Certain Defenses**

1. **Misstatements in the Application** --After this rider has been in force during your lifetime for 2 years from its date, misstatements, except for fraudulent misstatements, made by you on the application for this rider cannot be used to void this rider or deny a claim under this rider for a disability that begins more than 2 years after the date of the rider.

2. **Preexisting Conditions** --No claim for disability starting after 2 years from the date of this rider will be reduced or denied on the ground that a sickness or physical condition had started before the date of this rider unless, on the date the disability started, that sickness or physical condition was excluded from coverage by name or specific description.

**Premium**

The premium for this rider is shown on page 3.

**Termination**

This rider will end on the earliest of:

1. The date the policy ends;

2. The first premium due date on or after your 65th birthday; or

3. The date you request in writing to end this benefit, in which case you must return the policy to us. We will change the policy and return it to you.

Louis J. Ragusa
Vice President and Secretary

MLOCL001710

**Metropolitan Life Insurance Company**

## Rider: Option to Increase Monthly Benefit for Total Disability

This rider is a part of the policy if it is referred to on page 3.

| | |
|---|---|
| **Date of Rider** | The effective date of this rider is shown on page 3. |
| **Definitions** | **Policy benefit** means the monthly benefit for total disability, as shown on page 3, payable under your policy. |
| | **Option date** means each even-numbered anniversary of the date of issue that occurs on or before the expiry date. |
| | **Unit of increase** means an amount by which the policy benefit can be increased on an option date. That amount is shown on page 3, along with the maximum total increase. |
| | **Expiry date** is the date shown on page 3 when this rider ends. |
| **Benefit** | On the first option date, you may apply for an amount up to one unit of increase. On each subsequent option date, you may apply for an additional unit of increase. |
| | The minimum increase you may apply for is $200. Each increase you apply for must be a multiple of $100. |
| | If all or part of a unit of increase is not used as of any option date, you may carry it over and apply for it on the next option date. You may not carry it over past that next option date. |
| | In no event may you apply for more than 2 units of increase as of any option date. To use all or part of a carried-over unit of increase, you must also apply for all of your current unit of increase. The total increase applied for on all option dates can not exceed the maximum total increase shown on page 3. |
| | You may apply for no more than one unit of increase while you are disabled. |
| **To Qualify for an Increase** | You will qualify for an increase if, at the time you apply: |
| | 1. Your earned income is sufficient for an increase based on our underwriting rules; and |
| | 2. The sum of all your disability income coverage after the increase is not more than the maximum coverage we would then offer to new applicants in your class. The sum of your disability income coverage includes benefits you would receive from us, other insurers and government agencies. |
| **Application** | If you want to apply for an increase, notify us. We will send you a form, which must be completed and returned to us within 60 days before the option date. This form will ask you for a statement of your earned income and disability income coverage, but will ask no questions about your health. |

MLOCL001711

## Rider: Option to Increase Monthly Benefit for Total Disability
### (Continued)

**When an Increase Takes Effect**

An increase in your policy benefit will take effect on the applicable option date, if you are not then disabled. If you are disabled, but recover and work full time for at least 30 days, the increase will take effect at the start of the next policy term.

**Time Limit on Certain Defenses**

1. **Misstatements in the Application** --After this rider has been in force during your lifetime for 2 years from its date, misstatements, except for fraudulent misstatements, made by you on the application for this rider cannot be used to void this rider or deny a claim under this rider for a disability that begins more than 2 years after the date of the rider.

2. **Preexisting Conditions** --No claim for disability starting after 2 years from the date of this rider will be reduced or denied on the ground that a sickness or physical condition had started before the date of this rider unless, on the date the disability started, that sickness or physical condition was excluded from coverage by name or specific description.

**Premium**

The premium for this rider is shown on page 3.

In addition, there is a premium charge for each increase in the policy benefit. The premium for each increase will be at the rate for your age on the option date and for your class on the date of issue.

The premium for the increase must be paid within 31 days after the option date.

**Termination**

This rider will end on the earliest of:

1. The expiry date;

2. The date the total of all increases in the policy benefit equals the maximum total increase;

3. The date the policy ends; or

4. The date you request in writing to end this rider, in which case you must return the policy to us. We will change the policy and return it to you.

Louis J. Ragusa
Vice President and Secretary

MLOCL001712

**Metropolitan Life Insurance Company**

## Rider: Monthly Benefit for Total Disability in Your Occupation

This rider is a part of the policy if it is referred to on page 3.

| | |
|---|---|
| **Date of Rider** | The effective date of this rider is shown on page 3. |
| **Definitions** | The following is substituted for the first paragraph of the definition of total disability in your policy: |

" **Total disability** or **totally disabled** means that, because of injury or sickness, you are not able to perform the material and substantial duties of your regular occupation (your regular occupation is your usual work when total disability starts), even if you are gainfully employed in another occupation."

**Time Limit on Certain Defenses**

1. **Misstatements in the Application** --After this rider has been in force during your lifetime for 2 years from its date, misstatements, except for fraudulent misstatements, made by you on the application for this rider cannot be used to void this rider or deny a claim under this rider for a disability that begins more than 2 years after the date of the rider.

2. **Preexisting Conditions** --No claim for disability starting after 2 years from the date of this rider will be reduced or denied on the ground that a sickness or physical condition had started before the date of this rider unless, on the date the disability started, that sickness or physical condition was excluded from coverage by name or specific description.

**Premiums**   The premium for this rider is shown on page 3.

**Termination**   This rider will end on the earliest of:

1. The date the policy ends;

2. The first premium due date on or after your 65th birthday; or

3. The date you request in writing to end this benefit, in which case you must return the policy to us. We will change the policy and return it to you.

Louis J. Ragusa
Vice President and Secretary

1YO-90
(2)

DDAAAJ

MLOCL001713

 

**Metropolitan Life Insurance Company**

## Rider: Cost-of-Living Adjustment for Disability Benefits

This rider is a part of the policy if it is referred to on page 3.

| | |
|---|---|
| **Date of Rider** | The effective date of this rider is shown on page 3. |
| **Definitions** | **CPI-U** means the Consumer Price Index for Urban Wage Earners and Clerical Workers for all items. It is published by the United States Bureau of Labor Statistics. If the CPI-U cannot be used or is not available, we will choose a suitable index to replace it. CPI-U will then mean the chosen index. |
| | **Review date** means each anniversary date of the start of a period of continuous disability. |
| | **Index month** means the June before the review date. The first index month is the June before the start of a period of disability. |
| | **Monthly benefit for total disability** means the monthly benefit for total disability shown on page 3, plus any supplemental social insurance benefit payable under your policy. |
| | **Adjusted monthly benefit for total disability** means the monthly benefit for total disability plus the cost-of-living adjustment under this rider. |
| **Benefits** | The cost-of-living adjustment will be computed on each review date. To compute the adjustment we will compare the CPI-U for the latest index month to the one for the prior index month. |
| | If your disability lasts for at least one year we will adjust your benefits as follows: |

**Total Disability**

1. Instead of the monthly benefit for total disability, we will pay the adjusted monthly benefit for total disability.

2. On each review date we will compute the adjusted monthly benefit for total disability by multiplying the monthly benefit for total disability by a factor equal to the CPI-U for the latest index month divided by the CPI-U for the first index month. The adjusted monthly benefit for total disability will be rounded upwards to the nearest multiple of $10. But, the adjusted monthly benefit for total disability will not:

    a. Be paid if you are gainfully employed;

    b. Be increased in any year by less than 4% of the monthly benefit for total disability, or more than 7% of the adjusted monthly benefit for total disability;

3. If you are presumed totally disabled under the definition of "presumptive total disability", the adjusted monthly benefit for total disability will be paid only if you are not gainfully employed.

MLOCL001714

## Rider: Cost-of-Living Adjustment for Disability Benefits (Continued)

**Residual Disability (if included in your policy)**

In computing your monthly benefit for residual disability, we will use your adjusted monthly benefit for total disability, as described above, rather than your monthly benefit for total disability.

**Termination of Adjustment**

Annual computations of the cost-of-living adjustment will end on the earliest of:

1. The date a period of disability ends;

2. The date the maximum benefit period ends; or

3. The first premium due date on or after your 65th birthday.

If the computations end because of 1 or 2 above, you may, within 90 days, add the amount of the cost-of-living adjustment to the monthly benefit for total disability by paying a premium for this increased coverage. This premium will be determined from the rates in effect for a person of your age at the time computations end because of 1 or 2 above, and your class on the date of issue. Otherwise, benefits payable for a new period of disability will not include the cost-of-living adjustment from the prior period. In any case, a new first index month and review date will apply to a later period of disability.

If the computations end because of 3 above, and if your disability starts after the first premium due date on which you are 63, adjustments will be made on the first and second review dates.

**Time Limit on Certain Defenses**

1. **Misstatements in the Application** --After this rider has been in force during your lifetime for 2 years from its date, misstatements, except for fraudulent misstatements, made by you on the application for this rider cannot be used to void this rider or deny a claim under this rider for a disability that begins more than 2 years after the date of the rider.

2. **Preexisting Conditions** --No claim for disability starting after 2 years from the date of this rider will be reduced or denied on the ground that a sickness or physical condition had started before the date of this rider unless, on the date the disability started, that sickness or physical condition was excluded from coverage by name or specific description.

**Premium**

The premium for this rider is shown on page 3.

**Termination**

This rider will end on the earliest of:

1. The date the policy ends;

2. The first premium due date on or after your 65th birthday; or

3. The date you request in writing to end this benefit, in which case you must return the policy to us. We will change the policy and return it to you.

Louis J. Ragusa
Vice President and Secretary

1CA-02
(2)

2

DDAAAR

MLOCL001715

RFT

Name of Insured/Applicant

INNA OGANDZHANOVA

Agency          005

District/Branch    358

For H.O Use Only

SBP/DIS UND & ISSUE

1999 AU 27 PM 1: 08        Rev
                          3/11/99

Application Number
0013104
Date of this Form
6/22/99
Policy/Contract Number
6364168    AH

To: Metropolitan Life Insurance Company:          **Application Amendment**          **MetLife**

I amend the application referred to above, as follows:

<div style="writing-mode: vertical">Do not alter or amend this form</div>

MONTHLY BENEFIT IS $8000.

GUARANTEED INSURABILITY IS $1500.

I CERTIFY THAT I DO NOT HAVE ANY DISABILITY INSURANCE IN FORCE OR APPLIED FOR WITH PAUL
REVERE.

I CERTIFY THAT I HAVE NO OTHER COVERAGE IN FORCE OR APPLIED FOR OTHER THAN INDICATED ON MY
APPLICATION.

LIFETIME AND COST OF LIVING 4%-7% HAVE BEEN ADDED AS OPTIONAL BENEFITS.

This application amendment is part of the application referred to above and is subject to the agreements in that application. The application
and this amendment are part of the policy/contract to which they are attached.

To the best of my knowledge and belief, the statements and answers in the application as amended by this form are true and complete as of
the date this form is signed.  There are no facts or circumstances which would require a change in the answers in the application, except as
shown above.

| Witness (Licensed Resident Agent) | Place | Mo. Day. Yr. | Signature |
|---|---|---|---|
| Witness to Signature in (A) | Staten Island | 8/23/99 | (A) Insured / Applicant |
| Witness to Signature in (B) | | | (B) Spouse (if Spouse signed application) |
| Witness to Signature in (C) or (D) | | | (C) Owner (if other than (A) above) |

If Owner is a firm, corporation or trust, enter full name on line (C) and have one
or more partners, officers or trustees sign on line (D), and give their titles.          (D) _____

_____

Return signed forms to:

**MetLife - Disability Unit**
PO Box 30591
Tampa, FL 33630
A/R Control

0843-82-A (0694) Printed in U.S.A.                    18000021618 (0694)  NYHO-HY898A

MLOCL001716

Name of Insured/Applicant

INNA OGANDZHANOVA

Agency        005

District/Branch      358

For H.O Use Only

SBP./DIS UND & ISSUE

99 APR 26 AM 10: 04

3/11/99

RFT

Application Number
0013104

Date of this Form
3/11/99

Policy/Contract Number
6364168    **AH**

To: Metropolitan Life Insurance Company:          **Application Amendment**          **MetLife**

I amend the application referred to above, as follows:

MONTHLY BENEFIT IS $6500.

GUARANTEED INSURABILITY IS $1300.

I CERTIFY THAT I DO NOT HAVE ANY DISABILITY INSURANCE IN FORCE OR APPLIED FOR WITH PAUL REVERE.

I CERTIFY THAT I HAVE NO OTHER COVERAGE IN FORCE OR APPLIED FOR OTHER THAN INDICATED ON MY APPLICATION.

Do not alter or amend this form

**This application amendment** is part of the application referred to above and is subject to the agreements in that application. The application and this amendment are part of the policy/contract to which they are attached.

To the best of my knowledge and belief, the statements and answers in the application as amended by this form are true and complete as of the date this form is signed.  There are no facts or circumstances which would require a change in the answers in the application, except as shown above.

| Witness (Licensed Resident Agent) | Place | Mo. Day. Yr. | Signature |
|---|---|---|---|
| Witness to Signature in (A) | Staten Island, NY | 4/22/99 | (A) Insured / Applicant |
| Witness to Signature in (B) | | | (B) Spouse (if Spouse signed application) |
| Witness to Signature in (C) or (D) | | | (C) Owner (if other than (A) above) |

If Owner is a firm, corporation or trust, enter full name on line (C) and have one or more partners, officers or trustees sign on line (D), and give their titles.          (D) _____

_____

Return signed forms to:

**MetLife - Disability Unit**
**PO Box 30591**
**Tampa, FL 33630**
**A/R Control**

0843-82-A (0694) Printed in U.S.A.          18000021618  (0694)  NYHO-HY698A

MLOCL001717

**MetLife®**
Metropolitan Life Insurance Company   **Part A Application for Disability Income Insurance**   0114801 **-3**

1. (a) **Proposed Insured**   Inna Ospadchenova   Sex F   Date of Birth 1/7/63   Age 38
   Full Name   First, Middle Initial, Last Name

   (b) State of Birth (Country if other than U.S.) _Russia_

   (c) Are you a United States citizen? ☒ Yes ☐ No
   If No, how long have you been a resident of the United States? ____ Years ____ Months
   Status of your visa (if applicable)   ☐ Temporary ☐ Permanent

   (d) Social Security Number   _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_

   (e) Driver's License Number   _116 45 359_   State of Issue _TX_

2. (a) **Residence:**   _1227 E. Clearview_
   Number   Street
   _Casa Grande   AZ   85222_
   City   State   ZIP

   (b) Prior residence if less than 2 years at current residence:
   _4270 W. Calle Pos_
   Number   Street
   _Green Valley   AZ   85614_
   City   State   ZIP

3. **Business:** Employer's Name   _c/o Casa Grande Oncology, independent consultant_
   Business Address   _1811 E. McMurray Blvd_
   Number   Street
   _Casa Grande   AZ   85222_
   City   State   ZIP

4. Send communications to proposed insured at ☒ Residence ☐ Business

5. How is business organized? ☐ Sole proprietor ☐ Partnership ☒ Professional Corporation
   ☐ Self Employed   ☐ C Corporation ☐ S Corporation

6. (a) Occupation: (at which you work 30 hrs. or more per week) _Physician, Radiation Oncology_

   (b) Describe your exact daily duties and the percentage of time you spend on each duty.

   | Duty | % |
   |---|---|
   | _Patient care_ | _100%_ |

   (c) How long have you been employed in your present occupation? _4 yrs_

   (d) Are you actively at work fulltime in the above occupation? ☒ Yes ☐ No

   (e) Nature of business: _Medical clinic_

   (f) How long have you been employed by your present employer? _1+ yr_

   (g) If less than 5 years at current employment:
   Previous employer's name and address: _Indiana Cancer Center, Indiana, PA_
   _1/98-1/00, University of W. Va, Morgantown, W. Va : 1/00 - 6/00_

   (h) Do you have any other part-time or full-time job? (Give Details) _no_

   (i) Do you plan to change jobs within the next 6 months? ☐ Yes ☒ No   If Yes, give details ____

AH533-7

0114801-**4**

**7. Base Policy and Optional Benefits Being Applied For**

☒ **Disability Income Insurance
(Omni Plus)**

| | | | | | |
|---|---|---|---|---|---|
| Occupational Class | ☒ 5A | ☐ 4A | ☐ 3A | ☐ 2A | ☐ A | ☐ B |
| Elimination Period (days) | ☐ 60 | ☒ 90 | ☐ 180 | ☐ 365 | ☐ 730 |
| Benefit Period | ☐ 2 Years | | ☐ 5 Years | | ☒ Age 65 |

(5A, 4A, 3A, 2A only)

Monthly Benefit $ _1,500_

☒ Level Premiums        ☐ Step Rate
(5A, 4A, 3A, 2A only)

Additional Monthly Benefit $_____ (only if Benefit Period is Age 65)

| Elimination Period (days) | ☐ 60 | ☐ 90 | ☐ 180 | ☐ 365 | ☐ 730 |
|---|---|---|---|---|---|

☐ **Disability Income Insurance
(Priority Plus)**

| | | | | |
|---|---|---|---|---|
| Occupational Class | ☐ 5A | ☐ 4A | ☐ 3A | ☐ 2A |
| Elimination Period (days) | ☐ 60 | ☐ 90 | ☐ 180 | ☐ 365 | ☐ 730 |
| Benefit Period | ☐ 2 Years | | ☐ 5 Years | | ☐ Age 65 |

Monthly Benefit (Maximum $3,000) $_____

Additional Monthly Benefit $_____ (only if Benefit Period is Age 65)

| Elimination Period (days) | ☐ 60 | ☐ 90 | ☐ 180 | ☐ 365 | ☐ 730 |
|---|---|---|---|---|---|

**Disability Income Insurance
(Omni Plus—Priority Plus)
Optional Benefits**

☒ Lifetime (N/A in 2A, A, B or Priority Plus)

☐ Lifetime for Additional Monthly Benefit (N/A in 2A, A, B or Priority Plus)

☐ Refund of Premium (R.O.P.) (N/A in Priority Plus)

☒ Residual Disability (R/DI) (N/A in A and B)

☒ Cost of Living (COLA) (N/A in A, B or Priority Plus)

　☐ 4% level, no cap

　☒ 4%-7% (C.P.I.), no cap (N/A in 2A)

☒ Your Occupation (Y/OC) (Omni Plus 5A only)

☐ Occupation to 65 (Omni Plus 3A only)

☐ Principal Sum Amount $_____ (N/A in Priority Plus)

☐ Automatic Increase Feature (A.I.F.) (5A, 4A Omni Plus only)

☐ Supplemental Monthly Benefit (S.M.B.) (N/A in B)        Monthly Amount $_____

| Elimination Period (days) | ☐ 60 | ☐ 90 | ☐ 180 |
|---|---|---|---|

☐ Social Insurance Substitute (S.I.S.) (N/A in B)        Monthly Amount $_____

☐ Guaranteed Insurability (G.I.) (N/A in A, B or Priority Plus)        Monthly Amount $_____

**☐ Business Overhead Expense
(Expense Plus)
Questions 19 and 20 Must Be Completed**

| | | | | |
|---|---|---|---|---|
| Occupational Class | ☐ 5A | ☐ 4A | ☐ 3A | ☐ 2A |
| Elimination Period (days) | ☐ 30 | ☐ 60 | ☐ 90 |
| Benefit Period | ☐ 12 Months | | ☐ 24 Months |

Monthly Benefit    $_____

Guaranteed Insurability Amount (Optional) $_____

☐ Refund of Premium (R.O.P.)

AH533-7

MLOCL001719

0114801 **-5**

### ☐ Mortgage Disability Income Insurance
### MortgageComp

| | | | | |
|---|---|---|---|---|
| Occupational Class | ☐ 4A | ☐ 3A | ☐ 2A | ☐ A |
| Elimination Period (days) | ☐ 90 | ☐ 180 | | |
| Duration of Policy (Class A—10 Year Term Only) | ☐ 10 | ☐ 15 | ☐ 20 | ☐ 30 |

Monthly Benefit (Maximum $1,200) $ _____

When did you purchase your home? _____   When will mortgage expire? _____

Monthly mortgage payments
(principal, interest, taxes) $ _____
What percentage of the monthly mortgage amount
are you responsible for paying? _____

Mortgagor?

Name _____    Account number _____

Address _____    Telephone number _____

### ☐ Metromatic Disability Income Insurance

| | | | | | |
|---|---|---|---|---|---|
| Occupational Class | ☐ 5A | ☐ 4A | ☐ 3A | ☐ 2A | ☐ A   ☐ B |
| Elimination Period (days) | ☐ 60 | ☐ 90 | ☐ 180 | | |
| Benefit Period | ☐ 2 Years | ☐ 5 Years | ☐ Age 65 | | |
| | | | (5A, 4A, 3A only) | | |

Monthly Benefit  $ _____
(60% of Income to a Maximum of $3,000)

**8.** (a) Premium payments:

☐ Annual    ☐ Semi-Annual
☒ Check-O-Matic   ☐ Salary Savings

(b) Will the entire premium for this policy be paid directly by your employer?   ☐ Yes   ☒ No

(c) If Yes, will any portion of this premium be treated as taxable income to you?   ☐ Yes   ☒ No

**9.** Amount paid with Application: $ _137⁶⁰_   ☐ None
This amount ☒ is   ☐ is not at least equal to one month's premium.

