# Ex. 11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Metropolitan Life Insurance Company, a New York corporation, | No. 2:12-cv-372-GMS |
| Plaintiff/Counter-Defendant, | **DECLARATION OF DAVID G. LAMB, Ph.D.** |
| vs. | |
| Inna Ogandzhanova, M.D., | |
| Defendant/Counter-Claimant. | |

I, David G. Lamb, Ph.D., state as follows:

1.    The reports identified below are true and accurate copies of the reports I drafted based on my examinations of Dr. Inna Ogandzhanova and review of medical records and other materials outlined in my reports:

(a)    Independent Neuropsychological Evaluation dated March 3, 2008 (Bates Nos. MLOCL000756-MLOCL000765; Dkt. # 281-1, Ex. 12, 116-125);

(b)    Independent Neuropsychological Evaluation dated March 14, 2011 (Bates Nos. MLOCL001840-MLOCL001851; Dkt. # 281-1, Ex. 2, 35-46); and

(c)    Report of David G. Lamb, Ph.D., ABPP-CN dated March 1, 2013, which I understand has been identified as Exhibit 10 to MetLife's Controverting Statement of Facts re Defendant/Counter-Plaintiff's Motion for Summary Judgment on MetLife's Complaint for Declaratory Relief.

2.      The foregoing reports are true and accurate statements of my opinions, as updated and clarified in my most recent March 1, 2013 report.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this ___7ᵗʰ___ day of March, 2014.

DAVID G. LAMB, Ph.D.

2

**Ex. 12**

**Joel E. Parker, M.D.**
**Biltmore Psychiatric Group, PLLC**
**Board Certified: General Psychiatry,**
**Forensic Psychiatry,**
**Independent Medical Examinations**

6245 North 24th Parkway, #203
Phoenix, AZ 85016
602-843-0035 (phone)
602-843-8963 (fax)
joelparker@biltmorepsych.com

October 5, 2010

Eric Michael Kaplan, MD
Metropolitan Life Insurance Company
P. O. Box 30429
Tampa, FL 33630-3429

RE:                 Inna Ogandzhanova, MD
POLICY NO:    6 364 168 AH6 482 821 AH
DOB:

Dear Dr. Kaplan:

As you know, I recently interviewed Dr. Ogandzhanova, and have submitted a 26-page report related to that evaluation.   Today, I received additional documents.  I have not met with Dr. Ogandzhanova since the original interview of September 21, 2010.

I have received the following documents:

1.  A letter from Gerald Rozansky, MD, PhD, dated August 29, 2010.  Notable are the following:
    A.  "She continues to take Lexapro 30 mg daily."
    B.  "Dr. Ogandzhanova, as I have explained elsewhere, is suspicious that the only reason for sending the notes is to examine them for any reason to stop her insurance payments.  There has not been any evidence that information given by her (or me) to MetLife is used to help her."
    C.  "Her continuing complaints center on how she feels nothing of the pleasures of life except with her two children.  Her activities involve routine household chores and caring for her son and daughter.  They have traveled to vacation spots, but she finds no escape from profound disappointment and grief.  She occasionally has panic attacks but contains them with personal relaxation techniques as best she can.  Overly sensitive to any anxiety, at times she feels she may be dying."

**REDACTED**

MLOCL001975

Inna Ogandzhanova, MD                                     Page 2
October 5, 2010

    D. "Therapeutically I try to help her learn to focus on instances in life that give her pleasure. We work on her isolation, especially because she finds people to be so disappointing."

    E. "There is progress. She can smile and laugh a little, while being cynical about people and their shortcomings. Thus, her mood has lifted above its lowest ebb."

    F. "My diagnostic impression remains: Post-Traumatic Stress Disorder and anxiety and depression; complicated grief."

2. A reprint of a report from the Journal of Clinical Psychiatry from August 2010, entitled "Bereavement, Complicated Grief, and DSM." This discussed the proposed criteria set for complicated grief for the upcoming DSM-V.

3. Surveillance report dated September 14, 2010. Notable are the following:

    A. "We were informed by the reader that Ms. Ogandzhanova may be employed at Desert Oasis Medical Center located at 1281 E. Cottonwood Lane in Casa Grande, Arizona."

    B. They noted no activity on Tuesday, August 31, 2010, at her residence between 6 a.m. and 2 p.m.

    C. On Wednesday, September 1, 2010, there was no activity at her residence between 6:30 a.m. and 7:30 a.m.

    D. Wednesday, September 8, 2010:
      1) 6:18 a.m.: She is described as walking into view accompanied by a child, picking up something off the ground and carrying a bag of garbage.
      2) 8:13 a.m.: She drives to the Pima County Federal Credit Union where she completes a transaction.
      3) 8:44 a.m.: She returns to her residence and parks in the driveway.
      4) 10:48 a.m.: Casa Grande police officer arrives at the residence.
      5) 11:11 a.m.: A second Casa Grande police officer arrives at the residence.
      6) 11:55 a.m.: She drives in her Daewoo followed by a Casa Grande police officer.
      7) She is lost in traffic.

    E. Thursday, September 9, 2010:
      1) 9:18 a.m.: She drives into view.
      2) 9:23 a.m.: She is accompanied by a small boy and drives off.
      3) 9:31 a.m.: She arrives at the Cats Meow Beauty Salon.
      4) 10:30 a.m.: She goes to the Distinctive Earthscapes, where she purchases something and puts it into the vehicle and returns to her residence.

    F. Friday, September 10, 2010: There is no apparent activity.

MLOCL001976

Inna Ogandzhanova, MD                                                    Page 3
October 5, 2010

**UPDATED OPINION:**

My review of these documents does not change any of the opinions contained in my October 2, 2010 independent medical examination.

Sincerely Yours,

Joel E. Parker, M.D.
JEP/dka

2010 OC 14  AM 8: 50

MLOCL001977

**Ex. 13**

**Joel E. Parker, M.D., FAPA**
**Board Certified: General & Forensic Psychiatry,**
**Independent Medical Examinations**

6245 North 24th Parkway
Suite 203
Phoenix, AZ 85016
602-843-0035 (phone)
602-843-8963 (fax)
joelparker@biltmorepsych.com

February 15, 2013

Stephen Bressler
Lewis and Roca, LLP
40 N. Central Ave., 19th Floor
Phoenix, AZ 85004-4429

RE:    Metropolitan Life Insurance Company v. Ogandzhanova

Dear Mr. Bressler:

As you know, I evaluated Dr. Ogandzhanova somewhat over two years ago, from which I produced a report dated October 2, 2010. In that instance, I was retained by Metropolitan Life Insurance Company to provide a psychiatric independent medical evaluation regarding her psychiatric condition, if any, qualification for disability, and related matters. I have also authored addenda dated October 5, 2010 and June 2, 2011. I have not personally met with Dr. Ogandzhanova since the original interview. The purpose of this correspondence is to provide you with an updated opinion, based upon my earlier work in this matter and review of new documents. I have specifically been asked to comment of the opinions of Dr. Shear.

**REVIEW OF ADDITIONAL RECORDS:** I have reviewed the following additional documents:

**Bound folder includes transcript of deposition from James Boone, PhD, and Eric Kaplan, MD. Notable are the following:**

1. Transcript of videotaped deposition by James Boone, PhD, from October 26, 2012. Notable are the following:
    A. Page 11:
        A: "If they are a licensed psychologist. She has an FBT score of 73.
        Q: And what does that denote to you?
        A: It's telling me that she's reporting more florid psychiatric symptoms than folks who are inpatient psychiatric unit as well as people in the MMPI normative sample. And why - - why it's helpful, if someone has an elevated F scale sometimes they can be viewed as a cry for help or sometimes, like that. But if you have an FP scale also elevated, that tends to support maybe someone is deliberately over reporting, because they

are telling you they have more problems than someone in an inpatient psychiatric unit."

B. Page 12:

Q: "She scored a 73, right?

A: Yes

Q: Okay, and tell us your interpretation of what that means in this particular case.

A: Moderate over reporting of unlikely symptoms, even when compared with the inpatient psychiatric population.

Q: And you're able to tell from the scoring that symptoms or psychiatric symptoms she was moderately over reporting?

A: They - - they kick out symptoms she endorsed. I could probably identify those, yes."

C. Page 25:

Q: "Do you think that in this particular case, that Dr. Ogandzhanova suffers from PTSD, Major Depressive Disorder, and Complicated Grief Disorder, as a result of what she went through with her son?

A: No.

Q: And why is that?

A: Because the data that speaks to it is invalid. So, I don't - - people with PTSD and legitimate problems don't fail MMPI. So had her MMPI been valid, I would have been happy to say this person looks like she has got PTSD, depression, whatever. But if you over report it to the degree she is, we have to basically just throw the whole MMPI out, as it's invalid."

D. Page 28:

Q: "Do you believe that she's likely over reporting symptoms of depression and sadness?

A: Again, I would have to go through each individual item. But based on her scores, she's over reporting more problems than in patient psychiatric patients with psychosis, with depression, with anxiety. So even compared to known groups of people with these problems, she's over reporting."

E. Page 84:

Q: "So you are not saying that she's exaggerating her symptoms are you?

A: I'm saying she's - - she's over reporting. What tests are we talking about now?

Q: Any of them.

A: All right, based on the 2011 testing, clear evidence of exaggeration, clear evidence of over reporting of cognitive symptoms and psychological problems. Yes, I'm saying that."

F. Page 122:

Q: "Dr. Ogandzhanova's performance on one of two formal symptom validity tests was indicative of a suboptimal level of effort.

A: Right.

Q: Does that mean that her other score for the other symptom validity test was normal?

A: In neuropsychology any symptom validity failure is significant. So, most people don't fail every symptom validity test. Most people pass all the symptom validity tests. But it's really a misinterpretation to say, well this person passed two out of five, why don't you give him credit for the two. That's not kind of how we view it, because all of them are easily passed by mildly demented people, so it's still significant. But you are right, she did pass one of them."

F. Page 145:

Q: "Right, when do you get to a trial in this case, and you are in front of a jury in Phoenix, Arizona, you are not going to sit up on the witness stand and say, I've got all these opinions about her psychiatric condition. What you can say is that she was tested, and the results were invalid.

A: The psychological data do not support a psychiatric condition.

Q: Because they are invalid?

A: Yes.

Q: All right, but the fact that they are invalid doesn't negate the fact that she may have a psychiatric impairment, right?

A: It's always possible that someone has a condition that they over reporting. Yes, that's correct."

G. Page 168:

A: "So the data are very compelling from my end that – – that based on my results of the test data and all the file data that she's over reporting symptoms.

And in the field we have a whole systematic way of defining these conditions. We have definite malingering, which basically means that someone just admits, yeah, I was faking the test. We have probable malingering, which in this case fits, in which case you have multiple symptom validity test failures; you have inconsistencies; you have behaviors that don't jibe with the actual test results. So the nomenclature in this case would be probable malingering based on testing.

Dr. Lamb very specifically says she's over reporting symptoms; that he is basing the Axis I diagnosis really just on her self-reports; that we really cannot believe the psychological test results; we really can't believe the cognitive test results. He reports a GAF score of 70, which is well in the range of people that can work. Usually scores of 50 or less are people that cannot work.

So when I review a file, I try to keep track of all the data. In this case, I had multiple lines of evidence converging to support a diagnosis of probable malingering or over reporting of symptoms that Dr. Lamb says."

H. Page 169:

A: "The cognitive symptom validity tests are easily passed, again, by people with mild dementia, depression, and pain, psychiatric conditions, people who have had moderate to severe traumatic brain injury. So – – so

they're expected, people with - - people with legitimate conditions still are
expected to pass.  If I have someone in my office with multiple sclerosis or
mild car accident or depression, they are still expected to pass these
simple cognitive validity tests.

So again, if someone fails one, again, that is not enough to really say
someone is probably malingering.  In this case, we have at least three
indicators, plus the PAI, plus the failed MMPI from before.  We have lots of
lines of evidence converging into support a diagnosis of probable
malingering."
By Mr. Bressler:
Q:  Okay, what's that based on.  I mean is there some - - this data, when
you said confidence levels, are you basing it on some published data
within your field?
A:  Yeah, there is well-known research out there to show that - - that took
a look at what kind of confidence we can have when someone's not telling
the truth or over reporting if they fail one symptom validity measure, two
symptom validity measures, three symptom validity measures.

So when - - when we get up around three or more, we are looking about
the 98th percentile of likely over reporting of symptoms.  Why do we say
that?  Because she's performing worse than people with verified moderate
to severe traumatic brain injuries and some pretty horrible neurologic
conditions.  So - - so even if she had depression, even if she had PTSD,
she still should be able to pass these measures."

I.  Page 172:
Q:  "Okay, and then in 2011, I think you mentioned that the finger tapping
was one of the symptom validity tests that you noted was invalid in 2011,
right?
A:  Yes.
Q:  All right, and what were the other ones?
A:  I think she failed what we call dot counting.
Q:  What was her score?
A:  She has an E score of 17, which is clearly in the range of someone
exaggerating their problems.  She also has a pattern that makes no
sense, where she performs better on a pegboard test as compared to a
tapping test.  The reason that's significant is the pegboard test is - - is the
more complex test.
Q:  Let me ask you this.
A:  Yes.
Q:  So the dot counting is a symptom validity test, correct?
A:  Yes.
Q:  And you are saying that 17th percentile, is that the T score or is that
the...
A:  No, no, no, it's what they call an E score.
Q:  E score?

Mr. Bressler:  Steve, is there a reason you are standing up as you are questioning him?

Mr. German:  No, no, I just want.  I'm about to be done.

Mr. Bressler:  Oh, okay I didn't know whether you were trying to

Mr. German:  I'm just about done.

The Witness:  The E score is a score derived by errors in time, I believe.  But 17 is definitely elevated."

J. Page 173:

Q:  "Okay, so I'm clear, the symptom validity tests that she failed in 2011 include the dot counting - -

A:  Yes.

Q:  - - the finger tapping - -

A:  Yes.

Q:  - - the elevated PAI?

A:  Yes.

Q:  And what else?

A:  Something called reliable digit span, ability to repeat numbers forwards and backwards.  It looks like - - it looks like she couldn't repeat more than two digits backwards, which is very unusual.  Anyway, that's in the range of people over reporting of symptoms.  We also have a pattern that's a bit unusual where she performs better on a more difficult test, which is more of an embedded measure or more of a clinical inconsistency.

Again - - Again, even - - even with significant psychiatric conditions, you really should pass these measures.  If you - - if you fail one, no one's going to make a big deal about it.  But when you're up around the three or four territory, that's pretty good evidence of over reporting of symptoms."

2.  Transcript of a videotaped deposition by Eric Michael Kaplan, MD, dated October 25, 2012.  Notable are the following:

A.  Page 40:

Q:  "Okay, so even if everything she says is verified by you, that she's needing to run out of the cancer center, she's having a very hard time dealing with her cancer patients, that you would say is not a restriction or limitation from doing her job?

A:  Just based on this information, I would say no, you have to go further and look at the frequency of symptoms, severity of symptoms, the functional impact on their lives, associated symptoms, effects on activities of daily living.  So you have to look at more information than just her subjective report of what symptoms she is saying she's having.  Of course, you need to look at her attending physician's documentation of symptoms.  So, this would be one source of information, but you have to look at other sources to determine the severity and the functional impact of symptoms.

People with psychiatric disorders and more significant symptoms than this work all day, while receiving treatments. I treat a variety of physicians with symptoms much worse than this who work on a full-time basis, who do deal with life and death situations. So, just because someone has these symptoms doesn't mean they impair or restrict them from working safely as a physician.

In fact, we know that Dr. O worked with these symptoms. And, I have not heard any documentation that anyone brought her up to the state licensure organization or tried to get her involved in an impaired physicians network, or that she had any malpractice problems as a consequence of her psychiatric symptoms or where she harmed any patients and provided inadequate or inappropriate treatment as a consequence of her symptoms. So, just because she had these symptoms does not mean they would impair or restrict her from working as a radiation oncologist."

B. Page 45:
Q: "And I think you agreed before - - it's a yes or no - - that you have to be able to focus if you are going to be a radiation oncologist and do it properly.
A: I think that's accurate.
Q: Okay, if it's true that she's not able to focus properly, would you agree that that would be a restriction or limitation for a radiation oncologist.
A: It would depend on the severity of her attentional deficits."

C. Page 53:
Q: "Okay, in other words you have reasons to know that this was an experienced psychiatrist (Dr. Rozansky).
A: Oh, I have no idea how experienced he is. I mean he said he has these experiences, but based on the treatment he provides and the way he documents, I have questions about the manner in which he practices and the quality of care he provides. So, I don't know what kind of experiences this man has or does not have."

D. Page 81:
Q: "Thank you, you state that her claimed date of disability does correlate with the birth of her new daughter. Do you see that?
A: Yes. I do.
Q: Is that - - are you implying that Dr. O is simply wanting to stay home with the children now and no longer wants to be a radiation oncologist?
A: I'm not implying anything. It just so happens that she works until she gives birth, then right after she gives birth, that's when she's claiming disability, without a significant documentation of her worsening psychiatric symptoms.
Q: And you knew that before she gave birth, she was planning on coming back. Do you understand that?
A: I do.

Q:  And you understand that when she took that step backwards and took that break from her work she began to realize that she couldn't go back, according to Dr. Rozansky and Dr. O?
Mr. Bressler:  Objection to form.
The Witness:  According to them, that's correct."

E.  Page 90:
Q:  "And you have agreed, you don't have to have objective data to know whether or not somebody is impaired and has restrictions and limitations."
A:  Correct, but the information provided by Dr. Rozansky didn't include sections of psychiatric exams that would be typical from a psychiatrist, didn't include complete mental status examinations, despite the fact that she had subjective complaints of cognitive difficulties.  I would have expected this as a normal psychiatric examination report.  He did not provide such information.  So to ask for objective testing and further evaluation of cognition would be reasonable and desired."

F.  Page 113:
Q:  "And once again you conclude - - is this on 1258, right above recommendations.  In summary based on all the available data, the medical documentation does not support that Dr. O is impaired from working as a radiologist due to depression, panic disorder, or any other mental illness.  Correct?
A:  Correct.  There was documentation of mild depressive symptoms, and the symptoms documented were less severe compared to her symptoms when working as an oncological radiologist."

G.  Page 131:
Q:  "Are you accusing Dr. O of being a fraud?
A:  Define 'fraud.'
Q:  Any possible description of the word fraud.  Are you suggesting that she is fraudulent in any manner?
A:  I - - I need
Mr. Bressler:  Object – excuse me – object to the form.
The Witness:  I would need –
Ms. Rosenthal:  Well, excuse me.  What is the objection?
Mr. Bressler:  Because that is a vague term and you're asking him to answer a term you haven't defined.  It can mean many things to many people and that his answer will be taken out of context.
Ms. Rosenthal:  Okay.
Mr. Bressler:  Fraud, fraud is a legal term and he is not a lawyer.
Ms. Rosenthal:  Okay, well let's, I'll break it down."

3.  Deposition of Gerald Rozansky, MD, PhD, from December 20, 2012.  Notable are the following:
A.  Page 13:
Q:  "Did you wonder why somebody who lived in Arizona was coming over to Los Angeles to see you?
A:  Yes.

