WO

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Metropolitan Life Insurance Company, a New York corporation, | No. CV-12-00372-PHX-GMS |
| Plaintiff/Counter-Defendant, | **ORDER** |
| v. | |
| Inna Ogandzhanova, M.D., | |
| Defendant/Counter-Claimant. | |

Pending before this Court is Plaintiff Metropolitan Life Insurance Company's ("Met Life") Motion for Sanctions for Dr. Ogandzhanova's Failure to Comply with Court Orders (Doc. 235). For the reasons stated below the motion is granted. The Court will issue a permissive adverse inference instruction at trial, and MetLife is awarded its reasonable fees and expenses incurred in bringing this motion.

## BACKGROUND

On August 23, the Court held a status conference in this matter, a principal subject of which was Plaintiff's request to compel production from Dr. Ogandzhanova and re-open her deposition. Discovery in the action had otherwise long since been closed. Nevertheless, just prior to the end of discovery in April of 2013, Plaintiff satisfied the Court that Dr. Ogandzhanova's delayed responses to relevant discovery concerning her business and investment enterprises, and the then-recent discovery of Hotmail accounts containing relevant documents that she had not previously disclosed, justified that she

turn over the computers she used during the relevant period to be subjected to a key word search by Plaintiff's expert, and further that Defendant turn over access to her email accounts and fully respond to previous discovery requests.

At the August conference Plaintiff moved again to re-open the deposition of Dr. Ogandzhanova.   In addition to raising the incomplete responses to the earlier discovery orders of this Court, later-discovered information which appeared to be inconsistent with Dr. Ogandzhanova's earlier deposition testimony, and some newly asserted claims by Dr. Ogandzhanova about which Plaintiff avowed it had not been able to earlier inquire at her deposition, Plaintiff also asserted that the evidence clearly demonstrated that Dr. Ogandzhanova had not complied with the order of this Court that she turn over all the computers she used during the period relevant to this lawsuit. Further, Plaintiff alleged that, as to the hard drive of the desktop that she did provide, data had been deleted within the 24 hours prior to its surrender.

Dr. Ogandzhanova objected to the re-opening of her deposition, noting that it had been Plaintiff's choice to depose her prior to receiving all responses to written discovery that it had served on her and further asserting that the extensive discovery was detrimental to her fragile emotional condition.  Accordingly, the Court determined that rather than re-open the deposition of Dr. Ogandzhanova, it would allow an additional period in which Plaintiff could make additional specifications and Dr. Ogandzhanova could supplement her responses to the Court's previous orders.  If the Plaintiff remained dissatisfied with the probity and/or adequacy of Dr. Ogandzhanova's response after this period, it could move for sanctions, and the Court would resolve the matter in the context of a motion for sanctions.  The Court set a deadline for Plaintiff to file such a motion, and it did so on October 10.

Plaintiff's expert, who had earlier filed a report concerning her word search of the two hard drives provided by Dr. Ogandzhanova, supplemented her report to include her analysis and conclusions that Dr. Ogandzhanova had, in derogation of the Court's Order, not supplied all the computers she used, and had deleted material from one of the

computers provided.  This supplement was filed as an attachment to Plaintiff's October 10 motion.

Pursuant to the stipulation of the parties, the Court set forth an additional schedule which specified the date by which Dr. Ogandzhanova's computer forensic expert would disclose its report to MetLife, (November 22), the date by which Dr. Ogandzhanova would be required to depose MetLife's expert (December 13), the date Dr. Ogandzhanova's response to the motion for sanctions would be due (December 30), and the date by which MetLife could depose Dr. Ogandzhanova's expert (January 15) and file its Reply (January 30).  The motion is now completely briefed.

The Court set oral argument on the Motion for Sanctions for May 15, 2014.  In so doing the Court notified the parties that it had fully read the briefing on the motion, the entire report and the entire supplement of both experts, and many of the excerpts of deposition of both of the forensic computer excerpts, Dr. Ogandzhanova and Mr. Bates, as well as the various supplemental affidavits of Mr. Bates and Dr. Ogandzhanova that have been attached to the motions.  The Court set forth particular questions which it wished the parties to address, and further informed the parties that in light of the extensive discovery periods that it had provided the parties it would not allow the parties at oral argument to assert additional facts that were not presently in the record, nor would the Court entertain additional affidavits or expert reports.  In answering the Court's questions the parties were advised that they were to cite to specific items in the record (e.g. deposition testimony, expert report, affidavit, discovery responses and their content, or otherwise), but that they could present argument based on identifiable facts in the record.

## ANALYSIS

Plaintiff's Motion seeks sanctions including dismissal of Dr. Ogandzhanova's counterclaim for her: (1) failure to comply with the Court's order requiring her to avow that she had made available to Plaintiffs all of the computers that she actually used within the period relevant to this lawsuit; (2) failure to comply with the Court's order requiring

her to provide to Plaintiffs all the computers she used during the period relevant to this lawsuit; (3) deletion of files from the desktop computer that she provided; and (4) the ongoing failure to provide documents, including privilege logs, required by the Court's April 24, 2013 order.

### FACTUAL DETERMINATIONS

The Court has the responsibility to make factual findings in determining a motion for sanctions. *Leon v. IDX Systems Corp.,* 464 F.3d 951, 957–58 (9th Cir. 2006) (citing *Anheuser-Busch, Inc. v. Natural Beverage Distribs.,* 69 F.3d 337, 348 (9th Cir. 1995)); *Anheuser-Busch,* 69 F.3d at 348 (citing *EEOC v. Bruno's Rest.,* 13 F.3d 285, 289 (9th Cir. 1993)).  Accordingly, and for the following reasons, the Court makes the following factual determinations:

### A.    Dr. Ogandzhanova Did Not Produce Or Adequately Account For All of the Computers She Used Or Over Which She Had Control.