**10.** (a) Revocable Beneficiary

| _Isaac S. Bates_ | _sℓ_ | _11/3/58_ |
|---|---|---|
| Full Name | Relationship | Date of Birth |

(b) Revocable Contingent Beneficiary

| | | |
|---|---|---|
| Full Name | Relationship | Date of Birth |

**11.** (a) Do you have, or are you applying for other:

(1) Individual, Association or Group disability income coverage?   ☒ Yes   ☐ No
(2) Formal employer sick pay or Union disability income coverage not included in (1)?   ☐ Yes   ☒ No
(3) Business Overhead Expense Disability coverage?   ☐ Yes   ☒ No
(Give details below of all disability coverage in force and applied for. Type should be shown as: I—Individual, A—Association, G—Group, E—Employer Sick Pay or Union, and BOE—Business Overhead Expense).

| MONTHLY DISABILITY COVERAGE | | | | |
|---|---|---|---|---|
| Company or Source | Type (I, A, G, E, or BOE) | Monthly Disability Amount | Benefit Period Accident | Sickness |
| _Metlife #_ _6364168_ | _I_ | _8,000_ | _Age 65_ _(Lifetime)_ | |
| | | | | |

(b) Are you covered by Social Security?   ☒ Yes   ☐ No

(c) Does any of the above coverage include a Social Security supplement or substitute benefit?   ☐ Yes   ☒ No

If Yes, give company name and amount of such benefit: _____  $ _____

AH533-7

0114801-**6**

**12. (a)** Is the coverage being applied for to replace or change any existing insurance?  ☐ Yes ☒ No

If yes, complete the following (examples of Type of Coverage are: personal, overhead, individual, group association or buyout):

| Insurance Company Name and Address | Policy Number | Monthly Benefit | Type of Coverage | Date of Termination or Lapse | Premium Mode |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

Metropolitan Life Insurance Company will rely on the fact that the coverage under the policy(ies) listed above will terminate or lapse on the date shown. If the coverage does not terminate or lapse on that date, any policy issued will be rescinded and all premiums will be returned and no benefits will be payable. Metropolitan Life Insurance Company may contact any listed insurer after the date of termination or lapse to confirm that the coverage has terminated or lapsed.

**(b)** Is policy applied for to replace any Metropolitan Life Insurance Company disability income insurance?  ☐ Yes ☒ No
If Yes, give details and policy number below:

_____ (estimated) _____

**13.**

| | Current Year | Last Year | Two Years Ago |
|---|---|---|---|
| (a) Annual Salary | $_____ | $_____ | $_____ |
| (b) Commissions | $_____ | $_____ | $_____ |
| (c) Bonuses | $_____ | $_____ | $_____ |
| (d) Pension and Profit-sharing Contributions and other Deferred Compensation | $_____ | $_____ | $_____ |
| (e) Earnings from other occupations | $_____ | $_____ | $_____ |
| Totals | $ 290,000 | $ 290,000 | $ 220,000 |
| Other Income: | | | |
| (f) Dividends and Interest | $_____ | $_____ | $_____ |
| (g) Net Real Estate Income Before Depreciation | $_____ | $_____ | $_____ |
| (h) Other (Identify Source:) _____ | $_____ | $_____ | $_____ |

_____

_____

**(i)** Does your net worth exceed $3,000,000?  ☐ Yes ☒ No  (If "Yes", give details below. Amounts expressed to the nearest $10,000 are acceptable. Show current values less indebtedness.)

**CURRENT NET WORTH**

| | |
|---|---|
| Cash, Savings, Stocks & Bonds .............................................. | $_____ |
| Personal Property (such as jewelry, furnishings) .......................... | $_____ |
| Personal Residence ........................................................ | $_____ |
| Other Real Estate ......................................................... | $_____ |
| Business Interest ......................................................... | $_____ |
| Other ..................................................................... | $_____ |
| TOTAL | $_____ |

AH533-7

0114801-7

14. Have you flown as a pilot, student pilot, crew member or passenger (except on a scheduled airline) in the last 2 years or do you intend to do so in the next 12 months? ☐ Yes ☒ No
If Yes, give details in Item 18.

15. Have you had a driving license suspended or revoked in the last 3 years; ever been convicted of 3 or more moving violations or driving while impaired or intoxicated; or been charged but not acquitted of the violation of any criminal law in the last 3 years? ☐ Yes ☒ No
If Yes, give details in Item 18.

16. Has any application for a policy of Life or Health Insurance on you ever been declined, postponed, rated, modified or required an extra premium? ☐ Yes ☒ No
If Yes, give date, company, type of insurance and reason in Item 18.

17. Have you ever engaged in or do you plan to engage in: Automotive, Motorcycle (including off road use) or Power Boat Racing; Bobsledding; Ballooning; Scuba or Sky Diving; Hang Gliding (including Slope Soaring, Parakiting, Ultralighting, etc.); Mountain Climbing; Parachuting; Snowmobile Racing; or any other hazardous sport or hobby? ☐ Yes ☒ No
If Yes, give details in Item 18.

18. Give details of each Yes answer in Items 14 through 17:
Item No.

---

| Answer questions 19 and 20 only if Business Overhead Expense coverage is applied for: | |
|---|---|
| **19.** (a) Your position in business: | ☐ Self Employed<br>☐ Sole proprietor<br>☐ Partner<br>☐ Professional Corporation<br>☐ Shareholder of Corporation |
| (b) Your percentage of ownership: | _____% |
| (c) Number of employees: | _____ |
| (d) Number of employees who are members of your profession: | _____ |

**20.** List your average monthly business overhead expenses during the six months before the date of this application. (If you share monthly business expenses with others, list only your share of the expenses. Exclude salaries of any employees who are relatives, and salaries, fees, drawing accounts, profits or any other remuneration for you, any partner or any person hired to perform your duties.)

| | | | |
|---|---|---|---|
| Rent | $_____ | Depreciation of business equipment | $_____ |
| Taxes (not income taxes)<br>and mortgage interest payments | $_____ | Employees' salaries (exclude relatives<br>and members of your profession) | $_____ |
| Other interest on business<br>indebtedness | $_____ | Other normal and customary fixed<br>offices expenses (specify) | $_____ |
| Utilities<br>Electricity | $_____ | ................................... | |
| Telephone | $_____ | ................................... | |
| Heat | $_____ | ................................... | $_____ |
| Water | $_____ | Total | $_____ |

AH533-7

MLOCL001722

0114801 **-8**

| Part B | Statements By The Proposed Insured |
|---|---|

Only the Proposed Insured's answers should be inserted below.

**1.** (a) Height _____ (b) Weight _____

**2.** How much time have you lost from work during the past 5 years because of accident or sickness? _____

**3.** In past 5 years, has any physician, counselor, chiropractor, practitioner or health facility examined, advised or treated you?
☐ Yes ☐ No

If Yes, give details below for each instance.

| Name and Address of Each Physician, Counselor, Chiropractor, Practitioner and Health Facility | Dates | Symptoms or Ailments, or Other Reasons for Consultation, Diagnosis |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

**4.** Tobacco Use

Date you last used tobacco in any form

Date _____ Type _____
☐ Never used

**5.** Name and address of your personal physician, practitioner, counselor chiropractor, or health facility if not mentioned above:

_____
_____

**6.** Have you EVER received treatment, attention, or advice from any physician, counselor, chiropractor, practitioner or health facility for, or been told by any physician, practitioner or health facility that you have had:

| | Yes | No |
|---|---|---|
| (a) Disorder of heart, arteries or veins; chest pain? | ☐ | ☐ |
| (b) Arthritis, disorder or deformity of the bones, muscles or joints; neck or back disorders? | ☐ | ☐ |
| (c) Mental or nervous condition? | ☐ | ☐ |
| (d) Elevated blood pressure (hypertension)? | ☐ | ☐ |
| (e) Cancer, tumor or polyp? | ☐ | ☐ |
| (f) Diabetes? | ☐ | ☐ |
| (g) Lung disorders, asthma or allergy? | ☐ | ☐ |
| (h) Disorder of liver, gall bladder, pancreas, digestive tract including intestines; ulcer, colitis, hemorrhoids, or hernia? | ☐ | ☐ |
| (i) Epilepsy, unconsciousness, dizziness, paralysis, or impairment of nervous system? | ☐ | ☐ |
| (j) Disorder of the urinary tract; sugar, albumin or blood in urine, or venereal disease? | ☐ | ☐ |

| | Yes | No |
|---|---|---|
| (k) Acquired Immune Deficiency Syndrome (AIDS), AIDS Related Complex (ARC) or other immune deficiency? | ☐ | ☐ |
| (l) Deformity or loss of limb? | ☐ | ☐ |
| (m) Disorder of glands; anemia, leukemia or other blood disorders? | ☐ | ☐ |
| (n) Any disorder of the prostate or testes if a male; uterus, ovaries or breasts if a female? (If hysterectomy or breast surgery, including biopsy, has been performed, also indicate whether entire organ was removed, specific diagnosis, and how long hospitalized.) | ☐ | ☐ |
| (o) Disorder or impairment of eyes or of ears, mouth, nose, throat? | ☐ | ☐ |
| (p) Endocrine disorders or goiter or disorder of the thyroid gland? | ☐ | ☐ |

AH533-7

MLOCL001723

0114801-9

**7. Have you EVER:**

(a) Had any surgical operation not revealed in previous questions, or gone to a hospital, clinic, dispensary or sanatorium for observation, examination or treatment not revealed in previous questions? ☐ Yes ☐ No

(b) Been advised to modify or restrict eating, drinking, or living habits because of any health conditions? ☐ Yes ☐ No

(c) Received or applied for disability benefits from any source in past 5 years? If Yes, give dates of onset (and termination if fully recovered), reason, extent of disability and present status. If claim was to Metropolitan, so indicate. ☐ Yes ☐ No

(d) Been advised to have an operation that was not performed? ☐ Yes ☐ No

(e) Had persistent cough, pneumonia, chest discomfort, muscle weakness, unexplained weight loss of 10 pounds or more, swollen glands, patches in mouth, visual disturbance or recurring diarrhea, fever or infection? ☐ Yes ☐ No

**8.**
(a) Are you currently disabled, or expect to be disabled? ☐ Yes ☐ No
(b) Are you pregnant? ☐ Yes ☐ No

**9.** Have you ever used heroin, cocaine, marijuana, barbiturates or other drugs, except as prescribed by a physician or other licensed practitioner; or received treatment or advice from a physician or other practitioner regarding the use of alcohol, or the use of drugs except for medical purposes; or received treatment or advice from an organization which assists those who have an alcohol or drug problem? ☐ Yes ☐ No

**10.** ..... For any Yes answer to Items 6 through 9 give the following details:

| Item No. | Name and Address of Each Physician, Counselor, Chiropractor, Practitioner and Health Facility | Dates and Durations | Nature and Severity of Condition, Frequency of Attacks, Specific Diagnosis and Treatment |
|----------|-----|-----|-----|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**11.** Did any parent, brother or sister have heart or coronary artery disease, high blood pressure, cancer or diabetes? ☐ Yes ☐ No

If Yes, give details for each person, including age at onset, in Item 12.

**12.**

| Family Record | Age if Living | Age at Death | Details and/or Cause of Death |
|---------------|---------------|--------------|-------------------------------|
| Father |  |  |  |
| Mother |  |  |  |
| Brothers |  |  |  |
| Sisters |  |  |  |

AH533-7

MLOCL001724



0114801-**10**



## Agreement

**I have read this application and agree that all statements and answers are true
and complete to the best of my knowledge and belief. It is also agreed that:**

1. The statements and answers in this application are the basis of any policy issued.

2. No information will be considered to have been given to Metropolitan unless it is stated in the application.

3. No account representative or other person except the President, Secretary or a Vice-President of Metropolitan may (a) make or change any contract of insurance; or (b) change or waive any of the terms of an application, receipt or policy.

4. Except as set forth in the receipt, Metropolitan will have no liability until a policy is delivered personally to the proposed

insured and the full first premium due is paid. The policy will then be in effect as of its date of issue. But it will not be in effect unless at the time it is delivered:

(a) the condition of health of the proposed insured is the same as given in the application;

and

(b) the proposed insured has not received any medical advice or treatment from a physician or other practitioner since the date of the application.

If there are any exceptions to (a) or (b) give us the details in writing.

| WITNESS (Licensed Resident Agent) | PLACE | Mo.  Day  Yr. | Signature of Proposed Insured |
|---|---|---|---|
| | Casa Grande, AZ | 3/23/01 | |

## Personal History Interview

I understand that a telephone interview may be required. I can be reached during normal business hours at:

☐ Home   Area Code _520_   Phone Number _876-9764_

☐ Office   Area Code _520_   Phone Number _421-3355_

☐ Other   Area Code _____   Phone Number _____

Most convenient time _____ A.M.   _____ P.M.

Witness _____

Signature of Proposed Insured

Date _3/23/01_

MLOCL001725

0114801-**11**



## Authorization and Acknowledgement Form

For underwriting and claims purposes, I permit:

—Any physician or other medical practitioner, hospital, clinic, other medically related facility, consumer reporting agency, or the Medical Information Bureau, Inc. (MIB) to give **Metropolitan Life Insurance Company** data of a medical nature. This data includes findings on medical care, psychiatric or psychological care or examination, or surgery. I specifically authorize the disclosure to **Metropolitan** of any information concerning sexually transmitted diseases including venereal diseases, any Human Immuno-deficiency Virus (HIV) test results, or information about Acquired Immune Deficiency Syndrome (AIDS) or AIDS related conditions, or confidential HIV related information, and any information concerning a serious communicable disease, and any information concerning mental health. Also, any insurer may give **Metropolitan** medical data described above and data about any current or pending coverage I may have with them.

—**Metropolitan** to get consumer reports, investigative consumer reports and motor vehicle reports about me.

—Any employer, business associate, financial institution, insurer, government unit or MIB to give **Metropolitan** any data that they may have about the occupation, avocations, driving record, finances, character, general reputation and aviation activities.

I understand that:

—My medical records, including any alcohol or drug abuse data, may be protected by Federal Regulations—42 CFR Part 2. I permit **Metropolitan** to get any data for the reasons set forth above. I consent to the re-disclosure of such data as set forth on this form.

—Information concerning mental illness, HIV, AIDS, HIV-related illness and sexually transmitted or other serious communicable diseases may be controlled by various state or federal laws and regulations. I consent to the re-disclosure of such information as described in this form and as otherwise required or permitted by law.

—All or part of the data which **Metropolitan** gets may be sent to MIB. It may also be disclosed to and used by any **Metropolitan** reinsurer, employee, affiliate or contractor who performs any business service on any insurance I may have applied for or have with **Metropolitan**. If any application is declined or I am offered coverage in a substandard classification, **Metropolitan** may disclose all or part of the data to a substandard or declined risk broker or insurer that has obtained my written authorization to obtain such data.

—Information concerning myself, including HIV results, AIDS, HIV-related illnesses and serious communicable diseases may also affect the insurability of my spouse and children. To the extent **Metropolitan** may be considering applications on other family members, I consent to the use of such information to determine their insurability.

—I may ask to be interviewed if any investigative consumer report is obtained about me. Please get in touch with me between the hours of _____ and _____ . My phone number is _____

                                           (area code)              (number)

My consent to get the data described in this form will end two years from the date shown below or for a shorter period if such shorter period is prescribed by law. I may at any time, however, revoke my permission to get any data protected by 42 CFR Part 2 or any other federal or state law or regulation which provides for such revocation. Any action taken before revocation, however, will be valid.

I have been given **Metropolitan's** Consumer Privacy Notice. I know that I have a right to get a copy of this form. A photocopy of this form is as valid as the original form.

Witness

Date ___3/28/01___

AH5337-AUTH

Signature of the Proposed Insured

Print name of the Proposed Insured

Print Surname as it is on records if different from that signed above

MLOCL001726

0114801 **-12**

**DO NOT WRITE HERE**

AH533-7

MLOCL001727

Mar-27-01 12:20P emsi J n vance inc        602 ~~7 9626        P.03

☒ Metropolitan Life Insurance Company                    ☐ Security First Life Insurance Company

## PART B – APPLICATION FOR LIFE INSURANCE
The spaces below are for answers of person to be examined only. Nothing but the answers of such person should be recorded.

1. Name of Person to be Examined

   INNA — OGANDZHANOVA

   First Name | Middle Initial | Last Name

2. Tobacco Use ☒ NEVER

   Indicate date Proposed Insured last smoked/used:

   / / ☐ Never Cigarette    / / ☐ Never Cigar
   / / ☐ Never Pipe    / / ☐ Never Smokeless Tobacco    / / ☐ Never Other

3. Name and address of your personal physician, practitioner or health facility. SUN LIFE CLINIC

   DR. CAREY LEEDS MD.   865 N. ARIZOLA RD.
   CASA GRANDE, AZ. 85222

   For any Yes Answer to Questions 4 through 12, give details in Item 15.

4. In past 5 years, has any physician, practitioner or health facility examined, advised or treated you?   ☒ Yes  ☐ No
   If Yes, give details below for each instance.

   | Name and Address of each Physician Practitioner and Health Facility | Dates | Your Symptoms or Ailments, or Other Reasons For Consultation | Diagnosis, Treatment or Advice Given. |
   |---|---|---|---|
   | DR. CAREY LEEDS MD | JAN. 2001 | OBGYN CHECK-UP | PAPSMEAR — NNL |
   | UNIV. OF W. VIRGINIA MORGAN TOWN, W. VIRGINIA | 2000 | CHECK-UP | MAMMOGRAM-Neg. |

5. During the past 10 years, have you consulted a physician or practitioner for, been treated for, had or been informed that you had Acquired Immune Deficiency Syndrome (AIDS), AIDS Related Complex (ARC), or other immune deficiency?   ☐ Yes  ☒ No

6. Within the past 2 years, have you had persistent cough, pneumonia, chest discomfort, muscle weakness, unexplained weight loss of ten pounds or more, swollen glands, white spots or unusual blemishes in mouth, visual disturbance, or recurring diarrhea, fever or infection?   ☐ Yes  ☒ No

7. During the past 5 years, have you had a blood test or any other test result indicating the presence of the AIDS virus or antibodies to the AIDS virus?   ☐ Yes  ☒ No

8. Have you EVER had or received treatment, attention, or advice from any physician, practitioner or health facility for, or been told by any physician, practitioner or health facility that you had:
   (a) Disease of heart, arteries, or veins; chest pain; stroke or palpitations?   ☐ Yes  ☒ No
   (b) High Blood pressure (hypertension)?   ☐ Yes  ☒ No
   (c) Cancer, tumor or polyp? (If Yes, also indicate type and part of body affected.)   ☐ Yes  ☒ No
   (d) Diabetes; sugar, albumin, or blood in urine?   ☐ Yes  ☒ No
   (e) Asthma, bronchitis, tuberculosis, or other lung disease?   ☐ Yes  ☒ No
   (f) Ulcers; colitis; or disorder of liver, stomach, gall bladder, or intestines?   ☐ Yes  ☒ No
   (g) Nervous breakdown, or any mental or nervous disorder?   ☐ Yes  ☒ No
   (h) Epilepsy, unconsciousness, dizziness or fainting spells?   ☐ Yes  ☒ No
   (i) Kidney stones or any disease of the kidney, bladder, or other part of urinary tract?   ☐ Yes  ☒ No
   (j) Any disease of the prostate or testes if male; of the uterus, ovaries or breasts if a female? (If hysterectomy or breast surgery, prostate surgery or biopsy was performed, also indicate whether entire organ was removed; specific diagnosis; and how long hospitalized.)   ☐ Yes  ☒ No
   (k) Arthritis, rheumatic fever, gout; paralysis or deformity of the bones, muscles or joints?   ☐ Yes  ☒ No
   (l) Disease of glands (thyroid, lymph, etc.); or anemia, leukemia or other blood disease?   ☐ Yes  ☒ No
   (m) Disease or impairment of eyes or ears?   ☐ Yes  ☒ No

9. Have you ever had a surgical operation not revealed above, or gone to a hospital, clinic, dispensary

MLOCL001728

Mar-27-01 12:20P emsi john vance inc        602 257 9626        P.04

## PART B – APPLICATION FOR LIFE INSURANCE (Continued)

| | | | | | Yes | No |
|---|---|---|---|---|---|---|
| 10. | In past 5 years: | | | | | |
| | (a) | Have you had any electrocardiogram, X-ray, or other medical test? (If Yes, name test and give reasons, dates, name and address of each physician or other practitioner and each hospital, and results.) | | | ☒ Yes | ☐ No |
| | (b) | Have you received, or applied for, disability or hospitalization benefits from any source? (i) (If Yes, give dates of onset (and of termination if fully recovered), reason, extent of disability and present status. (ii) If claim was made to us, so indicate.) | | | ☐ Yes | ☒ No |
| 11. | (a) | Have you been aware of any impairment of health not revealed above? (If Yes, give details.) | | | ☐ Yes | ☒ No |
| | (b) | Are you now contemplating any surgical operation, or are you planning to seek other medical advice or treatment? (If Yes, give details.) | | | ☐ Yes | ☒ No |
| | (c) | In the past 6 months, have you taken any prescribed medication or have you been advised to restrict your diet or living routine? (If Yes, state details, who recommended, and give reason.) | | | ☐ Yes | ☒ No |
| 12. | (a) | Have you ever used heroin, cocaine, barbiturates or other drugs, except as medication prescribed by a physician or other licensed practitioner? | | | ☐ Yes | ☒ No |
| | (b) | Have you ever received treatment from a physician or other practitioner regarding the use of alcohol, or the use of drugs except for medicinal purposes; or received treatment or advice from an organization which assists those who have an alcohol or drug problem? | | | ☐ Yes | ☒ No |
| 13. | | Did either of your parents or any of your brothers or sisters ever have heart or coronary artery disease, high blood pressure, cancer, diabetes, mental disease, kidney or neurological disorder? (If Yes, give details for each person, including age at onset, in item 14.) | | | ☐ Yes | ☒ No |

| 14. Family Record | Age if Living | Age at Death | Details to Item 13 and/or Cause of Death |
|---|---|---|---|
| Father | 61 | | |
| Mother | 64 | | |
| Brothers 1 | 34 | | |
| Sisters 0 | | | |

5. For any Yes answer to Items 4 through 12 give the following details.

| Item No. | Name and Address of Each Physician, Practitioner and Health Facility | Dates and Durations | Nature and Severity of Condition, Frequency of Attacks, Specific Diagnosis and Treatment |
|---|---|---|---|
| 9. | Vaginal Birth Inpatient x 2 days | 11-3-98 | Northwest Memorial Hosp. Sherman, Texas |
| 10A. | Insurance Physical for Met Life. | 1999 | EKG - normal results |
| | | | |
| | | | |

I have read the answers to Questions 2–15 before signing. They have been correctly written, as given by me, and are true and complete to the best of my knowledge and belief. There are no exceptions to any such answers other than as written.