Q:  And what did you learn?
A:  I learned that she was having difficulty arranging an appointment in
Phoenix, and that her husband - - her significant other investigated the
internet and found me."

B.  Page 14:
Q:  "Did you do a mental status examination on the first visit?
A:  Of course.
Q:  Where is that documented in the records, in your notes of January
4th?
A:  It probably wasn't specifically documented in that I don't usually unless
I'm doing an evaluation for some particular reason, and unless they're -- -
it's important to the diagnosis and treatment."

C.  Page 15:
Q:  "When you did the mental status exam, did you test her for cognition?
A:  I test for cognition the whole time I see someone.
Q:  How was her cognition on January 4, 2007?
A:  It was adequate.
Q:  What about her memory.
A:  It's adequate.
Mr. German:  Form, foundation.
By Mr. Bressler:
Q:  "I couldn't hear you."
A:  Adequate.
Q:  What about her attention span?
Mr. German:  Form, foundation.
The Witness:  It was an initial visit and attention span was that of a
distressed person.  It was pretty good.  She was able to concentrate and
answer questions.
By Mr. Bressler:
Q:  And was her thought process?
A:  Adequate.
Q:  And her organization?
A:  Very focused on her pain.
Q:  Now when you use the term 'adequate' what do you mean by that?
A:  Just that.  It was an adequate for a person coming in for their first
session who is in some distress.
Q:  Did you perform a mini-mental status exam?
A:  Specifically, that's all a part of the general evaluation of the person
when I see them.  You know, I've done this for 50 years or more,
considering my training before that, it becomes all part of what you do.  It's
not specifically delineated unless it's called upon through evaluation, like
for the FAA, or something like that, then it might get very specific about
those various areas.  But being that this is a patient coming in, expressing
anxiety an (sic) immediate situation, that's what I deal with."

Q:  If some other physician were to do a consult or take over her care, how would they know what has gone on in your treatment if not everything is contained in your office notes?

A:  They would talk to me."

D.  Page 19:

Q:  "When she came to see you on January 7th - - let me start over, when she came to see you on January 4, 2007, were you aware that she was in the process of selling her radiation oncology practice?

A:  I don't know.

Q:  Do you know anything about the sale of her radiation oncology practice?

A:  Other than she sold it.

Q:  Do you know what the name of it was?

A:  No.

Q:  Do you know whether or not Don Bates was involved in the sale of her practice?

A:  I don't.

Q:  Do you know whether or not she had a business broker or other professional involved in the sale of her practice?

A:  This was on the first visit?

Q:  Or just generally because you told me earlier that you're not sure you can isolate what you learned to a particular visit, having seen her for several years now.

A:  But then you're also then switching and talking about that specific date. On that specific date I didn't know."

E.  Page 21:

Q:  "Were you aware that she sold the practice for approximately eight million dollars?

Mr. German:  Objection, form, foundation.

The Witness:  I don't know that I have that information."

F.  Page 24:

Q:  "Did you ever make diagnoses along the DSM-IV five axes?

A:  No.  The five - - no.

Q:  Why not?  Do you not use those five axes?

A:  I certainly, in my thinking, cover the five axes.  I don't specify them routinely on patients coming to the office.

Q:  So for example, Axis V is a Global Assessment of Functioning GAF.

A:  Yes.

Q:  Did you ever assign a GAF score to Dr. O?

A:  No.

Q:  Axis II is personality disorder.  Do you believe that Dr. O had any personality disorders?

A:  No.

Q:  Axis III, medical conditions.

A:  She was pregnant.

Q:  Anything else besides being pregnant, and no I'm encompassing the entire period of time you've seen her.

A:  Overweight.  Medically?  I think that's it medically.

Q:  Did you, you told us just a moment, that your diagnoses were Post-Traumatic Stress Disorder, panic attacks, depressed, and grieving.

A:  Yes.

Q:  Did you inform any impression at the first visit - - well, let's open it up.  Have you informed any impression to how long she had those conditions?

A:  How long she had them?  I think they were developing from the time of her - - I don't think there is a beginning or an end to it.  It certainly progressed more rapidly with the death of her son."

G. Page 28:

Q:  "Do you know when she sold the practice.

A:  No, I don't know the date of her selling the practice.  I don't know when she stopped practicing, but I suggested to her that she should stop working.

Q:  You're aware she stopped working when she gave birth to her second child, Esther?

A:  I don't know the timing of it, but yes, I think it was around then.

Q:  Do you know if she gave birth to Esther before or after she sold the practice?

A:  No, I don't.

Q:  And you say that she had panic attacks.  What were the symptoms that caused you to - -

A:  Primarily hyperventilating and the feeling of dying.  She would get a rapid heartbeat, and this comes from hyperventilating and changing in the acidity of the blood, and often people who are having panic attacks, I think it's a chemical reaction in the brain.  There is some sense that you're dying, and they feel like they're dying."

Q:  Did this happen in your office, or was this what she reported to you?

A:  She reported the panic attacks.  I've seen her when she's had an attack in the office too.  That's when I suggested she breathe into a paper bag.

Q:  Did you set up a treatment plan for her?

A:  A specific treatment plan?

Q:  Yes.

A:  Other than visits with her?

Q:  Right.

A:  That was the treatment plan.

Q:  Okay.

A:  Medicating.

Q:  So when you say the treatment plan, it consists of visits, correct?

A:  Yes, and medicating.

Q:  How often did you want to see her?

A:  As often as I could.

Q:  If she - - if you were limited because she's in another state, correct?

A: That's right.
Q: If she lived down the street, how often would you want to see her?
Mr. German:  Objection, form, foundation.
The Witness:  If she lived down the street, probably once a week."

H. Page 32:
Q:  "All right, if she were a local patient, somebody who lived in the Los Angeles area, today, how often would you want to see her?
A:  Today, anywhere from once a week to once a month.
Q:  So, the frequency of the visits still is not to your liking.  You'd like to see her more frequently?
Mr. German:  Objection; foundation, form.
The Witness:  Yes."

I. Page 35:
Q:  "Do you accept at face value her statements that there weren't physicians available in Arizona?
A:  At the time I accepted that as her reality, and felt that the situation was difficult enough that she needed the help then – – it's like an emergency room situation – – and that I should provide it, and we'd worry about the issue of finding someone locally later on.
Q:  And did you later on, as you put it, revisit this with her about how she might be better served with someone locally.
A:  I don't know anyone locally to say that there would be someone who would better serve her.
Q:  It's not a comment on you, Dr. Rozansky, but a comment on you said that she really should be seeing somebody ideally, at least at that point in time, two to three times a week, and my question to you is after you got past what you called the emergent situation, did you then talk to her about – well maybe, it's time to try to find somebody in Phoenix or Casa Grande that you could see more often?
A:  We talked about finding a therapist that she could talk to more frequently.
Q:  What did she say in response?
A:  She didn't want to."

J. Page 37:
Q:  "You said that your treatment plan consisted of both visits and medication.
A:  That's right.
Q:  What medication?
A:  It ended up being Solexa (sic) – – Lexapro excuse me, Lexapro.
Q:  How did you settle on that?
A:  Well first she was on Effexor, which with pregnancy, is not a good idea, so it was stopped.
Q:  Did you put her on Effexor or did somebody else?
A:  I don't know, but I know that I put her on Lexapro, and how did I settle on Lexapro?  Lexapro is a good antidepressant with fairly good profile in

terms of side effects and also has a good antianxiety effect, so it provided help for both her depressive symptoms and anxiety."

K.  Page 38:

Q:  "Do you know what the FDA approved antidepressants for PTSD?

A:  Specific guidelines for that - - look, I've been in practice for over 50 years.  I have my own guidelines for treatment which are accepted and recognized.  I've run two hospitals.  I'm presently working in the Mental Health Clinic of the County of Los Angeles.  I think that my awareness of medications and my approach to medications goes past the issues of guidelines from the APA.

Q:  My question is, are you aware of the FDA approved antidepressants for PTSD?

A:  I don't think it's an issue of FDA approved.  It's the FDA okays that this medication may be used for that, but the FDA doesn't recommend treatment.

Q:  Okay, but my question is, are you aware of what the FDA recommends --

A:  They recommend many things, but the FDA is the FDA, and people can prescribe off label.  Think of prescribed medications which are used for various things.  Even the diagnoses vary, as you see with the DSM changing all the time.

Q:  I want to go back to my question about what the FDA, as you put it, recommends for PTSD.  Were you prescribing Lexapro off label?

A:  No.

Q:  Are you able to tell us what the FDA recommended drugs for PTSD are?

Mr. German:  Ask and answered.

The Witness:  No."

L.  Page 42:

Q:  "Okay, here it is.  Here it says, 'Phone call; contacted gyn and Lexapro okay, 10 mg; contacted therapist.  Will see this week;' do you see that?

A:  Yes.

Q:  Do you know who that therapist is?

A:  No.

Q:  Are you aware of whether she actually saw that therapist?

A:  No, I'm not aware of it.

Q:  Okay, would it be fair to say that if she saw a therapist you would likely no about it?

Mr. German:  Objection; form, foundation.

The Witness:  Well, I know this much about it, I said she contacted therapists and will see this week.  I know nothing more about that, so I don't know that she did or didn't.  I presume that since I didn't hear anything about it that she probably didn't.

Q:  Okay, and we're now nearly six years later from January 15, 2007, and to your knowledge, she never did see a therapist, correct?

A:  Yeah, to my knowledge, no, she never did.

Q:  And that was something you had recommended to her?

A:  Yes."

M.  Page 46:

Q:  "Did you ever tell her, you know, I'd like to see you more frequently so I can do formal psychoanalysis with you?

A:  No.  It was obvious that there was limitation of how frequently I could see her, that our visits were helping her.  She felt better with them.  She developed an ability with her children, that she could start relating to them. At first, when they were first born, she was afraid that she couldn't bond to them, and that improved.  So she was improving.  So the treatment was effective, and I felt that justified or continuing as we were doing; that if she found someone else to work with that would be fine with me too, but it was working, it was helpful."

N.  Page 50:

Q:  "So you're saying that what you do has been the elements of cognitive behavioral therapy?

A:  I think cognitive behavioral therapy has been the elements of what I do."

O.  Page 61:

Q:  "For example, she worked for the Texas Department of Corrections and was terminated, were you aware of that?

A:  Not specifically, no.

Q:  Were you aware that she sued them for wrongful termination?

A:  No.

Q:  When she came to Arizona she was in practice with an oncologist, and they ended up separating and suing each other.  Were you aware of that?

A:  Yes."

P.  Page 70:

Q:  "Has that been difficult with Dr. Ogandzhanova - - I should have said Dr. O and stopped there, but you told us a while ago that she had some, I think you said, paranoid flavors, if I remember your terminology.

A:  Yes.

Q:  Have you had difficulty getting her to come around and see her role and behaviors in her interpretation of events?

A:  She - - with me, she'll stop and look at her own behavior and that's - - she feels safe enough now, and I think for a long time - - I think she feels safe enough to step back and take a look and - -

Q:  Because you've described somebody who has blamed a lot of people, like - -

A:  Absolutely, yeah.

Q:  Like the doctors at University Medical Center?

A:  Uh huh.

Q:  Yes?  The uh huh's don't get on the court reporter's -- I need you to say yes or no.

A:  I'm sorry.  Yes.

Q:  And the doctor at Phoenix Children's, yes?

A: Yes.

Q: And the doctor at Texas Department of Corrections?

A: Yes.

Q: And her former radiation oncology department, Dr. Truitt?

A: Uh huh.

Q: Yes?

A: Yes.

Q: Has she come around with any of them to realize that maybe the fault lied with her?

A: There has not been any focus on that at recent time. That's – – those are old issues now."

Q. Page 76:

Q: "Do you know how much per month that Dr. O's disability benefit is?

A: No.

Q: If you wanted to test whether there is exaggeration, are there psychological or neuropsychological tests that could be administered?

A: I'm aware that one was administered to her, and I commented on that and said that I think it's inappropriate measurement with her because of her background; that this is a paranoid – – you know – – paranoia is part of being Russian in those years, maybe still. But Russian is being paranoid."

Q: Are you saying that all Russians are paranoid?

A: There is a level of suspicions that exists among Russian, and many people in a world. We live in a different society here. It's much more open and free, and you can say that this is paranoid. In some places, it's a reality to be paranoid, and watch out if you're not. Your survival is based on being paranoid."

Q: Does that paranoia that you see in Dr. O permeate her relationship with MetLife?

A: I'm sure it does, but it's exaggerated by MetLife, by the reexamination of her.

Q: Examination being with the psychiatrist and the psychologist?

A: Yes."

R. Page 78:

Q: "Do you feel that there are any psychological or neuropsychological tests that would have been more appropriate to administer to her?

A: No. I can't think of any, but I don't think that these were appropriate for her.

Q: Do you believe that no testing should have been administered at all?

A: I think you can do what you need to do.

Q: Do you place any reliance on the data that came from those tests?

A: Not when they didn't recognize that deficiency in them.

Q: What deficiency do you mean?

A: The fact that this is a personality test, and a charactered person that is different than the usual that they would be testing."

S. Page 83:

Q: "Did Don have a girlfriend?

A:  He had a relationship with someone else.  I don't know whether it was a girlfriend or not.

Q:  Okay, because I saw at other points in your notes that – – excuse me, I knocked my microphone off.   At other points in your notes, there's references to Don having what appears to be girlfriends and even bringing them into the house, which disgusted Dr. O.

A:  Yeah.  Certainly during manic episodes, people can be hypersexual, and that may have been the case.  I think it was.

Q:  With Don?

A:  Yeah, with Don.

Q:  And this is something that's been going on continually?

A:  Periodically, yeah."

T.  Page 91:

Q:  "Did Galena, how long had Galena been with Dr. O?

A:  I don't know.

Q:  Did Galena take care of Isaac?

A:  Yes.

Q:  Did Dr. O buy Galena her own home?

A:  Yes.

Q:  And did Galena at some point sell that home?

A:  I think so.  I'm not certain.

Q:  Okay, was that an issue for Dr. O, that she sold the home that she gave to Galena?

A:  I would think so."

U.  Page 114:

Q:  "In light of the fact that she's not getting better, why not change the treatment and either have more frequent visits or increase the dosage of the medication, or change the medication?

A:  "I think the medication was treating her adequately.  There is some question about add-on medications when someone is depressed, but I felt that she was having more than a depression, and it was this issue of Complicated Grief that came up, and that Complicated Grief is one that is long-term, and she needs supportive care, and that's what I was providing, and that I'm an expert in.

Q:  You're an expert in Complicated Grief?

A:  No, in supportive care.  As far as an expert in Complicated Grief, I think anyone that's been in practice a long time becomes knowledgeable about Complicated Grief.

Q:  You did not see any need to refer her out to somebody who held themselves as a specialist in Complicated Grief, did you?

A:  No, I did not."

V.  Page 119:

Q:  "You mentioned add-on therapy to the Lexapro.

A:  Yes.

Q:  What are you referring to?

A:  Other antidepressants on top of it.

Q:  Such as?
A:  A mood stabilizer.  There are any number of antidepressant drugs and medications.
Q:  Which ones would they be specifically?
A:  I don't know right now what I would use.
Q:  At some point did you add on Abilify?
A:  Yes.
Q:  When did you add that on?
A:  What or when?
Q:  Yes, when?
A:  I don't know.
Q:  What dosage.
A:  I don't recall.
Q:  Why did you add Abilify?
A:  As a mood stabilizer to see if it would be effective on top of the Lexapro.
Q:  Has it been?
A:  No.
Q:  Have you discontinued it?
A:  Yes.
Q:  When did you discontinue it?
A:  I don't know.
Q:  Have you placed it with another add on?
A:  No."

W. Page 165:
Q:  "Did you think she had a low-grade psychosis?
A:  Do I think?  Did I think or do I think?
Q:  Did you?
A:  No.
Q:  Do you think?
A:  I don't know what a low-grade psychosis is.  That she has - - that she has a responsiveness that would be at one end of the scale in terms of not being psychotic but being overly suspicious, certainly a difficulty with people and relating to people, and trusting people.  But, you know, it's like there's a thing called imprinting in which the way you raise an animal can determine what it thinks of itself so that you can raise a duck with a swan and it will think it's a swan and behave like a swan.  And there's theoretical evidence that imprinting also goes on in human beings, that we, at certain stages, need particularly things to happen in order to continue to develop the way other people develop, and if that gets skewed, you may develop aberrantly and become rather peculiar.  Psychotic?  Is that what psychosis just because you're different from other people?
Q:  Does Abilify treat the condition or phenomena you're talking about?
A:  Abilify would not - - the question would be if I could treat it because that's who the person is.  If you're - - you know, if you grow up thinking

you're a swan, giving some drug is not going to turn you into a duck, so
far.

Q:  But if you think you're a duck and you're not perceiving accurately,
does Abilify help correct that?

Mr. German:  Form and foundation.

The Witness:  It may quiet down the moods, the swings of things that go
on."

X.  Page 184:

Q:  "I'm looking at the second paragraph and I'm reading the last few
sentences: 'Things are black and gray, seldom white.  Look at the record.
She has no communication with any family members.  She alienated
Isaac's treating doctors, broke up with her business partner, divorced her
husband, and has a poor relationship with her significant other.'  Do you
see that?

A:  Yes.

Q:  In Dr. O's world, does she blame the others for those conflicts?

Mr. German:  Objection; form and foundation.

The Witness:  I'm sorry, what was the question?

By Mr. Bressler:

Q:  In Dr. O's world does she blame the others for those conflicts?

Mr. German:  Same objection.

The Witness:  She finds fault with everyone and herself, so it's both.

By Mr. Bressler:

Q:  "Do you believe she's made improvement in the nearly six years that
you've been treating her?

A:  Yes.

Q:  And in what regard have you seen improvement?

A:  Well, you asked that before.  I think the biggest measurement of
improvement is that - - two things come to mind immediately - -  are her
children and her relationship with her children, that she's been able to be
with them, bond with them, and enjoy them, and relate to their
specialness, so that's pretty healthy stuff."

Q:  Anything else?

A:  Yeah, just herself.  She - - she's not as overwhelmed as when I first
started seeing her.  She, although very negative in many ways, is able to
form positive relationships with people.

Q:  Such as?

A:  They are few and far between, but people who meet her, can find her
to be pleasant and charming, and it's not an intimate relationship, but she
does that."

Y.  Page 209:

A:  "And in fact, at times, she feels she communicates with him (Isaac),
that she is - - that there is certain communication which does go on
between the two of them, which I've seen in other cases of a parent to
child relationship with the death of the child.

Q:  Would you call that magical thinking?

Mr. Bressler:  Object to form, leading.

The Witness:  You can call it magical thinking.

By Mr. German:

Q:  What would you call it?

A:  It's almost like a hysterical delusional system that is done to protect her from her own feelings and fears of guilt and shame.  If she can maintain that he's still alive, that he didn't die, and if he didn't die then she didn't fail, and

Q:  Does part of what may have impacted her illness the fact that according to Inna, 95% of patients or children that suffer from this type of leukemia survive.