#### 1.    Affidavits Avowing to Computer Use

On May 22, 2013, Dr. Ogandzhanova provided the hard drives from two computers to Plaintiff's forensic expert, Tami Loehrs.  One was a Dell Dimension 2350 Desktop computer purchased by Dr. Ogandzhanova in 2003, and the other was a Sylvania GNet 13001 Laptop computer. Doc. 227-1, ¶ 2.  As it pertained to these computers at the August 23, 2013 status conference, MetLife informed the Court that Ms. Loehrs had concluded in her analysis that Dr. Ogandzhanova did not produce or identify to MetLife all the computers that she regularly used during the relevant time period as ordered by the Court.

The Court, among other things, entered a supplemental scheduling order that required Dr. Ogandzhanova, by September 6, 2013, to execute and file an affidavit indicating that she provided all computers that she used during the relevant period.  In that affidavit, Dr. Ogandzhanova avowed that her Dell desktop and the Sylvania laptop were the only two computers that she owned, but she did not indicate that they were the only computers she used or over which she had control during the relevant period.  She

did state, however, that she used computers in internet cafes and hotel conference centers when traveling to access her email account and print off boarding passes.

In an e-mail to Dr. Ogandzhanova's counsel dated September 18, 2013, MetLife's counsel pointed out that Defendant did not avow in her affidavit that she had provided all computers under her control.  When Plaintiff received no response from Defendant prior to October 10, this failure became a subject of MetLife's Motion for Sanctions.

In conjunction with filing her Response to the Motion for Sanctions, on December 30, Dr. Ogandzhanova filed another affidavit in which she testified that she only used the two computers whose hard drives she provided, as well as publicly available computers "such as those provided in hotels or internet cafes" that she had previously discussed. She also indicated, however, that prior to the sale of her radiology oncology clinic, which was apparently in March or April 2007, she may have used on occasion some of those computers, however, she no longer has access to them or control over them.

Dr. Ogandzhanova's original affidavit was insufficient to comply with this Court's order.  Nevertheless in conjunction with her supplemental affidavit filed late, on December 30, and only after it was a subject of Plaintiff's motion for sanctions, it is sufficient to meet the requirements of the Court's August 23 order.  Between the two affidavits, Dr. Ogandzhanova avows that except for when she was traveling, in which case she used internet cafes and hotel conference accounts to access her email and get boarding passes, she used no other computers after March/April 2007, other than those she surrendered to Plaintiff's expert.

With this specification, and in conjunction with the other evidence provided by MetLife's expert, the Court determines that Dr. Ogandzhanova neither provided a fair accounting of, nor did she disclose, the computers she used during the time period between 2007 and 2013.

### 2.    The Lack of Computer Activity

There is little activity reflected on either of the computers provided by Dr. Ogandzhanova.  Ms. Loehrs noted in her report that "[t]he forensic software tool Internet

Evidence Finder (IEF) was run against the forensic images of [the desktop] and [the laptop] for all Internet artifacts in allocated and unallocated space.  Over 13,000 artifacts were recovered. . . . It should be noted that a computer examined with IEF that has been in use for many years and regularly accessed the Internet would typically result in the recovery of millions of artifacts."  Doc. 235-2 at 26.  Dr. Ogandzhanova's expert does not challenge these statements nor, for the most part, does Dr. Ogandzhanova.[1]

With respect to the desktop computer, Ms. Loehrs noted in her first supplemental report filed with this Court on October 10, 2013, that "[t]here is virtually no activity to speak of on the [desktop] computer between 2007, when the current operating system was installed, and 2011 and then some sporadic activity occurs on a few occasions in 2012, followed by very minimal activity for a few months between February, 2013 and April 2013."  Doc. 235-2 at 4.  Dr. Ogandzhanova's expert did not challenge this assessment.  In fact, under questioning from Dr. Ogandzhanova's counsel at his deposition, he testified:  "[T]he level of activity I saw on the computer is pretty light.  I'm, again, hesitant to quantify what's light, what's heavy.  But on—on a broad scale, this would definitely fall on the light end, yeah."  Doc. 305-2 at 31 (Cardwell Depo. p. 285).  He further testified in response to questioning by MetLife's attorney that Dr. Ogandzhanova's use of the computer consisted of periods of inactivity, with "bumps" of activity that occurred in 2009, 2011, 2013 and one more "bump" whose date was not identified.  He further testifies that such bumps may not even reflect user activity but may only reflect system activity.  *Id.* at 13, 14 (Cardwell Depo. pps. 106–09, 118–21).[2]

---

[1] Dr. Ogandzhanova's expert found slightly different artifact figures for the laptop and desktop, but, in any event, there was substantial agreement between the two experts' conclusions in this respect.  Neither expert found artifact figures sufficient to suggest that either computer was much used.

[2] At oral argument on the motion, Defense counsel presented a number of pages from the backup materials attached to Ms. Loehrs reports in which his paralegals had identified account activity that they believe demonstrates that Dr. Ogandzhanova used both computers more than Ms. Loehrs concluded that they did.  Yet, Mr. Cardwell did not conduct this analysis and the paralegals that work for Defendants law firm do not present themselves as experts in this matter.  Nor does Defendant dispute her own sworn statement that she did not use the laptop very much, nor the testimony of her expert that

1       Dr. Ogandzhanova testified by affidavit that she did not frequently use the laptop

2 computer while traveling because it was slow and made it difficult to access the internet.

3 Doc. 227-1 ¶ 6.  Seemingly consistent with that, the hard drive of the laptop showed little

4 activity.  Doc 235-2 at 10.