Witness to Signature _____  Place Casa Grande AZ _____  Mo. Day Yr. 2 4 01  Signature _____

Person being Examined

MLOCL001729

**MetLife**
Metropolitan Life Insurance Company

**Part 1: Application for Disability Income Insurance**

0013104 **-3 TX**

**1. (a) Proposed Insured**

Inna Ogandzhanova

Full Name  First, Middle Initial, Last Name

Sex **F**   Date of Birth **1/7/63**   Age **35**

(b) State of Birth (Country if other than U.S.) **Russia**

(c) Are you a United States citizen? ☒ Yes ☐ No
If No, how long have you been a resident of the United States? ____ Years ____ Months
Status of your visa (if applicable)   ☐ Temporary ☐ Permanent

(d) Social Security Number **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**

(e) Driver's License Number **116 45398**   State of Issue **TX**

**2. (a) Residence:**

**1000 North 12th St**

Number   Street

**Honey Grove   TX   75446**

City   State   ZIP

(b) Prior residence if less than 2 years at current residence:

**1301 Hwy 14N #307**

Number   Street

**Benham, TX 75418**

City   State   ZIP

**3. Business: Employer's Name   Indiana Cancer Center**

Business Address **877 Hospital Rd**

Number   Street

**Indiana, PA   15701**

City   State   ZIP

**4.** Send communications to proposed insured at ☒ Residence ☐ Business

**5.** How is business organized? ☐ Sole proprietor ☐ Partnership ☐ Professional Corporation
☐ Self Employed ☒ C Corporation ☐ S Corporation

**6. (a)** Occupation: (at which you work 30 hrs. or more per week) **Physician, Radiation Oncology**

(b) Describe your exact daily duties and the percentage of time you spend on each duty.

| Duty | % |
|---|---|
| Patient care | 100% |

(c) How long have you been employed in your present occupation? **8 yrs (including residency)**

(d) Are you actively at work fulltime in the above occupation? ☒ Yes ☐ No

(e) Nature of business: **oncology center**

(f) How long have you been employed by your present employer? **just started**

(g) If less than 5 years at current employment: **University of Texas Medical Branch,**
Previous employer's name and address:
**301 Univ. Blvd, Galveston, TX   residency between 1993-1997, employee in 1998**

(h) Do you have any other part-time or full-time job? (Give Details) **Yes**

(i) Do you plan to change jobs within the next 6 months? ☐ Yes ☒ No   If Yes, give details **MDA, 3495 Holcomb Bridge Rd, Norcross, GA 30092 ; consulting work part-time**

AH533-8-TX

MLOCL001730

0013104 **-4 TX**

**7.   Base Policy and Optional Benefits Being Applied For**

☐ **Disability Income Insurance**
**(Omni Plus)**

Occupational Class                           ☒ 5A      ☐ 4A      ☐ 3A      ☐ 2A      ☐ A      ☐ B
Elimination Period (days)                  ☐ 60      ☒ 90      ☐ 180    ☐ 365    ☐ 730
Benefit Period                                  ☐ 2 Years                  ☐ 5 Years                  ☒ Age 65
                                                                                                                    (5A, 4A, 3A, 2A only)

Monthly Benefit $ 2,000_____           ☒ Level Premiums      ☐ Step Rate
                                                                                                    (5A, 3A, 4A, 2A only)

Additional Monthly Benefit $_____ (only if Benefit Period is Age 65)
    Elimination Period (days)                  ☐ 60      ☐ 90      ☐ 180    ☐ 365    ☐ 730

☐ **Disability Income Insurance**
**(Priority Plus)**

Occupational Class                           ☐ 5A      ☐ 4A      ☐ 3A      ☐ 2A
Elimination Period (days)                  ☐ 60      ☐ 90      ☐ 180    ☐ 365    ☐ 730
Benefit Period                                  ☐ 2 Years                  ☐ 5 Years                  ☐ Age 65
Monthly Benefit (Maximum $3,000) $_____

Additional Monthly Benefit $_____ (only if Benefit Period is Age 65)
    Elimination Period (days)                  ☐ 60      ☐ 90      ☐ 180    ☐ 365    ☐ 730

**Disability Income Insurance**
**(Omni Plus—Priority Plus)**
**Optional Benefits**

☐ Lifetime for Monthly Benefit (N/A in 2A, A, B or Priority Plus)

☐ Lifetime for Additional Monthly Benefit (N/A in 2A, A, B or Priority Plus)

☐ Refund of Premium (R.O.P) (N/A in Priority Plus)

☒ Residual Disability (R/DI) (N/A in A and B)

☐ Cost of Living (COLA) (N/A in A, B or Priority Plus)
    ☐ 4% level, no cap
    ☐ 4%-7% (C.P.I.), no cap (N/A in 2A)

☒ Your Occupation (Y/OC) (Omni Plus 5A only)

☐ Occupation to 65 (Omni Plus 3A only)

☐ Principal Sum Amount $_____ (N/A in Priority Plus)

☐ Automatic Increase Feature (A.I.F.) (5A, 4A Omni Plus only)

☐ Supplemental Monthly Benefit (S.M.B.) (N/A in B)                  Monthly Amount $_____
    Elimination Period (days)                  ☐ 60      ☐ 90      ☐ 180

☐ Social Insurance Substitute (S.I.S.) (N/A in B)                  Monthly Amount $_____

☒ Option to Increase Monthly Benefit (G.I.) (N/A in A, B or Priority Plus)      Monthly Amount $ 1,900

☐ **Business Overhead Expense**
**(Expense Plus)**
**Questions 19 and 20 Must Be Completed**

Occupational Class                           ☐ 5A      ☐ 4A      ☐ 3A      ☐ 2A
Elimination Period (days)                  ☐ 30      ☐ 60      ☐ 90
Benefit Period                                  ☐ 12 Months                  ☐ 24 Months
Monthly Benefit        $_____
Option to Increase Monthly Benefit—Amount  $_____
☐ Refund of Premium (R.O.P)

AH533-8-TX

MLOCL001731

0013104 **-5 TX**

☐ **Mortgage Disability Income Insurance**
**MortgageComp**

| | | | |
|---|---|---|---|
| Occupational Class | ☐ 4A | ☐ 3A | ☐ 2A | ☐ A |
| Elimination Period (days) | ☐ 90 | ☐ 180 | | |
| Duration of Policy (Class A—10 Year Term Only) | ☐ 10 | ☐ 15 | ☐ 20 | ☐ 30 |

Monthly Benefit (Maximum $1,200) $_____

When did you purchase your home? _____   When will mortgage expire? _____

Monthly mortgage payments
(principal, interest, taxes) $_____

What percentage of the monthly mortgage amount
are you responsible for paying? _____

Mortgagor?

Name _____

Account number _____

Address _____

Telephone number _____

☐ **Metromatic Disability Income Insurance**

| | | | | |
|---|---|---|---|---|---|
| Occupational Class | ☐ 5A | ☐ 4A | ☐ 3A | ☐ 2A | ☐ A | ☐ B |
| Elimination Period (days) | ☐ 60 | ☐ 90 | ☐ 180 | | | |
| Benefit Period | ☐ 2 Years | ☐ 5 Years | ☐ Age 65 | | | |
| | | | (5A, 4A, 3A only) | | | |

Monthly Benefit $_____
(60% of Income to a Maximum of $3,000)

8. (a) Premium payments:

☐ Annual    ☐ Semi-Annual
☒ Check-O-Matic    ☐ Salary Savings

(b) Will the entire premium for this policy be paid directly by
your employer?  ☐ Yes  ☒ No

(c) If Yes, will any portion of this premium be treated as taxable
income to you?  ☐ Yes  ☒ No

9. Amount paid with Application: $ *342 75*    ☐ None
This amount ☒ is  ☐ is not at least equal to one month's premium.

10. (a) Revocable Beneficiary

*Ella Ogradhaiova*
Full Name

*mother*
Relationship

*12/24/38*
Date of Birth

(b) Revocable Contingent Beneficiary

_____
Full Name

_____
Relationship

_____
Date of Birth

11. (a) Do you have, or are you applying for other:

| | |
|---|---|
| (1) Individual, Association or Group disability income coverage? | ☐ Yes ☒ No |
| (2) Formal employer sick pay or Union disability income coverage not included in (1)? | ☐ Yes ☒ No |
| (3) Business Overhead Expense Disability coverage? | ☐ Yes ☒ No |

(Give details below of all disability coverage in force and applied for. Type should be shown as: I—Individual,
A—Association, G—Group, E—Employer Sick Pay or Union, and BOE—Business Overhead Expense).

| MONTHLY DISABILITY COVERAGE | | | |
|---|---|---|---|
| Company or Source | Type (I, A, G, E, or BOE) | Monthly Disability Amount | Benefit Period Accident   Sickness |
| | | | |
| | | | |
| | | | |

(b) Are you covered by Social Security?  ☒ Yes  ☐ No

(c) Does any of the above coverage include a Social Security supplement or substitute benefit?  ☐ Yes  ☒ No

If Yes, give company name and amount of such benefit: _____  $ _____

AH533-8-TX

MLOCL001732

0013104 **-6 TX**

12. (a)  Is the coverage being applied for to replace or change any existing insurance?  ☐ Yes ☒ No

If yes, complete the following (examples of Type of Coverage are: personal, overhead, individual, group association or buyout):

| Insurance Company Name and Address | Policy Number | Monthly Benefit | Type of Coverage | Date of Termination or Lapse | Premium Mode |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |

Metropolitan Life Insurance Company will rely on the fact that the coverage under the policy(ies) listed above will terminate or lapse on the date shown. If the coverage does not terminate or lapse on that date, any policy issued will be rescinded and all premiums will be returned and no benefits will be payable. Metropolitan Life Insurance Company may contact any listed insurer after the date of termination or lapse to confirm that the coverage has terminated or lapsed.

(b)  Is policy applied for to replace any Metropolitan Life Insurance Company disability income insurance?  ☐ Yes ☒ No
If Yes, give details and policy number below.

13.

|  | (estimated) 1999 | 1998 | 1997 |
|---|---|---|---|
|  | Current Year | Last Year | Two Years Ago |
| (a) Annual Salary | $ 190,000 | $ 90,000 | $ ~~60,000~~ |
| (b) Commissions | $ | $ | $ 29,772 |
| (c) Bonuses | $ 30,000 | $ | $ |
| (d) Pension and Profit-sharing Contributions and other Deferred Compensation | $ | $ | $ |
| (e) Earnings from other occupations | $ | $ | $ |
| Totals | $ 190,000 | $ 90,000 | $ 29,772 |
| Other Income: | | | |
| (f) Dividends and Interest | $ 2,000 | $ 1,000 | $ 1,000 |
| (g) Net Real Estate Income Before Depreciation | $ | $ | $ |
| (h) Other (Identify Source:) _____ | $ | $ | $ |

(i)  Does your net worth exceed $3,000,000?  ☐ Yes ☒ No  (If "Yes", give details below. Amounts expressed to the nearest $10,000 are acceptable. Show current values less indebtedness.)

**CURRENT NET WORTH**

| | |
|---|---|
| Cash, Savings, Stocks & Bonds .................................................. | $ |
| Personal Property (such as jewelry, furnishings) ............................ | $ |
| Personal Residence ............................................................. | $ |
| Other Real Estate .............................................................. | $ |
| Business Interest .............................................................. | $ |
| Other .......................................................................... | $ |
| TOTAL | $ |

AH533-8-TX

MLOCL001733

0013104 **-7 TX**

**14.** Have you flown as a pilot, student pilot, crew member or passenger (except on a scheduled airline) in the last 2 years or do you intend to do so in the next 12 months? ☐ Yes ☒ No
If Yes, give details in Item 18.

**15.** Have you had a driving license suspended or revoked in the last 3 years; ever been convicted of 3 or more moving violations or driving while impaired or intoxicated; or been convicted of, pleaded guilty to or pleaded no contest to the violation of any criminal law in the last 3 years? ☐ Yes ☒ No
If Yes, give details in Item 18.

**16.** Has any application for a policy of Life or Health Insurance on you ever been declined, postponed, rated, modified or required an extra premium? ☐ Yes ☒ No
If Yes, give date, company, type of insurance and reason in Item 18.

**17.** Have you ever engaged in or do you plan to engage in: Automotive, Motorcycle (including off road use) or Power Boat Racing; Bobsledding; Ballooning; Scuba or Sky Diving; Hang Gliding (including Slope Soaring, Parakiting, Ultralighting, etc.); Mountain Climbing; Parachuting; Snowmobile Racing; or any other hazardous sport or hobby? ☐ Yes ☒ No
If Yes, give details in Item 18.

**18.** Give details of each Yes answer in Items 14 through 17:
Item No.  *University of Texas*

*The applicant completed her residency in July of 1997. She then worked for University Dept of Education as a physician until she joined Indiana Cancer Institute as a substantially higher salary.*

---

| Answer questions 19 and 20 only if Business Overhead Expense coverage is applied for: |
|---|

**19. (a)** Your position in business:
☐ Self Employed
☐ Sole proprietor
☐ Partner
☐ Professional Corporation
☐ Shareholder of Corporation

**(b)** Your percentage of ownership: _____ %
**(c)** Number of employees: _____
**(d)** Number of employees who are members of your profession: _____

**20.** List your average monthly business overhead expenses during the six months before the date of this application. (If you share monthly business expenses with others, list only your share of the expenses. Exclude salaries of any employees who are relatives, and salaries, fees, drawing accounts, profits or any other remuneration for you, any partner or any person hired to perform your duties.)

| | | | |
|---|---|---|---|
| Rent | $ *650* | Depreciation of business equipment | $ _____ |
| Taxes (not income taxes) and mortgage interest payments | $ _____ | Employees' salaries (exclude relatives and members of your profession) | $ _____ |
| Other interest on business indebtedness | $ _____ | Other normal and customary fixed offices expenses (specify) | $ _____ |
| Utilities Electricity | $ _____ | .................................... | |
| Telephone | $ _____ | .................................... | |
| Heat | $ _____ | .................................... | $ _____ |
| Water | $ _____ | Total | $ _____ |

AH533-8-TX

MLOCL001734



0013104 **-8 TX**

**Part B**        **Statements By The Proposed Insured**
Only the Proposed Insured's answers should be inserted below.

**1.** (a) Height _5'6"_        (b) Weight _150_

**2.** How much time have you lost from work during the past 5 years because of accident or sickness? _none_

**3.** In past 5 years, has any physician, psychiatrist, psychologist, chiropractor, or other licensed practitioner examined, advised or treated you?    ☒ Yes ☐ No
If Yes, give details below for each instance

| Name and Address of Each Physician, Psychiatrist, Psychologist, Chiropractor, or Other Licensed Practitioner | Dates | Symptoms or Ailments, or Other Reasons for Consultation, Diagnosis |
|---|---|---|
| Thomas McCoy, MD Indiana, PA (see below) | 1998 | regular checkup |
| | | |
| | | |
| | | |

**4.** Tobacco Use

Date you last used tobacco in any form

Date _____ Type _____
☒ Never used

**5.** Name and address of your personal physician, psychiatrist, psychologist, chiropractor, or other licensed practitioner if not mentioned above:

Thomas McCoy, MD,
875 Hospital, Suite 201, Indiana, PA 15701

**6.** Have you EVER received treatment or advice from any physician, psychiatrist, psychologist, chiropractor, or other licensed practitioner for, or been told by any physician or other licensed practitioner that you had:

|  | Yes | No |
|---|---|---|
| (a) Disorder of heart, arteries or veins; chest pain? | ☐ | ☒ |
| (b) Arthritis, disorder or deformity of the bones, muscles or joints; neck or back disorders? | ☐ | ☒ |
| (c) Mental or nervous condition? | ☐ | ☒ |
| (d) Elevated blood pressure (hypertension)? | ☐ | ☒ |
| (e) Cancer, tumor or polyp? | ☐ | ☒ |
| (f) Diabetes? | ☐ | ☒ |
| (g) Lung disorders, asthma or allergy? | ☐ | ☒ |
| (h) Disorder of liver, gall bladder, pancreas, digestive tract including intestines; ulcer, colitis, hemorrhoids, or hernia? | ☐ | ☒ |
| (i) Epilepsy, unconsciousness, dizziness, paralysis, or impairment of nervous system? | ☐ | ☒ |
| (j) Disorder of the urinary tract; sugar, albumin or blood in urine, or venereal disease? | ☐ | ☒ |

|  | Yes | No |
|---|---|---|
| (k) Acquired Immune Deficiency Syndrome (AIDS), AIDS Related Complex (ARC) or other immune deficiency? | ☐ | ☒ |
| (l) Deformity or loss of limb? | ☐ | ☒ |
| (m) Disorder of glands; anemia, leukemia or other blood disorders? | ☐ | ☒ |
| (n) Any disorder of the prostate or testes if a male; uterus, ovaries or breasts if a female? (If hysterectomy or breast surgery, including biopsy, has been performed, also indicate whether entire organ was removed, specific diagnosis, and how long hospitalized.) | ☐ | ☒ |
| (o) Disorder or impairment of eyes or of ears, mouth, nose, throat? | ☐ | ☒ |
| (p) Endocrine disorders or goiter or disorder of the thyroid gland? | ☐ | ☒ |

AH533-8-TX

0013104 **-9 TX**

**7. Have you EVER:**

(a) Had any surgical operation not revealed in previous questions, or gone to a health facility for observation, examination or treatment not revealed in previous questions?  ☒ Yes  ☐ No

(b) Been advised by a licensed medical practitioner to modify or restrict eating, drinking, or living habits because of any health conditions?  ☐ Yes  ☒ No

(c) Received or applied for disability benefits from any source in past 5 years? If Yes, give dates of onset (and termination if fully recovered), reason, extent of disability and present status. If claim was to Metropolitan, so indicate.  ☐ Yes  ☒ No

(d) Been advised by a licensed medical practitioner to have an operation that was not performed?  ☐ Yes  ☒ No

(e) Had persistent cough, pneumonia, chest discomfort, muscle weakness, unexplained weight loss of 10 pounds or more, swollen glands, patches in mouth, visual disturbance or recurring diarrhea, fever or infection?  ☐ Yes  ☒ No

**8.** (a) Are you currently disabled, or expect to be disabled?  ☐ Yes  ☒ No
   (b) Are you pregnant?  ☐ Yes  ☒ No

**9.** Have you ever used heroin, cocaine, marijuana, barbiturates or other controlled substance except as prescribed by a physician or other licensed practitioner; or received treatment or advice from a physician or other practitioner regarding the use of alcohol, or the use of drugs except for medical purposes; or received treatment or advice from an organization which assists those who have an alcohol or drug problem?  ☐ Yes  ☒ No

**10.**                **For any Yes answer to Items 6 through 9 give the following details:**

| Item No. | Name and Address of Each Physician, Counselor, Chiropractor, Practitioner and Health Facility | Dates and Durations | Nature and Severity of Condition, Frequency of Attacks, Specific Diagnosis and Treatment |
|---|---|---|---|
| 7) | 11/3 - 11/4/98 Wilson N. Jones Hospital, Shoreman, TX | 11/3-11/4 1998 | Normal childbirth |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**11.** Did any parent, brother or sister have heart or coronary artery disease, high blood pressure, cancer or diabetes?  ☐ Yes  ☒ No
If Yes, give details for each person, including age at onset, in Item 12.