A:  Yes."

Z.  Page 225:

Q:  "So the first six months after Isaac died, she worked?

A:  Yeah.  She was - - but it was something unconscious, that ended up as, you know, as hyperventilating and the anxiety attacks - - you know, and she wasn't able to continue that defense.  If you think of work as - - it's among many things, but one of it is, it's a defense.  If you can go off and work you can forget about other things in your life, you can just focus there, and she would do that.  Then she wasn't able to do that, and things weren't going any better in her life until she got pregnant and had children, and

Q:  So for the first six months her form of self-defense or relief was working?

A:  Yeah.

AA.  Page 234:

Q:  "Is it your opinion, to a reasonable degree of psychiatric probability that PTSD prevents Inna from working around cancer patients?

Mr. Bressler:  Objection; lack of foundation, form.

The Witness:  Yes, no question about that.

By Mr. German:  And along the same lines, is your opinion to a reasonable degree of psychiatric probability that PTSD prevents Inna from working as a radiation oncologist?

Mr. Bressler:  Same objection; form and foundation.  Are you able to hear me when I talk?

The Court Reporter:  Yes.  I've got these in.

Mr. Bressler:  Terrific, I'm just trying not to yell.  You may answer.

The Witness:  Yell at me.  Yes, it's.  I think there's a lot of effort about nothing in this whole case, because I think she is just not able to be what she once was.  She isn't who she once was.  She's failed.  She never failed before, and she failed in a big way, and that big way, it attaches totally to the work as a radiation oncologist and the needs of patients who are seeking help with them.  She is unable to do that.  That's why I think it's - - I don't know why this thing continues on and on with her, because it's so obvious."

BB.  Page 246:

Q:  "Are there - - aside from PTSD and Depressive Disorder, you mentioned before Complicated Grief Disorder.  Is that another affliction she suffers that also contributes to making it most probably she'll never work as a radiation oncologist?

Mr. Bressler:  Objection; form.

The Witness:  They all blend into each other.  It's what - - it's Inna.  It's not these various diseases or diagnoses.  And you know, for her to - - I would want to go to her if I were - - if I had cancer and needed a radiation oncologist, even knowing her and her remarkable intellectual capacity and all of that.  I might take her in as a consultant on a case or something, but I wouldn't want her treating me.

Q:  Why is that?

A:  Because I think she's had too many places, she's in too many places at once with it.  You know, it's her child again, and it's what treatment he got, and what should the right treatment that she gives, and if the patient gets sick, is it her fault, is she failing again, and all those things are open to her, and no."

**Bound Folder Entitled "Medical Records of Gerald Rozansky, MD.  Notable are the following:**

1. Patient information sheet signed by Dr. Ogandzhanova on January 4, 2007, indicating occupation of "rad onc."
2. January 4, 2007 (?):  Page 4:  Notable are the following:
   A.  "Panic attack – never any problem with depression.  Mo passed away in March – grieving but functioning.  In October started feeling depressed.  Started having sleep problems.  Would go to office 4 a.m. and totally irregular sleeping after (illegible)."
   B.  "I couldn't help him (illegible) treat all the other people who are (illegible).  Hard to concentrate and very depressed – got pregnant.  Began feeling couldn't deal with cancer at 10:20 a.m.  Breathing, pulse and needed to run away... Anything to do with cancer I cannot deal with it.  Feel I (illegible) anxious."
   C.  "Want to stay in bed, watch TV – nothing excites me.  Don't care if lives or dies.  Not suicidal, not depressive by nature."
3. Undated:  (This appears to be a document that is out of order, with improved legibility and not a progress note).  Notable are the following:
   A.  "For her institutions were not beneficial to the individual except when it served the purpose of the institution.  The death of her child only furthered her feelings of isolation and that there is no reliability or support that will occur in life.  Whatever the insurance company purpose is, in having another evaluation, even if only a routine, she reacts defensively which will seem obstructive and probably cause a response of being more insistent that she submit.  To submit results in feeling more helpless at the hands of an oppressive institution, and then as she describes it, taken over by a (illegible)."

    B. "My therapeutic approach has been the prescription of Lexapro to reduce both depression and anxiety. To help with her suspiciousness I encourage pleasurable pursuits such as enjoying her children with her in the (illegible) and now rather than ruminating about the past. I try to separate her past from her successful life since immigration. Of course this approach is problematic, because Isaac was a great part of her pleasure and sense of freedom and success."

    C. "I hope this information is helpful in your understanding Dr. Ogandzhanova and her conflicts and behavior. I continue to have no impression of malingering or secondary gain."

4. Page 000007: "I find Dr. Ogandzhanova to be motivated and cooperative in her treatment. I do not find that she is psychotic or suffering a personality disorder. It is my impression that she has a chronic Post-Traumatic Stress Disorder with symptoms of anxiety and depression."

5. Page 000008: "To find therapists in Arizona." Diagnosis was PTSD, panic attacks, depression, and (illegible).

6. January 3, 2007: "Apathetic."

7. February 1, 2007: "Still depressed – stopped buying. No difference with medication. Cannot shut brain – constantly – nothing makes me feel less depressed – my son is gone."

8. April 13, 2007: "Still on Lexapro 20 mg. Still depressed – (illegible) panic attacks."

9. May 16, 2007: "Was supposed to go back to work on Monday. Couldn't go back. Makes her feel like facing (?) everything again... Cannot face cancer. Cannot face real issues anxiety and like before panic attack." Lexapro appears to be increased to 30 mg per day, but it is very poor copy quality.

10. May 29, 2007: "Cannot take pressure. Functioned for five years and three months after son died. Not doing well but didn't deal with anything. Worked the five years and the day he died – he developed septic shock and (illegible) - ... no reaction for five months... Panic attacks started in October 06. Depression – at the same time."

11. June 12, 2007: "(Illegible) of three months to see residuals. Cannot stand to go back into office."

12. July 27, 2007: "Everything new is a stress – found a lawyer. Feels better with less stress. Extremely sensitive – two days ago – crying – used to be (illegible) and now people treat her differently. Less able to deal with problems of everyday life – has panic attacks – but not dealing with any patients... Depression – now more vulnerable. Crying because angry they have hurt me – powerless – he got from me what he needed."

13. September 1, 2007: "Girlfriend died – autoimmune disease."

14. October 2, 2007: "Feel a lot of anger and (illegible) for Don and triggers a lot of things. He is bipolar – underneath a good person."

15. November 9, 2007: "I don't want to leave home – stress when go out... MetLife charging $3,000/month while deciding if disabled or not – abused at every turn."

16. December 3, 2007: "Discussed want to move Isaac emotionally where he was buried (illegible) and can't go there."

17. February 5, 2008:  "Eating too much – 40+ pounds… Can't live in this society. Can't deal with any frustration. Can stay (illegible) only by avoiding everyone."
18. March 8, 2008:  "Depressed and irritable… <u>Psychological testing</u>.  Tired of everything.
19. April 3, 2008: "Depressed thinking."
20. June 1, 2010:  "Came by plane.  Trouble keeping self in some balance. Everyday a new problem. Stays away from everyone. Doesn't want to socialize. I can't talk to anyone when I do.  Something (illegible) comes up and memories."…  Extensive  discussion  about  "Don"  including  numerous medications.
21. July 29, 2010: "Anxiety, feels trembling inside.  Not hyperventilating, tired all the time."
22. September 11, 2010:  "He was getting worse and worse (with Esther and Emmanuel). I chose to be with him (illegible) in hope to work out."
23. October 21, 2010:  "Don't know what to do with Don and (illegible)… Forensic psychiatrist evaluating her – Joel Parker, MD.  Only one that MetLife (illegible)… No energy to deal with anything."
24. November 10, 2010: "I can't deal with real illness.  Have to believe with what you do and help them.  Isaac had disease 95% treatable."
25. December 21, 2010: "Letter from MetLife… (Illegible).  Paranoid thoughts they are out to get her (illegible) at MetLife."
26. January 25, 2011:  "Feeling overwhelmed with everything, especially people. Don't have energy (illegible) very tired."
27. March 6, 2011: "Whenever feel mistreated by bad people hard to concentrate. Sent a check in payment then insurance was canceled.  Incredible after that to MetLife doctor – angry when saw him – so angry didn't care… Forgot @ insurance payment. Everything out of balance."
28. May 8, 2011: "Testing done. Same as three years ago. More (illegible)."
29. June 6, 2011: "Want to lay in bed and watch TV. No energy for children. Feels overwhelmed. Sleep, get up at 2, 3. My (illegible) depressed and anxiety, tired. Waking up at 2:30 – 3 a.m.  Chronic tiredness."
30. July 30, 2011:  "No communication from me personally…  Crying all day yesterday.  How horrible people are…  Tucson try to avoid…  Provocation – interrogation… Fitful sleep."
31. October 8, 2011:  "Bringing Galena back – can't take it.  Don has no money. Think will try Abilify."
32. November 19, 2011: "How unfair people are – always after (illegible)… Abilify 5 mg no effect.  Increase to 10 mg."
33. December 12, 2011: "Abilify 5 mg to increase to 10 mg.  No effect, all the same. Feels sad, irritable, angry, as little responsibility as possible… Pleasure with the other children.  Glad had them – beautiful and smart… dissociative."
34. February 20, 2012:  "<u>Bad faith</u>??  Constantly hyperventilating.  MetLife – continued with letter of February 8, 2012.  <u>Bad faith</u> - … Since Isaac feel everything more acute and have to do something."
35. April 2, 2012:  "'I don't remember things…  I remember traumatic events'…  In federal court.  Discussion of radio oncology.  Does she feel she could (illegible)."

36. April 16, 2012: "Lots of times they were giving wrong treatment (illegible)."
37. May 5, 2012: "Cannot deal with the work. People are horrible. That is why stay to self."
38. May 31, 2012: "Father cardiac arrest (illegible)… Father being flown back."
39. August 4, 2012: "Exhausted from life. Always feel in confrontation… Doesn't feel helpless today. Does get joy from children. Abilify 25 mg, Lexapro 20 mg. Memory is so bad – really bad."
40. August 24, 2012: "Everything comes back (illegible). PTSD takes a life of its own."
41. November 6, 2012: "Pleased with meeting with Dr. Shear. Felt understood. Nothing really now. A lot of time spent in Mexico. Mood seemed good (illegible) this time trying to describe what happened to her."
42. Typewritten psychiatric notes, apparently transcribed from Dr. Rozansky's earlier work. Notable are the following:
    A. April 13, 2007: "Still depressed – but a few panic attacks."
    B. September 9, 2007: A typewritten note of some pages. Notable are the following:
        1) "Becoming progressively more depressed, difficult to concentrate. She would feel short of breath, had a rapid pulse rate, and felt she needed to run away. She got pregnant."
        2) "She found herself unable to work with cancer patients, because it would always bring her to thoughts of her son."
        3) "When the panic attacks and depression progressed, she could not tolerate working or living her usual life. Escaping by traveling to faraway places hoping that she would feel better and be able to be at home in the clinic. She did not get for the hoped for results."
        4) "The mental status examination revealed a depressed woman who showed objective or subjective evidence of a thought disorder."
        5) "It is my opinion that Inna Ogandzhanova cannot function in her work as a radiation oncologist. The effort required with the type of patients she has to work with is impossible because it so parallels and intersects with the years of torment she suffered with her son's illness, which ended in his tragic death. As a person who has always worked hard and independently to achieve, she had been able to conquer every obstacle until her son's illness. The loss of sense of herself, her identity and being the mother of a child whom was she helpless in keeping from death, in spite of her efforts, has rendered her incapable of working in the field of medicine and failed to save Isaac."
43. September 2, 2011: Letter to Jamie Frederick from Metropolitan Life. Notable are the following:
    A. "Dr. Lamb suggests that the doctor is not sufficiently engaged in efforts to treat her depression, that weekly meetings would be of benefit. This raises questions: Why not daily, or hospitalization. What does once every 7days have over every 30 days? Has Dr. Lamb ever treated a patient on

a long-term basis as I have, and in the hospital setting as I have, or four times a week as I have?  I believe I have some ability to judge my capabilities with a patient even if seeing the patient once a month."  (This lies in sharp contrast to Dr. Rozansky's deposition where he reported that seeing more frequently would likely be of benefit.)

B. "What I found in Dr. Lamb's evaluation was not an independent neuropsychological evaluation of the whole person, but rather geared toward disability evaluation and how to we (sic) get this person back to work.   Perhaps being a housewife and a mother might be a better psychological adjustment."

C. "She reported having been raped three times when she was in her 20's. No further comment about the rapes was made, nor does it seem that Dr. Parker attempted to elicit any further history about the rapes or the emotional aftermath."  (On deposition, Dr. Rozansky could not recall any of the details of the rapes himself.)

D. "The video surveillance interpretation raises further questions. 'Her report that she cannot go to Tucson where is videotaped evidence of her twice going to Tucson.'  In fact, she remarked that she doesn't go to areas of Tucson that remind her of Isaac, not the whole city of Tucson."  (This is not supported in my report, which talked about her avoiding Tucson, without any additional specifics.)

E. "Playing, smiling, and even kissing the child does not mean that bonding has occurred.  Bonding involves emotions that one has and her statement earlier that she had problems bonding with the children and that she lacks emotional sense that she had with Isaac.  Gradually she has found this emotional state that has has (sic) been reported as improving."

F. "Dr. Parker's recommendations for changes in medication management I find appropriate and will discuss them with Dr. Ogandzhanova."  (There is no discussion in his records other than 'consider Abilify' of any medication changes.)

G. "Are not Drs. Lamb and Parker looking for all the ways to discredit her rather than evaluate how does Dr. Ogandzhanova's testing compared to others who have had their child die and die of a disease that they have treated and treated successfully."

H. "Regarding my therapeutic alliance with this patient resulting in limited objectivity; my PhD is in psychoanalysis and I'm an expert in transference and countertransference reactions.  In regard to experience, I've worked with PTSD and Complicated Grief since the Vietnam War and war injured children, families of cyanotic children, impaired physicians, nurses, attorneys, police officers, fire fighters, and other people.  I do frequent independent medical evaluations for a federal government agency."

44. Administration and scoring of the MMPI-2, taken from a book.

45. November 18, 2010:  Related to a letter he has received.

46. A paper on Bereavement and Complicated Grief.

47. A Psychiatric Times picture of a website with circled "Polypharmacy:  Some art some science, much alchemy."

48. Invoice for transcription of notes by Dr. Rozansky for $1,000.
49. My IME addendum dated June 2, 2011, with handwritten notes.
50. My addendum dated October 5, 2010.
51. My IME dated October 2, 2010, with handwritten notes from Dr. Rozansky.
52. Copy of Dr. Lamb's independent neuropsychological evaluation dated March 14, 2011, with handwritten notes.
53. Independent neuropsychological evaluation by Dr. Lamb dated March 3, 2008, with handwritten notes.
54. February 8, 2012:  Letter from MetLife, Jamie Frederick,  to Jason Newfield. Notable are the following:
    A.  "According to our consulting psychiatrist, I disagree with Mr. Newfield's various opinions and found the reports by Drs. Parker and Lamb to be thorough, well supported, and non-biased…[The information submitted by Mr. Newfield] does not change my previous impressions of this case… In summary, the documentation does not support that [Dr. Ogandzhanova] is impaired from working as a radiation oncologist secondary to Major Depressive Disorder, PTSD, or any other psychiatric disorder."
    B. "According to our consulting neuropsychologist [the updated] records do not alter my opinion…Mr. Newfield appears to misinterpret an elevated FB scale of the MMPI-2 in 2008 as "fake bad scale" and attaches several articles that are critical of using the scale.  The FB scale, however, refers to the F back scale, which is associated with exaggeration of problems in the second half of the test and does not mean the fake bad scale… Dr. Lamb's IME findings from March 8, 2011, are well supported.   Dr. Ogandzhanova fails multiple symptom validity measures."
    C. "After reviewing the additional information that you provided, we do not find a basis to alter the termination set forth in our July 1, 2011 letter that Dr. Ogandzhanova is not experiencing any restrictions and limitations as a result of her claimed psychiatric condition, and therefore, she is not disabled in accordance with the policy's terms and provisions."
55. Typewritten notes, of unclear authorship (Bates:  Dr. O – SDT – Rozansky – 000137 through 158).  This is written in the first person, likely by Dr. Rozansky.
56. October 11, 2010:  An email from Dr. Ogandzhanova to Dr. Rozansky, previously reviewed.
57. September 2, 2011:  Report to Jamie Frederick entitled "rough draft."
58. December 12, 2007:  Letter to Dr. Rozansky requesting a transcript copy of the progress notes.
59. A statement from Dr. Ogandzhanova, undated, discussing her report.  Notable are the following:
    A. "We had a 50% mortality rate at my cancer center of patients dieing (sic) from their disease."
    B. "I started having panic attacks while working in the cancer center.  I felt I needed to run from the cancer center.  I began to have a hard time concentrating.   I had anxiety over seeing patients, which I never experienced before.  All my symptoms got worse over time.  I started

     having a hard time doing my daily tasks. I felt anger, depression, anxiety, and panic attacks that led me away from the cancer center."

    C. "Dr. Rozansky told me I needed to get out completely, and I did. I left the cancer center in mid-March 2007. My anxiety and panic attacks went away, but I am still depressed and angry. I can't work feeling the way I do when I'm responsible for so many lives. I remain under Dr. Rozansky's care at this time."

    D. "I am presently unable to work as a radiation oncologist. My depression has taken away my ability to focus properly and to have the necessary emotional support for my patients. I am no good to patients if I do not have the ability to focus and if I cannot be supportive. In fact, I could place them at risk of further harm in my present condition. Also, whenever I return to the cancer center, I had intense anxiety, so I would be able to return to that environment."

60. Copy of a report, "When Doctors Grieve" from the New York Times dated May 25, 2012.

61. September 12, 2007: Evaluation summary from Dr. Rozansky, previously reviewed.

62. Another copy of the transcribed notes.

63. February 1, 2009: To whom it may concern letter indicating, "In response to your request for my patient's office notes, it is my opinion that I would be jeopardizing my relationship with the patient. Moreover, releasing the records intrudes in the doctor/patient relationship and interferes with treatment."

64. October 24, 2009: Letter to Dr. Kaplan from Dr. Rozansky. Notable are the following:

    A. "Dr. Ogandzhanova's overall condition has not improved. Her symptoms persist. She continues experiencing most of her symptoms on a daily basis. She has episodes of hyperventilation several times a week."

    B. "She experiences difficulties concentrating on tasks as routine as balancing her checkbook. She complains of decrease of memory. She cannot rely on anyone. There is no one who could reverse what has happened. She avoids contact with people and feels disconnected with them. She continues being constantly depressed. She has no social life. She feels despair. She stated to me: 'Nothing helps.'"

    C. "There is no evidence of secondary gain. She remained isolated. She takes care of herself with little to no support from others."

65. October 24, 2009: Letter to Dr. Kaplan, duplicate.

66. February 19, 2010: To Lisa Kaarela at Metropolitan Life, noting, "Her general condition has remained much the same as stated in my letter to Dr. Kaplan in October 2009."