5       Dr. Ogandzhanova's infrequent use of these computers does not in and of itself

6 signify much.  But it does take on significance in light of Dr. Ogandzhanova's testimony

7 and other evidence demonstrating that she did or must have used a computer or

8 computers regularly during this period.

9 ### 3. The Email Accounts

10       Dr. Ogandzhanova had two e-mail accounts—a Cox email account that she has not

11 accessed since 2008 and which is no longer accessible, and thus, the contents of which

12 have not been produced to Plaintiffs. *See, e.g.*, Doc. 227-1 at ¶ 7.  She also had a Hotmail

13 account which she used from 2005 to the present.  Dr. Ogandzhanova also supplied

14 Plaintiff's expert with the password to her Hotmail account.  Dr. Ogandzhanova has since

15 changed the password to this account and Plaintiff no longer has access to it, nor did

16 Plaintiff's expert make any copies of the account while conducting her analysis.  The

17 record thus contains the Plaintiff's analysis of the Hotmail account, but does not contain

18 its actual contents.

19       According to Plaintiff's expert, when she accessed it in 2013, the Hotmail account

20 drinnao@hotmail.com contained 8,300 e-mails dated between 2005 and 2013.  This

21 would not include emails that may have been deleted prior to Plaintiff's access to the

22 account.  Approximately 900 of those 8300 emails that still existed in the account

23 predated the installation of Dr. Ogandzhanova's new operating system in the Dell

24 desktop on December 31, 2007, leaving approximately 7400 e-mails that were sent or

25 received since that operating system was installed, between January 1, 2008 and the day

26

---

27 neither computer reflects much use.  Thus, even were the Court to accept the proposition
that there are instances in Ms. Loehrs work papers that reflect that Dr. Ogandzhanova

28 used the computer somewhat more than Ms. Loehrs concluded she did, she still did not
use it much.

that the account was accessed by Loehrs in mid-2013.[3]

Yet there is virtually no evidence of sending and receiving e-mails on the hard drive of the desktop computer that Dr. Ogandzhanova produced, Doc. 235-2 at 4,[4] or on the hard drive of the laptop.  *Id.* at 10.  MetLife's expert opined that a single log-in to an e-mail account typically results in "hundreds of instances of the e-mail address being "cached," or recorded, to a hard drive even if only a few e-mails are sent or received."  *Id.* at 5, 26.  Thus "regular access to Dr. Ogandzhanova's on-line email account for the purpose of sending and receiving emails for a period of approximately six years would likely result in millions of instances of her email address appearing on her computer."  *Id.*  Yet Loehrs found only 4,464 instances of Ogandzhanova's e-mail address being cached to the desktop, in either allocated or unallocated space which indicates almost no use of the Desktop for sending or receiving e-mails.  *Id.* at 5.  Further, "at least 90% of the e-mail text fragments forensically recovered from [the desktop] are from emails dated after April, 2012.  Conversely, only 100 (approximate) search hits contained the "Hotmail" header associated with email activity prior to April 2012.  This . . .  reflects virtually no activity associated with the email account between 2007 and April 2012."  The expert also notes that while there was virtually no activity on the [desktop] computer for 2007, 2008, 2009, 2010 and 2011, Dr. Ogandzhanova's Hotmail account reflects activity for all of these years."  *Id.* at 5–6.

Plaintiff's expert further noted that there were only 65 such hits on the laptop, and these hits "do not represent 65 individual emails but appear to be the result of accessing the "inbox" of the email account.  All 65 search hits contain the term "Hotmail" in the header.  As previously explained, this indicates the email account was likely accessed

---

[3] At oral argument, Defendant asserted that Ms. Loehrs only found approximately 3000 such emails in Dr. Ogandzhanova's Hotmail account, but Plaintiff pointed out that it was only 3000 of the 7400 emails that actually contained the search terms requested by Plaintiff.

[4] In referring to Loehr's report, the Court uses the pagination for the document in which it is filed with the Court which occurs in the header, instead of the pagination used in the actual report.

sometime before April 2012.  I was unable to recover any emails from [the laptop] and found no activity with regard to sending or receiving emails from this account using [the laptop].  *Id.*

Although Defendant's expert, Mr. Cardwell, had the opportunity to do so, he does not contest any of these conclusions or opinions.[5]

Prior to the hearing the Court requested the parties to answer a number of questions so that it could have a more precise idea of the nature of Dr. Ogandzhanova's access to the her email account.  Among those questions were:

> 5.  Please identify the dates of emails in the Hotmail account that were sent or received in 2007, 2008, 2009, 2010 and 2011, and the numbers of emails for each date during those years 'when there was virtually no activity whatsoever' on the desktop.

Doc. 325 at 6.  Plaintiff could not respond to the question because, as has been explained above, MetLife did not make a copy of Dr. Ogandzhanova's Hotmail account.  This lack of access also prevented MetLife from answering similar questions posed by the Court to both parties such as whether any emails in the Hotmail account were dated on days on which MetLife was conducting surveillance of Dr. Ogandzhanova at her home in Casa Grande, even though no traces of such emails or other activity were contained on either of the computers provided by Dr. Ogandzhanova, whether the Hotmail account contained any emails dated 22 Sep. 2008, the date on which Dr. Ogandzhanova had made PayPal payments that left no traces on her hard drive, and whether the Hotmail account contained any emails dated after April 26, 2013 the date her computers were last accessed prior to their surrender to MetLife's experts.

---

[5] To the extent that Defendant desires this Court to determine based the assertions of counsel's paralegal that Ms. Loehrs enumeration is incorrect, the court declines to engage in such a venture, especially in light of the fact that the characterizations of Ms. Loehrs back-up documentation by Defendant's counsel are far from uncontested by Plaintiff.  *See, e.g.*, *supra* footnote 3.