**12.**

| Family Record | Age if Living | Age at Death | Details and/or Cause of Death |
|---|---|---|---|
| Father | 58 | | N/A |
| Mother | 62 | | |
| Brothers | 32 | | |
| Sisters | | | |

AH533-8-TX

MLOCL001736

  0013104-**10 TX**

## Agreement

**I have read this application and agree that all statements and answers are true
and complete to the best of my knowledge and belief. It is also agreed that:**

1. The statements and answers in this application are the basis of any policy issued.

2. No information will be considered to have been given to Metropolitan unless it is stated in the application.

3. No account representative or other person except the President, Secretary or a Vice-President of Metropolitan may (a) make or change any contract of insurance; or (b) change or waive any of the terms of an application, receipt or policy.

4. Except as set forth in the receipt, Metropolitan will have no liability until the date of issue or the date the full first premium due is paid, whichever is later. The policy will then be in effect as of its date of issue, as defined in the policy. But it will not be in effect unless at the time it is issued the condition of health of the proposed insured is the same as given in the application.

If there are any exceptions give us the details in writing.

| WITNESS (Licensed Resident Agent) | PLACE | Mo. Day Yr. | Signature of Proposed Insured |
|---|---|---|---|
| | Wayne, NJ | 1/6/98 | |

### Personal History Interview

I understand that a telephone interview may be required. I can be reached during normal business hours at:

☐ Home   Area Code _724_   Phone Number _463 - 1805_

☐ Office   Area Code _724_   Phone Number _465 - 8900_

☐ Other   Area Code _____   Phone Number _____

Most convenient time _____ A.M.   _____ P.M.

Witness _____

Date _1/6/98_

Signature of Proposed Insured _____

AH533-8-TX

MLOCL001737

  0013104 **-11 TX**

## ✠ MetLife®

## Authorization and Acknowledgement Form

For underwriting and claims purposes, I permit:

—Any physician or other medical practitioner, hospital, clinic, other medically related facility, consumer reporting agency, or the Medical Information Bureau, Inc. (MIB) to give **Metropolitan Life Insurance Company** data of a medical nature. This data includes findings on medical care, psychiatric or psychological care or examination, or surgery. I specifically authorize the disclosure to **Metropolitan** of any information concerning sexually transmitted diseases including venereal diseases, any Human Immuno-deficiency Virus (HIV) test results, or information about Acquired Immune Deficiency Syndrome (AIDS) or AIDS related conditions, or confidential HIV related information, and any information concerning a serious communicable disease, and any information concerning mental health. Also, any insurer may give **Metropolitan** medical data described above and data about any current or pending coverage I may have with them.

—**Metropolitan** to get consumer reports, investigative consumer reports and motor vehicle reports about me.

—Any employer, business associate, financial institution, insurer, government unit or MIB to give **Metropolitan** any data that they may have about the occupation, avocations, driving record, finances, character, general reputation and aviation activities.

I understand that:

—My medical records, including any alcohol or drug abuse data, may be protected by Federal Regulations—42 CFR Part 2. I permit **Metropolitan** to get any data for the reasons set forth above. I consent to the re-disclosure of such data as set forth on this form.

—Information concerning mental illness, HIV, AIDS, HIV-related illness and sexually transmitted or other serious communicable diseases may be controlled by various state or federal laws and regulations. I consent to the re-disclosure of such information as described in this form and as otherwise required or permitted by law.

—All or part of the data which **Metropolitan** gets may be sent to MIB. It may also be disclosed to and used by any **Metropolitan** reinsurer, employee, affiliate or contractor who performs any business service on any insurance I may have applied for or have with **Metropolitan**. If any application is declined or I am offered coverage in a substandard classification, **Metropolitan** may disclose all or part of the data to a substandard or declined risk broker or insurer that has obtained my written authorization to obtain such data.

—Information concerning myself, including HIV results, AIDS, HIV-related illnesses and serious communicable diseases may also affect the insurability of my spouse and children. To the extent **Metropolitan** may be considering applications on other family members, I consent to the use of such information to determine their insurability.

—I may ask to be interviewed if any investigative consumer report is obtained about me. Please get in touch with me between the hours of _____ and _____. My phone number is _____.

                                                       (area code)                        (number)

My consent to get the data described in this form will end two years from the date shown below or for a shorter period if such shorter period is prescribed by law. I may at any time, however, revoke my permission to get any data protected by 42 CFR Part 2 or any other federal or state law or regulation which provides for such revocation. Any action taken before revocation, however, will be valid.

I have been given **Metropolitan's** Consumer Privacy Notice. I know that I have a right to get a copy of this form. **A photocopy of this form is as valid as the original form.**

Signature of the Proposed Insured

INNA Oyardzlanou
Print name of the Proposed Insured

Witness

1/6/89

Date

AH533-8-AUTH-TX

Print Surname as it is on records if different from that signed above

MLOCL001738

0013104-**12 TX**

D.O. NOT WRITE HERE

AH533-8-TX

MLOCL001739

[ RECEIVED 02/18 14:48 1999 AT 9146201257     PAGE   4 (PRINTED PAGE   4) ]

## Part B of Application for Life Insurance Policy
The spaces below are for answers of person to be examined only. Nothing but the answers of such person should be recorded.

**1. Name of Person to be Examined**
Rena                                      Ogondzhanova
_First Name_            _Middle Initial_            _Last Name_

**2. Cigarette Smoking**
Date you last smoked a cigarette  ☐ _____   ☑ Never smoked
_(Date)_

**3. Name and address of your personal physician, practitioner or health facility.**
Dr. McCoy 841 Hosp Rd   Indiana PA  15701

**4. In past 5 years has any physician, practitioner or health facility examined, advised or treated you?     Yes ☑   No ☐**
If Yes, give details below for each instance.

| Names and Address of each Physician Practitioner and Health Facility | Dates | Your Symptoms or Ailments, or Other Reasons For Consultations | Diagnosis, Treatment or Advice Given. |
|---|---|---|---|
| Dr. McCoy - address above | Jan 6 99 | post childbirth visit | normal exam. |

**5. Have you EVER received treatment, attention, or advice from any physician, practitioner or health facility for, or been told by any physician, practitioner or health facility that you had:**

| | | |
|---|---|---|
| (a) Disease of heart, arteries, or veins; chest pain? | Yes ☑ | No ☑ |
| (b) High Blood pressure (hypertension)? | Yes ☐ | No ☑ |
| (c) Cancer, tumor or polyp? (If Yes, also indicate type and part of body affected.) | Yes ☐ | No ☑ |
| (d) Diabetes; sugar, albumin, or blood in urine? | Yes ☐ | No ☑ |
| (e) Asthma, bronchitis, tuberculosis, or other lung disease? | Yes ☐ | No ☑ |
| (f) Ulcers; colitis; or disorder of liver, stomach, gall bladder, or intestines? | Yes ☐ | No ☑ |
| (g) Nervous breakdown, or any mental or nervous disorder? | Yes ☐ | No ☑ |
| (h) Epilepsy, unconsciousness, or dizziness? | Yes ☐ | No ☑ |
| (i) Kidney stones or any disease of the kidney, bladder, or other part of urinary tract? | Yes ☐ | No ☑ |
| (j) Any disease of the prostate or testes if a male; of the uterus, ovaries or breasts if a female? (If hysterectomy or breast surgery, including biopsy, was performed, also indicate whether entire organ was removed; specific diagnosis, and how long hospitalized.) | Yes ☐ | No ☑ |
| (k) Arthritis, rheumatic fever, gout; paralysis or disease or deformity of the bones, muscles or joints? | Yes ☐ | No ☑ |
| (l) Disease of glands (thyroid, lymph, etc.); or anemia, leukemia or other blood disease? | Yes ☐ | No ☑ |
| (m) Disease or impairment of eyes or ears? | Yes ☐ | No ☑ |

**6.** Have you ever had a surgical operation not revealed above, or gone to a hospital, clinic, dispensary or sanatorium for observation, examination or treatment not revealed above?     Yes ☑   No ☐

**7.** In past 5 years:
(a) Have you had any electrocardiogram, X-ray, or other medical test? (If Yes, name test and give reasons, dates, name and address of each physician or other practitioner and each hospital, and results.)     Yes ☑   No ☐

(b) Have you received, or applied for, disability or hospitalization benefits from any source? (i) (If Yes, give dates on onset (and of termination if fully recovered), reason, extent of disability and present status. (ii) If claim was made to Metropolitan, so indicate.     Yes ☐   No ☑

**8.** (a) Have you been aware of any impairment of health not revealed above? (If Yes, give details.)     Yes ☐   No ☑

(b) Are you now contemplating any surgical operation, or are you planning to seek other medical advice or treatment? (If Yes, give details.)     Yes ☐   No ☑

(c) In the past 6 months, have you taken any prescribed medication or have you been advised to restrict your diet or living routine? (If Yes, state details, who recommended, and given reason.)     Yes ☑   No ☐

US6K-B

_Vitamins_

MLOCL001740

## Part B (continued)

9. (a) Have you ever used heroin, cocaine, barbiturates or other controlled substances, except as medication prescribed by a physician or other licensed practitioner?     Yes ☐   No ☒

(b) Have you ever received treatment or advice from a physician or other practitioner regarding the use of alcohol, or the use of drugs except for medicinal purposes; or received treatment or advice from an organization which assists those who have an alcohol or drug problem?     Yes ☐   No ☒

10. Did either of your parents or any of your brothers or sisters ever have heart or coronary artery disease, high blood pressure, cancer, diabetes or mental disease? (If Yes, give details for each person, including age at onset, in Item 11.)     Yes ☐   No ☒

| 11. Family Record | Age if Living | Age at Death | Details to Item 10 and/or Cause of Death |
|---|---|---|---|
| Father | 58. | | Good Health |
| Mother | 62. | | Good Health |
| Brothers (1) | 32 | | Good Health |
| Sisters | | | |

### For any Yes answer to Items 5 through 9 give the following details.

| Item No. | Name and Address of Each Physician, Practitioner and Health Facility | Illness and Duration | Nature and Severity of Condition, Frequency of Attacks, Specific Diagnosis and Treatment |
|---|---|---|---|
| 6 | Sherman Texas | Nov '98 | Childbirth - normal vaginal birth. |
| 7a | Blood testing done for routine pregnancy 1998. | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

I have read the answers to Questions 2–11 before signing. They have been correctly written, as given by me, and are true and complete to the best of my knowledge and belief. There are no exceptions to any such answers other than as written.

| Witness to Signature | Place | Mo. Day Yr. | Signature |
|---|---|---|---|
| [signature] | Residence | 2 5 99 | [signature] |

Person being Examined

086K-B

MLOCL001741

## Notice

When you write to us, please give us your name, address and policy number. Please notify us promptly of any changes. We will write to you at your last known address.

Checks, drafts or money orders may be drawn on a U.S. bank to the order of Metropolitan Life (or "MetLife"). They are received subject to the condition that they may be handled for collection in accordance with the practice of the collecting bank or banks. If we do not receive the full amount of any check, draft or money order, it will not constitute payment. All payments are to be made in U.S. currency.

**Voting for Directors**   Our Board of Directors is elected by the policyholders. For details on how to vote, write to our Secretary.

Metropolitan Life Insurance Company
One Madison Avenue
New York, New York 10010-3690

Countersigned and Delivered _____ By _____

## Table of Contents

| | Page |
|---|---|
| **Renewability** | 1 |
| **Schedule of Benefits** | 3 |
| **Understanding This Policy** | 5 |
| **Definitions** | 5 |
| **Benefits** | 6 |
| Monthly Benefit for Total Disability | 6 |
| Total Disability Because of Transplant Surgery | 7 |
| Rehabilitation | 7 |
| **Recurrent and Concurrent Disability** | 7 |
| **Renewal Privilege if Employed** | 7 |
| Renewal Privilege | 7 |
| Total Disability Benefit with Limited Benefit Period | 7 |
| Premiums | 7 |

| | Page |
|---|---|
| **Provisions Applicable to All Benefits** | 8 |
| Waiver of Premiums | 8 |
| General Exclusions | 8 |
| Preexisting Conditions Limitation | 8 |
| **Premium and Reinstatement** | 8 |
| Premium Payment | 8 |
| Grace Period | 8 |
| Reinstatement | 9 |
| Suspension During Military Service | 9 |
| **Dividends** | 9 |
| **Claims** | 10 |
| Time of Loss | 10 |
| Written Notice of Claim | 10 |
| Claim Forms | 10 |
| Written Proof of Loss | 10 |
| Physical Examination | 10 |
| Time of Payment of Claim | 10 |

| | Page |
|---|---|
| Payment of Claims | 10 |
| Beneficiary | 10 |
| How to Change the Beneficiary | 10 |
| Assignment | 10 |
| Misstatement of Age and Sex | 10 |
| **General Provisions** | 11 |
| The Contract | 11 |
| Limitation on Account Representative's or Other Person's Authority | 11 |
| Time Limit on Certain Defenses Misstatements in the Application | 11 |
| Preexisting Conditions | 11 |
| Legal Actions | 11 |
| Conformity with State Statutes | 11 |
| Waiver of Policy Provisions | 11 |

Riders providing additional benefits, special endorsements or exclusion riders, if any, follow page 11.

## Disability Income Insurance Policy - Omni Plus

* **Noncancelable and Guaranteed Renewable to Age 65. No Change in Premium Rates.** This means that, as long as you pay the premium on time, we cannot change your policy or its premium rate until the first premium due date on or after your 65th birthday.
* **Renewal Privilege from Age 65 to Age 75. Premium Rates are Subject to Change.** If you are actively and regularly employed full time as of the first premium due date on or after your 65th birthday, you may continue this policy to the first premium due date on or after your 75th birthday for as long as you remain so employed. This privilege is explained on page 7.

* The Schedule of Benefits provided by this policy is shown on page 3.
* There is an exclusion for Preexisting Conditions on page 8.
* This policy is eligible for dividends.

AH 1-90  Printed in U.S.A.                                                                 DCAAAH

MLOCL001742

# EXHIBIT J







**MetLife®**

Metropolitan Life Insurance Company
One Madison Avenue, New York, New York 10010-3690

Metropolitan Life Insurance Company ("MetLife"), a stock company, will pay the benefits of this policy according to its provisions.

**Disability Income Insurance Policy**

* **Noncancelable and Guaranteed Renewable to Age 65. No Change in Premium Rates.** This means that, as long as You pay the Premium on time, We cannot change Your policy, or its Premium rate as shown on page 3, until the first Premium Due Date on or after Your 65th birthday.

* **Renewal Privilege After Age 65 With Limited Benefit Period. Premium Rates are Subject to Change.** If You are Gainfully Employed for at least 30 hours per week as of the first Premium Due Date on or after Your 65th birthday, You may continue coverage under this policy, exclusive of any riders providing additional benefits, for as long as You remain so employed.  This privilege is explained on page 9.

* The Schedule of Benefits provided by this policy is shown on page 3.

We have issued this policy to You in consideration of the payment of the Premium and the statements made in Your Application.  Your Application is part of Your policy.

Gwenn L. Carr
Vice-President and Secretary

C. Robert Henrikson
Chairman, President and Chief Executive Officer

**TRUE COPY**

**10-Day Right to Examine Policy.** Please read this policy.  It is a legal contract between You and Us. You may return the policy to Us or to the representative through whom You bought it within 10 days from the date You receive it.  If You return it within the 10-day period, the policy will be considered never to have been issued.  We will refund any Premium paid.

See Table of Contents on page 4.

Countersigned and delivered on _____ By _____

MLOCL001745

## Metropolitan Life Insurance Company
### Policy Schedule

| | |
|---|---|
| Effective Date: **JULY 28, 2006** | Policy Number: **6482821 AH** |
| Insured: **INNA OGANDZHANOVA** | Issue Age and Sex: **43 FEMALE** |

**Monthly Benefit for Total Disability: $5,500    Elimination Period  90 days**
**Regular Occupation Period:    To Age 65**
**Accumulation Period:           180 days    Maximum Benefit Period:   To Age 65**
**(See Table A in This Schedule)**

| Benefit Provisions | | Annual Premium |
|---|---|---|
| Monthly Benefit for Total Disability | | $4,051.30 |
| Lifetime Benefit for Total Disability | IDI2000-PR/L45-TD | $0.00 |
| Monthly Benefit for Residual Disability With 24 Mos Recovery Benefit | IDI2000-PR/RDIS-REC2 | $1,081.85 |
| Cost of Living Adjustment With Benefit Purchase Option | IDI2000-PR/COLA-PO | $1,632.40 |
| Presumptive Disability | IDIPE03-6 | $0.00 |
| Your Occupation Benefit | IDI2000-PE/YOCC | $823.90 |

IDI2000-P/NC        5S  Nonsmoker                OMNI ADVANTAGE

Page 3

MLOCL001746

## Metropolitan Life Insurance Company

## Policy Schedule

| | | | |
|---|---|---|---|
| Effective Date: | JULY 28, 2006 | Policy Number: | 6482821 AH |
| Insured: | INNA   OGANDZHANOVA | Issue Age and Sex: | 43       FEMALE |

|  |  |
|---|---|
| Policy Fee | $60.00 |
| Financial Documentation Adjustment | ($551.75) |
| Total Annual Premium | $7,097.70 |
| Total Premium For Initial Term | $612.53 |
| Monthly Check-O-Matic | |

**Endorsements and Riders to Your policy may change terms (including definitions, conditions, exclusions and limitations of coverage).  You should always check each Endorsement and Rider to confirm what coverage You have.**

Table A    Maximum Benefit Period Varies By Age When Disability Begins
Age When Disability Begins              Maximum Benefit Period

| Age When Disability Begins | Maximum Benefit Period |
|---|---|
| Before Age 61 | To Age 65 |
| At Age 61, before Age 62 | 48 Months |
| At Age 62, before Age 63 | 42 Months |
| At Age 63, before Age 64 | 36 Months |
| At Age 64, before Age 65 | 30 Months |
| At Age 65, before Age 75 | 24 Months |
| At or after Age 75 | 12 Months |

See Renewal Provision for Ages 65 and Greater
See Policy Wording for Benefits Payable Under Any Riders

IDI2000-P/NC          5S  Nonsmoker                    OMNI ADVANTAGE

MLOCL001747

## Table of Contents

Renewability.................................................................................... 1
Schedule of Benefits............................................................................ 3
Understanding this Policy.................................................................... 5
Definitions..................................................................................... 5
Benefits........................................................................................ 7
    Monthly Benefit for Total Disability.................................................. 7
    Waiver of Premiums..................................................................... 7
    Disability Because of Transplant Surgery.......................................... 8
    Rehabilitation.......................................................................... 8
Recurrent and Concurrent Disability....................................................... 8
Renewal Privilege if Employed After Age 65............................................ 9
    Renewal Privilege...................................................................... 9
    Total Disability Benefit With Limited Benefit Period ............................. 9
    Premiums................................................................................. 9
Exclusions...................................................................................... 9
    General Exclusions..................................................................... 9
    Preexisting Conditions Exclusion.................................................... 9
Premium and Reinstatement................................................................. 9
    Premium Payment....................................................................... 9
    Grace Period............................................................................ 10
    Reinstatement.......................................................................... 10
    Suspension During Military Service................................................. 10
    Suspension During Unemployment.................................................. 10
Claims.......................................................................................... 11
    Time of Loss............................................................................ 11
    Notice of Claim......................................................................... 11
    Claim Forms............................................................................ 11
    Proof of Loss........................................................................... 11
    Authorizations.......................................................................... 11
    Examinations............................................................................ 12
    Time of Payment of Claim............................................................ 12
    Payment of Claims..................................................................... 12
    Beneficiary.............................................................................. 12
    How to Change the Beneficiary...................................................... 12
    Assignment.............................................................................. 12
General Provisions............................................................................ 12
    The Contract............................................................................ 12
    Limitation on Agent's or Broker's or Other Person's Authority................. 12
    Time Limit on Certain Defenses..................................................... 13
    Misstatement of Age and Sex........................................................ 13
    Legal Actions........................................................................... 13
    Conformity with State Statutes....................................................... 13
    Waiver of Policy Provisions.......................................................... 13

Riders providing additional benefits, special endorsements or exclusion riders, if any, follow page 13.

MLOCL001748

## Understanding This Policy

To make this policy clear and easy to read, We have left out many cross-references and conditional statements. Therefore, the provisions of the policy must be read as a whole. For example, the Exclusions on page 9 apply to all benefit provisions of this policy.

A policy term and a policy anniversary are measured from the Effective Date of the policy. For example, if the Effective Date is May 5, 2001, the first policy anniversary is May 5, 2002. If the policy term is 6 months, the first term ends November 4, 2001.