67. Copy of poor quality from the "New York Times." "After a death, the pain that won't go away."

68. August 29, 2010: Letter to Jamie Frederick from Dr. Rozansky. "I hope this letter provides you with the information needed to make your decision about Dr. Ogandzhanova. In the past I have suggested you (MetLife) might contribute approaches to treatment that would be thought to be helpful by your medical

consultants so that I might at least consider them and benefit Dr.
Ogandzhanova."

69. November 10, 2010:  Letter to James Frederick at MetLife, previously reviewed.
70. Additional copies of information regarding the MMPI-2.
71. September 2, 2011:  Another copy of the report concerning the psychiatric and
    psychological IME's.
72. Copies of additional articles.

**Additional Records from Dr. Rozansky.  Notable are the following:**

1.  Transcript of handwritten documents, previously reviewed.
2.  August 29, 2012:  Handwritten note, "Everything comes back further (illegible)
    depressed, PTSD takes a life of its own.  (Illegible) no memory."
3.  February 1, 2007:   "No difference with medication.   Cannot shut brain –
    constantly."
4.  January 3, 2008:  "Feel so depressed.  Have to do something to feel better for a
    little bit.  Through with (illegible)."
5.  May 23, 2008: Progress note.  Notable are the following:
    A.  "Insurance company – notes – if they want to question disability get their
        own examiner – interferes in treatment in being able to be open."
    B.  "MetLife, they want to prove it is not (illegible) anger that don't treat her
        well.  Feel they are terrorizing her."
6.  November 18, 2009:  "Began two months ago, extreme fatigue then pain in right
    (illegible), now plantar fasciitis."
7.  December 19, 2009:  "Has high self-esteem.  Not (illegible) dependence on
    people.  It's my hope (illegible) for their faults and responsibility for them."
8.  January 29, 2009:  Progress note.  Notable are the following:
    A.  "Terribly depressed – cannot concentrate on anything.  Not suicidal.  Very
        sensitive to anything."
    B.  "(Illegible) she getting better – feels much better when left (illegible).
        Cannot deal with being oncologist."
9.  March 4, 2009:  "Feels she may die – when hyperventilating."
10. August 10, 2009:  "Bad enough, depressed, and hyperventilating, and husband
    manic.  Cannot do anything.  Now aftermath of all that has happened and now
    (illegible) illness."
11. January 25, 2010: Progress note.  Notable are the following:
    A.  "Paranoid – lives with enemies.  Anxiety – depression, doesn't leave
        house.  Thinks the bad stuff – remembered – not the good stuff.  Doesn't
        communicate with anyone."
    B.  "No interest left in anything medical.  Doesn't read anything.  Hard to
        concentrate.  Watch the news every day."
12. February 17, 2010:  "Draft a letter to Ms. Kaarela.  Her general condition has
    remained much the same as stated in my letter to Dr. Kaplan in October 2009."

**Records from Dr. Shear-Salzman. Notable are the following:**

1.  Statement from Dr. Ogandzhanova, undated, of some 18 pages, with handwritten notes.  Notable are the following:

    A. "I took classes form (sic) the highly-skilled and very expensive tutors for which my maternal Armenian grandfather both worked (illegible) for which my paternal grandfather paid.  (There is an illegible handwritten comment here.)  I did well on exams and was accepted into the medical school."

    B. "My early years, let say (sic) before five years of age, were fine.  My parents worked all the time, but I had two grandfathers and two grandmothers, and they all contributed tremendously to my successful upbringing.  They spent with me every summer for three months in the country, took me for the classes to the music school and sports classes.  I felt the love and care from all of them."

    C. "My mom was very successful civil engineer, but unfortunately for me she was extremely misbalanced emotionally, and she made me the center and victim of all her emotional abuse and outbursts.  That continued for years.  I was a 'good girl,' but there was nothing I could ever possibly do to please her or appease her.  It turned my life into Hell.  At that time there were two possibilities for me:  To become a weak person and eventually to melt way (sic) or become a strong and determined (sic) I turned into."

    D. "My second year resident was a Pakistani guy, who I could not understand at all, and neither could I understand his handwriting.  Apparently nobody could have understood either.  So, as a preemptive strike, he sacrificed me.  I did not know the American system.  So, in two weeks he complained on me and the administration immediately transferred me from the internship to an externship without giving me a chance and putting me on probation.  I have two choices:  To take it and learn as much as I could or to complain that it was illegal.  It would ruin my future because my resume would have been destroyed."

    E. "There is a female attendant (sic) physician who found the biggest problem in me – she wrote in her report that I was a patient advocate, which was a negative trait in her books."

    F. "My son, Isaac, grew up as incredible child.  He had a presence of the genious (sic) grown up who could have been the leader of our world."

    G. "Trouble started when Isaac developed neutropenic fever as a result of his chemotherapy, and the assigned Dr. Bagatel at the time started on the antibiotic coverage, which was not adequate.  I was very respectful and polite and I explained her (sic) why we should reconsider.  But as a result of her own incompetence that translated into defensiveness, she transferred Isaac unilaterally to the Phoenix Children Hospital (sic) with no WBC's with the accompanying character letter citing that we 'did not reach the therapeutic trust (sic)'"

    H. "That was our introduction to the chain of medical professionals that had lacking both souls and knowledge and contributed very negatively to my son's Isaac's ultimate outcome of his disease."

Metropolitan Life Insurance Company v. Ogandzhanova                    Page 28
February 15, 2013

I. "In Phoenix, Dr. Baranco was the chairman of the department at pediatric oncology. I am not a violent person. I believe, I am a kind human being. But for years I found emotionally rewarding (sic) to imagine the picture of Dr. Baranco and some few other doctors to be squashed by the roll (sic). It somehow gave me a feeling of satisfaction of justice to be done (sic)."

J. "He had 0 europhiles (sic). He had pseudomonas sepsis, and he was not treated adequately. Doctors avoided coming to his room, and I had to chase doctors so they would come to check on Isaac."

K. "Two weeks before Isaac's passing, the hospital administration got together and handed me the letter where it was explicitly stated that administration of the hospital would call the guards and escort me from the room of my minor child, if I 'continued to interfere' with his medical care."

L. "In continued to work full time through Isaac's illness. Very often I would work during the days and would sleep in the Isaac's (sic) room at night. I did what I had to do without complaints, without going to any psychiatrist or taking any medicines. I had only one goal – to do everything humanly possible for Isaac to survive."

M. "After my son passed away, I continued working as before. Looking back, I think I was in some kind of frozen state most the time, void of emotions. Somewhere at the end of September, beginning of October, I noticed that at times I felt like running away, running out of the cancer center. I would use some excuses and would run out of the building. I would drive around the block, would come home... I had the increasing feeling that I could not deal with cancer patients. I felt more and more overwhelmed."

N. "Another time I had an (sic) follow appointment with the lady who survived breast cancer. In her memory she was going on and on, telling me how unsatisfied she was with her postsurgical scar and postradiation changes. I remember having a strong desire to get out of my chair, to jump at her and to suffocate her. My son was dead, what she was complained about!!! (sic). I noticed though gradually getting worse. I became depressed at times. I felt difficult time concentrating. I thought about my sin (sic) all the time. I would wake up thinking about him and falling asleep feeling that he is with me."

O. "My hate toward the people who caused my son harm would grow more. In January I decided I would like to talk to a doctor. There was a shortage of psychiatrists in AZ. I asked Don to find a couple of people on internet (sic). I thought, LA would be the closest place. Also, I expected to continue working as a radiation oncologist, and I did not necessary (sic) any rumors spread that I was seeing the psychiatrist. We made an appointment with two doctors: The Russian-speaking female psychiatrist and Dr. Rozansky. First I saw the female doctor. She was okay, but all she interested was to push just medications. Then I saw Dr. Rozansky. I like his approach and I continued seeing him about once a month from there on. He started me on Lexapro, then increased dose, but it did nothing for me. Then he added Abilify. I did not notice any changes. Specifically, I did feel better."

2.  A CGTOA scale.  Notable are the following:
    A.  "You should have done something to prevent your loved one's death or
        made the death easier. "- "a little."
    B.  "There is no place that feels safe from danger." – "very strongly."
    C.  "Your life is unbearable without the patient who died." – "very strongly."
    D.  "The only thing that can help you is to have this person back.  Without him
        or her you will never be happy again." – "very strongly."
    E.  "You cannot forgive people who were irresponsible or incompetent or who
        could have done more to help your loved one." – "very strongly."
3.  Worksheets for the SAAM.
4.  Dr. Ogandzhanova notes.  Notable are the following:
    A.  "In summary, she is a person who was raised in a family where there was
        love and kindness but not a lot of emotional support and in a culture
        where she was not socially accepted by her peers.  She made a decision
        as a young person that she needed to be strong and take care of herself.
        She did exactly that – learned to be watchful of others, to rely on herself
        and seek protection where and how she could."
    B.  "She was especially close to her child and was frightened and saddened
        by his illness, ultimately feeling abandoned and mistreated by her son's
        doctors and medical team, and her own family.  During the very difficult
        period of Isaac's illness and death she tried to stay focused on her work,
        the one thing that had always gotten her through.  However, she was
        devastated by Isaac's death and for the first time in her life was
        confronted by a problem she could not solve.  She tried seeking health
        from the mental health system, and this too has failed her (sic) until she
        found Dr. R. who seemed to understand her suffering and was willing to
        listen to her and try to help."
5.  Extensive list of publications on grief by Dr. Shear.
6.  Power point presentation regarding grief and loss.

**File Entitled Defendant's/Counter-Plaintiff Expert Disclosure.   Notable are the
following:**

1.  Disclosure of expert testimony.
2.  M. Catherine Shear, MD, expert consultation in the disability case of Dr.
    Ogandzhanova dated January 11, 2013.  Notable are the following:
    A.  "Her parents divorced when she was 19 years old.  She was never close
        to her brother."
    B.  "During her son's illness none of her family was supportive.  Though both
        of her parents had moved to the United States by this time, her parents
        disappointed her, and her brother was critical and unsupportive as well.
        This essentially recapitulated the experience she had as a child in Russia
        and confirmed her belief that she could only rely upon herself.  During the
        very stressful hours of Isaac's illness and treatments, Dr. O continued to
        work long hours and perform at a high level."

C. "Dr. Rozansky treated her anxiety and depression with escitalopram 30 mg and provided successful supportive psychotherapy focused on helping her regain 'her remarkable strengths that she so effectively used in the past.' He also attempted to help her see that Isaac's death was not her personal failure. Through this work she gradually began to be able to connect with her young children, however, both he and Dr. O feel the progress was minimal."

D. "Dr. Rozansky's impression of the patient seems more accurate. He points out that Dr. O has little to gain by trying to manipulate the insurance company. While the insurance company consultant, Dr. Kaplan, seems to believe that Dr. O has an easier life since she sold her radiation oncology business, Dr. Rozansky reports that she experiences her life as empty and meaningless without her life's work. She is not someone who wishes to be a housewife or to be taken care of by someone else. Dr. O is clearly a person who has taken great satisfaction in her ability to perform and achieve in her life, since a very early age. Becoming someone who manipulates in order to get herself provided for would require a dramatic change in her sense of herself, her value system, and her basis for satisfaction. There is no evidence that this has occurred."

E. "However, Dr. O is suffering from symptoms of Complicated Grief (CG). On my clinical evaluation she endorsed symptoms of intense longing and yearning for Isaac, preoccupation with thoughts and memories of him, rumination over troubling aspects of his illness and death, occasional reveries in which she is with Isaac again that are quasi hallucinatory, avoidance of reminders of Isaac, and inability to imagine a future with purpose or meaning without him. In addition, Dr. O described panic attacks and some symptoms of depression. She further described manic symptoms for a period after his death. These led to excessive spending for items that she has little or no use for."

F. "The patient scored an 81 on the Structured Clinical Interview for Complicated Grief (SGI-CG) administered as a part of this assessment. Her current symptoms include: Frequent and intense yearning and longing for her son (she goes to sleep thinking about him and wakes up thinking about him); intense feelings of sorrow because of the death; intrusive thoughts about her son that make it difficult for her to concentrate on tasks; frequent daydreaming about her son; thoughts about how and why he died (particularly related to the inadequate care he received); difficulty accepting the idea that her son is not coming back (she often thinks about the day she will join him and feels she would not survive without the belief that one day she would see him again); emotional numbness; difficulty having positive memories and thoughts about him; anger about his death (and the care he received); guilt about not being able to protect him; worry about not being able to manage (emotionally) without him; extensive avoidance of reminders of her son (including the university where he died, the cancer center where she worked, looking at photos of him other than the ones she has out, going through his things);

intense emotional reactions as well as physical reactions (anxiety, nausea, upset stomach) when reminded of the loss; a desire to be close to him by talking with him daily, looking at four specific photos that she keeps out, looking at a picture that she drew in his bathtub chair; difficulty trusting others who have not experienced a similar loss; difficulty feeling close to family; feelings of intense loneliness; a feeling that life is empty and has no purpose or meaning except for taking care of her children; difficulty experiencing joy and satisfaction without him; difficulty planning for the future; a belief that grief is interfering a lot with her ability to function (work and socially); and that grief is her most important problem.'"(sic)

G.  "Kim further notes that, 'The patient is clear in her mind that she would very much like to be working but that the emotions that get stirred up when reminded of her loss make it impossible for her to function as a pediatric (sic) oncologist where reminders are omnipresent."

H.  "On the Structured Clinical Interview for DSM-IV, Dr. O met the criteria for past Major Depressive Episode, Single Episode (2006, following her son's death) with symptoms of depressed mood, diminished interest in activities, significant decrease in appetite, insomnia, difficulty concentrating and focusing.  She does not currently meet criteria for depression, likely as a result of Dr. Rozansky's treatment.  The patient also met criteria for a past manic episode (2007 through 2009) characterized by unrestrained buying sprees of jewelry, porcelain, glass objects, and antique furniture.  The patient spent thousands of dollars, accumulating significant debt.  Of note, there are several reports in the literature of 'funeral mania' in which a bereaved person who has never before had these symptoms develops a manic episode." (Dr. Shear does not document any of the other criteria of mania other than the unrestrained spending.)

I.  "Dr. O also meets criteria for Panic Disorder with chronic PTSD, related to her son's death, and for Generalized Anxiety Disorder, based upon excessive worries about her children, her health, finances, and the insurance suit. Co-occurring disorders, such as these, are common in the aftermath of a difficult loss and are also seen in association with Complicated Grief."

J.  "The syndrome of Complicated Grief has been recognized only recently as a serious and debilitating condition that occurs in only 7% of bereaved people overall, but a much higher proportion of parents who have lost children.  Multiple studies document the fact that the loss of a child is by far the most difficulty for most people to experience.  Studies show that, on average, parents who have lost children endorse significantly greater levels of symptomatology of anxiety and depression for 7-9 years after the death, and may have high rates of physical illness as well as more psychiatric hospitalizations.  Because of this, some have argued that Complicated Grief should not be diagnosed until much longer than the usual six months.  However, given that Isaac died in 2007, it has now

been seven years, and Dr. O has experienced persistent intense grief along that time.  Her current symptoms warrant a global severity rating of severe, higher than most the patients who enter our treatment studies."

K.  "Complicated Grief is associated with clinically significant impairment in work and social functioning and disruption in daily activities, suicidal thinking and behavior, and impairment in reality functioning.  CG symptoms manifest a chronic persistent course and show little response to several antidepressant medications.  We are currently testing the response to citalopram in an NIMH-funded randomized controlled trial. We have previously shown benefit from a targeted psychotherapy called Complicated Grief Treatment, and reported positive results of a randomized controlled trial of this treatment.  A second study is nearing completion and two studies outside of the United States have supported this general approach.  However, CGT is not yet a standard treatment and, as far as I know, there are no therapists in Arizona who provide this treatment."

L.  "It is possible that Dr. O would respond to CGT.  However, it is highly unlikely that she would ever return to work as a radiation oncologist.  Her complicated grief is severe and may or may not respond to the best treatment available.  Importantly, though, even among people who heal after a loss, many find it impossible to continue their lives as before the death.  In this case, given that her son's death occurred after failure of oncology treatment and that every case is a reminder of her son, it is highly unlikely that Dr. O would ever be able to return to being a radiation oncologist."

3.  Expert Declaration of Harvey A. Gilbert, MD, describes the daily duties of radiation oncology. Notable are the following:

A.  "After reviewing the facts in this matter, it is my opinion, to a reasonable degree of vocational and medical probability that Dr. Inna Ogandzhanova is not capable of consistently and successfully carrying out the multidisciplinary function of, and thus working as a radiation oncologist. My opinions are based on a review of the facts underlying this matter, along with decades of experience as a clinical radiation oncologist, the teaching posts I have held, research I have performed, literature I have authored, and my overall experience in the field of radiation oncology."

B.  "Prior to the initial consultation, frequently there are a series of interactions between the radiation oncologist, the referring physician (one or several) and multiple institutions who have the patient's prior records over many years.  At times this can be very challenging.  Maintaining the mental and psychological stamina to transition the patient from his (her) private encounters with surgeons, medical oncologists, radiologists, pathologists, alternative medical providers, insurance plans, psychological counselors, and a myriad of conflicting web-based informational sources to a new environment in the radiation oncology center, while appearing orderly, thoughtful, and scientifically appropriate can be a great challenge."

C. "The initial consultation can be very emotional for the patient as well as for the practitioner."

D. "The overriding role of the radiation oncologist during the initial consultation is to comfort the patient and their family and to provide positive emotional support and direction as well as integrating all the affected health care providers."

E. "A radiation oncologist suffering emotional and mental illnesses that include PTSD and Major Depressive Disorder, or who is afflicted with cognitive deficits involving concentration and memory, would not consistently have the capacity or the ability to safely, appropriately, or properly provide reliable reasonable patient care.  This consistency is paramount to providing the best results.  Radiation oncology patients require a doctor who is emotionally and mentally grounded, and able to counsel them for distress, fears, self-doubts, etc."

F. "The radiation oncologist must consistently exercise excellent judgment, and must work with the patient to assist in coming up with an appropriate treatment plan."

G. "Thus, radiation oncologists act as patient advocates as well, and for that reason, the radiation oncologist needs to stand strong and communicate soundly and clearly the patient's needs, while exercising strong interpersonal skills and other medical providers, caregivers, and family members.  This advocacy is especially true given the frequent need to justify various tests and increasing levels of therapeutic sophistication to insurance company and the government."

H. "During this prolonged process, the radiation oncologist generates a strong bond with the patient.  Radiation treatments usually last anywhere between four to eight weeks.  The radiation oncologist examines the patients at least once every week during that period to review the factors of the radiation treatment, assess the patient's ability to tolerate the treatment, to manage any side effects of the treatment and to help guide the patient through such issues as daily transportation to the center."

I. "Based on my review of the materials, I can state unequivocally that she is not capable of returning to her occupation as a practicing radiation oncologist, nor should she consistently work with oncology patients in general."