Dr. Ogandzhanova, who still has access to her Hotmail account, provided no such answers to the Court.  Presumably she did not do so since no record of the contents of her Hotmail account are currently part of the documented record that exists after discovery, except to the extent of Ms. Loehrs analysis is contained in her report and backup materials.  Dr. Ogandzhanova did not request at oral argument, nor has she requested since, that she be allowed to supplement the record with such information.

### 4.      Surfing the Net

The hard drives of Dr. Ogandzhanova's computers do not reflect any significant internet browsing.  MetLife's forensic expert examined the internet history detectable on the computer which came from both allocated and unallocated space, to characterize the extent to which the internet was used.  The Internet Explorer activity that was not deleted from the computer revealed extremely sporadic and sparse usage.  Further, the expert located a total on the desktop of "430 entries related to terms and phrases that were typed into search engines such as Google and Bing. . . . This does not represent 430 different search sessions . . . because many of the search terms are repeated for a single session.  For example, there are approximately 42 entries regarding a search for Oprah's interview with Amanda Berry although this appears to be a single search session."  Further the expert indicated a review of the 'recent folder' in the hard drive of the desktop revealed only 25 links with user activity that occurred on seven different dates between January 30, 2012 and February 26, 2013.

This is significant because, at her 2012 deposition, Dr. Ogandzhanova described searching the internet as a day to day activity.  Depo. of Dr. Ogandzhanova at 279–80.  Defendant argues that Plaintiff mischaracterizes Dr. Ogandzhanova's deposition, because she discussed her internet searches in response to a specific question as to whether she reads.  Yet, the Court has reviewed the page numbers cited by the Plaintiff, and has determined that Plaintiff's characterization is fair.  Dr. Ogandzhanova described her internet searching in the context of answering questions about her "day to day activities."  As an example of such searches, she testified to a multiple hour inquiry concerning

Albert Einstein that she conducted the night before her deposition and an extensive search earlier that week conducted on Elizabeth Taylor.  In her report, Plaintiff's expert specifically notes that the desktop bears no evidence of any searches made for "Albert Einstein" or "Elizabeth Taylor" in the date ranges that Dr. Ogandzhanova specified in her deposition.

As for any search related to Albert Einstein, Dr. Ogandzhanova's counsel responds that the search to which she testified would have been conducted the night before her deposition in Phoenix, and thus would not likely have been conducted from her desktop computer in Mexico to which she had moved by that time.  Further, counsel points out, Dr. Ogandzhanova testified in her affidavit that she did not frequently use her laptop for such searches.

Thus, apparently, rather than conduct on her laptop what Dr. Ogandzhanova herself described as an "hours long session" of internet browsing on Albert Einstein the night before her deposition, she chose to conduct it at an internet café, or from a hotel conference center or other facility, even though, as she also averred, she generally uses such facilities "to access my e-mail account and/or to print off boarding passes." Dr. Ogandzhanova attempts no specific explanation as to why there are no searches for Elizabeth Taylor that occurred in the week before her deposition reflected in either of her computers.

At any rate, there is extremely little internet searching reflected on either computer.  This is inconsistent with her Hotmail account and her testimony that she searched the internet as part of her daily activities and that, apart from when she was traveling, she used one of the two computers at issue here.

### 5.    Letter with Complaints About MetLife

At her deposition Dr. Ogandzhanova testified that over a period of several weeks in July 2011 she used her computer to type a 22 page letter complaining about MetLife. Doc 235-3 at 9.  Yet Loehrs enumerates the personal documents created in the computer none of which were the 22 page letter.  Doc. 235-2 at 7.  Plaintiff's forensic expert stated

that "[w]hen a user writes a document, temporary files of the document are created, prefetch files for the application used to write the document would be created, the document itself would be created and written to, and the document content would be cached in the pagefile.sysfile." The Plaintiff's forensic expert further detailed the steps she undertook to determine whether the document was written on either the laptop or the desktop. Ultimately plaintiff's forensic expert concluded "I did not find forensic evidence supporting that this document was created, accessed, or written using the [desktop] or [laptop]." Defendant's expert does not contest these points.

In response Dr. Ogandzhanova argues that she may have saved the document other than in the My Documents folder on the computer or may not have typed the letter on a computer at all. Nevertheless, the face of Loehrs report indicates Ms. Loehrs did not restrict her search for the document to the My Documents folder. And further, Dr. Ogandzhanova's deposition clearly demonstrates that her best recollection is that she in fact typed the document on her computer. There is no persuasive explanation for why there is no trace of such a document on her computer now.

### 6.    Internet Banking

In response to MetLife's requests for bank statements including "cancelled checks" from Dr. Ogandzhanova's bank accounts, counsel responded that "most bank statements no longer include cancelled checks. This is especially true given the availability of online banking, which Inna participated in." Doc. 232 at 9. It is apparently undisputed that Dr. Ogandzhanova had millions of dollars in personal funds that resulted from her successful professional practice and its subsequent sale. She invested some or all of these sums in various real estate, brokerage accounts and other investments, and has not been able to provide records or documentation concerning many of the total amounts that she claims to have invested in various undertakings, partially apparently because she engaged in online banking.

Nevertheless, on the computers provided, Loehr's found no evidence indicating that anyone conducted any kind of regular or consistent banking transactions on the

computers.  Doc 305, Ex. 2 at 221:1–9.  Dr. Ogandzhanova's own expert, did not recall seeing "any transaction" of online banking on Dr. Ogandzhanova's computers.  Doc. 305, Ex. 1 at 299:15–300:11).   In reviewing such evidence as there is on the desktop pertaining to the web-based transactions with the Pinal County Federal Credit Union the Plaintiff's forensic expert noted "Although a review of the search hits revealed minimal access to this website, it is such an insignificant amount of data that it is inconsistent with a user accessing an online bank account for several years."  The Defendant's expert did not challenge this opinion.