Read this policy to find out how to exercise Your rights. Instructions for submitting a claim can be found on page 11. If You want to change an address, or request any administrative action by Us, You should do so on the forms prepared for each purpose. You can get these forms from Your licensed insurance representative or one of Our local offices.

When You Write to Us, please give Us Your name, address and policy number. Please notify Us promptly of any changes. We will Write to You at Your last known address.

Checks, drafts or money orders may be drawn on a U.S. bank to the order of Metropolitan Life (or "MetLife"). They are received subject to the condition that they may be handled for collection in accordance with the practice of the collecting bank or banks. If We do not receive the full amount of any check, draft or money order, it will not constitute payment. All payments are to be made in U.S. currency.

## Definitions

**Accumulation Period** means the number of consecutive days during which the Elimination Period must be satisfied. The Accumulation Period is shown on page 3, and begins on the first day that You are Disabled.

**Age 65** means the first Premium Due Date that occurs on or after Your 65th birthday.

**Age 70** means the first Premium Due Date that occurs on or after Your 70th birthday.

**Application** means the Written application(s) for this policy, including any amendments thereto, and any application(s) for a policy change or reinstatement.

**Complications of Pregnancy** means:

1.   Diseases of the mother which are not caused by pregnancy but which coexist with and are adversely affected by pregnancy, such as heart, kidney, lung and other similar diseases;

2.   Maternal conditions caused by the pregnancy which make its treatment more difficult, such as placenta praevia, ectopic pregnancy, hemorrhage following delivery, or similar severe conditions; or

3.   A cesarean section or a miscarriage.

This term does not include Physician-prescribed rest, false labor, morning sickness, occasional spotting, or other minor conditions associated with normal pregnancy.

**Disability** or **Disabled** means Total Disability that starts while Your policy is in force.

**Effective Date** means the date that the policy, or a rider, takes effect.

**Elimination Period** means the number of days of Disability which must elapse before benefits become payable for that Disability. These need not be consecutive days of Disability, but must occur within the Accumulation Period for the same or a related cause. No benefits are payable for the Elimination Period. Elimination periods are shown on page 3.

**Gainfully Employed** means actively engaged in an occupation for remuneration or profit.

**Impairment** means a loss of use or function that can be evaluated by medical means.

MLOCL001749

 **Definitions (Continued)** 

**Injury** means an accidental bodily injury that occurs on or after the Effective Date of the policy and while Your policy is in force.

**Maximum Benefit Period** means the longest period of time for which We will pay benefits for any one period of Disability.  Maximum Benefit Periods are shown on page 3.

**Physician** means a person who is:

1.   Legally licensed to practice medicine or psychology; or

2.   A duly licensed practitioner or therapist operating within the scope of his or her license.

A Physician can not be:

1.   You or anyone to whom You are related by blood or marriage;

2.   Anyone with whom You share a business interest; or

3.   Your employee.

**Preexisting Condition** means a Sickness or Injury for which, in the 5 years prior to the Effective Date:

1.   Medical advice or treatment or care was contemplated, or was recommended by or received from a Physician; or

2.   Symptoms existed that would cause an ordinarily prudent person to seek diagnosis, care or treatment.

**Premium** is shown on page 3 and is the amount required to keep Your policy in force.

**Premium Due Date** means the first day of each policy term.

**Regular Occupation** means Your usual occupation (or occupations, if more than one) in which You are Gainfully Employed at the time You become Disabled.  If You are not Gainfully Employed at the time Your Total Disability begins, Regular Occupation shall then mean any occupation(s) for which You are reasonably fitted by Your education, training or experience.

**Regular Occupation Period** means the period of time as shown on page 3 which starts on the first day following the Elimination Period.

**Sickness** means sickness or disease that first manifests itself on or after the Effective Date of the policy and while Your policy is in force.

**Signed** means any symbol or method executed or adopted by a person with the present intention to authenticate a record.  The signature may be transmitted by paper or electronic media, provided it is consistent with applicable law.

MLOCL001750

 **Definitions (Continued)** 

**Total Disability** or **Totally Disabled** means that due solely to Impairment caused by Injury or Sickness, You are:

1.  Before the end of the Regular Occupation Period shown on page 3:

    a.  Prevented from performing the material and substantial duties of Your Regular Occupation;

    b.  Not Gainfully Employed; and

    c.  Receiving appropriate care from a Physician who is appropriate to treat the condition causing the Impairment.

2.  After the Regular Occupation Period shown on page 3:

    a.  Prevented from performing any occupation for which You are or become reasonably fitted by Your education, training or experience;

    b.  Not Gainfully Employed; and

    c.  Receiving appropriate care from a Physician who is appropriate to treat the condition causing the Impairment.

We may waive the requirement of care from a Physician if Your Physician provides documentation acceptable to Us that continued care would be of no benefit to You.

**We, Us** and **Our** mean Metropolitan Life Insurance Company.

**Write, Written** or **Writing** means a record that may be transmitted by paper or electronic media, and that is consistent with applicable law.

**You** and **Your** mean the insured named on page 3.

## Benefits

**Monthly Benefit for Total Disability**

We will pay the Monthly Benefit for Total Disability shown on page 3 while You are Totally Disabled. This benefit will start to accrue after the Elimination Period. We will pay the benefit while You remain Totally Disabled, but not beyond the Maximum Benefit Period. For periods of less than a month, benefits will be prorated based on a 30-day month.

If You die during a continuous period of Disability after benefits were paid for 12 months or more, an additional benefit, equal to the amount of the benefit payable for the last month of Disability, will be paid to Your beneficiary for each of the first 3 months after Your death.

**Waiver of Premiums**

After the earlier of the date:

1.  You have been Disabled for a period of 90 consecutive days; or

2.  You satisfy the Elimination Period,

We will waive any Premium that becomes due while You remain Disabled. Your policy and its benefits will continue as if the Premium had been paid.

We will also refund to You any Premium that You paid that became due during the first 90 consecutive days of Disability, or the period during which the Elimination Period was satisfied.

MLOCL001751

 **Benefits (Continued)** 

The Premium waived will be based on the frequency of payment in effect on the date Your Disability starts.

If Premiums are being waived, and benefits have been payable for 12 months or more, any Premiums due during the first 90 days after that period of Disability ends will be waived. This additional 90-day waiver of Premium will apply only once during a period of Disability, including Recurrent Disabilities. Thereafter, any Premiums due will be payable. If You do not pay the first Premium due by the end of its grace period, Your policy will end.

Waiver of Premium ends when You are no longer Disabled. When You are no longer eligible for waiver of Premium, You can continue Your policy by paying the next Premium that becomes due.

**Disability Because of Transplant Surgery**

If You are Disabled because You have had surgery, at least 6 months after the Effective Date, to transplant part of Your body to someone else, We will consider You Disabled due to Sickness.

**Rehabilitation**

While You are receiving monthly benefits for Disability, We will consider participating in the cost of an occupational rehabilitation program aimed at helping You to return to Gainful Employment. Such program may include, but is not limited to, an accredited program of professional retraining or recertification. The program may be at Your request or We may suggest it. We will continue to pay benefits to You based on terms that We agree on with You.

In no case will We continue benefits beyond the Maximum Benefit Period.

## Recurrent and Concurrent Disability

**Recurrent Disability**

If, after the end of a period of Disability for which Disability benefits have been paid, You become Disabled again, the later period of Disability will be deemed a Recurrent Disability, which is a continuation of the preceding period of Disability, unless:

1.  You have been Gainfully Employed for at least 30 hours per week for at least 12 months following the end of the preceding period of Disability, if the Maximum Benefit Period for the Monthly Benefit for Total Disability is To Age 65 or longer; or

2.  You have been Gainfully Employed for at least 30 hours per week for at least 6 months following the end of the preceding period of Disability, if the Maximum Benefit Period for the Monthly Benefit for Total Disability is shorter than To Age 65; or

3.  The later period of Disability is due to a different or unrelated cause.

If either 1, 2 or 3 applies, the later period of Disability will be deemed a new period of Disability. A new Elimination Period must be satisfied before benefits start again, and a new Maximum Benefit Period will apply.

If the later period of Disability is deemed a Recurrent Disability, then it is not necessary for You to satisfy a new Elimination Period. However, Disability benefits paid for a Recurrent Disability are considered a continuation of the preceding period of Disability and will be subject to the Maximum Benefit Period that started with the preceding period of Disability. If the Maximum Benefit Period had ended with respect to the preceding period of Disability, no benefits will be payable for a recurrence of that Disability.

**Concurrent Disability**

If a Disability is caused by more than one Injury or Sickness, whether related or unrelated, which overlap for any time during a continuous period of Disability, We will pay benefits as if the Disability were caused by one Injury or Sickness.

MLOCL001752

## Renewal Privilege if Employed After Age 65--
## Total Disability Benefit With Limited Benefit Period

**Renewal Privilege**

Following the first Premium Due Date on or after Your 65th birthday, You may continue the coverage under this policy, exclusive of any riders providing additional benefits, as long as:

1.  You remain Gainfully Employed for at least 30 hours per week; and

2.  The Premium is paid on time.

You may exercise this privilege only while Your policy is in force and You are not Disabled.

We may require proof on each policy anniversary that You have continued to be Gainfully Employed for at least 30 hours per week during the 13 weeks immediately prior to that policy anniversary.

**Total Disability Benefit With Limited Benefit Period**

If You continue coverage under this privilege, benefits will be paid subject to the same provisions, limitations and exclusions in the policy. The Maximum Benefit Period will be 24 months for Total Disability starting before Your 75th birthday. If Total Disability starts after Your 75th birthday, the Maximum Benefit Period will be 12 months.

**Premiums**

The Premium will be based on:

1.  Your attained age, and will change on each policy anniversary based on Your attained age; and

2.  Your class on the Effective Date of the policy.

We may also change the Premium rate for Your policy as of any policy anniversary, but only if We change it for all policies in Your class.

## Exclusions

**General Exclusions**

We will not pay benefits for a Disability:

1.  Due to an act of war, whether declared or undeclared;

2.  Due to pregnancy or childbirth, but We will cover Disability due to Complications of Pregnancy;

3.  Due to any loss We have excluded by name or specific description;

4.  Due to Your committing, or attempting to commit, a felony;

5.  Existing while You are legally incarcerated or detained; or

6.  Caused by an intentionally self-inflicted Injury.

**Preexisting Conditions Exclusion**

We will not pay benefits for a Disability that starts during the first 2 years after the Effective Date if it was due to a Preexisting Condition. This exclusion does not apply to any condition that was disclosed, and that was not misrepresented, in the Application and was not excluded by name or specific description.

## Premium and Reinstatement

**Premium Payment**

The payment of the Premium shown on page 3, on or before the Effective Date, will keep the policy in force for the term which starts on the Effective Date. At the end of any term while the policy has been in force, You may renew the policy for a further term (called a renewal term). To renew, You must pay the Premium shown on page 3 by the Premium Due Date.

The last renewal term of the policy will end on the day before the first Premium Due Date on or after Your 65th birthday. See Renewal Privilege if Employed After Age 65 on page 9 for renewal past this date.

MLOCL001753

## Premium and Reinstatement (Continued)

All policy terms will begin at 12:01 A.M. and end at midnight Standard Time, where You live.

You may change the frequency of payment with Our approval.

**Grace Period**

This policy has a 31-day grace period. This means that each Premium after the first may be paid up to 31 days after its due date. During the grace period, the policy will stay in force. If You become Disabled during the grace period while the Premium remains unpaid, We may deduct any unpaid Premium(s) from the benefits due You.

**Reinstatement**

If You do not pay the Premium before the end of the grace period, the policy will lapse. After the policy has lapsed, You may apply for reinstatement by completing an Application and paying all unpaid Premium(s). If We have not sent You a Written disapproval of the reinstatement Application within 45 days, the policy will be reinstated as of the date We received the Premium.

Any Premiums We accept for a reinstatement will be applied to a period for which Premiums have not been paid.

The reinstated policy will cover only a loss that results from an Injury that occurs or a Sickness that first manifests itself after the date of reinstatement. In all other respects You and We will have the same rights under the policy, subject to any provisions noted on or attached to the reinstated policy.

**Suspension During Military Service**

If You enter full-time active duty in the military (land, sea or air) service of any nation or international authority, You may suspend this policy. But, You may not suspend the policy during active duty for training lasting 3 months or less. The policy will not be in force while it is suspended, and We will not accept Premiums for that period. Your policy will be suspended as of the date We receive Your Written request to suspend the policy. No privileges or options under this policy or any attached riders may be exercised during suspension. We will refund the pro rata portion of any Premium paid for a period beyond the date We receive your request. Premiums must be paid to the date of suspension.

If Your full-time active duty in the military service ends before the first Premium Due Date on or after Your 65th birthday, You may request that We place this policy back in force without evidence of insurability. Your coverage will start again when We receive:

1.    Your Written request to place the policy back in force; and

2.    The required pro rata Premium for coverage until the next Premium Due Date.

Your request and Premium payment must be received by Us within 90 days after the date Your active duty in the military service ends. Premiums will be at the same rate that they would have been had Your policy remained in force. The policy will not cover any loss due to an Injury that occurs or a Sickness that first manifests itself while the policy is suspended. In all other respects You and We will have the same rights under the policy as at the time before it was suspended.

**Suspension During Unemployment**

After this policy has been in force for at least one year from the Effective Date, You may suspend this policy if You:

1.    Become unemployed; and

2.    Receive 8 weeks of governmental unemployment benefits.

The policy will not be in force while it is suspended, and We will not accept Premiums for that period. No privileges or options under this policy or any attached riders may be exercised during suspension.

MLOCL001754

 **Claims (Continued)**    6  482 821 A14

| | |
|---|---|
| **Examinations** | At Our expense, as often as is reasonably necessary, We may require You to have an independent examination by a Physician of Our choice. |
| | At Our expense, as often as is reasonably necessary, We may require an audit of all Your business and financial records, by a financial examiner of Our choice. This may include examination of business and financial records for any business in which You have an ownership interest. |
| | At Our expense, as often as is reasonably necessary, We may have Our representatives conduct telephone or in-person interviews with You regarding Your claim. |
| **Time of Payment of Claim** | After We receive Written proof of loss, We will pay the benefits due under the policy. |
| **Payment of Claims** | All benefits will be paid to You. But, if You are not legally competent to give a valid release, or if any benefit is payable to Your estate, We may pay up to $10,000 to anyone who We believe is entitled to it. If We make such a payment in good faith, We will not be liable to anyone for the amount Wwe pay. |
| **Beneficiary** | The beneficiary is the person or persons to whom any benefits unpaid at Your death are payable. You may name a contingent beneficiary to become the beneficiary if all the beneficiaries die while You are alive. If no beneficiary or contingent beneficiary is named, or none is alive when You die, Your estate will be the beneficiary. While You are alive, You may change any beneficiary or contingent beneficiary. |
| | If more than one beneficiary is alive when You die, We will pay them in equal shares, unless You have chosen otherwise. |
| **How to Change the Beneficiary** | You may change the beneficiary or contingent beneficiary of this policy by Written notice or assignment of the policy. No change is binding on Us until it is recorded at Our office. Once recorded, the change binds Us as of the date You Signed it. This change will be without prejudice to Us as to any payment We make or action We take before We record the change. We may require that You send Us the policy to make the change. |
| **Assignment** | You may assign Your policy or any claim under it by Written assignment. No assignment is binding on Us until it is recorded at Our office. Once recorded, the assignment binds Us as of the date You Signed it. The assignment will be without prejudice to Us as to any payment We make or action We take before We record the assignment. We will not be responsible for the validity of any assignment. We may require that You send Us the policy to record the assignment. |

## General Provisions

| | |
|---|---|
| **The Contract** | This policy with riders, if any, and the Application make up the entire contract. All statements in the Application will be representations and not warranties. No statement will be used to contest the policy unless it appears in the Application. |
| **Limitation on Agent's or Broker's or Other Person's Authority** | No agent, broker, or other person except Our President, Our Secretary or Vice-President may: |
| | 1.   Make or change any contract of insurance; or |
| | 2.   Change or waive any terms of this policy. |
| | Any change or waiver must be in Writing and Signed by Our President, Secretary, or Vice-President. |

IDI20000-P/NC

MLOCL001755



## Premium and Reinstatement (Continued)

The suspension will begin when We receive:

1.  Your Written request to suspend the policy; and

2.  Your certification that You are unemployed and that You have received 8 weeks of governmental unemployment benefits.

We will refund the pro rata portion of any Premium paid for a period beyond the date that the suspension begins.  Premiums must be paid to the date of suspension.

After the end of a period of suspension, this policy may not be suspended again until 48 months have elapsed from the end of that period of suspension.

The suspension will end at the earlier of:

1.  6 months after the date of suspension, at which time You will be notified that the policy has been placed back in force and Premiums are now due; or

2.  The date We receive Your Written request to end the suspension, subject to evidence satisfactory to Us that You are Gainfully Employed.

You will be required to pay the pro rata Premium for coverage until the next Premium Due Date.  If this policy is suspended on the first Premium Due Date on or after Your 65th birthday, this policy will end at that time and cannot be renewed.

Premiums will be at the same rate that they would have been had Your policy remained in force. The policy will not cover any loss due to an Injury that occurs or a Sickness that first manifests itself while the policy is suspended.  In all other respects You and We will have the same rights under the policy as at the time before it was suspended.

### Claims

**Time of Loss**        All losses must occur while Your policy is in force.

**Notice of Claim**     Written notice of claim must be given to Us at Our office within 30 days after a covered loss starts, or as soon thereafter as reasonably possible.

**Claim Forms**         After We receive the Written notice of claim We will send You Our proof of loss forms within 15 days.  If We do not, You will meet the Written proof of loss requirements if You send Us, within the time set forth below, a Written statement of the nature and extent of Your loss.

**Proof of Loss**       Written proof of loss satisfactory to Us must be sent to Us within 90 days after the end of each monthly period for which You claim benefits.  Failure to furnish such proof within the time required shall not invalidate nor reduce any claim if it was not reasonably possible to give proof within such time.  However, such proof must be furnished as soon as reasonably possible and in no event, except in the absence of legal capacity, later than one year from the time proof is otherwise required.  As often as is reasonably necessary, We may require as part of the proof of loss financial proof such as personal and business income tax returns, income statements, accountant's statements and other proof acceptable to Us.

We may also require on a monthly basis, that You, and any Physician treating You, complete and Sign supplemental statements of claim.

**Authorizations**      We may require, as often as is reasonably necessary, that You provide authorizations for Us to obtain medical information, financial information, and any other information pertinent to Your claim.

MLOCL001756



## General Provisions (Continued)

| | |
|---|---|
| **Time Limit on Certain Defenses** | After 2 years from the Effective Date of this policy, or of any policy change or reinstatement, no misstatements, except for fraudulent misstatements, made by You on the Application can be used to void this policy or such policy change or reinstatement, or to deny a claim under this policy or the policy change or reinstatement, for a Disability starting after the end of such 2-year period.

No claim for Disability starting after 2 years from the Effective Date of this policy, or of any policy change or reinstatement, will be reduced or denied on the grounds that a Sickness or physical condition had existed, but not manifested itself, before the Effective Date of this policy, or of such policy change or reinstatement, unless, on the date the Disability starts, that Sickness or physical condition was excluded from coverage by name or specific description. |
| **Misstatement of Age and Sex** | If Your age or sex is not stated correctly on Our records, the benefits under the policy will be those that the Premium You paid would have bought at Your correct age and sex. |
| **Legal Actions** | No legal action may be brought until 60 days after Written proof of loss has been provided to Us. No such action may be brought after 3 years from the time Written proof of loss is required to be provided to Us. |
| **Conformity with State Statutes** | Any provision in this policy which, on the Effective Date, conflicts with the laws of the state in which You reside on that date is amended to meet the minimum requirements of such laws. |
| **Waiver of Policy Provisions** | Our failure to invoke or enforce a right We have reserved under the terms of this contract may not be deemed a permanent waiver of that right. |

Copy of Application is attached.

MLOCL001757

**Metropolitan Life Insurance Company**

### Endorsement

This endorsement is a part of the policy if it is referred to on page 3.

**Effective Date**   The Effective Date of this endorsement is shown on page 3.

**Provisions**

1.   The Definition of Preexisting Condition is deleted.

2.   The Preexisting Conditions Exclusion in the Exclusions section is deleted.

3.   The second paragraph of the Time Limit on Certain Defenses provision is deleted.

4.   The following is substituted for the Definition of Sickness in Your policy:

   "**Sickness** means sickness or disease."

*Gwenn L. Carr*
Gwenn L. Carr
Vice-President and Secretary

DDAR4G

MLOCL001758

Metropolitan Life Insurance Company

## Rider: Monthly Benefit for Total Disability in Your Occupation

This rider is a part of the policy if it is referred to on page 3.

**Effective Date**    The Effective Date of this rider is shown on page 3.

**Premium**    The Premium for this rider is shown on page 3.

**Definitions**    The following is substituted for the definition of Total Disability in your policy:

**"Total Disability or Totally Disabled** means that due solely to Impairment caused by Injury or Sickness, you are:

a.    Prevented from performing the material and substantial duties of Your Regular Occupation; and

b.    Receiving appropriate care from a Physician who is appropriate to treat the condition causing the Impairment.