**The Defendant's Counter-Plaintiff's Expert Disclosure.  Notable are the following:**

1. Neuropsychological assessment by Susan Borgaro, PhD, dated January 22, 2013.  Notable are the following:

    A. "In conclusion, the data clearly reflect a pattern of significant cognitive inefficiency secondary to her pronounced psychiatric symptoms, Major Depressive Disorder, and PTSD.  Thus, there is no evidence to suggest that Dr. Ogandzhanova would be able to return to work of any kind, and particularly as a radiation oncologist where there is potential for significant risk, until her psychiatric symptoms have been alleviated.  Therefore,

continued psychiatric intervention is recommended.   She is currently getting counseling via her psychiatric treatment, and it is recommended that both medication management and counseling continue."

**Transcript of the deposition of Dr. Ogandzhanova dated November 28, 2012 and December 1, 2012  Notable are the following:**

A.  Page 8:
Q:  "So you were deposed in that lawsuit a couple months ago?
A:  Approximately.  I don't remember dates.  My memory is very bad after what I went through.
Q:  And you said that you were - - you've been deposed at least one other time, when was that?
A:  It was about 2004.  Dates are very difficult for me.  I suffer very poor memory because after what I went through."

B.  Page 9:
Q:  "When did you work for Dr. Truitt?
A:  In – 2000, 2001, 2002, I don't remember exact dates at all.
Q:  Did you get fired?
A:  I don't even remember details of that.
Q:  Why did you leave?
A:  I don't remember how I left.  My memory is very bad.
Q:  What became of the lawsuit?
A:  Oh, it was dismissed, and I was issued my legal fees to be paid to me by Dr. Truitt.
Q:  Did you win the lawsuit?
A:  Yes.
Q:  Where was the - - what court was the lawsuit in?
A:  You ask me details.  Hard for me to remember.  I remember it started somewhere in Phoenix, then I don't remember in which court.  What year was filed, but at some point I remember it being – in Pinal County in Florence."

C.  Page 16:
Q:  "How long has your memory been poor?
Mr. German:  Form, foundation.
The witness:  I do not know sir.  I don't know the exact date, but it was all after - - after all events happened.
Q, by Mr. Bressler:  What –
A:  After Isaac passed away, after some time passed, I cannot tell you exactly dates, times.  You're asking me things I cannot tell you.
Q:  When you say that your memory got poor after the events, are you referring to Isaac's illness and death?
A:  The most crucial event is when my son died.
Q:  The most crucial event is when your memory became poor.
A:  It's not what I said sir.
Q:  Then set me straight please.

A:  I said that my - - I don't - - cannot pinpoint you exact date.  All of this time to me, like it's such - - it was such dark times.  It all feels like gloom mass with some events that I remember well, like birth of my children that give some anchor to the times for the last several years.  When my son passed away, at some point I was functioning as usual.  I didn't realize anything was happening to me.  And I think for another couple of years or year, I didn't even think my memory was decreasing.  I didn't think about that, but every time I am - - I'm faced to recall something I recognize to my incredible fear how much my memory was affected.

Q:  By the death of your son?

A:  By - - as a result - - I don't know exactly what - - for what I went through, but I didn't realize it for some time after that.  It was very difficult to go through everything I went through.  It was 4.5 years of Isaac illness.  It was his passing.  It was what I had to deal with to deal with a very sick child, what I had to go through.  But I didn't realize it at the time.  I didn't think at that time anything about my memory at all.  And all, that all realization came much later, much later than when Isaac passed.

Q:  So what you're telling us is that your memory was probably poor sometime before Isaac passed away, but you didn't recognize it until later?

A:  All I said is that when Isaac passed away and after all these events for quite a long time, I was able to function very well.  I didn't realize that anything was happening to me.  I went - - back into business as usual.  And it was not until later -- months, months later when I started having any symptoms, and my memory was part of the symptoms."

D.  Page 21:

Q:  "Who were you suing?

A:  State of Texas for discrimination.

Q:  How did you believe they discriminated against you?

A:  It's not that I believed.  I was discriminated against.

Q:  Tell me about that.

A:  Again, I have very, very difficult time recollecting events.  What I remember that I asked - - I believe that - - again, it's my best recollection, I believe for some time off because I was having abdominal pains.  I got pregnant at that time and - -

Q:  This was with Isaac?

A:  Yes.  And then I remember one nurse said, you can - - in general conversation, what can you expect from a Russian Jew, and I remember that I believe I was fired from a job.  I don't remember how it all came around, but I was discriminated."

E.  Page 113:

A:  "I would come in early.  I always came in early even when I - - I would come early.

Q:  What's early?

A:  Depends on the day, but some days I come at 6:00.  Some days I come at 7:00, and some days I stay - - I stay very late, maybe 10:00,

maybe 8:00.  It all depends what's going on.  I have to review all the
patients.  I have to look through all the issues that I need to think through.
I look it up to see if I need to find it in the literature to do research, if I
needed to talk to someone or try to get hold of some doctors after working
hours."

F.  Page 115:

Q:  "Who took care of Isaac while you were working these long hours?
A:  I had a family member who helped me.
Q:  Who was that?
A:  Galena Khachacuran."

G.  Page 126:

Q:  "How much were you earning per year from 2004 to 2007?
A:  I don't remember the amount of money, but it was a very substantial
amount of money, over $600,000 a year.
Q:  Each year?
A:  Yeah.  Over, I loved it so much.  I was so good at radiation oncology,
and as part of my – part of me feels so horrible that I worked so many
years to become radiation oncologist, and I cannot work as a radiation
oncologist anymore.
Q:  Do you miss it?
A:  Yes I do.  But I know how I felt when I was - - at the end of the - - of the
practice.  I knew I could not continue that.
Q:  Have you ever talked to Dr. Rozansky about treatment that might help
you return to work?
A:  We tried that.
Q:  What did you try?
A:  Psychoanalysis, medications.  He tried technique when he was talking
again, again about my son Isaac saying that the way treatment works that
somehow I should start feeing better about situation, but it's never helped
me.  One thing I can tell you, that he was able at least to help me in such
a way I was able to take care of my two children.  I didn't commit suicide.
I didn't become a drunk.  I was capable to do my daily routines, and for
that I'm very appreciative of him.""
Q:  What medication or medications has he prescribed?
A:  He prescribes me Lexapro.
Q:  Anything else?
A:  And Abilify.
Q:  How long have you been taking Abilify?
A:  I don't remember.
Q:  A year or less?
A:  Maybe more, I think more.
Q:  What else besides the Lexapro and Abilify?
A:  Medication wise?
Q:  Yes.
A:  Nothing else."

H.  Page 166:

Q:  By Mr. Bressler: "Dr. O, after your son died, did you keep working?
A:  Yes I did.
Q:  Did your schedule change at all, or did you keep working full time?
A:  No.  My schedule may not have changed at all.
Q:  Did you apply for more insurance with MetLife after your son died?
A:  My agent called me, I remember, at some point, and I agreed - - I agreed to more insurance.
Q:  When did your agent call you?
A:  I don't remember.  Shortly after son passed away.
Q:  Was it coincidental that he called you?
A:  I don't remember exactly, but we were in touch with him.  We kept in touch with him.
Q:  Are you friends with the agent?
A:  I would not say friends, but we were friendly."

I.  Page 173:
Q:  "Dr. O you told us earlier that you started to experience depression and anxiety in early 2006 or thereabouts.
A:  I believe that was correct.
Q:  And you wrote somewhere in the claim file that you were having panic attacks while working in the cancer center and felt that you needed to run from the cancer center.
A:  That's true.
Q:  Did you actually leave in the middle of any patient treatment?
A:  I know that I left in the middle that was – that I was taking care of patients giving some excuses.  And I remember."

J.  Page 190:
Q:  "When did you decide you wanted to sell your practice?
A:  I don't think I made decision.  I went kind of along with that.  There were people who contacted the cancer center and my - - my condition was getting worse.  And I'm glad I did because knowing MetLife, I - - if I couldn't work in the cancer center I don't know what would have happened."

K.  Page 193:
Q:  "How did you determine what the sale price would be?
A:  I don't remember.
Q:  Did you contact anybody to say please evaluate what my practice is worth so I can make sure I get a fair price to sell it?
A:  I don't remember that.
Q:  If we wanted to know this information, we should talk to Don?
A:  I don't know.
Q:  Where is the paperwork regarding the sale?
A:  There is some paperwork, you know.  I don't remember where - - I don't remember where the copy is, but you know, I'm sure they're somewhere."

L.  Page 198:
Q:  "Do you remember how much you sold the practice for.

A: It was complicated sale. It was 8 million dollars. It included out of this, they paid several million dollars for equipment and things like that.

Q: Did you turn around and give any of that equipment money to a company that might have financed the equipment?

A: But that's out of this money, the part of what the company did. So they - - they made a deal. They paid several million dollars to this company, and they were able to get me out of the liability.

Q: How much were you able to walk away from the sale with?

A: Oh, I don't remember right now exactly.

Q: Was it nearly 8 million dollars?

A: No, no, no, no. It was much less."

M. Page 201:

Q: "That's not actually my question. What I hear you saying is I was sick and I didn't spend the money well. I didn't invest it well. But my question is: What did you walk away from the sale with? Did you at least get to keep the six million, 493 - -

A: I think that was about that, that range.

Q: Okay.

A: But that's what I told you before. I don't remember the numbers exactly.

Q: Did you get to keep the money allocated for the non-compete agreement, the $531,371?

A: No. I don't remember ever getting this. I don't know what a non-compete means."

N. Page 205:

Q: "How much did you invest in the Panama venture?

A: Over four million dollars.

Q: And was that to buy a piece of land?

A: No, it was part of the hotel. It was apartments. It was several things, and it went bad."

O. Page 211:

Q: "Is it your testimony that you did not get any of the four million dollars back?

A: I got some money back.

Q: How much?

A: I don't remember how much?

Q: Over a million?

A: No, no, no, no, no. Maybe $500,000 out of everything. But - - you know altogether I got about $400,000."

P. Page 225:

Q: "Does that help refresh your memory or confirm for you when you sold your practice?

A: That's what I said, it sounds like around this time. The question was when I, when I last time worked. That's when I worked, March 12th.

Q: Basically you worked right up to the time you sold your practice, correct?

A: Yes I did.

Q: When you sold your practice, did you consider yourself temporarily or permanently unable to return to radiation oncology?

Mr. German: Form, foundation.

The witness: When I sold my practice, immediately I gave birth to my daughter.

By Mr. Bressler: What was the date of your daughter's birth?

A: March 17th."

Q. Page 227:

Q: "How much time were you planning to take off for the birth of your daughter?

A: I don't remember exact specific times that I thought at that time.

Q: If I understand what you're saying, though, is that after the birth of your daughter, when it came time for you to think about going back to radiation oncology, you started experiencing these anxiety symptoms. Is that correct?

A: Not necessarily. I - - I think very shortly after my daughter was born and every time I would think that, you know, I have to go back to work as a radiation oncologist, I recall this severe anxiety, what I going to do, and that's why I continued to see Dr. Rozansky trying to resolve that fear of what I needed to do, what I should do, what's going to happen to me and to my profession, to my occupation. That's what I remember.

Q: Were you - - when you sold your practice did you have plans to return to radiation oncology after that?

A: Yes I had.

Q: What were your plans when you sold the practice?

A: To return to radiation oncology.

Q: Where?

A: I know I had some still service agreement with these people. I don't remember the detail of that. I know that at the same time, there were multiple offers to work. I was always getting that. I know I could find full time, but temporary work, if I wanted. I cannot recall exact, you know, pinpoint exact time and exact thoughts, but that's what I recall was going on."

R. Page 230:

Q: "When you submitted your claim to MetLife and very shortly thereafter, you hired Mr. Newfield and you mentioned that a couple of moments ago. Correct:

A: Yes, that's true. I hired him at some point.

Q: Now, you hired before anything had been provided to MetLife in terms of claim forms. True?

A: I don't recall that. I don't recall who provided the claim forms. I just don't remember who provide - - it might have been the agent send me the claim forms. It might be Dr. - - Mr. Newfield filled out the claim forms. I cannot recall what specifics.

Q: Why did you hire Mr. Newfield?

A: Because I don't think I was well to handle on my own. I needed help.
Q: Any other reason?
A: I thought I was not well.
Q: How did you find Mr. Newfield?
A: To the best of my recollection, I think it was Don Bates who found him on internet."

S. Page 231:
Q: "Why did you go with the lawyer from New York rather than a lawyer here in Arizona?
A: I cannot answer this question. All I can tell you is that he - - Don was searching for a disability lawyer and that's what came up on the search engine. That's what he told me. And I didn't know how to use internet. I didn't know how to look for a lawyer for a specific disability, and I went with that."

T. Page 241:
Q: "What records do you think he (Dr. Parker) could go to (to look up details of Isaac's illness and her response to it)?
A: Hospital records. That's all – it all exists in the public records. Isaac was treated for years in the Arizona hospitals.  He didn't need to interrogate me to elicit my feelings.
Q: You feel that he should have looked at the records of the treatment of Isaac, correct?
Mr. German: Form, foundation.
The witness: What I thought that it was - - it was - - there was no reason for him, a psychiatrist, who knows from my records what I experienced, what I felt and what conditions I was, to try to push me over the cliff."

U. Page 242:
Q: "What was his (Dr. Parker) tone of voice when he talked to you?
A: I do not remember specifically his tone of voice. As I remember, the questions, after the questions, beating me up, and putting me to the place from which I tried to escape, my goals was not to be disabled - - my - - my goal was to feel better. My goal is to function as good as I can. And, and my goal was to resist being in that place where nothing – I cannot see anything except having this repetitious – like what is the name of the movie Hog Day. Help me with this. It was American movie."

V. Page 243:
Q: "What was his demeanor as he spoke to you?
A: Demeanor. What do you mean 'demeanor?'
Q: Was he cold an impersonal? Was he harsh, or did he just ask you a lot of questions and cause you to relive the experience?
A: He was, to my best recollection, cold and impersonal and keep asking me with no heart these questions, one after another."

W. Page 247:
Q: "Why did you sell your practice? Why did you sell your practice?
A: Why?
Q: Yes.

Metropolitan Life Insurance Company v. Ogandzhanova                    Page 41
February 15, 2013

A:  My symptoms was getting worse.  I had no initially any plans to leave
the practice, so if I was not doing well and somebody take responsibility of
operations or had - - maybe it would have been an easy life for me to just
concentrate to be radiation oncologist.  I went eventually along with that.
Because remember, my symptoms was getting worse, and it was a
reasonable decision that I made to go along with that."

X.  Page 252:
Q:  "The answer is no, you never contacted his (Dr. Parker's) office again?
A:  No, personally I did not contact.  I contacted my psychiatrist, and I
know that I talked to my attorney.
Mr. German:  Don't talk about anything with your attorney.
The witness:  Yes, then I contacted my doctor.
By Mr. Bressler:
Q:  Did anyone on your behalf get back to Dr. Parker and say, 'I'm not
coming back to do this exam?
Mr. German:  Foundation.
The witness:  I don't know."

Y.  Page 268:
Q:  "Dr. Rozansky's letters and records indicate that you have anger
against the doctors who treated your son.  Is that correct?
A:  I do."

Z.  Page 269:
Q:  "Dr. Rozansky's notes indicate that you have some anger toward the
post office.  What was that about?
A:  I went again through tremendous, tremendous trauma.  I went through
tremendous effect.  The way I responded to the outside situation is very
different to the way I responded to my usual state when I was not going
through what I'm going through now, and it has changed me, as I told
you."

AA.  Page 269:
Q:  "What's the situation with the post office?
A:  To the best of my recollection, what I remember, that was some –
there was some partial that came, and it was – the content was broken
and there was insurance, and they told me that somehow – it's my best
recollection of that event, maybe it's not that event.  It's hard to remember,
but this is what comes to mind.  And this woman in the post office claimed
that someone used the wrong box or somebody used the wrong bag – box
to package it.  I don't remember details.  And that made me angry
because it was not fair yet."

BB.  Page 270:
Q:  "Did the postmaster call you and tell you that you are going to have to
behave or you would no longer be able to use their post office?
A:  I don't remember that.  I remember talking to post office master, but I
don't remember if he called me or what the conversation was.  I do not
have recall right now."

**Additional documents:**

1. Email by Dr. Ogandzhanova sent to Dr. Rozansky on October 11, 2010, at 6:35 a.m. (three weeks after my interview with her).
2. Article from the Journal of Clinical Psychiatry, August 2010, for Bereavement, Complicated Grief, and DSM Part II, by Sidney Zisook, et al. This is a very poor quality reproduction.
3. Reprint from the Journal of the American Medical Association, June 1, 2005: Treatment of Complicated Grief, by Shear et al. The response rate in the treatment arm was 51%.
4. October 31, 2011: Letter from Jason Newfield.

The opinions in this report are based on my review of these new materials and previous work in this matter.

**UPDATED OPINION:**

1. Dr. Shear has opined that "It is possible that Dr. O. would respond to CGT. However, it is highly unlikely that she would ever return to work as a radiation oncologist. Her complicated grief is severe and may or may not respond to the best treatments available." In the 2005 randomized controlled trial published in JAMA by Dr. Shear and others, 51% of patients in the complicated grief treatment arm of the study responded to the treatment. Therefore, Dr. Ogandzhanova has a better than even chance of responding to complicated grief treatment.

2. In her report, Dr. Shear does not specifically address the invalid neuropsychological data and does not appear to have reviewed the video surveillance, so the database upon which she bases her opinion is different than mine.

3. Dr. Shear does not provide a specific rationale for her opinion that Dr. Ogandzhanova would be unable to work as a radiation oncologist, except, "Even among people who heal after a loss, many find it impossible to continue their lives as before the death. In this case, given that her son's death occurred after a failure of oncology treatment, and that every case is a reminder of her son, it is highly unlikely that Dr. O would ever be able to return to being a radiation oncologist." This is a valid concern, but does not address the numerous deaths to which Dr. Ogandzhanova has been exposed during her career as a radiation oncologist. According to Dr. Ogandzhanova's undated statement, "We had a 50% mortality rate at my cancer center of patients dieing (sic) from their disease." Dr. Ogandzhanova, therefore, has had a substantially greater exposure to death than the average person, or even the average doctor. Her substantial familiarity with death, in her role as a radiation oncologist, should assist her in coping with the death of her son. Unless Dr. Ogandzhanova regularly treats pediatric leukemia patients, it is not likely that "every case" would be a reminder of her

Metropolitan Life Insurance Company v. Ogandzhanova                 Page 43
February 15, 2013

son. While the loss of her son is by no means equivalent to the loss of her many patients, her familiarity with death may make it easier to cope with this loss compared to the average person. Additionally, her skills as a radiation oncologist may provide her with a healing environment to prevent the deaths of other patients.

4. There is no hard evidence that Dr. Ogandzhanova has impaired cognition such that she cannot return to work as a radiation oncologist. Notably,

    a. Dr. Rozansky's records do not substantially document cognition.   On deposition, Dr. Rozansky answered the following:

        Q:  "When you did the mental status examination, did you test her for cognition?
        A:  I test for cognition the whole time I see someone.
        Q:  What was her cognition on January 4, 2007?
        A:  It was adequate.
        Q:  What about her memory?
        A:  It's adequate."