### 7.   Internet Shopping

Further, Dr. Ogandzhanova claimed during her deposition that, as a symptom of her depression and PTSD, she bought a lot of furniture and other things on eBay.  She characterized herself as being reckless with money because she was not well.  Depo of Dr. Ogandzhanova at 212.  *See also* Doc. 85 at 3 ("She also started spending recklessly, buying jewelry through QVC, and on E-Bay, then furniture, granite, etc. all in huge quantities, and for hundreds of thousands of dollars.").  Further Mr. Bates testified that he personally witnessed Dr. Ogandzhanova shopping on the internet "hour after hour" from her home in 2006.  Doc. 235 at 50–51.

According to Loehrs, a single purchase of an item on eBay would result in numerous internet artifacts associated with searching the site, reading reviews, selecting an item, entering shipment and payment information.  Loehrs Report at 27.  Loehrs only found two internet artifacts with the word "eBay" and two hits for "qvc.com" on her search of the laptop and nothing on the desktop.  This is not consistent with even a single purchase.  Defendant's expert does not contest these specific points.

By way of explanation, Defendant asserts that such internet shopping occurred prior to 2007.  Certainly to the extent that her internet shopping ceased prior to the installation of the new operating system in the desktop in 2007 the Court can understand how such purchases might not be reflected on the desktop computer.  Nevertheless, Dr. Ogandzhanova consummated other electronic purchases after this date that were not

reflected on either of the computers she provided here.  For example, on March 18, 2008, Dr. Ogandzhanova authored an e-mail to Gillian Large that was in her Hotmail account. PayPal records otherwise provided by Dr. Ogandzhanova indicate that on March 18 a Pay pal transaction was conducted with Gillian Large.  There are no traces of activity from either computer that indicate any PayPal transactions on that date.  Dr. Ogandzhanova's computers similarly show no traces of any emails authored or accessed on March 26, 2008 a date on which Dr. Ogandzhanova authored an email to semenov_hohloma stating that she had just returned from Mexico and in which she instructs "Julie" to go ahead with her order.  "A review of the forensic evidence revealed that no files on either computer reflected traces of this e-mail. Further, PayPal records otherwise provided by Dr. Ogandzhanova indicate that on September 22, 2008 PayPal transactions were conducted between Dr. Ogandzhanova and "Dinnerware Classics Inc.," "K.F. Perlmutter, Inc." "Barbara Pruitt" "narine aznavurian" and "Antiques and Uncommon Treasure." They similarly show no traces of any emails authored or accessed on 22 Sep. 2008.

Dr. Ogandzhanova argues that when she was traveling she did not use the desktop or the laptop but used computers "in hotel conference centers and internet cafes, when [she] travel[s] in the United States and abroad."  She testified that she mainly used these "public computers to access my e-mail account and/or to print off boarding passes."  She further avowed, without additional explanation, that doctor's appointments, meetings with attorneys, traveling to visit relatives and family vacation trips caused her to use publicly available computers in Internet cafes.  She offered as an example that in her attempt to recoup her Panamanian investments, she traveled frequently to Panama to meet with people and that, while there, she used public computers.

Nevertheless, when asked about the extent of her travel at her deposition that occurred earlier, she testified that "sometimes we go somewhere" (Doc. 305 Ex. 4 at 282) after which she recounted a trip to Sea World in San Diego, to Simi Valley, California, to Angel Fire, New Mexico, and to her property in Colorado.  (Doc. 305, Ex. 4 at 282–83) She testified that she doesn't travel to Angel Fire New Mexico very often.  But there was

a time "I stayed there for a long period of time."  Further, she stated that when she visits her property in Colorado she stays in the house in Angel Fire because "it is not long from there." *Id.*  She did not apparently mention travels to Panama during her deposition.

Further, to the extent that Dr. Ogandzhanova nevertheless took the position in her September 6 affidavit that she accessed her Hotmail account from publicly available computers in Panama while she was there on business, this is contradicted in significant part by her own contemporaneous emails discovered on examination of her Hotmail account.  In a 2008 email that Loehrs extracted from Dr. Ogandzhanova's Hotmail account and included in her report, and which Dr. Ogandzhanova acknowledged as genuine at oral argument, Dr. Ogandzhanova states, apparently to a fabric vendor, "Please send me the list as soon as you can, as I am leaving for Panama early morning ***and I would not have access to a computer in Panama." See, e.g.***, 235-2 at 43 (emphasis added).  At oral argument counsel suggests that what Dr. Ogandzhanova was actually saying was not that she didn't have access to a computer in Panama but that she would have to use publicly-available internet facilities.  That is, however, not what the email states, nor the concept that it conveys.  Even to the extent that, at some point after she wrote the email Dr. Ogandzhanova might have been able to locate and actually use publicly available computers in Panama, she also testified in her 2012 deposition that she hadn't been back to Panama recently.  (Doc. 305, Ex. 4 at 282–83).  This modest travel record, and the inability of computer access in Panama for at least part of the time, simply does not explain the relative absence of all activity on her computer given the extent of internet access in which she otherwise engaged.

After January 2012 when she moved to Mexico, it is conceivable that Dr. Ogandzhanova may have been away from her home computer when she made trips to visit her doctor or her attorney in the United States.  But, even so, this provides no explanation as to the paucity of any email activity that occurred prior to her move to Mexico as a result of doctor or lawyer visits.