We may waive the requirement of care from a Physician if Your Physician provides documentation acceptable to Us that continued care would be of no benefit to You.

**Time Limit On Certain Defenses**    After 2 years from the Effective Date of this rider, no misstatements, except for fraudulent misstatements, made by You on the Application for this rider or the policy to which it is attached can be used to void this rider or deny a claim under this rider for a Total Disability starting more than 2 years from the Effective Date of this rider.

No claim for Total Disability starting after 2 years from the Effective Date of this rider will be reduced or denied on the grounds that a Sickness or physical condition had existed, but not manifested itself, before the Effective Date of this rider unless, on the date the Total Disability starts, that Sickness or physical condition was excluded from coverage by name or specific description.

**Termination**    This rider will end on the earliest of:

1.    The date the policy ends;

2.    The first Premium Due Date on or after Your 65th birthday; or

3.    The date We receive your Written request to end this benefit, in which case You must return the policy to Us.  We will change the policy and return it to You.

*Gwenn L. Carr*

Gwenn L. Carr
Vice-President and Secretary

**Metropolitan Life Insurance Company**

## Rider: Cost-of-Living Adjustment for Disability Benefits

This rider is a part of the policy if it is referred to on page 3.

| | |
|---|---|
| **Effective Date** | The Effective Date of this rider is shown on page 3. |
| **Premium** | The Premium for this rider is shown on page 3. |
| **Definitions** | **CPI-W** means the Consumer Price Index for Urban Wage Earners and Clerical Workers for all items. It is published by the United States Bureau of Labor Statistics. If the CPI-W cannot be used or is not available, We will choose a suitable index to replace it. CPI-W will then mean the chosen index. |

**Review Date** means each anniversary date of the start of a period of Disability.

**Index Month** means the June before the Review Date. The first Index Month is the June before the start of a period of Disability.

**Adjusted Monthly Benefit for Total Disability** means the amount determined in the Benefits section below.

**Benefits**

If Your period of Disability lasts for at least one year We will adjust any further Monthly Benefit for Total Disability and (if a Residual Disability or Transitional Your Occupation rider is included in Your policy) Residual Disability or Total Disability in Your Occupation payable for that Disability by substituting the Adjusted Monthly Benefit for Total Disability for the Monthly Benefit for Total Disability.

The Adjusted Monthly Benefit for Total Disability will be redetermined on each Review Date.

The Adjusted Monthly Benefit for Total Disability is computed by multiplying the Monthly Benefit for Total Disability shown on page 3 by a factor equal to the CPI-W for the latest Index Month divided by the CPI-W for the first Index Month. This amount will be rounded upwards to the nearest multiple of $10. But, the Adjusted Monthly Benefit for Total Disability will not be increased from one year to the next by more than 7%, or less than 1%.

**Termination of Adjustment**

No further cost-of-living adjustments will be made after the earliest of:

1.   The date a period of Disability ends;

2.   The date the Maximum Benefit Period ends; or

3.   The first Premium Due Date on or after Your 65th birthday, or the second Review Date if later.

**Benefit Purchase Option**

If the adjustments end because of 1 or 2 above, and:

1.   You are Gainfully Employed for at least 30 hours per week; and

2.   You have not attained age 60;

IDI2000-PR/COLAA-PO                                    1                                    DDABOT

MLOCL001760

## Rider: Cost-of-Living Adjustment for Disability Benefits (Continued)

You may, within 90 days, add the amount of the last cost-of-living adjustment to the Monthly Benefit for Total Disability, provided that You pay the premium for this increased coverage. This premium will be based on the rates in effect for a person of Your age at the time the adjustments end because of 1 or 2 above, and Your class on the Effective Date of this rider. Otherwise, benefits payable for a new period of Disability will not include the cost-of-living adjustment(s) from the preceding period. In any case, a new first Index Month and Review Date will apply to a later period of Disability.

**Time Limit on Certain Defenses**

After 2 years from the Effective Date of this rider, no misstatements, except for fraudulent misstatements, made by You on the Application for this rider or the policy to which it is attached can be used to void this rider or deny a claim under this rider for a Disability starting more than 2 years from the Effective Date of this rider.

No claim for Disability starting after 2 years from the Effective Date of this rider will be reduced or denied on the grounds that a Sickness or physical condition had existed, but not manifested itself, before the Effective Date of this rider unless, on the date the Disability starts, that Sickness or physical condition was excluded from coverage by name or specific description.

**Termination**

This rider will end on the earliest of:

1. The date the policy ends;

2. The first Premium Due Date on or after Your 65th birthday; or

3. The date We receive Your Written request to end this benefit, in which case You must return the policy to Us. We will change the policy and return it to You.

*Gwenn L. Carr*
Gwenn L. Carr
Vice-President and Secretary

MLOCL001761



**Metropolitan Life Insurance Company**

## Rider: Monthly Benefit for Residual Disability

This rider is a part of the policy if it is referred to on page 3.

**Effective Date**    The Effective Date of this rider is shown on page 3.

**Premium**    The Premium for this rider is shown on page 3.

**Definitions**    The definition of Disability or Disabled in Your policy is amended to read as follows:

> "**Disability** or **Disabled** means either Total or Residual Disability that starts while Your policy is in force."

**Residual Disability** or **Residually Disabled** means that due solely to Impairment caused by Injury or Sickness:

1. Your Earnings are reduced by at least 20 percent of Your Prior Earnings; and

2. You are receiving appropriate care from a Physician who is appropriate to treat the condition causing the Impairment; and

3. You are not Totally Disabled, and are Gainfully Employed, but You are:

   a. Prevented from performing one or more of the material and substantial duties of Your Regular Occupation; or

   b. Performing the material and substantial duties of Your Regular Occupation, but are not able to perform them for more than 80 percent of the time normally required of You; or

   c. Engaged in another occupation.

We may waive the requirement of care from a Physician if Your Physician provides documentation acceptable to Us that continued care would be of no benefit to You.

**Earnings** means income or compensation, payable as remuneration to You, for actual services You perform, or for goods or services provided by a business in which You have an ownership interest. This term includes salary, fees, profits or losses, commissions, bonuses and other payment for goods or services, which You or Your business render or provide.  Earnings are determined after deduction of normal and customary unreimbursed business expenses, but before deduction of any income taxes.

Earnings do not include:

1. Income from dividends, interest, rent, royalties, annuities, or investments; or

2. Income from deferred compensation plans, formal sick pay benefits, disability income policies, or retirement plans.

**Review Date** means each anniversary date of the start of a period of Disability.

**Index Month** means the June before the Review Date. The first Index Month is the June before the start of a period of Disability.

MLOCL001762

## Rider: Monthly Benefit for Residual Disability (Continued)

**CPI-W** means the Consumer Price Index for Urban Wage Earners and Clerical Workers for all items. It is published by the United States Bureau of Labor Statistics. If the CPI-W cannot be used or is not available, We will choose a suitable index to replace it. CPI-W will then mean the chosen index.

**Prior Earnings** means the greater of Your average monthly Earnings for the 3 calendar years immediately prior to the start of Your Disability, or for the 24 months immediately prior to the start of Your Disability, provided there is financial documentation satisfactory to Us.

After the start of a period of Disability, the Prior Earnings are increased each year, on the Review Date. The Prior Earnings will be multiplied by a factor equal to the CPI-W for the Index Month divided by the CPI-W for the preceding Index Month. The percentage increase in the Prior Earnings in any given year will not be more than 7% or less than 1%.

**Recovery** or **Recovered** means that following a period of Total or Residual Disability, for which total or residual benefits have been paid:

1. You are working full time performing all of the material and substantial duties of Your Regular Occupation. Full time means You are working at least as many hours as You worked before being Totally or Residually Disabled; and

2. Your Earnings continue to be reduced by at least 20 percent of Your Prior Earnings; and

3. Your Earnings are reduced directly and solely due to the same Impairment that caused the Total or Residual Disability.

**Benefits**    **Monthly Benefit for Residual Disability** --While You are Residually Disabled, We will pay a monthly benefit for Residual Disability, if the Elimination Period has been met (by Total Disability and/or Residual Disability).

The monthly amount of this benefit equals:

$\frac{A-B}{A}$ x Monthly Benefit for Total Disability as shown on page 3

"A" is Your Prior Earnings.

"B" is Your Earnings for the month for which Residual Disability is claimed. Such Earnings will not include income received for services You performed prior to the date Your Residual Disability started.

If Earnings for the month for which Residual Disability is claimed are 25 percent or less of Prior Earnings, We will consider "B" to be zero; that is, the full Monthly Benefit for Total Disability, as shown on page 3, will be payable.

For example, if Your Monthly Benefit for Total Disability is $1,000, and Your Prior Earnings are $2,000, and Your monthly Earnings for the month for which Residual Disability is claimed are $800; Your Residual Disability benefit would be computed as follows:

$\frac{\$2,000-\$800}{\$2,000}$ x $1,000 = $600

For periods of less than a month, benefits will be prorated based on a 30-day month.

MLOCL001763

## Rider: Monthly Benefit for Residual Disability (Continued)

During the first 6 months during which Residual Disability benefits are paid, the minimum monthly benefit for Residual Disability will be 50 percent of the Monthly Benefit for Total Disability.

In determining "A" and "B" above, the same accounting method (cash or accrual) must be used. Once chosen, the accounting method (cash or accrual) will be applied consistently to the formula above.

**Cost-of-Living Adjustment for Disability Benefits**—If a Cost-of-Living Adjustment for Disability Benefits (COLA) rider is included in Your policy, then in computing Residual Disability benefits, We will substitute the Adjusted Monthly Benefit for Total Disability, as defined in the COLA rider, for the Monthly Benefit for Total Disability.

The Residual Disability benefit will be payable starting on the day after the Elimination Period ends; however, We will not pay a Residual Disability benefit while We are paying You the Total Disability benefit.

We will continue to pay this benefit until the earlier of:

1.    The date You are no longer Residually Disabled; or

2.    The date the Maximum Benefit Period ends.

**Monthly Recovery Benefit**—A monthly Recovery benefit will be paid if You have Recovered.  The monthly amount of this benefit equals:

$\frac{A-B}{A}$ X Monthly Benefit for Total Disability as shown on page 3

"A" is Your Prior Earnings.

"B" is Your earnings for the month in which Recovery benefits are claimed.

In determining "A" and "B", the same accounting method (cash or accrual) that was used in determining the Residual Disability benefit will be applied.

**Cost-of-Living Adjustment for Disability Benefits**—If a Cost-of-Living Adjustment for Disability Benefits (COLA) rider is included in Your policy, then in computing the Recovery benefit, We will substitute the Adjusted Monthly Benefit for Total Disability, as defined in the COLA rider, for the Monthly Benefit for Total Disability.

A monthly Recovery benefit will be paid until the earliest of the following dates:

1.    Benefits have been paid for a period equal to the Elimination Period, plus the period for which Disability benefits had been paid;

2.    24 months of Recovery benefits have been paid;

3.    The Maximum Benefit Period ends; or

4.    You no longer satisfy the definition of Recovered.

MLOCL001764

## Rider: Monthly Benefit for Residual Disability (Continued)

**Proof of Earnings**

We may require proof from You, as often as is reasonably necessary, as to Your:

1.   Prior Earnings; and

2.   Earnings for each month for which a Residual Disability or Recovery benefit is claimed.

This may include financial proof such as Your personal and business income tax returns, income statements, accountant's statements or other proof acceptable to Us.  We may require an audit of all Your business and financial records, by a financial examiner of Our choice.  This may include examination of financial records for any business in which You have an ownership interest.

**Time Limit on Certain Defenses**

After 2 years from the Effective Date of this rider, no misstatements, except for fraudulent misstatements, made by You on the Application for this rider or the policy to which it is attached can be used to void this rider or deny a claim under this rider for a Disability starting more than 2 years from the Effective Date of this rider.

No claim for Disability starting after 2 years from the Effective Date of this rider will be reduced or denied on the grounds that a Sickness or physical condition had existed, but not manifested itself, before the Effective Date of this rider unless, on the date the Disability starts, that Sickness or physical condition was excluded from coverage by name or specific description.

**Termination**

This rider will end on the earliest of:

1.   The date the policy ends;

2.   The first Premium Due Date on or after Your 65th birthday; or

3.   The date We receive Your Written request to end this benefit, in which case You must return the policy to Us.  We will change the policy and return it to You.

*Gwenn L. Carr*
Gwenn L. Carr
Vice-President and Secretary

MLOCL001765

**Metropolitan Life Insurance Company**

## Rider: Presumptive Total Disability

This rider is a part of the policy if it is referred to on page 3 of the policy.

| | |
|---|---|
| **Date of Rider** | The Effective Date of this rider is shown on page 3 of the policy. |
| **Premium** | The Premium for this rider is shown on page 3 of the policy. |
| **Definitions** | **Presumptive Total Disability** means that You are presumed to be totally and permanently Disabled if an Injury or Sickness causes Your complete, irrecoverable and irreparable loss of: |

    1.   The use of both hands, or both feet, or one hand and one foot;

    2.   The sight in both eyes;

    3.   Speech; or

    4.   Hearing in both ears.

| | |
|---|---|
| **Benefits** | If You are Totally Disabled according to the definition of Presumptive Total Disability, We will: |

    1.   Consider You to be Totally Disabled even if You are able to work and even if You are not receiving medical care from a Physician; and

    2.   Waive the Elimination Period, except with respect to any Social Insurance Offset Benefit rider included in Your policy.

Benefits for Presumptive Total Disability will be the Monthly Benefit for Total Disability shown on page 3 of the policy, and will be paid in place of any other Disability benefits. Benefits for Presumptive Total Disability will be payable while You remain Presumptively Totally Disabled, but not beyond the Maximum Benefit Period for this policy shown on page 3 of the policy.

| | |
|---|---|
| **Time Limit on Certain Defenses** | After 2 years from the Effective Date of this rider, no misstatements, except for fraudulent misstatements, made by You on the Application for this rider or the policy to which it is attached can be used to void this rider or deny a claim under this rider for a Total Disability starting more than 2 years from the Effective Date of this rider. |

No claim for Total Disability starting after 2 years from the Effective Date of this rider will be reduced or denied on the grounds that a Sickness or physical condition had existed, but not manifested itself, before the Effective Date of this rider unless, on the date the Total Disability starts, that Sickness or physical condition was excluded from coverage by name or specific description.

| | |
|---|---|
| **Termination** | This rider will end on the earliest of: |

    1.   The date the policy ends;

    2.   The first Premium Due Date on or after Your 65th birthday, or the fifth policy anniversary, if later; or

    3.   The date We receive Your Written request to end this benefit, in which case You must return the policy to Us. We will change the policy and return it to You.

*Gwenn L. Carr*
Gwenn L. Carr
Vice-President and Secretary

MLOCL001766



**Metropolitan Life Insurance Company**

## Rider: Lifetime Monthly Benefit for Total Disability

This rider is a part of the policy if it is referred to on page 3.

**Effective Date**   The Effective Date of this rider is shown on page 3.

**Premium**   The Premium for this rider is shown on page 3.

**Benefit**   This rider provides a lifetime Total Disability benefit.  We will pay this benefit during Your continuous Total Disability if:

1.   Such Total Disability starts before and continues until the first Premium Due Date on or after Your 65th birthday; and

2.   The benefits under Your policy have been paid during Your Total Disability.

This rider does not extend the Maximum Benefit Period for the policy, or for any other rider included with the policy.

**When Payable**

We will start to pay this benefit on the later of:

1.   The first Premium Due Date on or after Your 65th birthday; or

2.   The date the Monthly Benefit for Total Disability, as shown on page 3, ends.

We will pay it while You remain Totally Disabled for as long as You live.

Benefits will not be payable under this rider for any period for which benefits are payable under the Total Disability Benefit under Your policy.

**Amount of Benefit**

The monthly amount We will pay will be based on the Monthly Benefit for Total Disability shown on page 3.  This amount, plus any applicable cost-of-living adjustment, will be multiplied by a factor determined from the table below to determine the monthly amount We will pay.

| Age at the Start of Total Disability | Factor |
|---|---|
| 45 or less | 1.00 |
| 46 | 0.95 |
| 47 | 0.90 |
| 48 | 0.85 |
| 49 | 0.80 |
| 50 | 0.75 |
| 51 | 0.70 |
| 52 | 0.65 |
| 53 | 0.60 |
| 54 | 0.55 |
| 55 | 0.50 |
| 56 | 0.45 |
| 57 | 0.40 |
| 58 | 0.35 |
| 59 | 0.30 |
| 60 | 0.25 |
| 61 | 0.20 |
| 62 | 0.15 |
| 63 | 0.10 |
| 64 or 65, but before the first premium due date on or after your 65th birthday. | 0.05 |

MLOCL001767

## Rider: Lifetime Monthly Benefit for Total Disability (Continued)

**Time Limit on Certain Defenses**

After 2 years from the Effective Date of this rider, no misstatements, except for fraudulent misstatements, made by You on the Application for this rider or the policy to which it is attached can be used to void this rider or deny a claim under this rider for a Total Disability starting more than 2 years from the Effective Date of this rider.

No claim for Total Disability starting after 2 years from the Effective Date of this rider will be reduced or denied on the grounds that a Sickness or physical condition had existed, but not manifested itself, before the Effective Date of this rider unless, on the date the Total Disability starts, that Sickness or physical condition was excluded from coverage by name or specific description.

**Termination**

This rider will end on the earliest of:

1. The date the policy ends;

2. The first Premium Due Date on or after Your 65th birthday; or

3. The date We receive Your Written request to end this rider, in which case You must return the policy to Us. We will change the policy and return it to You.

*Gwenn L. Carr*
Gwenn L. Carr
Vice-President and Secretary

IDI2000-PR/L45-TD (2)

2

DDABMI

MLOCL001768

Name of Insured
OGANDZHANOVA, INNA

Agency
86L
Sales Office
WEALTH PL GP NJ

**Metropolitan Life Insurance Company**

Application Number
706010825
Date of this form
07/28/2006
Policy Number
6482821 AH

To: Metropolitan Life Insurance Company          **Application Amendment**

I amend the application referred to above, as follows

## MetLife®

Metropolitan Life Insurance Company
New York, New York, 10010

The answer to question #11L on page 4 is no.
The answer to question #2 on page 5 is none.

Amendment Desk

SBP/DIS UND & ISSUE
2006 AUG 21  AM 8:39

**Do Not Alter or Amend This Form**

This **application amendment** is part of the application referred to above and is subject to the agreements in that application. The application and this amendment are part of the policy/contract to which they are attached.

To the best of my knowledge and belief, the statements and answers in the application as amended by this form are true and complete as of the date this form is signed. There are no facts or circumstances which would require a change in the answers in the application, except as shown above.

(X) _I.O._ ____ 8/2/06 ____ _____ 8/16/06

Signature of Insured          Date          Signature of Witness          Date

It is important that this signed document be returned to the IDI office within 30 days of receipt.  Send to:

**MetLife – Disability Income Unit**
**PO Box 30591**
**Tampa Fl 33630-3591**
**Attention: A/R Control**
**Fax: 813-673-3808**

0843-82-A (0694)                                                    DEABEO

MLOCL001769

## MetLife®

Metropolitan Life Insurance Company
One Madison Avenue, New York, NY 10010

**1 AZ**

## Part A. Application for Disability Income Insurance

1. (a) Proposed Insured
   Full Name _Inna_ First/Given  _Ogandzhanova_ Last/Surname  Suffix (e.g. Jr.) Prof. Desig.  (Maiden name if applicable)

   Sex _F_   Date of Birth _1/07/1963_   Age _43_   (b) State of Birth _Russia_ (Country, if other than U.S.)

   (c) Are you a United States citizen? ☒ Yes ☐ No  If "No," how long have you been a resident of the United States? __ Years __ Months
   Status of your visa (if applicable) ☐ Temporary   ☐ Permanent

   (d) Social Security Number _099 - 74 - 4056_

   (e) Driver's License Number _D 02638390_   State of Issue _AZ_   exp. _1/7/2019_

   (f) Do you read and write English? ☒ Yes ☐ No   If No, primary language you read and write _____

2. Residence: _1227_ Number  _East Clearview Dr_ Street

   _Casa Grande_ City  _AZ_ State   _85222_ Zip

3. (a) Business Address: _1281 E Cottonwood Lane 1227 East Clearview Dr_ Number   Street

   _Casa Grande_ City   _, AZ  85222_ State   Zip

   (b) Email Address: _____   Mail correspondence to: ☒ Home ☐ Business

   (c) Employer's or Business Name: _Desert Rose Oncology LLC_   (d) Type of Business: _hospital_

   **Business Owners Only**
   (e) What is your percentage of ownership? _100%_   (f) How long have you been an owner? _5_
   (g) How long has the business existed? _5 yrs_   (h) Number of employees in the business: _5_
   (i) How is the business organized? ☐ Sole Proprietor ☐ Partnership ☐ C Corporation ☐ S Corporation
   ☐ PA   ☐ PC   ☒ LLC   ☐ LLP

4. (a) Primary Occupation: _Radiation Oncologist, MD_   (b) Your exact duties and
   the percentage of time devoted to each duty including amount and type of travel, foreign and domestic:

   _Patient care_ _____ _100_ %

   (c) How many employees do you supervise? _5_
   (d) How long have you been employed in your present occupation? _9_
   (e) How long have you been employed by your present employer? _5_
   (f) Are you actively at work at least 30 hours per week in the above occupation? ☒ Yes ☐ No   If "No," explain below.