        Therefore, her treating psychiatrist did not document any difficulties with her cognition.

    b. In her January 11, 2013 report, Dr. Shear does not document Dr. Ogandzhanova's mental status examination, nor is there any apparent documentation of cognition.

    c. In his October 26, 2012 deposition, Dr. Boone opined that her performance (from Dr. Lamb's 2008 data) was "indicative of a suboptimal level of effort" and that the data were invalid.

5. Although Dr. Ogandzhanova reports that she does not want to return to working with cancer patients, the available data do not provide convincing support that she suffers from psychiatric symptoms that would cause her to be unable to work as a radiation oncologist.

Please contact me for additional questions.

Sincerely Yours,

Joel E. Parker, M.D.
JEP/dka

# CURRICULUM VITAE

## JOEL E. PARKER, MD, FAPA

**BUSINESS ADDRESS:**   BILTMORE PSYCHIATRIC GROUP, PLLC
6245 N 24th STREET, SUITE 203
PHOENIX, AZ 85016
PHONE: 602-843-0035   FAX:   602-843-8963
E-Mail:   joelparker@cox.net

**PERSONAL:**
Year/Place of Birth   1959 / New Mexico
Marital Status:   Married, two children

## EDUCATION:

1991:   Psychiatry Residency,
University of Colorado, Denver, CO

1988:   Internal Medicine Internship,
Mt. Zion Hospital, San Francisco, CA

1987:   M.D. Degree,
Case Western Reserve University, Cleveland, OH

1982:   B.S. Degree,
Stanford University, Stanford, CA

## BOARD STATUS:

1993: American Board of Psychiatry and Neurology, lifetime board certification in Psychiatry
1999: American Board of Psychiatry and Neurology, additional qualification Forensic Psychiatry
2003: American Board of Independent Medical Examiners
2008: American Board of Independent Medical Examiners, recertified
2009: American Board of Psychiatry and Neurology, recertified, Forensic Psychiatry

**LICENSURE:**   Arizona   1992
Colorado   1989 (inactive)

## EXPERIENCE:

2007-2008:   Secretary, Arizona Psychiatry Society

2006-2007:   Treasurer, Arizona Psychiatric Society

10/2004 – Present:   Biltmore Psychiatric Group, PLLC, Outpatient Psychiatric Services

CV: JOEL E. PARKER, M.D.                                                                    PAGE 2

| | |
|---|---|
| 1992 – 2004: | Arizona Community Psychiatric Groups, Ltd.<br>Outpatient Psychiatric Services – Adolescent and Adult |
| 2000 – 2001: | Governor's Developmental Disabilities Advisory Council |
| 2000 – 2003: | Wyeth-Ayerst Pharmaceuticals Speakers Bureau |
| 1999 – 2000: | Aetna U.S. Healthcare Quality Advisory Committee |
| 1998 – 1999: | Managing Partner Arizona Community Psychiatric Groups, Ltd |
| 1998: | Pfizer Pharmaceuticals Speakers Bureau |
| 1996 – 1997: | Human Affairs International Quality Advisory Committee |
| 1995 – 1996: | Medical Director, Charter Hospital of the East Valley, Mesa, AZ |
| 1991 – 1992: | Comprehensive Psychiatry Services, Walnut Creek, CA<br>East Bay Hospital, Richmond, CA |

**FORENSIC PSYCHIATRY CLIENT LIST:**

United States Department of State
Federal Public Defender
Arizona Attorney General
Superior Court of Arizona
Maricopa County Attorney
Maricopa County Public Defender
Maricopa County Legal Defender
Maricopa County Office of the Legal Advocate
Arizona Child Protective Services
Arizona Division of Developmental Disabilities
Arizona Board of Behavioral Health Examiners
Unum Provident
Northwestern Mutual Life
Berkshire Life Insurance Company
NMR Elite Physicians
MLS National Medical Evaluation Services, Inc.
Best Doctors Disability Management Network
Comprehensive Health Services, Inc.
Genex Exam Services
Associates in Rehabilitation Management, Inc.
MES Solutions
Industrial Commission of Arizona
Columbia Medical Consultants, Inc.
Basec Medical Consult Services, Inc.
Medical Assurance Group
Jones, Skelton, & Hochuli, PLC
Moeller Law Office

**CV:  JOEL E. PARKER, M.D.**                                                    **PAGE** 3

Law Office of Larry Langley
Law Office of Greg Clark
Quindry and Koniuszy, LLP
Law Office of Carol Coghlan Carter

# FORENSIC PSYCHIATRY EXAMINATION TYPES:

Competence to Stand Trial
State of Mind at Time of Offense
Guilty Except Insane
Parental Capacity
Competence to Proceed as Counsel
Criminal Mitigation
Death Penalty Mitigation
Diagnostic Clarification
Psychiatric Damages
Workers' Compensation
"Mental – Mental" Injury

**MEMBERSHIPS:**      American Psychiatric Association
American Academy of Psychiatry and the Law
Arizona Psychiatric Society

## PRESENTATIONS:

11/30/07: Performing Guilty Except Insane Examinations, Judicial College of Arizona,

9/8/09:  Post Traumatic Stress Disorder, presentation to the Arizona Worker's Compensation Claims Association.

10/25-26/10:  Arizona Supreme Court Legal Competency and Restoration Training for Mental Health Experts, "Table Top Discussion" participant and presentation of "Performing Guilty Except Examinations," with Patti Starr, Esq.

2/22-24/12: Arizona Supreme Court Legal Competency and Restoration Training for Mental Health Experts, "Competency Work Groups" participant, presentation of "Performing Guilty Except Examinations," with Hon. Patti Starr, and Mock Trial participant.

9/19/12:  "The Challenges of the Psychiatric IME," presented to the Arizona Attorney General's office in a panel on "The Physician as Expert Witness: Providing Ethical and Effective Expert Witness Testimony" with Raymond Schumacher, MD, Anthony Theiler, MD, and Steven Pike, MD.

1/10/13:  "Bipolar Disorder: What it is, what it isn't," presented to Maricopa County Superior Court Judges' "Lunch and Learn.

# Testimony Log for Joel E. Parker, M.D.

February 12, 2013

| Date | Case Name | Judge | Court | Called By | Side | Issue |
|---|---|---|---|---|---|---|
| 2/10/2009 | Christina Hanan | Nye | Ind. Commission | Terrence Kurth | Defense | Sexual Harassment |
| 2/12/2009 | Issa Marji | Haley | Ind. Commission | Bill Enriquez | Defense | Psychiatric Causality |
| 2/13/2009 | Theresa McStoots | Udall | Superior Court | Ron Siegel | Atty General | Parental Capacity |
| 2/24/2009 | Steven Polito | Israel | Ind. Commission | Terrence Kurth | Defense | Medically Stationary |
| 2/26/2009 | Janice Territ | Halas | Ind. Commission | Denise Siegenthaler | Defense | Mental-Mental Condition |
| 3/2/2009 | Alfred Townsend | Bergin | Superior Court | Kim Thiss | Atty General | Antisocial Personality Disorder |
| 5/27/2009 | Grant Poth | | Deposition | | Fact | Psychiatric damages |
| 6/4/2009 | James Garbani | Israel | Ind. Commission | Bill Enriquez | Defense | Causality |
| 7/13/2009 | Timothy Day | Holding | Superior Court | Todd Baker | Prosecutor | Competence to stand trial |
| 7/27/2009 | Holly Haines | Barth | Superior Court | Larry Ruhl | GAL | Guardianship for Divorce |
| 8/26/2009 | Nadine Wiese | Haley | Ind. Commission | Eric Slavin | Defense | Depression Causality |
| 8/28/2009 | Robin Propst | Hintze | Superior Court | Frances Robinson | Defense | Competence to stand trial |
| 10/9/2009 | Jayne Cox | Brodman | Superior Court | Jeff Myer | Atty General | Parental Capacity |
| 10/22/2009 | Eugenio Ortiz | Israel | Ind. Commission | Terrence Kurth | Defense | Impairment |
| 10/23/2009 | Donald Mitchell | Hintze | Superior Court | Catherine Fuller | Prosecutor | Competence to stand trial |
| 11/19/2009 | Geneva Stevenson | Mosesso | Ind. Commission | Geneva Stevenson | Plaintiff | Diagnosis, Causality |
| 11/19/2009 | Bill Waltrip | Ireson | Ind. Commission | Maria Morlacci | Defense | New Condition r/t injury |
| 12/8/2009 | Diane Amborski | Israel | Ind. Commission | Stephen Baker | Defense | Return to Work |
| 1/27/2010 | Mercedes Barrera | Hansen | Ind. Commission | Pardee | Defense | Psychiatric Causality |
| 2/2/2010 | Penny Schleppegrell | Haley | Ind. Commission | Bill Enriquez | Defense | New Condition r/t injury |
| 2/3/2010 | Janice Baker | Stoffa | Ind. Commission | Suzanne Scheiner N | Defense | Medication Usage |
| 3/29/2010 | Michael Ultsch | Ireson | Ind. Commission | Bill Enriquez | Defense | Substance Abuse |
| 4/14/2010 | Steve Kubasak | Long | Ind. Commission | Darryl Engle | Plaintiff | Work Restrictions |
| 5/13/2010 | Jack Amari | Deposition | | Andrew Cross | Plaintiff | Depression Causality |
| 5/19/2010 | Glenn Bowling | Israel | Ind. Commission | Terrence Kurth | Defense | Supportive Care |
| 7/1/2010 | Maria Reap | Smith | Superior Court | Susan Frank | Atty General | Parental Capacity |
| 7/13/2010 | Pamela Post | Israel | Ind. Commission | Denise Siegenthaler | Defense | Depression Causality |
| 8/26/2010 | Richard Verdico | Powell | Ind. Commission | Charles Rehling | Defense | Depression Causality |
| 9/30/2010 | Nancy Ritchie | | Ind. Commission | | | |
| 10/12/2010 | Krystyanna Zimmerman | Ruechel | Superior Court | Jackie Kozlik | Atty General | Parental Capacity |
| 10/27/2010 | Grazynia Osipowicz | Israel | Ind. Commission | | Defense | Medically Stationary |
| 11/10/2010 | Alma Pacheco | Coury | Superior Court | Tyne Naven | Atty General | Termination of Parental rights |
| 12/1/2010 | Michael Michalak | Nye | Ind. Commission | Maria Morlacci | Defense | Psychiatric Causality |
| 12/22/2010 | Linda Hinske | | Deposition | Pat McNamara | Plaintiff | Psychiatric Causality |

| Date | Name | | Court | | | Topic |
|---|---|---|---|---|---|---|
| 2/7/2011 | Linda Hinske | Israel | Ind. Commission | Jo Fox Zingg | Defense | Permanency |
| 5/11/2011 | Carl Rediger | Powell | Ind. Commission | Sharon Hensley | Defense | Spinal cord stimulator |
| 5/23/2011 | Gloria Sanchez | Taylor | Ind. Commission | Scott Houston | Defense | Psychiatric DX |
| 6/3/2011 | Susan Peterson | Ireson | Ind. Commission | Maria Morlacci | Defense | Impairment |
| 6/8-9/2011 | Joanne Finnegan | Gordon | Superior Court | Greg Meell | Petitioner | Substance Abuse |
| 7/7/2011 | Arturo Zilleruelo | | Deposition | Paul Paterson | Defense | Treatment Needs |
| 7/13/2011 | Earl Jordan | Nye | Ind. Commission | Rachel Morgan | Defense | Apportionment, psychoneurotic disability |
| 7/15/2011 | Darnell Muhammad | Steinle | Superior Court | Bruce MacArthur | Atty General | Parental Capacity |
| 8/18/2011 | Guadalupe Trahin | Israel | Ind. Commission | Scott Houston | Defense | Supportive Care needs |
| 9/7/2011 | Piotr Klusek | Fraser | Ind. Commission | Brandyn Stewart | Defense | Supportive Care needs |
| 9/8/2011 | Joanne Finnegan | Gordon | Superior Court | Greg Meell | Petitioner | Substance Abuse |
| 11/3/2011 | Jorge Barrera | Haley | Ind. Commission | Terrence Kurth | Defense | Medically Stationary |
| 11/8/2011 | Ryan Ellsworth | Lamb | Sup Ct (Navajo Cty) | Creighton Cornell | Defense (Crimina | OCD |
| 11/23/2011 | Johnny Flores | Eaton | Ind. Commission | Charles Ferris | Defense | Symptom exaggeration |
| 12/7/2011 | James Schank | Powell | Ind. Commission | Deborah Mittelman | Defense | Supportive Care needs |
| 12/13/2011 | Hugo Reyes | Deposition | | James Marner | Defense | PTSD Treatment |
| 3/14/2012 | Brent Spooner | Haley | Ind. Commission | Veronique Pardee | Defense | New Condition r/t injury |
| 3/21/2012 | Mariquita Stubbs | Haley | Ind. Commission | Eric Slavin | Defense | Supportive Care needs |
| 4/4/2012 | William Marsh | Retzer | Ind. Commission | Deborah Mittelman | Defense | "Incapacitated Person" |
| 5/23/2012 | Ronald Coleman | Haley | Ind. Commission | Veronique Pardee | Defense | Psychiatric Causality |
| 6/13/2012 | Sergio Sanchez | McMurdie | Superior Court | Shawn Fuller | Prosecutor | Competency to plea |
| 6/27/2012 | Mary Salinas | Israel | Ind. Commission | Frank Frey | Defense | Causation, DX, Treatment needs |
| 7/18/2012 | Joseph Messecar | Gaffaney | Ind. Commission | Stephen Venezia | Defense | Medically Stationary |
| 7/25/2012 | Michael Ulinger | Eaton | Ind. Commission | Deborah Mittelman | Defense | Supportive Care needs |
| 8/22/2012 | Jason Callewaert | Astrowsky | Juvenile Court | Carol Coghlan Carte | Defense | Parental Capacity |
| 8/29/2012 | Norma Brown | Israel | Ind. Commission | Steve Dix | Plaintiff | Need for Active Treatment |
| 9/5/2012 | Mariquita Stubbs | Haley | Ind. Commission | Eric Slavin | Defense | Work Restrictions |
| 9/11/2012 | Kevin Spence | Retzer | Ind. Commission | Todd Lundmark | Defense | Supportive Care needs |
| 9/26/2012 | Tina Stoltenberg | Ireson | Ind. Commission | Frank Frey | Defense | Malingered PTSD |
| 10/1/2012 | Tiffany Levens | McNally | Superior Court | Debbie Oelze | Atty General | Parental Capacity |
| 10/24/2012 | Chandra Brown | McNally | Superior Court | Debbie Oelze | Atty General | Termination of Parental rights |
| 10/31/2012 | Manuel Espinoza | Haley | Ind. Commission | Steve Dix | Plaintiff | Supportive Care needs |
| 11/8/2012 | Amber Hamilton/Juan Zacari | Anderson | Superior Court | Sean Campbell | Atty General | Termination of Parental rights |
| 12/5/2012 | Maria Murrieta | Haley | Ind. Commission | Joseph Lodge | Defense | Depression Causality |
| 12/10/2012 | Andre Leteve | O'Connor | Superior Court | Kirsten Valenzuela | Prosecutor | Capital Mitigation Rebuttal |

**Ex. 14**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Metropolitan Life Insurance Company, a
New York corporation,

          Plaintiff/Counter-Defendant,

vs.

Inna Ogandzhanova, M.D.,

          Defendant/Counter-Claimant.

No. 2:12-cv-372-GMS

**DECLARATION OF
JOEL E. PARKER, M.D.**

I, Joel E. Parker, M.D., state as follows:

1.     The reports identified below are true and accurate copies of reports I drafted based on my examination of Dr. Ogandzhanova and review of medical records and other materials outlined in my reports:

    (a)     Independent Medical Examination dated October 2, 2010 (Bates Nos. MLOCL002000-MLOCL002025; Dkt. # 281-1, Ex. 1, 5-30);

    (b)     Updated Opinion dated October 5, 2010 (Bates Nos. MLOCL001975-MLOCL001977) which I understand has been identified as Exhibit 12 to MetLife's Controverting Statement of Facts re Defendant/Counter-Plaintiff's Motion for Summary Judgment on MetLife's Complaint for Declaratory Relief;

    (c)     Updated Opinion dated June 2, 2011 (Bates Nos. MLOCL001820-MLOCL001828; Dkt. #281-2, Ex. 30, Ex. E, 59-67); and

1          (d)     Updated Opinion dated February 15, 2013, which I understand has

2   been identified as Exhibit 13 to MetLife's Controverting Statement of Facts re

3   Defendant/Counter-Plaintiff's Motion for Summary Judgment on MetLife's Complaint

4   for Declaratory Relief.

5

6       2.    The foregoing reports are true and accurate statements of my opinions.

7   I declare under penalty of perjury that the foregoing is true and correct.

8   Executed on this ___6th___ day of March, 2014.

9

10  JOEL E PARKER, M.D.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

**Ex. 15**

**Medical Consultant Transcription:**

| | |
|---|---|
| Claimant: | Inna Ogandzhanova |
| Claim No.: | 120706054945 |
| Date: | 04/17/08 |
| Examiner: | Lisa Kaarela, T024 |

The entire file is reviewed. It is reported that her son died of leukemia in March 2006. She reports she is unable to return to work because of depression, anxiety, and panic attacks. It is reported she sold her practice in March 2007.

Dr. Ogandzhanova was seen for neuropsychological IME by Dr. Lamb on 02-13-08 and 02-19-08. She reports depression, PTSD, and panic attacks that started approximately six months after he son's death in March 2006. She also complains of poor concentration and memory. She passes several cognitive symptom validity measures (TOMM, Dot Counting, **Fb**-test) but behavioral inconsistencies are reported that raise suspicion of suboptimal effort. For example on the Finger Tapping Test her tapping speed was much slower than her speed when she was practicing just prior to starting. On the actual cognitive testing, significant performance problems are indicated on measures of manual dexterity, attention, executive sequencing skills, verbal memory, and verbal fluency.

The psychological test results are invalid (on the MMPI-2). She endorses a tremendous number of unlikely and pathological problems (F scale: T = 99; Fb scale: T = 89). Dr. Lamb reports "there is convincing evidence that Dr. Ogandzhanova was exaggerating her psychological symptoms while taking the MMPI-2." Although the MMPI-2 is invalid, Dr. Lamb felt the overall data indicated PTSD (chronic, delayed onset) and Major Depressive Disorder (single episode, moderate). I disagree with Dr. Lamb's conclusion – "It also seems reasonable to expect some type of impairment in her ability to work in her chosen profession as a radiation oncologist, given the fact that her son died of cancer." Dr. Lamb notes that she has explored dong business in hair removal and skin treatments. He notes she is not actively seeking aggressive treatment for her depression and that she should be capable of returning to work in some capacity that utilizes her medical degree.

Overall, the IME validly indicates (albeit weakly) significant cognitive impairment that Dr. Lamb attributes to PTSD and Major Depressive Disorder. His diagnostic impressions appear based largely on self-report data as the MMPI-2 is invalid. Given the behavioral data suggestive of poor effort and the invalid MMPI-2, I suggest consideration of re-testing in the future.