/ / /

- 15 -

Don Bates, Dr. Ogandzhanova's partner, also filed an additional supplemental affidavit on December 30, 2013, in conjunction with Dr. Ogandzhanova's Response to MetLife's Motion for Sanctions.  Doc. 267-7.  In his affidavit Don Bates avows to an understanding that, upon the sale of her clinic, Doctor Ogandzhanova downloaded patient information for the transition of her patients' care on a newly installed operating system on the Dell desktop.  Then, according to Don Bates' understanding, in 2009 all of the patient information on the hard drives was removed by a computer expert hired by Dr. Ogandzhanova onto the computer expert's external Seagate hard drive.  "It is my understanding that the computer technician hired to remove confidential patient data first copied all of the data from Dr. O's computers onto a Seagate external hard drive, owned by the technician, then wiped all data from Dr. O's two computers.  It is my understanding that, after wiping all data from Dr. O's computers in order to completely remove any confidential data, the technician then reinstalled certain programs and data that Dr. O and I wanted to keep in order to continue using the two computers."  Doc. 267-7 at ¶¶ 11–12.

Such statements are inadmissible.  Don Bates has no foundation to make them. Fed. R. Ev. 602; *Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir. 1989).  Even if such "understandings" were considered, they lack persuasiveness or credibility.   As Dr. Ogandzhanova's expert testified at his deposition, the Seagate hard drive was an internal not an external hard drive and thus apparently could not have been connected to the laptop as Mr. Bates suggests.  (Doc 305, Ex. 1 at 310:15–18, 146:25–147:18).  More importantly, regardless of anything else, all data was not wiped from the desktop computer in 2009.  The operating system installed in 2007 remained in place, Doc. 305, Ex. 1 82:25–83:12, as did a number of files from before 2009.  To the extent that Mr. Bates suggests that some data was wiped from the file and some was replaced, he offers no description of the materials that were replaced on the computer or how the computer technician accomplished this partial replacement.

/ / /

Simply put, Mr. Bates has no foundation to testify as to what the computer technician hired by Dr. Ogandzhanova in April of 2009 did on the two computers. The Court thus disregards such testimony. Even assuming that Mr. Bates did have the foundation to offer it, it does nothing to explain the apparent lack of the computer's use after 2009 coupled with Dr. Ogandzhanova's continued access to her Hotmail account during this period.

Finally, as is undisputed, when a computer is being used, temporary internet files stored in unallocated space on the hard drive may be randomly written over leaving only traces of previous activity. But, even when temporary internet files in an unallocated part of the hard drive are overwritten, traces of such activity are left, as well as the temporary internet files that overwrote such files. The traces that are left are what makes forensic investigation possible. Thus, while the lack of traceable evidence on the hard drives of an identified electronic document the Defendant is known to have accessed or written on any particular date, is not in of itself sufficient to determine that the Plaintiff used other computer(s), both experts agree that the computers were used little. In the face of evidence that Defendant was a regular computer user, the lack of use persuasively demonstrates that Defendant has not identified or provided the computers she principally used. The only expert evidence presented to the Court in this matter is that "[t]here is virtually no activity to speak of on the [desktop] computer between 2007, when the current operating system was installed, and 2011 and then some sporadic activity occurs on a few occasions in 2012, followed by very minimal activity for a few months between February, 2013 and April 2013." Doc. 235-2 at 4. Further the only evidence is that while there are a number of emails in the live webmail account, as well as other testimony of activity that reflect substantial activity in 2007, 2008, 2009, 2010 and 2011, there is virtually no activity on the [desktop] computer for these years. *Id.* at 5–6. In light of the substantial use that Dr. Ogandzhanova made of computers over these years, the inactivity on the computers provided demonstrates by clear and convincing evidence that Dr. Ogandzhanova has willfully failed to comply with the Court order to identify and provide

the computers she used during the relevant time period.[6]

### B. Dr. Ogandzhanova Didn't Provide Relevant Documents Within Her Control Relating to Her Business Investments, Loans and Personal Finances

In its Supplemental Scheduling Order, filed after the August status conference, the Court required Counsel for Plaintiff to identify for Defendant the documents that they believed had not yet been provided that were required by this Court's April 24, 2013 order and counsel for Defendant to "either supply all further responsive documents or avow to Plaintiff's counsel on the records (sic) that no such documents exist by September 23, 2013." Doc. 226.

On September 24, Counsel for Defendant filed its Notice of . . . Compliance with Court's Supplemental Scheduling Order Dated August 23, 2013. Doc. 232. Among other things the notice attaches a letter sent by Ogandzhanova to MetLife on September 24. The letter appears to be an itemized response to each area set forth in MetLife's September 6 email to council. It indicates that, with the exception of a few additional documents provided with that supplement, apparently 31 such documents, that "Dr. Ogandzhanova has provided all information and/or documentation within her control."

Further, the next month, on the day before Plaintiff's motion for sanctions was due, Dr. Ogandzhanova filed an affidavit stating that she: (1) had requested a copy of a life insurance policy from American General Life Insurance but did not receive it; (2) diligently requested loan and other documents regarding Angel Fire, Green Tree and Paradise Valley and that she produced all documents she was able to obtain; and, (3), she was informed that the original entity Country Wide no longer exists and that she was informed her documents were unavailable from them. Doc. 234-1. Further, on the eve of the deadline for MetLife to file its motion for sanctions, Dr. Ogandzhanova informed

---

[6] At oral argument Defense counsel asserted, without authority, that the applicable standard is clear and convincing evidence. Even assuming without deciding that this is so, that standard has been met here.

Plaintiff for the first time that there were a number of documents concerning Dr. Ogandzhanova's Panamanian investments that had not been previously provided or identified by way of a privilege log because such documents were confidential.  Doc. 235 at 12.  She finally filed a privilege log identifying such documents in January of this year. She apparently claims an attorney-client privilege in some of the documents, and a broader, undefined confidentiality privilege in other documents relating to the arbitration of the disputes.  Dr. Ogandzhanova had previously in this litigation been reproved by the Court for claiming privilege in a document without providing a privilege log.  Doc. 204 at 4.