   (g) Do you have any other full or part-time jobs? ☐ Yes ☒ No   If "Yes," give duties, hours worked and travel required below.

   (h) Do you plan to change jobs in the next six months? ☐ Yes ☒ No   If "Yes," give details below.

   (i) Are you aware of any fact that could change your occupational status or financial stability? ☐ Yes ☒ No
   If "Yes," give details below.

IDI2000-APP-AZ

MLOCL001770

**5. Base Policy and Optional Benefits Being Applied For:**

☒ Omni Advantage   ☐ Omni Select   ☐ Omni Essential
Monthly Benefit $ _5,500_
Benefit Period (years) ☐ 2   ☐ 5   ☒ To Age 65 (N/A in B)
☐ To Age 70 (N/A in A, B)
Elimination Period (days) ☐ 60   ☒ 90   ☐ 180   ☐ 365
☐ 730 (365 & 730 N/A w/ 2 yr Benefit Period)

**☐ Additional Monthly Indemnity (AMI)**
Monthly Benefit $ _____
Benefit Period (years) ☐ 2   ☐ 5   ☐ To Age 65 (N/A in A, B)
☐ To Age 70 (N/A in A, B)
Elimination Period (days) ☐ 60   ☐ 90   ☐ 180   ☐ 365
☐ 730 (365 & 730 N/A w/ 2 yr Benefit Period)

**Disability Income Optional Benefits**
☐ Social Insurance Offset Benefit
Monthly Benefit $ _____
Elimination Period (days) ☐ 60   ☐ 90   ☐ 180   ☐ 365
☐ 730 (365 & 730 N/A w/ 2 yr Benefit Period)
☒ Residual with Recovery Benefit (N/A in A, B) ☒ 24 mos. ☐ 36 mos.
☐ Residual without Recovery Benefit (N/A in A, B)
☐ Guaranteed Insurability Option (N/A in A, B)
Option Amount $ _____
☐ Good Health Benefit/Refund of Premium
☒ Lifetime (N/A in 3A, A, B)
☐ Lifetime for AMI (N/A in 3A, 2A, A, B)
☐ Long-Term Care Guaranteed Purchase Option
☒ Your Occupation (N/A in 5AS, 4A, 3A, 2A, A, B) (N/A in Essential)
☐ Transitional Your Occupation (N/A in Essential)
☐ 5 yr (N/A in 4A, 3A, 2A, A, B)
☐ 10 yr (N/A in 4A, 3A, 2A, A, B)
☐ To Age 65 (N/A in 4A, 3A, 2A, A, B)
☐ Catastrophic Benefit        Monthly Amount $ _____
☐ 3% Simple Cost of Living Adjustment with Buy-up
☒ 1-7% Compound Cost of Living Adjustment with Buy-up
☐ Automatic increase Benefits _____
☐ Other _____

☐ **Priority Plus Disability Income Insurance** (N/A in A, B)
Monthly Benefit $ _____
Benefit Period (years) ☐ 2   ☐ 5   ☐ To Age 65
Elimination Period (days) ☐ 60   ☐ 90   ☐ 180   ☐ 365
☐ 730 (365 & 730 N/A w/ 2 yr Benefit Period)

☐ Residual
Supplemental Monthly Benefit (S.M.B.) Monthly Amount $ _____
Elimination Period (days) ☐ 60   ☐ 90   ☐ 180
Social Insurance Substitute (S.I.S.) Monthly Amount $ _____

☐ **Mortgage Comp**
**Fixed Term Disability Income Insurance**
Monthly Benefit $ _____
Duration of Policy (years) ☐ 10   ☐ 15   ☐ 20   ☐ 30
**Note: Applicant's Age + Duration Must Not Exceed Age 65**
Elimination Period (days) ☐ 60   ☐ 90   ☐ 180
Mortgage or Loan Date _____
Mortgage or Loan Amount $ _____
% of Mortgage for which you are responsible _____ %

---

**2 AZ**

Name and Address of Mortgagor/Lending Institution:
_____

Premiums   ☐ Level   ☐ Step Rate

**☒ Business Overhead Expense Insurance**
(a) Maximum Monthly Benefit for Covered Monthly Expense
$ _50,800_
Benefit Period (months)   ☐ 12   ☒ 24
Elimination Period (days)   ☐ 30   ☐ 60   ☒ 90
☐ Guaranteed Insurability Option Amt. $ _____

(b) For a business other than a personal service business, please describe the personal services that you provide to your business without which revenue would be substantially reduced.
_Dr. Ogoudikanova is the principal_
_occupant and medical director of_
_the clinic_

(c) Excluding yourself,
(i) How many are employed in the business? _4_
(ii) How many of these employees are members of your profession? _none_
(iii) How many of these employees are members of your immediate family? _none_

(d) List your average monthly business overhead expenses during the past 6 months. If you share monthly business expenses with others, list only your share. Exclude salaries, fees, drawing accounts, profits or any other remuneration for:
(i) you;
(ii) any partners;
(iii) any member of your profession or person performing duties similar to yours; or
(iv) any members of your immediate family

Rent ........................................................$ _8,000_
Taxes (not income taxes) and mortgage interest payments ...............................$ _5,000_
Other interest on business indebtedness .......$ _____
Utilities
Electricity .......................................$ _3,000_
Telephone .....................................$ _800_
Maintenance Services ....................$ _1,500_
Property & Liability Insurance .............$ _2,600_
Depreciation of Business Equipment ........$ _50,000_
Employees' salaries (excluding items in (d) above .....................................$ _9,000_
Other normal and customary fixed office expenses (specify below) Contract labor $ _12,000_
_Office expense_    _1,700_
_Miscellaneous_    _17,700_

Total (of d above) ..............................$ _92,300_

MLOCL001771

**3 AZ**

6.  (a) Mode of Premium Payment:
    ☐ Annual   ☐ Semi-Annual
    ☒ Check-O-Matic   ☐ Payroll Deduction
    (b) Will the entire premium for this policy be paid directly
        by your employer?   ☐ Yes   ☒ No
    (c) If "Yes" will any portion of this premium be treated
        as taxable income to you?   ☐ Yes   ☐ No

7. Amount paid with Application: $ *582* 16 or ☐ None
   This amount ☒ is ☐ is not equal to at least one month's premium.
   No temporary insurance can take effect unless one month's premium
   is received.
8. Revocable Beneficiary

   *Don Bates*          *spouse*        *10/8/54*
   Full Name            Relationship    Date of Birth

9.  Do you have or have available to you through your employer, or are you applying for any other type of:
    (a) Individual, Association or Group disability income insurance coverage?   ☒ Yes   ☐ No
    (b) Formal employer sick pay or Union disability income coverage not included in (a)?   ☐ Yes   ☒ No
    (c) Business Overhead Expense or Buy/Sell Disability coverage?   ☐ Yes   ☒ No
        If "Yes" to question 9a, 9b or 9c, complete the following using the following codes for questions 9 and 10 to indicate
        "Type": G-Group; A-Association; E-Employer Sick Pay or Union; B-Business Overhead Expense; B/S Buy/Sell

### Disability Coverage In Force, Applied For or Available Through Your Employer

| Company or Source | Type | Total Monthly Benefit | Social Insurance Offset | Issue Month/ Year | Elimination Period Accident | Elimination Period Sickness | Benefit Period Accident | Benefit Period Sickness |
|---|---|---|---|---|---|---|---|---|
| *MetLife* | *DI* | *9,500* | — | *1999* | *90 days* | | *Age 65* | |
| | | | | | | | | |
| | | | | | | | | |

10. Is coverage being applied for replacing or changing any existing insurance with MetLife or any other insurance company?
    ☐ Yes   ☒ No   If "Yes", complete the following:

### Disability Coverage to be Replaced or Changed

| Insurance Company Name And Address | Policy Number | Monthly Benefit | Type | Issue Month/Year | Termination Month/Year | Premium Mode |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

11. Financial Information:                   ( *Estimated 2005* )

|  | Current Year (Annualized) *(Estimated 2005)* | Last Year *2004* | Two Years Ago *2003* |
|---|---|---|---|
| **Employee/Salaried Earnings** | | | |
| (a) Base Salary (W-2 Income) | $ | $ | $ |
| (b) Commissions | $ | $ | $ |
| (c) Bonus, Profit-Sharing or Incentive Payments | $ | $ | $ |
| **Owner/Shareholder Earnings** | | | |
| (d) Sole Proprietor net business earnings/losses | $ | $ | $ |
| (e) Partnership/S-Corporation net business earnings/losses | $ *1,000,000+* | $ *845,125* | $ |
| (f) Net share of corporate earnings/losses | $ | $ | $ |
| **Total Earned Income (Sum of Lines a through f)** | $ *1,000,000+* | $ *845,125* | $ *800,000+* |
| **Other Income; Unearned Income** | | | |
| (g) Dividends and Interest | $ *500* | $ *468* | $ *500* |
| (h) Net rental income before depreciation | $ | $ | $ |
| (i) Other (identify source) _____ | $ | $ | $ |

Financial Information (cont.)

IDI2000-APP-AZ

MLOCL001772

**4 AZ**

**11. Financial Information (cont.)**

**Current Net Worth**

(j)  Does your net worth exceed $3,000,000?  ☑ Yes  ☐ No
(If "Yes" give details below. Amounts expressed to the nearest $100,000 are acceptable)

|  | Assets |
|---|---|
| Cash, Savings, Stock & Bonds ......................................... | $ *100,000* |
| Personal Property (such as jewelry, furnishings) ................ | $ *100,000* |
| Personal Residence ........................................................ | $ *1,000,000* |
| Other Real Estate ......................................................... | $ *1,000,000* |
| Business Interest(s) ...................................................... | $ *2,000,000* |
| Other (specify source) _____ | $ _____ |
| Less: Indebtedness | $ _____ |
| Total | $ *7,200,000* |

(k)  Which tax forms are being submitted with this application?  ☑ 1040s and all schedules  ☐ W-2s  ☐ Other _____

(l)  In the past five years have you or any business in which you held at least a 5% interest filed for bankruptcy?
☐ Yes  ☐ No   If "Yes", give details below, including date of discharge, status and type.
_____
_____
_____

12.  (a)  Have you: had a driver's license suspended or revoked in the last 3 years; been convicted of 3 or more moving violations; been
convicted of driving while impaired or intoxicated?  ☐ Yes  ☑ No   If "Yes", give details below.
(b)  Other than above, have you been convicted of any felony or misdemeanor, or do you have any charges pending?
☐ Yes  ☑ No   If "Yes", give details below.
_____
_____

13.  Has any application for a policy of Life, Health or Disability Insurance on you ever been postponed, rated, modified, declined, rescinded
or required an extra premium?  ☐ Yes  ☑ No   If "Yes", give details below.
_____
_____

14.  (a)  Are you required to hold a professional job license?  ☑ Yes  ☐ No
(b)  If "Yes", have you been subject to any disciplinary action, revocation, or suspension of your license, or do you have any charges
currently pending against your license?  ☐ Yes  ☑ No   If "Yes", give details below.
_____
_____

15.  Have you flown as a pilot, student pilot, or crew member in the last 2 years or do you intend to do so in the next 12 months?
☐ Yes  ☑ No   If "Yes", complete the Aviation Questionnaire.

16.  Have you ever engaged in or do you plan to engage in: Automotive, Motorcycle (including off road use) or Power Boat Racing;
Bobsledding; Snowboarding; Skiing; Underwater Cave Exploration; Water Skiing; White Water Rafting; Spelunking; Ballooning; Scuba
Diving; Sky Diving; Bungee Jumping; Hang Gliding (including Slope Soaring, Parakiting, Ultralighting, etc.); Mountain Climbing;
Parachuting; Snowmobile Racing; Slalom Racing; Rodeo Activities; Karate or Martial Arts?
☐ Yes  ☑ No   If "Yes", complete the Avocation Questionnaire.

IDI2000-APP-AZ

MLOCL001773

**5 AZ**

## Part B. Statements By the Proposed Insured

1.  (a)Height _5'4"_     (b)Weight _160_

2.  How much time have you lost from work during the past 5 years because of accident or sickness?

3.  Date you last used tobacco in any form:   Date _____   Type _____   ☒ Never used tobacco

4.  (a)  Please provide the name, address and phone number of your personal/primary care physician(s) as well as the date and reason for your last consultation. If none, check here ☒

| Name, Address and Phone Number | Date | Reasons for Consultation: Nature, Severity and Frequency of Symptoms; Diagnosis, Treatment and Current Status of Condition |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

(b)  In addition, in the past 5 years has any Chiropractor, Counselor, Health Facility, Physician, Practitioner, Psychiatrist, Psychologist, Social Worker, or Therapist examined or treated you?   ☐ Yes   ☒ No

Give details below for each instance:

(Use Supplementary Information Page, pg. 7 if more space is needed)

| Name, Address and Phone Number of each Chiropractor, Counselor, Health Facility, Physician, Practitioner, Psychiatrist, Psychologist, Social Worker or Therapist | Date | Reasons for Consultation: Nature, Severity and Frequency of Symptoms; Diagnosis, Treatment and Current Status of Condition |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

IDI2000-APP-AZ

MLOCL001774

**6 AZ**

5. Have you EVER received treatment, attention or advice for; been told that you had; or had any known indication of:

|  | Yes | No |
|---|---|---|
| (a) Any disease or disorder of the heart; arteries or veins; chest pains; elevated (high) blood pressure (hypertension)? | | ✓ |
| (b) Arthritis; any disease, disorder or deformity of the bones, muscles, tendons, or joints, including the spine; any neck or back problems or disorders; carpal tunnel syndrome? | | ✓ |
| (c) Any mental, nervous or emotional problem, condition or disorder, including anxiety, depression or stress? | | ✓ |
| (d) Stroke, embolism, thrombosis? | ☐ | ✓ |
| (e) Cancer, tumor or polyp? | ☐ | ✓ |
| (f) Diabetes or high blood sugar? | ☐ | ✓ |
| (g) Any disease or disorder of the lungs or respiratory system, including asthma, allergy, emphysema, or Chronic Obstructive Pulmonary Disease? | | ✓ |
| (h) Any disease or disorder of the liver, gall bladder, pancreas, digestive tract, including intestines; ulcer, colitis, hemorrhoids, or hernia? | | ✓ |
| (i) Memory loss, loss of concentration, fatigue, neurologic disorder, unconsciousness, loss of cognition, dizziness, paralysis or numbness, impairment of nervous system, epilepsy, or seizures? | ☐ | ✓ |
| (j) Any disease or disorder of the urinary tract or kidney; sugar, albumin or blood in urine? | ☐ | ✓ |
| (k) Any physical deformity or physical impairment? | | ✓ |
| (l) Any disease or disorder of glands; anemia, leukemia or other blood disorders? | | ✓ |
| (m) Any disease or disorder of the prostate or testes; uterus, ovaries or breasts? | | ✓ |
| (n) Any disease or disorder or impairment of the eyes, ears, mouth, nose or throat; any loss of vision or hearing? | | ✓ |
| (o) Endocrine disorders or goiter or disease or disorder of the thyroid gland? | | ✓ |
| (p) Any sexually transmitted disease, Positive HIV test; Acquired Immune Deficiency Syndrome or other immune deficiency? | | ✓ |

|  | Yes | No |
|---|---|---|
| (q) Adult Attention Deficit Disorder, Adult Attention Deficit Hyperactivity Disorder, Alzheimer's Disease, Chronic Fatigue Syndrome, Epstein-Barr Virus, Fibromyalgia, Lyme Disease, Myalgia or Encephalitis? | | ✓ |

6. Have you EVER:

|  | Yes | No |
|---|---|---|
| (a) Been advised to have any medical test or surgical operation that was not performed, or had any medical test or surgical operation performed, or gone to a hospital, doctor's office, clinic, dispensary or sanatorium for observation, examination or treatment; and this information has not been revealed by previous questions? | ☐ | ✓ |
| (b) Been advised to modify or restrict eating, drinking or living habits because of any health conditions? | | ✓ |
| (c) Had persistent cough, pneumonia, chest discomfort, muscle weakness, unexplained weight loss of 10 pounds or more, swollen glands, patches in the mouth, visual disturbance, recurring diarrhea, fever or infection? | | ✓ |

7.

|  | Yes | No |
|---|---|---|
| (a) Are you currently disabled, or do you expect to be disabled? | ☐ | ✓ |
| (b) Have you received or applied for disability, workers' compensation, or military disability benefits from any source in the past 5 years? | ☐ | ✓ |
| (c) Are you pregnant? If "Yes," expected delivery date? _____ | ☐ | ✓ |
| (d) Within the last five years, have you taken any prescription medications, over the counter herbal medications, or been advised by a physician to take any medications, or are you now taking any prescription medications or over the counter herbal medications? If "Yes", give name, dosage, dates and reason below. | ☐ | ✓ |

8. Have you EVER used heroin, cocaine, marijuana, barbiturates or other drugs, except as prescribed by a physician or other practitioner; abused alcohol or drugs; or received treatment or advice regarding the use of alcohol or drugs from a physician, other practitioner, or organization which assists those who have an alcohol or drug problem? | ☐ | ✓ |

9. For any "Yes" answer to Questions 5 through 8, give details: (Use Supplementary Information Page, pg. 7 if more space is needed)

| Item No. | Name, Address and Phone Number of each Chiropractor, Counselor, Health Facility, Physician, Practitioner, Psychiatrist, Psychologist, Social Worker or Therapist | Dates | Reason for Consultation; Nature, Severity, and Frequency of Symptoms; Diagnosis, Treatment & Current Status of Condition |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

IDI2000-APP-AZ

MLOCL001775

**7 AZ**

# Supplementary Information Page for Applicant

Provide additional application information on this page. This information will be included in the Policy.

ID12000-APP-AZ



**8 AZ**

## Agreement

I have read this application and any supplemental applications or amendments, and to the best of my knowledge and belief, I agree that: (a) All statements and answers are true and complete; and (b) All of the information is correctly recorded in the application; and (c) Such written statements may be relied on by MetLife in order to determine if I qualify for issue of a policy.

I understand that the application seeks full disclosure of the information sought; and that no one has the right to alter or exclude or to direct me to alter or exclude any information from the application.

I understand that this application, any paramedical application, and any supplemental applications or amendments will become a part of any policies issued as a result of this application.

Except as set forth in the Temporary Insurance Agreement, the policy will not be in effect and MetLife will have no liability until: (a) a policy is delivered to me and is accepted by me; and (b) the full first premium due is paid. The policy will then be in effect as of its date of issue if at the time it is delivered:

> (a) the condition of my health, the amount of my income, and the status of my employment or occupation are the same as given in the application; and (b) I, the proposed insured, have not received any medical advice or treatment from a physician or other medical practitioner since the date of this application.

If there are any exceptions to (a) or (b), the policy will not be in effect and I will immediately give MetLife details in writing.

I understand that MetLife will rely on the fact that coverage under any policies listed in Part A, Question 10 on page 3 will end on the Effective Date of Termination shown. If such coverage does not end at that time, any policy issued as a result of this application will be void from the beginning; all premiums will be returned; and no benefits will be payable. MetLife has the right to contact any listed insurer after the Effective Date of Termination to confirm that coverage has ended.

Any person who knowingly, and with intent to defraud an insurance company or other person, submits an application for insurance or files a claim containing any false, incomplete, or misleading information is guilty of insurance fraud, which is a crime.

| Witness (Licensed Resident Agent) | Place | Mo. | Day | Yr. | Signature of Proposed Insured |
|---|---|---|---|---|---|
| X | Cas Creek, AZ | 5 | 18 | 06 | X ⟋_01 |

## Personal History Interview

As part of your application process, MetLife, or someone it designates, will telephone you to verify information in this application, including your occupation, medical history and income. This phone call will take between 15 and 20 minutes to complete. Please indicate below, the best way to reach you.

| | | | Home: | | | AM/PM | 520 431-4015 | | | | Work: | | AM/PM | 520 876-5770 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Day of Week | Date | Time | | Phone | | | | Day of Week | Date | Time | | | Phone | |

| | | | Other: | cell | | AM/PM | 520 431-3547 | |
|---|---|---|---|---|---|---|---|---|
| Day of Week | Date | Time | | Phone | | | | |

### CHECK-O-MATIC (C-O-M)

I understand that paying my insurance premiums monthly may result in a higher yearly out-of-pocket cost than a less frequent premium mode.

Be sure to enclose a voided blank check for the account you wish to use and sign this authorization.