James R. Boone, PhD, – 04-17-08
Diplomate in Clinical Neuropsychology
American Board of Professional Psychology
Dictated but not proofread
JB:spc
05-00944301

MLOCL001309

**Ex. 16**

**Medical Consultant Transcription:**

Claimant:     Inna Ogandzhanova

Claim No.:     120706054945

Date:     01-19-12

Examiner:     Jamie Frederick, T068

The updated records are reviewed.  These records do not alter my opinion from 06-23-11 and 04-21-11.  Mr. Newfield appears to misinterpret an elevated Fb scale on the MMPI-2 in 2008 as 'Fake Bad Scale' and attaches several articles that are critical of using the scale.  The Fb scale, however, refers to the 'F-back Scale' which is associated with exaggeration of problems on the second half of the test and does not mean the Fake Bad Scale.  Please note that Dr. Lamb's IME findings from 03-08-11 are well-supported.  Dr. Ogandzhanova fails multiple symptom validity measures.  The personality testing (with the Personality Assessment Inventory) also indicated exaggeration of problems.

James R. Boone, PhD, – 01-19-12
Diplomate in Clinical Neuropsychology
American Board of Professional Psychology
Dictated but not proofread
JB:spc
13-00514184

MLOCL002173

# Ex. 17

*Neuropsychology Report / James R. Boone, Ph.D., ABPP(CN)*

Name: Ogandzhanova, M.D., Inna
Claim No: 120706054945
Primary Diagnosis: PTSD, Depression
Occupation: Radiation Oncologist

In addition to the opinions previously expressed, the following opinion is based on additional records including a neuropsychology review performed by Susan Borgaro, Ph.D. (ABPP) on 1-22-13. Dr. Borgaro's review was referred by Mr. Steve German, Esquire. It is noted that Dr. Borgaro is board-certified in rehabilitation psychology and not clinical neuropsychology.

The first half of Dr. Borgaro's file review is a summary of Dr. David Lamb's findings from his two neuropsychological evaluations that were performed on 2-13-08/2-19-08 and on 3-2-11/3-8-11. Dr. Borgaro opines that the unusual behaviors observed by Dr. Lamb in his first evaluation were not unusual "when considered in an individual with significant depression and psychiatric distress." Dr. Borgaro states that inconsistencies in behavior and test results are common in individuals with significant depression. This reviewer disagrees with Dr. Borgaro's statements as the behavioral inconsistencies observed by Dr. Lamb (e.g., slower finger tapping performance on the actual test as compared with the practice trial) also can be characteristic of dissimulating respondents and are actually part of the recommended Slick et al criteria (1999) and more recent modifications (Boone, 2007; Larabee, 2007) for identifying malingering. Dr. Borgaro incorrectly views inconsistencies as indicative only of psychological problems and not also potentially indicative of malingering.

Dr. Borgaro makes the repeated assertion that depressed persons often perform poorly on neuropsychological testing but omits the fact that depressed persons, pain patients, and even persons with mild dementia easily pass performance validity measures. Dr. Ogandzhanova's failure on numerous performance validity indicators in Dr. Lamb's second evaluation is highly significant and is not typical of patients with PTSD, depression, or other psychological disorders. Of note, the confidence that a respondent is malingering is significantly increased when multiple failed performance validity indicators are present, in conjunction with behavioral inconsistencies, as is the case with Dr. Ogandzhanova. Larrabee (2007) demonstrated that when three or more performance validity measures are failed (in Dr. Lamb's 2011 evaluation she fails Dot Counting, Reliable Digit Span, Combined Finger Tapping, and exhibits a non-neurological pattern of motor performance), the probability of malingering approximates 98%. It is not plausible that Dr. Ogandzhanova cognitively performs worse than patients with moderate and severe traumatic brain injury - particularly when considering that she drives and is active.

Dr. Borgaro makes no mention that Dr. Ogandzhanova's performance with Dr. Lamb in March 2011 clearly meets the Slick et al criteria for probable malingering: presence of a

2
Neuropsychology File Review
2-28-13

substantial external incentive, failing performance on multiple performance validity measures, discrepancy between test data and known patterns of brain functioning (e.g., Dr. Ogandzhanova performs in the severely impaired range on measures of attention but in the Average range on memory testing), and discrepancy between test data and observed behavior (e.g, severely impaired attention yet she is able to regularly drive). Dr. Borgaro omits commenting that psychiatric patients are expected to pass performance validity measures. PTSD and depression do not adequately account for the above findings.

Dr. Borgaro cites Dr. Ogandzhanova's poor performance on measures of executive functioning as evidence of frontal lobe dysfunction but fails to note the obvious inconsistency between her Mentally Retarded range performance on a simple visual sequencing task (1st percentile) and her activities (e.g., ability to drive an automobile).

Dr. Borgaro asserts that Dr. Lamb was wrong in stating that the MMPI-2 data from 2008 indicated exaggeration of symptoms. However, notably, all four of the MMPI-2 validity scales that are sensitive to over-reporting of problems are significantly elevated (F scale: T = 99; Fb scale: T = 89; Fp scale: T = 73; FBS: T = 72). The MMPI-2 results were clearly invalid and indicative of exaggerated problems. Notably, Dr. Ogandzhanova's Fp scale (T = 73) is a score that is even substantially above psychiatrically hospitalized patients. Per a standard MMPI-2 text (Graham, 2006), these Fp items "are far less likely to reflect psychopathology than the F scale items." The elevated Fp scale is highly significant as this scale "adds incrementally to the F scale in the discrimination between persons faking bad and psychiatric inpatients." Dr. Borgaro attempts to explain the MMPI-2 results as indicating Dr. Ogandzhanova's cry for help, and not over-reporting of symptoms, but does not acknowledge that exaggeration of symptoms is necessarily present to make the inference that she is 'crying for help.'

Dr. Borgaro states that Dr. Ogandzhanova would have problems returning to work given that Dr. Lamb diagnosed her with PTSD and Major Depression in his first evaluation in February 2008. This is an overly general statement as many individuals with PTSD and Major Depression can maintain employment. The fact that Dr. Lamb diagnosed her with these conditions is an insufficient basis to conclude that she has occupational restrictions-limitations.

Dr. Borgaro opines that Dr. Ogandzhanova's failure on a symptom validity test with Dr. Lamb in 2011 cannot be validly interpreted as the comparison group is a sample of depressed persons, and not depression plus PTSD – "which suggests a greater level of emotional/psychiatric distress." I disagree with Dr. Borgaro's conclusion as Dr. Ogandzhanova performs implausibly poorly on this measure. It is notable that her score on this measure (Dot Counting Test: score = 17) significantly exceeds the recommended cutoff score of ≥ 12 for depression patients. Dr. Ogandzhanova's reported additional PTSD (in conjunction with consideration of her observed activities and driving) does not reasonably justify a more liberal cutoff score as is applied with persons with schizophrenia, traumatic brain injury, mild dementia, and stroke. It is again noted that

3
Neuropsychology File Review
2-28-13

probable malingering is not diagnosed by a single implausible performance but by multiple indicators that are present in this case (per Slick et al criteria; Larrabee et al, 2007). Dr. Borgaro is incorrect in asserting that there was no adequate formal method of assessing effort in Dr. Lamb's re-evaluation in March 2011.

Dr. Borgaro criticizes Dr. Lamb's interpretation of the results on the Personality Assessment Inventory (PAI) in his March 2011 evaluation. However, the PAI data does support an interpretation of possible exaggeration of complaints (Negative Impression Management: T = 73; positive findings indicated on the PAI Negative Distortion Configural Analysis). Per a standard PAI text (Morey, 1996) a NIM score at this level "suggest an element of exaggeration of complaints and problems...any interpretive hypotheses based on clinical scale elevations should be considered with caution." Morey also reports that the NIM validity scale works best with efforts to simulate severe forms of mental disorder (e.g., PTSD, Major Depressive Disorder); where milder forms of psychological disorder are falsified, it is less effective. Dr. Borgaro's assertion is unfounded that additional testing (e.g., with the SIRS) was needed to further evaluate potential over-reporting of psychological symptoms.

Dr. Borgaro states that Dr. Ogandzhanova's improved performance on some measures in Dr. Lamb's re-evaluation is evidence that she was exerting good effort. This is an inaccurate conclusion as it is known that malingerers do not fail every cognitive measure and typically will exhibit inconsistent performance across re-evaluations.

Overall, a review of Dr. Borgaro's file review does not change my opinion. Probable malingering of cognitive problems is indicated from the overall file data (per Slick et al criteria; Larrabee et al). I am happy to review any additional information.

James R. Boone, Ph.D. / 2-28-13
Diplomate in Clinical Neuropsychology
American Board of Professional Psychology
MetLife Consultant

# CURRICULUM VITAE

**JAMES R. BOONE, Ph.D., ABPP- CN**
2625 Keystone Road, Suite A-3
Tarpon Springs, FL  34688
Office: (727) 944-4600 / Fax: (727) 945-9800

**Personal Information:**

Date of Birth: ████████████; Cleveland, Ohio
Married, two children

**Professional Certification:**

Florida Licensed Psychologist Number PY 04361
Diplomate in Clinical Neuropsychology, Diplomate Number 5677
American Board of Professional Psychology (ABPP)

**Education:**

| | | |
|---|---|---|
| 1977-81 | B.A. | University of Arizona (Psychology) |
| 1983-85 | M.A. | University of South Florida (Clinical/ Health  Psychology) |
| 1985-89 | Ph.D. | University of South Florida (Clinical/ Health Psychology) |

**Internship, Postgraduate Training and Fellowship Appointments:**

1988-89     Predoctoral Internship, Department of Psychology, Gainesville Veteran's Administration Medical Center, Gainesville, FL.

1989-90     Postdoctoral Fellow in Clinical Neuropsychology, J. Hillis Miller Health Center, Shands Hospital, University of Florida, Gainesville, FL.

**Clinical Experience:**

1990          Assistant Clinical Director, Brain Injury Rehabilitation Program, Rehabilitation Institute of Sarasota, Sarasota, FL.

1991          Psychological Examiner, Psychology Department, Horizon Hospital, Pinellas Park, FL.

1991–93     Coordinator of Neuropsychological Services, Rehabilitation Institute of Edward White Hospital, St. Petersburg, FL.



James R. Boone, Ph.D., ABPP- CN
Curriculum Vitae
Page 2

1993-98          Clinical Neuropsychologist - private practice; St. Petersburg·· Suncoast
                 Medical Clinic; Department of Neurology; St. Petersburg, FL.

1998- present    Clinical Neuropsychologist – private practice; Tarpon Springs, FL.

Areas of focus include neuropsychological evaluations, learning disability evaluations, psychotherapy, forensic psychology, and consulting services. Services are provided to adults and children. Consultation services are also provided to physicians, attorneys, insurance companies, and private / state organizations. Appointed by the Sixth Judicial Circuit Court to perform incapacity/ guardianship evaluations, mental retardation/ developmental delay evaluations, family law psychological evaluations, and independent Baker-Act evaluations. Appointed by the Thirteenth Judicial Circuit Court to perform guardianship evaluations. Consultant to the Florida Institute for Neurologic Rehabilitation, Advisory Council for Alzheimer's Family Organization, Board member Alzheimer's Association (Pasco Chapter; 1998). Numerous presentations made in areas of neuropsychology. Psychotherapy areas include depression, anxiety, marital, and family.

**Consulting Services:**

Work Sample Reviewer for the American Board of Clinical Neuropsychology, Florida Institute for Neurologic Rehabilitation, Department of Children and Families- Safe Children's Coalition, Florida Office of Vocational Rehabilitation, Advisory Board of Alzheimer's Family Organization, Department of Disability Determinations with the Social Security Administration, and Sixth and Thirteenth Judicial Circuits (Pinellas, Pasco, Hillsborough counties).

**Memberships in Professional and Scientific Societies:**

       American Academy of Clinical Neuropsychology (AACN)
       Florida Psychological Association; Pinellas-Pasco Chapter (2001
          Chapter President); Key Psychologist: 2006 - current
       American Psychological Association
          Division 40, Clinical Neuropsychology
       International Neuropsychological Society
       National Academy of Neuropsychology

**Memberships in Civic Societies:**

       Rotary International

James R. Boone, Ph.D., ABPP- CN
Curriculum Vitae
Page 3

## Research Publications, peer-reviewed:

Crosson, B., Moberg, P.J., Boone, J., Gonzalez-Rothi, L., & Raymer, A.(1997). Category specific naming deficit for medical items and conditions after dominant thalamic and capsular hemorrhage. Brain and Language, 60, 407-442.

## Presentations at professional meetings:

1.  J. Boone (1987). Detection of malingering on neuropsychological memory tasks. Paper presentation at meeting of the Southeastern Psychological Association, New Orleans, LA.

2.  Boone, J. (1990). The detection of malingering on neuropsychological memory tasks. A poster presentation at the annual meeting of the International Neuropsychological Society, Orlando, FL.

3.  Boone, J. (1991). Principles of Neuroanatomy. Presented to the staff of the Rehabilitation Center of Sarasota, Sarasota, FL.

4.  Boone, J. (1991). Neuropsychological assessment; methods and issues. Presented to the staff of the Psychology Department, Horizon Hospital, Clearwater, FL.

5.  Boone, J. (1991). Alcoholism; Neuroanatomical and cognitive correlates. Invited presentation at St. Anthony's Hospital, Speaker Series, St. Petersburg, FL.

6.  Boone, J. (1992). Specific category naming deficit associated with thalamic lesion. A research study presented by the primary authors in a symposium on subcortical structures in language at the annual meeting of the International Neuropsychological Society, P.J. Moberg, B. Crosson, J. Boone, & L. Gonzalez-Rothi.

7.  Boone, J. (1992). The role of the neuropsychologist in a rehabilitation setting. Presentation for the staff at the Edward White Rehabilitation Institute, St. Petersburg, FL.

8.  Boone, J. (1992). Neurocognitive consequences of stroke; Presented to the Square One stroke support group at Edward White Hospital, St. Petersburg, FL.

James R. Boone, Ph.D., ABPP- CN
Curriculum Vitae
Page 4

9.   Boone, J. (1992).  Cognitive and behavior disorders in Alzheimer's dementia: treatment considerations.  Presentation was part of the Alzheimer's speaker's series at Edward White Hospital, St. Petersburg, FL.

10.  Boone, J. (1992).  Role of the neuropsychologist in evaluating clients with vocational disability; relevance to the VR counselor ?  Presentation for the annual meeting of Vocational Rehabilitation, Clearwater, FL.

11.  Boone, J. (1992).  Neuropsychological considerations for the care-giver of the Alzheimer's resident.  Presentation at the Alzheimer's support group, Majestic Towers, Gulfport, FL.

12.  Boone, J. (1993).  Evaluating cognitive and behavioral problems in the elderly.  Presentation for Speaker's series at Majestic Towers, Gulfport, FL.

13.  Boone, J. (1993).  Helping the physician understand the role of the neuropsychologist.  Presentation for the St. Petersburg Medical Clinic, St. Petersburg, FL.

14.  Boone, J. (1994).  Behavior Modification and the demented patient.  Presentation for yearly meeting of Neighborhood Senior Services, St. Petersburg, FL.

15.  Boone, J. (1994).  Neuropsychological assessment of memory disorders.  Presented at Tampa Bay Neuropsychological Society, St. Petersburg, FL.

16.  Boone, J. (1996).  Dementia and care-giver stress.  Presentation at Integrated Health Services, Pinellas Park, FL.

17.  Boone, J. (1999).  Research Advances in Alzheimer's Dementia.  West Pasco Aging Conference; New Port Richey, FL.

18.  Boone, J. (1999).  Alzheimer's Disease; Updates.  Staff Education meeting at Community Hospital of New Port Richey, FL.

19.  Boone, J. (1999).  Behavioral Disorders and Alzheimer's Dementia.  Novartis Pharmaceuticals Conference, Don Caesar Resort, St. Petersburg, FL.

20.  Boone, J. (2000).  Managing Behavioral Problems with the Demented Patient.  West Pasco Aging Conference; New Port Richey, FL.

21.  Boone, J. (2001).  Neuropsychology and the Disability Claim.  Eastern Claims Conference, New York, New York.

James R. Boone, Ph.D., ABPP- CN
Curriculum Vitae
Page 5

22.   Boone, J. (2002).  The Impact of Alzheimer's Disease on the Family with Stress
      Relieving Techniques.  Alzheimer's Disease Seminar; Hudson, Florida.

23.   Boone,  J.  (2003).   Neuropsychology  in  2003- What's  New?.   Continuing
      Education  Lecture  to  Pinellas  Chapter  of  the  Florida  Psychological  Association;
      Clearwater, Florida.