In its Motion for Sanctions, MetLife complains as to the inadequacy of Dr. Ogandzhanova's disclosure of documents pertaining to her Panamanian Investments, and her recovery of those investments.    Plaintiff's motion is well-taken. Dr. Ogandzhanova has failed to comply with the Court's orders regarding these documents.  They have been repeatedly asked for; but many documents pertaining to the recovery by Dr. Ogandzhanova were not even specifically identified to the Plaintiff until after the briefing on the motion for sanctions was over, and nine months after the Court had granted the Plaintiff's motion to compel such documents, and approximately the same amount of time after the discovery deadline.  Whether or not there actually is some sort of confidentiality in such documents is now beside the point.  They have not even been identified by Defendant until well after discovery had closed, and discovery had been extended for an additional nine months for Dr. Ogandzhanova to provide such documents.   Clearly, by finally identifying documents nine months after the Court ordered her to provide such documents and after the briefing on the motion to compel was completed, Dr. Ogandzhanova has failed to provide documents that have been requested and ordered.  That failure was willful. This behavior is both in violation of the Court's orders and dilatory.

MetLife similarly raises the failure of Dr. Ogandzhanova to provide her current life insurance policy, her current loans and other documentation regarding her current

financial position and investments.   Again, Plaintiff's motion is well-taken.   Dr. Ogandzhanova apparently does not dispute that she has a current life insurance policy or policies, that such documents have been repeatedly requested from her by Plaintiff, that production has been ordered by the Court, and that she has not provided them.   She does not contest that she has a right to receive the policy from her life insurance company and that she could compel the company to provide it, or that the policy is otherwise within her control.   She simply has not obtained a copy to provide the Plaintiff.   She apparently believes that it is sufficient to relieve her from the obligation of providing such a policy that she has asked for a copy of the policy from her life insurance company or companies, and her request to obtain a policy was not initially successful.   She is mistaken in this belief.   "If the party to whom a request for production has been made had the legal right to obtain the documents sought to be produced, discovery can be had even in the absence of actual possession." *Burton Mechanical Contractors, Inc. v. Foreman,* 148 F.R.D. 230, 236 (N.D. Ind. 1992) (quoting *Bowman v. Consolidated Rail Corp.,* 110 F.R.D. 525, 526 (N.D. Ind. 1986)).

Similarly Dr. Ogandzhanova does not dispute that she has outstanding loans and/or investments and other documents concerning such loans or investments regarding Angel Fire, Green Tree and Paradise Valley.   She does not dispute that such documents have been repeatedly requested from her by Plaintiff, that such production has been ordered by the Court, and yet that she has not provided all such documents within her control.   She does not contest that she has a right to receive the documents and that she could, if insistent, obtain them from the relevant financial institution.   She simply has not done so.   Again, she apparently but incorrectly believes that her initially unfruitful request from the bank or other financial institution for such documents is sufficient to relieve her from the obligation of providing them.   Such documents are within Dr. Ogandzhanova's control.   *Id.*   She has not provided them.   She, thus, again has violated the orders of the Court.

### C.    Deletions From One of The Computers Provided

It is apparently undisputed that just prior to Dr. Ogandzhanova's surrender of the two computer hard drives to Tami Loehrs, 81,048 files were deleted from the desktop computer.  There appears to be no dispute that most of the file deletions were system or program files.  267-5 at 38.  Although Windows updates can cause the deletion of a number of files when a computer is turned on, especially if it has not been turned on for a period of time, the files were not deleted by normal Windows Updates, although no wiping software was used to delete the files. Some of the deleted files were not program files and did involve the search terms that Plaintiff used to search Dr. Ogandzhanova's computer hard drives, although all but a few of them may still be somewhere on the hard drive.

There can be no reasonable dispute that Dr. Ogandzhanova was under an obligation to preserve her computers without alteration at the time that the files were deleted.  It does not appear that Dr. Ogandzhanova did so.  Nevertheless, the Court need not base its conclusion that Dr. Ogandzhanova has intentionally withheld discovery or otherwise destroyed evidence on whether or not she deleted material from the hard drives prior to production.  For the reasons stated above the Court has concluded that Dr. Ogandzhanova did not provide access to the computers she used during the relevant period despite the repeated Court orders to do so, and has further concluded that she has failed to provide to Plaintiff relevant financial documents within her control despite repeated Court orders to do so.  These refusals are in bad faith and are prejudicial to the Plaintiff's ability to present its case.

### ANALYSIS

District courts may impose sanctions as part of their inherent power "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991), *reh'g denied*, 501 U.S. 1269 (1991). "Sanctions that a federal court may impose . . . include assessing attorney's fees and costs, giving the jury an adverse inference instruction, precluding evidence, or imposing

the harsh, case-dispositive sanctions of dismissal or judgment." *Surowiec*, 790 F. Supp. 2d at 1008.  If the Court determines that sanctions are necessary it is required to weigh several factors prior to imposing the sanction of dismissal:

> (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions.

*Leon* 464 F.3d at 858 (quoting *Anheuser-Busch,* 69 F.3d at 348).

Plaintiff requests that as sanctions for her failure to provide the computers and financial documents that were requested, (1) Dr. Ogandzhanova's counterclaim be dismissed, (2) the jury be instructed that it may draw an adverse inference from Dr. Ogandzhanova's failure to provide the requested documents and computers, and (3) that MetLife be awarded its attorneys' fees and expenses caused by Dr. Ogandzhanova's violation of this Court's orders.  The Court has already dismissed Dr. Ogandzhanova's counterclaim on a motion for summary judgment.  Therefore, Plaintiff's request that Dr. Ogandzhanova's counterclaim be dismissed as a sanction is moot.[7]  For the following reasons the Court grants MetLife's request for an instruction permitting the jury to draw an adverse inference from Dr. Ogandzhanova's failure to provide ordered discovery, and further awards MetLife's reasonable attorneys' fees incurred in bringing this motion for sanctions.