I authorize: (1) MetLife to initiate monthly deductions from my checking account, by electronic or other means, as payment for the coverage level selected; and (2) the financial institution on which my enclosed sample check (marked VOID) is drawn, to: (a) accept the deductions initiated by MetLife; and (b) give MetLife my most recent address upon MetLife's request. Withdrawals will continue until MetLife has had a reasonable opportunity to act upon my written request to end this service. I authorize deductions to be taken on the effective date of the policy and on the _____ day of the month, or the next business day.

| X | | 5/18/06 |
|---|---|---|
| Signature of Account Holder for Monthly Automatic Deductions | | Date |

If your check is drawn on a credit union, indicate credit union phone number: (_____)_____

IDI2000-APP-AZ

MLOCL001777




**MetLife®**
Metropolitan Life Insurance Company
One Madison Avenue, New York, NY 10010

## AUTHORIZATION

**In connection with an application for insurance, for underwriting and claim purposes, I authorize:**

- Any medical practitioner or facility or related entity; any insurer; the Medical Information Bureau. Inc. (MIB); any employer; group policyholder, contract holder. or any benefit plan administrator to give Metropolitan Life Insurance Company (the "Company"), or any third party acting on behalf of the Company in this regard:
  - personal information and data about me;
  - medical information, records and data. about me, including information. records and data about drugs prescribed, medical test results and sexually transmitted diseases;
  - information, records and data about me related to alcohol and drug abuse and treatment. including information and data records and data related to alcohol and drug abuse protected by Federal Regulations 42 CFR part 2;
  - information, records and data about me relating to Acquired Immune Deficiency Syndrome (AIDS) or AIDS related conditions including, where permitted by applicable law, Human Immunodeficiency Virus (H IV) test results; and
  - information, records and data about me relating to mental illness, other than psychotherapy notes.
- The Company to redisclose information, records. and data receiv~d pursuant to this Authorization about me as authorized by me in writing or as otherwise permitted by applicable law.
- The Company, or any third party acting on behalf of the Company in this regard, to request and obtain consumer, investigative consumer or motor vehicle reports about me.
- Any employer, business associate, financial institution, or government agency to give the Company, or any third party acting on behalf of the Company in this regard, any information or data that it may have about my occupation, avocations, driving record, finances, character, reputation and aviation activities.

**By signing below, I acknowledge my understanding that:**

- All or part of the information, records and data that the Company receives pursuant to this authorization may be disclosed to MIB. Such information may also be disclosed to and used by any reinsurer, employee, affiliate or independent contractor who performs a business service for the Company on the insurance applied for or on existing insurance with the Company, or disclosed as otherwise required or permitted by applicable laws.
- Medical information. records and data that may have been subject to federal and state laws or regulations, including federal rules issued by Health and Human Services, setting forth standards for the use, maintenance and disclosure of such information by health care providers and health plans and records and data related to alcohol and drug abuse protected by Federal Regulations 42 CFR part 2, once disclosed to the Company, may no longer be covered by those laws or regulations.
- Information obtained pursuant to this authorization about me may be used, to the extent permitted by applicable law, to determine the insurability of other family members. I may ask to be interviewed if an investigative consumer report is ordered.
  Please call me at ( )_____ time _____ if such report is ordered.
- Information relating to H IV test results will only be disclosed as permitted by applicable law.
- This authorization will end 30 months from the date on this form or sooner if prescribed by law. I may revoke it at any time by writing to the Company at and advising the Company that I have revoked this Authorization. Revocation may result in rejection of the application or in denial of coverage or a claim for benefits. Any action taken before the Company has received my revocation will be valid.
- I have a right to receive a copy of this form.

**A photocopy of this form is as valid as the original form.**

Signature of Proposed Insured  ⊗ _~I~_  Date: *5/18/06*  Birth Date: *1/07/1963*

Print Name of Proposed Insured  *Inna Ogandzhanova*

IDI2000-APP-AUTH

MLOCL001778

*Reviewed w/applicant*   7 [06] 01 3825

RD
NISV

**PART II: Paramedical/Medical Exam**                    Case/Policy No.: _____

☐ Metropolitan Life Insurance Company          ☐ Metropolitan Tower Life Insurance Company
☐ MetLife Investors Insurance Company          ☐ Metropolitan Insurance and Annuity Company
☐ New England Life Insurance Company           ☐ MetLife Investors USA Insurance Company
☐ Texas Life Insurance Company                 ☐ General American Life Insurance Company

The Company indicated above is referred to as "the Company".
For Texas Life: If medical examination is not required, questions are to be completed by Agent.
The spaces below are for answers of person to be examined only. Nothing but the answers of each person should be recorded.

1. Name of Proposed Insured: (Last, First, Middle)                        Date of Birth: (Mo./Day/Year)
   Tanazhanova (NMI) Inna                                                 01 07 63

2. Tobacco Use – Indicate date last smoked/used:
   ___/___/___ ☒ Never      ___/___/___ ☒ Never      ___/___/___ ☒ Never      ___/___/___ ☒ Never
        Cigarette                Smokeless Tobacco           Cigar/Pipe                Patch/Gum

   Amount/Frequency:                                          Tobacco Never Used: ☒ Yes  ☐ No

3. Who is the doctor, practitioner, or health care facility who can give us the most complete and up to date information concerning
   your present health? If "None", check ☒

   Name, full address, and phone number:        N/A

   When was this doctor last consulted?          Why?

   What treatment was given or medication prescribed? If "None", check ☐.

   Reasons, findings, earlier consultations past 5 years?

4. a) Height   b) Weight        c) Change in weight in past 12 months (give reason)   None
   5 ft 4½ in.   111 lbs.         Pounds lost ____ Pounds gained ____ Reason ____

5. Have you EVER received treatment, attention, or advice from any physician, practitioner   Details: List question number. Give:
   or health facility for, or been told by any physician, practitioner or health facility that   details; dates; duration; diagnosis;
   you had:                                                                                       treatment; and doctors' names and
                                                                                                  addresses.

   a) High blood pressure; chest pain, heart attack; or any other          ☐ Yes ☒ No     *All questions asked*
      disease or disorder of the heart or circulatory system?                              *and understood.*
   b) Asthma; bronchitis; emphysema; sleep apnea; shortness of             ☐ Yes ☒ No     *No known medical*
      breath; or any other disease or disorder of the lungs or                            *history.  kd.*
      respiratory system?
   c) Seizures; stroke; paralysis; Alzheimer's disease; multiple sclerosis; ☐ Yes ☒ No
      Lou Gehrig's disease (ALS); memory loss; Parkinson's disease;
      progressive neurological disorder; headaches; dizziness; or any
      other disease or disorder of the brain or nervous system?
   d) Ulcers; colitis; hepatitis; cirrhosis; or any other disease or       ☐ Yes ☒ No
      disorder of: the liver, gallbladder; stomach; or intestines?
   e) Any disease or disorder of: the kidney; bladder; prostate;           ☐ Yes ☒ No
      reproductive organs; or breasts; sexually transmitted disease;
      sugar; albumin; blood or pus in the urine?
   f) Diabetes; thyroid disorder; or any other endocrine disorder?         ☐ Yes ☒ No
   g) Arthritis; gout; or disorder of the muscles, bones, or joints?       ☐ Yes ☒ No
   h) Cancer; tumor; polyp; or cyst? Any disease or disorder of the skin?  ☐ Yes ☒ No

SEP 01 2006 & OBS ISSUE

JAN 9 2006 AM 9:25

JAN 2 2 2006

MLOCL001779

Details (Continued):

| | | Yes | No |
|---|---|---|---|
| i) | Anemia; leukemia; or any other disorder of the blood or lymph glands? | ☐ Yes | ☒ No |
| j) | Depression; stress; anxiety; or any other psychological or emotional disorder or symptoms? | ☐ Yes | ☒ No |
| k) | Any disease or disorder of the eyes, ears, nose, or throat? | ☐ Yes | ☒ No |

**6.** Are you now, or within the last six months, under observation or taking medication or treatment? (including over the counter medications, vitamins, herbal supplements, etc.)  ☐ Yes  ☒ No

**→ 7.** Do you have any doctor's visits, medical care, or surgery scheduled?  ☐ Yes  ☒ No

**→ 8.** Other than the above, during the past five years have you had any:
a) Checkup; electrocardiogram; chest x-ray; or medical test?  ☐ Yes  ☒ No
b) Illness; injury; or health condition not revealed above; or have been recommended to have any: treatment; hospitalization; surgery; medical test; or medication?  ☐ Yes  ☒ No

**9.** Have you:
a) ever been diagnosed or treated by a member of the medical profession as having Acquired Immune Deficiency Syndrome (AIDS) or AIDS related Complex (ARC)?  ☐ Yes  ☒ No
b) ever tested positive for the AIDS (HIV) virus or for antibodies to the AIDS (HIV) virus?  ☐ Yes  ☒ No

**10.** a) Have you ever used heroin, cocaine, barbiturates, or other drugs, except as prescribed by a physician or other licensed practitioner?  ☐ Yes  ☒ No
b) Have you ever received treatment from a physician or counselor regarding the use of alcohol, or the use of drugs except for medicinal purposes; or received treatment or advice from an organization that assists those who have an alcohol or drug problem?  ☐ Yes  ☒ No

**→ 11.** Do you exercise?  ☒ Yes  ☐ No  Type _Walking, gym set_  How often? _twice a week_

**12.** Are you now pregnant?  ☐ Yes  ☒ No  If "Yes", estimated date of delivery? _____

**13.** Has a parent or sibling of any person to be insured ever had: heart disease; coronary artery disease; high blood pressure; cancer; diabetes; or mental illness? (If Yes, indicate below.)  ☐ Yes  ☒ No

| Relationship to Proposed Insured: | Age(s) If Living | Age(s) at Death | State of Health (Specific Conditions) or Cause of Death Attach additional sheet(s) if necessary. |
|---|---|---|---|
| N/A | | | |
| | | | |

**14.** a) Do you currently use any mechanical equipment such as a walker, wheelchair, long leg braces or crutches?  ☐ Yes  ☒ No
b) Do you need any assistance or supervision with the following activities: bathing, dressing, walking, moving in/out of a chair or bed, toileting, continence or taking medication?  ☐ Yes  ☒ No

I have read the answers to questions 2-14 before signing. They have been correctly written, as given by me, and are true and complete to the best of my knowledge and belief. There are no exceptions to any such answers other than as written.

| Witness to Signature | City and State | Mo./Day/Year | Signature of Proposed Insured (Parent or Guardian if under 18) |
|---|---|---|---|
| G. Alvarado | Casa Grande, AZ | 5/25/06 | X |

Page 2
EMED-13-02

MLOCL001780

# EXHIBIT K

From: Inna Ogandzhanova

As you know Mr. Newfield I have disability policies with Met Life. I always thought that if I became disabled that Met Life would take care of me as my Met Life representative Alex Glushenok and Met Life promised. You know Mr. Newfield that I sold some of the assets of my practice. If I had not sold but retained those assets and liabilities, keeping the majority of my business by now I would have had to claim bankruptcy while waiting on Met Life. The whole idea for me to have insurance was to have piece of mind about my future were I to become disabled. I always paid my premiums in good faith believing that Met Life would fulfill their terms of the contract as I have. Little did I know that I would put through the trauma of trying to get the benefits I have paid for. It's already the end of December, by now regardless of when Met Life got notice of claim or documentation I would have expected Met Life to have fulfilled their obligation under the terms of my disability policies and started paying me. Though I may be fortunate to have some reserve resources they are not unlimited. I feel the way Met Life proceeds with my disability claim does not show good faith on their part.

In the last letter I received from you, which had attached the last letter from Met Life, it shows a one sided approach to my insurance claim in which unilateral statements are made by Met Life to their benefit.

For example it was directly stated in the letter that for two months since September 13th through November 15th they had been unsuccessful in receiving Dr. Rozansky's treatment notes. In fact they only asked for the notes on November 8th from you and they received them on November 15th, a mere week. They asked and received the information in one week. Met Life did not actually ask for those documents/notes from Rozansky from September 13th thru November 8th, a period of eight weeks. Met Life is misstating the facts as to who is procrastinating. I find their action capricious and willful. If they had problems getting any information or communicating they had you to notify to get action.

While they are sitting on their thumbs I am still paying premiums for their inaction. Some of the request for production of financials have previously been provided or explained, and any request for additional information should have been made at the time of the original request on September 6th not now after four months. In fact a review of their request now is nearly a duplicate of their original request. P/L statements, tax returns, and explanations were previously provided, why are they requesting again? There is no association between them getting documentation about the medical aspects of my disability and requesting additional and repetitive documentation on financials. You don't have to have one to do the other.

It shows that their mode of operation is to procrastinate, to come up with multiple excuses and reasons to not process fairly my claim. I think they have failed to see me as a person and what they are doing to me as a consequence of their actions in this horrible time in my life is inexcusable. I have anger and anxiety which is being exacerbated by the

MLOCL001000

actions of Met Life. My disability is of a mental disorder so I don't have the emotional and psychological endurance to put up with their actions and what they are putting me through. Besides the problems I have and am still experiencing, I have a much more pronounced inability to concentrate, sleep, eating/weight gain, constant emotional outburst, crying, and anxiety attacks. I can not deal as well with my nine month old baby as I should, having a hard time dealing with anyone or place outside my home. Met Life is causing my family financial difficulties as I have always been responsible for the financial health of the family unit. I can't help but believe that Met Life's whole purpose is to continually procrastinate, delay and push me emotionally to gain leverage in the process by which I become even less able to cope, function or reasonably remain engaged in the process perhaps to the ultimate despair of not wanting to go on.

I hold Met Life responsible for the additional decline of my mental and emotional state and any other issues or problems associated with their actions. I am glad Mr. Newfield that I retained you as it is obvious I would be run over by the corporate mentality of Met Life to deny, deny and procrastinate some more. Six or seven years ago I was going to change my disability to Guardian as I was told that Met Life didn't treat people fairly. My Met Life representative Alex Glushenok told me it wasn't true that Met Life would take care of me so I stayed with them. Besides my disability policy with Met Life I have two large whole life policies that I am still paying for. I was told that after about ten years that I wouldn't have to make premium payments as they would become self funding... a review of the policies doesn't indicate that promise will happen soon.

The action of Met Life takes away my faith about the fairness of their company. I have anxiety as to whether or not Met Life is going to pay my daughter Esther accordingly when I pass away. That is a worry that I don't need. I continue paying over $2000.00 monthly for disability policies while being disabled while Met Life procrastinates by dragging their feet paying my legitimate claim according to the contracts. I had a business overhead policy that pays $30,000.00 per month. The amount of business overhead expenses I am now filing for are less than $10,000.00 which is 80% less than the policy could pay. The fact they are still procrastinating over the business overhead policy, in fact claiming they owe nothing just re-enforces my view that they are dealing in bad faith. To me it is no different than what other people say about Met Life and other disability insurance companies in only wanting your money and trying everyway possible to not pay claims. I reviewed on the internet hundreds of pages of feed back about lawsuits and court orders in which people had to fight, to the extent of being financially ruined to get what they were entitled to. In my opinion the actions of Met Life are malicious, and a calculated course of action. In most of the instances where Met Life and others procrastinated, it ended up in court, in the end after the person has exhausted their life savings, sold their house, or filed for bankruptcy does the insurance company "settle" for what they were obligated to do in the first place.

Hopefully Met Life will start living up to the obligation they have contractually entered into with me; if not perhaps I need to take them up on their offer to have the matter reviewed by the Arizona Department of Insurance. Arizona, Mr. Newfield has some strong consumer protection laws, perhaps they might be helpful.

MLOCL001001

EXHIBIT L



**F N** **FRANKEL & NEWFIELD, P.C.**                              ATTORNEYS AT LAW

Justin C. Frankel*                                                                585 Stewart Avenue
Jason A. Newfield*                                                                      Suite 312
*Admitted in NY, CT and PA                    January 25, 2008            Garden City, NY 11530
                                                                          Tel: (516) 222-1600
                                                                          Fax: (516) 222-0513
                                                                          www.frankelnewfield.com

**VIA FACSIMILE (813) 983-6489**
**AND FIRST CLASS MAIL**

Lisa Kaarela
Technical Claim Advisor
Met Life
18210 Cranes Nest Drive
Tampa FL, 33647

    Re:   Dr. Inna Ogandzhanova

Dear Mrs. Kaarela:

    We are in receipt of your letter dated January 24, 2008 concerning Met Life's changing of the upcoming IME, and other related issues, and wish to further respond.

    While we appreciate that Met Life has validated our concerns about Dr. Hinkin and his lack of impartiality due to his well known relationship with insurance companies, we are left to wonder why Met Life would have selected him as an "Independent" doctor in the first instance. It raises a serious question as to how Met Life goes about the process of having claimants examined, particularly Dr. Ogandzhanova. We note that Met Life has selected another practitioner, David Lamb, PhD, and would request that Met Life immediately provide his CV, so that we can determine the qualifications of this examiner.[1]

    Your letter also raises numerous issues wherein Met Life is claiming that Dr. Ogandzhanova is seeking to impose "pre-conditions" upon an examination. Toward that end, Met Life has now changed the examination location from California to Arizona, suggesting that Dr. Ogandzhanova has no right to "dictate" the terms of the examination. It thus appears to us that Met Life is acting in a punitive fashion by "forcing" Dr. Ogandzhanova to attend in Arizona, when previously California was acceptable to Met Life. Such punitive action is not conduct that can be viewed as good faith.

    In furtherance of that theme, while Met Life indicated previously that the examination with Dr. Hinkin would be 4-6 hours in length (during our call yesterday), the January 24th letter dictates that the examination will now be 14 hours, spanning two days. This also appears to be punitive action taken against Dr. Ogandzhanova due to her questioning of Dr. Hinkin's bias - a fair question of any examiner, but even more so when cursory investigation demonstrates his bias.

---

    [1]   While Met Life had indicated that Dr. Hinkin's CV was forwarded, to date, that material has not been provided - leaving open the question of whether Met Life intended to send the documentation or not.

MLOCL000801



# FRANKEL & NEWFIELD, P.C.

Lisa Kaarela
Met Life

While your letter further disputes Dr. Ogandzhanova's rights to ensure the integrity of the examination, and our requests in that regard, you appear to rely upon un-written terms of the policy for your position. In that regard, I suggest that you both examine the terms of the policy, as I will identify herein, and become aware of the implied covenant of good faith and fair dealing which is embodied in each and every contract, but particularly in those contracts of adhesion - like the instant one - where the contract is drafted by one party with no ability to alter the terms. The contract discusses Met Life's entitlement to an examination, where it states:

> *At Our expense, as often as is reasonably necessary, We may require*
> *You to have an independent examination by a Physician of Our Choice.*

Please note that the contract fails to identify any other terms of such an examination, such as the right to have a witness attend or observe the examination, the right to videotape or audiotape the examination, or the right to take pictures of the testing environment. Thus, it is not reasonable for Met Life to supplement the terms of the policy with its own demands. The choice of the examining doctor is Met Life's, the choice of the frequency of the testing is within Met Life's consideration (so long as it is reasonably necessary), but the other issues surrounding the examination are NOT within Met Life's domain, as they are not specifically articulated in the policy.

You have asked for legal authority permitting our rights in the above regard. Based upon our initial research, Arizona law permits Dr. Ogandzhanova to undertake the steps which she has requested and further permits her to audiotape the examination. See Burton v. The Industrial Comm. of Arizona, 166 Ariz. 238 (Ct. App. 1990)(reversing a lower court and permitting claimant who was to be examined to audiotape the examination). In reaching this holding, the court relied upon the contactual principle of *expressio unius est exclusio alterius*, meaning that the expression of one or more items to the exclusion of others implies an intent exclude items not expressly included. Applied to the facts herein, the limitations which Met Life seeks to impose (by restricting the rights to a witness, or to audiotape, videotape or photograph the examination) are not restricted in the policy and are thus not proper to impose upon Dr. Ogandzhanova.[2]

We further note that Met Life has failed to address our concern about who is to administer the testing. We reiterate our request to be assured that Dr. Lamb, and Dr. Lamb alone, will be the sole person administering the testing, as the utilization of any other individual to administer the testing would certainly serve to impact the validity (and thus using Met Life's own words, the integrity) of the testing.

---

[2]     The statute at issue also permits Dr. Ogandzhanova to have a physician present at the examination, if procured and paid for herself. This right remains under consideration.

MLOCL000802



FRANKEL & NEWFIELD, P.C.

Lisa Kaarela
Met Life


As stated in our prior letter, it has been our experience that during neuro-psychological testing, on occasion, the tests are not administered by the actual doctor, but perhaps by a technician. It is our view that the integrity of the examination would be substantially impacted by any alteration in protocols by having a technician administer testing, rather than the actual examiner. Thus, kindly provide us with the written assurance that only Dr. Lamb will be administering the testing to Dr. Ogandzhanova.

Lastly, given the further time lag involved in this claim, we are once again requesting that Met Life issue benefits, even if under a reservation of all rights, to be of service to its insured during her period wherein she is not earning any income.

Thank you for your expected attention to these matters.

Very truly yours,

FRANKEL & NEWFIELD, P.C.

By: _____
Jason A. Newfield

JAN/bms
cc: Dr. Inna Ogandzhanova
X:\Shared\Ogandzhanova\MetLife 12 ltr.wpd

2008 JA 28 PH 3:43

MLOCL000803