24.   Boone, J. (2004).  Depression and Alzheimer's Disease.  Alzheimer's Disease
      Seminar; Bayonet Point, Florida.

James R. Boone, Ph.D.                                    2625 Keystone Rd.
Clinical Psychology / Clinical Neuropsychology          Suite A-3
Diplomate in Clinical Neuropsychology                   Tarpon Springs, FL 34688
American Board of Professional Psychology               (727) 944-4600

## List of Court Appearances and Depositions

Metlife vs Ogandzhanova - Deposition – Tampa- October, 2012
Incapacity- Joan Steiner – Hearing – June 2012
Incapacity - Virginia Bittner – Hearing – December 2011
Susan Bass vs. Hanover Insurance Company and Progressive Auto Pro
 Insurance Company a/k/a Progressive Select Insurance Company --
  Deposition in office - 5-19-10
Dianna D'Angelo vs. Robert Hughes – Deposition in office - 3-9-10
Michael Alvarez and Karen Alvarez vs. Darris L Hughes and Darris Hughes
 Lone Wolf trucking, Inc. - Deposition in office - 1-29-10
Christian John Leonhardt  vs Julian D. Acevedo and
 Jaime Enrique Acevedo Rueda – Deposition in office – 9-10-09
Susan Bass vs. Hanover Insurance Company and Progressive Auto Pro
 Insurance Company a/k/a Progressive Select Insurance Company – court
  appearance - 6-15-09
Wohlgemuth vs. PCSO – Deposition in office 10/30/08
Lorditch v. AstraZeneca LP, et al. - Deposition in office 8/27/08
Geoffrey Grey Strange, Sr. vs State of Florida – Court appearance 5/6/08
Douglas R. Stalley, Guardian for Stephen J. Demaris and Julia Barile-
 Demaris vs Carlos R. Roman and Timothy D. Blackman – Deposition in
  office 5-5-08
Martha P. Godwin and David L. Godwin v. Linwood D. Blanton Trial –
 1-30-08 – Court Appearance, Tampa, Florida
McLellan vs American International Insurance Co. – 1/9/08 – Deposition
State of Florida vs. Michael Ward – 9/27/07 – Court Appearance
State of Florida vs. Dane Lynch – 8/2/07 – Court Appearance
State of Florida vs. Steven Schwartz – 8/15/07 – Court Appearance
McDonald vs Evenflo – 7-16-07 – Court Appearance
State of Florida vs. E. Hristopoulos – 3/19/07 – Court Appearance
State of Florida vs. M. Santiago – 3/15/07 – Court Appearance
State of Florida vs. Curtis Taylor – 3/1/07 – Court Appearance
Ryan C. Schrader vs Frances S. Rosati – 01/24/07 – Court Appearance
State of Florida vs Kristoffer McNeil – 01/08/07 – Court Appearance
State of Florida vs Christian Hamacher – 11/26/06 – Court Appearance

2

State of Florida vs Jeffery Allen Cousineau – 11/16/06 – Court Appearance
State of Florida vs Jerome Chambers – 10/30/06 – Court Appearance
James LeClerc vs Theodore D. Steele, Jr., Individually; and Kobie Complete
Heating and Cooling, Inc.  – 10/11/06 – Deposition
Terry Young vs Garlock Equipment Co and Phoenix Sales, Inc. –
    10/6/06 - Deposition
Bechtol vs Metlife – 9/28/06 – Deposition
Ryan Schrader vs Frances S. Rosati – 9/21/06 – Deposition
Manning vs Brewster – 3/27/06 - Deposition
State of Florida vs. Betty Butler – 10/12/05 – Court Appearance
State of Florida vs. Donald Fountain – 7/13/05 – Court Appearance
State of Florida vs. Charles Freeman – 4/28/05 – Court Appearance
State of Florida vs. Lizzie Moncrief – 7/19/05 – Court Appearance
Boris Vasiljevic vs Progressive Insurance Co. – 3/24/05 – Court Appearance
State of Florida vs Delia Marie Pascale – 4/6/05 – Court Appearance for the
    Sixth Judicial Circuit of Florida – Case CRC03-04794CFAWS-4 –
Lucy Stasio vs Stephen McManaway – Deposition – 2/2/05;  Court
Appearance on 2/24/05 and 2/25/05
State of Florida vs Alvin W. Levine – 11/19/04 – Court Appearance
James Kurppe – State of New Jersey – 8-27-04 – Court Appearance (via
    phone)
Jessica and Brian Tircuit vs Orville B. McKenzie, Atlantic Industrial
    Services – 3/24/04 – Deposition
Cordovi, Torres & Torres vs Rosenblatt – 3/17/03 - Deposition
State of Florida vs William DeGroat – 2/4/04 – Court Appearance
State of Florida vs Milen Karpuzi – 1/27/04 – Deposition
State of Florida vs Curtis Shields – 1/26/04 – Court Appearance
State of Florida vs Tiffany Cassara – 1/21/04 – Court Appearance
State of Florida vs Rolando Young – 1/16/04 – Court Appearance
State of Florida vs Michael Luttrell – 1/12/04 – Phone deposition
State of Florida vs Rosemarie Street – 1/6/04 – Phone deposition
State of Florida vs Maureen A.Giordano-Growney– 11/24/06 – Court
    Appearance
Flores and Horning vs Mellott vs Southern Transportation Investments –
    11/7/03 – Deposition
State of Florida vs Anderson 10/27/03 – Court Appearance
State of Florida vs William Konkle – 11/3/03 – Court Appearance
Dominick Valenti vs Unum Life Insurance Company of America – 10/15/03
    Court Appearance (Plaintiff)
State of Florida vs Katie Aslsett 9/03 – Expert witness- Court Appearance

3

State of Florida vs Thomas Cardella 6/03 – Deposition
Lahey vs State Farm Mutual Automobile Insurance Company 1/6/03 -
    Deposition
Jonathan K. Platt vs Leonard Earl Russek & Lenvest, Inc.-2/14/03.  Court
Appearance - Plaintiff
Benjamin Todd vs Verizon Data Services, Inc. f/k/a GTE Date Services
    12/17/02 – Deposition-  Defense
M. Kantaras vs. L. Kantaras- Court Appearance – 10/02 - plaintiff
State of Florida vs Fredrick Oliver- 1/15/02 – Court Appearance – plaintiff
State of Florida vs Kaliope Boulafentis 6/02 – Deposition
State of Florida vs Emory E. Carter-  7/14/01 – Court Appearance - plaintiff
State of Florida vs Franklin Louis Copus – 10-01 – Deposition


6-12

**Ex. 18**

**Medical Consultant Referral for Dr. J. Boone**

From: Jamie Frederick, T068 _____ Date: 03-Sep-13

Name: OGANDZHANOVA, M.D., INNA  Age: 50   Claim No. 120706054945 & 4946
Dates Claimed: 3//13/07-present          Status: Open
Effective Date: 3/10/1999

Primary Diagnosis: PTSD
Occupation: _____ Radiation Oncologist _____

Your Last Review: 1/19/12
Request:              Dr. Boone, please review the available information and respond to
                     The following questions:

   1.) Please comment on any restrictions and limitations;

   2.) Please note the following definitions from the policies;

   "You will not be considered to be totally disabled for any time you are not receiving
   care by a physician which is appropriate for the condition causing the disability..."
   and "Total Disability means...you are receiving appropriate care from a Physician
   who is appropriate to treat the condition causing the Impairment..."

   Based upon your review of the available information, is Dr. Ogandzhanova
   receiving care by a physician appropriate for her condition/ receiving appropriate
   care from a physician? Please elaborate.

   3.) Are there any additional steps that you recommend be taken in order to further
   evaluate Dr. Ogandzhanova's claimed condition?

              Thank you.

Susan Borgaro, Ph.D. Review of records (1-22-13) and deposition (5-16-13):

Dr. Borgaro's records review from 1-22-13 was previously reviewed.  Please see my
review from 2-28-13.

Dr. Borgaro's assertion in deposition is incorrect that the widely accepted 40% plus-
minus 10 number of people that exaggerate cognitive deficits only applies to persons with
mild TBI.  Notably, Larrabee et al (2009) indicated that the available data suggest this
number applies generally to "feigned cognitive symptoms in compensation-seeking
settings."  For example, a number of studies have demonstrated that cognitive symptom
validity measures are failed by compensation seeking patients with a variety of conditions
including chronic pain (Meyers and Diep, 2000), PTSD/ other anxiety disorder/
depression (Gervais et al), and soft tissue injuries or fibromyalgia (Richman et al, 2006).

MLOCL005320

2
Ogandzhanova, M.D., Inna
Neuropsychology Review

Dr. Borgaro's assertion is also not supported that depression and PTSD largely account for Dr. Ogandzhanova's poor performance on several effort measures. This view is not supported by the available literature (Boone, 2013; Goldberg et al, 2007).

Dr. Borgaro's assertion is not supported that Dr. Ogandzhanova's high MMPI-2 scores on the F and Fb validity scales in her 2008 evaluation with Dr Lamb indicated a 'cry for help' rather than over-reporting of unlikely symptoms. For example, Boone (2013) noted "there is little empirical evidence for a "cry for help" F-family pattern of elevations that is separate from frank malingering."

Dr. Borgaro's assertion that a neuropsychological evaluation should never have been conducted with Dr. Ogandzhamova, because she is not claiming a neurological condition, makes little sense as a neuropsychological evaluation was appropriate to independently evaluate her claim of poor concentration, memory, and psychological difficulties. Please note that the co-existence of cognitive and psychological symptoms is common in persons undergoing neuropsychological evaluations (e.g., persons with reported depression, stress, PTSD, multiple sclerosis, fibromyalgia, and neurological disorders). It is also notable that her psychiatrist (Dr. Rozansky) recommended that Dr. Ogandzhanova obtain a neurological consultation, which supports that an evaluation of her neurocognitive status was appropriate to obtain.

Dr. Shear Report (1-11-13) and Deposition (4-13-13):

Dr. Shear reported that Dr Ogandzhanova's diagnoses were Complicated Grief, Panic Disorder, PTSD, and Generalized Anxiety Disorder. She reported that Dr. Ogandzhanova's Major Depressive Disorder had "resolved."

Dr. Shear reported that Dr. Rozansky has not provided complicated grief therapy (CGT). She reported that Complicated Grief is not a DSM-IV diagnosis. Dr. Shear reported that Dr. Ogandzhanova was no longer depressed. Dr. Shear reported that there were no CGT providers in Arizona.

Dr. Lamb's Deposition (3-12-13) and his review of records (3-1-13) :

Dr. Lamb stated in his deposition that because the 2011 test results were invalid, he did not think it was reasonable to expect some type of impairment. Dr. Lamb opined that the 2011 results were invalid due to inconsistencies seen from the surveillance data, test results, behavioral observations, and numerous unexpected test scores. Dr. Lamb reported that Dr. Ogandzhanova's report was unreliable. Dr. Lamb stated that he should not have repeated the diagnoses from the first evaluation in 2008 as no diagnoses could be determined in the second evaluation due to Dr. Ogandzhanova's lack of cooperation. Dr. Lamb stated that he did not administer the MMPI-2 in 2011 because he thought it might be too lengthy. Dr. Lamb disagreed with the 2008 MMPI-2 results as indicating a

MLOCL005321

3
Ogandzhanova, M.D., Inna
Neuropsychology Review

'plea for help.' He noted that Dr. Ogandzhanova failed all three embedded validity measures.

Dr. Lamb reviewed additional records and stated that Dr. Rozansky provided no rationale why every 30 days was an appropriate level of treatment for Dr. Ogandzhanova. Dr. Lamb disagreed with Dr. Borgaro's explanation of the inconsistencies he observed with Dr. Ogandzhanova (e.g., she performed much faster on a finger tapping test while learning the instructions as compared with her slower performance when actually taking the test). Dr. Lamb cited Goldberg et al (2007) as indicating that depression does not appreciably lower finger tapping scores. Dr. Lamb reported that no diagnoses could be determined from the 2011 evaluation as there was significant evidence for lack of cooperation. Dr. Lamb reported that it was illogical to require a test be normed with a sample of depressed, PTSD, and complicated grief patients before any test conclusions could be made. Dr. Lamb reported support for his interpretations of the Morey Negative Distortion Configuration Analysis and the Roger's Discriminant Function measures on the Personality Assessment Inventory. He noted that an RDF of 1.11 exceeded zero which lent support to a malingering interpretation. Dr. Lamb reported that there was no evidence that Dr. Ogandzhanova could not work as a radiation oncologist.

Dr. Ogandzhanova's Deposition:

Dr. Ogandzhanova reported that she had a poor memory and that she used to have an incredible memory. She reported that she was able to function after Isaac died for a few months until approximately October 2006. She reported he was ill for 4.5 years. He received chemotherapy and a bone marrow transplant at University Medical Center in Tucson. She reported that she first began seeing Dr. Rozansky in January 2006. She stated that she has lived in Mexico since January 2012. She has two children (ages 3 and 5).

Dr. Joel Parker's Deposition and review of records (2-15-13):

Dr. Parker reported that he saw Dr. Ogandzhanova for IME on 9-21-10. She was unable to finish the MMPI-2. He noted that her son initially survived severe sepsis (bilateral necrotizing pseudomonas pneumonia). He was treated at University Medical Center in Tucson, then at Phoenix Children's Hospital, then at UMC. He received chemotherapy and two bone marrow transplants. Her son passed-away from septic shock on 3-15-06. Dr. Ogandzhanova stated that she decreased her workload in January 2007. Dr. Parker reported diagnoses of Bereavement, Major Depressive Disorder (single, chronic), and PTSD. He reported a GAF score of 65. Dr. Parker noted that, in his review of Dr. Rozansky's deposition, it was reported by Dr. Rozansky that Dr. Ogandzhanova's cognition was adequate on 1-4-07.

Dr. Parker opined on 2-15-13 that Dr. Ogandzhanova was not impaired.

MLOCL005322

4
Ogandzhanova, M.D., Inna
Neuropsychology Review

## Summary:

Although the second neuropsychological evaluation by Dr. Lamb in March 2011, in consideration of the other file data, did not support cognitive impairment and restrictions-limitations, it is noted that Dr. Lamb's evaluation was conducted approximately 2.5 years ago. It is recommended that an updated independent neuropsychological evaluation with performance validity measures be conducted that may clarify her current cognitive and psychological functioning.

The file data indicate that Dr. Ogandzhanova has not been receiving care by a physician appropriate for her condition. It is inconsistent for Dr. Ogandzhanova to report that she is experiencing PTSD, with complaint of occupational impairment, but be seeing her psychiatrist (Dr. Rozansky) only on a monthly basis. Typically, persons with a moderate or severe psychological disorder participate in psychotherapy once or twice a week to achieve emotional stabilization. A monthly frequency of psychotherapy is appropriate for patients who have achieved significant emotional stability and require only supportive psychotherapy. Although Dr. Rozansky has recommended more frequent sessions, as well as a neurological consultation, Dr. Ogandzhanova has not complied with these recommendations. It is noted that there are multiple recommended psychotherapy approaches for PTSD patients such as cognitive behavioral therapy, EMDR, and exposure strategies. The file data indicate that Dr. Ogandzhanova has not sought out any of these psychotherapy approaches. It is not credible that Dr. Ogandzhanova was unable to obtain more frequent psychotherapy sessions by a well qualified mental health professional in the metropolitan Phoenix area. Please note that psychopharmacological interventions are also clearly important in the treatment of PTSD - comment on this is deferred to Dr. Kaplan.

I am happy to review any additional information.

James R. Boone, Ph.D., ABPP(CN)
Diplomate in Clinical Neuropsychology
American Board of Professional Psychology
MetLife Consultant

Date of Review: 10-3-13

MLOCL005323

Medical Consultant Referral for Dr. J. Boone

From: Jamie Frederick,  T068                                    Date: 10-Oct-13

Name: OGANDZHANOVA, MD, INNA       Age: 50         Claim No. 120706054945
Dates Claimed: 3/13/07-present              Status: Open
Effective Date: 3/10/1999

| Primary Diagnosis: | PTSD |
| Occupation: | Radiation Oncologist |

| Your Last Review: | 10/3/13 |
| Request: | Dr. Boone, from your last review, please share what kind of testing you would recommend, and who you recommend to administer this testing. Thank you. |

A comprehensive neuropsychological evaluation is recommended that includes multiple performance validity measures and an MMPI-2. Notably, the MMPI-2 or MMPI-2 RF contains multiple validity scales — I recommend M. Kyle Boone in Los Angeles. She has extensive forensic experience, has published extensively, and developed the Dot Counting Test, which was a measure employed by Dr. Sawl in his March 2011 evaluation.

J. Boone          10-31-13
# 12-00838469

Medical Consultant Referral for Dr. J. Boone                Date: 10/10/13

MLOCL005324

**Ex. 19**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Metropolitan Life Insurance Company, a New York corporation,

              Plaintiff/Counter-Defendant,

    vs.

Inna Ogandzhanova, M.D.,

              Defendant/Counter-Claimant.

No. 2:12-cv-372-GMS

**DECLARATION OF JAMES R. BOONE, Ph.D.**

I, James R. Boone, Ph.D., state as follows:

1.    The reports identified below are true and accurate copies of reports I drafted based on my review of Independent Medical Examination reports and other materials outlined in my reports.

(a)    Report dated April 17, 2008 (Bates No. MLOCL001309), which I understand has been identified as Exhibit 15 to MetLife's Controverting Statement of Facts re Defendant/Counter-Plaintiff's Motion for Summary Judgment on MetLife's Complaint for Declaratory Relief;

(b)    Report dated April 21, 2011 (Bates No. MLOCL001832; Dkt. # 281-2, Ex. 30, Ex. A, 47);

(c)    Report dated January 19, 2012 (Bates No. MLOCL002173), which I understand has been identified as Exhibit 16 to MetLife's Controverting Statement of

1  Facts re Defendant/Counter-Plaintiff's Motion for Summary Judgment on MetLife's

2  Complaint for Declaratory Relief;

3          (d)      Neuropsychology Report dated February 28, 2013, which I

4  understand has been identified as Exhibit 17 to MetLife's Controverting Statement of

5  Facts re Defendant/Counter-Plaintiff's Motion for Summary Judgment on MetLife's

6  Complaint for Declaratory Relief; and

7          (e)      Report dated September 3, 2013 (Bates Nos. MLOCL005320-

8  MLOCL005324), which I understand has been identified as Exhibit 18 to MetLife's

9  Controverting Statement of Facts re Defendant/Counter-Plaintiff's Motion for Summary

10 Judgment on MetLife's Complaint for Declaratory Relief.

11

       2.      The foregoing reports are true and accurate statements of my opinions.

12

13 I declare under penalty of perjury that the foregoing is true and correct.

14

15 Executed on this __6th__ day of March, 2014.

16

17                                            JAMES R. BOONE, Ph.D.

18

19

20

21

22

23

24

25

26

27

28

                                            2

**Ex. 20**

## Psychiatry Consultant Referral for Dr. Kap

From: Lisa Kaarela, T024                                           Date: November 15, 2007

**Name:** OGANDZHANOVA, INNA        **Age:** 44              **Claim No.** 120706054945
**Dates Claimed:** 3/13/07 to the present    **Status:** Pending
**Effective Date:** 3/10/1999

| Primary Diagnosis: | Depression, Panic |
| Occupation: | Oncological Radiologist |

| Your Last Review: | |
| Request: | |
| | Please review and comment on restrictions and limitations from onset to the present |

Plear re typed eval

[signature] 11/20/07

Psychiatry Consultant Referral for Dr. Kaplan                        Date: 11/15/07

MLOCL000368

Policyholder Name: Inna Ogandzhanova
Claim #: 120706054945
for Lisa Kaarela
Claiming disability since 3/13/07 for Depression and Panic
Occupation: oncological radiologist

**Gerald Rozansky, M.D.   Psychiatry**

Treatment records:
Handwritten notes

10/2/07: relationship issues, anger issues re; Don
9/1/07: claustrophobia, depressed
7/27/07: panic attacks, less able to deal with problems of everyday
Sensitive, crying
Lexapro 30 mg.
6/12/07: can't stand to go back into office
5/29/07: cannot take pressure, panic attacks started Oct. 2006,
5/16/07: cannot face cancer, face real issues, anxiety, panic
4/13/07: still depressed, less panic, uneventful delivery.
2/1/07; depressed, don't want to socialize, just want to lie in bed and not deal
with people
1/4/07 eval:
Panic attacks
Grieving son's death
Feeling depressed, insomnia
Wants to lay in bed
Diagnosis: PTSD, Panic Attacks, Depression

**Impression:**

I have reviewed the medical documentation regarding Dr. Inna Ogandzhanova.
The treatment notes are handwritten.   I am not able to read all the information
documented in these notes.   The notes I have read document depressive and
anxiety symptoms.  The symptoms documented prior to the claimed date of
disability are similar to those symptoms documented after the claimed date of
disability.

The medical information presently contained in the file is not sufficient to render
an opinion regarding the claimant's level of impairment and the resultant
restrictions and limitations, if any, in her mental capacity.

**Recommendations:**

1.  Please utilize the above impressions to assist you in determination of her
    request for disability income.

MLOCL000369

2. I would be happy to review any additional medical documentation you may receive.
3. Please request that Dr. Rozansky have his treatment records typed so that I can read all the clinical information in his records.
4. If the claimant is also seeing a therapist, please obtain those notes for my review.


Eric Michael Kaplan, M.D.
November 20, 2007
Diplomate, American Board of Psychiatry and Neurology
Diplomate, American Board of Forensic Medicine
Diplomate, American Board of Disability Analysts

MLOCL000370