---

[7] Nevertheless, applying the appropriate considerations in *Leon v. IDX Systems, Corp.,* 464 F.3d 951 (9th Cir. 2006), the Court finds that Dr. Ogandzhanova's failure to comply with the Court's order in this case would have provided an appropriate alternate basis for the dismissal of her counterclaim. For dismissal to be proper, the "conduct to be sanctioned must be due to 'wilfulness fault or bad faith." *Id.* at 948 (quoting *Fjelstad v. American Honda Motor Co.,* 762 F.2d 1334, 1337 (9th Cir. 1985)).  Based on the facts set forth above, the Court so finds.  "Due process concerns further require that there exist a relationship between the sanctioned party's misconduct and the matters in controversy such that the transgression 'threaten[s] to interfere with the rightful decision of the case." *Anheuser-Busch,* at 348 quoting *Wyle,* 709 F.2d at 589.  As is set forth below, the Court further finds that this condition is met in this case.

**A.    Expeditious Resolution and The Court's Ability To Control Its Docket**

Dr. Ogandzhanova's violations have significantly delayed the resolution of this case and prevented the Court from effectively managing its docket.  Plaintiff learned for the first time in Mr. Bates deposition that through litigation and other negotiation, Dr. Ogandzhanova had recovered a considerable portion of her Panamanian investments and had ultimately re-invested those funds in investments in Paradise Valley and other locations. Doc. 235-3 at 61.  On April 24, 2013 this Court held a telephonic conference with the parties in which such matters were discussed.  After having evaluated the arguments, the Court determined that Dr. Ogandzhanova's other business activities were relevant to whether or not she was disabled under the terms of her policy and whether there were other potential causes of emotional damage to Dr. Ogandzhanova other than MetLife's reservation of rights and subsequent declaratory action.  The Court thus determined that Dr. Ogandzhanova had not adequately responded to Plaintiff's interrogatories 23–28 and its Requests for Production number 17–18, 20–25, and 37–39 and required her to fully respond within 45 days of the date of that conference. Doc. 191. The Court further required Dr. Ogandzhanova to provide her computer(s), email accounts, and/or hard drives that she used during the periods relevant to this lawsuit, together with necessary passwords, to be searched by the Plaintiff pursuant to conditions and protections set forth in that docket entry. *Id.*

After having another telephonic conference with the parties regarding a separate discovery dispute, the Court further emphasized that "[e]xcept for those few matters on which the Court has authorized additional undertakings [e.g. the April 24th order] discovery is closed.  To the extent that there were matters outstanding at the time of the discovery deadline that were not previously raised with the Court, or resolved by the parties pursuant to agreement, the Court will not take them up." Doc. 209.

Discovery nevertheless had to be extended to permit the computer forensic search in response to Dr. Ogandzhanova's failure to initially provide requested documents. MetLife has incurred significant expense in conducting such additional discovery, and the

Court has had to expend considerable time and judicial resources in resolving this dispute. The Court extended the various deadlines a number of times in this action prior to this dispute. Further, the disputes which are at the core of this motion required the Court to additionally extend the various deadlines again and extensively so.

**B.      Prejudice to MetLife and the Ability to Resolve the Case on the Merits**

"It is appropriate to presume" that evidence being withheld would be highly relevant to the litigation. *Anheuser Busch*, 69 F.3d at 354. Having withheld evidence in this case, Dr. Ogandzhanova "can hardly assert a presumption of irrelevance." *See Leon,* 464 F.3d at 958–59. Dr. Ogandzhanova cannot successfully assert that an understanding of her activities, including her economic activities, during the relevant period may not be relevant to the question of whether she was entitled to claim disability benefits under the policy. In fact, Dr. Ogandzhanova requested, and was granted the disqualification of MetLife's previous counsel from this case based on its previous representation of an LLP solely-owned by Dr. Ogandzhanova during the relevant period. Certainly Dr. Ogandzhanova's withholding of the hard drives and documents in this case may well interfere with the ability of a fact-finder to correctly decide whether she in fact qualifies as disabled under the policy. *Leon,* 464 F.3d at 959. Thus, the refusal merits significant sanctions.

Further, "a party's motive or degree of fault" in failing to comply with court order "is relevant to what sanction, if any, is imposed." *Napster*, 462 F. Supp. 2d at 1066–67. When a party on notice intentionally defies a court rather than accidentally loses documents, the party has acted willfully. *Leon* 464 F.3d at 959. (destruction was willful when a party "knew he was under a duty to preserve [evidence], but intentionally deleted many files and then wrote a program to write over the deleted documents").

"Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44. Nevertheless, due to the extent and continued nature of the non-compliance in this case, even restraint dictates both the award of sanctions including an adverse inference instruction and an award of reasonable

attorneys' fees and expenses to Plaintiff upon Plaintiff's compliance with LRCiv 54.2.

**IT IS THEREFORE ORDERED THAT:**

1.      Plaintiff's Motion for Sanctions (Doc. 235) is granted.  The Court will issue to the jury a permissive adverse inference instruction at the trial of this matter noting that Plaintiff did not provide material ordered by the Court from which fact the jury may draw appropriate adverse inferences.

2.      MetLife is awarded its reasonable attorneys' fees and expenses incurred in bringing this motion upon compliance with LRCiv 54.2.

Dated this 12th day of June, 2014.

_____

G. Murray Snow
United States District Judge

- 25 -